# UNITED STATES DISTRICT COURT

**EASTERN** DISTRICT OF **CALIFORNIA**

———————————————————————————oOo—————

**FILED**

JAN 05 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
DEPUTY CLERK

### UNITED STATES OF AMERICA
v.

### FREDERICK SCOTT SALYER

## CRIMINAL COMPLAINT

CASE NUMBER **2** 1 0 - **M** - 0 0 0 2 · DAD

(Name and Address of Defendant)

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief.

‣ **Count 1:** That beginning no later than in or about Jan. 1998, and continuing until in or about Apr. 2008, in the Eastern District of California, the Northern District of California, the Northern District of Texas, the District of New Jersey, and elsewhere, defendant Frederick Scott Salyer and others known and unknown did knowingly devise and intend to devise a scheme and artifice to defraud Frito-Lay, Inc., and to obtain money and property from it by means of materially false and fraudulent pretenses, representations and promises, and to conceal said scheme, and in furtherance of such scheme caused an interstate wire communication to be sent between the District of New Jersey and the Eastern District of California, on or about Apr. 7, 2008, in violation of 18 U.S.C. §§ 1343 and 2;

**Counts 2 and 3:** That beginning in or about Jan. 2004, and continuing until in or about Apr. 2008, in the Eastern District of California, the Northern District of California, the Northern District of Illinois, the District of New Jersey, and elsewhere, defendant Frederick Scott Salyer and others known and unknown did knowingly devise and intend to devise a scheme and artifice to defraud Kraft Foods, Inc., and to obtain money and property from it by means of materially false and fraudulent pretenses, representations and promises, and to conceal said scheme, and in furtherance of such scheme caused interstate wire communications to be sent between the District of New Jersey and the Eastern District of California on or about Apr. 8, 2008, and Jul. 11, 2007, in violation of 18 U.S.C. §§ 1343 and 2;

**Count 4:** That beginning no later than in or about Sept. 2004, and continuing until in or about Apr. 2008, in the Eastern District of California, the Northern District of California, the District of New Jersey, and elsewhere, defendant Frederick Scott Salyer and others known and unknown did knowingly devise and intend to devise a scheme and artifice to defraud B&G Foods, Inc., and to obtain money and property from it by means of materially false and fraudulent pretenses, representations and promises, and to conceal said scheme, and in furtherance of such scheme caused an interstate wire communication to be sent between the Eastern District of California and the District of New Jersey on or about June 13, 2007, in violation of 18 U.S.C. §§ 1343 and 2;

**Counts 5 through 20:** That beginning no later than in or about Feb. 2001, and continuing until in or about Apr. 2008, in the Eastern District of California, the Northern District of California, and elsewhere, defendant Frederick Scott Salyer and others known and unknown did devise and intend to devise a scheme and artifice to defraud certain customers of SK Foods, and to obtain money and property from those customer companies by means of materially false and fraudulent pretenses, representations and promises, and to conceal said scheme, and in furtherance of such scheme caused interstate wire communications to be sent between the Eastern District of California, the Northern District of California, and the District of New Jersey on or about Jan. 3, 2007, and Jan. 23, 2007, and in furtherance of such scheme caused certain items to be delivered by mail and private commercial carrier, from the Eastern District of California to New Jersey, Michigan, Pennsylvania, California, Ohio, Texas, Illinois, New Jersey, Texas, Nebraska, Maryland, Minnesota, California, and Arkansas, on or about Feb. 20, 2001, Jul. 10, 2003, Jul. 18, 2003, Jul. 23, 2003, Mar. 1, 2005, Mar. 7, 2005, Jan. 4, 2007, Apr. 17, 2007, May 1, 2007, Jun. 22, 2007, Dec. 5, 2007, Dec. 18, 2007, Feb. 4, 2008, and Mar. 20, 2008, respectively, all in violation of 18 U.S.C. §§ 1341, 1343, and 2.

All in violation of Title **18**, United States Code, Sections **1341, 1343, and 2**. I further state that I am a Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

▸ **See Attached Affidavit**

Continued on the attached sheet and made a part of this complaint: **X**

Signature of Complainant Paul S. Artley
Special Agent, FBI

Sworn to before me, and signed in my presence
January 5, 2010                                                    at     Sacramento, California

Date                                                                         City                    State

Hon Dale A. Drozd          U.S. Magistrate Judge

Name of Judge                  Title of Judge                   Signature of Judge

## AFFIDAVIT OF SPECIAL AGENT PAUL S. ARTLEY
## IN SUPPORT OF ARREST WARRANT and CRIMINAL COMPLAINT

I, Paul S. Artley, Special Agent, U.S. Department of Justice, Federal Bureau of Investigation ("FBI"), being duly sworn, state as follows:

## I. BACKGROUND AND EXPERTISE OF AFFIANT

1.    I have been an FBI Special Agent for approximately fifteen years.  Prior to becoming an FBI special agent, I received a bachelor's degree in Accounting, became a certified public accountant ("CPA") and was employed by a public accounting firm.

2.    Following my training at the FBI Academy, I received over 200 hours of training in various aspects of criminal investigation as well as attending classes and seminars dealing specifically with white collar crime, money laundering, and various aspects relating to various financial investigative techniques and related financial investigations.

3.    I am currently assigned to the FBI Sacramento Division. For approximately the past twelve years, I have been assigned to investigate white collar crime matters which include mail fraud, wire fraud, bank fraud and money laundering.  I have also investigated individuals and organized crime groups who used sophisticated methods to launder their illicit proceeds.  I have been the lead case agent on at least 50 fraud or economic crime investigations, have participated in at least 50 search warrants

-1-

in white collar investigations, and have interviewed numerous witnesses and defendants about methods of committing and concealing economic crimes.

4.   Since August 2005, I have been one of several agents assigned to the investigation of FREDERICK SCOTT SALYER and SK Foods, which has been conducted jointly by the FBI, the Internal Revenue Service Criminal Investigation Division ("IRS"); the Office of Inspector General, Food and Drug Administration ("FDA"); and the Department of Justice, Antitrust Division.

5.   Based on my personal participation in this investigation, including my review of documents, electronic communications, surveillance, the interception of wire communications, interviews with numerous witnesses, and my discussions with other investigating agents, I am familiar with the facts and circumstances of this investigation.   The information set forth in this affidavit reflects my personal knowledge or has been provided to me by other law enforcement officers and agents with whom I have spoken, or whose reports I have reviewed.   I have not included every fact known to me, rather, only those facts necessary to establish probable cause for the issuance of the instant Criminal Complaint and Arrest Warrant are included in this affidavit.   The opinions and conclusions set forth below are based on my training and experience as an FBI agent, my discussions with other law enforcement officers, and my participation in this investigation.

-2-

## II.  CHARGES

6.  I make this Affidavit in support of an Arrest Warrant and a Criminal Complaint.  The information set out below establishes probable cause to believe that:

(A)  Beginning no later than in or about January 1998, and continuing until in or about April 2008, in the Northern District of California, the Eastern District of California, the Northern District of Texas, the District of New Jersey, and elsewhere, defendant SALYER and others known and unknown did knowingly devise and intend to devise a scheme and artifice to defraud Frito-Lay, Inc., and to obtain money and property from it by means of materially false and fraudulent pretenses, representations and promises, and to conceal said scheme, and in furtherance of such scheme caused an interstate wire communication to be sent between the District of New Jersey and the Eastern and Northern Districts of California, on or about April 7, 2008, in violation of Title 18, United States Code, Sections 1343, and 2;

(B)  Beginning in or about January 2004, and continuing until in or about April 2008, in the Northern District of California, the Eastern District of California, the Northern District of Illinois, the District of New Jersey, and elsewhere, defendant SALYER and others known and unknown did knowingly devise and intend to devise a scheme and artifice to defraud Kraft Foods, and to obtain money and property from it by means of materially false and fraudulent pretenses, representations and promises, and to conceal said scheme, and in furtherance of such scheme caused interstate wire communications to be sent between the District of New Jersey and the Eastern District of California on or about April 8, 2008, and July 11, 2007, in violation of Title 18, United States Code, Sections 1343, and 2;

(C)  Beginning no later than in or about September 2004, and continuing until in or about until April 2008, in the Northern District of California, the Eastern District of California, the District of New Jersey and elsewhere, defendant SALYER and others known and unknown did knowingly devise and intend to devise a scheme and artifice to defraud B&G Foods, Inc., and to

-3-

obtain money and property from it by means of
materially false and fraudulent pretenses,
representations and promises, and to conceal said
scheme, and in furtherance of such scheme caused an
interstate wire communication to be sent between the
Eastern District of California and the District of New
Jersey on or about June 13, 2007, in violation of Title
18, United States Code, Sections 1343, and 2; and

(D)   Beginning no later than in or about February 2001, and
continuing until in or about April 2008, in the
Northern District of California, the Eastern District
of California, and elsewhere, defendant SALYER and
others known and unknown did devise and intend to
devise a scheme and artifice to defraud certain
customers of SK Foods, and to obtain money and property
from those customer companies by means of materially
false and fraudulent pretenses, representations and
promises, and to conceal said scheme, and in
furtherance of such scheme caused interstate wire
communications to be sent between the Eastern District
of California, the Northern District of California and
the District of New Jersey on or about January 3, 2007,
and January 23, 2007, and in furtherance of such scheme
caused certain items to be delivered by mail and
private and commercial carrier, from the Eastern
District of California to New Jersey, Michigan,
Pennsylvania, California, Ohio, Texas, Illinois, New
Jersey, Texas, Nebraska, Maryland, Minnesota,
California, and Arkansas, on or about February 20,
2001, July 10, 2003, July 18, 2003, July 23, 2003,
March 1, 2005, March 7, 2005, January 4, 2007, April
17, 2007, May 1, 2007, June 22, 2007, December 5, 2007,
December 18, 2007, February 4, 2008, and March 20,
2008, respectively, all in violation of Title 18,
United States Code, Sections 1341, 1343, and 2.

## III.   **INTRODUCTION**

7.   I certify that since August 2005, the FBI, the United

States Attorney's Office for the Eastern District of California,

and the United States Department of Justice, Antitrust Division,

in conjunction with the Internal Revenue Service and the U.S.

Food and Drug Administration have been conducting an

-4-

investigation into various criminal offenses conducted by
defendant FREDERICK SCOTT SALYER, SK Foods, L.P., and many of SK
Foods' leaders, employees and associates. These criminal
offenses were conducted and carried out in the Eastern District
of California, the Northern District of California, and various
other jurisdictions across the United States.

## A.    Frederick Scott SALYER

8.    Beginning in 1990, and continuing until in or about
2009, defendant SALYER was an owner of, and has served as Chief
Executive Officer of, SK Foods, L.P., a limited partnership with
principal places of business in Monterey, California, and
Williams, Ripon, and Lemoore, in the Eastern District of
California. SK Foods, L.P., and its related corporate entities
involved in the growing, processing and sale of processed tomato
products ("SK Foods"), was a grower and processor of tomato
products and other food products, for sale to food product
manufacturers, food service distributors and marketers, and
retail outlets. During all periods relevant to the instant
Criminal Complaint, SK Foods was a privately held company, which
sold tomato products such as diced tomatoes and bulk tomato
paste. These items were ultimately used as ingredients in
finished products such as soups, ketchup, salsa, and sauces. SK
Foods' customers during the period relevant to this Criminal
Complaint included large corporate organizations such as Kraft
Foods, Inc. ("Kraft"), the H. J. Heinz Company ("Heinz"), ConAgra

-5-

Foods ("ConAgra") and Frito-Lay, Inc. ("Frito-Lay").

9.   The government's investigation has revealed that in his role as owner and Chief Executive Officer of SK Foods, SALYER served as SK Foods' primary leader and decision maker, giving direction to and receiving regular reports regarding all manner of SK Foods' business from SK Foods' leadership and employees.

## B.   Genesis of the Investigation - Anthony Ray Manuel

10.   The overall investigation into SK Foods began in 2005, and involves numerous theories of criminal liability.  In 2005, the FBI was contacted by a private investigative firm that had been hired by Morning Star Packing Company ("Morning Star"), another manufacturer and marketer of bulk tomato products based in the Eastern District of California, and a competitor of SK Foods.   The report to the Sacramento FBI concerned the embezzlement and theft from Morning Star by a former employee, who, by that point, was working as a Vice President for SK Foods - Anthony Ray Manuel ("Manuel").  Subsequent investigation confirmed that Manuel had defrauded Morning Star out of approximately $1,000,000 through a variety of schemes between 1997 and 2005.   Shortly after being contacted by the FBI, Manuel began providing information to the FBI with respect to his current employer, SK Foods, in return for consideration on federal criminal charges, which were to be filed against him in this district.   That cooperation included making monitored telephone calls and engaging in monitored discussions with other

-6-

SK Foods employees. Charges were ultimately brought against Manuel, and on January 27, 2009, Manuel plead guilty in U.S. District Court in Sacramento to two counts of wire fraud in violation of 18 U.S.C. § 1343, and one count of subscribing to a false tax return in violation of 26 U.S.C. § 7206(1). Manuel has yet to be sentenced, and remains at liberty. He stands to benefit from a government motion pursuant to U.S.S.G. § 5K1.1 for his substantial assistance in the investigation of SALYER and others.

11. The investigation sparked by the cooperation of Manuel uncovered widespread corporate fraud on the part of SK Foods, which was ultimately directed by SALYER and perpetrated in many different areas, and by many different leaders, employees and associates of the company. The investigation has revealed that at SALYER's direction, SK Foods regularly paid bribes to the purchasing managers of many of its customers to ensure that those customers purchased processed tomato products from SK Foods rather than from its competitors, and that they purchased the product from SK Foods at elevated, above-market prices. In other instances, SK Foods' bribes to purchasing managers were made in order to wrongfully obtain its competitors' proprietary bid information. By receiving these bribes for their own personal benefit, the purchasing managers for SK Foods' customer companies acted in their own personal interest rather than in the interest of their employers.

12. The government's investigation also uncovered that SK Foods, at SALYER's direction, engaged in a knowing and widespread practice of selling and shipping processed tomato product to customers that did not meet contractual specifications, and was adulterated because it contained mold levels in excess of the thresholds established by the United States Food and Drug Administration and was thus unsaleable domestically as detailed more fully in section IV.D., below. At SALYER's direction, various individuals at SK Foods falsified both internal and customer-bound documentation to make the product appear as if it were contractually compliant.

C. **Randall Lee Rahal**

13. A central figure in SK Foods' criminal conduct was Randall Lee Rahal ("Rahal"). Since at least 1990, Rahal has served as the president of Intramark USA, Inc., a New Jersey-based company that holds itself out as a wholesaler of food ingredients, including tomato products, and an importer of juice concentrates. In his role as SK Foods' Chief Executive Officer, in 1993, SALYER hired Rahal to serve as a sales broker for SK Foods. From 1993 until April 2008, Rahal acted as a kind of advisor and supervisor for SK Foods, giving direction to and receiving periodic reports regarding various aspects of SK Foods' business from SK Foods employees. From at least 2004 until April 2008, Rahal formally served on SK Foods' Board of Directors. In these roles, Rahal maintained close communications with SK Foods'

-8-

senior management, to include SALYER.

14.  In his role as a sales broker for SK Foods, and with SALYER's knowledge and direction, Rahal oversaw, among other things, the negotiation of contracts between SK Foods and many of its customers, such as Kraft, ConAgra, B&G, and Frito-Lay.  At SALYER's direction, and with the knowledge of the majority of SK Foods' executive management team, Rahal routinely paid bribes to the purchasing agents of many of SK Foods' customers in order to ensure that those customers purchased tomato-based products, and other products, from SK Foods rather than from its competitors. In other instances, Rahal, at the direction of SALYER, paid bribes to purchasing agents so that those agents would provide bidding and other proprietary information from SK Foods' competitors.

15.  On December 16, 2008, Rahal pled guilty in the Eastern District of California to a three-count Information charging him with violations of 18 U.S.C. §§ 1962(d) (conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity) and 1957 (money laundering), and 15 U.S.C. § 1 (price fixing).  Rahal has been cooperating in the government's investigation since October 2008.  He has yet to be sentenced, and remains at liberty.  He also stands to benefit from a government motion pursuant to U.S.S.G. § 5K1.1 for his substantial assistance in the investigation of SALYER and others.

-9-

**D.    Other Individuals Who Have Pled Guilty to Criminal
       Conduct That is the Focus of the Government's
       Investigation**

16.    The government's investigation has revealed that
between in or about January 1998 and in or about April 2008,
James Richard Wahl, Jr., ("Wahl") served in various positions, to
include Senior Group Manager for Ingredients Purchasing, for
Frito-Lay, Inc., a multinational food company with a principal
place of business and headquarters in Plano, Texas.  Wahl worked
at the company headquarters in Plano.  On February 18, 2009, Wahl
pleaded guilty in the Eastern District of California to an
Information charging him with two counts of honest services mail
fraud in violation of 18 U.S.C. §§ 1341 and 1346.  Wahl is
cooperating in the government's investigation, has yet to be
sentenced, and remains at liberty.  Wahl further stands to
benefit from a government motion pursuant to U.S.S.G. § 5K1.1 for
his substantial assistance in the investigation of SALYER and
others.

17.    The government's investigation has revealed that during
the period of time relevant to this Criminal Complaint Alan Scott
Huey ("Huey") served in a variety of positions and most recently
as Vice President for Sales and Marketing for SK Foods.   On
November 17, 2009, Huey pleaded guilty in the Eastern District of
California to an Information charging him with Conspiracy, in
violation of 18 U.S.C. § 371.  Huey is cooperating in the
government's investigation, has yet to be sentenced, and remains

-10-

at liberty.  Huey further stands to benefit from a government motion pursuant to U.S.S.G. § 5K1.1 for his substantial assistance in the investigation of SALYER and others.

18.  The government's investigation has revealed that during certain periods of time relevant to this Criminal Complaint, Jeffrey Sherman Beasley ("Beasley"), served in a variety of positions and most recently as the Vice President for Industrial Sales for SK Foods.  On August 25, 2009, Beasley pleaded guilty in the Eastern District of California to an Information charging him with Conspiracy, in violation of 18 U.S.C. § 371.  Beasley is cooperating in the government's investigation, has yet to be sentenced, and remains at liberty.  Beasley further stands to benefit from a government motion pursuant to U.S.S.G. § 5K1.1 for his substantial assistance in the investigation of SALYER and others.

19.  The government's investigation has revealed that between January 2004 and April 2008, Robert Watson served as a purchasing manager for Kraft Foods, Inc., a multinational food products company with a principal place of business and headquarters in Northfield, Illinois.  Watson worked at the company headquarters in Illinois, and also maintained a residence in White Plains, New York.  On January 27, 2009, Watson pleaded guilty in the Eastern District of California to an Information charging him with two counts of honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346.  Watson was sentenced on

-11-

August 11, 2009 to twenty-seven months in prison.  He was also
ordered to pay $1.8 million in restitution to his former
employer, Kraft.

     20.  The government's investigation has revealed that
between September 2004 until April 2008, Robert Turner ("Turner")
served as a corporate purchasing manager for B&G Foods, Inc., a
multinational manufacturer, seller and distributor of various
food products with a principal place of business and headquarters
in Parsippany, New Jersey.  From 2007 until April 2008, Turner
was Director of Purchasing for B&G.  Turner worked at the
corporate headquarters in Parsippany.  On May 5, 2009, Turner
pleaded guilty in the Eastern District of California to an
Information charging him with two counts of honest services mail
fraud in violation of 18 U.S.C. §§ 1341 and 1346.  Turner has yet
to be sentenced by the district court.

     21.  The government's investigation has revealed that
between November 1993 and April 2008, Jennifer Lou Dahlman
("Dahlman") was employed in a variety of positions, and most
recently as a Reports and Business Analyst, by SK Foods.  Working
out of SK Foods' Lemoore, California facility, Dahlman assisted
in managing SK Foods' inventory of processed tomato and other
food products, and arranged for the shipment of those food
products to SK Foods' customers across the United States.  On
February 18, 2009, Dahlman pleaded guilty in the Eastern District
of California to an Information charging her with one count of

-12-

introducing, and delivering for introduction, adulterated and misbranded food into interstate commerce with the intent to defraud and mislead in violation of 21 U.S.C. §§ 331(a) and 333(a)(2). Dahlman is cooperating in the government's investigation, has yet to be sentenced, and remains at liberty. Dahlman further stands to benefit from a government motion pursuant to U.S.S.G. § 5K1.1 for her substantial assistance in the investigation of SALYER and others.

## E. Interception of Wire Communications

22. On June 4, 2007, the Honorable Lawrence K. Karlton authorized thirty days of interception of wire communications over the business telephone of Intramark and the cellular telephone used by Rahal. A second thirty days was authorized on July 5, 2007. Two more thirty-day interception periods over the same two phone lines were authorized by the court on February 21, 2008, and March 24, 2008, respectively.

## F. Execution of Judicially Authorized Search Warrants

23. The government's investigation of SALYER and SK Foods became overt on April 16, 2008, when the FBI, the IRS and the FDA executed numerous judicially authorized search warrants in the Eastern and Northern Districts of California, and in the District of New Jersey. Hundreds of thousands of paper and electronic documents were seized from SK Foods and Intramark's facilities. The FBI and the IRS also conducted coordinated interviews of various targets and witnesses at the time of the search, to

-13-

include the purchasing managers who were the recipients of Rahal, SALYER, and SK Foods' bribe payments. Grand jury subpoenas were served on numerous customer companies at the time of the search, and investigating agents have received and analyzed hundreds of thousands of documents in response thereto.

## G.    SK Foods' Bankruptcy and SALYER's flight to avoid prosecution

24.   SK Foods declared Chapter 11 bankruptcy in May of 2009, and the assets of the limited partnership were purchased out of bankruptcy by the Singapore-based Olam International.  Another SALYER entity, Salyer American Fresh Foods, also declared bankruptcy in May of 2009, and ceased operations at that time because the company's lenders refused to advance it any additional funding.  SALYER's current employment is unknown, although it is believed that, until recently, he still maintained an ownership interest in the Cedenco company – another food products conglomerate, which is based in New Zealand.  SALYER traveled frequently to New Zealand and Australia during the period relevant to this Criminal Complaint to attend to that business.

25.   Recent information obtained in the course of the government's investigation indicates that SALYER has moved large amounts of money offshore - to banks in Liechtenstein and the West Indies.  The government is in the process of confirming the exact amount of the transfers, and the numbers of the accounts to

-14-

where the funds were sent.

26. The government has also obtained very recent
information, set forth more fully at Section IV.E of this
affidavit, which indicates that SALYER has left the United
States, and appears to be planning a permanent relocation abroad
in order to avoid prosecution by the government in this matter.

## IV. SUBSTANTIVE DISCUSSION OF CHARGES AGAINST FREDERICK SCOTT SALYER

### A. Wire Fraud with Respect to Frito-Lay, Inc.

27. The government's investigation has revealed that as a
purchasing manager at Frito-Lay, James Richard Wahl, Jr. was
vested with authority to negotiate and enter into contracts, with
the approval of his employer, for the purchase of processed
tomato products and other food products from various processors,
such as SK Foods. Wahl has indicated in the factual basis to his
publicly-filed plea agreement with the government that in the
normal course, he and Frito-Lay received bids for the sale of
processed tomato and other food products from processors to
Frito-Lay by way of what was intended to be a competitive bidding
process. In response to questioning, both Wahl and Rahal have
indicated that Frito-Lay was a regular customer of SK Foods, and
purchased millions of pounds of tomato paste, diced tomatoes and
other agricultural products from SK Foods on an annual basis.

28. The government's investigation has revealed that as
part of a scheme to defraud Frito-Lay, beginning in 1998 Rahal

-15-

began making personal bribery payments to Wahl. Wahl has
admitted in his publicly-filed plea agreement with the government
that he received approximately $160,000 in such payments from
Rahal between 1998 and April 2008. The government's
investigation has further revealed that during the relevant
period, Rahal routinely sent various checks to Wahl, via United
States Mail from New Jersey to Wahl in Texas. Two such mailings
included payments of $4,000 and $5,722.94, and were dated
September 7, 2006, and March 26, 2006, respectively.

29. Certified bank records for Intramark from January 2004
through August 2007, which were obtained in the course of the
government's investigation show Intramark checks totaling
approximately $56,000 being paid to Wahl at "3205 Drexel Drive,
Dallas, TX." The checks are written on a near quarterly basis
and range from $2,500 to $4,000. The checks are signed by Rahal.
Furthermore, Wahl's tax returns from 2004 and 2005 show, in
addition to his earnings at Frito-Lay, $11,000 and $14,000,
respectively, of gross receipts for a "consulting business."
Wahl received 1099's from Intramark, which were the same as the
amounts Wahl claimed as gross earnings for "consulting."

30. The information obtained from Rahal and Wahl concerning
the nature of their relationship in this regard is corroborated,
in part, by the content of intercepted wire communications
between the two. For example, on March 26, 2008, M.S. (Rahal's
secretary at Intramark) received an incoming call at the

-16-

Intramark office from Wahl who instructed M.S. to send a
"package" from Intramark to him at Frito-Lay. Wahl stated that
the package should be sent to "7701 Legacy Drive, Plano, TX
75024." Two minutes later, Rahal made an outgoing call on his
cell phone to Wahl. During their conversation, Rahal asked why
Wahl was having the package sent to his office at Frito Lay.
Wahl responded, "So I can get it and put it in, because my bank
is over here anyway." Rahal replied that his assistant "will
put the return address of her house in Jersey, and UPS it, it'll
have [her] name on it." Rahal also said that Wahl should have
the package by tomorrow, but he was not comfortable sending it to
Wahl at his office at Frito Lay but added "you do what you want."
In response to questioning from agents, Rahal indicated that he
made this statement to Wahl because he was concerned that someone
at Frito-Lay would discover the illegal kickback payments being
made to Wahl by Rahal.

31. Wahl has admitted in his publicly-filed plea agreement
with the government that in return for the bribe payments he
agreed to, and did, ensure that Frito-Lay purchased processed
tomato products and other products from SK Foods rather than from
certain of SK Foods' competitors. In addition, in response to
questioning both Wahl and Rahal have indicated that in return for
the bribe payments, Wahl provided Rahal and SK Foods with
confidential information that allowed SK Foods to sell certain
food products to Frito-Lay at inflated prices.

-17-

32. The government's investigation has also revealed that
the aforementioned scheme to defraud Frito-Lay, which was
perpetrated through Rahal's bribe payments, originated with
SALYER. In response to questioning, Rahal has indicated that his
payments to Wahl were expressly authorized and directed by SALYER
on numerous occasions. Rahal's statements in this regard are
corroborated by the content of various interstate telephone calls
between Rahal and SALYER, which were intercepted by the
government as part of the Title III wire that was authorized in
this matter. For example, on April 11, 2008, SALYER and Rahal
engaged in an interstate telephone conversation during which the
two discussed that so long as Wahl remained employed by Frito-Lay
as Senior Group Manager for Ingredients Purchasing, SK Foods'
competitor, Morning Star, would not be approved to supply
processed tomato products to Frito-Lay. Later in that same
conversation, SALYER directed Rahal to speak with Wahl, and to
direct Wahl on how to allocate Frito-Lay's tomato product
purchases between SK Foods and another SK Foods competitor,
Ingomar Packing Company. Specifically, the relevant portion of
the call is as follows:

   Salyer: We didn't, we're not in that business. Let Barilla
   and Frito and all the rest of them go (inaudible). Morning
   Star may own North America, but we'll be making money
   selling it someplace else.

   Rahal: I'm informing you what's going on, that's why I sent
   you what I sent you.

   Salyer: Right. The problem with Frito is, is that they
   can't get Morning Star in cause they're not approved yet.

-18-

Rahal:  And you can thank Jim Wahl for that.

Salyer:  Exactly, and I think it'll take em a couple years, at least, to get approved.

Rahal:  Well they've been trying to get approved for the last five years.

Salyer:  Right.

Rahal:  As long as Jim is there, they're not gonna get approved, I can tell you that.

Salyer:  No, I know that.  What Jim needs to do is give us all the diced and give Pruett all the paste.

Rahal:  I could make that happen too.

Salyer:  Why not?

Rahal:  I can make that happen.  Pruett wants to sell paste cheap, let him have the paste.

Salyer:  Let him have the paste and well take the diced.

Rahal:  Yeah, ok.

Salyer:  And Jim can look at that thing, right, and say, the price for the diced is 17 cents a pound and that's, you know, that's what it's gonna be.

Rahal:  That's fine.

Salyer:  So we'll take the 17 cent diced, and Pruett gets (inaudible) really only has two suppliers and it's us and Ingomar.

33.  Further evidence of SALYER's involvement in the bribery payments to Wahl is provided in the form of an April 7, 2008 email which was transmitted from Wahl in the Northern District of Texas to Rahal in the District of New Jersey.  The email, which was obtained by the government in the course of its investigation, forwarded a Morning Star proposal for a three-year contract for the sale of processed tomato products to Frito-Lay.

-19-

In response to questioning, Wahl has indicated that he provided
this otherwise proprietary information to Rahal in return for the
bribe payments.  That same day - April 7, 2008, Rahal transmitted
the surreptitiously obtained proposal to SALYER and other senior
leaders of SK Foods, to include vice presidents Huey, Beasley and
Manuel via email, from the District of New Jersey to the Eastern
and Northern Districts of California.  In response to
questioning, both Huey and Beasley have indicated that they
received this particular bid proposal from Rahal.  According to
Huey, the bid information was used to set bid prices at a SK
Foods pricing strategy meeting a few days later.  The April 7,
2008 email from Rahal to SALYER, Huey, Beasley and others forms
the basis for Count One of the instant Criminal Complaint.

34.   In addition to evidence derived directly from Rahal and
Huey, Wahl has also provided information concerning SALYER's
knowledge of Rahal's bribe payments to him.  In the factual basis
to his publicly-filed plea agreement with the government Wahl has
admitted that in the Spring of 2006, he met with SALYER in Plano,
Texas in order to discuss certain business arrangements between
Frito-Lay and SK Foods.  Wahl admitted further that during their
meeting, SALYER expressly inquired into whether Wahl was
satisfied with the value of the payments Wahl had received from
Rahal to that point.

35.   The government's investigation has also uncovered
evidence indicating that Rahal's bribery payments to purchasing

managers, such as Wahl were openly discussed at SK Foods'
executive management meetings. The government was able to record
portion of one such meeting, which occurred in Pebble Beach,
California, on January 17, 2008. On the recording, SALYER can be
heard telling Rahal to offer a bribe payment in order to
surreptitiously obtain an "export stamp," which would enable the
company to falsely certify that its product packaging was
appropriate for international shipment.

## B. Wire Fraud with Respect to Kraft Foods, Inc.

36. The government's investigation has revealed that Robert
Watson was the purchasing manager at Kraft Foods with whom Rahal,
and SK Foods, did business. Watson has admitted in the factual
basis to his publicly-filed plea agreement with the government
that as a purchasing manager he was vested with authority to
negotiate and enter into contracts, with the approval of his
employer, for the purchase of processed tomato products and other
food products from various processors, such as SK Foods. Watson
has further admitted pursuant to his plea agreement with the
government that in the normal course, he and Kraft received bids
for the sale of processed tomato and other food products from
processors to Kraft by way of what was intended to be a secret
and competitive bidding process. In response to questioning,
Huey, Rahal, Beasley and Manuel have all indicated that Kraft was
a regular customer of SK Foods, and purchased tens of millions of

-21-

pounds of tomato paste, diced tomatoes and other agricultural
products from SK Foods on an annual basis.

37.  In response to questioning, Rahal has indicated that as
part of a scheme to defraud Kraft, beginning in 2004 Rahal began
making personal bribery payments to Watson.  Watson has admitted
in the factual basis to his plea agreement with the government
that Rahal paid him approximately $158,000 in this regard between
2004 and 2008.  The government's investigation has further
revealed that during the relevant period Rahal routinely sent
various checks to Watson, via United States Mail, from New Jersey
to Watson in Illinois.  Two such mailings included payments of
$10,000 and 17,252.78, and are dated January 19, 2006, and July
25, 2007, respectively.

38.  Certified bank records for Intramark from January 2004
through August 2007, which were obtained during the course of the
government's investigation show Intramark checks being paid to
"Robert L. Watson, 301 Wood Creek Road, Apt. 513, Wheeling, IL
60090."  The checks are written on a near quarterly basis and
range from $3,000 to $17,253.  "Brokerage" is usually written in
the memo section of each check along with a particular quarter of
the year.  At times the checks reflect notations such as "tomato
paste" or "bill and hold."  The checks are all signed by Rahal.
Certified bank records obtained during the course of the
government's investigation also indicate that, since 2004, there
were checks totaling approximately $134,000 written from

-22-

Intramark bank accounts to Watson.  Watson did not report $23,000 received from Rahal on his 2004 tax return.  However, in 2005 and 2006, Watson received 1099's from Intramark for $26,000 and $50,000, respectively, and Watson reported those amounts as income on his tax returns.

39.  Watson has admitted in the factual basis to his plea agreement with the government that in return for the personal bribe payments, Watson agreed to, and did, ensure that Kraft purchased processed tomato products and other products from SK Foods rather than from certain of SK Foods' competitors.  Watson has also admitted in his plea agreement that in return for the bribe payments, he provided Rahal and SK Foods with information that allowed SK Foods to sell processed tomato products to Kraft at inflated prices.

40.  In response to questioning, Rahal, Huey and Beasley have also all indicated that in return for the bribe payments, Watson routinely provided SK Foods with the proprietary bid information of SK Foods' competitors.  Documents obtained during the course of the government's investigation corroborate those statements.  For example, on April 8, 2008, Watson faxed to Rahal and SK Foods a Three-Year Sales Proposal for the sale of tomato paste and diced tomatoes from Morning Star to Kraft.  Further documentary evidence uncovered as part of the government's investigation demonstrates that the bid proposal had been sent to Watson by Morning Star seven days prior.  Rahal ultimately caused

-23-

the bid proposal to be forwarded, via email, from the District of New Jersey to Huey and Beasley in the Northern and Eastern Districts of California, respectively, on or about April 8, 2008. This April 8, 2008 email forms the basis for Count Two of the instant Criminal Complaint.

41. Intercepted phone calls between Rahal and Huey on April 2, 2008, and April 7, 2008, respectively, evidence Watson's knowledge that what he was doing was wrong. According to Rahal, Watson did not want to fax the information from his office or from his "personal fax." Instead, Rahal told Huey that Watson intended to fax the Morning Star proposal to Rahal from an "outside" location, which could not be traced back to him.

42. The information provided to the government by Watson and Rahal concerning the nature of their relationship is corroborated, in part, by the contents of various interstate telephone calls between the two, which were intercepted by the government as part of the Title III wire recordings that were authorized in this matter. For example, on June 6, 2007, in an intercepted telephone conversation, Rahal and Watson discussed an invoice from Kraft that needed to be paid. During the call, Rahal told Watson, "you and I got money in there." In response to questioning, Rahal has indicated that this statement meant that once Kraft had paid its "bill," with respect to certain shipments of tomato product, Rahal was poised to kickback some of the proceeds to Watson. In a call later that day, Rahal and

-24-

Watson discussed the prospect of Rahal buying health insurance for Watson's daughter. Specifically, Rahal stated that he had checked about putting Watson's daughter on his payroll, but thought it would be cheaper for her to go out and get the best insurance she could on her own and Rahal could pay for it at a later time.

43. Later on July 26, 2007, in an intercepted telephone conversation, Rahal told Watson that he had just mailed out a check for $17,000 to him. Certified bank records obtained during the course of the government's investigation confirm that a check dated July 25, 2007, from Rahal to Watson for $17,252.78, was cashed.

44. The information admitted to by Rahal in his publicly-filed plea agreement with the government – that he routinely paid bribes to the purchasing managers of various customers of SK Foods, including Kraft – is also corroborated by the contents of a July 11, 2007 intercepted telephone call between Rahal and Beasley, during which Rahal stated: "I wrote checks today almost $65,000, end of June, going into third quarter." Rahal added, "between Watson, Jim Wahl, I had lunch with Bob Turner, he had a big chunk . . . we got another 500,000 pounds out of Joel, so he'll get a thousand bucks that I'll bring with me, over at Agusa, Tony got another order from him for 500,000 pounds and Mike Chavez, I'm gonna see him in Walnut Creek on Thursday." In response to questioning, both Rahal and Beasley have indicated

-25-

that during the call Rahal was recounting approximately $65,000

in bribe payments he had recently made to customer purchasing

managers, including Watson.  The July 11, 2007 telephone call

between Rahal in the District of New Jersey and Beasley in the

Eastern District of California forms the basis for Count Three of

the instant Criminal Complaint.

    45.  The information obtained from Rahal and other sources

concerning SK Foods' bribery payments to Watson is also

corroborated by emails and other documentation that has been

provided to the government by Kraft in response to grand jury

subpoenas.  One example of the scheme to defraud Kraft occurred

during the spring 2007 contract season.  Certified business

records provided to the government by Kraft detail that on April

24, 2007, Kraft began accepting electronic bids to sell to Kraft

close to 80 million pounds of processed tomato products, which

included both tomato paste and diced tomatoes.  The electronic

bidding period was originally set to end on May 1, 2007, although

some difficulties with the site meant that some bidders submitted

hard copy bids as late as May 4th.  The details of the 2007 Kraft

bid, and its associated delays, were discussed in email

correspondence between SALYER, Rahal, Huey and others in April

and May 2007.  In response to questioning, both Rahal and Huey

have indicated that the bidding was open to anyone who could

supply the requested products, however, Kraft policy limited

award of contracts to only those suppliers that had gone through

-26-

Kraft's internal approval process.  As the Kraft documentation
indicates, in the spring of 2007, Morning Star, SK Foods and
Ingomar were approved suppliers to Kraft for processed tomato
paste and diced tomatoes.

46.  Business records provided by Kraft pursuant to subpoena
indicate that while the online process was open, on May 1, 2007,
Morning Star bid $0.33 per pound for 67 million pounds of tomato
paste, and $0.18 per pound for 3.5 million pounds of diced
tomatoes.  Business records provided by Kraft indicate that the
next day, Ingomar submitted its bid to Kraft.  Ingomar bid $0.365
per pound for 10 million pounds of tomato paste, and $0.165 per
pound for 3.5 million pounds of diced tomatoes.  At about the
same time, SK Foods submitted a bid of $0.36 per pound for 67
million pounds of processed tomato paste and $0.185 per pound for
diced tomatoes.

47.  In response to questioning, Rahal has indicated that by
at least May 16, 2007, Watson had provided SK Foods, through
Rahal, with the exact amount and quantities that Ingomar had bid
to Kraft on May 1st.  Rahal has indicated further that
notwithstanding the fact that Morning Star had already submitted
a bid that was $0.03 per pound less than SK Foods for tomato
paste, and $0.005 per pound less for diced tomatoes, on May 16,
2007, SK Foods sent a second bid offer to Watson in which SK
Foods increased its bid to Kraft to $.365 per pound for processed
tomato paste.  Rahal has indicated that although the time for bid

-27-

submissions had long since passed, Watson "re-opened" the bidding process so that SK Foods could increase its bid and, consequently, defraud Kraft out of more than $2 million.

48. In addition, evidence obtained during the government's investigation indicates that the price of at least one other contract between Kraft and SK Foods was raised at Watson's initiation, so that Watson could reap a larger benefit from his illicit kickback arrangement with SK Foods. In an intercepted phone call between Rahal and Watson on April 10, 2008, the two discussed a contract between the respective companies for jalapeno peppers and enchilada sauce. During the call, Rahal reminded Watson on multiple occasions that the contract to which he was referring was the one that Watson told Rahal to raise the price on, stating "we raised the price on it; you told us to raise the price," and "you told me 'no, raise the price' from where we were, which we did." And finally, "you raised it."

49. Evidence obtained during the course of the government's investigation demonstrates that the bribe payments to Watson also induced Watson to release SK Foods from its contractual obligation to provide millions of pounds of tomato paste to Kraft at a specific price, without the knowledge or approval of Watson's superiors, at times when it best suited SK Foods. For example, evidence obtained during the course of the government's investigation indicates that during the spring of 2008, SK Foods experienced a period during which its supply of tomato paste was

-28-

far short of its outstanding contractual obligations.  SK Foods'
shortage of tomato product for sale to customers is discussed on
various phone calls between Rahal and Huey, which were
intercepted by agents at the time they occurred.

50.  For example, during multiple phone conversations on
March 13 and 14, 2008, Rahal and Huey discussed how SK Foods was
60 million pounds short of a certain quality of tomato paste
because its contractual obligations for that product were more
than it could produce.  On March 13, 2008, Huey asked Rahal to
"shut Kraft off" in order to alleviate part of SK Foods'
shortfall.  After Rahal explained to Huey that "Watson will do
what I tell him," Huey went on to explain to Rahal that SK Foods
had a number of orders with oversees customers for the same
tomato paste at higher prices, and that SK Foods could make more
money if it shipped the paste to them instead of Kraft.  Later in
the call, Rahal stated to Huey that SK Foods had Watson cancel
contracts for tomato paste in past years as well.

51.  In subsequent phone calls between Huey and Rahal on
March 14, 2008, Rahal confirmed for Huey that Watson had "zeroed
out" the balance of tomato paste that SK Foods was required to
send to Kraft under their existing contracts.  Rahal and Watson
also engaged in a series of recorded phone calls during the
second week of March 2008, in which Watson agreed to relieve SK
Foods of its contractual obligations.  In one particular call,
Rahal informs Watson that if SK Foods "has an opportunity to go

-29-

to Europe with [the paste] . . . for both of us it would be a
good thing."

52.   Information obtained by the government during the
course of its investigation from Kraft representatives indicates
that as a result of the scheme to defraud, Kraft was forced to
purchase replacement product on the open market.  Kraft has
calculated its resulting loss to be approximately $1.6 million,
and the company submitted a letter to probation at the time
Watson was sentenced detailing that fact.

53.   Further information obtained during the course of the
government's investigation demonstrates that the scheme to
defraud Kraft, like the scheme to defraud Frito-Lay, began with
SALYER.  In response to questioning, Rahal has indicated that his
payments to Watson were expressly authorized and directed by
SALYER on numerous occasions.  Soon after Watson was elevated to
being the Kraft purchasing manager responsible for securing
tomatoes, Rahal and SALYER engaged in email correspondence, dated
on or about February 13, 2004, in which Rahal described Watson as
"low hanging fruit" because he was incurring repeated costs in
commuting to Illinois from White Plains, New York during the
week.  SALYER responded to Rahal that he "love[d] the low fruit,"
and recognized that "[c]omuting form NY costs $$$$."  SALYER's
knowledge and direction of the scheme to bribe Watson is also
evidenced by the content of certain interstate telephone
conversations between Rahal and SALYER, which were intercepted by

-30-

the government as part of the Title III recordings that were authorized in this matter.  For example, on April 14, 2008, SALYER and Rahal engaged in a interstate telephone conversation during which the two discussed the fact that Rahal had recently ordered Watson to relieve SK Foods of its obligation to provide Kraft with millions of pounds of processed tomato product so that SK Foods could sell the product elsewhere for a higher price. Rahal goes on in the call to tell SALYER that he had just made personal bribe payments to Watson totaling $24,000.

Specifically, the relevant portion of the call is as follows:

    Salyer:  Uh-huh.

    Rahal:  He's going to get us 5 million pounds.  He's got to find out what stuff he's going to give us.

    Salyer: Shit, that's huge.  We need it.

    Rahal:  Yeah.  I can't get it any cheaper than 37 cents, though.

    Salyer:  That's okay.

    Rahal:  I'm trying.

    Salyer:  We're going to lose money on it, but I don't care.

    Rahal:  Yeah, alright.

    Salyer:  I don't want to cut people like Kraft off.

    Rahal:  Well, I had the coon walk away from stuff.  Closed it out.  But stuff we never packed.

    Salyer:  Yeah.  That didn't really help our (inaudible).

    Rahal:  No, I know.  I know.  He don't know that.  I just sent that mother fucker a . . . [M.S.] - tell Scott how much money we sent the nigger.  Get on the phone.  Don't yell.

    M.S. (Rahal's secretary): $24,000.

-31-

Salyer:  Jesus Christ.  Is it Christmas time over in (inaudible).

Rahal:  It's taxes time.

M.S.:  It's tax time.

Salyer: Oh, It's tax time.  I knew there was something going on.

Rahal:  Thank you, [M.S.].

Salyer:  It's Christmas time for mister Watson.

Rahal:  Yeah.  That's why I'm inviting him to the house for barbecue.  He said he needs watermelon.

Salyer:  Well, we can get watermelon.

Rahal:  Oh, yeah.  We got good watermelon in California. Thank you, Maryann.  Anyway.

Salyer: Thanks, Maryann.

54.  In addition to conversations between Rahal and SALYER, which specifically address Watson, SALYER's overall knowledge and direction of the various schemes to bribe the purchasing managers of certain of SK Foods' customers is evidenced by the content of other recorded telephone calls between the two.  For example, on July 11, 2007, agents intercepted a call between Rahal and Manuel, during which the two discussed J.D., a purchasing manager at Agusa, which was a former SK Foods customer whose contract Manuel oversaw.  Manuel informed Rahal that J.D. had called and wanted to get another "1/2 million pounds of cold brick" (a type of tomato paste) right away.  Rahal responded, "so, we got an order for 500 and he wants another 5?  Well, I am coming to see him next week and I was going to give him 500 bucks for his

-32-

500,000 pounds, then I will just give him $1,000." Rahal then told Manuel, "I am paying him $1,000 per million pounds, that's the deal, so when you talk to him, tell him I will be in next week to see him."

55. Subsequently, on July 13, 2007, agents intercepted a telephone call between Rahal and SALYER during which Rahal stated: "I got to see my friend [J.D] over at Agusa, he's now my best friend, and give him something. He told me, he's doing exactly what he told me, he's rejecting that Chinese paste left and right." SALYER responded, "perfect, but it's small volumes." Rahal responded, "I know, but we started at zero volume and I don't think we'll ever be a big player in there, I don't think the Mendios (owners of Agusa) will ever let us be a big player, unless there's a catastrophe." SALYER then stated, "unless they start rejecting everybody else's paste, too." Rahal replied, "you never know what can happen, a little bit of money in the right place can do." SALYER stated, "I've heard about that type of shit happening, sample bags thrown away, results changed, there's all kinds of shit can happen."

56. Similarly, on July 6, 2007, agents intercepted a call between Rahal and Beasley during which the two discussed D.P., who at the time was a purchasing manager for Del Monte Foods, another SK Foods customer, and an account that Beasley was responsible for. During the recorded call, Beasley asked Rahal if D.P. "would want to get on the program." In response to

-33-

questioning, both Rahal and Beasley have indicated that "the program" was the phrase that various leaders at SK Foods would use when referring to the bribery scheme. Beasley then asked, "what happens if you put him on the program?" Rahal replied, "I can do it, we can get that Del Monte business." Rahal then told Beasley that they would have to meet with D.P. Beasley stated he would "try to get something going with [D.P.]" by setting up a meeting between Rahal, Beasley and D.P. Rahal told Beasley, "he's a survivor and he knows how to play this game . . . you know a thousand dollars in his pocket for every million pounds, that turns out to be, you know that's ten grand on ten million pounds."

57. A few days later, on July 10, 2007, agents intercepted another interstate telephone communication between SALYER and Rahal, during which the two discussed D.P. Rahal stated, "D.P.'s gonna need a retirement program. So, it's a perfect fit for me." SALYER asked Rahal, "How fast are you going to reel in that fish?" Rahal replied, "probably by the time the coffee comes that'll be done." In response to questioning Rahal has indicated that he was referring to a dinner meeting he had scheduled with D.P. SALYER then stated, "I want that sucker on speed reel. You know that big electric reel. Whew . . . ." No evidence has been obtained in the investigation indicating that Rahal succeeded in actually paying bribes to D.P.

-34-

## C.    Wire Fraud With Respect to B&G Foods, Inc.

58.    Information obtained during the course of the
government's investigation indicates that Robert Turner was the
purchasing manager at B&G with whom Rahal, and SK Foods, did
business.   In the factual basis to his publicly-filed plea
agreement with the government, Turner has admitted that during
the period relevant to this Criminal Complaint he was vested with
authority to negotiate and enter into contracts, with the
approval of his employer, for the purchase of processed tomato
products and other food products from various processors, such as
SK Foods.   Turner has further admitted that in the normal course,
he and B&G received bids for the sale of processed tomato and
other food products from processors to B&G by way of what was
intended to be a competitive bidding process.   In response to
questioning Turner, Rahal, Huey, Beasley and Manuel have all
indicated that B&G was a regular customer of SK Foods, and
routinely purchased millions of pounds of tomato paste, diced
tomatoes and other agricultural products from SK Foods on an
annual basis.

59.    Both Turner and Rahal have admitted in the factual
bases to their respective plea agreements with the government
that as part of a scheme to defraud B&G, beginning in 2004 Rahal
began making personal bribery payments to Turner.   Analysis of
certified bank records indicates that Rahal paid approximately
$14,698 in this regard to Turner between 2004 and 2008.   The
government's investigation has further revealed that during the

relevant period, Rahal routinely sent various checks, via United States Mail, to Turner at his residence in New Jersey. Two such mailings included payments of $1,000 and 9,698.80, and are dated May 17, 2006, and December 12, 2007, respectively.

60.   Turner has also admitted in his plea agreement with the government that prior to being employed by B&G, Turner served in a purchasing manager capacity for Nabisco, Inc., a manufacturer, distributor and seller of cookies, snacks and other food products, also with a principal place of business in Parsippany, New Jersey. Turner has admitted in his plea agreement that while employed by Nabisco, Rahal paid Turner approximately $50,500 in personal bribe payments on behalf of SK Foods in the same manner as he did while Turner was employed by B&G.

61.   Furthermore, both Rahal and Turner have admitted in their respective plea agreements with the government that in return for the personal bribe payments, Turner agreed to, and did, ensure that B&G purchased processed tomato products and other products from SK Foods rather than from certain of SK Foods' competitors. Rahal and Turner have also admitted that in return for the bribe payments, Turner secured contracts between B&G and SK Foods for the sale of certain food products at inflated prices.

62.   For example, in May 2007, SK Foods and B&G entered into a cost-plus contract whereby SK Foods agreed to sell B&G 13,000,000 pounds of chile and jalapeno peppers at a price of $0.22 per pound. In response to questioning, Rahal has indicated

that subsequent to entering into the agreement, and in exchange
for bribe payments, Turner agreed to increase the price per pound
that B&G would pay SK Foods under the contract by $.01 per pound.
In response to questioning, Rahal has also stated that in
exchange for his efforts in helping secure the pepper contract
between SK Foods and B&G, as well as its inflated price, he
promised Turner a personal bribe payment in the approximate
amount of $65,000 – equating to $.005 per pound on the entire
contract.  In his publicly-filed plea agreement, Turner has
admitted to increasing the price of this pepper contract by $.01
per pound in return for personal bribe payments from Rahal.

63.  Rahal's statements in this regard are corroborated by
recorded interstate wire communications between Rahal and Turner.
On June 8, 2007, for example, Rahal and Turner agreed to "split
the penny" on the chile contract, which, as Rahal has stated to
agents, meant that Turner would receive a kickback of ½ cent per
pound of the total quantity of chile peppers and jalapenos that
B&G purchased from SK Foods.  Rahal has also admitted to agents
that he would receive the other ½ cent per pound.  Rahal went on
in the call with Turner to state, "I don't know how big your
chile purchase is, but it can be a lot of money.  It's your kids'
education."

64.  Subsequently, on July 12, 2007, during an intercepted
call, Rahal told Turner "I just want to make sure that you know
that you're getting half of that 13 million pounds.  That's
yours."  Turner replied, "All right."  Rahal then stated, "that's

-37-

a penny on 13 is $130,000.  So you're getting half of that . . .
make no bones about it."  Turner replied, "Okay."  Rahal then
told Turner that he would pay Turner, "once that money starts,
coming in, I don't care how you take it."

65.  Rahal has indicated that this scheme to defraud B&G,
·like the schemes to defraud Frito-Lay and Kraft, originated with
SALYER.  In the course of the government's investigation Rahal
has informed agents that his payments to Turner were expressly
authorized and directed by SALYER.  Again, Rahal's statements in
this regard are corroborated by the content of certain interstate
telephone calls between Rahal and SALYER.  For example, on June
12, 2007, SALYER and Rahal engaged in a recorded interstate
telephone conversation during which the two discussed how Rahal
had just secured the cost-plus chile and pepper contract with
Turner and B&G.  During the call, Rahal relayed to SALYER that he
had promised Turner a personal bribe payment in order secure the
contract.  Specifically, Rahal and SALYER stated:

Salyer:  Yeah, Randy.

Rahal:  Hi, I just sold the rest of the jalapenos to Bob
Turner at 28 ½ cents.

Salyer: I'll be a son of a bitch.

Rahal:  I had to give him the penny.  He said write it up.
I just got off the phone with Poretti.  Have Poretti send me
an email.  He dictated it to me and I gave it to Poretti.
So.

Salyer:  Is that jalapenos and chilies?

Rahal:  Both.  And they were at two different prices.  I
didn't know that.  That was what Poretti told me.  The

jalapenos were at 20, the chilies were at 22.  I just sold
it all at the same price.

Salyer:  Well that makes it easier.

Rahal:  Fuck 'em.  They have more money than us.  I just
gave up my money but I'm not going to turn it away.

Salyer:  So we sold the other 50% at 25.

Rahal:  Right. And then the balance.

Salyer:  At 28.

Rahal: 28 ½.

66.  As SALYER and Rahal discussed in their June 12, 2007
interstate telephone conversation, SK Foods' Vice President Mike
Poretti was subsequently given instructions to prepare an email
to Turner setting forth the pricing agreement reached between
Turner and SK Rahal.  Poretti sent a draft of that email on or
about June 13, 2007 from the Eastern District of California to
Rahal in the District of New Jersey.  That email forms the basis
for Count Four of the instant Criminal Complaint.

67.  Subsequently, on June 21, 2007, SALYER and Rahal
engaged in another recorded interstate telephone conversation
during which SALYER instructed Rahal to further increase the
price per pound that B&G would pay SK Foods under the cost-plus
pepper contract.  In this regard, SALYER directed Rahal to
provide Turner with a fictitious justification for the increased
contract price, namely that SK Foods was experiencing increased
agricultural costs in connection with the peppers.

-39-

**D.  Mail and Wire Fraud with Respect to the Shipment to Customers of Adulterated and Misbranded Processed Tomato Product**

68.  In the factual basis to his publicly-filed plea and cooperation agreement with the government Alan Huey has stated that during his tenure at SK Foods, he worked both out of SK Foods' Lemoore, California facility, and at the company's headquarters in Monterey, California.  Huey has also admitted that as Senior Vice President for Sales and Marketing, he reported directly to SALYER.  Huey has indicated that during certain periods of time relevant to this Criminal Complaint, he was responsible for overseeing and managing SK Foods' inventory of processed tomato products and other food products, to include the shipment of those food products to SK Foods' customers across the United States.  Huey routinely collaborated with other members of SK Foods' senior management, to include SALYER, Rahal and Beasley, to determine what terms and pricing to offer to SK Foods' customers in its contracts for the sale of processed tomato products.

69.  In the normal course, the market price of processed tomato products fluctuates based on the percentage of Natural Tomato Soluble Solids ("NTSS") that the product contains (also known as the product's "Brix value").  Based on interviews conducted with individuals in the tomato processing industry, customers frequently specify a required NTSS concentration in their contracts with manufacturers such as SK Foods.  Customers

-40-

will also often specify acceptable levels of other processed
tomato product characteristics such as the product's pH, mold
content, color, acidity and viscosity (sometimes referred to as
"Bostwick"), depending on the customer's intended finished
product (i.e., ketchup, salsa, barbeque sauce, etc.).

70.  In addition to the quality control factors described
above, SK Foods' customers typically specified the acceptable
shelf life of the processed tomato product that they were
purchasing.  During the period relevant to this Criminal
Complaint, most customers required that SK Foods provide product
that was 24 months old or less.  SK Foods' Internal Quality
Management Systems Product Specification documents, which were
seized from SK Foods' facilities during the execution of
judicially authorized search warrants on April 16, 2008, detail
how SK Foods represented that the maximum shelf life of its
aseptic tomato paste product was 24 months from the date of
production.

71.  During the relevant period, SK Foods was also subject
to the United States Standards for grades of tomato paste and
puree as established by the United States Department of
Agriculture ("USDA").  SK Foods was further subject to Title 21,
Code of Federal Regulations, Section 110.110, through which the
United States Food and Drug Administration ("FDA") has
established maximum limits of natural or unavoidable defects in
foods sold within the United States, which present no health
hazard.  The limits are set out as Food Defect Action Levels.

-41-

72. The limits prescribed by the Food Defect Action Levels represent thresholds above which FDA will take enforcement action for the food products being "adulterated" pursuant to 21 U.S.C. § 342(a)(3). For example, FDA has set a Food Defect Action Level for mold in tomato paste; if the mold count (as measured using the Howard mold count method) of all of the subsamples of a lot of tomato paste are higher than 40%, the FDA considers that product adulterated and unfit for sale within the United States.

73. According to interviews conducted with numerous witnesses, during the relevant period SK Foods was required to, and did, regularly subject its processed tomato product to laboratory testing to ensure it complied both with applicable laws and regulations, and with customer specifications. Both Huey and Dahlman have admitted in their publicly-filed plea and cooperation agreements with the government that in the normal course, SK Foods' employees initially recorded the raw results of this testing process on handwritten lab result registers. That data was subsequently entered into a proprietary computer system owned and operated by SK Foods.

74. Information obtained during the course of the government's investigation has further revealed that when SK Foods shipped processed tomato products to customers, those products were usually accompanied by a Certificate of Analysis ("COA"), which identified the particular grading factors (i.e., pH, mold count, color, viscosity and NTSS) derived from the SK Foods laboratory testing of the product. According to Huey,

-42-

Dahlman, Beasley, Manuel and Rahal, SK Foods routinely affixed
labels to the actual storage containers holding the processed
tomato product destined for its customers. These container
labels, along with the bills of lading and invoices that
accompanied a customer-bound shipment, typically identified the
date of production and NTSS level of the processed tomato paste.
According to Huey and Dahlman, duplicate copies of the documents
described above also were faxed or mailed to SK Foods' customers
at the time of product shipment.

75. Information obtained during the course of the
government's investigation demonstrates that beginning in
approximately 2000, and continuing until April 2008, it became a
regular practice for SK Foods to knowingly cause the
falsification of the various grading factors and data contained
on the COAs, bills of lading, invoices and bin labels
(hereinafter, "quality control documents") that accompanied
customer-bound shipments of tomato product, which was produced,
purchased and sold by SK Foods. Huey has admitted that as Senior
Vice President for Sales and Marketing he routinely falsified and
directed Dahlman and other SK Foods employees to falsify these
documents so that they reflected mold count levels in SK Foods'
tomato product as being below the applicable Food Defect Action
Level in many instances when, in fact, those levels were
significantly above the federal threshold. Dahlman has also
admitted to falsifying these quality control documents in her
plea and cooperation agreement with the government.

-43-

Specifically, Dahlman has stated that she falsified mold count levels and other recorded attributes of SK Foods' product on a near-daily basis.

76. Huey and Dahlman also routinely caused the falsification of quality control documents so that they reflected NTSS levels that were higher than what the tomato product actually contained, as well as altered pH, color, viscosity values, and dates of production to meet customers' contractual specifications. Huey has admitted pursuant to his plea agreement that he subsequently distributed and directed Dahlman and other SK Foods employees to distribute such product, along with the falsified quality control documents, to certain of SK Foods' customers in interstate commerce. Huey and Dahlman also routinely caused duplicate copies of the falsified quality control documents to be sent and transmitted to SK Foods' customers via facsimile and United States mail at the time of shipment.

77. According to Huey and other SK Foods leaders, these actions described above were conducted at the express instruction and direction of SALYER, and were intended to make it appear to SK Foods' customers as if particular shipments of processed tomato product were compliant with USDA and FDA standards, and with customer specifications, when in fact they were not. As a result, adulterated and misbranded processed tomato product was frequently introduced into interstate commerce, and SK Foods'

-44-

customers were fraudulently induced to pay for such product, or
to overpay for the product.

78.   Huey's statements and the statements of other witnesses
in this regard are corroborated by information obtained from SK
Foods' former President Glen McClaran.  According to McClaran, in
April and May of 2007, both Huey and SALYER explained the
procedure of mislabeling processed tomato product and changing
quality control documents associated with product destined for
customers.  According to McClaran, he refused to participate in
this practice and eventually terminated his employment at SK
Foods as a result.  According to McClaran, in May 2007 he and
another SK Foods employee were discussing an inventory shortage
at SK Foods when SALYER stated, "You can solve all your problems
with a label printer."  McClaran also stated that he spoke with
Dahlman, who told him that she was instructed by Huey to change
labels when orders came in for product that was not in inventory.
According to McClaran, on or about June 7, 2007, he had a
conversation with SALYER during which McClaran told him that he
did not agree with this practice.  According to McClaran, SALYER
responded, "You can take your ethics book and shove it up your
ass.  We have always manipulated inventory and will continue to.
We will lie to anyone outside the circle, but not to each other."
McClaran is currently involved in litigation against SALYER
relating to his termination from SK Foods.

79.   The witness statements outlined above concerning
SALYER's knowledge and direction of the sale of adulterated and

-45-

misbranded food is further corroborated by the content of
interstate wire communications, which were intercepted during the
course of the government's investigation.  For example, on June
11, 2007, Rahal and SALYER engaged in a recorded interstate
telephone conversation during which the two discussed how Dahlman
was valuable to the company, because she frequently changed
labels and other quality control data at the request of SK Foods'
leadership.  Specifically, Rahal and SALYER stated:

> Rahal:  Um, I talked with Jeff, I talked with Tony.  Not
> Tony, I talked with Jeff, I talked with Mike Poretti, and I
> talked to Alan today.  Our Alan.  He said, "we're ready."  I
> don't want to lose Jennifer either.
>
> Salyer:  I don't either
>
> Rahal:  I really don't.  We just got to find the right
> person for her- the right job for her kind of person.  She's
> a hard worker.  That's the kind of example that you need to
> set- somebody who'll just dig in and do the job.
>
> Salyer:  Yeah.
>
> Rahal:  Like Duffy.  Like some of those original people.
>
> Salyer:  Yep.  Jennifer just needs to be locked up in an
> office.
>
> Rahal:  I- that's fine.  Whatever she can do, she can do it.
> She's also very good at changing labels and getting that
> kind of stuff done.
>
> Salyer:  Well, that's, she's a go to person.
>
> Rahal:  I don't want everybody in the world trained on how
> to do that.
>
> Salyer:  I think we just- that's why-  You know what?   The
> reality is she almost- you know what she needs?  She needs
> just what I was saying, she needs to be Inventory Manager,
> Inventory administrator.  And that way she can always be
> watching and she can make sure that the inventory counts are
> right for the accountants.  You know, and that's fine, and
> she can do that.

-46-

Rahal:  Mmhmm, manipulate the numbers.

Salyer:  But she can do that, and then when we need something done-

Rahal:  I know she can do that.

Salyer:  If warehousing or something can't figure it out, she goes out and makes it happen.

Rahal:  You bet, she's done it for me a number of times. I said, you do it, you go out and get the label, and you put it on those drums.  By god, she did it.  She called me back three hours later- that load was done and ready to go.  So, that's the kind of person I need from my support side.

Salyer:  Yeah, she's been trained.  We can't train new people like that.  And you're sure as hell ain't going to get Glen [McClaran]- Glen's got his CPA hat on.  He's talking about integrity.

Rahal:  Yeah, well, there's a lot of people talk to us about integrity.  That's fine, he's just got to come into the fold.  I don't want to keep doing a character assassination of this guy.  I don't.  Let this guy do his thing.  He is a CPA.  You know how hard it was to get these kind of people. Shit, we're paying them a ton of fucking money.

80.  Witness statements concerning SALYER's knowledge and direction of the sale of adulterated and misbranded food is further corroborated by recordings obtained by the government, which were made at various SK Foods' executive meetings.  For example, on a recording made on February 28, 2007, Rahal and SALYER discussed an occasion during which SK Foods intentionally delivered product to Safeway, Inc. that did not meet the specifications Safeway had outlined in its contact with SK Foods. During that conversation, SALYER stated:  "We're changing labels faster than the printers can run."  Rahal then replied, "I got a

-47-

label maker in my office." SALYER stated, "When it comes to this type of manipulation, you don't need to know about this."

81. Witness statements concerning SALYER's knowledge and direction of the sale of adulterated and misbranded food is further corroborated by certain email communications, which were obtained as a result of judicially authorized search warrants executed on April 16, 2008. A number of emails from January 2007 are particularly telling. In one such email, dated January 3, 2007, SALYER sent a communication from the Northern District of California to Huey in the Northern District of California, Rahal in the District of New Jersey, and Beasley in the Eastern District of California, suggesting that SK Foods misbrand millions of pounds of processed tomato product in order to meet its contractual requirements to customers. In another email, dated January 23, 2007, Beasley sent a communication from the Eastern District of California to SALYER in the Northern District of California, Rahal in the District of New Jersey, and others, in which he suggested that SK Foods misbrand approximately 7.9 million pounds of tomato paste to reflect a higher NTSS concentration than what the product actually contained so that SK Foods could satisfy its unwitting customers. These two emails form the basis for Counts Five and Six of the instant Criminal Complaint, respectively.

82. Information obtained from various witnesses during the course of the government's investigation, including Huey and Dahlman has revealed that, at SALYER's direction, SK Foods

-48-

shipped millions of pounds of processed tomato product to customers that was either adulterated or was misbranded in one aspect or another. Agents from the Federal Bureau of Investigation and the Internal Revenue Service have reviewed the historical quality control and shipments records for these shipments. Each of these shipments originated at SK Foods facilities in the Eastern District of California and was sent to different states around the country. According to Dahlman, at the time of each shipment, she mailed an invoice to the particular customer describing the contents of the misbranded and/or adulterated tomato product.

83. As a result, on or about the dates set forth below, in the Eastern District of California, for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud, SALYER did knowingly cause Huey, Dahlman and others to deliver by mail and private and commercial carrier, the items listed below:

| COUNT | DATE | SENDER | ITEM INCLUDED IN MAILING | ASSOCIATED FALSIFICATION |
|-------|------|--------|--------------------------|--------------------------|
| SEVEN | 2/20/01 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Intramark USA in Westwood, New Jersey, via United States Mail, with respect to customer Land O'Lakes | Production Date for 16,251 pounds of tomato paste falsified from 9/25/98 to 7/24/99 |

-49-

| EIGHT | 7/10/03 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Gerber Products in Michigan, via United States Mail | Production Date for 13,475 pounds of tomato paste falsified from 8/4/00 to 7/7/02 |
|---|---|---|---|---|
| NINE | 7/18/03 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Antis Food Products, Inc. in Pennsylvania, via United States Mail | Classifica-tion for 9,217 pounds of tomato paste falsified from conventional to organic |
| TEN | 7/23/03 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Heinz USA in California, via United States Mail | Classifica-tion for 37,721 pounds of tomato paste falsified from conventional to organic |
| ELEVEN | 3/1/05 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Nestle USA in Ohio, via United States Mail | Mold count for 26,050 pounds of tomato paste falsified from 56% to 40% |
| TWELVE | 3/7/05 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to San Antonio Farms in Texas, via United States Mail | Production Date for 40,032 pounds of tomato paste falsified from 9/23/02 and 9/24/02 to 9/17/03 and 9/18/03 |

| THIRTEEN | 1/4/07 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Barilla America, Inc. in Illinois, via United States Mail | Mold count for 54,160 pounds of tomato paste falsified from 58% to 36% |
|---|---|---|---|---|
| FOURTEEN | 4/17/07 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Intramark USA in Westwood, New Jersey, via United States Mail, with respect to customer Chelten House | Mold counts for 137,070 pounds of tomato paste falsified from 48-86% to 36-40% |
| FIFTEEN | 5/1/07 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Kraft Foods, Inc. in Texas, via United States Mail | Mold counts for 137,066 pounds of tomato paste falsified from 48-86% to 34-40% |
| SIXTEEN | 6/22/07 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Con Agra in Nebraska, via United States Mail | Mold count for 5,988 pounds of tomato paste falsified from 74% to 40% |
| SEVENTEEN | 12/5/07 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to B&G Foods in Maryland, via United States Mail | Mold count for 11,347 pounds of tomato paste falsified from 62% to 40% |
| EIGHTEEN | 12/18/07 | Dahlman | Invoice sent from SK Foods' Williams, CA facility to General Mills Operations, Inc. in Minnesota, via United States Mail | Mold count for 19,564 pounds of tomato paste falsified from 53% to 40% |

-51-

| NINETEEN | 2/4/08 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Heinz USA in California, via United States Mail | Mold count for 4,811 pounds of tomato paste falsified from 76% to 40% |
|---|---|---|---|---|
| TWENTY | 3/20/08 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Tyson Foods, Inc. in Arkansas, via United States Mail | Mold count for 2,889 pounds of tomato paste falsified from 60% to 20% |

84. According to information provided by Huey, Dahlman and other witnesses, as well as through agents' review of SK Foods' historical quality control and shipments records, the government has determined that between 2004 and 2008 alone, SK Foods routinely falsified quality control documents relating to, and subsequently shipped, adulterated and/or misbranded tomato product manufactured by SK Foods to at least 55 different customer victims, in 22 different states. Certain of these shipments were accompanied by falsified COAs.

85. In addition to the information set forth in paragraphs 67-84 above, the government's investigation has revealed that during 2007, SK Foods experienced a period during which it was unable to provide an adequate supply of processed tomato paste containing 31% NTSS in order to meet its contractual obligations to certain customers, including Kraft Foods. According to Huey, Beasley, Manuel, and Rahal, in an attempt to alleviate the

shortage, SALYER contacted the owner and president of a competing manufacturer of processed tomato products, Ingomar Packing Company, in February 2007, and arranged to purchase approximately 3,400,000 pounds of processed tomato product containing lower NTSS concentrations of 26% and 28%. The negotiations of this purchase are spelled out in a series of email communications that were drafted between the two owners in January 2007, and which have been obtained by the government during the course of its investigation.

86. According to numerous witnesses, and the text of the obtained email communications, the product purchased from the competitor by SALYER was also classified as "high mold," and uniformly contained mold counts significantly in excess of the applicable FDA Food Defect Action Level. Accordingly, the product purchased from the competitor did not meet the specifications contained in certain of SK Foods' existing contracts, and was adulterated and unsaleable in the United States due to its excessive mold content. In his emails with the competitor's owner SALYER explicitly acknowledged that the product was "high mold." At one point, the competitor's owner asked SALYER what he is going to do with the product because the mold levels were so high. SALYER proceeded to lie and tell the competitor's owner that he would sell it overseas. According to Huey, in order to conceal the tomato product's inferior quality, SALYER ordered Huey to misbrand the product by causing the

-53-

falsification of certain customer-bound quality control documents
so that they incorrectly reflected the product as uniformly
containing 31% NTSS tomato paste and a mold count at or below
40%.  SALYER's direction to Huey in this regard came, in part, in
the form of a January 22, 2007 email, which the government has
obtained during the course of its investigation, and which was
sent in interstate commerce.  In that email, SALYER ordered Huey
to incorporate the high mold paste from the competitor into SK
Foods' existing inventory intended for domestic customers.
According to Dahlman, she actually misbranded the product at
Huey's direction.  SK Foods quality control and shipment records,
as well as statements from Huey, Dahlman and others indicate that
SK Foods caused the adulterated and misbranded tomato product,
and the accompanying falsified documentation, to be shipped
during the spring of 2007, via interstate carrier, from SK Foods'
facilities in the Eastern District of California to Kraft Foods'
facilities in other states.

### E.    SALYER's Flight to Avoid Prosecution

87.   Recently, the government has obtained information which
indicates that SALYER may have fled the United States in order to
avoid prosecution for the criminal conduct outlined above.
During certain periods relevant to the instant Criminal
Complaint, J.J. served as a Vice President for SK Foods, and as a
personal assistant for SALYER.  According to J.J., during the
second week of October 2009, well after this investigation became

-54-

overt, and after negotiations between Assistant United States
Attorneys and SALYER's criminal defense attorneys concerning
SALYER's potential culpability, SALYER left the United States in
order to reside permanently in France.  I have reviewed
international travel records for SALYER, and have confirmed that
on October 18, 2009, SALYER flew from San Francisco International
Airport to Auckland, New Zealand aboard an Air New Zealand
flight.  According to J.J., SALYER told J.J. that the next time
he would see J.J. would be in Paris, and that SALYER felt he
could not be extradited back to the United States from France.
According to J.J., SALYER returned briefly to the United States
during the second week of December in order to celebrate his
birthday in the Monterey area.  I have reviewed international
travel records for SALYER, and have confirmed that on December
10, 2009, SALYER traveled from London to San Francisco
International Airport aboard a British Airways flight.  He
subsequently returned to London aboard another British Airways
flight on December 13, 2009.  On December 14, 2009, SALYER flew
from London to Paris.

88.  In response to questioning by investigating agents,
J.J. indicated that during the fall of 2009, J.J. assisted SALYER
in attempting to obtain a residence in Paris, France, where
SALYER intended to reside permanently.  I have reviewed a
contract which purports to be from a company entitled Paris Real
Estate Finders, which describes an agreement whereby the company

-55-

would attempt to locate an apartment in Paris for SALYER. J.J. signed the agreement with Paris Real Estate Finders on behalf of SALYER. Additionally, according to J.J., in October of 2009, SALYER contacted J.J. and requested that J.J. send SALYER medications to him in France. SALYER provided J.J. with a mailing address for him in the city of Paris.

89. According to J.J., before SALYER left the United States for Europe in October 2009, SALYER instructed J.J. to sell many of SALYER's personal belongings such as his guns, artwork and other personal effects. SALYER also instructed J.J. to distribute other such items to SALYER's friends and relatives. According to J.J., SALYER's former primary residence in Pebble Beach, California is vacant and has been largely emptied of SALYER's personal belongings. A public database search has confirmed that SALYER's residence is currently for sale for approximately $7,000,000.

90. In response to questioning by investigating agents, J.J. indicated also that on or about October 19, 2009, SALYER instructed J.J. to wire approximately 30,000 euros to an entity entitled Pushon, Ltd., which purports to be a London-based company specializing in assisting foreigners obtain residency and employment in the European Union. I have reviewed an October 19, 2009 email from SALYER to J.J., in which SALYER instructed J.J. to wire 30,000 euros to Pushon, and to use certain funds located in bank accounts associated with SALYER's former entity, SS

Farms, to satisfy the transfer. I have also reviewed an invoice from Pushon, Ltd. to SS Farms for 50,000 euros. Both documents were provided to the government by J.J. in response to an issued grand jury subpoena.

91. According to J.J., during the fall of 2009, she also engaged in conversations with SALYER during which the two discussed SALYER's attempts to gain permanent resident status in Uruguay, Paraguay, Andora, and France, because these were locations that SALYER felt he couldn't be extradited from. In response to questioning from agents, J.J. recounted another instance during the fall of 2009, during which SALYER spoke with a friend of J.J., who was born in Brazil, as to whether SALYER could be successful in obtaining permanent residence status in Brazil.

92. According to J.J., in aid of SALYER's flight to avoid prosecution, she, along with certain other individuals, assisted SALYER in transferring millions of dollars to banks in foreign countries. Specifically, J.J. has indicated that SALYER instructed J.J. to move millions of dollars in assets from accounts that were originally associated with various SK Foods entities involved in the tomato processing business, and which were located at Bank of the West and Wells Fargo Bank, to other accounts located at Mechanics Bank in San Francisco. According to J.J., SALYER then instructed certain personal accountants and individuals at Mechanics Bank to transfer the funds at Mechanics

-57-

Bank to financial institutions in the West Indies and in
Liechtenstein. I have reviewed email correspondence, provided to
the government by J.J., from a bank employee at Mechanics Bank to
SALYER and J.J., which references two bank accounts that have
been established for SALYER in Liechtenstein and Charlestown,
West Indies, respectively.

## V.  CONCLUSION

Based on the foregoing, there is probable cause to believe
that defendant FREDERICK SCOTT SALYER, in the Eastern District of
California and elsewhere, has violated Title 18, United States
Code, Sections 1341, 1343, and 2, as is set forth more fully at
Section II, paragraph 6 of this affidavit.  Accordingly, I
request that a warrant be issued for the arrest of FREDERICK
SCOTT SALYER for committing these offenses.

## VI.  SEALING REQUEST

The criminal investigation regarding FREDERICK SCOTT SALYER
and others is continuing.  A number of additional interviews,
subpoenas, and possibly grand jury testimony, searches and
arrests are contemplated in the very near future.  Furthermore,
and as is set forth more fully above, the evidence obtained by
the government to date suggests that SALYER has fled the United
States in anticipation of criminal charges being brought against
him by the United States Attorney's Office.  Disclosure of the
contents of this affidavit at this time would seriously impede
the continuing investigation and prosecution by disclosing the

-58-

details of the government's investigation, which potentially
could cause SALYER or others to flee or to abscond to a different
location.  Disclosing the details of the government's
investigation could also potentially cause others to destroy
evidence, or intimidate and attempt to corruptly influence
potential witnesses in the case.  Such activity would seriously
impede the investigation and prosecution.  Accordingly, it is
respectfully requested that the Court issue an order sealing this
affidavit and the associated Criminal Complaint until further
order of this Court.

The information set forth above in this affidavit is true
and correct to the best of my knowledge:

Paul S. Artley
Special Agent
Federal Bureau of Investigation

Reviewed and approved as to form:

Sean C. Flynn
Assistant United States Attorney

Subscribed and sworn to before
me in Sacramento, California this
5th Day of January, 2009.

Honorable Dale A. Drozd
U.S. Magistrate Judge

-59-