BENJAMIN B. WAGNER
United States Attorney
SEAN C. FLYNN
Assistant U.S. Attorney
501 "I" Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2771


IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| UNITED STATES OF AMERICA, | CR. No. S-10-0061-GEB |
| Plaintiff, | **GOVERNMENT'S MOTION SEEKING DEFENDANT FREDERICK SCOTT SALYER'S PRETRIAL DETENTION** |
| v. | |
| FREDERICK SCOTT SALYER, | Date: February 26, 2010 |
| Defendant. | Time: 2:00 p.m. |
| | Hon. Edmund F. Brennan |

## I.   Introduction

Defendant Frederick Scott Salyer (hereinafter, "Salyer") is scheduled to make his first appearance in the Eastern District of California on Friday, February 26, 2010, having been charged in a seven-count, fifty-four page indictment with violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) and obstruction of justice, among other charges.  The allegations stem from Salyer's role as the owner and Chief Executive Officer of SK Foods, L.P., formerly a multi-million dollar grower, processor and distributor of processed tomato products and other foods products for sale both nationwide and internationally.[1]  As is alleged in the

---

[1]SK Foods declared Chapter 11 bankruptcy in May of 2009, and the assets of the limited partnership were purchased out of bankruptcy by the Singapore-based Olam International.  Another

Indictment, over the course of at least the last ten years Salyer personally orchestrated a variety of wide ranging schemes whereby SK Foods regularly paid bribes to the purchasing managers of many of its corporate customers in return for their securing fraudulently elevated contract prices, among other things.  Salyer also knowingly placed millions of pounds of mold-laden tomato product onto American dinner tables.  He routinely ordered the misbranding, sale and shipment of processed tomato products that did not meet customer's contractual specifications and were adulterated and unsaleable domestically because they contained mold count levels that were significantly in excess of thresholds established by the United States Foods and Drug Administration.[2]

Salyer, himself a licensed jet pilot, was arrested at John F. Kennedy Airport in New York City on February 4, 2010, pursuant to a twenty-count Criminal Complaint authorized by the Honorable Dale A. Drozd.  Salyer was taken into custody by FBI agents after he had stepped off a Swiss Air flight from Zurich, Switzerland, and after he had cleared U.S. Customs.[3]  Salyer intended to be in the United

---

Salyer entity, Salyer American Fresh Foods, also declared bankruptcy in May of 2009, and ceased operations at that time because the company's lenders refused to advance it any additional funding.

[2]The government has been careful in maintaining throughout its investigation that the mold contained in SK Foods' tomato product did not constitute a health threat.

[3]At the time of his arrest, Salyer was carrying close to $12,000 in cash on his person.  He failed to notify United States Customs and Border Protection Officials that he had more than $10,000 in his possession when he completed his Customs Declaration form at the airport.  See Exhibit A, attached hereto.

States for all of twenty-six hours, having booked a return flight to Zurich scheduled to leave JFK on February 5, 2010, at 6:10 p.m. EST.

Salyer's arrest in New York ended a six-month odyssey during which Salyer relocated to France, attempted to gain residency in countries such as Andorra, Paraguay, Uruguay, Brazil, and Australia, and moved millions of dollars to offshore accounts in Liechtenstein, Switzerland and the West Indies.  That money remains overseas. Salyer made his initial appearance before the Honorable Magistrate Judge Steven Gold on February 5, 2010, in Brooklyn, New York, and was denied bail.  In ordering that Salyer be remanded for his transport to Sacramento, Judge Gold stated:

> I have been doing this for a bit of time.  This is one of
> the most elaborate schemes to flee that I have come
> across, and I do not think there are any reasonable
> conditions, given the amount of wealth involved and the
> amount of planning to flee involved, that would reasonably
> assure the continued appearance of the defendant.

Criminal cause for arraignment, Tr., at 13-14 (Feb. 5, 2010) (attached hereto at Exhibit B).

Based on the totality of the information obtained by the United States concerning Salyer's efforts to leave this country, Judge Gold couldn't have been more correct.  The voluminous and detailed documentation appended to this submission clearly establishes, by a preponderance of the evidence, that there are no conditions or combination of conditions that can reasonably assure Salyer's future appearances in this Court.[4]  This is not a situation where a

_____

[4]The United States is not currently seeking Salyer's detention based on dangerousness grounds.

defendant poses a mere risk of future flight.  Salyer had already

laid a careful plan to abscond, and put that scheme into action.

Given these circumstances, detention is manifestly warranted.

## II.  Argument

The issue to be litigated during Salyer's looming pretrial

detention proceeding is whether any "condition or combination of

conditions will reasonably assure the appearance of [the defendant]

as required."  18 U.S.C. § 3142(e).  The burden of proof, by a

preponderance of the evidence, lies with the United States.  <u>See</u>

<u>United States v. Motamedi</u>, 767 F.2d 1403 (9th Cir. 1985).[5]

This court's consideration of whether release conditions can be

fashioned is guided by the factors set forth in 18 U.S.C. § 3142(g),

including (1) the nature and circumstances of the offense charged,

(2) the weight of the evidence against the person and (3) the

history and characteristics of the person.  <u>See</u> 18 U.S.C. § 3142(g).

The history and characteristics of the person to be evaluated

include, <u>inter alia</u>, the person's family ties, employment, financial

resources, community ties, past conduct and criminal history.  <u>See</u>

<u>id</u>.

---

[5]The "rules concerning admissibility of evidence in criminal
trials do not apply to the presentation and consideration of
information" at the detention hearing.  18 U.S.C. § 3142(g).
Accordingly, the government intends to proceed at the detention
hearing by way of proffer, as is its right.  <u>See</u> <u>United States v.</u>
<u>Winsor</u>, 785 F.2d 755, 756 (9th Cir. 1986) ("the government may
proceed in a detention hearing by proffer or hearsay"); <u>United</u>
<u>States v. Cabrera-Ortigoza</u>, 196 F.R.D. 571, 574 (S.D. Cal. 2000)
("The circuit courts that have interpreted 18 U.S.C. § 3142(f) have
uniformly made it clear that the government may proceed by proffer
at a detention hearing under the Bail Reform Act of 1984.").

-4-

Pretrial detention is intended to be ordered with respect to defendants in situations where a Court can not be reasonably assured that the defendant will make his next court appearance in the pending criminal matter. This is just such a situation. Indeed, application of the § 3142(g) factors to the instant action clearly militates in favor of Salyer remaining in custody pending his trial before Judge Karlton on racketeering, obstruction, and other charges.

**A.   The Offenses Charged and the Weight of the Evidence**

   **1.   The Nature of the Charges Against The Defendant**

The Indictment in this matter alleges that SK Foods, L.P. constituted a "racketeering enterprise," an organization that Salyer directed, and other SK Foods leaders, employees and associates helped to further through a variety of illicit activities, including mail fraud, wire fraud and bribery. See generally Indictment. Specifically, Salyer is alleged to have ordered the payment of hundreds of thousands of dollars in bribes to the purchasing managers of certain of SK Foods' corporate customers, such as Kraft Foods, Inc., Frito-Lay, Inc., Safeway, Inc. and B&G Foods, Inc. These payments were designed to: (1) ensure that those customers purchased processed tomato products, such as bulk tomato paste and diced tomatoes, from SK Foods rather than from certain of its competitors; (2) ensure that those customers paid an inflated price for such products; (3) induce the customers' purchasing agents to disclose bidding and other proprietary information of certain of SK Foods' competitors; and (4) ensure that SK Foods could control

-5-

certain customer purchasing agent's decisions as to when to accept and to not accept product from SK Foods.  See Indictment, at pgs. 10-11.

The Indictment also alleges that Salyer systematically directed the falsification of the various grading factors and data contained on Certificates of Analysis and other quality control documents that accompanied customer bound shipments of processed tomato products that were produced, purchased and sold by SK Foods.  See Indictment at pgs. 11-12.  At Salyer's direction, and over the course of a number of years, SK Foods falsified the documentation accompanying millions of pounds of tomato paste and diced tomatoes destined for customers.  Mold count levels were falsified.  The dates of production for particular lots of tomato paste were altered so that the paste appeared fresh, when in fact it was older than what the customer had contracted for.  In other instances tomato product was tendered as "organic" when it was not, in violation of regulations promulgated by the National Organic Program (Section 6517 of the Federal Organic Foods Production Act of 1990 (7 U.S.C. § 6501 et seq.)).  At bottom, Salyer directed this scheme in order to deceive his customers into believing that the processed tomato products that they were receiving from SK Foods were in compliance with contractual specifications, and with the law, when in fact they were not.

Salyer is also charged with obstructing justice by ordering the alteration and falsification of certain SK Foods' corporate records after the government's investigation of the company became known.

-6-

See Indictment, at pgs. 49-50.  Specifically, the Indictment alleges that two weeks after former SK Foods sales broker and Director Randall Lee Rahal pleaded guilty to racketeering, money laundering, and antitrust charges in December 2008, Salyer ordered certain individuals to alter the minutes of a company Board of Director's meeting to eliminate any reference to Rahal as a director of SK Foods.

The bribery and food misbranding schemes directed by Salyer have caused losses to victim companies in amounts exceeding ten million dollars.  A portion of this sum resulted from fraudulently elevated tomato prices, which were ultimately passed on to the American consumer.  Should he ultimately be convicted at trial of either the RICO or RICO Conspiracy counts contained in the Indictment, Salyer's likely advisory Sentencing Guidelines range is 262-327 months.

### 2.   The Weight of the Evidence Against Salyer

The evidence demonstrating Salyer's culpability for the crimes for which he has been indicted is substantial.  As is detailed in the affidavit in support of the original criminal complaint against Salyer, the investigation into the defendant and SK Foods began in 2005.  See generally Affidavit of Special Agent Paul S. Artley in Support of Arrest Warrant and Criminal Complaint, attached hereto as Exhibit C (hereinafter, "Artley Affidavit").  Since that time, the United States has compiled a considerable volume of direct evidence against Salyer, from a wide variety of sources.

As an initial matter, pursuant to judicially authorized

wiretaps, the United States intercepted approximately 190 hours of wire communications over the business and cellular telephones of SK Foods' sales broker and Director Randall Lee Rahal over four 30-day periods in 2007 and 2008.  As is detailed at length in the Artley Affidavit, Salyer was recorded in numerous conversations with Rahal during which the two explicitly discussed the various crimes now alleged in the Indictment.  See Artley Affidavit at ¶¶ 32, 53, 55, 57, 65, 79.  Additionally, during the course of its investigation the government obtained hours of audio recordings of certain SK Foods executive meetings by way of a body wire that was worn by a cooperating witness.  That individual also served as a Vice President of the company.  Certain of those recordings contain various incriminating discussions to which Salyer was a party.

The government also executed judicially authorized search warrants at SK Foods and Intramark's facilities in the Eastern and Northern District of California, and the District of New Jersey on April 16, 2008.  Hundreds of thousands of paper and electronic documents were seized from those facilities, and those documents, including many of Salyer's personal email communications, form the basis for some of the charges contained in the instant Indictment.  Other documents were obtained from various third parties by way of grand jury subpoenas.

Federal agents have also interviewed scores of cooperating witnesses and former employees of SK Foods over the past two years.  Ultimately, the government has obtained no less than ten guilty pleas in this matter to date, including former Vice Presidents and

Directors of SK Foods, and certain employees of SK Foods' customers who accepted the bribes directed by Salyer.   Seven of those individuals are cooperating directly against Salyer in this matter.

**B.    Salyer's Characteristics and His Flight to Avoid Prosecution**

The voluminous witness and documentary evidence obtained by the government indicate that Salyer made plans to flee and actually fled the United States to avoid prosecution.

**1.    Salyer's Initial Preparations to Flee Abroad**

Whether because SK Foods had crumbled into bankruptcy, or because Salyer had viewed the detailed and publicly filed plea agreements of his former lieutenants and subordinates, during the summer of 2009 Salyer began making plans to not be in North America when charges were ultimately filed against him.   With the help of a former Vice President of SK Foods, who also served as a personal assistant for Salyer,[6] during 2009 Salyer began moving millions of dollars associated with various SK Foods entities to banks in Switzerland, Liechtenstein, and the Carribean.   J.J. has indicated to the government that she discussed with Salyer his attempts to obtain permanent residency in countries such as France, Andorra, Paraguay, Uruguay and Brazil, because Salyer believed he could not be extradited to the United States from these countries.   See Artley Affidavit, at ¶ 91.   According to J.J., just before Salyer left the United States for good in October 2009, Salyer told J.J. that the

---

[6]The Artley Affidavit refers to this particular former assistant by the initials "J.J."   See Artley Affidavit, at ¶¶ 87-92, attached hereto as Exhibit C.

-9-

next time he would see her "would be in Paris."[7]  Artley Affidavit,
at ¶ 87.

During the second week of October 2009, well after the
government's investigation became overt, and after negotiations
between Assistant United States Attorneys and Salyer's criminal
defense attorneys concerning Salyer's potential culpability, Salyer
left the United States to reside permanently in France.  Before
Salyer left the United States for Europe, he instructed J.J. to sell
many of his personal belongings such as his guns, artwork, and other
personal effects.  See Artley Affidavit, at ¶ 89.  Salyer also
instructed J.J. to distribute other such items to Salyer's friends
and relatives.  See id.  At one point, Salyer's former primary
residence in Pebble Beach, California was vacant and had been
largely emptied of his personal belongings.  See id.  A public
database search also revealed that as of January 5, 2010, Salyer's
residence was listed for sale for approximately $7,000,000.  See id.
Attached hereto as Exhibit E is a copy of a Coldwell Banker listing
sheet, indicating that Salyer was attempting to sell his home for
$6,995,000.  A call placed to the listing agent on February 23,
2010, indicates that the home is still available for sale.

The information provided to the government by J.J. is
independently corroborated by the content of Salyer's personal email

---

[7]Bank account statements associated with Salyer's former entity
SS Farms indicate that just before he left the United States for
good in October 2009, Salyer purchased "Rosetta Stone," a product
that is billed as the world's number one language learning software.
The relevant portion of the Mechanic's Bank account statement is
attached hereto as Exhibit D.

communications and numerous other documents, which have been
obtained by the government during the course of its investigation.
Some of these documents were provided by J.J., and others were
obtained as a result of public database searches and the execution
of a judicially authorized search warrant on Salyer's personal
Google email account.

### 2.   Salyer's Preparation to Relocate to France, and Relocation to France

Regardless of Salyer's self serving claims concerning his
devotion as a father or his longstanding residency in California,
the simple fact remains that for the past five months Salyer has
been living in France.  As early as September 2009, Salyer began
looking for a "long term lease" for a "vacation villa" or other
residence in France.  In one particular string of emails between
September 18 and 22, 2009, Salyer inquired with an individual
concerning leasing a villa in Nice, France, for up to one year.
Ultimately, Salyer instructed J.J. to transfer 500 euros to the
individual in order to secure the residence.[8]  Subsequently, on
October 19, 2009, J.J. executed a contract on behalf of Salyer with
a company entitled "Paris Real Estate Finders."  A copy of that
document is attached hereto as <u>Exhibit G</u>.  The document describes an
agreement whereby the company would attempt to assist Salyer in
purchasing an apartment in Paris, France.[9]

---

[8]A copy of Salyer's email correspondence with the prospective
landlord, and with J.J., as well as the 500 euro Western Union
transfer receipt are attached hereto as <u>Exhibit F</u>.

[9]Additionally, according to J.J., in October of 2009, Salyer
contacted J.J. and requested that J.J. send Salyer certain

-11-

Salyer was apparently assisted in his transition from life as an American to life as a European by a company called Pushon, Ltd., which purports to be a London-based entity specializing, in part, in assisting foreigners in obtaining residency and employment in the European Union.  On October 19, 2009, Salyer instructed J.J. to wire approximately 30,000 euros to the company, and to use certain funds located in bank accounts associated with Salyer's former entity, SS Farms, to satisfy the transfer.  Attached hereto as <u>Exhibit</u> <u>H</u> are copies of Salyer's email communications with a "manager" of Pushon, as well as a 50,000 euro invoice from the company and Salyer's payment instructions to J.J.[10]

Although Salyer appears to have resided in Paris for a period of time during the summer and fall of 2009, ultimately it appears Salyer settled in the area around Nice, in the South of France. Attached hereto as <u>Exhibit</u> <u>L</u> is a copy of Salyer's January 18, 2010

---

medications to him in France.  Salyer provided J.J. with a mailing address for him in the city of Paris.  <u>See</u> Artley Affidavit, ¶ 88, attached hereto as <u>Exhibit</u> <u>C</u>.

[10]In another email, dated November 20, 2009, Salyer asks J.J. for a copy of his birth certificate, explaining that he had previously had J.J. send a copy of it to "Pushon."  A copy of that email correspondence is attached hereto as <u>Exhibit</u> <u>I</u>.

It should be noted that during the time J.J. was interfacing with international organizations at Salyer's behest, she had been warned by Salyer to only contact him on his "gmail" account.  In response to questioning, J.J. indicated that in conversations Salyer stated that he felt having a "gmail" account was more secure, and that the government would be unable to read or intercept communications that were sent to or from such an email account.  In one email, which is attached hereto as <u>Exhibit</u> <u>J</u>, Salyer instructed J.J. that "anything to do with me, use gmail."  In another email, attached hereto as <u>Exhibit</u> <u>K</u>, Salyer instructed J.J. to stop using a different email address for him and to use his gmail account.

post to an internet blog entitled "Franco Flyers," which appears to be a location where French flying enthusiasts can post aviation-related questions.  In that document Salyer explicitly states:  "I'm recently relocating to Nice/Cannes area."[11]  He then goes on to mention that he is interested in joining local flying clubs and making "aviation friends."[12]

### 3.   Salyer's Investigation of Relocation to Other Countries From Which He Believed He Could Not Be Extradited

Although Salyer may have chosen France for his long term plans, evidence obtained by the government during the course of its investigation demonstrates that throughout the summer and fall of 2009, Salyer was considering a variety of different international locations in which to establish his permanent residence.  Salyer indicated to J.J. that he felt he could not be extradited from almost all of these locations.

---

[11]The contents of Salyer's personal diary, which were obtained by FBI agents at the time of Salyer's arrest, indicate also that Salyer was recently looking to purchase a three bedroom apartment in the Nice area for approximately $1,800,000.  Salyer's notations indicate that he intended to offer the unknown buyer approximately $1.4 million for the property.  A copy of the relevant portions of Salyer's diary are attached hereto as Exhibit M.

[12]As previously mentioned, an interesting twist to this detention matter is presented by the fact that Salyer is a jet pilot.  Indeed, Salyer is licensed to fly, among other aircrafts, the Hawker 800 and 900 series of business jets.  See Exhibit L.  The Hawker 900XP has a range of approximately 2,800 nautical miles, and a maximum ceiling of 41,000 feet.  See Exhibit N, attached hereto. Indeed, Salyer frequently flew many of his associates and business colleagues to various worldwide locations in one of SK Foods' two private jets.  Also attached to this submission is a copy of Salyer's Flight Safety, Professional Pilot, Proficiency Card, and other aviation documents, which were contained in Salyer's wallet at the time of his arrest.  See Exhibit O, attached hereto.

### a.   Australia

In addition to SK Foods and its related entities, until recently, Salyer maintained an ownership interest in the Cedenco Company – another food products conglomerate based in New Zealand and Australia.  Indeed, Salyer traveled frequently to those two countries during the past few years to attend to various aspects of that business.  Although Salyer may have been a frequent visitor to Australia during that period, during the summer of 2009, Salyer began laying the groundwork to become a resident of that country.  A search warrant executed on Salyer's email account has revealed that in June 2009, Salyer engaged in various email communications with J.J. and with two executives of Cedenco, during which the four discussed Salyer's attempts to obtain a Visa in Australia.  One particular chain of emails dated June 16, 2009, is attached hereto as Exhibit P.  In those emails, one executive of Cedenco expressed his satisfaction that "the wheels turned quickly . . . [regarding Salyer's] wishes to come and live in the Southern hemisphere."  The reference was to the fact that Salyer's Visa for Australia had been approved, in part because Cedenco had put Salyer on the company's Australia payroll.  The Cedenco executive expressed concern, however, that Salyer's intentions "to move to Australia" should not be made public until after Cedenco had obtained various financing agreements from its lenders.[13]  Salyer responded to the Cedenco

---

[13]The Cedenco executive went on to state: "[t]o surprise [the banks] now in my opinion would not be good and could well be catastrophic!"  Exhibit P.  It is believed that this statement meant that Cedenco's lenders did not want Salyer involved in any way with the company's operations because it could jeopardize the company's

-14-

executive that mid or late July would work for his trip to Australia and that he was "ready to get out of here."  See Exhibit P, attached hereto.

### b.   Andorra

The United States has various forms of extradition treaties with over 110 countries.  See Exhibit Q, attached hereto.  The 181 square mile principality of Andorra in the Pyrenees mountains between France and Spain is not one of them.  The government ventures to guess that when questioned, most people would not know that Andorra was even a country, much less where it was.  All this said, Salyer expressed great interest in relocation to Andorra for one reason, which the government believes is self-evident.

During the fall of 2009, Salyer had discussions with J.J. concerning his efforts to gain permanent resident status in Andorra. See Artley Affidavit, at ¶ 91.  And J.J.'s statements to the government are corroborated by numerous documents obtained during the course of the government's investigation.  For example, between September 22 and 23, 2009, Salyer corresponded with an individual at "Tribune Properties" named R.M. about obtaining residency in Andorra.  Copies of the relevant emails are attached hereto at Exhibit R.  In one email from that series Salyer asks R.M. "[h]ow long [it takes to] get residency in Andorra."  Salyer goes on to state that he is "interested in [Andorra]."  In responding to Salyer's inquiries, R.M. indicated that "we can do residency for you in 45 days," and that Tribune Properties "would also introduce

financing.

[Salyer] to banks in the principality."

In a previous email between the two dated September 16, 2009, R.M. thanked Salyer for visiting Tribune Properties' "property internet site," and provided Salyer with detailed requirements for obtaining residency in Andorra, as well as a list of the "current properties for sale." A copy of this email exchange and the appended documentation is attached hereto as <u>Exhibit S</u>.

Indeed, it appears as if Salyer had been seriously considering purchasing a home in Andorra for a period of time. As previously mentioned, upon his arrest in this matter, Salyer's personal diary was obtained by the government. That diary references Andorra, in one fashion or another, seven separate times. Attached hereto as <u>Exhibit T</u> are copies of the relevant pages from Salyer's book. On one such page, Salyer has written notes concerning the purchase of a home in La Massana, which is one of Andorra's seven parishes, located in the northwest of the country. <u>See id</u>. According to the notations, Salyer was at least considering sending 10% of the purchase price for a home valued at either 475,000 dollars or euros to someone named Xavier. <u>See id</u>. Other notations by Salyer reference a "plane" and "hotel" next to the word Andorra. <u>See id</u>. Indeed, Salyer admits in his moving papers before this Court, that at the time of his arrest he was in the process of "<u>purchasing a residence</u>" in Andorra, and attempting to purchase an interest in a business there. Furthermore, contained within Salyer's wallet at the time of his arrest was a credit card issued by "Credit Andorra." A copy of that credit card is attached hereto as <u>Exhibit U</u>.

c.   __Uruguay, Paraguay, and Brazil__

In response to questioning by government agents, J.J. has also indicated that J.J. also discussed with Salyer his attempts to gain residency in Paraguay, Uruguay, and Brazil, because he believed those were also countries Salyer felt he could not be extradited from.   See Artley Affidavit, at ¶ 91.   J.J. recounted one instance during the fall of 2009, during which Salyer spoke with a friend of J.J., who was born in Brazil, as to whether Salyer could be successful in obtaining permanent residence status in Brazil.   See Artley Affidavit, at ¶ 91.   It bears note that the contents of Salyer's personal diary also contained the addresses and telephone numbers for the Brazilian and Paraguayan embassies in France. Copies of those notations are attached hereto at Exhibit V.

**4.   Salyer's Movement of Millions of Dollars to Banks in Liechtenstein, the West Indies and Switzerland, Among Other Locations**

Having spent considerable effort to locate a suitable living situation in the European Union, Salyer now has the financial wherewithal to remain there indefinitely, having moved millions of dollars associated with former SK Foods entities involved in the tomato processing business, and which were located at the Bank of the West and Wells Fargo Bank, to banks outside the United States.[14]

---

[14]At Salyer's initial appearance in Brooklyn, New York, on February 5th, counsel for the defendant claimed that the sole reason Salyer had been in Europe for the previous five months was that he was "looking for work."   Criminal cause for arraignment, Tr., at 10 (Feb. 5, 2010) (attached hereto as Exhibit B).   Even crediting defendant's questionable claim that he could not find work anywhere in the United States because of the publicity surrounding this case, the fact remains that Salyer maintains significant wealth that has now been transferred elsewhere.

In response to questioning, J.J. has admitted that she and other individuals assisted Salyer in the movement of that money.  See Artley Affidavit, at ¶ 92.  J.J.'s statements are independently corroborated by the content of various documents obtained by the government in the course of its investigation.  Indeed, Salyer routinely used his personal gmail account to help facilitate the transfer of money outside the country.

According to J.J., Salyer sent her an email, on or about September 17, 2009 instructing her to close the bank accounts of all SK Foods entities located at Bank of the West and to move those funds to a single account located at Mechanic's Bank in San Francisco.  In the course of its investigation, the government has obtained certain "wire transfer requests," all of which are signed by J.J. and dated September 17, 2009.  The wire transfer requests denote transfers from accounts in the names of SK PM Corp., SK Foods, LLC, SARS, LLC, CSSS LP, Central Valley Shippers, SS Farms LLC, SSC Farming, SSC Farming LLC, SSC Farms I LLC, SSC Farms II, LLC, and SSC Farms III Inc. totaling approximately $217,269.95.  All of the funds were deposited into Mechanic's Bank account number XXXXX4126, in the name of SSC Farms II, LLC.  Copies of those wire transfer requests are attached hereto at <u>Exhibit W</u>.  An earlier email, dated April 16, 2009, indicates that at least $1,500,000 was moved from Bank of the West accounts in the name of SS Farms to the SS Farms II account at Mechanic's Bank.  A copy of that April 16, 2009 email is attached hereto as <u>Exhibit X</u>.

Salyer also instructed certain personal accountants and other

individuals to transfer the funds at Mechanic's Bank to financial institutions in the West Indies, Liechtenstein, and Switzerland. Salyer also ordered that approximately $812,000 be wired from Mechanic's Bank to his then-girlfriend in Australia.  Copies of those wire transfers are attached hereto as <u>Exhibit JJ</u>.  It appears Salyer's relationship with certain bankers in Switzerland was initiated by one of Salyer's personal accountants in San Francisco. Attached hereto as <u>Exhibit Y</u> is a copy of email correspondence between a banker in Zurich and Salyer's personal accountant, in which the two discuss setting up certain "business relationships." The email was ultimately forwarded by the accountant to Salyer.  In subsequent email communications between Salyer and his accountant, dated July 11, 2009, the two discuss meeting with a banker at Valartis Bank in Zurich on Thursday, July 17, 2009.  Notably, the accountant mentions to Salyer that he had not "disclosed to Valartis any of the US legal activities" and that "face time with Swiss bankers settles their nerves."  A copy of the July 11, 2009 email is attached hereto as <u>Exhibit Z</u>.[15]

Additional communications between Salyer and his accountant indicate that the two again met in Europe in September 2009 in order to meet with a different individual at VT Wealth Management AG in

_____

[15]Additional email communications between Salyer and his accountant further discuss the July 17, 2009 meeting in Zurich.  One such email dated July 15, 2009, also evidences the fact that Salyer's accountant had also set up a "secondary bank contact" at Volksbank in Switzerland.  A copy of this email is attached hereto as <u>Exhibit AA</u>.

Zurich.[16]   In one such email chain between September 8 and 11, 2009, Salyer's accountant tells the individual that he will "be wiring the balance of the funds into the SS account [the next day]" and that "Scott would like to meet the banker [the following week]."  The individual at the wealth management company responded that she would be "watching out for the funds."  Copies of these emails are attached hereto at Exhibit BB.  Later in an email dated on or about September 14, 2009, an associate of Salyer's accountant contacted the individual at the Zurich Wealth Management company to let them know that "additional funds [would be] arriving that day."  A copy of this email is attached hereto at Exhibit CC.

Ultimately, the government has obtained various email communications during the course of its investigation, which indicate that large sums of money were, indeed, wired from Mechanic's Bank to various financial institutions in Europe.  As an initial matter, the government was provided with documentation, dated October 26, 2009, which references two bank accounts that have been established for Salyer in Liechtenstein and Charlestown, West Indies.  A copy of that documentation is attached hereto as Exhibit DD.  The bank in Liechtenstein is entitled Volksbank AG, while the

---

[16]Between June of 2009 and September of 2009, five wires totaling approximately $2,100,000 were transferred from three different accounts at Mechanic's Bank to Salyer's personal accountant in San Francisco.  Additionally, during August of 2009 two government refund checks in the name of Frederick Scott Salyer, totaling approximately $3,200,000 were endorsed by Salyer and deposited into his personal accountant's bank account.  Copies of those wire transmittals, check and deposit slips are attached hereto at Exhibit KK.

bank in the West Indies in entitled Fast Falcon, LLC.[17]

Additionally, documentation obtained by the government in the course of its investigation indicates that additional monies were moved to a least one bank in Zurich. One such document is an email dated July 7, 2009 between J.J. and a personal accountant working for Salyer. The email inquires as to whether "dollars were rec'd in Switzerland." A copy of the email is attached hereto as Exhibit GG. In subsequent emails dated September 11 and 12, 2009 an employee at Mechanic's Bank and Salyer's accountant discuss how Mechanic's Bank was having problems sending wire transfers to Europe, but that ultimately they intended to send a "2+ Million" dollar wire once Mechanic's Bank was able to obtain the correct "ABA number." In a later email in the chain, dated September 12th, Salyer expresses his displeasure with the fact that money had not yet been sent to Europe. Copies of these emails are attached hereto at Exhibit HH. Ultimately however, Mechanic's Bank was successful in getting funds out of the country for Salyer. See Exhibit II, attached hereto. During the course of its investigation the government has also obtained information that demonstrates that Salyer's personal accountant was successful in sending approximately $3,750,000.00 to banks established for Salyer in Liechtenstein and the West Indies.

---

[17]The government fully expects Salyer to claim at his bail hearing that the totality of the funds he sent overseas were for one or both of his two daughters. Indeed, counsel for the defendant stated as much in a Sacramento Bee article published on February 5, 2010. A copy of that article is attached hereto as Exhibit EE. Of course, some of the handwritten notations contained in Salyer personal diary indicate that he intended to have the "Fast Falcon $" distributed at some point to him. A copy of those notations are attached hereto at Exhibit FF.

-21-

Copies of the relevant wire transfer documents are attached hereto at <u>Exhibit LL</u>.

   **C.   Salyer Has Already Demonstrated a Clear Intent to Flee the United States.   There Are No Reasonable Conditions Which Would Assure His Future Appearances in This Matter.**

Before his arrest in New York, Salyer had been gone from the United States for almost five months. He has moved considerable assets overseas. He has sought or discussed seeking residency in a least five different countries, one of which does not have an extradition treaty with the United States. He had put his house in Pebble Beach, California up for sale. His former company has dissolved into bankruptcy and he currently has no known employment in this country. The evidence against Salyer on the underlying racketeering charges is substantial and if convicted he could likely be sentenced to twenty years in prison. The government respectfully submits that it has met the preponderance of the evidence standard here, and that this Court would undoubtedly be on solid ground should it chose to detain this defendant pending trial. See, e.g., <u>United States v. Jamal</u>, 326 F. Supp. 2d 1006 (D. Ariz. 2003) (Finding that pretrial detention was warranted where defendant had been charged with being the leader of a large interstate conspiracy involving theft and money laundering, had relatively few assets in United States and more substantial assets overseas, had made plans and preparations to move overseas, had declared his willingness to abandon assets in United States and flee overseas when faced with prosecution, where the United States had no extradition treaty or agreement with destination country, and where defendant faced

considerable prison time if convicted).

## III. Conclusion

The Magistrate Judge presiding over Salyer's initial appearance in New York determined that Salyer's efforts to flee the United States to avoid prosecution constituted one of the most elaborate schemes he had come across during his time on the bench.  Given the volume of evidence obtained by the government in this matter concerning that flight, it is not difficult to see how the judge came to that conclusion.  For the foregoing reasons, the United States respectfully requests that defendant Frederick Scott Salyer be detained until the date of his trial in this matter.

Dated: February 25, 2010                   Respectfully submitted,
                                           BENJAMIN B. WAGNER
                                           U.S. ATTORNEY

                                       by: /s/ Sean C. Flynn
                                           SEAN C. FLYNN
                                           Assistant U.S. Attorney

# EXHIBIT A

U.S. Customs and
Border Protection

## Customs Declaration

19 CFR 122.27, 148.12, 148.13, 148.110, 148.111, 1498; 31 CFR 5316

Each arriving traveler or responsible family member must provide the following information (only ONE written declaration per family is required):

**1. Family Name**   SALYER

First (Given)   FREDERICK   Middle   SCOTT

**2. Birth date**   Day ▮▮   Month ▮▮   Year ▮▮

**3. Number of family members traveling with you**   1

**4. (a) U.S. Street Address** (hotel name/destination) ▮▮▮▮▮▮▮▮

(b) City   Pebble Beach   (c) State   Ca

**5. Passport issued by** (country)   USA

**6. Passport number**   ▮▮▮▮▮▮

**7. Country of Residence**   USA

**8. Countries visited on this trip prior to U.S. arrival**   FRANCE, ITALY

**9. Airline/Flight No.** or Vessel Name   LX 014

**10.** The primary purpose of this trip is business:   Yes [X]   No

**11. I am (We are) bringing**

(a) fruits, vegetables, plants, seeds, food, insects:   Yes   No [X]

(b) meats, animals, animal/wildlife products:   Yes   No [X]

(c) disease agents, cell cultures, snails:   Yes   No [X]

(d) soil or have been on a farm/ranch/pasture:   Yes   No [X]

**12.** I have (We have) been in close proximity of (such as touching or handling) livestock:   Yes   No [X]

**13.** I am (We are) carrying currency or monetary instruments over $ 10,000 U.S. or foreign equivalent: (see definition of monetary instruments on reverse)   Yes   No [X]

**14.** I have (We have) commercial merchandise: (articles for sale, samples used for soliciting orders, or goods that are not considered personal effects)   Yes   No [X]

**15. Residents** — the total value of all goods, including commercial merchandise I/we have purchased or acquired abroad, (including gifts for someone else, but not items mailed to the U.S.) and am/are bringing to the U.S. is:   $

**Visitors** — the total value of all articles that will remain in the U.S., including commercial merchandise is:   $

Read the instructions on the back of this form. Space is provided to list all the items you must declare.

I HAVE READ THE IMPORTANT INFORMATION ON THE REVERSE SIDE OF THIS FORM AND HAVE MADE A TRUTHFUL DECLARATION.

X _____   _____
(Signature)   Date (day/month/year)

For Official Use Only

# EXHIBIT B

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

---------------------------X
                           :
UNITED STATES OF AMERICA,  :
                           :    10-MJ-124
        v.                 :
                           :    February 5, 2010
FREDERICK SCOTT SALYER,    :
                           :    Brooklyn, New York
             Defendant.    :
                           :
---------------------------X
```

        TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT
          BEFORE THE HONORABLE STEVEN M. GOLD
             UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:          BENTON J. CAMPBELL, ESQ.
                             UNITED STATES ATTORNEY
                             BY: GINA PARLOVECCHIO, ESQ.
                             ASSISTANT U.S. ATTORNEY
                             271 Cadman Plaza East
                             Brooklyn, New York  11201


For the Defendant:           NOAH SHELANSKI, ESQ.
                             FREDERICK HAFETZ, ESQ.



Audio Operator:


Court Transcriber:           ARIA TRANSCRIPTIONS
                             c/o Elizabeth Barron
                             31 Terrace Drive, 1st Floor
                             Nyack, New York 10960
                             (215) 767-7700


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1           THE CLERK:  Criminal cause for arraignment, United
2   States versus Frederick Scott Salyer, 10-MJ-124.  Counsel,
3   your appearances.
4           MS. PARLOVECCHIO:  Gina Parlovecchio and Una Dean
5   (ph) for the United States.  Good afternoon, your Honor.
6           MR. HAFETZ:  Frederick P. Hafetz, here with my
7   associate, Noah Shelanski, for Mr. Salyer.
8           THE COURT:  Mr. Salyer, do you speak and
9   understand English?
10           THE DEFENDANT:  Yes, your Honor.
11           THE COURT:  Is Special Agent Otley (ph) here?
12           SPECIAL AGENT OTLEY:  Yes.
13           THE COURT:  Do you swear to the truth of your
14   affidavit?
15           SPECIAL AGENT OTLEY:  I do.
16           THE COURT:  Mr. Salyer, now that you're under
17   arrest, it's my responsibility to make certain you
18   understand certain rights you have.  You have the right to
19   remain silent.  You don't have to make any statements or
20   answer any questions.  If you started to do so, you have the
21   right to stop.
22           If you choose to remain silent, no one may use it
23   against you by arguing to a court or a jury that silence is
24   evidence of guilt.  On the other hand, if you make any
25   statement to anyone other than your own attorneys, the

1    prosecution may find out what you've said and attempt to use

2    it against you as evidence.

3            Do you understand me?

4            THE DEFENDANT:  Yes, your Honor.

5            THE COURT:  You have the right to be defended by

6    counsel and to ask the Court to appoint counsel to defend

7    you, if you cannot afford to retain a lawyer privately.  Mr.

8    Hafetz has filed a form with the Court indicating that

9    you've elected to retain him to defend you and you do not

10   seek court appointed counsel.

11           Is that correct?

12           THE DEFENDANT:  That is correct, your Honor.

13           THE COURT:  You have the right to understand what

14   you're being accused of.  The prosecution has prepared a

15   written statement of the charges against you and has

16   provided a copy, I presume, to Mr. Hafetz.

17           Has he reviewed it with you and do you understand

18   what you're accused of?

19           THE DEFENDANT:  I have not seen anything, your

20   Honor.

21           THE COURT:  Alright.  Would you like an

22   opportunity to sit with your lawyer for a few minutes an

23   review the documents accusing you?

24           MR. HAFETZ:  Your Honor, we'll waive (ui).

25           THE COURT:  Well, I want your client to understand

1   what he's accused of. We don't need to read it all to him

2   but at least is he aware of what he's being charged with?

3           MR. HAFETZ: (Ui).

4           THE COURT: Are you?

5           THE DEFENDANT: I understood I was charged with

6   wire fraud. That's all I've seen so far.

7           THE COURT: Alright, well, I'm sure your lawyer

8   will make a copy of the charges available to you and explain

9   them to you in greater detail.

10          Basically, what's occurred is that an agent of the

11  FBI prepared an affidavit, making allegations about your

12  involvement in the distribution of adulterated food

13  products.

14          MS. PARLOVECCHIO: As well as bribery, your Honor.

15          THE COURT: And bribery; presented it to a court

16  in California. That court issued a warrant for the arrest

17  of someone named Frederick Scott Salyer. When you were

18  arrested, Special Agent Otley here prepared an affidavit,

19  stating facts that caused the government to allege that you

20  are the Frederick Scott Salyer for whom the warrant issued

21  in California.

22          Is that clear to you?

23          THE DEFENDANT: Yes.

24          THE COURT: Counsel, are you satisfied your client

25  understands the basics of the charge against him and his

1    fundamental constitutional rights?

2              MR. HAFETZ:  Yes.

3              THE COURT:  Mr. Salyer, because the charge against

4    you comes from a different court in a different part of the

5    country, you have a right to a hearing here in Brooklyn, New

6    York, where the prosecution would be required to prove that

7    there was probable cause to believe that you're the person

8    who's wanted in California before you could make -- anyone

9    could make you go there.

10             If you want such a hearing, I will schedule it.

11   If you want to waive that hearing, you will be permitted to

12   appear in California and contest the accuracy of the

13   charges, but you'll be admitting that you're the person

14   described in the warrant; not that you're guilty of the

15   crime but that they have the right individual.

16             Mr. Hafetz, have you discussed this with your

17   client?

18             MR. HAFETZ:  Yes, your Honor.  We're prepared to

19   execute the waiver of the removal hearing.

20             THE COURT:  Will your client wish a preliminary

21   hearing?

22             MR. HAFETZ:  We're prepared to waive that.

23             THE COURT:  Have you advised him of his -- I'm

24   going to say Rule 20 rights but I'm not sure it still is --

25   his right to seek the permission of the U.S. attorneys in

1   California and New York to enter a plea of guilty here if

2   that's the choice he wishes to pursue.

3           MR. HAFETZ:  We haven't discussed it.  He's not

4   pleading guilty.

5           THE COURT:  Very well.

6           What's the government's position on bail?

7           MS. PARLOVECCHIO:  The government requests that

8   the defendant be remanded to the Eastern District of

9   California in custody because there are no combination of

10  conditions that would assure his reappearance in court.

11          Now, there's ample evidence in this case to show

12  that the defendant poses a significant risk of flight.

13  First, given the nature and circumstances of this case, the

14  defendant is facing a significant amount of jail time based

15  on the loss amount.  In this case, the defendant's guideline

16  range approaches nearly twenty years.

17          As your Honor can see from the complaint, there is

18  a significant amount of evidence showing the defendant's

19  involvement in the charged wire fraud and mail fraud.  As

20  the complaint details, there are not only multiple

21  cooperating witnesses who have already pled guilty to

22  cooperation agreements and are willing to testify, but there

23  are also significant wiretap recordings showing the

24  defendant's involvement in the scheme.

25          Now, as far as the defendant's personal history

1   and characteristics, the defendant has abundant financial
2   resources abroad and in fact, has taken significant steps in
3   attempting to secure residency in foreign countries, which
4   he believes will prevent him from being extradited to the
5   United States on the pending charges.

6           As noted in the complaint attached to the removal
7   complaint from the Eastern District of California,
8   paragraphs 87 through 92, the defendant has sought to locate
9   an apartment in Paris and has instructed a cooperating
10  witness to sell his personal belongings and wire
11  approximately 30,000 euros to a London-based company that
12  specializes in placing individuals in residency and in jobs
13  in the E.U.

14          In fact, the government is in possession of
15  documents from that company, Punchin (ph), an invoice as
16  well as some e-mails from the defendant, directing the
17  cooperating witness to wire money to that company for their
18  services.

19          The cooperating witness was also instructed by the
20  defendant to assist him in moving millions of dollars
21  overseas to accounts in Liechtenstein and the West Indies,
22  and the government is also in possession of email
23  correspondence regarding his directions to do so, and an e-
24  mail from a bank employee at Mechanics Bank that confirms
25  that in fact, he has two bank accounts abroad.

1          Further, the government has e-mails between the
2    defendant, the cooperating witness and his accountant,
3    talking about the movement of the defendant's money into a
4    bank in Switzerland.

5          Further, according to the cooperating witness, the
6    defendant has discussed with her his attempts to gain
7    permanent resident status in Uruguay, Paraguay, Andorra and
8    France, because they're locations from which he believed he
9    would not be able to be extradited.

10         In fact, the government is in possession of an e-
11   mail or several e-mails, actually, from September, 2009,
12   where the defendant e-mails an employee of a company called
13   Tribune Properties, which indicates that he had sought
14   information regarding establishing residency in Andorra,
15   which is a principality in the Pyrenees Mountains.

16         In a later e-mail, an employee from Tribune says
17   that they do have full residency service for a nominal fee
18   of 500 euros.  The defendant subsequently instructed the
19   cooperating witness by e-mail to send his information to
20   Tribune Properties for purposes of establishing residency in
21   Andorra.

22         Now, as noted in the Pretrial Services report, his
23   only employment at this time is based in London.  In fact,
24   his ties to the United States at this point are minimal.  In
25   addition to having the cooperating witness I mentioned give

1   away his belongings, the defendant's residence in Pebble

2   Beach, California has been vacant and has largely been

3   emptied of his personal belongings, and a personal database

4   search has confirmed that his residence is currently for

5   sale for approximately seven million dollars.

6          The defendant has no further business ties to the

7   U.S., as his companies had gone bankrupt and then were

8   bought by another entity.  As far as family ties, he is

9   unmarried.  His girlfriend, who perhaps is now his wife,

10  based on the pretrial report is Australian and does not live

11  in the United States.  Really, his only family ties here are

12  his two adult children.  Apparently, he has even taken steps

13  to ensure that his dog is cared for in the United States, so

14  his ties are quite minimal.

15         One thing that isn't noted in the complaint or in

16  the Pretrial Services report is that the defendant had a

17  flight booked already to go back to Switzerland today, so

18  there's no overt evidence of his intention to stay here over

19  the long term.

20         So for those reasons, we would request a permanent

21  order of detention and that he be remanded in custody.

22         THE COURT:  Thank you.

23         Mr. Hafetz?

24         MR. HAFETZ:  Yes.  Your Honor, Mr. Salyer is 58

25  years old.  He's never been convicted before.  He's a third

1  generation Californian.  All three generations have been in

2  the same --

3          THE COURT:  Sui-May, is that microphone on?

4          Excuse me, Mr. Hafetz.  Now it is.

5      MR. HAFETZ:  Were you able to hear?

6      THE COURT:  I just want it to be on the record, in

7  case we have to revisit this again in the future.

8      MR. HAFETZ:  Okay.  Third generation of a three

9  generation California family.  The family has always been in

10  the agribusiness, agriculture business in California.  They

11  have lived -- he and the family have always lived in the

12  central and northern part of California.  In fact, he was in

13  the agricultural business as well.

14          He has two daughters, one is 20, the other is 28.

15  The 28-year-old daughter is expecting to deliver a child

16  within the next two weeks.  He has lived abroad for several

17  months now, I believe, close to four or five months, while

18  looking for work.  This case received a lot of publicity in

19  California and he was unable to get work there, so he has

20  been searching for employment there, utilizing a search

21  agency.

22          Significantly, he has known about this

23  investigation since 2008.  He retained counsel out in San

24  Francisco, Malcolm Segal, and Mr. Segal has been in

25  discussions with the U.S. attorney's office in San Francisco

1    during the last two years, with respect to the investigation

2    which has resulted in the criminal complaint here.  So it's

3    not as if Mr. Salyer was coming back to the U.S. when

4    apprehended at JFK unaware that there was a serious criminal

5    investigation.

6         He has been back to the U.S. knowing of the

7    investigation three times within the last six months.  He

8    came back in October, visited his daughters in California.

9    He came back at Christmas for ten days, which he spent at

10   the daughter's home in the Carmel area, in California.

11        With regard to the plane flight that the

12   prosecutor just referred to, to go back to Switzerland,

13   that's correct, but he had another flight already booked,

14   which can be established, to come back to the U.S. on

15   February 24th, so that he could be with his daughter upon the

16   delivery of the child.

17        So he clearly has known about the investigation.

18   If he had any intent to flee on a two-year investigation

19   which involves wiretaps, I don't think he would have

20   presented himself at JFK in his own name, walked through the

21   airport and come back three times in the last six months.

22        He disputes all of the allegations with respect to

23   the cooperating informant who was referred by the prosecutor

24   that were made to him -- about him.  At a trial, any of

25   those allegations would be disputed as those of a

1  disgruntled, hostile witness who has great bias against Mr.
2  Salyer.

3       Your Honor, in addition to the other -- to these
4  facts, Mr. Salyer is involved in civil litigation, defending
5  them actively in the United States, and has been during the
6  last year or so.  Again, I believe this bespeaks the fact
7  that he has no interest in pulling out of and not coming
8  back and returning to the U.S.  He is actively defending
9  these cases.

10      So Pretrial Services has recommended release on a
11 substantial collateral, a co-signed bond.  Your Honor, we
12 would ask that a bond be set in the amount -- a personal
13 recognizance bond in the amount of five million dollars,
14 with collateral to be posted by Mr. Salyer in the amount of
15 $500,000 and the signature of a responsible person in the
16 amount of five million dollars.

17              THE COURT:  Thank you.

18              Did you want to add anything?

19              MS. PARLOVECCHIO:  Your Honor, I'd simply like to
20 add that although the defendant may not have fled the United
21 States as soon as he found out about the investigation, it
22 took some time.  Given the more recent evidence of his
23 intent to establish residency abroad, especially in places
24 where extradition would be avoided, which are corroborated
25 by documentation, I think weighs heavily in favor of finding

1   that the defendant is a significant risk of flight.

2           And especially given his enormous financial

3   resources -- we have evidence that he's moved at least ten

4   million dollars overseas at this point.  I don't think a

5   five-million-dollar bond is significant to ensure his

6   reappearance.

7           THE COURT:  You've spoken about documentary

8   corroboration.

9           MS. PARLOVECCHIO:  Yes, your Honor.

10           THE COURT:  When can those documents be provided

11   to the defendant?

12           MS. PARLOVECCHIO:  We have most of the documents,

13   your Honor, so we could --

14           THE COURT:  So promptly?

15           MS. PARLOVECCHIO:  Yes, your Honor.

16           THE COURT:  Did you want to say anything else, Mr.

17   Hafetz?

18           MR. HAFETZ:  Just with regard to the residence

19   abroad, your Honor, to be able to work in the position that

20   he is seeking, he needs a residence abroad.

21           THE COURT:  Thank you.

22           I have reviewed the complaint, I have reviewed the

23   Pretrial Services report and I have heard the arguments of

24   counsel.  I have been doing this for a bit of time.  This is

25   one of the most elaborate schemes to flee that I have come

```
 1   across, and I do not think that there are any reasonable
 2   conditions, given the amount of wealth involved and the
 3   amount of planning to flee involved, that would reasonably
 4   assure the continued appearance of the defendant.  I'm
 5   remanding him in custody.
 6           However, I am directing the government, by the
 7   close of business Monday, to provide the documentary
 8   corroboration described on the record today.
 9           Mr. Hafetz, if after seeing those documents, it
10   becomes the defendant's position that the government has
11   overstated the strength of the case that the defendant has
12   been scheming to flee and you wish to have reconsideration
13   of my decision, I will be happy to hear your argument in
14   that respect, once you have the documents.
15           MR. HAFETZ:  Your Honor, I also would like to --
16   given the fact that your Honor has ordered that Mr. Salyer
17   be remanded, I would like to request whether there's any way
18   to have him be transported out to California in a relatively
19   quick manner?
20           THE COURT:  I think the marshals have ten days,
21   right?
22           UNIDENTIFIED SPEAKER:  Yes, your Honor.
23           THE COURT:  I'm not going to arrange a separate
24   trip for him.  My understanding is that they collect
25   individuals who need to be transported and every ten days,
```

1  there's a trip, so nobody is held for more than ten days.

2  Maybe he'll be lucky and he'll be at the end of a ten-day

3  collection.  But if he's not, I can't order a separate

4  taxpayer provided trip to the west coast for Mr. Salyer.

5          MR. HAFETZ:  Okay.

6          THE COURT:  Alright?  Do you have the form where

7  he waives an identity and preliminary hearing?

8          MR. HAFETZ:  Your Honor, we would be willing, if

9  the Court would entertain it, to have Mr. Salyer provide the

10  plane tickets for a trip --

11          THE COURT:  No.  Defendants are transported and

12  housed the same way regardless of their wealth.  Otherwise,

13  we would have rich people saying, I don't need to go to MDC,

14  you can put me over at the Plaza and I'll hire my own

15  guards.  That's not our country, Mr. Hafetz.

16          MR. HAFETZ:  Your Honor, one other request.  The

17  client has a medical condition.  He has medication --

18          THE COURT:  We'll make note of it.  What is it?

19          MR. HAFETZ:  -- that requires -- diabetes pills.

20  The FBI agent gave the medication to the prison authorities.

21  He needs to take the medication within 24-hour periods.

22  It's been 48 hours since he has last had the medication.  So

23  I would ask that the Court order that the prison authorities

24  be instructed that he be given his medication forthwith.

25          THE COURT:  I will note the indication.  I will

```
 1   not issue a court order.  They will not allow an inmate to
 2   bring in medicine from the outside, for reasons I imagine
 3   you can quickly understand.
 4              Do you have the medication here?  Does anybody
 5   have the medication here?  Can you tell me what the label
 6   says or will it be transported with the inmate, Marshal?
 7              MARSHAL:  Yes.
 8              THE COURT:  Defendant is diabetic and requires
 9   medication, which he has with him, right?
10              The bottom of this form is not filled out.  I take
11   it Mr. Salyer's intention is to waive identity hearing and
12   preliminary examination?
13              MR. HAFETZ:  I'm sorry, yes, correct, your Honor.
14              THE COURT:  I'm going to mark that on the form.
15              Mr. Salyer, this gives up your right to that
16   hearing here in Brooklyn, New York, where the government
17   would have to prove that you're the person who is wanted in
18   California.
19              Do you understand that?
20              THE DEFENDANT:  I do, your Honor.
21              THE COURT:  Do you consent to the entry of that
22   order?
23              THE DEFENDANT:  Yes.
24              THE COURT:  I find the defendant's consent knowing
25   and voluntary.  I'm adding my endorsement to this form to
```

```
 1   reflect my finding.

 2           Is there anything else concerning Mr. Salyer for

 3   my attention?

 4           MS. PARLOVECCHIO:  Yes, your Honor.  There is the

 5   matter of the inventory because Mr. Salyer was apprehended

 6   at the airport.

 7           THE COURT:  Thank you.

 8           (Pause in Proceedings)

 9           THE COURT:  Is the inventory accurate, Mr. Hafetz?

10           MR. HAFETZ:  We believe so.  My client believes

11   so.

12           THE COURT:  Thank you very much, everybody.  Have

13   a good afternoon.

14           MS. PARLOVECCHIO:  Thank you, Judge.

15                     *  *  *  *  *  *  *  *  *

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18        I certify that the foregoing is a correct transcript
19   from the electronic sound recording of the proceedings in
20   the above-entitled matter.
21
22
23
24
25   ELIZABETH BARRON                    February 12, 2010
```

# EXHIBIT C



**ORIGINAL FILED**

JAN 0 5 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

IN RE: SEALED CASE ) No. **2** 1 0 - **M** - 0 0 0 2 DAD
)
)
)
)
)

### SEALING ORDER

Upon application of the United States of America and good cause having been shown,

IT IS HEREBY ORDERED that all documents in the above referenced case shall be and are hereby ordered SEALED until the first defendant is arrested by agents of the United States, except for copies for use by the United States.

DATED: January 5, 2009

_Dale A. Drozd_
HONORABLE DALE A. DROZD
United States Magistrate Judge

1

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

——————————————oOo——————————————



**UNITED STATES OF AMERICA**

**v.**

**FREDERICK SCOTT SALYER**

**WARRANT FOR ARREST**

CASE NUMBER:

YOU ARE HEREBY COMMANDED to arrest **FREDERICK SCOTT SALYER** **2 1 0 - E - 0 0 0 2**   DAD

and bring him or her forthwith to the nearest magistrate to answer a(n)

___ Indictment      ___ Information     **X  Complaint**    ___ Order of court    ___ Violation Notice    ___ Probation

charging him or her with (brief description of offense)

**Knowingly devising and intending to devise schemes and artifices to defraud Frito-Lay, Inc., Kraft Foods, Inc., and B&G Foods, Inc., and to obtain money and property from those companies by means of materially false and fraudulent pretenses, representations and promises, and to conceal said schemes, and in furtherance of such schemes causing the transmission of interstate wire communications in violation of 18 U.S.C. §§ 1343 and 2 (4 Counts);**

**Knowingly devising and intending to devise a scheme and artifice to defraud certain customers of SK Foods, and to obtain money and property from those customer companies by means of materially false and fraudulent pretenses, representations and promises, and to conceal said scheme, and in furtherance of such scheme causing the transmission of interstate wire communications in violation of 18 U.S.C. §§ 1343 and 2 (2 Counts), and in furtherance of such scheme causing certain items to be delivered by mail and private commercial carrier, from the Eastern District of California to other states in violation of 18 U.S.C. §§ 1341 and 2 (14 Counts).**

**All in violation of Title 18, United States Code, Sections 1341, 1343, and 2**

| | |
|---|---|
| The Honorable Dale A. Drozd | United States Magistrate Judge |
| Name of Issuing Officer | Title of Issuing Officer |
| *Dale A. Drozd* | January 5, 2010, in Sacramento, California |
| Signature of Issuing Officer | Date and Location |

Bail fixed at    $ No Bail Pending Hearing by    The Honorable Dale A. Drozd

Name of Judicial Officer

| RETURN |
|---|
| This warrant was received and executed with the arrest of the above-named defendant at |

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| DATE OF ARREST | | |

SEALED

ORIGINAL
FILED

JAN 0 5 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

1  BENJAMIN B. WAGNER
   United States Attorney
2  SEAN C. FLYNN
   Assistant U.S. Attorney
3  501 I Street, Suite 10-100
   Sacramento, California  95814
4  Telephone:  (916) 554-2700

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,     )   CR. No. S- 2 10 - M - 0 0 0 2    DAD
                                  )
12            Plaintiff,          )   PETITION TO SEAL CRIMINAL
                                  )   COMPLAINT, AFFIDAVIT, AND
13            v.                  )   ARREST WARRANT
                                  )
14  FREDERICK SCOTT SALYER,       )   UNDER SEAL
                                  )
15            Defendant.          )
    _____)

16

17       TO THE HONORABLE DALE A. DROZD, UNITED STATES MAGISTRATE:

18       COMES NOW SEAN C. FLYNN, Assistant United States Attorney for

19  the Eastern District of California, to petition this Court and

20  respectfully represent:

21       1.   That on January 5, 2010, a Criminal Complaint and the

22  associated Affidavit of Special Agent Paul S. Artley were submitted

23  to the Honorable Dale A. Drozd for approval and execution.  The

24  Criminal Complaint charges the above-named defendant with twenty

25  (20) counts of mail and wire fraud in violation of 18 U.S.C. §§

26  1341, 1343 and 2.

27       2.   That there have been no prior charges brought against the

28  defendant FREDERICK SCOTT SALYER in relation to this case.

                              1

3.   That the criminal investigation regarding FREDERICK SCOTT SALYER and others is continuing.  A number of additional interviews, subpoenas, and possibly grand jury testimony, searches and arrests are contemplated in the very near future.  Furthermore, the evidence obtained by the government to date suggests that SALYER has fled the United States in anticipation of criminal charges being brought against him by the United States Attorney's Office.  Disclosure of the contents of this affidavit at this time would seriously impede the continuing investigation and prosecution by disclosing the details of the government's investigation, which potentially could cause SALYER and/or others to flee or to abscond to a different location.  Disclosing the details of the government's investigation could also potentially cause others to destroy evidence, or intimidate and attempt to corruptly influence potential witnesses in the case.  Such activity would seriously impede the investigation and prosecution.

THEREFORE, your petitioner prays that all documents in this matter, to include this Petition, the Criminal Complaint, and the associated Affidavit of Paul S. Artley be sealed until the arrest of the defendant.

DATED: January 5, 2010

BENJAMIN B. WAGNER
United States Attorney

By: _____
SEAN C. FLYNN
Assistant U.S. Attorney

2

AO 91 (Rev. 12/03) Criminal Complaint (v0)

# UNITED STATES DISTRICT COURT

### EASTERN   DISTRICT OF   CALIFORNIA

ORIGINAL FILED

JAN 05 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFOR.
DEPUTY CLERK

### UNITED STATES OF AMERICA
### v.
### FREDERICK SCOTT SALYER

**CRIMINAL COMPLAINT**

CASE NUMBER 10 - M - 0002   DAD

(Name and Address of Defendant)

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief.

► **Count 1:** That beginning no later than in or about Jan. 1998, and continuing until in or about Apr. 2008, in the Eastern District of California, the Northern District of California, the Northern District of Texas, the District of New Jersey, and elsewhere, defendant Frederick Scott Salyer and others known and unknown did knowingly devise and intend to devise a scheme and artifice to defraud Frito-Lay, Inc., and to obtain money and property from it by means of materially false and fraudulent pretenses, representations and promises, and to conceal said scheme, and in furtherance of such scheme caused an interstate wire communication to be sent between the District of New Jersey and the Eastern District of California, on or about Apr. 7, 2008, in violation of 18 U.S.C. §§ 1343 and 2;

**Counts 2 and 3:** That beginning in or about Jan. 2004, and continuing until in or about Apr. 2008, in the Eastern District of California, the Northern District of California, the Northern District of Illinois, the District of New Jersey, and elsewhere, defendant Frederick Scott Salyer and others known and unknown did knowingly devise and intend to devise a scheme and artifice to defraud Kraft Foods, Inc., and to obtain money and property from it by means of materially false and fraudulent pretenses, representations and promises, and to conceal said scheme, and in furtherance of such scheme caused interstate wire communications to be sent between the District of New Jersey and the Eastern District of California on or about Apr. 8, 2008, and Jul. 11, 2007, in violation of 18 U.S.C. §§ 1343 and 2;

**Count 4:** That beginning no later than in or about Sept. 2004, and continuing until in or about Apr. 2008, in the Eastern District of California, the Northern District of California, the District of New Jersey, and elsewhere, defendant Frederick Scott Salyer and others known and unknown did knowingly devise and intend to devise a scheme and artifice to defraud B&G Foods, Inc., and to obtain money and property from it by means of materially false and fraudulent pretenses, representations and promises, and to conceal said scheme, and in furtherance of such scheme caused an interstate wire communication to be sent between the Eastern District of California and the District of New Jersey on or about June 13, 2007, in violation of 18 U.S.C. §§ 1343 and 2;

**Counts 5 through 20:** That beginning no later than in or about Feb. 2001, and continuing until in or about Apr. 2008, in the Eastern District of California, the Northern District of California, and elsewhere, defendant Frederick Scott Salyer and others known and unknown did devise and intend to devise a scheme and artifice to defraud certain customers of SK Foods, and to obtain money and property from those customer companies by means of materially false and fraudulent pretenses, representations, and promises, and to conceal said scheme, and in furtherance of such scheme caused interstate wire communications to be sent between the Eastern District of California, the Northern District of California, and the District of New Jersey on or about Jan. 3, 2007, and Jan. 23, 2007, and in furtherance of such scheme caused certain items to be delivered by mail and private commercial carrier, from the Eastern District of California to New Jersey, Michigan, Pennsylvania, California, Ohio, Texas, Illinois, New Jersey, Texas, Nebraska, Maryland, Minnesota, California, and Arkansas, on or about Feb. 20, 2001, Jul. 10, 2003, Jul. 18, 2003, Jul. 23, 2003, Mar. 1, 2005, Mar. 7, 2005, Jan. 4, 2007, Apr. 17, 2007, May 1, 2007, Jun. 22, 2007, Dec. 5, 2007, Dec. 18, 2007, Feb. 4, 2008, and Mar. 20, 2008, respectively, all in violation of 18 U.S.C. §§ 1341, 1343, and 2.

All in violation of Title 18, United States Code, Sections 1341, 1343, and 2. I further state that I am a Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

▸   **See Attached Affidavit**

Continued on the attached sheet and made a part of this complaint:   **X**

_____
Signature of Complainant  Paul S. Artley
                          Special Agent, FBI

Sworn to before me, and signed in my presence
January 5, 2010                                              at    Sacramento, California
_____          _____
Date                                                          City                    State


Hon Dale A. Drozd          U.S. Magistrate Judge          _____
Name of Judge              Title of Judge                 Signature of Judge

**AFFIDAVIT OF SPECIAL AGENT PAUL S. ARTLEY
IN SUPPORT OF ARREST WARRANT and CRIMINAL COMPLAINT**

I, Paul S. Artley, Special Agent, U.S. Department of
Justice, Federal Bureau of Investigation ("FBI"), being duly
sworn, state as follows:

## I. BACKGROUND AND EXPERTISE OF AFFIANT

1.   I have been an FBI Special Agent for approximately
fifteen years.  Prior to becoming an FBI special agent, I
received a bachelor's degree in Accounting, became a certified
public accountant ("CPA") and was employed by a public accounting
firm.

2.   Following my training at the FBI Academy, I received
over 200 hours of training in various aspects of criminal
investigation as well as attending classes and seminars dealing
specifically with white collar crime, money laundering, and
various aspects relating to various financial investigative
techniques and related financial investigations.

3.   I am currently assigned to the FBI Sacramento Division.
For approximately the past twelve years, I have been assigned to
investigate white collar crime matters which include mail fraud,
wire fraud, bank fraud and money laundering.  I have also
investigated individuals and organized crime groups who used
sophisticated methods to launder their illicit proceeds.  I have
been the lead case agent on at least 50 fraud or economic crime
investigations, have participated in at least 50 search warrants

-1-

in white collar investigations, and have interviewed numerous witnesses and defendants about methods of committing and concealing economic crimes.

4.   Since August 2005, I have been one of several agents assigned to the investigation of FREDERICK SCOTT SALYER and SK Foods, which has been conducted jointly by the FBI, the Internal Revenue Service Criminal Investigation Division ("IRS"); the Office of Inspector General, Food and Drug Administration ("FDA"); and the Department of Justice, Antitrust Division.

5.   Based on my personal participation in this investigation, including my review of documents, electronic communications, surveillance, the interception of wire communications, interviews with numerous witnesses, and my discussions with other investigating agents, I am familiar with the facts and circumstances of this investigation.  The information set forth in this affidavit reflects my personal knowledge or has been provided to me by other law enforcement officers and agents with whom I have spoken, or whose reports I have reviewed.  I have not included every fact known to me, rather, only those facts necessary to establish probable cause for the issuance of the instant Criminal Complaint and Arrest Warrant are included in this affidavit.  The opinions and conclusions set forth below are based on my training and experience as an FBI agent, my discussions with other law enforcement officers, and my participation in this investigation.

-2-

## II.  **CHARGES**

6.  I make this Affidavit in support of an Arrest Warrant and a Criminal Complaint.  The information set out below establishes probable cause to believe that:

(A)  Beginning no later than in or about January 1998, and continuing until in or about April 2008, in the Northern District of California, the Eastern District of California, the Northern District of Texas, the District of New Jersey, and elsewhere, defendant SALYER and others known and unknown did knowingly devise and intend to devise a scheme and artifice to defraud Frito-Lay, Inc., and to obtain money and property from it by means of materially false and fraudulent pretenses, representations and promises, and to conceal said scheme, and in furtherance of such scheme caused an interstate wire communication to be sent between the District of New Jersey and the Eastern and Northern Districts of California, on or about April 7, 2008, in violation of Title 18, United States Code, Sections 1343, and 2;

(B)  Beginning in or about January 2004, and continuing until in or about April 2008, in the Northern District of California, the Eastern District of California, the Northern District of Illinois, the District of New Jersey, and elsewhere, defendant SALYER and others known and unknown did knowingly devise and intend to devise a scheme and artifice to defraud Kraft Foods, and to obtain money and property from it by means of materially false and fraudulent pretenses, representations and promises, and to conceal said scheme, and in furtherance of such scheme caused interstate wire communications to be sent between the District of New Jersey and the Eastern District of California on or about April 8, 2008, and July 11, 2007, in violation of Title 18, United States Code, Sections 1343, and 2;

(C)  Beginning no later than in or about September 2004, and continuing until in or about until April 2008, in the Northern District of California, the Eastern District of California, the District of New Jersey and elsewhere, defendant SALYER and others known and unknown did knowingly devise and intend to devise a scheme and artifice to defraud B&G Foods, Inc., and to

-3-

obtain money and property from it by means of
materially false and fraudulent pretenses,
representations and promises, and to conceal said
scheme, and in furtherance of such scheme caused an
interstate wire communication to be sent between the
Eastern District of California and the District of New
Jersey on or about June 13, 2007, in violation of Title
18, United States Code, Sections 1343, and 2; and

(D)   Beginning no later than in or about February 2001, and
continuing until in or about April 2008, in the
Northern District of California, the Eastern District
of California, and elsewhere, defendant SALYER and
others known and unknown did devise and intend to
devise a scheme and artifice to defraud certain
customers of SK Foods, and to obtain money and property
from those customer companies by means of materially
false and fraudulent pretenses, representations and
promises, and to conceal said scheme, and in
furtherance of such scheme caused interstate wire
communications to be sent between the Eastern District
of California, the Northern District of California and
the District of New Jersey on or about January 3, 2007,
and January 23, 2007, and in furtherance of such scheme
caused certain items to be delivered by mail and
private and commercial carrier, from the Eastern
District of California to New Jersey, Michigan,
Pennsylvania, California, Ohio, Texas, Illinois, New
Jersey, Texas, Nebraska, Maryland, Minnesota,
California, and Arkansas, on or about February 20,
2001, July 10, 2003, July 18, 2003, July 23, 2003,
March 1, 2005, March 7, 2005, January 4, 2007, April
17, 2007, May 1, 2007, June 22, 2007, December 5, 2007,
December 18, 2007, February 4, 2008, and March 20,
2008, respectively, all in violation of Title 18,
United States Code, Sections 1341, 1343, and 2.

## III.   INTRODUCTION

7.   I certify that since August 2005, the FBI, the United

States Attorney's Office for the Eastern District of California,

and the United States Department of Justice, Antitrust Division,

in conjunction with the Internal Revenue Service and the U.S.

Food and Drug Administration have been conducting an

investigation into various criminal offenses conducted by
defendant FREDERICK SCOTT SALYER, SK Foods, L.P., and many of SK
Foods' leaders, employees and associates.  These criminal
offenses were conducted and carried out in the Eastern District
of California, the Northern District of California, and various
other jurisdictions across the United States.

**A.    Frederick Scott SALYER**

8.   Beginning in 1990, and continuing until in or about
2009, defendant SALYER was an owner of, and has served as Chief
Executive Officer of, SK Foods, L.P., a limited partnership with
principal places of business in Monterey, California, and
Williams, Ripon, and Lemoore, in the Eastern District of
California.  SK Foods, L.P., and its related corporate entities
involved in the growing, processing and sale of processed tomato
products ("SK Foods"), was a grower and processor of tomato
products and other food products, for sale to food product
manufacturers, food service distributors and marketers, and
retail outlets.  During all periods relevant to the instant
Criminal Complaint, SK Foods was a privately held company, which
sold tomato products such as diced tomatoes and bulk tomato
paste.  These items were ultimately used as ingredients in
finished products such as soups, ketchup, salsa, and sauces.  SK
Foods' customers during the period relevant to this Criminal
Complaint included large corporate organizations such as Kraft
Foods, Inc. ("Kraft"), the H. J. Heinz Company ("Heinz"), ConAgra

Foods ("ConAgra") and Frito-Lay, Inc. ("Frito-Lay").

9.   The government's investigation has revealed that in his role as owner and Chief Executive Officer of SK Foods, SALYER served as SK Foods' primary leader and decision maker, giving direction to and receiving regular reports regarding all manner of SK Foods' business from SK Foods' leadership and employees.

**B.   Genesis of the Investigation – Anthony Ray Manuel**

10.   The overall investigation into SK Foods began in 2005, and involves numerous theories of criminal liability.  In 2005, the FBI was contacted by a private investigative firm that had been hired by Morning Star Packing Company ("Morning Star"), another manufacturer and marketer of bulk tomato products based in the Eastern District of California, and a competitor of SK Foods.  The report to the Sacramento FBI concerned the embezzlement and theft from Morning Star by a former employee, who, by that point, was working as a Vice President for SK Foods – Anthony Ray Manuel ("Manuel").  Subsequent investigation confirmed that Manuel had defrauded Morning Star out of approximately $1,000,000 through a variety of schemes between 1997 and 2005.  Shortly after being contacted by the FBI, Manuel began providing information to the FBI with respect to his current employer, SK Foods, in return for consideration on federal criminal charges, which were to be filed against him in this district.  That cooperation included making monitored telephone calls and engaging in monitored discussions with other

-6-

SK Foods employees.  Charges were ultimately brought against
Manuel, and on January 27, 2009, Manuel plead guilty in U.S.
District Court in Sacramento to two counts of wire fraud in
violation of 18 U.S.C. § 1343, and one count of subscribing to a
false tax return in violation of 26 U.S.C. § 7206(1).  Manuel has
yet to be sentenced, and remains at liberty.  He stands to
benefit from a government motion pursuant to U.S.S.G. § 5K1.1 for
his substantial assistance in the investigation of SALYER and
others.

        11.  The investigation sparked by the cooperation of Manuel
uncovered widespread corporate fraud on the part of SK Foods,
which was ultimately directed by SALYER and perpetrated in many
different areas, and by many different leaders, employees and
associates of the company.  The investigation has revealed that
at SALYER's direction, SK Foods regularly paid bribes to the
purchasing managers of many of its customers to ensure that those
customers purchased processed tomato products from SK Foods
rather than from its competitors, and that they purchased the
product from SK Foods at elevated, above-market prices.  In other
instances, SK Foods' bribes to purchasing managers were made in
order to wrongfully obtain its competitors' proprietary bid
information.  By receiving these bribes for their own personal
benefit, the purchasing managers for SK Foods' customer companies
acted in their own personal interest rather than in the interest
of their employers.

12. The government's investigation also uncovered that SK Foods, at SALYER's direction, engaged in a knowing and widespread practice of selling and shipping processed tomato product to customers that did not meet contractual specifications, and was adulterated because it contained mold levels in excess of the thresholds established by the United States Food and Drug Administration and was thus unsaleable domestically as detailed more fully in section IV.D., below. At SALYER's direction, various individuals at SK Foods falsified both internal and customer-bound documentation to make the product appear as if it were contractually compliant.

C. **Randall Lee Rahal**

13. A central figure in SK Foods' criminal conduct was Randall Lee Rahal ("Rahal"). Since at least 1990, Rahal has served as the president of Intramark USA, Inc., a New Jersey-based company that holds itself out as a wholesaler of food ingredients, including tomato products, and an importer of juice concentrates. In his role as SK Foods' Chief Executive Officer, in 1993, SALYER hired Rahal to serve as a sales broker for SK Foods. From 1993 until April 2008, Rahal acted as a kind of advisor and supervisor for SK Foods, giving direction to and receiving periodic reports regarding various aspects of SK Foods' business from SK Foods employees. From at least 2004 until April 2008, Rahal formally served on SK Foods' Board of Directors. In these roles, Rahal maintained close communications with SK Foods'

-8-

senior management, to include SALYER.

14.   In his role as a sales broker for SK Foods, and with SALYER's knowledge and direction, Rahal oversaw, among other things, the negotiation of contracts between SK Foods and many of its customers, such as Kraft, ConAgra, B&G, and Frito-Lay.  At SALYER's direction, and with the knowledge of the majority of SK Foods' executive management team, Rahal routinely paid bribes to the purchasing agents of many of SK Foods' customers in order to ensure that those customers purchased tomato-based products, and other products, from SK Foods rather than from its competitors. In other instances, Rahal, at the direction of SALYER, paid bribes to purchasing agents so that those agents would provide bidding and other proprietary information from SK Foods' competitors.

15.   On December 16, 2008, Rahal pled guilty in the Eastern District of California to a three-count Information charging him with violations of 18 U.S.C. §§ 1962(d) (conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity) and 1957 (money laundering), and 15 U.S.C. § 1 (price fixing).  Rahal has been cooperating in the government's investigation since October 2008.  He has yet to be sentenced, and remains at liberty.  He also stands to benefit from a government motion pursuant to U.S.S.G. § 5K1.1 for his substantial assistance in the investigation of SALYER and others.

**D.  Other Individuals Who Have Pled Guilty to Criminal
Conduct That is the Focus of the Government's
Investigation**

16.  The government's investigation has revealed that
between in or about January 1998 and in or about April 2008,
James Richard Wahl, Jr., ("Wahl") served in various positions, to
include Senior Group Manager for Ingredients Purchasing, for
Frito-Lay, Inc., a multinational food company with a principal
place of business and headquarters in Plano, Texas.  Wahl worked
at the company headquarters in Plano.  On February 18, 2009, Wahl
pleaded guilty in the Eastern District of California to an
Information charging him with two counts of honest services mail
fraud in violation of 18 U.S.C. §§ 1341 and 1346.  Wahl is
cooperating in the government's investigation, has yet to be
sentenced, and remains at liberty.  Wahl further stands to
benefit from a government motion pursuant to U.S.S.G. § 5K1.1 for
his substantial assistance in the investigation of SALYER and
others.

17.  The government's investigation has revealed that during
the period of time relevant to this Criminal Complaint Alan Scott
Huey ("Huey") served in a variety of positions and most recently
as Vice President for Sales and Marketing for SK Foods.  On
November 17, 2009, Huey pleaded guilty in the Eastern District of
California to an Information charging him with Conspiracy, in
violation of 18 U.S.C. § 371.  Huey is cooperating in the
government's investigation, has yet to be sentenced, and remains

-10-

at liberty.  Huey further stands to benefit from a government
motion pursuant to U.S.S.G. § 5K1.1 for his substantial
assistance in the investigation of SALYER and others.

18.  The government's investigation has revealed that during
certain periods of time relevant to this Criminal Complaint,
Jeffrey Sherman Beasley ("Beasley"), served in a variety of
positions and most recently as the Vice President for Industrial
Sales for SK Foods.  On August 25, 2009, Beasley pleaded guilty
in the Eastern District of California to an Information charging
him with Conspiracy, in violation of 18 U.S.C. § 371.  Beasley is
cooperating in the government's investigation, has yet to be
sentenced, and remains at liberty.  Beasley further stands to
benefit from a government motion pursuant to U.S.S.G. § 5K1.1 for
his substantial assistance in the investigation of SALYER and
others.

19.  The government's investigation has revealed that
between January 2004 and April 2008, Robert Watson served as a
purchasing manager for Kraft Foods, Inc., a multinational food
products company with a principal place of business and
headquarters in Northfield, Illinois.  Watson worked at the
company headquarters in Illinois, and also maintained a residence
in White Plains, New York.  On January 27, 2009, Watson pleaded
guilty in the Eastern District of California to an Information
charging him with two counts of honest services mail fraud in
violation of 18 U.S.C. §§ 1341 and 1346.  Watson was sentenced on

August 11, 2009 to twenty-seven months in prison. He was also ordered to pay $1.8 million in restitution to his former employer, Kraft.

20. The government's investigation has revealed that between September 2004 until April 2008, Robert Turner ("Turner") served as a corporate purchasing manager for B&G Foods, Inc., a multinational manufacturer, seller and distributor of various food products with a principal place of business and headquarters in Parsippany, New Jersey. From 2007 until April 2008, Turner was Director of Purchasing for B&G. Turner worked at the corporate headquarters in Parsippany. On May 5, 2009, Turner pleaded guilty in the Eastern District of California to an Information charging him with two counts of honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346. Turner has yet to be sentenced by the district court.

21. The government's investigation has revealed that between November 1993 and April 2008, Jennifer Lou Dahlman ("Dahlman") was employed in a variety of positions, and most recently as a Reports and Business Analyst, by SK Foods. Working out of SK Foods' Lemoore, California facility, Dahlman assisted in managing SK Foods' inventory of processed tomato and other food products, and arranged for the shipment of those food products to SK Foods' customers across the United States. On February 18, 2009, Dahlman pleaded guilty in the Eastern District of California to an Information charging her with one count of

-12-

introducing, and delivering for introduction, adulterated and
misbranded food into interstate commerce with the intent to
defraud and mislead in violation of 21 U.S.C. §§ 331(a) and
333(a)(2). Dahlman is cooperating in the government's
investigation, has yet to be sentenced, and remains at liberty.
Dahlman further stands to benefit from a government motion
pursuant to U.S.S.G. § 5K1.1 for her substantial assistance in
the investigation of SALYER and others.

    **E.**   **Interception of Wire Communications**

    22.  On June 4, 2007, the Honorable Lawrence K. Karlton
authorized thirty days of interception of wire communications
over the business telephone of Intramark and the cellular
telephone used by Rahal.  A second thirty days was authorized on
July 5, 2007.  Two more thirty-day interception periods over the
same two phone lines were authorized by the court on February 21,
2008, and March 24, 2008, respectively.

    **F.**   **Execution of Judicially Authorized Search Warrants**

    23.  The government's investigation of SALYER and SK Foods
became overt on April 16, 2008, when the FBI, the IRS and the FDA
executed numerous judicially authorized search warrants in the
Eastern and Northern Districts of California, and in the District
of New Jersey.  Hundreds of thousands of paper and electronic
documents were seized from SK Foods and Intramark's facilities.
The FBI and the IRS also conducted coordinated interviews of
various targets and witnesses at the time of the search, to

include the purchasing managers who were the recipients of Rahal, SALYER, and SK Foods' bribe payments.  Grand jury subpoenas were served on numerous customer companies at the time of the search, and investigating agents have received and analyzed hundreds of thousands of documents in response thereto.

### G.   SK Foods' Bankruptcy and SALYER's flight to avoid prosecution

24.   SK Foods declared Chapter 11 bankruptcy in May of 2009, and the assets of the limited partnership were purchased out of bankruptcy by the Singapore-based Olam International.  Another SALYER entity, Salyer American Fresh Foods, also declared bankruptcy in May of 2009, and ceased operations at that time because the company's lenders refused to advance it any additional funding.  SALYER's current employment is unknown, although it is believed that, until recently, he still maintained an ownership interest in the Cedenco company – another food products conglomerate, which is based in New Zealand.  SALYER traveled frequently to New Zealand and Australia during the period relevant to this Criminal Complaint to attend to that business.

25.   Recent information obtained in the course of the government's investigation indicates that SALYER has moved large amounts of money offshore – to banks in Liechtenstein and the West Indies.  The government is in the process of confirming the exact amount of the transfers, and the numbers of the accounts to

where the funds were sent.

26. The government has also obtained very recent
information, set forth more fully at Section IV.E of this
affidavit, which indicates that SALYER has left the United
States, and appears to be planning a permanent relocation abroad
in order to avoid prosecution by the government in this matter.

IV.  **SUBSTANTIVE DISCUSSION OF CHARGES AGAINST FREDERICK SCOTT
     SALYER**

     A.  **Wire Fraud with Respect to Frito-Lay, Inc.**

27. The government's investigation has revealed that as a
purchasing manager at Frito-Lay, James Richard Wahl, Jr. was
vested with authority to negotiate and enter into contracts, with
the approval of his employer, for the purchase of processed
tomato products and other food products from various processors,
such as SK Foods. Wahl has indicated in the factual basis to his
publicly-filed plea agreement with the government that in the
normal course, he and Frito-Lay received bids for the sale of
processed tomato and other food products from processors to
Frito-Lay by way of what was intended to be a competitive bidding
process. In response to questioning, both Wahl and Rahal have
indicated that Frito-Lay was a regular customer of SK Foods, and
purchased millions of pounds of tomato paste, diced tomatoes and
other agricultural products from SK Foods on an annual basis.

28. The government's investigation has revealed that as
part of a scheme to defraud Frito-Lay, beginning in 1998 Rahal

-15-

began making personal bribery payments to Wahl. Wahl has admitted in his publicly-filed plea agreement with the government that he received approximately $160,000 in such payments from Rahal between 1998 and April 2008. The government's investigation has further revealed that during the relevant period, Rahal routinely sent various checks to Wahl, via United States Mail from New Jersey to Wahl in Texas. Two such mailings included payments of $4,000 and $5,722.94, and were dated September 7, 2006, and March 26, 2006, respectively.

29.   Certified bank records for Intramark from January 2004 through August 2007, which were obtained in the course of the government's investigation show Intramark checks totaling approximately $56,000 being paid to Wahl at "3205 Drexel Drive, Dallas, TX." The checks are written on a near quarterly basis and range from $2,500 to $4,000. The checks are signed by Rahal. Furthermore, Wahl's tax returns from 2004 and 2005 show, in addition to his earnings at Frito-Lay, $11,000 and $14,000, respectively, of gross receipts for a "consulting business." Wahl received 1099's from Intramark, which were the same as the amounts Wahl claimed as gross earnings for "consulting."

30.   The information obtained from Rahal and Wahl concerning the nature of their relationship in this regard is corroborated, in part, by the content of intercepted wire communications between the two. For example, on March 26, 2008, M.S. (Rahal's secretary at Intramark) received an incoming call at the

-16-

Intramark office from Wahl who instructed M.S. to send a
"package" from Intramark to him at Frito-Lay. Wahl stated that
the package should be sent to "7701 Legacy Drive, Plano, TX
75024." Two minutes later, Rahal made an outgoing call on his
cell phone to Wahl. During their conversation, Rahal asked why
Wahl was having the package sent to his office at Frito Lay.
Wahl responded, "So I can get it and put it in, because my bank
is over here anyway." Rahal replied that his assistant "will
put the return address of her house in Jersey, and UPS it, it'll
have [her] name on it." Rahal also said that Wahl should have
the package by tomorrow, but he was not comfortable sending it to
Wahl at his office at Frito Lay but added "you do what you want."
In response to questioning from agents, Rahal indicated that he
made this statement to Wahl because he was concerned that someone
at Frito-Lay would discover the illegal kickback payments being
made to Wahl by Rahal.

31. Wahl has admitted in his publicly-filed plea agreement
with the government that in return for the bribe payments he
agreed to, and did, ensure that Frito-Lay purchased processed
tomato products and other products from SK Foods rather than from
certain of SK Foods' competitors. In addition, in response to
questioning both Wahl and Rahal have indicated that in return for
the bribe payments, Wahl provided Rahal and SK Foods with
confidential information that allowed SK Foods to sell certain
food products to Frito-Lay at inflated prices.

-17-

32.   The government's investigation has also revealed that
the aforementioned scheme to defraud Frito-Lay, which was
perpetrated through Rahal's bribe payments, originated with
SALYER.  In response to questioning, Rahal has indicated that his
payments to Wahl were expressly authorized and directed by SALYER
on numerous occasions.  Rahal's statements in this regard are
corroborated by the content of various interstate telephone calls
between Rahal and SALYER, which were intercepted by the
government as part of the Title III wire that was authorized in
this matter.  For example, on April 11, 2008, SALYER and Rahal
engaged in an interstate telephone conversation during which the
two discussed that so long as Wahl remained employed by Frito-Lay
as Senior Group Manager for Ingredients Purchasing, SK Foods'
competitor, Morning Star, would not be approved to supply
processed tomato products to Frito-Lay.  Later in that same
conversation, SALYER directed Rahal to speak with Wahl, and to
direct Wahl on how to allocate Frito-Lay's tomato product
purchases between SK Foods and another SK Foods competitor,
Ingomar Packing Company.  Specifically, the relevant portion of
the call is as follows:

> Salyer:  We didn't, we're not in that business.  Let Barilla
> and Frito and all the rest of them go (inaudible).  Morning
> Star may own North America, but we'll be making money
> selling it someplace else.

> Rahal:  I'm informing you what's going on, that's why I sent
> you what I sent you.

> Salyer:  Right.  The problem with Frito is, is that they
> can't get Morning Star in cause they're not approved yet.

Rahal:  And you can thank Jim Wahl for that.

Salyer:  Exactly, and I think it'll take em a couple years, at least, to get approved.

Rahal:  Well they've been trying to get approved for the last five years.

Salyer:  Right.

Rahal:  As long as Jim is there, they're not gonna get approved, I can tell you that.

Salyer:  No, I know that.  What Jim needs to do is give us all the diced and give Pruett all the paste.

Rahal:  I could make that happen too.

Salyer:  Why not?

Rahal:  I can make that happen.  Pruett wants to sell paste cheap, let him have the paste.

Salyer:  Let him have the paste and well take the diced.

Rahal:  Yeah, ok.

Salyer:  And Jim can look at that thing, right, and say, the price for the diced is 17 cents a pound and that's, you know, that's what it's gonna be.

Rahal:  That's fine.

Salyer:  So we'll take the 17 cent diced, and Pruett gets (inaudible) really only has two suppliers and it's us and Ingomar.

33.  Further evidence of SALYER's involvement in the bribery payments to Wahl is provided in the form of an April 7, 2008 email which was transmitted from Wahl in the Northern District of Texas to Rahal in the District of New Jersey.  The email, which was obtained by the government in the course of its investigation, forwarded a Morning Star proposal for a three-year contract for the sale of processed tomato products to Frito-Lay.

-19-

In response to questioning, Wahl has indicated that he provided this otherwise proprietary information to Rahal in return for the bribe payments.  That same day – April 7, 2008, Rahal transmitted the surreptitiously obtained proposal to SALYER and other senior leaders of SK Foods, to include vice presidents Huey, Beasley and Manuel via email, from the District of New Jersey to the Eastern and Northern Districts of California.  In response to questioning, both Huey and Beasley have indicated that they received this particular bid proposal from Rahal.  According to Huey, the bid information was used to set bid prices at a SK Foods pricing strategy meeting a few days later.  The April 7, 2008 email from Rahal to SALYER, Huey, Beasley and others forms the basis for <u>Count One</u> of the instant Criminal Complaint.

34.   In addition to evidence derived directly from Rahal and Huey, Wahl has also provided information concerning SALYER's knowledge of Rahal's bribe payments to him.  In the factual basis to his publicly-filed plea agreement with the government Wahl has admitted that in the Spring of 2006, he met with SALYER in Plano, Texas in order to discuss certain business arrangements between Frito-Lay and SK Foods.  Wahl admitted further that during their meeting, SALYER expressly inquired into whether Wahl was satisfied with the value of the payments Wahl had received from Rahal to that point.

35.   The government's investigation has also uncovered evidence indicating that Rahal's bribery payments to purchasing

managers, such as Wahl were openly discussed at SK Foods'
executive management meetings.  The government was able to record
portion of one such meeting, which occurred in Pebble Beach,
California, on January 17, 2008.  On the recording, SALYER can be
heard telling Rahal to offer a bribe payment in order to
surreptitiously obtain an "export stamp," which would enable the
company to falsely certify that its product packaging was
appropriate for international shipment.

B.   **Wire Fraud with Respect to Kraft Foods, Inc.**

36.   The government's investigation has revealed that Robert
Watson was the purchasing manager at Kraft Foods with whom Rahal,
and SK Foods, did business.  Watson has admitted in the factual
basis to his publicly-filed plea agreement with the government
that as a purchasing manager he was vested with authority to
negotiate and enter into contracts, with the approval of his
employer, for the purchase of processed tomato products and other
food products from various processors, such as SK Foods.  Watson
has further admitted pursuant to his plea agreement with the
government that in the normal course, he and Kraft received bids
for the sale of processed tomato and other food products from
processors to Kraft by way of what was intended to be a secret
and competitive bidding process.  In response to questioning,
Huey, Rahal, Beasley and Manuel have all indicated that Kraft was
a regular customer of SK Foods, and purchased tens of millions of

-21-

pounds of tomato paste, diced tomatoes and other agricultural
products from SK Foods on an annual basis.

37. In response to questioning, Rahal has indicated that as
part of a scheme to defraud Kraft, beginning in 2004 Rahal began
making personal bribery payments to Watson. Watson has admitted
in the factual basis to his plea agreement with the government
that Rahal paid him approximately $158,000 in this regard between
2004 and 2008. The government's investigation has further
revealed that during the relevant period Rahal routinely sent
various checks to Watson, via United States Mail, from New Jersey
to Watson in Illinois. Two such mailings included payments of
$10,000 and 17,252.78, and are dated January 19, 2006, and July
25, 2007, respectively.

38. Certified bank records for Intramark from January 2004
through August 2007, which were obtained during the course of the
government's investigation show Intramark checks being paid to
"Robert L. Watson, 301 Wood Creek Road, Apt. 513, Wheeling, IL
60090." The checks are written on a near quarterly basis and
range from $3,000 to $17,253. "Brokerage" is usually written in
the memo section of each check along with a particular quarter of
the year. At times the checks reflect notations such as "tomato
paste" or "bill and hold." The checks are all signed by Rahal.
Certified bank records obtained during the course of the
government's investigation also indicate that, since 2004, there
were checks totaling approximately $134,000 written from

-22-

Intramark bank accounts to Watson.  Watson did not report $23,000 received from Rahal on his 2004 tax return.  However, in 2005 and 2006, Watson received 1099's from Intramark for $26,000 and $50,000, respectively, and Watson reported those amounts as income on his tax returns.

39.  Watson has admitted in the factual basis to his plea agreement with the government that in return for the personal bribe payments, Watson agreed to, and did, ensure that Kraft purchased processed tomato products and other products from SK Foods rather than from certain of SK Foods' competitors.  Watson has also admitted in his plea agreement that in return for the bribe payments, he provided Rahal and SK Foods with information that allowed SK Foods to sell processed tomato products to Kraft at inflated prices.

40.  In response to questioning, Rahal, Huey and Beasley have also all indicated that in return for the bribe payments, Watson routinely provided SK Foods with the proprietary bid information of SK Foods' competitors.  Documents obtained during the course of the government's investigation corroborate those statements.  For example, on April 8, 2008, Watson faxed to Rahal and SK Foods a Three-Year Sales Proposal for the sale of tomato paste and diced tomatoes from Morning Star to Kraft.  Further documentary evidence uncovered as part of the government's investigation demonstrates that the bid proposal had been sent to Watson by Morning Star seven days prior.  Rahal ultimately caused

-23-

the bid proposal to be forwarded, via email, from the District of New Jersey to Huey and Beasley in the Northern and Eastern Districts of California, respectively, on or about April 8, 2008. This April 8, 2008 email forms the basis for <u>Count Two</u> of the instant Criminal Complaint.

41. Intercepted phone calls between Rahal and Huey on April 2, 2008, and April 7, 2008, respectively, evidence Watson's knowledge that what he was doing was wrong. According to Rahal, Watson did not want to fax the information from his office or from his "personal fax." Instead, Rahal told Huey that Watson intended to fax the Morning Star proposal to Rahal from an "outside" location, which could not be traced back to him.

42. The information provided to the government by Watson and Rahal concerning the nature of their relationship is corroborated, in part, by the contents of various interstate telephone calls between the two, which were intercepted by the government as part of the Title III wire recordings that were authorized in this matter. For example, on June 6, 2007, in an intercepted telephone conversation, Rahal and Watson discussed an invoice from Kraft that needed to be paid. During the call, Rahal told Watson, "you and I got money in there." In response to questioning, Rahal has indicated that this statement meant that once Kraft had paid its "bill," with respect to certain shipments of tomato product, Rahal was poised to kickback some of the proceeds to Watson. In a call later that day, Rahal and

-24-

Watson discussed the prospect of Rahal buying health insurance for Watson's daughter. Specifically, Rahal stated that he had checked about putting Watson's daughter on his payroll, but thought it would be cheaper for her to go out and get the best insurance she could on her own and Rahal could pay for it at a later time.

43. Later on July 26, 2007, in an intercepted telephone conversation, Rahal told Watson that he had just mailed out a check for $17,000 to him. Certified bank records obtained during the course of the government's investigation confirm that a check dated July 25, 2007, from Rahal to Watson for $17,252.78, was cashed.

44. The information admitted to by Rahal in his publicly-filed plea agreement with the government – that he routinely paid bribes to the purchasing managers of various customers of SK Foods, including Kraft – is also corroborated by the contents of a July 11, 2007 intercepted telephone call between Rahal and Beasley, during which Rahal stated: "I wrote checks today almost $65,000, end of June, going into third quarter." Rahal added, "between Watson, Jim Wahl, I had lunch with Bob Turner, he had a big chunk . . . we got another 500,000 pounds out of Joel, so he'll get a thousand bucks that I'll bring with me, over at Agusa, Tony got another order from him for 500,000 pounds and Mike Chavez, I'm gonna see him in Walnut Creek on Thursday." In response to questioning, both Rahal and Beasley have indicated

-25-

that during the call Rahal was recounting approximately $65,000
in bribe payments he had recently made to customer purchasing
managers, including Watson.  The July 11, 2007 telephone call
between Rahal in the District of New Jersey and Beasley in the
Eastern District of California forms the basis for <u>Count</u> <u>Three</u> of
the instant Criminal Complaint.

    45.   The information obtained from Rahal and other sources
concerning SK Foods' bribery payments to Watson is also
corroborated by emails and other documentation that has been
provided to the government by Kraft in response to grand jury
subpoenas.  One example of the scheme to defraud Kraft occurred
during the spring 2007 contract season.  Certified business
records provided to the government by Kraft detail that on April
24, 2007, Kraft began accepting electronic bids to sell to Kraft
close to 80 million pounds of processed tomato products, which
included both tomato paste and diced tomatoes.  The electronic
bidding period was originally set to end on May 1, 2007, although
some difficulties with the site meant that some bidders submitted
hard copy bids as late as May 4th.  The details of the 2007 Kraft
bid, and its associated delays, were discussed in email
correspondence between SALYER, Rahal, Huey and others in April
and May 2007.  In response to questioning, both Rahal and Huey
have indicated that the bidding was open to anyone who could
supply the requested products, however, Kraft policy limited
award of contracts to only those suppliers that had gone through

Kraft's internal approval process. As the Kraft documentation indicates, in the spring of 2007, Morning Star, SK Foods and Ingomar were approved suppliers to Kraft for processed tomato paste and diced tomatoes.

46. Business records provided by Kraft pursuant to subpoena indicate that while the online process was open, on May 1, 2007, Morning Star bid $0.33 per pound for 67 million pounds of tomato paste, and $0.18 per pound for 3.5 million pounds of diced tomatoes. Business records provided by Kraft indicate that the next day, Ingomar submitted its bid to Kraft. Ingomar bid $0.365 per pound for 10 million pounds of tomato paste, and $0.165 per pound for 3.5 million pounds of diced tomatoes. At about the same time, SK Foods submitted a bid of $0.36 per pound for 67 million pounds of processed tomato paste and $0.185 per pound for diced tomatoes.

47. In response to questioning, Rahal has indicated that by at least May 16, 2007, Watson had provided SK Foods, through Rahal, with the exact amount and quantities that Ingomar had bid to Kraft on May 1st. Rahal has indicated further that notwithstanding the fact that Morning Star had already submitted a bid that was $0.03 per pound less than SK Foods for tomato paste, and $0.005 per pound less for diced tomatoes, on May 16, 2007, SK Foods sent a second bid offer to Watson in which SK Foods increased its bid to Kraft to $.365 per pound for processed tomato paste. Rahal has indicated that although the time for bid

-27-

submissions had long since passed, Watson "re-opened" the bidding process so that SK Foods could increase its bid and, consequently, defraud Kraft out of more than $2 million.

48.  In addition, evidence obtained during the government's investigation indicates that the price of at least one other contract between Kraft and SK Foods was raised at Watson's initiation, so that Watson could reap a larger benefit from his illicit kickback arrangement with SK Foods.  In an intercepted phone call between Rahal and Watson on April 10, 2008, the two discussed a contract between the respective companies for jalapeno peppers and enchilada sauce.  During the call, Rahal reminded Watson on multiple occasions that the contract to which he was referring was the one that Watson told Rahal to raise the price on, stating "we raised the price on it; you told us to raise the price," and "you told me 'no, raise the price' from where we were, which we did."  And finally, "you raised it."

49.  Evidence obtained during the course of the government's investigation demonstrates that the bribe payments to Watson also induced Watson to release SK Foods from its contractual obligation to provide millions of pounds of tomato paste to Kraft at a specific price, without the knowledge or approval of Watson's superiors, at times when it best suited SK Foods.  For example, evidence obtained during the course of the government's investigation indicates that during the spring of 2008, SK Foods experienced a period during which its supply of tomato paste was

-28-

far short of its outstanding contractual obligations.  SK Foods'
shortage of tomato product for sale to customers is discussed on
various phone calls between Rahal and Huey, which were
intercepted by agents at the time they occurred.

50.  For example, during multiple phone conversations on
March 13 and 14, 2008, Rahal and Huey discussed how SK Foods was
60 million pounds short of a certain quality of tomato paste
because its contractual obligations for that product were more
than it could produce.  On March 13, 2008, Huey asked Rahal to
"shut Kraft off" in order to alleviate part of SK Foods'
shortfall.  After Rahal explained to Huey that "Watson will do
what I tell him," Huey went on to explain to Rahal that SK Foods
had a number of orders with oversees customers for the same
tomato paste at higher prices, and that SK Foods could make more
money if it shipped the paste to them instead of Kraft.  Later in
the call, Rahal stated to Huey that SK Foods had Watson cancel
contracts for tomato paste in past years as well.

51.  In subsequent phone calls between Huey and Rahal on
March 14, 2008, Rahal confirmed for Huey that Watson had "zeroed
out" the balance of tomato paste that SK Foods was required to
send to Kraft under their existing contracts.  Rahal and Watson
also engaged in a series of recorded phone calls during the
second week of March 2008, in which Watson agreed to relieve SK
Foods of its contractual obligations.  In one particular call,
Rahal informs Watson that if SK Foods "has an opportunity to go

-29-

to Europe with [the paste] . . . for both of us it would be a
good thing."

52.   Information obtained by the government during the
course of its investigation from Kraft representatives indicates
that as a result of the scheme to defraud, Kraft was forced to
purchase replacement product on the open market.   Kraft has
calculated its resulting loss to be approximately $1.6 million,
and the company submitted a letter to probation at the time
Watson was sentenced detailing that fact.

53.   Further information obtained during the course of the
government's investigation demonstrates that the scheme to
defraud Kraft, like the scheme to defraud Frito-Lay, began with
SALYER.   In response to questioning, Rahal has indicated that his
payments to Watson were expressly authorized and directed by
SALYER on numerous occasions.   Soon after Watson was elevated to
being the Kraft purchasing manager responsible for securing
tomatoes, Rahal and SALYER engaged in email correspondence, dated
on or about February 13, 2004, in which Rahal described Watson as
"low hanging fruit" because he was incurring repeated costs in
commuting to Illinois from White Plains, New York during the
week.   SALYER responded to Rahal that he "love[d] the low fruit,"
and recognized that "[c]omuting form NY costs $$$$."   SALYER's
knowledge and direction of the scheme to bribe Watson is also
evidenced by the content of certain interstate telephone
conversations between Rahal and SALYER, which were intercepted by

-30-

the government as part of the Title III recordings that were
authorized in this matter. For example, on April 14, 2008,
SALYER and Rahal engaged in a interstate telephone conversation
during which the two discussed the fact that Rahal had recently
ordered Watson to relieve SK Foods of its obligation to provide
Kraft with millions of pounds of processed tomato product so that
SK Foods could sell the product elsewhere for a higher price.
Rahal goes on in the call to tell SALYER that he had just made
personal bribe payments to Watson totaling $24,000.
Specifically, the relevant portion of the call is as follows:

    Salyer:  Uh-huh.

    Rahal:  He's going to get us 5 million pounds.  He's got to
    find out what stuff he's going to give us.

    Salyer: Shit, that's huge.  We need it.

    Rahal:  Yeah.  I can't get it any cheaper than 37 cents,
    though.

    Salyer:  That's okay.

    Rahal:  I'm trying.

    Salyer:  We're going to lose money on it, but I don't care.

    Rahal:  Yeah, alright.

    Salyer:  I don't want to cut people like Kraft off.

    Rahal:  Well, I had the coon walk away from stuff.  Closed
    it out.  But stuff we never packed.

    Salyer:  Yeah.  That didn't really help our (inaudible).

    Rahal: No, I know.  I know.  He don't know that.  I just
    sent that mother fucker a . . . [M.S.] - tell Scott how much
    money we sent the nigger.  Get on the phone.  Don't yell.

    M.S. (Rahal's secretary): $24,000.

Salyer:  Jesus Christ.  Is it Christmas time over in (inaudible).

Rahal:  It's taxes time.

M.S.:  It's tax time.

Salyer:  Oh, It's tax time.  I knew there was something going on.

Rahal:  Thank you, [M.S.].

Salyer:  It's Christmas time for mister Watson.

Rahal:  Yeah.  That's why I'm inviting him to the house for barbecue.  He said he needs watermelon.

Salyer:  Well, we can get watermelon.

Rahal:  Oh, yeah.  We got good watermelon in California. Thank you, Maryann.  Anyway.

Salyer:  Thanks, Maryann.

54.   In addition to conversations between Rahal and SALYER, which specifically address Watson, SALYER's overall knowledge and direction of the various schemes to bribe the purchasing managers of certain of SK Foods' customers is evidenced by the content of other recorded telephone calls between the two.  For example, on July 11, 2007, agents intercepted a call between Rahal and Manuel, during which the two discussed J.D., a purchasing manager at Agusa, which was a former SK Foods customer whose contract Manuel oversaw.  Manuel informed Rahal that J.D. had called and wanted to get another "1/2 million pounds of cold brick" (a type of tomato paste) right away.  Rahal responded, "so, we got an order for 500 and he wants another 5?  Well, I am coming to see him next week and I was going to give him 500 bucks for his

-32-

500,000 pounds, then I will just give him $1,000." Rahal then told Manuel, "I am paying him $1,000 per million pounds, that's the deal, so when you talk to him, tell him I will be in next week to see him."

55. Subsequently, on July 13, 2007, agents intercepted a telephone call between Rahal and SALYER during which Rahal stated: "I got to see my friend [J.D] over at Agusa, he's now my best friend, and give him something. He told me, he's doing exactly what he told me, he's rejecting that Chinese paste left and right." SALYER responded, "perfect, but it's small volumes." Rahal responded, "I know, but we started at zero volume and I don't think we'll ever be a big player in there, I don't think the Mendios (owners of Agusa) will ever let us be a big player, unless there's a catastrophe." SALYER then stated, "unless they start rejecting everybody else's paste, too." Rahal replied, "you never know what can happen, a little bit of money in the right place can do." SALYER stated, "I've heard about that type of shit happening, sample bags thrown away, results changed, there's all kinds of shit can happen."

56. Similarly, on July 6, 2007, agents intercepted a call between Rahal and Beasley during which the two discussed D.P., who at the time was a purchasing manager for Del Monte Foods, another SK Foods customer, and an account that Beasley was responsible for. During the recorded call, Beasley asked Rahal if D.P. "would want to get on the program." In response to

-33-

questioning, both Rahal and Beasley have indicated that "the program" was the phrase that various leaders at SK Foods would use when referring to the bribery scheme. Beasley then asked, "what happens if you put him on the program?" Rahal replied, "I can do it, we can get that Del Monte business." Rahal then told Beasley that they would have to meet with D.P. Beasley stated he would "try to get something going with [D.P.]" by setting up a meeting between Rahal, Beasley and D.P. Rahal told Beasley, "he's a survivor and he knows how to play this game . . . you know a thousand dollars in his pocket for every million pounds, that turns out to be, you know that's ten grand on ten million pounds."

57.   A few days later, on July 10, 2007, agents intercepted another interstate telephone communication between SALYER and Rahal, during which the two discussed D.P. Rahal stated, "D.P.'s gonna need a retirement program. So, it's a perfect fit for me." SALYER asked Rahal, "How fast are you going to reel in that fish?" Rahal replied, "probably by the time the coffee comes that'll be done." In response to questioning Rahal has indicated that he was referring to a dinner meeting he had scheduled with D.P. SALYER then stated, "I want that sucker on speed reel. You know that big electric reel. Whew . . . ." No evidence has been obtained in the investigation indicating that Rahal succeeded in actually paying bribes to D.P.

-34-

C.   **Wire Fraud With Respect to B&G Foods, Inc.**

58.   Information obtained during the course of the
government's investigation indicates that Robert Turner was the
purchasing manager at B&G with whom Rahal, and SK Foods, did
business.  In the factual basis to his publicly-filed plea
agreement with the government, Turner has admitted that during
the period relevant to this Criminal Complaint he was vested with
authority to negotiate and enter into contracts, with the
approval of his employer, for the purchase of processed tomato
products and other food products from various processors, such as
SK Foods.  Turner has further admitted that in the normal course,
he and B&G received bids for the sale of processed tomato and
other food products from processors to B&G by way of what was
intended to be a competitive bidding process.  In response to
questioning Turner, Rahal, Huey, Beasley and Manuel have all
indicated that B&G was a regular customer of SK Foods, and
routinely purchased millions of pounds of tomato paste, diced
tomatoes and other agricultural products from SK Foods on an
annual basis.

59.   Both Turner and Rahal have admitted in the factual
bases to their respective plea agreements with the government
that as part of a scheme to defraud B&G, beginning in 2004 Rahal
began making personal bribery payments to Turner.  Analysis of
certified bank records indicates that Rahal paid approximately
$14,698 in this regard to Turner between 2004 and 2008.  The
government's investigation has further revealed that during the

-35-

relevant period, Rahal routinely sent various checks, via United States Mail, to Turner at his residence in New Jersey. Two such mailings included payments of $1,000 and 9,698.80, and are dated May 17, 2006, and December 12, 2007, respectively.

60. Turner has also admitted in his plea agreement with the government that prior to being employed by B&G, Turner served in a purchasing manager capacity for Nabisco, Inc., a manufacturer, distributor and seller of cookies, snacks and other food products, also with a principal place of business in Parsippany, New Jersey. Turner has admitted in his plea agreement that while employed by Nabisco, Rahal paid Turner approximately $50,500 in personal bribe payments on behalf of SK Foods in the same manner as he did while Turner was employed by B&G.

61. Furthermore, both Rahal and Turner have admitted in their respective plea agreements with the government that in return for the personal bribe payments, Turner agreed to, and did, ensure that B&G purchased processed tomato products and other products from SK Foods rather than from certain of SK Foods' competitors. Rahal and Turner have also admitted that in return for the bribe payments, Turner secured contracts between B&G and SK Foods for the sale of certain food products at inflated prices.

62. For example, in May 2007, SK Foods and B&G entered into a cost-plus contract whereby SK Foods agreed to sell B&G 13,000,000 pounds of chile and jalapeno peppers at a price of $0.22 per pound. In response to questioning, Rahal has indicated

-36-

that subsequent to entering into the agreement, and in exchange for bribe payments, Turner agreed to increase the price per pound that B&G would pay SK Foods under the contract by $.01 per pound. In response to questioning, Rahal has also stated that in exchange for his efforts in helping secure the pepper contract between SK Foods and B&G, as well as its inflated price, he promised Turner a personal bribe payment in the approximate amount of $65,000 – equating to $.005 per pound on the entire contract. In his publicly-filed plea agreement, Turner has admitted to increasing the price of this pepper contract by $.01 per pound in return for personal bribe payments from Rahal.

63. Rahal's statements in this regard are corroborated by recorded interstate wire communications between Rahal and Turner. On June 8, 2007, for example, Rahal and Turner agreed to "split the penny" on the chile contract, which, as Rahal has stated to agents, meant that Turner would receive a kickback of ½ cent per pound of the total quantity of chile peppers and jalapenos that B&G purchased from SK Foods. Rahal has also admitted to agents that he would receive the other ½ cent per pound. Rahal went on in the call with Turner to state, "I don't know how big your chile purchase is, but it can be a lot of money. It's your kids' education."

64. Subsequently, on July 12, 2007, during an intercepted call, Rahal told Turner "I just want to make sure that you know that you're getting half of that 13 million pounds. That's yours." Turner replied, "All right." Rahal then stated, "that's

-37-

a penny on 13 is $130,000. So you're getting half of that . . . make no bones about it." Turner replied, "Okay." Rahal then told Turner that he would pay Turner, "once that money starts, coming in, I don't care how you take it."

65. Rahal has indicated that this scheme to defraud B&G, like the schemes to defraud Frito-Lay and Kraft, originated with SALYER. In the course of the government's investigation Rahal has informed agents that his payments to Turner were expressly authorized and directed by SALYER. Again, Rahal's statements in this regard are corroborated by the content of certain interstate telephone calls between Rahal and SALYER. For example, on June 12, 2007, SALYER and Rahal engaged in a recorded interstate telephone conversation during which the two discussed how Rahal had just secured the cost-plus chile and pepper contract with Turner and B&G. During the call, Rahal relayed to SALYER that he had promised Turner a personal bribe payment in order secure the contract. Specifically, Rahal and SALYER stated:

Salyer:  Yeah, Randy.

Rahal:  Hi, I just sold the rest of the jalapenos to Bob Turner at 28 ½ cents.

Salyer:  I'll be a son of a bitch.

Rahal:  I had to give him the penny. He said write it up. I just got off the phone with Poretti. Have Poretti send me an email. He dictated it to me and I gave it to Poretti. So.

Salyer:  Is that jalapenos and chilies?

Rahal:  Both. And they were at two different prices. I didn't know that. That was what Poretti told me. The

-38-

jalapenos were at 20, the chilies were at 22.  I just sold it all at the same price.

Salyer:  Well that makes it easier.

Rahal:  Fuck 'em.  They have more money than us.  I just gave up my money but I'm not going to turn it away.

Salyer:  So we sold the other 50% at 25.

Rahal:  Right. And then the balance.

Salyer:  At 28.

Rahal: 28 ½.

66.  As SALYER and Rahal discussed in their June 12, 2007 interstate telephone conversation, SK Foods' Vice President Mike Poretti was subsequently given instructions to prepare an email to Turner setting forth the pricing agreement reached between Turner and SK Rahal.  Poretti sent a draft of that email on or about June 13, 2007 from the Eastern District of California to Rahal in the District of New Jersey.  That email forms the basis for Count Four of the instant Criminal Complaint.

67.  Subsequently, on June 21, 2007, SALYER and Rahal engaged in another recorded interstate telephone conversation during which SALYER instructed Rahal to further increase the price per pound that B&G would pay SK Foods under the cost-plus pepper contract.  In this regard, SALYER directed Rahal to provide Turner with a fictitious justification for the increased contract price, namely that SK Foods was experiencing increased agricultural costs in connection with the peppers.

D.   **Mail and Wire Fraud with Respect to the Shipment to Customers of Adulterated and Misbranded Processed Tomato Product**

68.   In the factual basis to his publicly-filed plea and cooperation agreement with the government Alan Huey has stated that during his tenure at SK Foods, he worked both out of SK Foods' Lemoore, California facility, and at the company's headquarters in Monterey, California.  Huey has also admitted that as Senior Vice President for Sales and Marketing, he reported directly to SALYER.  Huey has indicated that during certain periods of time relevant to this Criminal Complaint, he was responsible for overseeing and managing SK Foods' inventory of processed tomato products and other food products, to include the shipment of those food products to SK Foods' customers across the United States.  Huey routinely collaborated with other members of SK Foods' senior management, to include SALYER, Rahal and Beasley, to determine what terms and pricing to offer to SK Foods' customers in its contracts for the sale of processed tomato products.

69.   In the normal course, the market price of processed tomato products fluctuates based on the percentage of Natural Tomato Soluble Solids ("NTSS") that the product contains (also known as the product's "Brix value").  Based on interviews conducted with individuals in the tomato processing industry, customers frequently specify a required NTSS concentration in their contracts with manufacturers such as SK Foods.  Customers

-40-

will also often specify acceptable levels of other processed
tomato product characteristics such as the product's pH, mold
content, color, acidity and viscosity (sometimes referred to as
"Bostwick"), depending on the customer's intended finished
product (i.e., ketchup, salsa, barbeque sauce, etc.).

70.  In addition to the quality control factors described
above, SK Foods' customers typically specified the acceptable
shelf life of the processed tomato product that they were
purchasing.  During the period relevant to this Criminal
Complaint, most customers required that SK Foods provide product
that was 24 months old or less.  SK Foods' Internal Quality
Management Systems Product Specification documents, which were
seized from SK Foods' facilities during the execution of
judicially authorized search warrants on April 16, 2008, detail
how SK Foods represented that the maximum shelf life of its
aseptic tomato paste product was 24 months from the date of
production.

71.  During the relevant period, SK Foods was also subject
to the United States Standards for grades of tomato paste and
puree as established by the United States Department of
Agriculture ("USDA").  SK Foods was further subject to Title 21,
Code of Federal Regulations, Section 110.110, through which the
United States Food and Drug Administration ("FDA") has
established maximum limits of natural or unavoidable defects in
foods sold within the United States, which present no health
hazard.  The limits are set out as Food Defect Action Levels.

-41-

72. The limits prescribed by the Food Defect Action Levels
represent thresholds above which FDA will take enforcement action
for the food products being "adulterated" pursuant to 21 U.S.C. §
342(a)(3). For example, FDA has set a Food Defect Action Level
for mold in tomato paste; if the mold count (as measured using
the Howard mold count method) of all of the subsamples of a lot
of tomato paste are higher than 40%, the FDA considers that
product adulterated and unfit for sale within the United States.

73. According to interviews conducted with numerous
witnesses, during the relevant period SK Foods was required to,
and did, regularly subject its processed tomato product to
laboratory testing to ensure it complied both with applicable
laws and regulations, and with customer specifications. Both
Huey and Dahlman have admitted in their publicly-filed plea and
cooperation agreements with the government that in the normal
course, SK Foods' employees initially recorded the raw results of
this testing process on handwritten lab result registers. That
data was subsequently entered into a proprietary computer system
owned and operated by SK Foods.

74. Information obtained during the course of the
government's investigation has further revealed that when SK
Foods shipped processed tomato products to customers, those
products were usually accompanied by a Certificate of Analysis
("COA"), which identified the particular grading factors (i.e.,
pH, mold count, color, viscosity and NTSS) derived from the SK
Foods laboratory testing of the product. According to Huey,

-42-

Dahlman, Beasley, Manuel and Rahal, SK Foods routinely affixed labels to the actual storage containers holding the processed tomato product destined for its customers. These container labels, along with the bills of lading and invoices that accompanied a customer-bound shipment, typically identified the date of production and NTSS level of the processed tomato paste. According to Huey and Dahlman, duplicate copies of the documents described above also were faxed or mailed to SK Foods' customers at the time of product shipment.

75. Information obtained during the course of the government's investigation demonstrates that beginning in approximately 2000, and continuing until April 2008, it became a regular practice for SK Foods to knowingly cause the falsification of the various grading factors and data contained on the COAs, bills of lading, invoices and bin labels (hereinafter, "quality control documents") that accompanied customer-bound shipments of tomato product, which was produced, purchased and sold by SK Foods. Huey has admitted that as Senior Vice President for Sales and Marketing he routinely falsified and directed Dahlman and other SK Foods employees to falsify these documents so that they reflected mold count levels in SK Foods' tomato product as being below the applicable Food Defect Action Level in many instances when, in fact, those levels were significantly above the federal threshold. Dahlman has also admitted to falsifying these quality control documents in her plea and cooperation agreement with the government.

-43-

Specifically, Dahlman has stated that she falsified mold count levels and other recorded attributes of SK Foods' product on a near-daily basis.

76. Huey and Dahlman also routinely caused the falsification of quality control documents so that they reflected NTSS levels that were higher than what the tomato product actually contained, as well as altered pH, color, viscosity values, and dates of production to meet customers' contractual specifications. Huey has admitted pursuant to his plea agreement that he subsequently distributed and directed Dahlman and other SK Foods employees to distribute such product, along with the falsified quality control documents, to certain of SK Foods' customers in interstate commerce. Huey and Dahlman also routinely caused duplicate copies of the falsified quality control documents to be sent and transmitted to SK Foods' customers via facsimile and United States mail at the time of shipment.

77. According to Huey and other SK Foods leaders, these actions described above were conducted at the express instruction and direction of SALYER, and were intended to make it appear to SK Foods' customers as if particular shipments of processed tomato product were compliant with USDA and FDA standards, and with customer specifications, when in fact they were not. As a result, adulterated and misbranded processed tomato product was frequently introduced into interstate commerce, and SK Foods'

customers were fraudulently induced to pay for such product, or
to overpay for the product.

78.  Huey's statements and the statements of other witnesses
in this regard are corroborated by information obtained from SK
Foods' former President Glen McClaran.  According to McClaran, in
April and May of 2007, both Huey and SALYER explained the
procedure of mislabeling processed tomato product and changing
quality control documents associated with product destined for
customers.  According to McClaran, he refused to participate in
this practice and eventually terminated his employment at SK
Foods as a result.  According to McClaran, in May 2007 he and
another SK Foods employee were discussing an inventory shortage
at SK Foods when SALYER stated, "You can solve all your problems
with a label printer."  McClaran also stated that he spoke with
Dahlman, who told him that she was instructed by Huey to change
labels when orders came in for product that was not in inventory.
According to McClaran, on or about June 7, 2007, he had a
conversation with SALYER during which McClaran told him that he
did not agree with this practice.  According to McClaran, SALYER
responded, "You can take your ethics book and shove it up your
ass.  We have always manipulated inventory and will continue to.
We will lie to anyone outside the circle, but not to each other."
McClaran is currently involved in litigation against SALYER
relating to his termination from SK Foods.

79.  The witness statements outlined above concerning
SALYER's knowledge and direction of the sale of adulterated and

-45-

misbranded food is further corroborated by the content of
interstate wire communications, which were intercepted during the
course of the government's investigation.  For example, on June
11, 2007, Rahal and SALYER engaged in a recorded interstate
telephone conversation during which the two discussed how Dahlman
was valuable to the company, because she frequently changed
labels and other quality control data at the request of SK Foods'
leadership.  Specifically, Rahal and SALYER stated:

> Rahal:  Um, I talked with Jeff, I talked with Tony.  Not
> Tony, I talked with Jeff, I talked with Mike Poretti, and I
> talked to Alan today.  Our Alan.  He said, "we're ready."  I
> don't want to lose Jennifer either.
>
> Salyer:  I don't either
>
> Rahal:  I really don't.  We just got to find the right
> person for her- the right job for her kind of person.  She's
> a hard worker.  That's the kind of example that you need to
> set- somebody who'll just dig in and do the job.
>
> Salyer:  Yeah.
>
> Rahal:  Like Duffy.  Like some of those original people.
>
> Salyer:  Yep.  Jennifer just needs to be locked up in an
> office.
>
> Rahal:  I- that's fine.  Whatever she can do, she can do it.
> She's also very good at changing labels and getting that
> kind of stuff done.
>
> Salyer:  Well, that's, she's a go to person.
>
> Rahal:  I don't want everybody in the world trained on how
> to do that.
>
> Salyer:  I think we just- that's why- You know what?  The
> reality is she almost- you know what she needs?  She needs
> just what I was saying, she needs to be Inventory Manager,
> Inventory administrator.  And that way she can always be
> watching and she can make sure that the inventory counts are
> right for the accountants.  You know, and that's fine, and
> she can do that.

Rahal:  Mmhmm, manipulate the numbers.

Salyer:  But she can do that, and then when we need something done-

Rahal:  I know she can do that.

Salyer:  If warehousing or something can't figure it out, she goes out and makes it happen.

Rahal:  You bet, she's done it for me a number of times. I said, you do it, you go out and get the label, and you put it on those drums. By god, she did it. She called me back three hours later- that load was done and ready to go. So, that's the kind of person I need from my support side.

Salyer:  Yeah, she's been trained. We can't train new people like that. And you're sure as hell ain't going to get Glen [McClaran]- Glen's got his CPA hat on. He's talking about integrity.

Rahal:  Yeah, well, there's a lot of people talk to us about integrity. That's fine, he's just got to come into the fold. I don't want to keep doing a character assassination of this guy. I don't. Let this guy do his thing. He is a CPA. You know how hard it was to get these kind of people. Shit, we're paying them a ton of fucking money.

80.  Witness statements concerning SALYER's knowledge and direction of the sale of adulterated and misbranded food is further corroborated by recordings obtained by the government, which were made at various SK Foods' executive meetings. For example, on a recording made on February 28, 2007, Rahal and SALYER discussed an occasion during which SK Foods intentionally delivered product to Safeway, Inc. that did not meet the specifications Safeway had outlined in its contact with SK Foods. During that conversation, SALYER stated:  "We're changing labels faster than the printers can run."  Rahal then replied, "I got a

-47-

label maker in my office."  SALYER stated, "When it comes to this type of manipulation, you don't need to know about this."

81.   Witness statements concerning SALYER's knowledge and direction of the sale of adulterated and misbranded food is further corroborated by certain email communications, which were obtained as a result of judicially authorized search warrants executed on April 16, 2008.  A number of emails from January 2007 are particularly telling.  In one such email, dated January 3, 2007, SALYER sent a communication from the Northern District of California to Huey in the Northern District of California, Rahal in the District of New Jersey, and Beasley in the Eastern District of California, suggesting that SK Foods misbrand millions of pounds of processed tomato product in order to meet its contractual requirements to customers.  In another email, dated January 23, 2007, Beasley sent a communication from the Eastern District of California to SALYER in the Northern District of California, Rahal in the District of New Jersey, and others, in which he suggested that SK Foods misbrand approximately 7.9 million pounds of tomato paste to reflect a higher NTSS concentration than what the product actually contained so that SK Foods could satisfy its unwitting customers.  These two emails form the basis for <u>Counts</u> <u>Five</u> and <u>Six</u> of the instant Criminal Complaint, respectively.

82.   Information obtained from various witnesses during the course of the government's investigation, including Huey and Dahlman has revealed that, at SALYER's direction, SK Foods

-48-

shipped millions of pounds of processed tomato product to
customers that was either adulterated or was misbranded in one
aspect or another.  Agents from the Federal Bureau of
Investigation and the Internal Revenue Service have reviewed the
historical quality control and shipments records for these
shipments.  Each of these shipments originated at SK Foods
facilities in the Eastern District of California and was sent to
different states around the country.  According to Dahlman, at
the time of each shipment, she mailed an invoice to the
particular customer describing the contents of the misbranded
and/or adulterated tomato product.

83.  As a result, on or about the dates set forth below, in
the Eastern District of California, for the purpose of executing
and attempting to execute the aforementioned scheme and artifice
to defraud, SALYER did knowingly cause Huey, Dahlman and others
to deliver by mail and private and commercial carrier, the items
listed below:

| COUNT | DATE | SENDER | ITEM INCLUDED IN MAILING | ASSOCIATED FALSIFICATION |
|-------|------|--------|--------------------------|--------------------------|
| SEVEN | 2/20/01 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Intramark USA in Westwood, New Jersey, via United States Mail, with respect to customer Land O'Lakes | Production Date for 16,251 pounds of tomato paste falsified from 9/25/98 to 7/24/99 |

| EIGHT | 7/10/03 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Gerber Products in Michigan, via United States Mail | Production Date for 13,475 pounds of tomato paste falsified from 8/4/00 to 7/7/02 |
|-------|---------|---------|---------|---------|
| NINE | 7/18/03 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Antis Food Products, Inc. in Pennsylvania, via United States Mail | Classification for 9,217 pounds of tomato paste falsified from conventional to organic |
| TEN | 7/23/03 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Heinz USA in California, via United States Mail | Classification for 37,721 pounds of tomato paste falsified from conventional to organic |
| ELEVEN | 3/1/05 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Nestle USA in Ohio, via United States Mail | Mold count for 26,050 pounds of tomato paste falsified from 56% to 40% |
| TWELVE | 3/7/05 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to San Antonio Farms in Texas, via United States Mail | Production Date for 40,032 pounds of tomato paste falsified from 9/23/02 and 9/24/02 to 9/17/03 and 9/18/03 |

| THIRTEEN | 1/4/07 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Barilla America, Inc. in Illinois, via United States Mail | Mold count for 54,160 pounds of tomato paste falsified from 58% to 36% |
| FOURTEEN | 4/17/07 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Intramark USA in Westwood, New Jersey, via United States Mail, with respect to customer Chelten House | Mold counts for 137,070 pounds of tomato paste falsified from 48-86% to 36-40% |
| FIFTEEN | 5/1/07 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Kraft Foods, Inc. in Texas, via United States Mail | Mold counts for 137,066 pounds of tomato paste falsified from 48-86% to 34-40% |
| SIXTEEN | 6/22/07 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Con Agra in Nebraska, via United States Mail | Mold count for 5,988 pounds of tomato paste falsified from 74% to 40% |
| SEVENTEEN | 12/5/07 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to B&G Foods in Maryland, via United States Mail | Mold count for 11,347 pounds of tomato paste falsified from 62% to 40% |
| EIGHTEEN | 12/18/07 | Dahlman | Invoice sent from SK Foods' Williams, CA facility to General Mills Operations, Inc. in Minnesota, via United States Mail | Mold count for 19,564 pounds of tomato paste falsified from 53% to 40% |

| NINETEEN | 2/4/08 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Heinz USA in California, via United States Mail | Mold count for 4,811 pounds of tomato paste falsified from 76% to 40% |
|----------|--------|---------|------|------|
| TWENTY | 3/20/08 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Tyson Foods, Inc. in Arkansas, via United States Mail | Mold count for 2,889 pounds of tomato paste falsified from 60% to 20% |

84. According to information provided by Huey, Dahlman and other witnesses, as well as through agents' review of SK Foods' historical quality control and shipments records, the government has determined that between 2004 and 2008 alone, SK Foods routinely falsified quality control documents relating to, and subsequently shipped, adulterated and/or misbranded tomato product manufactured by SK Foods to at least 55 different customer victims, in 22 different states. Certain of these shipments were accompanied by falsified COAs.

85. In addition to the information set forth in paragraphs 67-84 above, the government's investigation has revealed that during 2007, SK Foods experienced a period during which it was unable to provide an adequate supply of processed tomato paste containing 31% NTSS in order to meet its contractual obligations to certain customers, including Kraft Foods. According to Huey, Beasley, Manuel, and Rahal, in an attempt to alleviate the

-52-

shortage, SALYER contacted the owner and president of a competing
manufacturer of processed tomato products, Ingomar Packing
Company, in February 2007, and arranged to purchase approximately
3,400,000 pounds of processed tomato product containing lower
NTSS concentrations of 26% and 28%.  The negotiations of this
purchase are spelled out in a series of email communications that
were drafted between the two owners in January 2007, and which
have been obtained by the government during the course of its
investigation.

    86.  According to numerous witnesses, and the text of the
obtained email communications, the product purchased from the
competitor by SALYER was also classified as "high mold," and
uniformly contained mold counts significantly in excess of the
applicable FDA Food Defect Action Level.  Accordingly, the
product purchased from the competitor did not meet the
specifications contained in certain of SK Foods' existing
contracts, and was adulterated and unsaleable in the United
States due to its excessive mold content.  In his emails with the
competitor's owner SALYER explicitly acknowledged that the
product was "high mold."  At one point, the competitor's owner
asked SALYER what he is going to do with the product because the
mold levels were so high.  SALYER proceeded to lie and tell the
competitor's owner that he would sell it overseas.  According to
Huey, in order to conceal the tomato product's inferior quality,
SALYER ordered Huey to misbrand the product by causing the

-53-

falsification of certain customer-bound quality control documents
so that they incorrectly reflected the product as uniformly
containing 31% NTSS tomato paste and a mold count at or below
40%. SALYER's direction to Huey in this regard came, in part, in
the form of a January 22, 2007 email, which the government has
obtained during the course of its investigation, and which was
sent in interstate commerce. In that email, SALYER ordered Huey
to incorporate the high mold paste from the competitor into SK
Foods' existing inventory intended for domestic customers.
According to Dahlman, she actually misbranded the product at
Huey's direction. SK Foods quality control and shipment records,
as well as statements from Huey, Dahlman and others indicate that
SK Foods caused the adulterated and misbranded tomato product,
and the accompanying falsified documentation, to be shipped
during the spring of 2007, via interstate carrier, from SK Foods'
facilities in the Eastern District of California to Kraft Foods'
facilities in other states.

### E. SALYER's Flight to Avoid Prosecution

87. Recently, the government has obtained information which
indicates that SALYER may have fled the United States in order to
avoid prosecution for the criminal conduct outlined above.
During certain periods relevant to the instant Criminal
Complaint, J.J. served as a Vice President for SK Foods, and as a
personal assistant for SALYER. According to J.J., during the
second week of October 2009, well after this investigation became

-54-

overt, and after negotiations between Assistant United States
Attorneys and SALYER's criminal defense attorneys concerning
SALYER's potential culpability, SALYER left the United States in
order to reside permanently in France.  I have reviewed
international travel records for SALYER, and have confirmed that
on October 18, 2009, SALYER flew from San Francisco International
Airport to Auckland, New Zealand aboard an Air New Zealand
flight.  According to J.J., SALYER told J.J. that the next time
he would see J.J. would be in Paris, and that SALYER felt he
could not be extradited back to the United States from France.
According to J.J., SALYER returned briefly to the United States
during the second week of December in order to celebrate his
birthday in the Monterey area.  I have reviewed international
travel records for SALYER, and have confirmed that on December
10, 2009, SALYER traveled from London to San Francisco
International Airport aboard a British Airways flight.  He
subsequently returned to London aboard another British Airways
flight on December 13, 2009.  On December 14, 2009, SALYER flew
from London to Paris.

       88.  In response to questioning by investigating agents,
J.J. indicated that during the fall of 2009, J.J. assisted SALYER
in attempting to obtain a residence in Paris, France, where
SALYER intended to reside permanently.  I have reviewed a
contract which purports to be from a company entitled Paris Real
Estate Finders, which describes an agreement whereby the company

-55-

would attempt to locate an apartment in Paris for SALYER.  J.J.
signed the agreement with Paris Real Estate Finders on behalf of
SALYER.  Additionally, according to J.J., in October of 2009,
SALYER contacted J.J. and requested that J.J. send SALYER
medications to him in France.  SALYER provided J.J. with a
mailing address for him in the city of Paris.

89.  According to J.J., before SALYER left the United States
for Europe in October 2009, SALYER instructed J.J. to sell many
of SALYER's personal belongings such as his guns, artwork and
other personal effects.  SALYER also instructed J.J. to
distribute other such items to SALYER's friends and relatives.
According to J.J., SALYER's former primary residence in Pebble
Beach, California is vacant and has been largely emptied of
SALYER's personal belongings.  A public database search has
confirmed that SALYER's residence is currently for sale for
approximately $7,000,000.

90.  In response to questioning by investigating agents,
J.J. indicated also that on or about October 19, 2009, SALYER
instructed J.J. to wire approximately 30,000 euros to an entity
entitled Pushon, Ltd., which purports to be a London-based
company specializing in assisting foreigners obtain residency and
employment in the European Union.  I have reviewed an October 19,
2009 email from SALYER to J.J., in which SALYER instructed J.J.
to wire 30,000 euros to Pushon, and to use certain funds located
in bank accounts associated with SALYER's former entity, SS

-56-

Farms, to satisfy the transfer. I have also reviewed an invoice from Pushon, Ltd. to SS Farms for 50,000 euros. Both documents were provided to the government by J.J. in response to an issued grand jury subpoena.

91. According to J.J., during the fall of 2009, she also engaged in conversations with SALYER during which the two discussed SALYER's attempts to gain permanent resident status in Uruguay, Paraguay, Andora, and France, because these were locations that SALYER felt he couldn't be extradited from. In response to questioning from agents, J.J. recounted another instance during the fall of 2009, during which SALYER spoke with a friend of J.J., who was born in Brazil, as to whether SALYER could be successful in obtaining permanent residence status in Brazil.

92. According to J.J., in aid of SALYER's flight to avoid prosecution, she, along with certain other individuals, assisted SALYER in transferring millions of dollars to banks in foreign countries. Specifically, J.J. has indicated that SALYER instructed J.J. to move millions of dollars in assets from accounts that were originally associated with various SK Foods entities involved in the tomato processing business, and which were located at Bank of the West and Wells Fargo Bank, to other accounts located at Mechanics Bank in San Francisco. According to J.J., SALYER then instructed certain personal accountants and individuals at Mechanics Bank to transfer the funds at Mechanics

-57-

Bank to financial institutions in the West Indies and in Liechtenstein. I have reviewed email correspondence, provided to the government by J.J., from a bank employee at Mechanics Bank to SALYER and J.J., which references two bank accounts that have been established for SALYER in Liechtenstein and Charlestown, West Indies, respectively.

## V.   CONCLUSION

Based on the foregoing, there is probable cause to believe that defendant FREDERICK SCOTT SALYER, in the Eastern District of California and elsewhere, has violated Title 18, United States Code, Sections 1341, 1343, and 2, as is set forth more fully at Section II, paragraph 6 of this affidavit. Accordingly, I request that a warrant be issued for the arrest of FREDERICK SCOTT SALYER for committing these offenses.

## VI.   SEALING REQUEST

The criminal investigation regarding FREDERICK SCOTT SALYER and others is continuing. A number of additional interviews, subpoenas, and possibly grand jury testimony, searches and arrests are contemplated in the very near future. Furthermore, and as is set forth more fully above, the evidence obtained by the government to date suggests that SALYER has fled the United States in anticipation of criminal charges being brought against him by the United States Attorney's Office. Disclosure of the contents of this affidavit at this time would seriously impede the continuing investigation and prosecution by disclosing the

-58-

details of the government's investigation, which potentially could cause SALYER or others to flee or to abscond to a different location. Disclosing the details of the government's investigation could also potentially cause others to destroy evidence, or intimidate and attempt to corruptly influence potential witnesses in the case. Such activity would seriously impede the investigation and prosecution. Accordingly, it is respectfully requested that the Court issue an order sealing this affidavit and the associated Criminal Complaint until further order of this Court.

The information set forth above in this affidavit is true and correct to the best of my knowledge:

Paul S. Artley
Special Agent
Federal Bureau of Investigation

Reviewed and approved as to form:

Sean C. Flynn
Assistant United States Attorney

Subscribed and sworn to before
me in Sacramento, California this
5th Day of January, 2009.

Honorable Dale A. Drozd
U.S. Magistrate Judge

-59-

# EXHIBIT D




# Mechanics Bank



**November Statement** for activity from Oct. 06, 2009 through Nov. 04, 2009  **Inquiries: 1-866-552-8655**
SS FARMS LLC (                    )                                          BUS   4678 03   Page 1 of 3

## Your Visa® Platinum Business Rewards Card account at a glance

Account(

### Activity Summary

| | |
|---|---|
| Previous Balance | $3,960.18 |
| Payments and Credits | $15,840.72 |
| Purchases, Advances & Other Debits | $13,046.05 |
| FINANCE CHARGES | $0.00 |
| New Balance | $1,165.51 |

### Credit and Payment Information

| | |
|---|---|
| Credit Line | $5,000.00 |
| Available Credit | $3,834.49 |
| Minimum Payment Due (Current Month)... | $12.00 |
| Minimum Payment Due (Past Due) | $0.00 |
| Total New Minimum Payment Due | $12.00 |
| Payment Due Date | Dec. 01, 2009 |

To reduce or avoid paying additional finance charges on your purchase balance, pay the total new balance of $1,165.51 by 12/01/09.
Any cash balance or balance transfer balance will continue to accrue daily interest until the date your payment is received.

## Transactions  SALYER, SCOTT

Credit limit $5000

| Post Date | Trans Date | Ref. Nbr | Description of Transaction | Amount | Notation |
|---|---|---|---|---|---|
| 10/13 | 10/10 | 5217 | HERMES # 31      SAN FRANCISCO CA | $755.55 | - - - - - - - - |
| 10/14 | 10/13 | 2144 | ROSETTA STONE    540-432-6166 VA | $263.84 | - - - - - - - - |
| 11/02 | 10/29 | 9858 | THE WESTIN AUCKLAND  AUCKLAND  NZ | $27.88 | - - - - - - - - |
| | | | 37.00  NEW ZEALND DOL | | |
| 11/03 | 10/31 | 0022 | TRAVEL UTOPIA PTY LT  ERINA      AU | $2,056.60 | - - - - - - - - |
| | | | 2194.00  AUSTRALIAN DOL | | |
| 11/03 | 11/02 | 0030 | TRAVEL UTOPIA PTY LT  ERINA      AU | $1,757.58 | - - - - - - - - |
| | | | 1875.00  AUSTRALIAN DOL | | |
| | | | **Total for account** | **$4,861.45** | |

## Transactions

Credit limit $5000

| Post Date | Trans Date | Ref. Nbr | Description of Transaction | Amount | Notation |
|---|---|---|---|---|---|
| 10/08 | 10/07 | 6769 | MACY'S EAST #361      MONTEREY    CA | $1,560.79 | - - - - - - - - |
| 10/08 | 10/07 | 4962 | WCI*KINGSBURGDISPOSAL 800-300-6106 CA | $300.40 | - - - - - - - - |
| 10/08 | 10/07 | 2034 | CHEVRON 00098345    CARMEL      CA | $67.80 | - - - - - - - - |
| 10/09 | 10/08 | 9412 | FEDEX 72053135779      800-4633339  TN | $2.18 | - - - - - - - - |
| 10/13 | 10/09 | 4253 | FEDEX 797990289391    800-4633339 TN | $23.11 | - - - - - - - - |
| 10/13 | 10/09 | 3543 | FEDEX 796002667586    800-4633339 TN | $19.94 | - - - - - - - - |
| 10/15 | 10/12 | 6356 | CARMEL DRUG STORE    CARMEL      CA | $453.99 | - - - - - - - - |
| 10/15 | 10/14 | 4500 | FEDEX   638810136574  800-4633339  TN | $11.82 | - - - - - - - - |

Continued on Next Page

SSD 00199

# EXHIBIT E



**$6,995,000** ████████████, **Pebble Beach, 93953**

**Property Class:** Single Family Residential
**City:** Pebble Beach    **Area:** 177 Central Pebble Beach
**County:** MONTEREY    **State:** CA
COUNTY
**Beds:** 4    **Baths:** 4+ (1 partial)
**Living Area (SqFt):** 5057 **Approximate Lot Size:** 1.600 Square Feet
**Year Built:** 2000    **MLS#:** 80946509
**Last updated on 1/5/2010**

**Last updated on >**
Copyright MLS Listings (REINFOLINK). All rights reserved.



Presented By:
**Randi Greene**
Coldwell Banker Northern California
Mobile: (831)869-8325
http://RandiGreene.com

### Remarks

A spectacular residence awaits you with sweeping views of Point Lobos, Stillwater Cove & Carmel Beach. Completely gated private circular drive gives you an immediate WOW factor. Expansive floor plan designed for comfortable but elegant living. Master & one guest suite on main level. Huge West facing patio w/ outdoor kitchen, lg firepl, & hot tub, plus yard below has bocce ball court. Lg generator.

### Features

**Additional Listing Info:** Not Applicable / Not Disclosed
**Cooling System:** No Cooling
**Family Room:** No Family Room
**Formal Dining Room:** Separate Dining Room
**Garage/Parking:** Attached, Electric Door or Gate Opener, Guest Parking, Off Street Parking, 3 or More Car Garage
**Insulation:** Insulation Unknown
**Listing Includes:** Cooktop Range, Disposal, Dryer, 2 or More Dishwashers, Microwave Oven, 2 or More Ovens, Security Alarm System-Owned, Self Cleaning Oven, Trash Compactor, Washer, Window Coverings, 2 or More Refrigerators, Built-In Oven, Built-In Oven/Range Combo
**Sewer/Septic System:** Sewer in & Connected
**Type:** Detached Single Family

**Amenities:** 220 Volts in Kitchen, Double Pane Windows, Fire Sprinkler System, High Ceilings, 220 Volts in Laundry Area, Satellite Dish, Wet Bar, Cable TV Available
**Bedroom Description:** 2 or More Master Suites, Ground Floor Bedroom
**Fireplace Description:** Wood Burning Fireplace, Gas Starter in Fireplace
**Floor Covering:** Area Carpeting, Partial Hardwood, Granite Floors, Hardwood
**Heating System:** More than One Heating Zone, Central Forced Air Heat
**Informal Dining Room:** Breakfast Nook, Breakfast Bar
**Other Areas:** Laundry Area - Garage, Wine Cellar
**Roof:** Shake Roof
**View:** Bay View, Ocean View
**Yard/Grounds:** Patio, Sprinklers - Front, Sprinklers - Rear, Automatic Sprinkler(s), Barbecue Area, Fenced Yard, Game Court

**Bathroom Features:** Tub in Master Bedroom, Tub with Jets
**Exterior Features:** Stone Exterior, Stucco Exterior
**Fireplace Location:** Fireplace in Living Room, Fireplace in Master Bedroom, Fireplace in Other Location
**Foundation:** Concrete Perimeter & Slab
**Homeowner Protection Plan:** No Home Warranty
**Levels:** 2 Stories
**Other Rooms:** Den or Study
**Shower:** 2 or More Stall Showers
**Water Sources:** City/Public Water

Courtesy of Judith Profeta, Alain Pinel Realtors

Licensed to Coldwell Banker Northern California, CA. Terms of Use – Viewers must acknowledge: 1) All MLS information obtained from the website is intended only for the consumers/viewer's personal, noncommercial use; 2) The user has a bona fide interest in selling, leasing or purchasing real property of the type offered; 3) The user will not make available for redistribution any of the MLS content; and 4) The user acknowledges the validity of MLSListings copyright and ownership of MLS content.

The data relating to real estate for sale on this website comes in part from the Broker Listing Exchange program of the MLS Listings Inc. MLS system. Real estate listings are marked with the Broker Listing Exchange icon (a stylized house inside a circle) and detailed information about them

# EXHIBIT F

ATTORNEY-CLIENT –
PRIVILEGED
DUANE MORRIS

**From:** fscott.salyer@gmail.com [mailto:fscott.salyer@gmail.com] **On Behalf Of** Scott Salyer
**Sent:** Tuesday, September 22, 2009 3:04 PM
**To:** ▮
**Subject:** Fwd: The Most Astounding French Vacation Villa - AD-133487

Can you arrange a transfer of $ 500 EU to this guy in France via Western Union ?

When are you back ?

Spoke with Jane , love that Bank ...

SS

---------- Forwarded message ----------
From: **Cote d'Azur Villa** <coted39azurvilla@yahoo.com>
Date: Tue, Sep 22, 2009 at 2:50 PM
Subject: Re: The Most Astounding French Vacation Villa - AD-133487
To: Scott Salyer <scott@scottsalyer.net>

Yeah sure, currently I am in Italy with business send me insurance 500€ to keep the house occupied through
Western Union I pay the taxes is the easiest way here and secure pay online with credit card
You see the house if you do not like you will get full money back

▬▬▬▬▬▬

Italy address: 140, v. Maragliano , Florence

Thank you!

--- On **Tue, 9/22/09, Scott Salyer** <*scott@scottsalyer.net*> wrote:

From: Scott Salyer <scott@scottsalyer.net>

Subject: Re: The Most Astounding French Vacation Villa - AD-133487
To: "Cote d'Azur Villa" <coted39azurvilla@yahoo.com>
Date: Tuesday, September 22, 2009, 1:38 AM

Thank you for the price per month , is the Villa available for long term lease ?
4 people plus one small dog - King Charles Spaniel .

I will be in Nice next week , would like to view property if possible .

1

SSD 00311

Thank You ,

Scott Salyer

On Sat, Sep 19, 2009 at 1:12 PM, Cote d'Azur Villa <coted39azurvilla@yahoo.com> wrote:

price is 12200€ month,how many people?

Thank you!

--- On **Fri, 9/18/09, Viviun User - Scott Salyer** *<fscottsalyer@gmail.com>* wrote:

From: Viviun User - Scott Salyer <fscottsalyer@gmail.com>
Subject: Re: The Most Astounding French Vacation Villa - AD-133487
To: coted39azurvilla@yahoo.com
Date: Friday, September 18, 2009, 1:59 PM

**Error! Filename not specified.**
<u>View Listing</u>

| | |
|---|---|
| **From:** | Scott Salyer  (fscottsalyer@gmail.com) |
| **Phone:** | |
| **About:** | The Most Astounding French Vacation Villa - AD-133487 |
| **Date:** | 18-Sep-09 |

Would owner consider a one year lease ?
Availability starting in October .

Scott

**Is this a legitimate inquiry?** Please learn about <u>Internet Fraud</u>
**Maximize Your Results !!** - A feature listing will place your listing in the top positions
for its category, placing it over of all other competing properties. <u>Upgrade Now!</u>

**Viviun**  |  **Real Estate**  |  **Rentals**  |  **Sign In**  |  **Contact Us** Copyright © 2002-2009

**SSD 00312**

## WESTERN UNION

**Customer Receipt / Recibo del Cliente**               www.westernunion.com

```
SAFEWAY #2669-18              Oper ID: 916 Money Transfer Send
S CROSSROADS BLVD            09/24/2009    Envio de Dinero
CARMEL CA 92923              343P EDT      MTCN: 002-081-2379
```

Sender/Remitente: ▓▓▓▓▓▓▓▓
Receiver/Destinatario: NIKOS IOANIDE

Available In/Disponible en: ITALY EURO
Payout amount/Cantidad de pago: 500.73 Euro Euro
Exchange Rate/Tipo de cambio:   0.6395024

Western Union Card Number / Numero de Tarjeta ▓▓▓▓▓▓▓

```
                           Amount/Cantidad:    $  783.00
                           Charge(s)/Cargos:
                              Service/Servicio:    62.00
                                          l:   $  845.00
```

## WESTERN UNION

YOU'VE BEEN ENROLLED IN THE GOLD CARD REWARDS PROGRAM! To activate your
Rewards Card just use the Card Number listed above again. Once you do, we
will send your Card in the mail and you'll begin earning valuable rewards!

Agent Signature /
Firma del Agente

Customer Signature /
Firma del Cliente

IN ADDITION TO THE TRANSFER FEE, WESTERN UNION ALSO MAKES MONEY WHEN IT CHANGES YOUR DOLLARS INTO FOREIGN CURRENCY. PLEASE SEE REVERSE SIDE FOR MORE INFORMATION REGARDING CURRENCY EXCHANGE. IF THE EXCHANGE RATE FOR YOUR TRANSACTION IS DETERMINED AT THE TIME YOU SENT THE MONEY, THE CURRENCY TO BE PAID OUT AND THE EXCHANGE RATE ARE LISTED ON YOUR RECEIPT. OTHERWISE, THE EXCHANGE RATE WILL BE SET WHEN THE RECEIVER RECEIVES THE FUNDS. CERTAIN TERMS AND CONDITIONS GOVERNING THIS TRANSACTION AND THE SERVICES YOU HAVE SELECTED ARE SET FORTH ON THE REVERSE SIDE. BY SIGNING THIS RECEIPT, YOU ARE AGREEING TO THE TERMS AND CONDITIONS.

SERVICIO DE TRANSFERENCIA, WESTERN UNION TAMBIÉN GANA DINERO CUANDO CAMBIA SUS DÓLARES A ... REVERSO MÁS INFORMACIÓN SOBRE EL CAMBIO DE MONEDA. SI EL TIPO DE CAMBIO PARA SU ... EN EL QUE ENVÍO EL DINERO, LA MONEDA EN LA QUE SE HARÁ EL PAGO Y EL TIPO DE CAMBIO SE ... EL TIPO DE CAMBIO SE FIJARÁ CUANDO EL DESTINATARIO RECIBA LOS FONDOS. ALGUNOS ... ACCIÓN Y LOS SERVICIOS QUE USTED HA ELEGIDO SE ESTABLECEN EN LAS AL REVERSO. AL ... ACUERDO CON ESOS TÉRMINOS Y CONDICIONES.

# EXHIBIT G

# Paris Real Estate Finders

46, rue Pierre FONTAINE
Paris, FRANCE 75009
01.53.21.98.44

October 19, 2009

Scott    Salyer
scott@scottsalyer.net

Re: Purchase of Paris Apartment

Hello            Scott ,

This letter describes our engagement to assist you in purchasing your apartment in Paris. We have agreed to work with you for a ~2.0% of purchase price fee (or a minimum of $7,500 / 5000 Euros), which fee is payable in three parts.

The first installment of 2000 Euros is due as an engagement fee which will be deducted from your final search cost which is based on the price of the property actually purchased. The second fee is due at the signing of the promesse de vente and the third at the final closing which will occur 60-70 days after acceptance of the initial offer by the seller.

For this tripartite fee, we will help you select apartments you are interested in viewing, listed either on the service "Particulier a Particulier," direct from owner, through other "for-sale-by-owner" sources, or through any real estate agency. We will make necessary appointments, visit and evaluate apartments with you, and assist you in price negotiation and making a purchase offer. Once you have an accepted offer, we will accompany you to the signing of the "promesse de vente" and attend the closing (signing of the "acte authentique") and assist in necessary intermediate steps prior to the closing.

We are not licensed real estate agents and are not qualified to act under French law as attorneys or notaires. We make no representations as to individual properties except to confirm that we have no interest or undisclosed relationship of any nature with the seller of any property. We do not certify the condition of any property. Our participation in the inspection of a property consists of viewing the property on a surface visual inspection only and is not the basis of any representation or warranty of the nature and condition of a property. Further, we make no representations as to the investment value of a property.

In the event that you decide to terminate your search without purchasing, no portion of our fee is refundable. In the event that you purchase a property that we have helped you locate that is being sold through an estate agent, you will likely incur dual fees from them and from PREF. We will attempt to negotiate, on a best efforts basis, a reduction of the sale price and/or the realtor's commission to accommodate our ~2.0 % fee.

We agree that both parties will be available on a reasonable basis to work cooperatively during your periodic stays in Paris and further, we will advise you on a regular basis of properties that meet your designated criteria. This engagement is limited to the specific purchase of your apartment, and does not include services beyond those described above.

We look forward to working with you and the successful conclusion of your purchase! Please sign this letter below and return the original to us to confirm your acceptance of its terms.

Sincerely,


_____            _____
Darrell Halverson                            Stephanie Freedman


We accept the terms provided above:


_____  ██████████        10/20/09
Scott      Salyer                                                    Date:

SSD 00005

# EXHIBIT H

ATTORNEY-CLIENT –
PRIVILEGED
DUANE MORRIS

**From:** fscott.salyer@gmail.com [mailto:fscott.salyer@gmail.com] **On Behalf Of** Scott Salyer
**Sent:** Wednesday, September 23, 2009 7:49 AM
**To:** ▮▮▮▮▮▮▮▮▮▮
**Subject:** Fwd: info

Here it is !!

SS

---------- Forwarded message ----------
From: **Punshon** <dicenta@punshon.com>
Date: Wed, Sep 23, 2009 at 2:54 AM
Subject: Re: info
To: Scott Salyer <scott@scottsalyer.net>

Scott

Thank you very much for your E-mail !

Please send to:

Punshon Ltd.
Res. THE OFFICE
8, Bd. d'Aguillon
06600 ANTIBES
FRANCE

ok for the meeting with me.
Ask also Lissi and please confirm.
I prefer him to be present as well (of course if you agree).

Thank you very much.

Kind regards

Roland

--
CHAT ON-LINE or LEAVE YOUR MESSAGE:
www.punshon.com/roland

1

SSD 00313

**From:** fscott.salyer@gmail.com on behalf of Scott Salyer [scott@scottsalyer.net]
**Sent:** Monday, October 19, 2009 11:05 AM
**To:**
**Subject:** Fwd: Consultancy
**Attachments:** Invoice.pdf

Please pay this out of Farms .

$ 30k Euro's , Mags can handle wire and conversion .

Thanks ,

SS

---------- Forwarded message ----------
From: <manager@punshon.com>
Date: Mon, Oct 19, 2009 at 1:38 AM
Subject: Consultancy
To: Scott Salyer <scott@scottsalyer.net>

Hi Scott,
enclosed is the invoice for your kind settlement.

Thank you very much.

Sincerely yours

Roland di Centa

--
CHAT ON-LINE or LEAVE YOUR MESSAGE:
www.punshon.com/chat

1

SSD 00003

**From:** Scott Salyer <scott@scottsalyer.net>
**To:** dicenta@punshon.com
**Sent:** Tuesday, September 22, 2009 5:03:24 AM
**Subject:** Re: info

Roland

I need a physical address , your PO Box in Lugano or Monte Carlo .

Ready to ship documents out tomorrow .

Regarding our meeting , would you be available Wednesday September 30th in Monte Carlo ?

Scott

On Fri, Sep 18, 2009 at 8:57 AM, Scott Salyer <scott@scottsalyer.net> wrote:
Roland

My Secretary was able to find all information you requested .
Heading to get certified today .

When would we be able to meet and travel to project ?

Scott

2

**SSD 00314**



**...SINCE 25 YEARS**

# P U N S H O N ® Ltd.

## LONDON
### INTERNATIONAL LAW DEPARTMENT

27, Old Gloucester Street
**LONDON WC1N 3XX**
**GREAT BRITAIN**
Tel. ☎ +44-(0)-20-3239-7667
Fax ✆ +44-(0)-20-7691-9483
**Internet:** http://www.punshon.com
**Email:** info@punshon.com

**SS Farms**
**300 sky park drive**

**Monterey , CA 93940**
**U.S.A.**

1 october 2009

### Invoice No. 91001

Reference:        Intercontinental legal support

Competent global legal consultancy and assistance:

Preliminary personal and business consultancy for starting activities in Europe and overseas with examination of all legal and aspects and requirements as to relevant administrations.
Verification of particular local opportunities and considerations includitn preeminent advantages, as to any international implementation.
Comprehensive consultancy with several meetings before starting any project to take the appropriate steps prior setting up any business with personal and corporate tax efficiency.

Forfeit                                                    Euro € 50,000.00
                                                           ------------------
**Total**                                                  **Euro € 50,000.00**
                                                           ==================

Payable in 2 installments:
On reception of this invoice € 30.000
Concluding consultancy € 20.000

Please pay to:
Punshon Ltd.
Jyske Bank,
PO Box 143, 76 Main Street, Gibraltar
€ Euro Account Number: ████████████

**SSD 00002**

# EXHIBIT I

ATTORNEY-CLIENT –
PRIVILEGED
DUANE MORRIS

**From:**
**Sent:** Saturday, November 21, 2009 9:44 AM
**To:** 'Scott Salyer'
**Subject:** RE: FW: Final Judgment - Dissolution of Marriage (Salyer)

No –
I only have a copy that I sent to you via email – We had to send original to Barbara Hamilton.  We sent Pushon a
certified copy as well.

**From:** fscott.salyer@gmail.com [mailto:fscott.salyer@gmail.com] **On Behalf Of** Scott Salyer
**Sent:** Friday, November 20, 2009 2:52 AM
**To:**
**Subject:** Re: FW: Final Judgment - Dissolution of Marriage (Salyer)

JJ

Did you find my birth certificate ?

We had it for oz and Pushon ...

I dont have with me .

Thanks ,

Scott

On Mon, Nov 16, 2009 at 5:12 PM, Scott Salyer <scott@scottsalyer.net> wrote:
JJ

Thanks , I also need copy of my birth certificate .

Off to Italy Thursday ...

SS

1

SSD 00371