1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF CALIFORNIA

3                            --o0o--

4    UNITED STATES OF AMERICA,    ) Case No. 2:10-cr-00061-GEB
                                  )
5                   Plaintiff,    ) Sacramento, California
                                  ) Friday, February 26, 2010
6         vs.                     ) 2:34 P.M.
                                  )
7    FREDERICK SCOTT SALYER,      ) Hearing re: arraignment,
                                  ) initial appearance; and
8                   Defendant.    ) motions re: custody.
     ─────────────────────────────)
9
                         TRANSCRIPT OF PROCEEDINGS
10              BEFORE THE HONORABLE EDMUND F. BRENNAN
                    UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     For Plaintiff:                SEAN C. FLYNN
13                                 U.S. Attorney's Office
                                   501 I Street, Suite 10-100
14                                 Sacramento, CA   95814
                                   (916) 554-2700
15
     For Defendant:                MALCOLM S. SEGAL
16                                 JAMES P. MAYO
                                   Segal and Kirby
17                                 770 L Street, Suite 1440
                                   Sacramento, CA   95814
18                                 (916) 441-0828

19   Court Recorder:               JONATHAN ANDERSON
                                   U.S. District Court
20                                 501 I Street, Suite 4-200
                                   Sacramento, CA   95814
21                                 (916) 930-4072

22   Transcription Service:        Petrilla Reporting &
                                     Transcription
23                                 5002 - 61st Street
                                   Sacramento, CA   95820
24                                 (916) 455-3887

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

1

1    SACRAMENTO, CALIFORNIA, FRIDAY, FEBRUARY 26, 2010, 2:34 P.M.

2

3         (Call to order of the Court.)

4         THE CLERK:  Calling Criminal Case 10-61-GEB, United

5    States v. Frederick Scott Salyer.  This is on for arraignment

6    for defendant's initial appearance, as well as the parties'

7    motions regarding custody.

8         THE COURT:  All right.  We'll wait for the defendant

9    to be brought in.

10        (Pause.)

11        THE COURT:  Okay.  Your appearances please.

12        MR. FLYNN:  Good afternoon, Your Honor.  Sean Flynn

13   on behalf of the United States.

14        THE COURT:  Good afternoon, Mr. Flynn.

15        MR. SEGAL:  Good afternoon, Your Honor.  Malcolm and

16   Jim Mayo on behalf of the defendant, who's present in court.

17        THE COURT:  All right.  Good afternoon, Mr. Segal and

18   Mr. Mayo.  And Mr. Segal, you're retained; is that correct?

19        MR. SEGAL:  I am Your Honor.

20        THE COURT:  All right.  This is on for the

21   defendant's initial appearance, the arraignment on the

22   indictment and then the defendant's motion for bail review.

23        Mr. Salyer, you have the right to counsel throughout

24   these proceedings.  This includes the right to retain an

25   attorney of your own choosing.  It also includes the right to

2

1  have an attorney appointed for you if you cannot afford to hire

2  any attorney.

3          You have the right to remain silent.  You're not

4  required to say anything here today, but if you do say

5  anything, it can be used against you.

6          Mr. Segal, has the defendant received a copy of the

7  indictment and had the opportunity to review it with you?

8          MR. SEGAL:  He has, Your Honor.

9          THE COURT:  Do you waive a formal reading of the

10  indictment?

11          MR. SEGAL:  I waive a formal reading.

12          THE COURT:  All right.  Mr. Salyer, you've been

13  charged in count one of the indictment with conducting an

14  enterprise through a pattern of racketeering in violation of

15  Title 18, United States Code Section 1962(c).  If convicted of

16  this charge, the maximum penalties that you face are a term of

17  imprisonment of up to 20 years, a term of supervised release of

18  up to three years, a fine of up to $250,000, and a special

19  assessment of $100.

20          You've been charged in count two of the indictment

21  with conspiracy to conduct an enterprise through a pattern of

22  racketeering in violation of Title 18, United States Code

23  Section 1962(d).  If convicted of this charge, the maximum

24  penalties that you face are a term of imprisonment of up to 20

25  years, a term of supervised release of up to three years, a

3

1    fine of up to $250,000 and a special assessment of $100.

2           You have been charged in counts three through six of

3    the indictment with wire fraud in violation of Title 18, United

4    States Code Section 1343.  If convicted of these charges, the

5    maximum penalties that you face as to each count are a term of

6    imprisonment of up to 20 years, a term of supervised release of

7    up to three years, a fine of up to $250,000 and a special

8    assessment of $100.

9           In count seven of the indictment you've been charged

10   with destruction, alteration or falsification of records in a

11   federal investigation in violation of Title 18, United States

12   Code Section 1519.  If convicted of this charge the maximum

13   penalties that you face are a term of imprisonment of up to 20

14   years, a term of supervised release of up to three years, a

15   fine of up to $250,000 and a special assessment of $100.

16          The indictment also seeks pursuant to Title 18,

17   United States Code, Section 1963 a forfeiture of any property

18   that was derived from or used to facilitate the violations of

19   Section 1962 that are charged in counts one and two of the

20   indictment.  Should you be convicted of any of these charges

21   all ownership interest that you have in any such property,

22   including the property listed in the indictment, will be

23   forfeited.

24          Likewise, the indictment seeks, pursuant to Title 18,

25   United States Code, Section 981(a)(1)(C) and Title 28, United

1  States Code Section 853 the forfeiture of any property that was

2  derived from the violations of wire fraud that are charged in

3  counts three through six of the indictment.  Should you be

4  convicted of any of these charges, all ownership interest you

5  have in any such property would be forfeited.

6          Mr. Flynn, does this latter forfeiture allegation not

7  include a facilitation basis?  Is it solely use proceeds?

8          MR. FLYNN:  I believe that's correct, Your Honor.

9          THE COURT:  Mr. Segal, does the defendant wish to

10  enter a plea of not guilty and request a jury trial?

11          MR. SEGAL:  He does, Your Honor.

12          THE COURT:  All right.  That plea of not guilty is

13  hereby entered, as is the request for jury trial.

14          I have, Mr. Segal, your motion, which I'll take up

15  after we address further scheduling.  Do you want to set this

16  for a status conference, or how do you wish to proceed?

17          MR. SEGAL:  I -- well, it would be the government.

18          MR. FLYNN:  Your Honor, I understand it's currently

19  still before Judge Burrell.  I filed a notice of related case.

20          THE COURT:  I did see the notice, and I checked just

21  before the lunch hour and did not see a related case order, so

22  I think we have to proceed as though it's still before Judge

23  Burrell.  Why don't we --

24          MR. FLYNN:  Well, I guess as a ministerial matter

25  then, Your Honor, we can --

5

1          THE COURT:  Why don't we just set it for a status

2    before Judge Burrell, and at such time that an order issues

3    determining whether he'll be reassigned then that order will

4    vacate any dates, and you can set it before Judge Karlton.

5          MR. SEGAL:  I think a status conference in 30 days

6    would be appropriate.

7          THE COURT:  Do you concur, Mr. Flynn?

8          MR. FLYNN:  Well, Your Honor, I think that depends on

9    whether or not we're going to have some exclusions of time, and

10   that may depend on the result of this -- the detention motion.

11         THE COURT:  Do you have a basis to exclude time?

12         MR. FLYNN:  Your Honor, we're poised to turn over

13   millions of pages -- over a million pages of documents in this

14   case to defense counsel.

15         THE COURT:  Well, it sounds like that shouldn't be a

16   problem then.  Mr. Segal?

17         MR. SEGAL:  Probably get that done by Monday morning.

18         THE COURT:  All right.  You concur, then, that you'll

19   need additional time to review the enormous amount of discovery

20   that is headed your way?

21         MR. SEGAL:  I don't know yet, Your Honor.  My

22   suggestion is that depending on what we do this afternoon that

23   we make the determination as tot he date of the status

24   conference after we deal with the bail matter.

25         THE COURT:  All right.  We'll do that.  Let's move on

6

1    to your --

2          MR. FLYNN:  Your Honor, at the outset, with respect

3    to bail, the government -- Mr. Segal filed approximately 400,

4    500 pages less than 48 hours ago.  I have taken the time to

5    quickly through all of it.  I believe that my motion, or my

6    opposition, I suppose -- well, it was a motion filed the next

7    day, addresses the points that I wanted to cover.

8          There are some points that are raised in Mr. Segal's

9    filings that given the fact that this -- whatever order Your

10   Honor ultimately decides here with respect to detention is

11   likely to be appealed to Judge Karlton.

12         The Court -- the government would like the

13   opportunity to address those points in writing for the record,

14   and if -- to the extent the Court feels it needs it, and if

15   that's the case, we would ask to put it over for three days.

16         THE COURT:  Well, let's launch into this and see

17   whether or not that becomes necessary, Mr. Flynn.  I did -- I

18   have read the -- Mr. Segal's brief, the declarations, the more

19   significant exhibits.  I haven't had the time to get through

20   all of the exhibits.  As you can see, you all dropped about

21   five or six inches of paper on me.

22         I've done what I can to get through it, and I have

23   read, Mr. Flynn, your brief that you filed and I've gone

24   through the exhibits that you've submitted.

25         One of the things I would like each of you to

7

1   address, though, is the argument that Mr. Segal makes that I

2   have this de novo rather than this being a bail review motion

3   where Mr. Segal's trying to alter the status quo of the order

4   that was entered in New York.

5           MR. FLYNN:  Your Honor, under either standard, Your

6   Honor, I think based on the evidence that we've presented in

7   the moving papers, the 23-page brief that I filed, as well as

8   the 230 pages of exhibits, the documentary evidence that I have

9   appended to my brief, whether it's abuse of discretion, or some

10  other standard of review, or de novo review by Your Honor, but

11  clearly by a preponderance of the evidence, there are no -- as

12  pretrial has determined, there are no conditions or combination

13  of conditions that will reasonably assure the appearance, the

14  continued appearance of the defendant in this matter.

15          Your Honor, Andorra is a principality in the Pyrenees

16  Mountains between France and Spain which is 181 square miles.

17  It's 15 miles across at its widest point. You could walk across

18  that country in less than a day.

19          Admittedly, when I first heard of Mr. Salyer's

20  travails in this case, I did not know where Andorra was, and I

21  suspect that until this investigation began with respect to Mr.

22  Salyer, he didn't know where it was either.

23          Andorra is notable primarily for the fact that it is

24  one of the relatively small number of countries in this world

25  that has no extradition treaty with the United States of

8

1    America.  And on September 22nd and 23rd of 2009, the defendant

2    wrote to an individual at Tribune Properties in Andorra,

3    inquiring into Andorra's residency requirement, and how fast he

4    could get it.  The relevant email, Your Honor, is attached as

5    Exhibit R to my submission.

6            Indeed, as the defendant readily admits in his moving

7    papers, at the time of his arrest, he had entered into

8    negotiations for the purchase of a home inside Andorra's rather

9    small geography.  Salyer's had his name -- Mr. Salyer's had his

10   name etched on a credit -- Andorra credit card, a copy of which

11   has been presented to the Court, and the defendant's personal

12   diary, which was taken from him at the time he was arrested at

13   John F. Kennedy Airport in New York references the principality

14   of Andorra in one form or another seven separate times.

15           Given the seriousness of the defendant's current

16   legal predicament, seeking refuge in a tiny country in Europe

17   without an extradition treaty is not all that farfetched.

18           The defendant is charged with two counts of

19   racketeering, the first brought in this district in some time.

20   He's also charged with obstruction of justice.  The defendant

21   has led a widespread and nationwide commercial bribery scheme.

22   He has systematically ordered the mislabeling of millions of

23   pounds of mold laden and adulterated tomato product.  The

24   losses in this case, Your Honor, are astronomical.

25           If convicted at trial, he possibly faces a guideline

9

1    sentencing level of 262 to 327 months in prison.  As the
2    documents -- the weight of the evidence, Your Honor, in this
3    case, is also substantial.  The government -- the defendant has
4    been recorded on hours of wiretaps, both Title 3 and body
5    wires.  And as is detailed in the affidavit in support of the
6    criminal complaint in this matter, many of those recordings are
7    extremely incriminating.
8         The government has obtained Mr. Salyer's personal
9    email in the underlying matter pursuant to search warrants.
10   Some of those emails also form the basis for certain of the
11   racketeering acts that are included in this case.  In all, the
12   government has taken, or is about to take 10 guilty pleas in
13   this matter from former executives of SK Foods, and former
14   employees and SK Foods customers.  Seven of those individuals
15   are cooperating directly against the defendant.
16        As the documents -- the documents, Your Honor,
17   appended to the government's submissions spell out, the timing
18   of these guilty pleas is informative as to the defendant's
19   efforts to flee.
20        Mr. Salyer is quick to inform the Court that he's
21   been a lifelong resident of California.  This makes the timing
22   of Mr. Salyer's activities all the ore suspicious, Your Honor.
23   Only after the government began taking numerous guilty pleas in
24   this case one after another throughout all of 2009 did this
25   defendant suddenly choose to abandon the state he has called

10

1   home for five decade.

2          And as those publicly filed plea agreements and the

3   factual bases attached to them became public, and as the noose

4   tightened around him in this case during the summer of 2009,

5   Salyer made plans to head for the hills.  In this case, the

6   Pyrenees Mountains.

7          Salyer has also dubbed himself as an international

8   businessman, someone who has frequently traveled abroad.  This

9   is true.  But it wasn't until the summer of 2009 that he began

10  moving money to banks in Charlestown, West Indies, Switzerland

11  and Liechtenstein and seeking residency in countries that are

12  15 miles across in Europe that have no extradition treaty with

13  the United States.

14         A February 23rd, earlier this week phone call to a

15  real estate agent indicates that Salyer's former primary

16  residence on 17 Mile Drive in Pebble Beach is still for sale.

17  It may not be on the multiple listing service, but it's still

18  available to be shown for sale.  And around the time Mr. Salyer

19  left for good for Europe in October of this year, his credit

20  card records indicate that he purchased Rosetta Stone, a

21  product that is billed as the world's leading software language

22  learning software.

23         Of course, Andorra, Your Honor, wasn't the only

24  country or nation that Mr. Salyer has investigated residing in,

25  in the past few months.  As the documents submitted by the

1  government indicate, Mr. Salyer obtained a resident visa for

2  Australia.  In one email exchange with a former -- or with an

3  executive of Cedenco. his former company, he expressed his

4  pleasure, the executive did, that Mr. Salyer might be granted

5  his wish of coming to live in the Southern Hemisphere.  Nothing

6  that mentions traveling to Australia as the defendant would

7  like this Court to believe, and in his response to that

8  executive, which is attached here to my filing, Your Honor, as

9  Exhibit P, Mr. Salyer responded to his friend that he was

10  quote/unquote ready to get out of here.

11          Jeanne Johnston, who I'll talk a little bit more

12  about in a second, Your Honor, indicate that Mr. Salyer was

13  also looking into residing in Paraguay and Brazil, and when Mr.

14  Salyer was arrested at John F. Kennedy Airport in New York, his

15  personal dairy included the Brazilian and Paraguayan Embassy

16  addresses and phone numbers, and those numbers were not in Ms.

17  Johnston's writing.

18          Contrary to Mr. Salyer's repeated allegations in his

19  moving papers, the government is not relying solely on the

20  testimony of Jeanne Johnston in seeking to have the defendant

21  detained on a pretrial basis.  Far from it.  Your Honor, it is

22  the documents in this case that tell the story, and those

23  documents come from not only Jeanne Johnston but rom

24  independent sources like Google, and banks and Mr. Salyer's own

25  wallet, and his own diary.

12

1        Regardless, Mr. Salyer's claims that Ms. Johnston was

2   a disgruntled former employee of the defendant who

3   intentionally and repeatedly lied to the government are equally

4   unavailing.  Almost all of what she told the government agents,

5   Your Honor, is independently corroborated by the documentation

6   obtained during the course of the government's investigation.

7        Ms. Johnston told us that Mr. Salyer was looking for

8   residency in Andorra.  Google has produced emails which

9   evidence exactly that, and which are attached to my motion.

10  Ms. Johnston told the government that Mr. Salyer moved money to

11  banks in Liechtenstein and the West Indies, Mechanic's Bank

12  wire transfers independently obtained evidence exactly that.

13       Indeed, the government has obtained the very emails

14  between Mr. Salyer, Ms. Johnston, and Mr. Salyer's personal

15  accountant which discuss in some detail Mr. Salyer's travels in

16  Europe meeting with various European and Swiss bankers.  These

17  are Mr. Salyer's emails.

18       What's more, the government has provided the Court

19  with wire transfer documents from Mechanic's Bank which show

20  the transfer of almost $4 million in funds to accounts

21  established by Salyer and others, and $812,000 which Mr. Salyer

22  wired to his girlfriend in -- then girlfriend in Australia.

23       The focal point to be sure, Your Honor, the

24  defendant's brief, is that Ms. Johnston allegedly stole from

25  the defendant, and that's -- Mr. Salyer filed a police report

13

1    against her, and that the government failed to disclose this to

2    Judge Drozd and to the magistrate in New York.  Your Honor, the

3    complaint filed against her by Mr. Salyer was not filed until

4    December 31st, 2009, conveniently, that was nine days after the

5    government interviewed Ms. Johnston in San Francisco and after

6    Mr. Salyer became aware that we had contacted her.  The

7    government submits, Your Honor, that that is an obvious pretext

8    and possible retaliation.

9         Regardless, something that is barely mentioned in Mr.

10   Salyer's moving papers is that subsequent police investigation

11   -- and the police report is in Mr. Segal's moving papers --

12   subsequent investigation into the claims indicated that Ms.

13   Johnston version of events were corroborated, that being that

14   she had had a lunch meeting with Mr. Salyer, and another woman,

15   her friend, a Ms. Kenyon, in October 2009, during which Mr.

16   Salyer explicitly told her to sell or otherwise distribute his

17   artwork, guns and other personal effects to various

18   individuals.

19        And when the police also spoke to Ms. Kenyon, Ms.

20   Kenyon corroborated Ms. Johnston's version of events.

21   Thereafter, the matter was quickly resolved.  And all of this

22   is consistent, Your Honor, with the documents in this case on

23   which the government is primarily relying that show that Mr.

24   Salyer was selling his house, moving his assets overseas, and

25   that he was ready to get out of here.

1      It bears note, Your Honor, that Ms. Johnston was

2 given signatory authority on all of the Mechanic's Bank

3 accounts, excluding the Salyer revocable trust account during

4 the relevant period.  If she was disgruntled and wanted to

5 steal from Mr. Salyer, she had ample opportunity to steal far

6 more than just his furniture.

7      And ultimately, Your Honor, Mr. Salyer settled in

8 France, as he admits he'd be living in Nice.  His post on a

9 French enthusiast's -- flying enthusiast's blog indicates that

10 he was relocating to France.  Not visiting France, Your Honor,

11 relocating to France.

12      The documents indicate that Salyer, Mr. Salyer

13 investigated long-term leases in France.  The documents show

14 that he had Ms. Johnston wire money to secure the residence.

15 The documents indicate that Mr. Salyer was also looking at

16 purchasing a residence in Paris, and in Nice.

17      Your Honor, the defendant makes much in his moving

18 papers about the -- his argument that he came back and forth to

19 the United States a few times for short periods during the

20 summer and fall of 2009.  There is one thing, Your Honor,

21 that's undeniably true in the defendant's brief, and that is

22 that he did not know about the complaint that was filed under

23 seal, and that there was an arrest warrant out for him.

24      In the end, Your Honor, the government submits that

25 the defendant thought that he had more time.  The defense is

1   quick to point out that there were ongoing discussions between

2   counsel concerning the case, and that there had been

3   discussions concerning the pre-indictment disclosure of the

4   affidavits that underpin the wire and the search warrant in

5   this case.  And that is true.

6           The government submits, though, that for that reason,

7   the defendant thought he could still move in and out of the

8   country and that he would be advised when we were, I guess,

9   ready to pull the trigger for lack of a better term.  And in

10  fact, when he came in -- when he flew from Nice to Zurich to

11  JFK on February 4th, he had a return flight going back the same

12  exact way 26 hours later.

13          THE COURT:  All right.  Address Mr. Segal's argument

14  that he also had a one-way ticket to return back to the United

15  States about two weeks later.

16          MR. FLYNN:  Your Honor, I don't think it's -- well,

17  first of all, Your Honor, the fact that he had a ticket coming

18  back into the United States, I mean, he -- who knows how long

19  he was going to stay.

20          Again, I think it's consistent with our position that

21  he thought it was still safe to come back into the United

22  States.  And I mean, Your Honor, where was he going to live?

23  He hadn't lived in the house in Pebble Beach.  He was residing

24  in France.  I mean, all indications were that he was residing

25  in France, that he was coming in to observe the birth of his

1  grandchild.

2          I can accept that, Your Honor, but just because he

3  had a one-way ticket doesn't mean he could have purchased

4  another one-way ticket leaving the country immediately

5  thereafter.

6          Your Honor, all the evidence in this case is that he

7  was looking for -- he's looking to purchase a home in Andorra.

8  The house on 17 Mile Drive, he hasn't lived there in months.  I

9  mean, where was he going to reside permanently?  The simple

10  fact that he had a -- I'm sorry, Your Honor.

11          THE COURT:  All right.  Let me hear from Mr. Segal.

12  He's got a lot to respond to.  Mr. Segal, I'm going to allow

13  you to respond, but in the course of doing so, would you

14  address these bank accounts, but also the house, and when

15  property was moved out of the house, and when the house was put

16  on the market relative to the timing on the interviews that

17  you've had with the U.S. Attorney's Office and also when the

18  search warrants were executed.

19          MR. SEGAL:  May I actually start, Your Honor, by

20  answering your question?

21          THE COURT:  Yes.

22          MR. SEGAL:  Because in the final argument that the

23  United States Attorney has launched, he's done so before the

24  hearing has been held in this matter, and I know we could wait

25  to get that out, but I think we're entitled to the hearing

1    first.

2            The answer to your question is very simple.  We are

3    entitled to a de novo hearing before this Court.  We have

4    indicated that in our brief.

5            THE COURT:  You argued that, but I don't see that in

6    the statute.  Where does that come from?

7            MR. SEGAL:  We think it comes from --

8            THE COURT:  The fact that he was detained in New

9    York, why does that not carry over to this district, and why is

10   it not your burden to show changed circumstances?

11           MR. SEGAL:  Because we believe -- first of all, for

12   two reasons.  If you look at the cases we've cited, this is the

13   initial appearance in the charging district, and we believe

14   under 3145(b) de novo authority is conferred on a magistrate in

15   this district because this district has original jurisdiction.

16           Even if that were not the case, by reviewing the

17   transcript appended to the government's moving papers, you can

18   see that the hearing was held in New York on a Friday

19   afternoon, apparently not uncommon, and that hearing lasted but

20   a brief period of time, and it consisted entirely of an oral

21   argument like the one you just heard from an Assistant U.S.

22   Attorney based upon documents that were never presented to the

23   Court.

24           THE COURT:  Well, at the end of the -- I read the

25   transcript.  Didn't the judge in New York then ask the

18

1  government to provide the underlying documentation to back up

2  the proffer?

3         MR. SEGAL:  The government provided some of the

4  documents upon which the government is relying now, the

5  following week, but that was the week, of course, in which the

6  attorneys in New York had to determine whether or not the

7  defendant would receive due process and be transferred

8  immediately to the charging district, which apparently did not

9  turn out to be the case.

10        Because while we contacted the district regularly

11  trying to find out when he'd be transferred to this district,

12  the charging district, we learned that we can never ascertain

13  that information because it's confidential information, and it

14  ultimately took 21 days to transfer the defendant here.  Some

15  of that 21-days period he was in transit and there was no place

16  to make that motion.

17        Moreover, it's impossible for an attorney in New York

18  to conduct the kind of investigation necessary to refute those

19  documents when they have to be shipped here, they have to be

20  reviewed here, and then they have to be brought back to New

21  York for a hearing.

22        And finally, there were no witnesses available in New

23  York to challenge those documents and here we do have witnesses

24  available who can interpret those documents and challenge those

25  documents, including Agent Artley.

19

 1          THE COURT:  All right.  I've read the exhibits, so

 2    let's proceed with the assumption that it is de novo.

 3    Nonetheless, you've got a lot to explain, Mr. Segal.

 4          MR. SEGAL:  Well, I think first, Your Honor, I think

 5    that before I explain I would ask the Court to require the

 6    government to go forward and present the evidence in support of

 7    its position because the argument you just heard was based upon

 8    the government's interpretation of documents that it submitted

 9    to the Court, had never explained, had no witness to explain,

10    it's purely the result of their conjecture and their argument

11    in the matter.

12          THE COURT:  Well, we have the agent's initial

13    affidavit and then there are numerous exhibits that the

14    government submitted.  For example, let's take the dispute over

15    whether or not Ms. Johnston is -- has any credibility at all,

16    which your contention is she doesn't --

17          MR. SEGAL:  Um-hmm.

18          THE COURT:  -- and you argue that she made all of

19    this up because she had been accused of theft.

20          MR. SEGAL:  Yes.

21          THE COURT:  But yet when I look at the police report

22    that was -- well, it would be the sheriff's report, it does

23    indicate that there was -- that the officer, the deputy sheriff

24    did interview another witness who was present at that lunch

25    time meeting and corroborated everything that Ms. Johnston had

20

1  told the FBI.

2  MR. SEGAL:  The difficulty with that, Your Honor, is

3  first the government's argument that the police report was not

4  filed until the 31st of December is correct.  However, what the

5  government has not said is that Mr. Pruett who provided a

6  declaration in this case had made a complaint to Ms. Johnston

7  and demanded that Ms. Johnston return that property before she

8  met with the government agents.  And there ensued after that an

9  exchange of information between Ms. Johnston, Mr. Pruett, who

10  is the trustee of the childrens' estate and an attorney for Ms.

11  Johnston leading up to the fact that Ms. Johnston refused under

12  her attorney's advice to return the property, which

13  precipitated the filing of the police report.

14  And interestingly enough, as we point out in that

15  very police report, the police officer, or sheriff's officer

16  spoke directly to Mr. Salyer, who was then in France, via Sky

17  Telephone, and in that discussion, Mr. Salyer said, I'm going

18  to be back in California at the end of January 2010, in about

19  30 days, and in fact, that's when he came back.

20  That is supported by a letter contained in the

21  documents we provided to the Court, and I'm not sure if the

22  Court has read it yet, in which a woman who was present during

23  that conversation here in California said she heard Mr. Salyer

24  say that.

25  So I believe it's very clear that the complaint about

1   Ms. Johnston stealing property, several hundred thousand

2   dollars worth of property, and Mr. Salyer's dog, was made

3   before she was interviewed by the government, and that rather

4   than retaliation, Ms. Johnston said the things she said because

5   she knew that she had been caught taking that property.

6          Whether she stole money from the checking account or

7   not is irrelevant.  The fact of the matter is, she stole

8   several hundred thousand dollars worth of property and was

9   caught at it.

10          THE COURT:  Did the defendant's allegation against

11  her, did that come after it was clear that she was cooperating

12  with the government?

13          MR. SEGAL:  No, it came before, and as a matter of

14  fact, as we show in our moving papers, we've been in touch with

15  Ms. Johnston regularly during the past year because she

16  actually provided declarations tot he defendants in support of

17  motions that we had pending in the Bankruptcy Court.  And by

18  the way, I apologize to the Court, I'm voice challenged today.

19  My doctor said I have laryngitis this morning.

20          THE COURT:  Um-hmm.  My sympathies.

21          MR. SEGAL:  And I thank you.  And for that reason I

22  may at some point here ask that we continue the hearing until

23  Monday morning so I can complete that and deal with an issue

24  that Pretrial Services has raised.  But I'll go on as long as I

25  can -- my voice holds.

22

1      THE COURT:  All right.  I do want to get to these

2  bank accounts, and the emails that relate to these bank

3  accounts because they're compelling, Mr. Segal.

4      MR. SEGAL:  Well, I really don't think they are, Your

5  Honor, for a couple of reasons.  First of all, the evidence is

6  clear that Mr. Salyer is not a domestic businessman.  For years

7  he has had corporations in Australia and New Zealand.  He has

8  had corporations in the United States.  He has had farming

9  corporations and production corporations.  He has dealt with

10  companies all around the world.  That is his business.  He's an

11  international businessman.

12      And may I just back up for one second.  Mr. Flynn

13  said something which was entirely incorrect, and I really want

14  to make sure the record is clear about this.

15      The house in Carmel that he keep calling Mr. Salyer's

16  house, and it's indicative of the kind of errors that we're

17  seeing here, that house is owned by the daughters' trust.  It's

18  of record that title is in the daughters' trust's name.

19      THE COURT:  I read the District Court of the trustee.

20  I was curious about how actually was controlling that house, so

21  I read the trustee's declaration, and as he describes it, it

22  was purchased by the defendant and then the defendant

23  eventually put it in trust for the daughters, but then either

24  leased it, or continued to live in it under some sort of a

25  lease-like arrangement, and continued to use it as his

1  residence.

2        MR. SEGAL:  As part of his estate planning, working

3  with lawyers in the United States, and accountants in the

4  United States, some of them in this community, very well

5  respected lawyers in this community, as part of his estate

6  planning, he sold the house to his daughters' trust and

7  received a partial note back.  And the house was owned by the

8  estate.  His clothes were in the house.

9        One of the letters that Your Honor has in your

10  possession, because he filed those -- that letter, shows that

11  notwithstanding what the government alleges, and

12  notwithstanding what Ms. Jeanne Johnston says, that house was

13  full of Mr. Salyer's clothes at the time she claimed it was

14  abandoned.

15        And I questioned -- that's one of the things we

16  raised in our moving papers, is that Agent Artley accepted what

17  she said as true without any investigation whatsoever.  The

18  letter makes it perfectly clear that all of Mr. Salyer's

19  clothes were there, all his property was there, his dog was

20  there, and she took that property.

21        So the allegation that the house was abandoned, that

22  it was always up for sale, that he never intended to live there

23  was pure nonsense.  But it's Agent Artley's interpretation of

24  those facts, and frankly, when we get forward -- go forward

25  with the hearing to complete the hearing, I intend to ask the

24

1   Court to permit me to call Agent Artley as a witness in this

2   matter because I think you will see that as to every argument

3   the government made in that long argument made earlier, he

4   relies entirely upon what Agent Artley's interpretation of the

5   facts is, and that Agent Artley provided no investigatory

6   assistance to the government in determining whether those were

7   correct.

8          And in fact, those facts were incorrect.  And on the

9   very face of Agent Artley's affidavit you can see that, because

10  he says in his affidavit to a magistrate of this Court that the

11  defendant had flown California in October of 2009.  He

12  characterized it as the defendant's flight.  And I -- that is a

13  flight of fantasy by Agent Artley, because in the same

14  affidavit, and in every other document thereafter, it is very

15  clear the defendant didn't flee the state, he came back to the

16  states.  We -- everybody knew where he was.  He was in

17  Australia with his attorneys dealing with the Australian

18  company.

19         THE COURT:  Okay.  I'm going to bring you back to the

20  bank accounts.  Why the movement of all of these wire transfers

21  to the bank in Zurich?

22         MR. SEGAL:  In the first case, as we explained in our

23  moving papers, $1.2 million of the monies that were moved

24  to -- overseas to a corporation which was managed by the trust

25  was the result of the settlement of a dispute beteen the

25

1    trustee in bankruptcy for SK Foods, Bradley Sharp, and the

2    daughters' estate.  The daughters' trust those days

3    was -- excuse me.

4         The daughters' trustee was Gerard Rose.  He

5    participated along with me and Mr. Salyer and Bradley Sharp and

6    his attorneys in a settlement conference before Judge McManus

7    of this Court in which the girls were provided and the trusts

8    were provided $1.2 million out of the estate to settle a

9    wastewater dispute, or the rights to a wastewater discharge to

10   property that was necessary for SK Foods to operate.

11        The settlement agreement, which is in the moving

12   papers, and that settlement agreement which is referenced in

13   the docket sheet for the bankruptcy which we provided to this

14   Court, shows that those monies were to be protected from the

15   estate or any creditors, and those monies were to be provided

16   to the trusts so that they could use it as they wished, not Mr.

17   Salyer's money, the daughters' trust money.

18        Second of all -- and so --

19        THE COURT:  Well, I'm going to stop you on the

20   daughters' trust money, because that bothered me too.  I saw

21   that argument, but on the same page you also point out that Mr.

22   Salyer was contemplating using some of that money for his

23   business enterprises.

24        MR. SEGAL:  In that same account you will find when

25   testimony is educed, that Mr. Salyer poured into that account

1   his IRA and some pension money, and a tax refund generated by

2   the farming enterprise's losses for the previous year, and the

3   relationship that Mr. Salyer had with the childrens' trustee,

4   and the children permitted him to borrow that money as needed

5   to try to increase the family's wealth, and their business

6   opportunities under circumstances were two things were

7   happening.

8           First, in the United States, it was very clear that

9   SK Foods could not be saved, and in fact, it went into the

10  Chapter 11 bankruptcy proceedings.

11          The farming enterprises which had relied upon its

12  business dealings with SK Foods were suffering financially and

13  could not meet the requirements of planting crops and hiring

14  employees, so those farming enterprises were faltering.  So the

15  best opportunity for the girls, the trust for the girls to be

16  successful in the future, as to find places to invest the money

17  other than in the properties and the businesses which were

18  going under in the United States.

19          There were two excellent places to use that money.

20  One excellent place to use that money was in Australia and New

21  Zealand.  As you saw from the papers, and when you go through

22  the bankruptcy papers, which are voluminous, you will see that

23  the company in Australia and New Zealand was called Cedenco.

24  Cedenco itself was having problems with its banks and was

25  trying to survive.  It was in a receivership, but to the point.

27

1          It was believed by the accountants working with the

2     trust and with Mr. Salyer that Cedenco could be saved, and that

3     it was a viable enterprise.  So part of the money that was sent

4     to those accounts overseas was used to retain counsel, whose

5     letters are in the documents we submitted, and to contest the

6     receivership, and also to try to encourage --

7          THE COURT:  Why wouldn't that be wired to Australia

8     or New Zealand?  Why would it be wired to a Swiss bank?

9          MR. SEGAL:  Because it was -- because that's where

10    the central account was located for the trust.  The trust

11    account was located in one particular area, because as I said,

12    here were two reasons why the money was being used.  One was

13    being used to try to salvage the company in Australia, and I

14    might say, if I can just digress for one second, one of the

15    documents that we submitted, and it totally undercuts the

16    government's position that there are any concealed funds here,

17    one of the documents that was submitted was an F-bar, and I'm

18    not sure if the Court's familiar with F-bars.

19         The -- an F-bar is an IRS tax form which requires the

20    reporting of foreign bank accounts.  The government is

21    conducting an international investigation right now of the UBS

22    Corporation because of the failure of taxpayers to file F-bars.

23    There are supposedly 5,000 people under investigation.  People

24    only file F-bars if they want to conduct their business

25    honestly, because what they are doing is they're reporting to

28

1  the Internal Revenue Service every penny they have in foreign

2  bank accounts.

3          If you look at the F-bar that was filed by Mr.

4  Salyer, signed by Mr. Salyer for the year 2008, which was the

5  last reporting year, the 2009 reporting year has not started,

6  you will see that millions of dollars were put into foreign

7  bank accounts in 2008 in order to try to shore up Cedenco.

8          The same thing was happening with the deposits made

9  in the account in Switzerland.  It wad intended to be used to

10  shore up Cedenco and for business expenses.  And the credit

11  card on that account was being used by Mr. Salyer for his

12  travel expenses with the permission of the estate to try to

13  find other business opportunities in Europe, because as the

14  letters received say, and the letters are very clear about it

15  from individuals who know them, Mr. Salyer could not find

16  business opportunities in the United States.  It was

17  essentially he was being hounded by the lenders, and because

18  his reputation had suffered because of this investigation.

19          So, what he did was he was looking for business

20  opportunities in Europe as well as trying to shore up Cedenco

21  in Australia.  Those business opportunities were all over

22  Europe, and so he was looking for a centralized banking

23  location.  Andorra, which Mr. Flynn references regularly, is

24  one of those locations.

25          I spoke directly to the managing director of a

29

1  company named Inventco, I believe it is, whose card was in Mr.

2  Salyer's briefcase when he was arrested.  I spoke to the

3  managing director of that company on the telephone twice.  She

4  advised me that Mr. Salyer was not only trying to purchase a

5  residence in Andorra, but he was also trying to purchase an

6  interest in a business in an Andorra.  He was trying to buy

7  shares in Inventco and he was looking for other business

8  opportunities.  He needed fund from those accounts to do that,

9  and funds from those accounts were actually used.  And funds

10 from those accounts were actually used.  A deposit was made on

11 the residence out of that account.

12       There were other business opportunities that he was

13 pursuing with a company out of -- that was working out of

14 Surrey, England, whose card I produced, an international trade

15 organization. He was working in Europe throughout this period

16 off and on but coming back to the United States, and using

17 those funds to try to generate a business opportunity.

18       Mr. Salyer's reputation prior to this company -- the

19 demise of SK Foods, was that he could take a small amount of

20 money -- and by small, small to him, not small to me he could

21 take a million dollars as he did 20 years ago, and turn it into

22 a $300 million dollar corporation.

23       He knows how to build a business.  His expertise was

24 in international trade and agriculture.  And so he was using

25 that money that was in that account to try to promote business

30

1   interests.  That information is verified by the people with

2   whom he dealt with, and he had the business card of one of

3   those businesses in his -- he had a stack of business cards of

4   a Crossfield agency in his briefcase when he was arrested.

5        Last but not least, all of this information about

6   Andorra, what the government has ignored, and ignores in all

7   the paperwork, is that the FBI itself extradited somebody from

8   Andorra just months before this incident.

9        THE COURT:  All right.  I saw that in your brief.

10   But what matters is whether or not the defendant believed he

11   could avoid extradition.

12        MR. SEGAL:  And since I was able to find out about

13   that extradition by using the Google, which Mr. Flynn alluded

14   to before, we know the defendant Googles, all I had to do was

15   Google Andorra, extradition, and that story popped out at me.

16   And all I had to do was get on Pacer, and I found the case.

17        I certainly am not a research genius.  I was able to

18   find it.  The defendant uses Google all the time, and the

19   defendant found that information.  So --

20        THE COURT:  For the past five or -- was it four or

21   five months, he's been living in France; is that correct?  In

22   Paris, is that -- an apartment in Paris, or --

23        MR. SEGAL:  No, I don't think that is correct.  He

24   was living in Nice in a furnished apartment --

25        THE COURT:  Nice, all right.

31

1          MR. SEGAL:  Actually, it's Cannes, and I think that's

2     the -- that's the argument that hold the least water in this

3     case.

4          THE COURT:  And this company that he had been

5     connected up with, I've forgotten the name of it now, it

6     escapes me, but this --

7          MR. SEGAL:  Crossfield?

8          THE COURT:  Crossfield.  That was based in the UK?

9          MR. SEGAL:  It was based -- it's an international

10    company, it was based in the UK and we've actually had contact

11    with the managing director who was meeting Mr. Salyer regularly

12    in Paris.

13         THE COURT:  And was his -- was the defendant's

14    business activities in Paris?

15         MR. SEGAL:  They were in Paris, they were in London,

16    they were in Switzerland, they were in Andorra, he was

17    traveling throughout Europe trying to find business

18    opportunities.  That's what international business people do.

19         And let me just go back to that apartment, because I

20    know you read this, because it was a prominent feature in the

21    motion.  I was in that apartment about four days before his

22    arrest.  I was in that apartment with an investigator, with my

23    lead investigator who happened to be the former chief

24    assistant -- I'm sorry, the chief of the criminal division of

25    the United States Attorney's Office here in Sacramento and an

32

1    experienced accountant, meeting with the defendant for almost

2    three days in that very apartment.  I was there.  I have

3    personally observed the apartment.  It was a temporary

4    furnished apartment.  It had an office in it, but he was

5    working daily, I saw his computer.

6           We were meeting 8 to 10 hours a day to talk about the

7    settlement of the bankruptcy issues with the trustee.  That

8    settlement conference was scheduled to occur before Judge

9    McManus on March 3rd.  A meeting was scheduled with the trustee

10   and his attorneys for February 5th.

11          We met hour after hour hammering out settlement

12   possibilities, and the result of those settlement

13   possibilities, without playing our hand out, because we haven't

14   had the settlement conference yet because of his arrest, the

15   result of that settlement was to be that the childrens' trusts

16   would maintain control of Cedenco which the trustee has claimed

17   in return for us giving up other properties.

18          That is indicative of the fact that the defendant

19   intended to continue to participate in litigation, intended to

20   try to resolve litigation, and intended to continue to operate

21   Cedenco through his daughters' trust in Australia and New

22   Zealand.

23          Even more important than that we had, as I said, our

24   chief investigator who runs an investigative firm with us, an

25   we spent hour, after hour, after hour talking about how to

33

1    manage this criminal case that we knew the government had

2    launched.  We knew it for two years.  I've been involved in it

3    for a year.  We were participating in that investigation,

4    contacting Mr. Flynn regularly about the case.

5            We had written to Mr. Wagner about the case.  We were

6    discussing our access to affidavits in support of the wiretaps.

7    We were discussing how we would see documents. I was there with

8    my investigator who was a federal prosecutor for 20 years, and

9    he's been a lawyer for 30-some odd years.  I think he just

10   works as an investigator now, with an experienced accountant

11   day after day talking about the future of the criminal case,

12   and the future of the civil litigation.

13           When we left, we had a plan to handle both.  We had a

14   plan to deal with the wiretaps.  We had a plan to deal with the

15   future of the businesses, and what the government is saying is

16   that that three days that I spent in France with those two

17   people were just an attempt by Mr. Salyer to fool me.  I'm not

18   that easily fooled.

19           We were there because we believed there was a future

20   in the business world for Mr. Salyer and his family.  It makes

21   no sense for us to have been there for any other reason, and I

22   can represent to the Court that we didn't see a hint that Mr.

23   Salyer intended to flee.

24           And to the contrary, the discussion with Mr. Salyer

25   was that since we were having -- and I do this without waiving

34

1    the attorney/client privilege, the scheduled meeting with the

2    trustee was for February 5th, and we discussed the fact that

3    Mr. Salyer might want to come back to the United States to be

4    readily available for the discussions, because even if he

5    wasn't going to participate in person in those discussions with

6    the trustee because his present was not required, that we might

7    want to make immediate contact with him to discuss the issues.

8            And so he got on a plane and flew back to the United

9    States.  We knew about this investigation for two years.  We

10   were discussing the investigation with the United States

11   Attorney's Office.  We were discussing the disclosure of the

12   affidavits.  Mr. Salyer's name had been mentioned in an

13   affidavit filed by Agent Artley as far back as 2008, after the

14   search of the SK Foods premises where he was interviewed by

15   agents of the FBI, and by the Antitrust Division.

16           I met with Ben Wagner in January of 2009 when he told

17   me specifically that Mr. Salyer was a target of the

18   investigation and would be indicted.  We met with Mr. Salyer

19   four days before his arrest, and yet -- and we told him all

20   those things, obviously.  We discussed all of those things for

21   three days, and yet he got back on a plane and flew to the

22   United States.

23           That is not the conduct of a man who intended to

24   flee.  That is indicative of his intent to fight.  Every letter

25   you received, bar none, I've said to the Court -- and I can't

35

1   remember the exact number of letters, but every one of them has

2   said, including declarations from attorneys, including a

3   declaration from Donald Putterman who is a partner in a

4   national law firm who is representing the childrens' trusts,

5   they all said the same thing, that Mr. Salyer is a fighter for

6   his children, he's a fighter for himself, he's not afraid of

7   litigation, al you have to do is a litigation check in this

8   district and elsewhere.  He's not afraid to go to court, he's

9   prepared to go to court.

10          Why on god's earth would he have gotten on that plane

11   if he intended to flee, particularly since he flew in under his

12   own passport, he flew in under his own name, he went to the

13   busiest airport in the world --

14          THE COURT:  Well, to be fair, that was a round trip

15   ticket.  I know that you have your argument about the other

16   one-way ticket --

17          MR. SEGAL:  He was there for a specific business

18   purpose.

19          THE COURT:  -- the other one-way ticket that was

20   to -- from the UK back, which I didn't understand that.  Why

21   was that the UK rather than France?

22          MR. SEGAL:  Because that's where Crossfield was.

23          THE COURT:  But what --

24          MR. SEGAL:  He was going -- he was traveling through

25   Europe and he intended -- first of all, having been to Europe

36

1   only recently, I know that the UK is the jump-off point for

2   virtually all flights back to California.  You can come back

3   from Dugal and Paris, I've done that.  You can come

4   back -- last year I came back from the UK.  It's a short drive

5   through the tunnel to get to that airport, and it's got the

6   best flights.

7          But that said, the thing that's interesting about

8   that ticket is that that ticket was in Mr. Salyer's notebook,

9   the notebook that the government is relying upon, that ticket

10  was booked and paid for -- paid for in December of 2009 before

11  he left he United States.  We know that, because if you'll look

12  at the ticket you'll see that it has seat assignments, and they

13  do not assign seats unless you've paid in full for the ticket.

14         That ticket to the United States was a one-way ticket

15  to -- not to New York, or Philadelphia, or Washington, D.C., it

16  was a ticket to San Francisco International Airport, and that's

17  where his daughter resided with his son-in-law.  And the baby,

18  according to the letters you've seen, the baby was scheduled to

19  be born in the Bay Area within two days of that ticket.

20         And friends say he was coming back, coming one-way

21  back to be with his family during the period of birth, was

22  coming back to the house where all his goods had been restored

23  after the theft by Ms. Jeanne Johnston, and he intended to live

24  here indefinitely while he determined whether or not those

25  opportunities in Europe were going to go forward, what the

1   result of the settlement conference was going to be, which was

2   scheduled shortly thereafter on March 3rd, and what the result

3   would be of the initial settlement discussions with the

4   bankruptcy trustee.

5          Then finally, he was going to be here as long as it

6   took to determine his children were okay, and that Cedenco was

7   going to be safe for them.

8          THE COURT:  There's some other discrepancies I want

9   to ask you about, Mr. Segal.  I'm still bothered by the bank

10  accounts.  The fact that there was so much money that was wired

11  to -- well, let's just take the Swiss bank account.  And the

12  interview with Pretrial Services today, the representation's

13  made the money is gone, and that's just -- that's hard to

14  accept.

15         MR. SEGAL:  Now they -- well, first of all, it may be

16  hard to accept, but it's reality.  Here is why it's reality,

17  and it's -- I take full blame for that.  Is that if you look at

18  the package of litigation that is attached to our moving

19  papers, the docket sheets, you will see that not one, not two,

20  not three, not four, not five, but more firms than that are

21  representing Mr. Salyer and the childrens' trusts.  Massive

22  litigation throughout the state.

23         Mr. Putterman indicates that in his declaration.  The

24  docket sheets demonstrate that.  We're representing Mr. Salyer

25  in class action litigation in Fresno before Judge Ishii.  We're

38

1   representing in three now consolidated class action cases here

2   in this Court.  There is a RICO, civil RICO case filed against

3   him in this Court.  The trustee in bankruptcy has filed two

4   adversary actions which we were able to have dismissed.  He has

5   since filed four additional adversary actions.

6         Because we contended, and I think this is an

7   important fact, because we contended that the trustee in

8   bankruptcy had illegally seized documents belonging to the

9   childrens' estate, their farming enterprises, he made a motion

10  for return of property, we made a motion to disqualify the

11  trustee, we made a motion to disqualify the trustee's law firm.

12        We did not prevail in the Bankruptcy Court.  This all

13  happened towards the end of last year.  A person who intended

14  to flee the country and live off the benefits of his money in

15  Switzerland wouldn't have done what Mr. Salyer did.  What Mr.

16  Salyer and the childrens' trustees did was they told us to

17  appeal the adverse rulings.

18        If you look at the docket sheet, and if you pull up

19  the documents and I know Your Honor was a civil litigator, if

20  you look at them you will see we filed six briefs in the

21  District Court with something like 1,500 pages of support.

22  The -- we maxed out on all our briefs.

23        Those matter were heard in front of Judge England.

24  The trustee came in and made a motion to dismiss our appeals.

25  We opposed that.  We had to make a motion for an emergency stay

39

1    so that the trustee couldn't get access to those records.  If

2    Mr. Salyer was going to run away from this country, he wouldn't

3    have cared about those records.  But we made a motion to -- for

4    an emergency stay which was granted by Judge England.

5            The long and the short of this -- and I'm trying not

6    to go on, ut the long and the short of this is that the farming

7    enterprises of Mr. Salyer just here in the United States was

8    incurring a legal bill for five to six law firms, 300,000 a

9    month, 400,000 a month.  I don't look at the bills.  I just

10   look at my bill, and it's too high.  That's just a part of it.

11           Those entities were also suffering from attorney's

12   fees and accounting fees in Australia and New Zealand.  There

13   are two very large firms in those countries that are litigating

14   cases against the receiver.  Attorney's fees have beaten the

15   trust and Mr. Salyer to death.  That's not the end of it.

16           There is also the investigation which has been

17   vigorously disputed and investigated.  That causes attorney's

18   fees.  And then to boot, there are civil litigation which Mr.

19   Putterman identifies in his document, in his affidavit pending

20   in the Bay Area, lawsuit after lawsuit after lawsuit brought by

21   lenders in which he was defending the childrens' estates.   So

22   attorney's fees were enormous.  That could eat up $2, $3

23   million in a matter of six months, let alone a year.

24           In addition to that, some of those farming

25   enterprises are still operating at some level, and they were

40

1    incurring expenses, they were incurring salaries, they ere

2    incurring expenses for equipment.  In some cases crops were

3    planted only to be seized by lenders, and interestingly enough,

4    they were paying the salary of Jeanne Johnston.  Jeanne

5    Johnston's complaint to the FBI that Mr. Salyer was going to

6    flee the country came after he salary stopped when she was

7    complaining that she wasn't being paid any more.  I saw those

8    complaints.

9         So where is the money?  Why was the money used up?

10   It was used up in the massive litigation, and you have evidence

11   of that in front of you by those docket sheets.

12        THE COURT:  One other discrepancy I'd like you to

13   address.  The representation was made to the Pretrial Services

14   officer today that the house in -- is it Pebble Beach, is that

15   the location?

16        MR. SEGAL:  Yes, Your Honor.

17        THE COURT:  That it as on the market at one point.

18   It as at 6.9 million or 7, whatever it was listed for.

19        MR. SEGAL:  Um-hmm.

20        THE COURT:  But the listing expired, and it's no

21   longer on the market.  The declaration by the trustee for the

22   children, is that Pruett?

23        MR. SEGAL:  Yes.

24        THE COURT:  The Pruett declaration states that even

25   though it wasn't on -- and I think he uses the word "active

41

1    open market," I don't remember his exact terms.

2         MR. SEGAL:  Not a multiple listing anymore, and I

3    spoke to him personally.

4         THE COURT:  He states it's still being shown by

5    appointment and it is still for sale.

6         MR. SEGAL:  It's still being -- first of all, he

7    recognizes that he owes it to the children to try to see if he

8    can obtain some money for them so that they can go on with

9    their lives.  Second of all, he's indicated to me personally

10   that the house is being showed infrequently, privately.  If

11   somebody asks about it, he's shown it -- the real estate agent

12   has shown it.  It's not on the open market, but frankly, as the

13   Court may know, $7 million houses are not moving right now.

14        But I can tell you one thing, he sent me pictures of

15   the house, and I haven't burdened the record by providing those

16   pictures, that house is fully furnished.  It's not abandoned,

17   as Ms. Jeanne Johnston said.

18        THE COURT:  No, but it's for sale.

19        MR. SEGAL:  It is for sale with no likely sale in

20   sight.  And so -- we're the ones who said that.  This is not

21   the government saying that, we say that.  It's on a limited

22   offering.  It's not on the multiple listing, and the chances of

23   selling it are almost nil.

24        But Mr. Salyer is still residing in it when he's in

25   the United States, and he's welcome to reside in it tomorrow,

42

1   and he's welcome to reside in it under whatever special

2   conditions of release the Court sets, because there are people

3   who have said, including people we have identified to Pretrial

4   Services, who have said that if the Court released Mr. Salyer

5   on an ankle bracelet, and if the Court releases him in custody

6   of a third party, that those people are prepared to stand in

7   and be a third party custodian.

8           He can live in the house, says his children, and the

9   childrens' trustee.  We can arrange for monitoring, if

10  necessary.  All those things are possible under the

11  circumstances.  There's still some money left.  His

12  former -- his ex-wife is cooperating in that endeavor because

13  everybody believes one, that he's prepared to fight this case,

14  that he's not running away, and everybody believes one thing,

15  and I bet you Mr. Flynn even believes it too, because he said

16  it before, how on god's earth can Mr. Salyer defend this case

17  with a million documents in FBI storage, one million, with over

18  90 hours of tape recordings on wiretaps.

19          THE COURT:  It sounds like maybe we do need

20  excludable time, Mr. Segal.

21          MR. SEGAL:  No, what it means is, you need freedom.

22  Mr. Salyer needs to be free to work with his attorneys, to

23  listen to those tapes, to look at the affidavits which were

24  promised to him for the last six months so he could prepare, so

25  that he can look through the electronic records, and so that he

43

1   can look through the hard copy documents because there's a

2   defense in this case.

3         This case is not a walk-away case.  This case is very

4   defensible.  I don't care how many employees have bought their

5   freedom.  There's cross-examination of those employees.  Those

6   employees acted in their own self-interest.  There's a defense

7   in this case, Judge, and if Mr. Salyer is free, he'll be able

8   to mount that case.

9         I believe there are conditions of release which would

10   absolutely assure the Court of that.  Bernard Maydoff

11   (phonetic) was released and Mr. Maydoff has pled guilty and

12   said that day one he was going to plead guilty. He was released

13   under conditions of release.

14         Now Pretrial Services has indicated after doing a

15   fellow report, although it as a short time frame, that they're

16   concerned about a couple of issues.  They're concerned about

17   the assets of the estate.  They're concerned about the

18   availability of money, and they're interested in the issue of

19   the third party custodian.

20         We're prepared to provide that information, and what

21   I was going to do, after I get a chance to cross-examine Agent

22   Artley whose declaration in support of the arrest warrant, and

23   the removal warrant are patently false.  Once I get a chance to

24   cross-examine him, and we can conclude this bail hearing, and I

25   prefer to do that Monday morning, I think we're going to be

44

1   able to satisfy Pretrial Services that there are conditions of

2   release, and as to every dollar Your Honor's concerned about.

3          THE COURT:  All right.  Mr. Segal, if we have this

4   evidentiary hearing for you to cross-examine the agent as to

5   his affidavit, how much time do you think that would take?

6          MR. SEGAL:  An hour.

7          MR. FLYNN:  Your Honor, the government will

8   vehemently oppose any sort of -- we are moving by way of

9   proffer, Your Honor, and the case law is quite clear --

10         THE COURT:  I realize that.  I saw that in your

11  brief, but Mr. Segal is not accepting your proffer, and he

12  wants to challenge the evidence.

13         MR. FLYNN:  Sure, Your Honor.  He's entitled to make

14  a proffer of his own, and he's entitled to call his own

15  witnesses.  He's not entitled, in United States v. Winsor, the

16  Seminole Ninth Circuit on the matter states that he is not

17  entitled to cross-examine witnesses by the government who have

18  not been called in the case.

19         The government is entitled to proceed by way of

20  proffer.  It's -- he doesn't have that right to call my case

21  agent for what is obviously going to be a fishing expedition,

22  and a discovery expedition in this case.

23         Your Honor, if I can just address a few points --

24         THE COURT:  Well, before we move beyond this point,

25  I -- if there's a controlling Ninth Circuit case, I want the

45

1    citation to it, and then I want to give Mr. Segal a chance to

2    provide any citations that he wants to offer, and then if I

3    have to --

4              MR. SEGAL:   The Winsor case, Your Honor, is 785 F.2d

5    755 at 757, Ninth Circuit, 1986, and there's another case which

6    is worth reading in the Southern District of California, United

7    States v. C-a-b-r-e-r-a O-r-t-i-g-o-s-a, 196 FRD 571, 574,

8    Southern District of California at 2000.  We have other cases,

9    and I'm prepared to make a proffer just to start as to why

10   we're entitled to examine Agent Artley.

11             If you look at his affidavit in support of the arrest

12   warrant, nowhere in that affidavit does it say when he

13   interviewed Jeanne Johnston.  It doesn't tell us anything.  The

14   only information you have about that is the argument made by

15   Mr. Flynn.  We're entitled to ask Agent Artley when he spoke to

16   Jeanne Johnston and what she told him, because there's an

17   inherent ambiguity on the face of his own affidavit when he

18   says in the title that Mr. Salyer fled the country in October,

19   and then he says about a paragraph later, that he came back in

20   December.

21             We're entitled to ask about that.  And we're entitled

22   to ask him about another factor, which is, evidentiary hearing

23   makes this blithe statement that Jeanne Johnston said something

24   about Mr. Salyer not being extradited from France.  We need to

25   know what the conversation as, because we know that there is an

46

1    extradition treaty with France, and it has existed for 200

2    years, last amended in 1999.

3           THE COURT:  All right.  What I intend to do, I am

4    going to read the cases that you've cited, and Mr. Segal if I

5    do allow cross-examination, it's going to be limited to the

6    issues relevant to detention.  It's not going to be for

7    purposes of discovery.

8           MR. SEGAL:  Absolutely, Your Honor.

9           MR. FLYNN:  Your Honor the government would request

10   the opportunity to brief the issue for the Court, and I think

11   we'd like to kick the matter then, till Wednesday, which is

12   three days.

13          THE COURT:  When could you get a brief on file?

14          MR. FLYNN:  Your Honor, we could have a brief on file

15   tonight, first thing in the morning on Monday, but we would

16   like to kick the matter until Wednesday, then, as is our -- we

17   are entitled to do under the rules, three days, not including

18   the weekends.

19          THE COURT:  All right.  Well, let's -- why don't you

20   give yourself until midday Monday to file a brief Mr. Flynn and

21   Mr. Segal.

22          MR. SEGAL:  Your Honor, may I argue in opposition?

23   First of all --

24          THE COURT:  Well, let me --

25          MR. SEGAL:  -- presenting it's the law, we've

47

1   started -- we have started a detention hearing apparently, we

2   started by the argument.  Once a detention hearing is started,

3   commenced, the law provides that there is no longer three

4   day -- a three-day stay as a matter of right on either party's

5   side.

6          Once the -- you're entitled to move for three days,

7   as a matter of right by either the defense or the government,

8   but once it starts, there's no longer a three-day period.

9          But even more important than that, it's very clear

10  that the Bail Reform Act does not trump the due process clause

11  of the United States Constitution.  Mr. Salyer was arrested on

12  January 5th of this year.  He's been held in custody since

13  January 5th.  It took him -- I'm sorry, February 5th.  It took

14  three weeks to transport him to this district to get his bail

15  hearing.  He's entitled to a prompt bail heating, and in the

16  event of a rule which -- a ruling which confines him, he's

17  entitled to a prompt appeal.

18         There is case law, and I have the case law if you

19  want it, which essentially says that's a due process right.

20         THE COURT:  Well, Mr. Segal, you can't have it both

21  ways.  If you want an evidentiary hearing, I need time to give

22  you that evidentiary hearing.  I also need time to read the

23  cases that you just cited.  If you want an answer right now, I

24  can tell you, I have very strong concerns about whether he is a

25  flight risk.

48

1        MR. SEGAL:  I appreciate that.

2        THE COURT:  The fact that he spent the last five

3   months living abroad, the fact that he was moving millions of

4   dollars into offshore, or into overseas bank accounts the

5   unresolved discrepancies that I've asked you about, I have very

6   strong concerns about whether or not he is a flight risk.

7        MR. SEGAL:  So the -- just as -- I've got my argument

8   mode on, so let me see if I can back off my argumentative mode.

9   Is there a schedule that suits the Court?

10        THE COURT:  If Mr. Flynn can get a brief on file by

11   midday on Monday, how soon would you be able to get your

12   response brief on file?

13        MR. SEGAL:  By the end of the day.

14        THE COURT:  All right.

15        MR. SEGAL:  Or you know, by -- actually I'd say

16   Tuesday morning, I'm sorry.

17        THE COURT:  All right.  Why don't you give yourself

18   till midday Tuesday, and then let's try to have a hearing on

19   Wednesday.

20        MR. SEGAL:  Could we do it Tuesday afternoon?

21        THE COURT:  Wednesday.

22        MR. SEGAL:  I'd like to get this hearing done.

23        THE COURT:  Wednesday, I need time to read too.

24   Wednesday afternoon.

25        MR. SEGAL:  May I have one moment, Your Honor, I'd

49

1    like to confer with my client.

2          THE COURT:  Yes.

3          MR. FLYNN:  Your Honor, before we recess for the

4    day --

5          THE COURT:  Let's let Mr. Segal confer with his

6    client.

7       (Pause - defendant conferring with counsel.)

8          MR. SEGAL:  My client has indicated, Your Honor, that

9    he'd like a complete hearing, and therefore, if Wednesday is

10   the first day we could do that, that works for us.

11         THE COURT:  All right.  I have a civil calendar on

12   Wednesday morning.  I could do this right after the 2:00

13   o'clock calendar on Wednesday afternoon.

14         MR. SEGAL:  Your Honor, I have a scheduled settlement

15   conference in front of Judge McManus on the bankruptcy matter,

16   lawyers are coming in.  We're trying to get that postponed.

17   I'll indicate to the Court that this matter obviously takes

18   precedence over that.

19         THE COURT:  And if you prefer Thursday, that's better

20   for me, Mr. Segal.

21         MR. SEGAL:  No, I think Wednesday's a better day.

22   I'd like to get this done, Your Honor.  So if we can do this

23   Wednesday after your calendar, I'm happy to do that.

24         THE COURT:  All right.  Then we'll have further

25   hearing on Wednesday.  I'm not locking myself in, Mr. Segal as

50

1  to whether there'll be cross-examination.  I want to read the

2  cases and the briefs that you file.

3          MR. SEGAL:  I understand that, Your Honor, and

4  hopefully at some point I'll be able to get -- make my argument

5  and go through the government's documents that they've

6  submitted, because frankly, we've never seen any of those

7  documents before until they were just filed, and looking at the

8  documents after they were filed, it's very clear that the

9  interpretation of those documents is required and we're hopeful

10 that Agent Artley will be able to interpret them for us.

11         MR. FLYNN:  Your Honor, just for the record before we

12 recess, so when asked for a specific proffer as to what exactly

13 in the affidavit he wanted to question about, Mr. Segal said

14 that nowhere in his affidavit did Mr. Artley specifically state

15 the date he interviewed Jeanne Johnston.  That was it.  That's

16 the proffer, Your Honor.

17         MR. SEGAL:  No, that's not the proffer, Your Honor.

18         THE COURT:  All right.  Let's hear it, Mr. Segal.

19 Why don't you run through the things you wanted to cross-

20 examine on.

21         MR. SEGAL:  Let me see if I -- well, at the outset,

22 we believe that we are entitled to the -- not to discovery, but

23 to the investigation that he conducted leading to his

24 conclusion that Scott Salyer was a flight risk, because that's

25 an opinion he formed and articulated in his affidavit.

1        Second, we want to question him regarding his

2   comments on the documents and his opinion as to the documents

3   that have been filed by the government, because Agent Artley

4   offered an opinion on those documents and what he observed in

5   his affidavit.

6            THE COURT:  I would narrow that down to the topic of

7   flight risk.

8            MR. SEGAL:  Flight risk.  Well, that was the next

9   thing I was going to say, is that I think we're entitled to

10  examine him on the question of flight risk, and in particular,

11  we're entitled to examine him on the question of extradite-

12  ability from the companies he -- countries he mentions, and his

13  statements that there were no treaties from those countries.

14       We want to interview him about his conversations with

15  Jeanne Johnston focused entirely on the issue of her statements

16  regarding whether or not property was taken from the house and

17  what that property was, and whether there was any residual

18  clothing, or personal effects in the house.

19       And so essentially what we want to do is we're not

20  interested in the first, I think it's 50 pages of the affidavit

21  in which Mr. Artley just recounts what's in the complaint, or

22  in the indictments, because we know what that is, and we know

23  that's the least important factor in a bail hearing.

24       We want to focus entirely upon those last pages when

25  he offers the opinion that Mr. Salyer is a flight risk, and we

52

1   want to ask him questions about his removal declaration, which

2   was filed 30 days after the initial declaration, and we want to

3   question him about what he learned between the first affidavit

4   he filed, and the removal affidavit he filed, because it is

5   very clear that notwithstanding the fact that he'd asked for a

6   no-bail warrant, that he conducted no investigation to

7   determine whether or not Ms. Johnston was a truth teller or a

8   liar, and we know that because nowhere in his affidavit does he

9   mention the fact that that police complaint was filed.  Nowhere

10  in his affidavit does he indicated that he investigated her

11  allegations.  We want to ask him about that.

12        THE COURT:  All right.  You have the proffer Mr.

13  Flynn, you can address that in the brief that you file.

14        MR. FLYNN:  Yes, Your Honor.  If there's -- if I

15  could, I just wanted to address -- I didn't want to let one

16  point go before we left for the day.  And as I heard Mr.

17  Segal's argument, the defendant's position seems to be that all

18  this money that went -- was moved overseas, I know the Court

19  has a concern about it, all this money that was moved overseas

20  in September and November and October of 2009 is now gone.

21        He in -- as the exhibits, Exhibits JJ and so forth

22  will show, you know, wire November 10th, 2009, $303,000 to his

23  girlfriend, November 12th, 2009, $508,000 to his girlfriend.

24  Other wire transfers out of SS Farms, $700,000 on August 5th.

25  I mean this money wasn't wired years ago, this money was just

53

1   wired, and as he admits, he's -- the money is gone, he's

2   looking to purchase a residence in Andorra, the notations are

3   in his notebook when we arrest him.  He's going to offer it as

4   the notations indicate, $1.4 million for the house in Andorra.

5           The money's not gone.  I mean, as pretrial indicated,

6   he's not being forthcoming about where these assets are, and

7   that all goes to the flight, Your Honor.  I mean, Plan A may

8   have been to fight the bankruptcy from France.  Mr. Segal's

9   flying to France to meet with the defendant to discuss the

10  case.

11          Plan B is Andorra.  He's seeking -- I mean Bernie

12  Maydoff didn't seek residency in Andorra.  He's seeking

13  residency in two different countries.  Australia.  He's telling

14  his business partner that he's ready to get out of here.  He's

15  seeking residence in Andorra.  I mean, $1.4 million he's going

16  to offer for a house there?  The money's not gone, Your Honor,

17  and it was just transferred.

18          MR. SEGAL:  May I say something, Your Honor, just

19  briefly.

20          THE COURT:  Well, Mr. Segal, these are things that I

21  would want you to address at our hearing, because frankly, the

22  world may be a small place to your client given his

23  international contacts and travels, and frequent travels, but

24  to somebody who has to go find him if he flees, or he doesn't

25  appear, the world's a pretty big place.

54

1          MR. SEGAL:  It's still a small place.  But let me say

2     two things if I may, Your Honor.  One, I try not to

3     characterize what Mr. Flynn says, and I don't think he should

4     characterize what I say.  I didn't say the money was gone.  I

5     said large quantities of it were spent.  You'll see when we

6     make disclosure to Pretrial Services that there are still funds

7     available.

8          Second, the -- with respect to my proffer, I'm glad

9     Mr. Flynn reminded me -- one of the things that I think I need

10    to ask about is the interpretation placed by Agent Artley on

11    the documents that were taken from Mr. Salyer's briefcase at

12    the time of his arrest, because Mr. Artley has characterized

13    those documents, we think mischaracterized those documents.

14         We'd like to ask him questions about how he formed

15    those interpretations, and what investigation he did before he

16    made those statements before this Court.

17         THE COURT:  All right.  We'll see you on Wednesday.

18    Thank you, counsel.

19         MR. SEGAL:  Thank you very much, Your Honor.

20      (Whereupon the hearing in the above-entitled matter was

21    adjourned at 3:51 p.m.)

22                         --o0o--

23

24

25

55

<u>CERTIFICATE</u>

     I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____          February 27, 2010

Patricia A. Petrilla, Transcriber

AAERT CERT*D-113