1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   UNITED STATES OF AMERICA,

11              Plaintiff,                    No. CR. S-10-0061 LKK

12        vs.

13   FREDERICK SCOTT SALYER,          <u>ORDER</u>

14              Defendant.

15   _____/

16        Defendant's motion for pre-trial release, Dckt. No. 4, and the government's motion for

17   pretrial detention, Dckt. No. 11, were before the court for hearing on February 26, 2010 and

18   March 3, 2010.  Defendant is charged in this district in a seven count indictment with violations

19   of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), wire fraud, and

20   obstruction of justice.  Dckt. No. 1.

21        On February 4, 2010, defendant was arrested by FBI Agent Paul Artley at John F.

22   Kennedy Airport in New York, where he was arriving on a flight from Zurich, Switzerland.  His

23   return flight to Zurich was scheduled for the next day,  February 5.[1]  He made his initial

24   appearance before Magistrate Judge Steven Gold on February 5, 2010, in the Eastern District of

25   _____

26        [1]  Defendant also had a one way flight scheduled from the United Kingdom to San
     Francisco for February 24, 2010.  Dckt. No. 6.

                                    1

1   New York.  Judge Gold denied defendant bail and ordered that he be detained and transported to

2   this district.[2]

3         Defendant was thereafter transferred to this district, and made his initial appearance

4   before the undersigned on February 26, 2010.  At that initial appearance, defendant argued in

5   support of his motion for pre-trial release, Dckt. No. 4, and the government argued in support of

6   its motion for pretrial detention, Dckt. No. 11.  Defendant contended, and the government

7   conceded, that although the New York magistrate judge ordered defendant detained without bail,

8   defendant was entitled to a *de novo* detention hearing in this court, pursuant to 18 U.S.C.

9   § 3145(b).[3]  The court considered the documentary evidence and declarations submitted by the

10   parties, the affidavit in support of the arrest warrant, and the Eastern District of California

11   Pretrial Services reports,[4] and heard the arguments of counsel.

12         When presented with a motion for detention, the court undertakes a two-step inquiry.

13   ////

---

15      [2]  Although Pretrial Services in the Eastern District of New York had recommended that
16   defendant be released on his own recognizance, Judge Gold found that defendant's case
presented "one of the most elaborate schemes to flee that [he had] come across," and therefore
ordered defendant detained as a flight risk.  Dckt. No. 11, Ex. B at 13-14.

18      [3]  Following the February 26 hearing, the government submitted a brief raising the issue
of whether the undersigned had authority to hear the matter, citing to 18 U.S.C. § 3145, and case
19   law interpreting that statute.  *See* Dckt. No. 17.  Defendant responded with a supplemental brief
arguing that the matter was properly before a magistrate judge.  As defendant has argued, he is
20   entitled to a *de novo* hearing in the district in which the indictment is pending, the Eastern
District of California, and this court has by local rule referred to magistrate judges certain
pretrial matters, including motions for bail.  Local Rule 302(b).  Accordingly, further hearing on
21   the motions resumed on March 3, 2010, before the undersigned who considered *de novo*
defendant's arguments.  As noted at the hearing, the issues before the undersigned were *not*
22   whether the magistrate judge in New York erred, but simply whether under the circumstances as
they currently exist here in this district and the conditions proposed by defendant, pretrial release
23   is appropriate.
      Furthermore, the court notes that the motions had already been partially heard by the
24   undersigned and postponing the hearing to accommodate the suggestion of the government
would have resulted in undue delay.

26      [4]  Both the February 26, 2010, Pretrial Services report and the supplemental report
prepared on March 3, 2010, recommended that defendant be detained as a flight risk.

First, the court determines whether the government has shown, by a preponderance of the evidence, that defendant presents a risk of flight. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).  Second, the court determines whether the government has shown, by a preponderance of the evidence, that no condition or combination of conditions will reasonably assure the defendant's appearance. *Id.* at 1407.  Pursuant to the Bail Reform Act, in ascertaining whether to detain or release a defendant, the court shall consider:  "(1) the nature and seriousness of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, and criminal history; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release." *United States v. Cardenas*, 784 F.2d 937, 938 (9th Cir. 1986); 18 U.S.C. § 3142(g).

During the course of oral argument on February 26, defendant requested to cross-examine Agent Artley, arguing that his cross-examination would reveal that the agent did not adequately investigate the reliability of Jeanne Johnston, defendant's former assistant who made numerous statements to Artley about, among other things, defendant's intent to permanently reside in another country.  The government, which proceeded by way of proffer, opposed the request for cross-examination, relying on *United States v. Winsor*, 785 F.2d 755 (9th Cir. 1986). The government's proffer included Ms. Johnston's account, described in Artley's affidavit, of several statements by defendant showing that he was planning to leave the United States to permanently reside in a county where, he believed, he could avoid extradition.  The proffer also consisted of numerous documents that included emails and records of wire transfers showing defendant had transferred large sums of money to banks in the West Indies, Switzerland, Andorra and Liechtenstein.  At the February 26 hearing, defense counsel made a proffer as to his intended cross-examination.  Specifically, the defense intended to cross-examine Agent Artley as to the basis for his opinion that defendant was a flight risk, the agent's comments in his affidavit regarding the risk of flight, whether defendant could be extradited under extradition treaties, the

3

1   agent's interviews of Ms. Johnston regarding property removed from defendant's residence, and

2   what the agent may have learned between his first and second affidavits.[5]  After nearly one and a

3   half hours of oral argument, the undersigned requested further briefing from the parties regarding

4   whether cross-examination of the agent was appropriate, and continued the hearing on the

5   motions to March 3, 2010.

6        At the March 3, 2010 hearing, the undersigned denied defendant's request to cross-

7   examine Agent Artley.  The government may proceed by way of proffer and hearsay at a

8   detention hearing, as it did here.  *Winsor*, 785 F.2d at 756-57.  This does not, in and of itself,

9   afford the accused the right to cross-examine the affiant who provided the information proffered

10  by the government.  *Id.* at 757.  Rather, defendant must present a proffer that the government's

11  information was incorrect.  Here, defendant did not question Agent Artley's veracity.  There was

12  no challenge to whether he accurately reported what he was told by Ms. Johnston.  Significantly,

13  defendant stated that he did "not question Agent Artley's honesty, [he] question[ed] his

14  objectivity and the quality of his follow-up investigation."  Dckt. No. 19 at 2.  Thus, defendant's

15  dispute was actually over the veracity of Ms. Johnston, who reported several statements

16  allegedly made to her by defendant concerning his efforts to permanently relocate in a country

17  where, he believed, he could not be extradited.  There was no allegation by defendant that the

18  agent misstated in his affidavit what he was told by Ms. Johnston.  Nor was there any allegation

19  in defendant's proffer that the agent's affidavit includes any claim of percipient knowledge by

20  the agent that is disputed by defendant.  In short, there was no reason presented to test the

21  veracity of Agent Artley.

22       Instead, defendant argued that the agent should not be the sole interpreter of the records

23  and information he submits.  The court agreed.  But the court did not need the agent to

24  characterize or interpret the various emails and records showing bank transfers and inquiries

25

26       [5] Defendant's supplemental memorandum addressing the request for evidentiary hearing
     also added the topic of when the agent first spoke to Ms. Johnston.  Dckt. No. 19.

1   about how to obtain residency in another country.  Those records speak for themselves.  Nor did

2   the court rely on the agent to provide any interpretation of the meaning of the statements Ms.

3   Johnston attributes to defendant.  Moreover, although defendant sought to cross-examine the

4   agent about his opinion that defendant is a flight risk, it was the court's opinion as to whether

5   defendant is a flight risk that was of importance, not the agent's.  Therefore, the request to cross-

6   examine Agent Artley was denied.

7       Additionally, at the March 3, 2010 hearing, the undersigned denied defendant's motion

8   for pretrial release and granted the government's motion for pretrial detention.  Dckt. Nos. 4, 11.

9   For the reasons stated on the record at both the February 26 and March 3, 2010 hearings, and for

10   the reasons stated herein, the undersigned found that defendant is a flight risk and that there are

11   currently no conditions that could be imposed that would reasonably assure defendant's

12   appearance in this action.

13       The documentary evidence in support of the government's motion showed that not only

14   was defendant living abroad at the time of his arrest on February 4, 2010, and making inquiries

15   about acquiring permanent residence abroad, he was actively taking steps to do so.  Of

16   significant concern were emails from defendant in September 2009 inquiring about residency in

17   Andorra, asking how long it takes to get residency, and requesting that the residency process

18   "get started," Dckt. No. 20, Ex. OO; emails from defendant to a Swiss banker in January 2010,

19   directing the banker to transfer $3,250,000 to his "Credit Andorra" account because defendant

20   had "found a property to invest in," Dckt. No. 20, Ex. NN; and an email from defendant to an

21   agent in Andorra on January 28, 2010 (one week before he was arrested in New York),

22   indicating that he planned "to return in [the] next ten days to close property papers," Dckt. No.

23   20, Ex. PP.  As the government argued, Andorra is a small country in Europe which has no

24   ////

25   ////

26   ////

extradition treaty with the United States.[6]

As noted above, Ms. Johnston, whom defendant discredited as angry at defendant for accusing her of stealing some of defendant's personal property,[7] told Agent Artley, *inter alia*, that defendant left the United States to permanently reside in France; that she and defendant discussed defendant's attempts to gain permanent resident status in Uruguay, Paraguay, Andorra, or France, because those were locations defendant thought he could not be extradited from; that defendant asked her to transfer large amounts of money to various overseas accounts; and that before defendant left the United States in October 2009, he instructed her to sell as many of defendant's personal belongings from his Pebble Beach home as possible. Dckt. No. 11, Ex. C. In addition to various documents corroborating Ms. Johnston's statements and the fact that defendant's primary residence in Pebble Beach is currently available for sale, Ms. Johnston's statements were corroborated by the declaration of Soraya Cayen. Dckt. No. 20, Ex. MM. Ms. Cayen declared that she met with defendant and Ms. Johnston on or about October 10, 2009, and that at that meeting, defendant specifically asked Ms. Johnston to remove and attempt to sell the personal property that defendant later accused Ms. Johnston of stealing. *Id.* According to Cayen, during the meeting, defendant also asked her if she knew how to get citizenship in Brazil or how to establish residency in Paraguay or Uruguay. *Id.*

---

[6] Although defendant pointed to an example of where at least one U.S. citizen has been extradited from Andorra, the issue before the court was whether there is a risk of flight, not whether the government could ever successfully bring defendant back if he fled.

[7] The court found some measure of the credibility of defendant's allegation regarding Ms. Johnston in Defendant's Exhibit 13, the Monterey County Sheriff's Office report of its investigation of the matter. The report outlines defendant's allegation (made through his representative Pruett and by defendant via a conference call because defendant was in France), the response by Johnston who noted that Soraya Cayen was also present when defendant told Johnston to remove the belongings, and the fact that when the officer spoke with Cayen she "confirmed Johnston's account." The officer further notes that he informed Pruett of the contact with Johnston and Cayen and instructed Pruett to get an explanation from defendant. Tellingly, the report then notes "[u]pon my return to work on 2-2-10[,] I had an email from Pruett stating Salyer and Johnston's attorneys had reached a resolution and requested that this case be closed." Dckt. No. 8, Ex. 13.

Although the undersigned was mindful that defendant had a one-way ticket from the United Kingdom to the United States for a flight in late February and that defendant has ties to California and to his children and significant ongoing civil litigation here, those facts are significantly outweighed by the evidence demonstrating that not only did defendant plan to permanently relocate overseas (and, specifically, to a country that does not have an extradition treaty with the United States), but that the execution of that plan was well underway at the time of his arrest.  Although he argued that his return for an intended overnight stay in the United States (arriving February 4 with a scheduled flight to Zurich on February 5) shows that he was not fleeing prosecution, he was not aware of the sealed arrest warrant at the time of his return and ensuing arrest at JFK airport on February 4.  Indeed, as he argued, he believed that on-going talks with the government over obtaining discovery (i.e., the unsealing of affidavits and applications in support of wiretaps) would continue.  Dckt. No. 4 at 24-25.

In light of the ample documentary evidence plainly manifesting a scheme to obtain residency and purchase a residence in Andorra, and the extensive efforts to inquire of residency in other countries, the documentary evidence showing the wire transfers of millions of dollars to banks outside the United States, and the statements Ms. Johnston and Ms. Cayen attribute to defendant, the court found by a preponderance of the evidence that defendant is a flight risk. The remaining question was whether supervision by Pretrial Services and the imposition of conditions of release could mitigate that risk in a manner that would reasonably assure defendant's appearance at trial.

At the March 3, 2010 hearing, defendant proposed various conditions of release, including the surrendering of his passport and pilot's license, home confinement, electronic monitoring, and the repatriation of money in overseas accounts to the United States.  However, the starting point in determining whether those conditions would achieve their intended purpose was defendant's ability and willingness to cooperate with pretrial supervision.  The Pretrial Services reports of February 26 and March 3, 2010 recommending detention revealed that

1   defendant had not been candid in his interviews with the Pretrial Services officer about his

2   overseas bank accounts and about the deposit he made on the purchase of a residence in

3   Andorra.  Any conditions of confinement would require defendant's cooperation, and defendant

4   exhibited an unwillingness to be candid or to fully cooperate with Pretrial Services.  Moreover,

5   defendant is a licensed pilot with extraordinary liquid assets outside the United States that could

6   be used if he chooses to flee.  According to the Pretrial Services' February 26, 2010 report, at

7   least $2.2 million is currently unaccounted for.  The government identified several other wire

8   transfers of large amounts that remain unaccounted for.  Finally, not only has defendant been

9   residing outside the United States for the past several months, as of January 28, 2010, he was

10   very close to completing the purchase of a residence in Andorra, a country without an extradition

11   treaty with the United States.

12          Therefore, although defendant has resided in California for most of his life; has a place to

13   live and resources available to him in California, including a potential custodian, if released; and

14   has two children and a new grandchild in California, these facts are strongly outweighed by his

15   extraordinary efforts to relocate himself and his remaining sizeable assets outside the United

16   States.  For the reasons discussed above and at the detention hearings, the undersigned found that

17   defendant was a flight risk and that neither the conditions proposed by defendant nor any other

18   combination of conditions would reasonably assure defendant's appearance in this action.

19   Accordingly, defendant's motion for release was denied and the government's motion for

20   detention was granted.

21          SO ORDERED.

22   Dated:  March 5, 2010.
                              EDMUND F. BRENNAN
23                            UNITED STATES MAGISTRATE JUDGE

24

25

26

                                          8