MALCOLM S. SEGAL - 075481
JAMES P. MAYO - 169897
**SEGAL & KIRBY LLP**
770 L Street, Suite 1440
Sacramento, CA  95814
Telephone: (916) 441-0828
Facsimile: (916) 446-6003

Attorneys for Defendant
FREDERICK SCOTT SALYER

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO: 2:10-CR-0061-LKK |
| Plaintiff, | **DEFENDANT'S NOTICE OF MOTION AND MOTION FOR REVIEW OF MAGISTRATE JUDGE'S DETENTION ORDER** |
| v. | |
| FREDERICK SCOTT SALYER, | **[18 U.S.C. § 3145(b)]** |
| Defendant. | |
| _____/ | |
| | Date: **March 18, 2010** |
| | Time: **11:00 a.m.** |
| | Judge: **Hon. Lawrence K. Karlton** |

**To:    Benjamin B. Wagner, U.S. Attorney, and Sean C. Flynn and Matthew D. Segal, Assistant U.S. Attorneys:**

**PLEASE TAKE NOTICE** that on March 18, 2010, at 11:00 a.m., or as soon thereafter as the matter may be heard, the defendant, Frederick Scott Salyer, by and through his counsel, will and hereby does move for a review of his detention order by the District Court pursuant to 18 U.S.C. § 3145(b) and will request that he be released pursuant to the Bail Reform Act, 18 U.S.C. § 3141 et seq..

///

///

1

**MOTION FOR REVIEW OF MAGISTRATE JUDGE'S DETENTION ORDER**

## I.

## INTRODUCTION AND PROCEDURAL HISTORY

The defendant, Frederick Scott Salyer, was arrested by FBI Agent Paul Artley at John F. Kennedy Airport on February 4, 2010, on a criminal complaint filed in this District on January 5, 2010. He was arrested on his voluntary arrival at that airport on a scheduled flight into New York, flying openly under his own name and with a United States passport.

Mr. Salyer made his first appearance in the Eastern District of New York on February 5, 2010, and, although Pre-Trial Services had earlier that day recommended that he be released on a personal recognizance bond in the amount of five million dollars along with the signature of a responsible person, with collateral in the amount of five hundred thousand dollars, Mr. Salyer was ordered detained as a purported flight risk by a Magistrate Judge after a brief removal hearing and oral argument. The New York Magistrate Judge's determination to reject Pre-Trial Service's recommendation and detain the defendant was premised on the allegations in the complaint and removal affidavits prepared by FBI Agent Paul Artley in which the Agent opined that Mr. Salyer was a flight risk and documents which were waived in the air by an Assistant United States Attorney but never shown the Magistrate Judge or subjected to examination at the hearing.

The flight allegations were premised almost exclusively on statements made and information provided by one person – Mr. Salyer's disgruntled former personal assistant, Jeanne Johnston – who, motivated by her personal animus against Mr. Salyer arising from his filing of a police report against her for removal and failure to return hundreds of thousands of dollars in furnishings and art from a family home, claimed Mr. Salyer had fled the country in October 2009 to live in France with no intention of ever returning. She also claimed he had a future expectation of defeating extradition from France if later arrested. The Magistrate Judge accepted

2

1   Ms. Johnston's reported statements of flight at face value: despite the fact that Mr.

2   Salyer was arrested <u>returning</u> to the United States; even though France has a long-

3   standing extradition treaty with the United States; and, although Agent Artley

4   reported that Mr. Salyer had previously returned to the United States in December

5   2009 under circumstances where he was well aware he was the target of the then-

6   pending grand jury investigation.  The finding ignored the fact that Mr. Salyer had, at

7   the time of his arrest, an advanced booked and fully paid for, one-way ticket and

8   seat assignments back to San Francisco, California, from England less than two

9   weeks later on February 24, 2010.

10          Following an unusually lengthy transport period, the defendant arrived in the

11  Eastern District of California on February 25, 2010.  He made his initial appearance

12  on February 26, 2010, before  Magistrate Judge Edmund F. Brennan, at which time

13  he entered a not guilty plea on the indictment superseding the criminal complaint

14  and a detention hearing was commenced.[1]

15          The government began the hearing with an argument and proffer, again

16  largely based on the affidavits prepared by FBI Agent Artley and his opinion

17  purporting to establish that the defendant is a serious flight risk.  The defendant,

18  while requesting the complete hearing contemplated by Congress necessary to

19  satisfy the requirements of due process and the mandate of the Eighth Amendment,

20  responded to the Magistrate's questions through counsel, and demonstrated that the

21  prosecution was relying on fundamentally inaccurate information provided by Jeanne

22  Johnston and others, and was selectively ignoring evidence which conclusively

23  refuted the government's claim of flight.  The defense requested the opportunity to

24  call Agent Artley as a witness since the government had relied almost exclusively on

25  his ultimate opinions as to the risk of flight and need for detention, opinions premised

26  _____

27          [1] Before the hearing commenced, the defendant submitted a comprehensive
    motion and accompanying exhibits in support of his motion for pre-trial release.  Docket
28  No. 4 (filed 2/24/10).  The government likewise submitted a motion and accompanying
    exhibits in support of its motion for detention. Docket No. 11 (filed 2/25/10).

1   on inaccurate information.  An offer of proof was made by the defense as required

2   by applicable case law.  See Hearing Transcript (2/26/10) at 44:3-46:7 & 50:18-

3   52:13.[2]  The detention hearing was continued to March 3, 2010, to permit Mr. Salyer

4   the opportunity to cross-examine Agent Artley and to allow the parties to submit

5   additional briefing on the issue.[3]

6        The detention hearing resumed on March 3, 2010, at which time Magistrate

7   Judge Brennan denied the defendant the opportunity to cross-examination Agent

8   Artley.  Hearing Transcript (3/3/10) at 2:25-5:18.[4]   The Court also received further

9   argument from the parties, including a request from Mr. Salyer that he be released

10  on conditions that will reasonably assure his presence at trial, including surrender of

11  his passport and pilot's license, confinement to the home in Pebble Beach where he

12  had been residing and in which his clothes and possessions are located, electronic

13  monitoring, the appointment of a third party custodian, and the posting of substantial

14  cash bail, along with additional real property as collateral.   Hearing Transcript

15  (3/3/10) at 22:6-20.

16  _____

17      [2] See United States v. Winsor, 785 F.2d 755, 756-57 (9th Cir. 1986) ("Without a
    proffer from Winsor that the government's proffered information was incorrect, the
18  magistrate was not required to allow Winsor to cross-examine the investigators and
    police officer"); United States v. Cabrera-Ortigoza, 196 F.R.D. 571, 574 (SD Cal. 2000)
19  (reasoning that the defendant, in exercise of the court's discretion, is entitled to
    challenge the government's proffer via the medium of calling adverse witnesses under
20  circumstance where the government's proffer is shown to be unreliable or incorrect by a
    "counter-proffer" made by the defendant).
21
22      [3] See Docket No. 16 (Government's Brief - filed 3/1/10), and Docket No. 19
    (Defendant's Supplemental Brief - filed 3/2/10).   Before the hearing resumed on March
23  3, the government also submitted three additional sets of supplemental exhibits.
    Docket Nos. 20 (filed 3/2/10), 22 (filed 3/3/10), and 23 (filed 3/3/10).
24
        [4] The defense questioned the Agent's objectivity and the quality of his follow-up
25  investigation in connection with the core opinion he offered that the defendant actually
    fled the country in October 2009 seeking a haven in one or more countries from which
26  he could avoid extradition.  The opinion was subject to dispute because, among other
    things, the countries Agent Artley mentioned in his Affidavit to which Mr. Salyer
27  allegedly sought to flee to avoid extradition do in fact have extradition treaties with the
    United States.
28

Defendant's Motion For Review Of Magistrate Judge's Detention Order

1    In addition to arguing that release was mandated by the Bail Reform Act,

2  counsel argued Mr. Salyer's release was required to permit him the opportunity to

3  mount an effective defense.[5]

4    In two orders entered on March 5, 2010, Magistrate Judge Brennan ordered

5  Mr. Salyer detained on the basis that he is a flight risk and that no condition or

6  combination of conditions exist that will reasonably assure his continued

7  appearance.  Docket Nos. 28 & 29.  According to Magistrate Judge Brennan's

8  Detention Order (Docket No. 28), Mr. Salyer should be detained as a flight risk due

9  to his *efforts to permanently reside outside the United States.*"  In his written order

10  (Docket No. 29 at 8:12-20), Magistrate Judge Brennan further stated:

> [A]lthough defendant has resided in California for most of his life; has a
> place to live and resources available to him in California, including a
> potential custodian if released; and has two children and a new
> grandchild in California, these facts are strongly outweighed by his
> extraordinary efforts to relocate himself and his remaining sizeable
> assets outside the United States.  For the reasons discussed above and
> at the detention hearings, the undersigned found that defendant was a
> flight risk and that neither the conditions proposed by defendant nor any
> other combinations of conditions would reasonably assure defendant's
> appearance in this action.  Accordingly, defendant's motion for release
> was denied and the government's motion for detention was granted.

17    The decision to detain the defendant based on the conclusion that he intended

18  to "permanently reside outside the United States" is contrary to the demonstrated

19  facts that, well prior to his return, Mr. Salyer had made it clear to the government, his

20  friends, family and colleagues that he intended to return to his home in California

---

[5] The government advised the Court that it has over one million (1,000,000)
pages of discovery documents that it will provide to counsel.  In addition, the
government has previously advised that there are approximately one hundred hours of
audio recordings from wire taps and "body microphones" from at least four separate
interception applications, that an enormous amount of electronic media exists for
review, and that no less than seven persons have pled guilty and will be testifying,
along with others, in support of a fifty four page RICO conspiracy indictment where the
penalty exposure ranges from 262 to 327 months of incarceration.  Defense counsel
advised the Magistrate that it will be logistically impossible to prepare a defense if the
remains incarcerated pending trial.  Hearing Transcript (3/3/10) at 22:24-23:22.  Since
then it has become clear that there is considerably more discovery available in copied
computer hard drives and other electronic media.

1  from France, where he had been temporarily living and working due to his inability to

2  find work in the United States, to enjoy the benefit of seeing his then soon to be born

3  grandchild, and to fight the criminal charges now leveled against him which he had

4  known were coming since April 2008.  It is also inconsistent with the fact that at the

5  time of his arrest, Mr. Salyer had just returned into the United States for a brief

6  period and had a paid for, one-way ticket back to San Francisco, California, twenty

7  days later on February 24, 2010.

8       The defendant had no intention to permanently reside overseas, nor did the

9  evidence adduced before the Magistrate Judge support such a conclusion.  Indeed,

10  Mr. Salyer's travel overseas and international business activities to and from the

11  United States are and were well known to the government and have existed for

12  many years.  The fact that Mr. Salyer was living for several weeks at a time abroad

13  at the time of his arrest in pursuit of international business opportunities, and had

14  made a deposit on a condominium in a place where he intended to purchase a

15  business, was entirely consistent with his ordinary business activities and in no way

16  evinces "an extraordinary effort to relocate" as opined by the Magistrate Judge.

17       Moreover, the Magistrate's related concerns – that Mr. Salyer has "sizeable

18  assets outside the United States" and that he has not been candid with Pre-Trial

19  Services concerning those assets – present no impediment to his pre-trial release.

20  While there are accounts overseas, they have been used for business purposes and

21  much of those deposited funds belong to Mr. Salyer's daughters from a court-

22  approved settlement with the bankruptcy Trustee and from tax refunds generated by

23  the businesses.  Addressing the latter concern, the defendant attempted to identify

24  the current state of those personal and business assets to Pre-Trial Services, after a

25  month in custody and with no ability to look at the banking records.  He also tried to

26  accomplish the same task through his daughters' trustee.  No money was hidden

27  overseas, the funds were transferred overseas through normal banking channels

28  and any funds presently in foreign bank accounts can be ordered transferred to

Defendant's Motion For Review Of Magistrate Judge's Detention Order

banks in the United States.  Mr. Salyer has agreed to a full disclosure of the accounts and assets which can and will be provided to Pre-Trial Services by an accountant.

The evidence cannot be disputed that Mr. Salyer:  has long-standing ties to California; is a loving father of two daughters, one of whom has just given birth; has substantial and supportive relationships with family and friends in California; has the unwavering financial and emotional support of his family; has an outstanding work history;  has engaged in admirable and charitable conduct; and, has no history of criminal behavior with the exception of the charges now level against him.  At bottom, there is no evidence of intended flight, the defendant did not intend to permanently leave the United States, and there are conditions of release which will assure his appearance at trial.

Accordingly, Mr. Salyer should be released pending trial subject to the least restrictive condition or combination of conditions that will reasonably assure appearance in this case.

## II.

## STANDARD OF REVIEW OF THE MAGISTRATE'S DECISION

18 U.S.C. § 3145(b) provides:

> If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order.  The motion shall be determined promptly.

When a defendant moves for review of a detention order under 18 U.S.C. § 3145(b), the district court is to review the Magistrate Judge's findings and conclusions "de novo."

> [The district court] should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference.

. . .

Defendant's Motion For Review Of Magistrate Judge's Detention Order

1  The point is that the district court is to make its own "de novo"
   determination of facts, whether different from or an adoption of the
2  findings of the magistrate. It also follows . . . that the ultimate
   determination of the propriety of detention is also to be decided without
3  deference to the magistrate's ultimate conclusions.

4  *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990).

5                                   III.

6             **THE BAIL REFORM ACT FAVORS RELEASE**

7       Although this Court obviously has extensive experience with the Bail Reform

8  Act, its standards are always worthy of review. The Act generally favors release over

9  detention. 18 U.S.C. § 3142(b), provides, in relevant part:

10      The judicial officer *shall* order the pretrial release of the person [charged
        with an offense] on personal recognizance, or upon the execution of an
11      unsecured appearance bond in an amount specified by the Court . . .
        unless the judicial officer determines that such release will not
12      reasonably assure the appearance of the person as required or will
        endanger the safety of any other person or the community.  (emphasis
13      added)

14      Pursuant to 18 U.S.C. § 3142(c)(1)(B), if the Court determines that the release

15 described in § 3142(b) will not reasonably assure the appearance of the person as

16 required, or will endanger the safety of any other person or the community, the Court

17 *shall* order the release of the defendant "subject to the least restrictive further

18 condition or combination of conditions" that will reasonably assure the appearance of

19 the defendant and the safety of the community.

20      While the Act provides that release may be conditioned on the posting of

21 money or property, it also states that the court "may not impose a financial condition

22 that results in the pretrial detention of the person." *Id.*, subd. (c)(2).  It is likewise

23 important to note that "Section 3142 speaks only of conditions that will "reasonably"

24 assure the appearance, not guarantee it." *United States v. Xulam*, 84 F.3d 441, 444

25 (D.C. Cir. 1996) (per curiam).

26      18 U.S.C. § 3142(f) defines those specific situations under which a judicial

27 officer may hold a detention hearing.  Those situations include a case that involves

28 "a *serious*" flight risk. 18 U.S.C. § 3142(f)(2)(a).  Thus, a detention hearing is

1  authorized only where the government has demonstrated "that there are grounds for

2  a hearing under the specific provisions of either 3142(f)(1) or (f)(2)." *United States v.*

3  *Butler*, 165 F.R.D. 68, 71 (N.D. Ohio 1996).

4      Presented with a motion for detention, the Court undertakes a two-step

5  inquiry. "First, the court must determine whether the Government has established

6  'by a preponderance of the evidence that [the defendant] . . . presents a risk of flight

7  or obstruction of justice.'" *United States v. Khashoggi*, 717 F.Supp. 1048, 1049

8  (SDNY 1989), quoting *United States v. Friedman*, 837 F.2d 48, 49 (2nd Cir. 1988).

9      If the government carries this initial burden, the Court must then determine

10  whether the government has carried its burden of demonstrating "by a

11  preponderance of the evidence that no conditions or combination of conditions could

12  be imposed on the defendant that would reasonably assure his presence in court."

13  *United States v. Sabhani*, 493 F.3d 63, 75 (2nd Cir. 2007).  The government's task is

14  not insubstantial at this second stage.  In most cases, release is the presumptive

15  state.  See, 18 U.S.C. §§ 3142(b) and (c).  "The Court should also 'bear in mind that

16  it is only a 'limited group of offenders' who should be denied bail pending trial.'"

17  *United States v. Khashoggi*, 717 F.Supp. at 1049.

18      The Ninth Circuit holds that in evaluating the government's motion for

19  detention:

20      [The Court] should bear in mind that federal law has traditionally
        provided that a person arrested for a non-capital offense shall be
21      admitted to bail [citations omitted].  Only in rare circumstances should
        release be denied. [Citations omitted.]  Doubts regarding the propriety of
22      release should be resolved in favor of the defendant. [Citations omitted.]

23      Release pending trial is governed by the Bail Reform Act of 1984,
        which, like its predecessor, the Bail Reform Act of 1966 . . . mandates
24      release of a person under the least restrictive condition or combination
        of conditions that will reasonably assure the appearance of the person
25      as required. [Citations omitted.] The Fifth and Eighth Amendments'
        prohibitions of deprivation of liberty without due process and of
26      excessive bail require careful review of pretrial detention orders to
        ensure that the statutory mandate has been respected.

27

28  *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985).

Defendant's Motion For Review Of Magistrate Judge's Detention Order

1       To support detention based on serious risk of flight, the government must

2   affirmatively prove that risk by a preponderance of the evidence. *United States v.*

3   *Shakur*, 817 F.2d 198, 195 (2nd Cir. 1987) (citing *United States v. Chimurenga*, 760

4   F.2d 400, 405 (2nd Cir. 1985)); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir.

5   1991).  Mere ability or opportunity to flee is not sufficient to justify detention,

6   particularly where the defendant has ties to the jurisdiction where the prosecution is

7   proceeding.  See e.g., *Friedman*, 837 F.2d at 50 (finding no serious risk of flight

8   where the defendant was a "life-long New York resident, that he has no prior criminal

9   record, that he has no passport or known ability to evade surveillance, that he has

10  worked gainfully in the New York area for twenty-five years prior to his arrest, and

11  that he is married and has three children, all of whom live in the New York area.");

12  *United States v. Himler*, 797 F.2d 156, 162 (3rd Cir. 1986); *Khashoggi*, 717 F.Supp.

13  at 1049 (ruling that the defendant, "an enormously wealthy man" who was actually a

14  fugitive abroad for six months after being indicted for mail fraud, RICO violations and

15  obstruction of justice, and who possessed the means "to facilitate a hasty departure

16  from the jurisdiction" did not pose "a substantial risk of flight.")

17      And, in determining whether conditions may be set " that will reasonably

18  assure . . . the appearance of the [defendant] as required" the following factors are

19  relevant:

20      (1) the nature and circumstances of the offense charged, including whether

21  the offense is a crime of violence or involves a narcotic drug;

22      (2) the weight of the evidence against the person;

23      (3) the history and characteristics of the person, including –

24      (A) the person's character, physical and mental condition, family ties,

25  employment, financial resources, length of residence in the community, community

26  ties, past conduct, history relating to drug and alcohol abuse, criminal history, and

27  record concerning appearance at court proceedings; and,

28  ///

Defendant's Motion For Review Of Magistrate Judge's Detention Order

1     (B) whether, at the time of the current offense or arrest, the person was on

2    probation, on parole, or on other release pending trial, sentencing, appeal, or

3    completion of sentence for an offense under Federal, State, or local law; and

4     (4) the nature and seriousness of the danger to any person or the community

5    that would be posed by the person's release.  18 U.S.C. § 3142(g); *United States v.*

6    *Cardenas*, 784 F.2d 937, 938 (9th Cir. 1986).

7     The issue at this stage of the criminal proceedings is not whether Mr. Salyer

8    has been charged in a large RICO fraud scheme nor whether his alleged actions

9    have created a loss to others.  Instead, the Court must determine whether the

10   government has carried its <u>dual burden</u> of demonstrating that Mr. Salyer is a *serious*

11   flight risk and that no conditions or combination of conditions can be set that will

12   reasonably assure his appearance.  18 U.S.C. § 3142(e).

13     The government has failed to satisfy either of its burdens.  The evidence

14   shows the defendant is not a flight risk.  And, notwithstanding the government's

15   arguments to the contrary, the evidence clearly preponderates in favor of releasing

16   Mr. Salyer because there are conditions that can be imposed by the Court, through

17   the defendant's continued cooperation with Pre-Trial Services, which will more than

18   reasonably assure his appearance.

19     As a matter of law, the defendant is not within that "limited group" of

20   defendants who should be detained pending trial and he should be released.

21                      **IV.**

22   <u>**THE GOVERNMENT FAILED TO MEET ITS BURDEN TO ESTABLISH THAT THE**</u>

<u>**DEFENDANT'S RELEASE WOULD PRESENT AN ACTUAL RISK OF FLIGHT**</u>

23

24     The government's detention motion alleged there is a "serious" risk that Mr.

25   Salyer will flee if released.  The evidence presented by the government however, did

26   not support the conclusion that Mr. Salyer is a serious flight risk, and further, the

27   Magistrate's findings in this regard, when closely examined, similarly do not sustain

28   that conclusion.

1   Under 18 U.S.C. § 3142(g), "the history and character of the person charged"

2   must be considered in determining whether Mr. Salyer is a fight risk.  Among the

3   factors to be considered in that regard are the defendant's age, his citizenship, his

4   ties to the community, his family ties, his foreign relationships, his financial

5   resources, his prior arrest record, the nature of the offense with which the defendant

6   is charged, and his past conduct, if any, in avoiding prosecution.  *United States v.*

7   *Khashoggi*, 717 F.Supp. at 1050-51.  All of the foregoing factors weigh heavily here

8   in favor of release.

9   **A.    The Evidence Submitted By The Defendant, Including Letters, Declarations And Other Documents, Establish He Is Not A Serious**

10   **Flight Risk.**

11   **The defendant's life history and ties to California:**  Mr. Salyer is 54 years

12   old and has lived in California his entire life.  As a member of one of California's

13   most deeply-rooted farming families, he was raised on a farm outside of Corcoran,

14   California, started by his paternal grandfather, Clarence Salyer, in 1926.  At the time

15   of his death in 1974, Clarence Salyer owned and/or leased more than 100,000 acres

16   throughout California, which he passed down to his children who continued the

17   farming business.  In 1982, the defendant's father, Fred Salyer, acquired the Salyer

18   Land Company.

19   By 1979, the defendant, who had graduated from Cal Poly, San Luis Obispo,

20   had advanced to General Manager of the equipment and maintenance division of the

21   Salyer Land Company.  In 1982, the defendant advanced into commodity sales,

22   developing a direct sales component of the company in Asia and Europe.  Assigned

23   the task of diversifying the company, the defendant founded Salyer American Fresh

24   Foods (SAFF) in the Fall of 1983.  SAFF became a leading shipper of fresh

25   vegetables in the United States and around the world.

26   In 1990, under Scott Salyer's direction, the family opened SK Foods.  The

27   defendant took over operation of the business in 1993 and two years later

28   exchanged his ownership interest in the Salyer Land Company for the new company.

In 2002, under the defendant's leadership, SK Foods became international, buying out the then publicly-held <u>Cedenco Foods</u> of New Zealand.  In April 2007, the defendant purchased SAFF, the company he had founded almost 25 years earlier.  With that acquisition, the SK Foods Group was formed, offering processed foods in the United States and internationally, and fresh vegetables to domestic and international customers.  As recognized in the indictment, which deals with but a small part of an enormous worldwide business enterprise, SK Foods' customers were the largest, well-known, and most sophisticated food producers in the world.

Until the SK Foods, LP bankruptcy in May 2009,  SK Foods Group's worldwide sales exceeded over $700 million annually.   As the CEO of SK Foods, LP and manager of various associated farming entities, Mr. Salyer employed over 6,000 individuals in California, and the companies annually shipped hundreds of millions of pounds of tomato products.  Cedenco, the overseas business entity in New Zealand and Australia too commanded an international business presence and produced over one hundred millions pounds of tomato products.

Mr. Salyer is the father of two daughters, both United States citizens: a married daughter, Stefanie Gallegly, age 27;  and, Caroline Salyer, age 20, who both reside in Northern California.  Mr. Salyer's daughter Stefanie, who is married to Matthew Gallegly, was due to deliver her first child at the time of his arrest, also Mr. Salyer's first grandchild, two weeks later.  She has since given birth almost as scheduled - just a few days before his planned return to the United States on February 24.  See, Declaration of Stefanie Ann Gallegly, Exhibit 1 to the Compendium of Exhibits accompanying this motion[6]; and, Declaration of John Matthew Gallegly (Gallegly Decl.), Exhibit 2.

**The defendant's recent life history:**  As the prosecutor had previously been personally informed by Mr. Salyer's counsel during the period preceding his arrest –

---

[6] Unless otherwise indicated, and for the Court's convenience, all exhibits referenced in this motion are attached to the Compendium of Exhibits.

Defendant's Motion For Review Of Magistrate Judge's Detention Order

1   Mr. Salyer had spent the past couple of months prior to his arrest temporarily

2   residing and traveling abroad trying to preserve Cedenco, while at the same time

3   pursuing opportunities where he could use his expertise to start up or manage

4   agricultural and other businesses in countries with a need for his ability to build a

5   business from the ground up.

6       At the time of his arrest, the defendant was working with the title of

7   International Sales Manager for the Crossfield Agency, Ltd., whose principal offices

8   are located in Surrey, England, seeking such business opportunities in Europe and

9   elsewhere.  He had been living and working in a well-furnished apartment in Cannes,

10  France on a short term agreement, which was about to expire, when he returned to

11  the United States on February 4, 2010.  As reported in declarations before this

12  Court, he sought those opportunities abroad, and his associates knew such was the

13  case, because of his inability to pursue similar opportunities in the United States due

14  to the enormous volume of negative press generated by the investigation of this

15  case.

16      The defendant's friends, family and business associates know him as a

17  tireless traveler and businessman, with the business acumen to match that drive.

18  While he fought to keep SK Foods from bankruptcy, lenders placed him in

19  involuntary bankruptcy in May of 2009 largely attributable to the devastation caused

20  the business and its credit by the even then protracted criminal investigation which

21  became public knowledge by a series of searches conducted by over a hundred

22  agents of the FBI, IRS, and staff of the Department of Justice Antitrust Division in

23  April 2008.

24      Mr. Salyer's attorneys were repeatedly told he was to be the subject of a

25  forthcoming indictment.  In January of 2009, Mr. Salyer's present counsel was told in

26  no uncertain terms by members of the United States Attorney's Office, including the

27  current prosecution team, that Mr. Salyer was the primary target and that an

28  indictment would inexorably issue.  Nonetheless, Mr. Salyer's international business

Defendant's Motion For Review Of Magistrate Judge's Detention Order

1    and personal travel remained essentially unchanged.  The defendant did not flee

2    then and has no intention of fleeing now.  Mr. Salyer's family, friends, and

3    professional colleagues alike have provided declarations and have written letters

4    confirming his dedication to his children, his lack of any intention to leave them and

5    flee the United States, and his character as a person who does not give up in the

6    face of adversity and one who consistently fights and litigates matters where he

7    believes he is in the right, including these criminal charges.

8         The letter writers know the defendant well and have voluntarily come forward

9    to support him.  The fact that the defendant traveled extensively in recent months,

10   and returned to the United States for intermittent periods of time, is seen as troubling

11   by the government.  However, his daughter Stefanie confirmed the reason:  "While

12   he has spent a significant amount of his time out of the country on business over the

13   past few months, including in New Zealand and Australia, he has made it clear to

14   both me and Caroline that the reason for the travel was to do everything he could to

15   try and revive Cedenco for himself and our financial benefit."  Declaration of Stefanie

16   Gallegly at ¶6.[7]

17   Stefanie's husband, Matt Gallegly, similarly advised that:

18   "While Scott has spent a fairly significant amount of time out of the
     country on business over the past few months, including in New
19   Zealand and Australia, he has told us that the purpose for his extensive
     travel was to do everything he could to try and revive Cedenco for the
20   financial benefit of himself and his daughters who have an ownership
     interest in the business.  At the same time, he also stated that he has
21   been pursuing other international agri-business opportunities in Europe
     and elsewhere because he has been unable to find comparable work in
22   the United States due to the negative publicity stemming from the
     criminal investigation and the bankruptcy."

23

24   Gallegly Decl. at ¶5.    Mr. Salyer's friends and colleagues were also well aware of

25   why he was traveling and where.  The childrens' trustee, Robert Pruett, himself an

26   accomplished businessman with an impeccable background, noted that:

27

28
         [7] See also, letter from Caroline Salyer, Exhibit 3.
Defendant's Motion For Review Of Magistrate Judge's Detention Order

1   "Scott spent a great deal of time out of the country on business,
2   particularly in Australia and New Zealand over the past year, as a
    company in which the Trusts have an interest, Cedenco, went into a
3   receivership. He made it clear to me and it was obvious during the past
    year that he was trying to revive that multi-million dollar business and
4   still pursue other business opportunities outside the United States in
    countries with an evident need, particularly in the field of agriculture, for
5   people with his ability to build a business from the ground up. He was
    doing so because his reputation in California had been greatly damaged
6   by the adverse publicity coming out of the federal criminal investigation,
    with a constant stream of press releases and by reason of the many
    lawsuits following the filing of the Chapter 11 bankruptcy proceedings."
7

8   Declaration of Robert Pruett at ¶ 6, Exhibit 4.

9   **The defendant's well known travels and plans:** Mr. Salyer made it clear to

10  all that his immediate and future plans included his return to California to be with his

11  extensive network of family and friends. Ms. Joni Barna of the Pebble Beach Resorts

12  has known Scott for six years, observing that the last few of those years he has been

13  consumed with the litigation and business issues. According to Ms. Barna, he

14  always stayed in touch, and "[w]hile Scott has been traveling in Europe, he has

15  contacted me to make social plans upon his return without a hint that he may be

16  abroad indefinitely." "He had mentioned to me countless times that he looked

17  forward to the day he would have the opportunity to tell his side of the story."[8]

18  Mrs. Shugart, a widow Mr. Salyer assisted in her grief and also financially, has

19  known the defendant and his family for 25 years. She stated that: "During this time,

20  he has proven to be a good, honest and decent human being, concerned only with

21  the welfare of his family, friends and associates." He also told her many times that

22  "he wants his 'day in Court' in order to prove his innocence."

23  Recent brief trips abroad, during which Mr. Salyer rented hotel rooms and

24  apartments on a weekly and monthly basis, did not reflect any intent to abandon his

25  children or his personal property located on California. His son-in-law, Matt Gallegly,

26  stated that: "[I] am aware that Stefanie, through her trust, along with my sister-in-

27  _____

28  [8] This letter and the others mentioned in this motion are collectively attached as
    Exhibit 5 to the Compendium of Exhibits.

Defendant's Motion For Review Of Magistrate Judge's Detention Order

1   law, Caroline, own a residence in Pebble Beach, California.  When Scott would come

2   to California, and during the periods while he was living in California, Scott resided in

3   the home, furnished it, and kept his personal belongings there.  While Scott has been

4   away from California, I have been checking in on the house periodically at Scott's

5   request to make sure the house and its contents are safe and sound."   Gallegly Decl.

6   at ¶ 8.

7        Ms. Whitney Wheeler advised in her letter to the Court that the defendant has

8   two daughters, was "eagerly awaiting the birth of his first grandchild...," that they have

9   talked often, and that his travels were for business.  He made clear to her that he

10   intended to prepare for a trial.

11        Nor was the house in Pebble Beach abandoned as claimed by the

12   government's informant, Jeanne Johnston;  it was, and remains, fully furnished with

13   all of the defendant's clothes and personal belongings in place.  Indeed, as Robert

14   Pruett explained: "Although the Trusts own the property, Scott Salyer has most

15   recently resided in the home during those periods when he was in California.  His

16   extensive personal belongings and furnishings were kept at the house and most

17   remained there even when the home was on the market."  Pruett Decl. at ¶ 6.

18        And, contrary to the government's position, there was no plan to permanently

19   reside in a place where he could avoid prosecution.  Mr. Salyer always intended to

20   return home to California.  Ms. Barbara Zimmerman, a friend and employee of the

21   Lodi Unified School District, made this resoundingly clear in her letter to the Court:

22   "Scott is not a flight risk!  Scott is a committed father and would never consider

23   leaving his daughters."  She spoke to him on the evening of  February 2, 2010 - just

24   before his travel to New York and arrest.  <u>Mr. Salyer told her then that he was "[o]n</u>

25   <u>his way home to sort things out" and as she said, "hardly the actions of a man</u>

26   <u>intending to flee.</u>

27        Similarly, Ms. Pam Dubier, a San Francisco Real Estate Agent, stated in her

28   letter to the Court that Mr. Salyer had been looking for an apartment in San Francisco

Defendant's Motion For Review Of Magistrate Judge's Detention Order

1   and met with her in San Francisco on "October 11 to further discuss his real estate

2   needs."   He informed her he was in "pursuit of some business opportunities in

3   Europe."  She said that he told her then that "the US legal challenges had made it

4   virtually impossible for him to do business here and that he wanted to work on

5   projects outside of the US."  Based on her personal interactions with Mr. Salyer, she

6   finds it difficult to believe he would permanently leave his home and family in

7   California.  That letter, and the timing of the meeting the day after having allegedly

8   told the informant he intended to flee, entirely refutes entirely Agent Artley's claim that

9   the defendant had fled in October.

10          **The defendant's reputation and family relationship**:  To leave the country

11  and avoid the litigation he had been vigorously defending was not in Mr. Salyer's

12  makeup.  Jared Miller of Pebble Beach advised the Court by letter that:  "Scott has

13  always traveled extensively but was always reachable as needed."  He is loyal and a

14  fighter for what he believes in and "would never disappoint anyone by hiding - most of

15  all himself. That is just not his style."

16          Others feel the same way.  Ms. Nancy Chaves has known Mr. Salyer for a long

17  time.  She recounted in her letter that: "People knew he was flying to New York from

18  Europe - he isn't a runner and wants to fight this case and win."   Ed Martin, a former

19  member of the City Council in Lemoore, said that: "Knowing Scott I hardly think he

20  would endanger his reputation by fleeing.  I believe he wants to clear his name and

21  get on with life."  Ms. Dana Bambace, a close friend to Mr. Salyer for twenty-five

22  years, stated in her letter that he: "always puts his children first.  He frequently travels

23  abroad.  His home is here in California where his children are located, and now his

24  grandson. Had he been told not to travel this issue would not even have arisen."

25          The most compelling reason for his inevitable return to California was his

26  unwavering devotion to his children.  Ms. Daniela Peterson, who has known Mr.

27  Salyer for several years, said in her letter that: "He mainly talked about his daughters

28  and how proud he was to have them.  They are his life.  He could lose everything, but

1   can't lose his daughters. They are his 'reason of life.'  He would never flee and risk

2   that relationship."

3        Ms. Dana Valente who has known Mr. Salyer for thirty-three years, emphasized

4   in her correspondence that he would never run away.   He "adores his daughters and

5   would never let them down..."  And, Calvin Carter, a Cal Poly friend of thirty-five years

6   said:  "He loves his daughters very much... He would never leave them behind."

7   Moreover, as  reported by Mr. Salyer's counsel in his declaration, even in France in a

8   temporary apartment, Mr. Salyer had personalized the apartment with many framed

9   pictures of his children.  Declaration of Malcolm Segal in Support Defendant's Motion

10  at ¶ 37, Exhibit 6.

11       Finally, Mr. Salyer has no criminal record and no one sincerely questioned his

12  lawfulness prior to the investigation, nor has any significant evidence been disclosed

13  which would call his honesty into question save for these charges.  Quite obviously,

14  the charges call into question his activities in recent years but they do not alter a

15  lifetime of achievement, respect, and philanthropic good deeds.  While the

16  government may postulate that his integrity is lost based on the mere allegations in

17  the indictment, the argument misses the point because the issue of release from

18  detention is not the trial of the allegations, it is, in part, an examination of the

19  defendant's "history and characteristics" measured over a lifetime and not just during

20  the events in dispute.

21       **B.    The Government Did Not Establish Mr. Salyer Is A Flight Risk, Nor
           Did He Intend To "Permanently Reside Outside The United States."**

22

23       At the onset, it bears mention that each of the other nine defendants charged in

24  this case who have entered their appearance have been released on their own

25  recognizance, including the person identified as the active bribe-giver, Randall Rahal,

26  a food broker and claimed by the government to be a "director of SK Foods LP" – the

27

28

Defendant's Motion For Review Of Magistrate Judge's Detention Order

1  alleged RICO enterprise.[9]   Notwithstanding the fact that Mr. Salyer is charged with

2  virtually the same serious charges as Rahal and those similar to the other

3  defendants, the government seeks to distinguish him as a flight risk.  It based that

4  claim on statements of an angry former employee, Jeanne Johnston, who served as

5  Mr. Salyer's assistant until he could no longer pay her for her services, upon casual

6  and misinterpreted remarks by the defendant to a friend of hers and another woman

7  at lunches, and on documents Jeanne Johnston provided to the government but

8  which were incorrectly characterized.

9  **1.     Jeanne Johnston's Claims Of Flight Lack Any Credibility.**

10  The Criminal Complaint, now superseded by an indictment, and the supporting

11  affidavit of FBI Agent Artley, filed under seal on January 5, 2010,  stated the

12  particular information on which the government relied to assert that Mr. Salyer is a

13  flight risk.  The same assertions were summarized in Agent Artley's affidavit dated

14  February 5, 2010, filed in support of removal from the Eastern District of New York.

15  The allegations in their entirety are set forth in paragraphs 87 to 92 of the Complaint

16  affidavit under the conclusory heading: "Salyer's Flight to Avoid Prosecution."[10]

17  The allegations of the Complaint affidavit are entirely based on statements of a

18  person identified as "JJ," who "served as a Vice President for SK Foods, and as a

19  personal assistant for Salyer."  Affidavit at ¶ 87.[11]

20

21  _____

  [9] A tenth defendant, former SK Foods employee Steven King, was charged on
22  February 18, 2010, the same day the indictment against Mr. Salyer was filed and made
  public.  Mr. King's initial appearance has not yet occurred and he has not been
23  arrested.

24  [10] The relevant portions of the two Artley affidavits are attached to this motion as
  Exhibits A and B to facilitate a review by this Court.
25

  [11] No one disputes that the person identified is Jeanne Johnston, who identified
26  herself with those same criteria in a declaration she provided to counsel for Mr. Salyer
  and SS Farms, which was filed in 2009 in the Bankruptcy Court in this District.  See,
27  Exhibit 7 at ¶ 2.  Until the dispute with the defendant arose over his property, Ms.
  Johnston had cooperated with Mr. Salyer's counsel in the defense of civil litigation up to
28  and including a declaration filed in this Court and dated September 15, 2009.  Exhibit 8.

20

1    Agent Artley's affidavit states in essence at paragraphs 87 and 88, that in

2  response to questioning by investigating agents (presumably in December 2009, prior

3  to the application for the arrest warrant on January 5, 2010), Ms. Johnston asserted

4  that Mr. Salyer told her sometime during the second week of October 2009 that he

5  intended to leave the United States "in order to reside permanently in France. . .," and

6  that he thought that he "could not be extradited back to the United States from

7  France." She also claimed that Mr. Salyer was looking for other places without

8  extradition treaties and had instructed her to open bank accounts in certain countries

9  which she contends also lacked such treaties.   Among the countries she named as

10  potential safe havens was Andorra to which she had wired funds on his behalf.

11    Despite the conclusion that Mr. Salyer fled the country in October of 2009, the

12  affidavit recounts at paragraph 87 the conflicting information that Agent Artley had

13  confirmed Mr. Salyer's travel to New Zealand and a return to the United States and

14  then to his home base of Monterrey to celebrate a birthday during December 2009

15  and his return to "London" (a country with which the United States clearly has an

16  extradition treaty) that same month.[12]

17    Notwithstanding this ambiguity, and recitation of Ms. Johnston's claim that the

18  defendant had fled in October 2009, when he had not, the very premise of the

19  affidavit was inaccurate.[13]   France has an extradition treaty with the United States.

20

21    [12] During the period Ms. Johnston said  that the defendant had fled the country,
22  he was in fact very publicly in Australia and New Zealand working in person with a team
    of attorneys who had been retained to try to recover Cedenco from a receivership.
23  Daniel Hughes, a partner in the firm of Kensington Swan in Australia has verified by
    letter that Mr. Salyer was with him during the last week of October and into November
24  working on Cedenco issues. Exhibit 9.  That trip just preceded his return to California
    over the holidays in December.
25

26    [13] The government submitted a statement by a friend of the informant to
    corroborate her statement but it showed to the contrary.  (Government Exhibit MM.)
27  The friend, Soraya Cayen, stated that she had a long lunch and drinks with Ms.
    Johnston and Mr. Salyer on October 10, 2009.  She advised that Mr. Salyer said he
28  was going to Paris and could not take his dog.  During the conversation he said that he
    could not do business here in the United States because of the SK Foods bankruptcy

21

1    The alternative claim by Ms. Johnston that Andorra had been selected after

2  research as a safe place to flee and deposit money is belied by the fact that in 2009

3  the FBI itself had sought the arrest of a person named Brigit Mechlenburg, a Danish

4  citizen on fraud charges filed in the Western District of Virginia.  She was arrested in

5  Andorra in July 2009 and held for extradition.  Exhibit 10 (Copenhagen Post Article).

6  PACER records of the docket in the Western District of Virginia reveal that she was

7  readily extradited to the United States and appeared before a Magistrate Judge in

8  that District on February 1, 2010.  Exhibit 11.[14]  FBI Agent Artley was apparently

9  unaware of that activity by other agents when he accepted Ms. Johnston's statements

10  as true.

11    To support its claim that Mr. Salyer intended to flee the country, the

12  government also relied on Jeanne Johnston's statement that she was instructed to

13  sell Mr. Salyer's  belongings, distribute items to "friends," and empty his now former

14  residence, which was listed by him for sale.  Those allegations were demonstrably

15  false, but the government accepted them as truthful on their face in seeking

16

17  and wanted to live overseas, asking her for information about a variety of countries
18  including her own.  What Mr. Salyer <u>didn't say</u> was that he intended to flee to avoid
     extradition or even mention extradition as asserted by Ms. Johnston.  Indeed, Ms.
19  Cayen specifically stated that "he [Mr. Salyer] did not say why he wanted to establish
     residency outside the United States."  (As previously noted the very next day Mr. Salyer
20  met with Pam Dubier and told her was in "pursuit of some business opportunities in
     Europe."  She confirmed that Mr. Salyer told her then that "the US legal challenges had
21  made it virtually impossible for him to do business here and that he wanted to work on
     projects outside of the United States."  She came away from that conversation with a
22  clear view that he did not intend to permanently leave the country.)

23     [14] At the prior detention hearing, a letter was submitted by the defendant from
24  the Director of the company through which Mr. Salyer intended to purchase a
     condominium.  The letter puts to rest several of the specious allegations in the
25  government's argument about Andorra.  First, Mr. Salyer's investment was in the
     amount of a down payment of approximately 50,000 dollars on a condominium
26  apartment, not one million four hundred thousand as the government argued Agent
     Artley had discerned from interpreting scribbled notes in Mr. Salyer's notebook.
27  Second, the extradition of the person back to the United States  was well known and
     Mr. Salyer never raised the subject of avoiding extradition.  Third, Mr. Salyer  wanted to
28  purchase a business.  See, Exhibit 12.

22

1   detention.  In fact, the home in Pebble Beach was and is owned by Mr. Salyer's

2   childrens' trust and not Mr. Salyer (a fact readily verifiable in the public record) and it

3   was no longer being publicly shown for sale by the trust at the time of the arrest in

4   New York, although it was available if a buyer presented him or her self.  Pruett Decl.

5   at ¶ 5.

6        The most striking falsity, which the government likewise did not challenge or

7   completely verify, was the assertion by  Ms. Johnston that Mr. Salyer had "given her

8   his belongings" and himself "emptied the Pebble Beach home" where he was

9   residing.  In fact, Robert Pruett, the daughters' trustee, had during the early part of

10  December 2009, and prior to Ms. Johnston's interview with the FBI, tried to get her to

11  return the hundreds of thousands of dollars in property, and Mr. Salyer's dog, which

12  she had taken from the home.  According to Mr. Pruett, even Ms. Johnston's own

13  lawyer had advised her to return the property she had taken from the house some of

14  which she had given to her daughter to use and keep.  Pruett Decl. at ¶ 7.

15       On December 31, 2009, after Ms. Johnston continued to refuse to return the

16  property she had taken from the home, Mr. Pruett as trustee reported the matter to

17  the Monterey County Sheriffs Department and a formal case was opened.  Exhibit 13

18  (Sheriffs Report); Pruett Decl. at ¶ 8.  Since Mr. Salyer had by then returned to

19  London, the Sheriff's officer personally interviewed Mr. Salyer via Skype, in Mr.

20  Pruett's presence, during which Mr. Salyer confirmed that Ms. Johnston had taken

21  and kept his belongings.  Pruett Decl. at ¶ 9.[15]

22

23  _____

24       [15] Significantly, as Mr. Pruett reports in his declaration, Mr. Salyer told the
    Sheriff's officer on January 1, 2009 that he intended to return to the United States at the
    end of January 2010.  Pruett Decl. at ¶ 9.   That statement is also supported by the

25  letter of a person present during the interview, Deborah Meyers.  Exhibit 14.  He
    returned as planned.  The Monterey County Sheriff's Report (Exhibit 13) also indicates

26  on its face that Mr. Salyer advised the officer when interviewed, that he was a
    Consultant for an International Food Company and his business address was 5 Fir

27  Close, Walton, Surrey, U.K..  That is the address for the Crossfield Agency, the
    business cards for which were in Mr. Salyer's possession at the time of his arrest in

28  New York.

1    Thereafter, following a series of exchanges, including a letter from Ms.

2 Johnston's attorney, Ms. Johnston and her daughter finally agreed to return the

3 property she had taken from the house, including Mr. Salyer's dog, in return for a

4 payment of $3,000 for the dog's "boarding expenses," and the parties signed a

5 traditional settlement agreement with releases and denials of liability.  Pruett Decl. at

6 ¶¶ 11-13.   A key provision of the agreement was that on execution of the agreement

7 and on return of the property, Robert Pruett would advise the Monterrey Sheriff's

8 Department that the matter "was resolved" and the criminal case would be dismissed.

9 Exhibit 15; Pruett Decl. at ¶ 13.[16]

10    Ms. Johnston's allegations that Mr. Salyer had abandoned his property were

11 utterly untrue.  Gallegly Decl. at ¶ 6.  Reasonable inquiry would have revealed that

12 falsity to the government.[17]

13 ///

14 ///

15 ///

16 _____

17    [16] Of course, by January 21, after she had claimed to Agent Artley that Mr.
Salyer had fled, and Ms. Johnston knew her statements were going to be used as the
18 basis for an arrest warrant, she had a story ready for the Sheriff's Department.  She
claimed in her interview on that date that the theft report was retaliation for her
19 becoming "state's witness" against Mr. Salyer and said that she had returned all of the
property under the advice of her attorney.  Her friend then supported the statement that
20 she had received the property in good faith.  However, when Ms. Johnston became
concerned about the timing of the settlement and its effect on her credibility as a
21 government witness, her attorney unilaterally voided the settlement provision regarding
the $3,000 payment and returned the voided check in a letter postmarked February 9
22 (after Mr. Salyer's arrest).  Pruett Decl. at ¶ 14.

23    [17] The government also relied on claimed suspicious emails to bolster Ms.
24 Johnston's statements, including one in which Mr. Salyer told Ms. Johnston not to use
the SK Foods email system for private emails and instead use a gmail account. (Bate
25 Nos. SSD 00360-361).   The change was normal following a business bankruptcy and
was initiated on instructions from present counsel.  Contact with the Trustee in the
26 bankruptcy would have revealed to the government that after the filing of the SK Foods
bankruptcy, the Trustee had claimed that all such emails were no longer private even if
27 used for private business matters.  That very issue is the subject of appeals pending in
the District Court  (In re SK Foods, L.P., Debtor, SS Farms, LLC, et al., Appellant, Case
28 No. 09-CV-02942 - MCE).

1       At the time of his arrest, Mr. Salyer was living for a brief period in a rented,

2  furnished apartment in Cannes, France.[18]   Notwithstanding Ms. Johnston's claims to

3  the contrary, the United States has long enjoyed an extradition treaty with France,

4  thus entirely negating the Agent's purported fears that Mr. Salyer would and could

5  remain in France.[19]   Similarly, Ms. Johnston's statement (reported in the Artley

6  affidavit) that Mr. Salyer purportedly stated in October 2009 that he would "see

7  Jeanne Johnston next in Paris" as an indicator of flight is inaccurate because Mr.

8  Salyer visited the United States and Monterey just a few weeks thereafter in

9  December 2009.[20]

10      Moreover, as indicated, Mr. Salyer's travel overseas and business activities to

11  and from the United States are well known and have existed for years.   The fact that

12

---

13      [18] The fact that Mr. Salyer was living for several weeks at a time abroad was
14  entirely consistent with his living arrangements prior to the search in 2008, prior to the
time the investigation became overt, and most certainly prior to October 2009 - the point
15  in time where Ms. Johnson claims he fled the country.   An examination of his passport
shows that he was often out of the country for weeks at a time over the years and
16  received temporary resident's visas from certain countries so he could work in those
countries on extended business matters. See, Exhibit 16 (copies of passport entries);
17  Segal Decl. at ¶ 30.   Moreover, documents relied upon by the government at the
detention hearing (Bate Nos. 00189-199) are copies of Mr. Salyer's credit card bills
18  which confirm his extensive travels in Europe before Ms. Johnston claims he expressed
an intent to flee.   These credit card bills are entirely consistent with Mr. Salyer's travels
19  and expenses over the years.

20
      [19] That extradition treaty, and the extradition treaties for other countries
21  mentioned by Ms. Johnston as a place for non-extraditable flight are set forth in a
declaration of a former member of the Department of Justice with working expertise in
22  that area of the law. See, Declaration of Mark Zanides, Exhibit 17. Her claims were
23  simply specious.

24      [20] The government secured the declaration of a restauranteur, Anna Marie
Zoellin, to the effect that as she was passing Mr. Salyer's   table at lunch one day he
25  asked her about Paraguay and Brazil as places to live and work.  (Government Exhibit
QQ.)  Both countries have extradition treaties with the United States and fit the model
26  for business growth opportunities the defendant was publicly seeking.  In any event, it
can be vouched safe that anyone actually intending to surreptitiously flee the country
27  would be most unlikely to make such a casual and passing inquiry.   That the
28  government needed to seek out such a marginal statement is evidence of the thinness
of its claim of flight and intended flight.

Defendant's Motion For Review Of Magistrate Judge's Detention Order

1   Mr. Salyer was living for several weeks at a time abroad was entirely consistent with

2   his ordinary business activities, and an examination of his passport records readily

3   reveals that his travel patterns had not dramatically changed because of the

4   investigation.  See, Exhibit 16 (copies of passport entries); Segal Decl. at ¶ 30.  Mr.

5   Salyer's regular international travel and recent temporary relocation to Europe where

6   he was seeking employment and business opportunities were well known to the

7   government before the arrest because during discussions concerning agreed upon

8   access to the wiretap affidavits, his present counsel, Mr. Segal, specifically advised

9   the Assistant United States Attorney well before his arrest that Mr. Salyer was

10  traveling and that he was spending time in Europe and was waiting to make himself

11  available to counsel to review those affidavits when the government was ready to

12  provide them.[21]

13         Indeed, the search of the defendant's briefcase by the FBI recovered at the

14  time of arrest, reveals business cards evincing Mr. Salyer's efforts to locate business

15  projects and work in Europe.  The case contained a stack of business cards for

16  Crossfield Agency, Ltd., stating his title as an International Sales Manager, an

17  address and phone number and an email address of scott.salyer@crossfield-

18  agency.com.  Exhibit 18; Segal Decl. at ¶ 24.  It also contained the business card of

19  the company in Andorra (Exhibit 19), where Mr. Salyer was attempting to purchase

20  an interest in a business and condominium in aid of that business pursuit.  The

21  information was readily verified.  Segal Decl. at ¶ 25.

22         Finally, with respect to Ms. Johnston's statements to Agent Artley that "in aid of

23  [Mr. Salyer's] flight to avoid prosecution, she, along with certain other individuals,

24  assisted [him] in transferring millions of dollars to banks in foreign countries,"  these

25  too are less than accurate and could have been verified by the government by court

26  _____

27         [21] In fact, one of the very documents produced by the government in connection
       with the detention hearing (Bate No. SSD 00002) is a copy of a bill from a law firm in
28     London which confirms on its face that Mr. Salyer, as the firm's client, was seeking
       business opportunities in Europe.

1  records.  While there are accounts overseas, a good portion of those deposited funds

2  are his daughters from the court-approved settlement with the bankruptcy Trustee

3  (Exhibit 20) (easily verifiable by the government from the bankruptcy PACER site),

4  and from tax refunds generated by the businesses – a fact which must also be known

5  to the government.[22]

6       This, of course, is addition to the fact that Mr. Salyer had timely filed required

7  Foreign Bank Account Reports (FBARs) in the United States for the reporting year

8  2008 which openly revealed the existence of foreign bank accounts to the

9  government and met the government regulatory reporting standards. (The FBAR,

10  Exhibit 21, showed that much of the money then in those accounts went to Australia

11  where Cedenco was located.)  Contrary to the notion that Mr. Salyer was attempting

12  to hide money, the historic filing of FBARs displays the level of candor expected in

13  financial reporting. (The FBAR for 2009 is not yet due.)[23]

14       No evidence exists to support the notion that assets were being hidden.  In

15  fact, the claim that Mr. Salyer opened the overseas accounts to flee and avoid

16  extradition also fails in light of the fact that there was a logical reason why money was

17  placed in the accounts.  It was placed there not only for his daughters' trusts' benefit

18  to protect it as called for in the settlement agreement with the bankruptcy Trustee, but

19  also for use as Mr. Salyer tried to acquire an operating business in Europe and

20

---

21  [22] Documents relied upon by the government at the detention hearing (Bate Nos.

22  SSD 00135-37) do not show to the contrary. They reveal that the funds in question were apparently tax refunds and belonged to the daughters' trusts, not Mr. Salyer; in

23  fact most of the documents (Bate Nos. SSD 00214-225) were domestic transfers of money for the benefit of the ongoing farming corporations.

24

25  [23] The fact these overseas accounts exist present no barrier to Mr. Salyer's release on bail.  See e.g., *United States v. Demmler,* 523 F.Supp.2d 677, 684 (SD Ohio

26  2007) ("[T]he purported existence of Demmler's offshore accounts and access to counterfeit currency and documents does not demand that he be detained."); *United*

27  *States v. Giordano*, 370 F.Supp.2d 1256, 1269 (SD Fla. 2005) ("[E]ven with the $800,000 in funds available to him in offshore accounts, there is no compelling

28  evidence that he has sufficient foreign funds available to him to finance an extended absence from this jurisdiction.")

Defendant's Motion For Review Of Magistrate Judge's Detention Order

1   continued using funds to preserve Cedenco as an asset.

2          In sum, Ms. Johnston's statements to the government were made after months

3   of cooperation with the defense in various litigation matters in this District where Mr.

4   Salyer and his daughters' trusts were parties, including the signing of declarations in

5   Bankruptcy Court proceedings on their behalf.  Her newly minted and

6   unsubstantiated claim that he intended to flee the United States and avoid extradition

7   can only be attributed to her dispute with the Salyer family over the property she took

8   from them.[24]  No credibility can be attributed to Ms. Johnston's claims, even if

9   marginally supported as claimed by her friend, nor does her view of the documents,

10  which never say a single word about flight or extradition, hold any weight in light of

11  her conduct.

12          **2.      The Defendant Knew Of His Status As The Primary Target Of
                     The Grand Jury Investigation Yet Did Not Flee And His**
13          **Conduct Displays No Evidence Of Intended Flight.**

14          Since at least April 2008, when his personal home was searched by the

15  government along with the offices of SK Foods, Mr. Salyer has been aware he was

16  the key target of the government's criminal investigation. That knowledge was

17  reinforced by a meeting held between present counsel, the prosecutors and the

18  investigators in January of 2009, where the government outlined the charges in detail

19  and when counsel was advised that Mr. Salyer would be indicted.

20          Until recently, and knowing he was a principal target of the investigation, he

21  had his own jet plane and flew it himself, with co-pilots, around the world many times

22  to Australia and elsewhere using his own passport.  Each and every time, Mr. Salyer

23

24

25  _____

26      [24] Although Agent Artley reported that Jeanne Johnston had told him that Mr.
    Salyer had told her he intended to leave the United States "in order to reside
27  permanently in France," the Sheriff's Report (Exhibit 13) states she actually told the
    officer that Mr. Salyer "was leaving the country for an undetermined amount of time."
28  Ms. Johnston likewise did not tell the officer that Mr. Salyer was avoiding extradition in
    France as Agent Artley reported to the Magistrate Judge.

1    returned to the United States.[25]  He later voluntarily surrendered the plane back to the

2    lender because following the demise of SK Foods he could not sustain the expense.

3    Similarly, a smaller aircraft he piloted but which was capable of travel outside of the

4    United States was released to a lender.  Had the defendant wanted to flee, as alleged

5    by Ms. Johnston, he certainly could have done so at any time before relinquishing the

6    aircraft late last year and flown the planes anywhere in world.  He did just the

7    opposite.

8         The government's claim that his determination to flee and avoid extradition was

9    the product of the sudden realization he was in trouble makes little sense.  From the

10   plea agreements of other related defendants, and through his counsel's meeting in

11   January 2009 with the prosecution, Mr. Salyer plainly always knew he was targeted.

12   After the meeting in January 2009, and in response to a defense request, the

13   government offered to seek the unsealing of the wiretap affidavits in order to discuss

14   the case and possible resolutions.  The defendant and his counsel could not

15   appreciate the case without reviewing the applications for the wiretaps and

16   determining their validity.  Discussions regarding unsealing the affidavits began in

17   earnest in July 2009 and continued apace throughout the year.  Significantly, the

18   government required a written agreement to the effect that the defendant could not

19   have his own copy of the affidavits and that he would have to read them in the

20   presence of defense counsel.  Dissemination of the affidavits would be limited to

21   counsel and counsel's investigators.  The government drafted an agreement in

22   _____

23      [25] A review of Mr. Salyer's passport in possession of defense counsel reveals
     that it was issued on December 2, 2005. From 2005 until his home was searched in
24   April 2008, the time the investigation became public, Mr. Salyer made approximately 26
     trips to Australia, England, France, Italy, Mexico, New Zealand, Panama, Paraguay,
25   Scotland, Switzerland, and Turkey, often staying for an average of 5 days in some
     countries. Mr. Salyer's extensive pattern of personal and business travel did not change
26   during 2009 when he traveled to Australia, England, France, Italy, Paraguay, New
     Zealand, and Switzerland again often staying for an average of 6 days at a time. In fact,
27   several times during 2009 he received 3 month visitor's permits to Australia where the
     Cedenco manufacturing facility was located.  Segal Decl. at ¶ 30, and Exhibit 16
28   (passport entries).

1  writing which counsel signed, after conferring with his client as was requested, which

2  was signed in November 2009.   See, Exhibit 22; Segal Decl. at ¶ 32.

3        During the period before the end of the year, the request for unsealing was

4  renewed and discussed further with the AUSA, who indicated that disclosure was

5  forthcoming and delayed so that the government could "speak to witnesses."

6  Counsel specifically advised the AUSA that Mr. Salyer's business travel schedule

7  kept him away and counsel would need to coordinate his presence for purposes of

8  the review within the limitations imposed by the government.  Segal Decl. at ¶ 32.

9  (Anyone familiar with the bankruptcy issues, including the AUSA assigned to the case

10  and the US Trustee, would have known that Cedenco was being thrust into a

11  receivership and Mr. Salyer's presence in Australia and New Zealand was needed.

12  That information is contained in motions and orders filed in the bankruptcy court, and

13  on PACER, filed and heard during December of 2009.)

14        During several conversations thereafter, defense counsel was told that the

15  affidavits would soon be forthcoming.  On January 6, 2010, a month preceding Mr.

16  Salyer's arrest, defense counsel spoke to Assistant United States Attorney Sean

17  Flynn regarding the message he sent that same day in response to counsel's emails

18  on the subject of the disclosure stating in effect, "we should talk soon."  Exhibit 23.

19  (emails); Segal Decl. at ¶ 34.  During that conversation, counsel asked whether he

20  would soon be receiving the affidavits and documents in support of the wire taps and

21  other electronic devices which had recorded conversations on which the government

22  was relying in the prosecution of its case. Segal Decl. at ¶ 34.

23        Counsel also specifically told Mr. Flynn that Mr. Salyer was traveling

24  extensively on business in Europe and that counsel wanted to be able to show him

25  the affidavits at the earliest possible time.  In response to a question as to the reason

26  for his presence in Europe, and to respond to rumors that Mr. Salyer had fled,

27  counsel specifically advised the AUSA that Mr. Salyer had been in the United States

28  during Christmas, was out of the country at the moment working with a firm based in

1  England to create business opportunities in Europe and was looking for other

2  business opportunities abroad.  Counsel explained that Mr. Salyer was living in

3  Europe because it was a base convenient to those prospective businesses.  Segal

4  Decl. at ¶ 35.

5      Mr. Flynn chose not to tell counsel about the arrest warrant filed the day before

6  in that conversation.  Had he done so, counsel would have made immediate

7  arrangements for Mr. Salyer to return to respond to the charges.  Mr. Flynn did

8  however, say again that the affidavits would be forthcoming.   Segal Decl. at ¶ 36.

9  There was no valid reason to seek the arrest or detain the defendant since he was

10 not a flight risk and certainly there was no longer any reason after the conversation.

11     Acting on the strength of that conversation about the forthcoming affidavits, a

12 voluntary preliminary settlement conference with the Trustee for SK Foods scheduled

13 for February 17, and a tentatively scheduled judicial mediation for the remaining

14 bankruptcy issues before Judge McManus set on March 3, 2010, defense counsel

15 traveled to Cannes, France, on January 27 through 29, 2010,  to meet with Mr.

16 Salyer.  Counsel personally observed that Mr. Salyer was living in a well furnished

17 apartment which he was renting on a short term basis, had a business office on the

18 premises and that he had personalized the apartment with a number of displayed

19 framed pictures of his two daughters.  (Counsel was joined by an accountant and his

20 lead investigator for the purpose of a through discussion of all of the pending

21 matters.)  Mr. Salyer participated fully in the meeting and was actively preparing for

22 the bankruptcy settlement discussions and the criminal case.  Segal Decl. at ¶¶ 37,

23 41.[26]

24 ///

25

26     [26] No one can contend that the defendant was suffering any pressure at that
moment to flee since he knew that no criminal filing was immediately anticipated
27 because his counsel had been assured by Mr. Flynn that the defense would have
sufficient time to discuss the case and affidavits with his client after he received them.
28 To the contrary, immediately following the meeting he returned to the United States.

Defendant's Motion For Review Of Magistrate Judge's Detention Order

1   Additionally, at the time defense counsel spoke to Mr. Flynn on January 6,

2   2010, and when he met with his client in France at the end of January, counsel knew

3   about the allegations made by Ms. Johnston that Mr. Salyer was concealing money

4   overseas because Ms. Johnston's attorney had previously discussed the emails and

5   bank documents she later provided to the government with defense counsel to

6   provide the defendant with an opportunity to invoke the attorney client privilege where

7   appropriate.  Segal Decl. at ¶ 38.  The privilege was asserted and the government

8   knew of defense counsel's involvement (and perforce the defendant's) because it

9   received "attorney client privileged" labeled, "redacted" documents from Johnston's

10  attorney.  Segal Decl. at ¶ 38.  (More important, the government knew that Mr.

11  Salyer's counsel had had that conversation with Ms. Johnston's attorney.)

12  Knowing about the documents provided by Ms. Johnston to the government

13  detailing the foreign bank accounts, knowing about the allegations which Mr. Flynn

14  had raised with defense counsel, Mr. Salyer still returned openly and on his own

15  volition to the United States on February 4 under his own passport from a widely

16  watched airport in Europe to arguably the most closely watched airport in the world.[27]

17  He did so with a return ticket to Europe, but also with an advanced reserved ticket

18  and seats for a one-way flight back to the United States on British Airways on

19  February 24, 2010, which had been previously purchased by Mr. Salyer in December

20  2009.

21  The information was contained in the defendant's briefcase which Agent Artley

22  searched and inventoried.  See, Exhibit 24 (Inventory and Receipt).  The briefcase

23  was later forwarded to Sacramento by New York counsel.   Declaration of Malcolm

24  Segal Regarding Defendant Scott Salyer's Return Ticket To California at ¶ 3, Exhibit

25  

26  [27] The defendant made the relatively brief trip planning to take care of a business matter, to contact counsel for immediate followup on the earlier meeting, and meet a friend. While to some travelers such a fast return trip would be unusual, for a pilot such as Mr. Salyer such short trips on commercial and private flights are the norm and require no great effort.  Mr. Salyer's air travel logs and passport verify a very high level of like travel.

27  

28

25.  The briefcase contained a note book which, among other things, referenced the

flight that Mr. Salyer had taken to New York preceding his arrest and his return

booking.   On the very next page was a listing of a British Airways ticketing identifier.

*Id.* at ¶ 4.  By simply accessing the web page for British Airways and using the

identifier and Mr. Salyer's last name, a ticket was displayed confirming a flight from

London to San Francisco, California scheduled for February 24, 2010, which had

been purchased in December 2009.  *Id.* at ¶ 5, and Exhibit A thereto.

Unlike the February 4 flight, which was a round trip to New York and return to

Europe (upon which the government relied at the detention hearing in New York), the

British Airways ticket was for a <u>one-way flight</u> to the United States and more

particularly to San Francisco.  *Id.* at ¶ 6.  No flight was booked out of the United

States and none has been identified by the government.  It is clear from that modest

inquiry by counsel that Mr. Salyer intended to return to the United States in February

and, as his friends indicated in letters to the Court, he had no plans to leave.  *Id.* at ¶

7.  As in the case of the Ms. Johnston's inaccurate claim that Scott Salyer had

intended to avoid extradition - from countries which in fact had extradition treaties

with this country and complied with them -  the basic premise of the agent's opinion

that the defendant had fled the country and never intended to return was completely

undercut by the one-way return ticket to the very place from which he purportedly had

fled.

> **3.  Mr. Salyer's Unwavering Commitment To The Defense Of The Pending Civil And Bankruptcy Actions,  His Continued Personal Participation In Those Actions, And Intent To Continue To Fight Demonstrate An Absence Of Intent to Flee.**

Mr. Salyer has been actively involved in defending a panoply of civil and

bankruptcy-related cases brought against him and family related business entities,

including several federal cases predicated on the very same factual basis underlying

the instant criminal charges.  See generally, Exhibit 26 (Chart & Docket Sheets);

Declaration of Donald J. Putterman (Putterman Decl.) at ¶¶ 1-9 (describing pending

1  civil actions), Exhibit 27; Segal Decl. at ¶ 40.  Some of those cases were filed before

2  the bankruptcy and others after the bankruptcy filing.  His conduct in this regard,

3  which has included assertion and litigation of his Fifth Amendment privilege, is not

4  that of a person intending to avoid his financial obligations and flee the country, and

5  he certainly could have saved hundreds of thousands of dollars and an equal number

6  of hours of personal effort had he abandoned the effort a long time ago.  He instead

7  chose to litigate those cases in his own economic interests and to protect his

8  daughters' assets.   It is inconceivable that he would now walk away from that effort

9  and flee the jurisdiction only to see his family lose everything.

10       Consistent with Mr. Salyer's unflagging efforts in this regard, as previously

11  mentioned, Mr. Salyer's defense counsel, who also serves as his counsel in the

12  bankruptcy proceedings, visited Mr. Salyer in Cannes, France, along with an

13  accountant and his lead investigator just before Mr. Salyer's arrest.  The trip was

14  conducted in anticipation of settlement and mediation conferences in the bankruptcy

15  matters.  The complex issues under review and for settlement discussion included

16  claims against Mr. Salyer, his trusts, his daughters' trusts, substantive consolidation

17  of a number of business entities in the United States and abroad, preference actions,

18  appeals from the Bankruptcy Court pending in the District Court, access to records by

19  the Trustee and others, claims by the estate and entities against the estate, as well

20  as numerous other matters.  Segal Decl. at ¶ 41.[28]

21  ///

22

23       [28] The parties, including Mr. Salyer, had previously enjoyed success in past

24  settlement discussions before Judge McManus inasmuch as they settled the dispute
    regarding contracts to discharge wastewater on properties owned by Mr. Salyer's

25  children's trusts.  The resulting settlement (Exhibit 20), which was recorded in an
    agreement approved by the assigned bankruptcy judge, resulted in an agreement by

26  the bankruptcy estate to pay well over a million dollars to the trusts under
    circumstances where the funds would thereafter be unavailable to the Trustee, or

27  estate creditors, even in the event of successful litigation against business entities
    owned by the beneficiaries of the trusts.  Segal Decl. at ¶ 42.

28

1   The meeting in France, which lasted two full business days at Mr. Salyer's

2   apartment and temporary business offices, also involved preparation for the logistics

3   of an investigative review of the affidavits in support of the wiretaps. The goal of the

4   meeting, in anticipation of the long promised turnover of the records, was to plan for

5   the event.  Segal Decl. at ¶ 43.

6   This meeting was consistent with Mr. Salyer's intended continued participation

7   in all of the litigation, civil and criminal over the months ahead.  Indeed, the

8   anticipated settlement of the bankruptcy litigation contemplated a very public and

9   ongoing management role by Mr. Salyer in business ventures and not a life hiding

10   from the government.  Segal Decl. at ¶ 44.

11   The government's contention that Mr. Salyer's participation in such meetings,

12   and his enormous financial expenditures to defend the civil antitrust and RICO

13   complaints pending in this District and to protect his Fifth Amendment rights from

14   onslaught in several litigation matters, was merely to fool his own lawyers does not

15   hold water.  It is belied by the fact that he spent many thousands of dollars on the

16   settlement process itself and hundreds of thousands of dollars on the litigation to

17   protect his and his daughters' interests, when that very money could have been

18   hidden overseas as the government contends was his intention.

19   **4.   There Is No Evidence Of Mr. Salyer's Access Or Use Of False**
       **Travel Documents.**

20

21   Significantly, there is no allegation that the defendant used false documents

22   himself, or that any informant has claimed that he has accessed to, or has used, such

23   documents.  He has traveled on his own passport and handled his banking and

24   financial transactions openly.  The airline tickets were in his own name and booked in

25   advance from commercial carriers he used frequently.  When he rented apartments,

26   dealt with businessmen and traveled in Europe, he used his own name.  He did not

27   slink into hidden airports, but instead flew from among the world's most closely

28   watched and secure airports, JFK, Heathrow and Charles De Gaulle in the United

1   States, England and France respectively.  He also openly told friends, family, and

2   business colleagues alike of his whereabouts, even while living and working

3   overseas, and was in frequent contact with them.

4   Since investigators from multiple agencies, with access to sources in the

5   United States and overseas, have thoroughly examined the defendant's personal and

6   business transactions, it is difficult to imagine that such documents or persons with

7   access to them could remain undisclosed.  As with other issues raised by the

8   government, the idea of flight under false documents would collapse under its own

9   weight.

10   In this world of tightened borders and heightened security checks, it is

11   impossible to believe that Mr. Salyer, without an authentic passport could hope to

12   successfully leave this country together and enter another in the face of a border

13   watch.[29]   It is equally unimaginable that he would flee and leave his children,

14   grandchild, family, and friends behind indefinitely or attempt to have them follow him

15   abroad.

16   **5.     No Heightened Flight Risk Exists Due To The Potential Length Of Mr. Salyer's Sentence.**

17

18   To the extent the government argues that Mr. Salyer faces a longer sentence

19   than the other defendants who have plead guilty, including Randal Rahal, and that

20   there is a heightened risk of flight, such an argument must fail by reason of the plea

21   agreements themselves and the charges.  While it is clear that Mr. Salyer was the

22   CEO of SK Foods LP, the alleged RICO enterprise, Rahal is alleged to have been a

23   director of the company.  Rahal admitted that he personally bribed employees of the

24   customer companies and plead guilty to conspiring to conduct the affairs of an

25   enterprise through a pattern of racketeering activity in violation of 18 U.S.C. 1962(d)

26   _____

27   [29]   The best evidence of such scrutiny is the fact that Agent Artley learned that
     Mr. Salyer was aboard an incoming flight to JFK from Europe and apparently before the

28   plane landed was on a plane to New York from Sacramento and made the arrest
     himself in New York.

1  (RICO), money laundering in violation of Title 18 U.S.C. 1957; and a violation of the

2  Sherman Act, 15 U.S.C. Section 1 and 18 U.S.C. Section 2. He faces a long

3  sentence, tempered only by his cooperation with the government, yet nonetheless

4  remains free on his own recognizance.[30]

5        Unlike the case of the persons who plead guilty, the allegations of the

6  indictment against Mr. Salyer remain in dispute, as does the defendant's claimed role

7  in the alleged conspiracy and knowledge of its purported aims. While the strength of

8  the government's case is the least important factor in evaluating a defendant's right to

9  release (*United States v. Motamedi*, 767 F.2d at 1408), a reading of the indictment

10  makes it clear that after a four year investigation by teams of federal agents and

11  attorneys, the government's case against Mr. Salyer is dependent on the allegations

12  of a former employees and Rahal because at best the few statements found in the

13  thousands of emails and documents and the hours of tape recordings and now

14  attributed to Mr. Salyer are ambiguous. Were they not, and the evidence clear,

15  presumably after a then two year long investigation, he would have been charged

16  when Rahal was debriefed and plead guilty over a year ago.

17        In any event, the weight of the evidence against the accused is but one factor

18  to be considered at the detention hearing, but it is the least significant factor. *United*

19  *States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990). In the words of one District

20  Court Judge, to presume flight from purported evidence of guilt would be "tantamount

21  to a presumption of guilt." *United States v. Gray*, 651 F.Supp. 432, 436 (W.D. Ark.

22  1987); see also, 18 U.S.C. § 3142(j) ("Nothing in this section shall be construed as

23  modifying or limiting the presumption of innocence.") The nature of the alleged crime,

24  and the length of potential jail time are not sufficient factors to support a finding of a

25  _____

26     [30] Mr. Rahal sold his home in New Jersey for over almost a million dollars after pleading guilty, a fact which apparently does not trouble the government on the issue of

27  flight. Exhibit 28. The fact that Mr. Salyer's children at one time had their home on the market does because that fact was included in the Artley affidavit. For the purposes of

28  bail, the defendants should be on the same footing, even if one is cooperating with the prosecution of the other.

1  serious risk of flight. *Friedman*, 837 F.2d at 50 (requiring "more than evidence of the

2  commission of a serious crime and the fact of a potentially long sentence to support a

3  finding of serious risk of flight.")

4        Finally, the government's argument that Mr. Salyer's flight risk is increased due

5  to the sentence he <u>potentially</u> faces must fail in light of the treatment afforded those

6  who have plead guilty to the same crimes in the same case.  Perhaps more

7  important, pre-trial release is the rule in financial crimes cases and not the exception.

8  *United States v. Gebro*, 948 F.2d at 1121.  When the offense charged is a financial

9  crime, "<u>only in rare circumstances should release be denied, and doubts regarding</u>

10  <u>the propriety of release should be resolved in the defendant's favor.</u>"  *Id.* (emphasis

11  added).

12                                **V.**

13  <u>**THE GOVERNMENT FAILED TO MEET ITS BURDEN TO ESTABLISH THERE**</u>
   <u>**ARE NO CONDITIONS OR COMBINATION OF CONDITIONS THAT**</u>
14  <u>**WOULD REASONABLY ASSURE MR. SALYER'S APPEARANCE**</u>

15        As shown above, the government has failed to sustain its burden of showing,

16  by a preponderance of the evidence, Mr. Salyer is an actual flight risk, even if

17  released on his own recognizance.  However, that is only half of the government's

18  burden.   As the case law makes clear, under 18 U.S.C. §3142:

19        If the court determines that a defendant's release on an unsecured bond
          presents a risk of flight, the concern at issue in this case, the law still
20        favors pre-trial release "subject to the least restrictive further condition,
          or combination of conditions, that [the court] determines will reasonably
21        assure the appearance of the person as required.  Only if a detention
          hearing shows "that no condition or combination of conditions will
22        reasonably assure the appearance of the person as required . . . shall
          [the court] order the detention of the person before trial."

23

24  *United States v. Sabhani*, 493 F.3d at 75 (2nd Cir. 2007); *United States v. Berrios-*

25  *Berrios*, 791 F.2d at 250.  The law is clear that it is only in the rare case in which no

26  set of conditions would reasonably assure the defendant's appearance in court that

27  pre-trial detention should be ordered.  This is not such a case.

28  ///

                                38
              Defendant's Motion For Review Of Magistrate Judge's Detention Order

The defendant has proposed a set of conditions for his release which more than give reasonable assurance of his appearance.  Those conditions include, *inter alia,* surrender of his passport and pilot's license, home confinement, electronic monitoring, waiver of future extradition from any of the countries the government is concerned about, the posting of a cash bond secured by real property, appointment of a third party custodian, and the complete disclosure of all money in overseas accounts.

## VI.

## CONCLUSION

While the defendant faces a substantial sentence if convicted, and the charges in this case are indeed serious, they are not so serious that the defendant's past history and present need to mount a defense should be ignored.  The evidence cannot be disputed that Mr. Salyer: has long-standing ties to California; is a loving father of two daughters, a grandfather of a newborn; has substantial relationships with family and friends in California; has the support of his family; has an outstanding work history; and, has engaged in admirable conduct including the absence of criminal history, the lack of any history of drug or alcohol abuse, and no indication of any record of failures to appear.

Accordingly, insofar as the government cannot met its burden of showing that Mr. Salyer is a serious flight risk (because he is not), and there is no credible evidence he intended to "permanently reside outside the United States" he respectfully urges that he be released on the conditions proposed herein to permit him the opportunity to defend the charges against him.

Respectfully submitted,

Dated:   March 11, 2010       **SEGAL & KIRBY LLP**

BY:   /s/ Malcolm S. Segal
MALCOLM S. SEGAL
Attorneys for Defendant
FREDERICK SCOTT SALYER

Defendant's Motion For Review Of Magistrate Judge's Detention Order

# EXHIBIT A

**AFFIDAVIT OF SPECIAL AGENT PAUL S. ARTLEY
IN SUPPORT OF ARREST WARRANT and CRIMINAL COMPLAINT**

I, Paul S. Artley, Special Agent, U.S. Department of
Justice, Federal Bureau of Investigation ("FBI"), being duly
sworn, state as follows:

## I. BACKGROUND AND EXPERTISE OF AFFIANT

1.    I have been an FBI Special Agent for approximately
fifteen years.  Prior to becoming an FBI special agent, I
received a bachelor's degree in Accounting, became a certified
public accountant ("CPA") and was employed by a public accounting
firm.

2.    Following my training at the FBI Academy, I received
over 200 hours of training in various aspects of criminal
investigation as well as attending classes and seminars dealing
specifically with white collar crime, money laundering, and
various aspects relating to various financial investigative
techniques and related financial investigations.

3.    I am currently assigned to the FBI Sacramento Division.
For approximately the past twelve years, I have been assigned to
investigate white collar crime matters which include mail fraud,
wire fraud, bank fraud and money laundering.  I have also
investigated individuals and organized crime groups who used
sophisticated methods to launder their illicit proceeds.  I have
been the lead case agent on at least 50 fraud or economic crime
investigations, have participated in at least 50 search warrants

-1-

falsification of certain customer-bound quality control documents
so that they incorrectly reflected the product as uniformly
containing 31% NTSS tomato paste and a mold count at or below
40%. SALYER's direction to Huey in this regard came, in part, in
the form of a January 22, 2007 email, which the government has
obtained during the course of its investigation, and which was
sent in interstate commerce. In that email, SALYER ordered Huey
to incorporate the high mold paste from the competitor into SK
Foods' existing inventory intended for domestic customers.
According to Dahlman, she actually misbranded the product at
Huey's direction. SK Foods quality control and shipment records,
as well as statements from Huey, Dahlman and others indicate that
SK Foods caused the adulterated and misbranded tomato product,
and the accompanying falsified documentation, to be shipped
during the spring of 2007, via interstate carrier, from SK Foods'
facilities in the Eastern District of California to Kraft Foods'
facilities in other states.

    E.    **SALYER's Flight to Avoid Prosecution**

    87.   Recently, the government has obtained information which
indicates that SALYER may have fled the United States in order to
avoid prosecution for the criminal conduct outlined above.
During certain periods relevant to the instant Criminal
Complaint, J.J. served as a Vice President for SK Foods, and as a
personal assistant for SALYER. According to J.J., during the
second week of October 2009, well after this investigation became

-54-

overt, and after negotiations between Assistant United States
Attorneys and SALYER's criminal defense attorneys concerning
SALYER's potential culpability, SALYER left the United States in
order to reside permanently in France.  I have reviewed
international travel records for SALYER, and have confirmed that
on October 18, 2009, SALYER flew from San Francisco International
Airport to Auckland, New Zealand aboard an Air New Zealand
flight.  According to J.J., SALYER told J.J. that the next time
he would see J.J. would be in Paris, and that SALYER felt he
could not be extradited back to the United States from France.
According to J.J., SALYER returned briefly to the United States
during the second week of December in order to celebrate his
birthday in the Monterey area.  I have reviewed international
travel records for SALYER, and have confirmed that on December
10, 2009, SALYER traveled from London to San Francisco
International Airport aboard a British Airways flight.  He
subsequently returned to London aboard another British Airways
flight on December 13, 2009.  On December 14, 2009, SALYER flew
from London to Paris.

88.  In response to questioning by investigating agents,
J.J. indicated that during the fall of 2009, J.J. assisted SALYER
in attempting to obtain a residence in Paris, France, where
SALYER intended to reside permanently.  I have reviewed a
contract which purports to be from a company entitled Paris Real
Estate Finders, which describes an agreement whereby the company

-55-

would attempt to locate an apartment in Paris for SALYER.  J.J.

signed the agreement with Paris Real Estate Finders on behalf of

SALYER.  Additionally, according to J.J., in October of 2009,

SALYER contacted J.J. and requested that J.J. send SALYER

medications to him in France.  SALYER provided J.J. with a

mailing address for him in the city of Paris.

89.  According to J.J., before SALYER left the United States

for Europe in October 2009, SALYER instructed J.J. to sell many

of SALYER's personal belongings such as his guns, artwork and

other personal effects.  SALYER also instructed J.J. to

distribute other such items to SALYER's friends and relatives.

According to J.J., SALYER's former primary residence in Pebble

Beach, California is vacant and has been largely emptied of

SALYER's personal belongings.  A public database search has

confirmed that SALYER's residence is currently for sale for

approximately $7,000,000.

90.  In response to questioning by investigating agents,

J.J. indicated also that on or about October 19, 2009, SALYER

instructed J.J. to wire approximately 30,000 euros to an entity

entitled Pushon, Ltd., which purports to be a London-based

company specializing in assisting foreigners obtain residency and

employment in the European Union.  I have reviewed an October 19,

2009 email from SALYER to J.J., in which SALYER instructed J.J.

to wire 30,000 euros to Pushon, and to use certain funds located

in bank accounts associated with SALYER's former entity, SS

Farms, to satisfy the transfer.  I have also reviewed an invoice
from Pushon, Ltd. to SS Farms for 50,000 euros.  Both documents
were provided to the government by J.J. in response to an issued
grand jury subpoena.

91.  According to J.J., during the fall of 2009, she also
engaged in conversations with SALYER during which the two
discussed SALYER's attempts to gain permanent resident status in
Uruguay, Paraguay, Andora, and France, because these were
locations that SALYER felt he couldn't be extradited from.  In
response to questioning from agents, J.J. recounted another
instance during the fall of 2009, during which SALYER spoke with
a friend of J.J., who was born in Brazil, as to whether SALYER
could be successful in obtaining permanent residence status in
Brazil.

92.  According to J.J., in aid of SALYER's flight to avoid
prosecution, she, along with certain other individuals, assisted
SALYER in transferring millions of dollars to banks in foreign
countries.  Specifically, J.J. has indicated that SALYER
instructed J.J. to move millions of dollars in assets from
accounts that were originally associated with various SK Foods
entities involved in the tomato processing business, and which
were located at Bank of the West and Wells Fargo Bank, to other
accounts located at Mechanics Bank in San Francisco.  According
to J.J., SALYER then instructed certain personal accountants and
individuals at Mechanics Bank to transfer the funds at Mechanics

Bank to financial institutions in the West Indies and in
Liechtenstein.  I have reviewed email correspondence, provided to
the government by J.J., from a bank employee at Mechanics Bank to
SALYER and J.J., which references two bank accounts that have
been established for SALYER in Liechtenstein and Charlestown,
West Indies, respectively.

V.   CONCLUSION

        Based on the foregoing, there is probable cause to believe
that defendant FREDERICK SCOTT SALYER, in the Eastern District of
California and elsewhere, has violated Title 18, United States
Code, Sections 1341, 1343, and 2, as is set forth more fully at
Section II, paragraph 6 of this affidavit.  Accordingly, I
request that a warrant be issued for the arrest of FREDERICK
SCOTT SALYER for committing these offenses.

VI.  SEALING REQUEST

        The criminal investigation regarding FREDERICK SCOTT SALYER
and others is continuing.  A number of additional interviews,
subpoenas, and possibly grand jury testimony, searches and
arrests are contemplated in the very near future.  Furthermore,
and as is set forth more fully above, the evidence obtained by
the government to date suggests that SALYER has fled the United
States in anticipation of criminal charges being brought against
him by the United States Attorney's Office.  Disclosure of the
contents of this affidavit at this time would seriously impede
the continuing investigation and prosecution by disclosing the

-58-

details of the government's investigation, which potentially could cause SALYER or others to flee or to abscond to a different location.  Disclosing the details of the government's investigation could also potentially cause others to destroy evidence, or intimidate and attempt to corruptly influence potential witnesses in the case.  Such activity would seriously impede the investigation and prosecution.  Accordingly, it is respectfully requested that the Court issue an order sealing this affidavit and the associated Criminal Complaint until further order of this Court.

The information set forth above in this affidavit is true and correct to the best of my knowledge:


Paul S. Artley
Special Agent
Federal Bureau of Investigation


Reviewed and approved as to form:

Sean C. Flynn
Assistant United States Attorney




Subscribed and sworn to before
me in Sacramento, California this
5th Day of January, 2009.

Honorable Dale A. Drozd
U.S. Magistrate Judge

# EXHIBIT B

JP:GMP

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

FREDERICK SCOTT SALYER,

               Defendant.

- - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

AFFIDAVIT IN SUPPORT OF
REMOVAL TO THE EASTERN
DISTRICT OF CALIFORNIA

(Fed. R. Crim. P. 5(c))

     PAUL S. ARTLEY, being duly sworn, deposes and says that
he is a Special Agent with the Federal Bureau of Investigation,
duly appointed according to law and acting as such.

     Upon information and belief, on January 5, 2010, an
arrest warrant was issued by the United States District Court for
the Eastern District of California, commanding the arrest of the
defendant FREDERICK SCOTT SALYER for Wire Fraud, in Violation of
Title 18, United States Code, Section 1343, and Mail Fraud, in
Violation of Title 18, United States Code, Section 1341.

     The source of your deponent's information and the
grounds for his belief are as follows:

     1.  On January 5, 2010, an arrest warrant was issued
by the United States District Court for the Eastern District of
California, commanding the arrest of the defendant FREDERICK
SCOTT SALYER for Wire Fraud, in Violation of Title 18, United
States Code, Section 1343, and Mail Fraud, in Violation of Title
18, United States Code, Section 1341.  The arrest warrant was
issued following the filing of a complaint in that district.  A

copy of the arrest warrant and complaint are attached hereto.

2.   As detailed in paragraphs 87 through 92 of the above-noted complaint, during the second week of October 2009, after the investigation leading to the above-noted complaint became overt, and after on-going negotiations between the United States Attorney's Office and the defendant's attorneys took place, the defendant FREDERICK SCOTT SALYER fled the United States and took steps to establish residency outside of the United States.

3.   As noted in paragraphs 87 through 92 of the complaint, the defendant sought to locate an apartment in Paris, instructed a cooperating witness, J.J., to sell his personal belongings and wire approximately 30,000 Euros to an entity entitled Pushon, Ltd., which purports to be a London-based company specializing in assisting foreigners in obtaining residence and employment in the European Union.  The defendant's residence in Pebble Beach, California is vacant and has largely been emptied of the defendant's personal belongings.  A public database search confirmed that the defendant's residence is currently for sale for approximately $7,000,000.

4.   According to J.J., during Fall 2009, the defendant discussed with J.J. his attempts to gain permanent resident status in Uruguay, Paraguay, Andorra and France, because they were locations from which the defendant felt that he could not be extradited.  An email dated September 22, 2009, from the defendant to the employee of a company called Tribune Properties indicates that the defendant sought information regarding

2

establishing residency in Andorra. The defendant subsequently instructed J.J. by e-mail to send the defendant's information to Tribune Properties for purposes of establishing residency in Andorra. J.J. was also instructed by the defendant to move millions of dollars overseas to accounts in Liechtenstein and Charlestown, West Indies. E-mail correspondence from a bank employee at Mechanics Bank confirms that two bank accounts were established for the defendant in these two locations.

5. On February 4, 2010, the defendant arrived at John F. Kennedy International Airport ("JFK airport") after returning on a flight from Zurich, Switzerland.

6. Upon arriving at JFK airport, the defendant presented a U.S. passport to Customs and Border Protection Officers in the name of "Frederick Scott Salyer." The name, pedigree information and photograph in the U.S. Passport matched that of the name, pedigree information and photograph of the defendant FREDERICK SCOTT SALYER provided by the Federal Bureau of Investigation. The defendant admitted to being FREDERICK SCOTT SALYER. He was then placed under arrest.

7. It is the desire of the United States Attorney for the Eastern District of California that the defendant FREDERICK SCOTT SALYER be removed to that district for prosecution.

3

WHEREFORE, it is requested that the defendant FREDERICK
SCOTT SALYER be removed to the Eastern District of California so
that he may be dealt with according to law.


PAUL S. ARTLEY
Special Agent
Federal Bureau of
Investigation


Sworn to before me this
5th day of February, 2010


THE HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

4