MALCOLM S. SEGAL - 075481
JAMES P. MAYO - 169897
**SEGAL & KIRBY LLP**
770 L Street, Suite 1440
Sacramento, CA  95814
Telephone: (916) 441-0828
Facsimile: (916) 446-6003

Attorneys for Defendant
FREDERICK SCOTT SALYER

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>    v.<br><br>FREDERICK SCOTT SALYER,<br><br>            Defendant.<br>_____/ | CASE NO: 2:10-CR-0061-LKK<br><br>**DEFENDANT'S MEMORANDUM REGARDING CONDITIONS OF RELEASE AND DUE PROCESS**<br><br>[18 U.S.C. § 3145(b)]<br>_____<br><br>Date:    March 25, 2010<br>Time:   9:15 a.m.<br>Judge:  Hon. Lawrence K. Karlton |

The defendant does not present a serious risk of flight within the meaning of the Bail Reform Act and should be released from custody.  Should the Court, however, believe that conditions of release are necessary to reasonably assure the defendant's presence at trial, this memorandum proposes such conditions.  In addition, the memorandum anticipates and addresses the government's position that the defendant can be afforded some vestige of due process as he tries to prepare his defense while committed to Pre-Trial detention.

**Conditions Of Release Are Available Which Will Assure
The Defendant's Presence At Trial And Also Assure Him His Due Process
Right To Prepare And Present A Meaningful Defense**

Consistent with principles of due process and the liberty interests of a defendant yet to be tried, the Bail Reform Act requires an analysis of conditions

which will reasonably assure the defendant's presence at trial and which will permit him the opportunity to prepare for the defense of an extraordinarily large and complex case. This is because the subject of bail and detention implicates the due process clause, and requires that laws imposing pretrial detention "serve a compelling governmental interest." See *Jones v. United States*, 463 U.S. 354, 361 (1983) (observing that "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."); *United States v. Salerno*, 481 U.S. 739, 752 (1987); *United States v. Aileman*, 165 F.R.D. 571, 577 (N.D. Cal. 1996) (internal citations omitted).[1] As one court explained:

> Like all other criminal statutes, bail provisions are implicitly subject to limitations of due process. The Constitution operates as the backdrop against which criminal statutes and rules function. The statute provides that a person may be detained if no conditions would assure appearance or ensure community safety; implied is the constitutional requirement that due process not be offended. See, e.g., *Doe v. Dept. of Public Safety ex rel. Lee*, 271 F.3d 38, 59 (2d Cir.2001). Because of this constitutional limitation, the statute must be read as authorizing detention only where a due process analysis finds such detention acceptable.

*United States v. Speed-Joyeros, S.A.*, 204 F.Supp.2d 412, 437 (EDNY 2002).

Implicit in the statutory structure of the Bail Reform Act itself is the recognition that a defendant has a constitutionally-based right to adequately prepare his defense without unwarranted government interference, including overbearing pre-trial detention. 18 U.S.C. § 3142(i)(3). As the Supreme Court long ago stated in *Stack v. Boyle*, 342 U.S. 1, 3 (1951):

> From the passage of the Judiciary Act of 1789, 1 Stat. 73, 91, to the present Federal Rules of Criminal Procedure, Rule 46(a)(1), 18 U.S.C.A., federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to

---

[1] In *United States v. Aileman*, a complex drug conspiracy case, the court held that the period of at least thirty five months the defendant was expected to spend in custody prior to completion of trial due in large part to the volume of discovery and the need to transcribe Title 3 wiretaps warranted that the defendant be released on conditions in conformity with due process.

conviction. See *Hudson v. Parker*, 1895, 156 U.S. 277, 285, 15 S.Ct. 450, 453, 39 L.Ed. 424. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.

See also, *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1051 (8th Cir.1989) ("Pre-trial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials.  When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised.")

There are conditions available to this Court which will assure the defendant's presence at trial and the Bail Reform Act mandates that they be considered. *United States v. Orta*, 760 F.2d 887, 892 (8th Cir. 1985) ("The structure of the statute mandates every form of release be considered before detention may be imposed.")

In the interest of providing the Court with those conditions, but not conceding for a moment that any of them are required by the defendant's status or conduct,[2] the defendant suggests that the following conditions be considered under circumstances where, if they are imposed, the defendant will likely be able to meet them:

(1) The defendant will reside at a home or apartment approved by Pre-Trial Services in Sacramento or Monterey County. (The defendant proposes to live in the home owned by his childrens' trusts, in a rental apartment in Monterey or in a rental home in Sacramento, whichever the Pre-Trial Services may approve after the Court

---

[2] The defendant submits that these conditions are more than adequate to reasonably assure his presence at trial, and remain consistent with those imposed on others in this district who have been granted pre-trial release. In the relatively recent case of *United States v. Eric Clawson* (EDCA Case No. 09-CR-0097 MCE), Magistrate Judge Drozd, in the face of detention arguments by the government, accepted conditions of release in a complex case involving racial violence, and a pending indictment for substantial mortgage fraud, despite the fact that all three co-defendants in the mortgage fraud case had previously fled the jurisdiction, the defendant was a dual citizen of Canada and the United States and, in the face of claims of purported flight risk and threats to persons by reason of the defendant's history of violence.

sets the conditions of release and Pre-Trial receives the information.)

(2) The defendant will have a home monitoring unit installed in the place of his residence and a radio frequency transmitter attached to his person.

(3) The defendant will be restricted to the residence 24 hours a day and 7 days a week except for travel to his attorney's offices, the offices of any defense experts and the offices of the FBI or other federal agencies in California in possession of discovery documents or records. (Pre-Trial Services may authorize such medical visits as are necessary to maintain the defendant's health and care for his diabetes.[3])

(4) Travel to and from any such outside offices will be in the company of a person approved by Pre-Trial Services, including a third party custodian, a licensed private detective, or an attorney licensed in the State of California.

(5) Travel will be restricted to the Northern District of California and the Eastern District of California.

(6) The defendant will be released to a third party custodian.

(7) Robert Storey, a retired Probation Officer of this Court, or another person approved by Pre-Trial Services, will, in addition to any monitoring employed by Pre-Trial Services, make random contact with the defendant, at least once in person and once by telephone, every two weeks during the pendency of the case and report directly to Pre-Trial Services as to his status.

(8) The defendant will surrender all passports and pilots licenses and shall not apply for any travel documents during the pendency of the case.

(9) The defendant will post cash bail in the amount of $300,000.

---

[3] Counsel has previously advised Pre-Trial Services, the Magistrate Judge and this Court in moving papers that the defendant has seemed disoriented at times and not been able to recall or directly respond to questions, and attributed it to the long period of incarceration and custodial travel. It is now becoming apparent that the defendant's ten year medical history of diabetes, which has not been accommodated by diet during his pre-trial incarceration, has taken a toll on his health and the symptoms have become more evident while in custody. (See, *infra*.)

(10) The defendant shall sign a personal surety bond secured by his interest and the interest of his daughters' trust in the property located at Ronda Road, Pebble Beach, California. In the alternative, the defendant shall cause to be posted as security an interest in one or more homes or real property owned by friends or family members.[4]

If the Court finds an additional level of security is necessary, the following is posited:

(11) During all periods when the offices of Pre-Trial Services are closed, and generally from 6:00 p.m. and 8:00 a.m. daily and all 24 hours on Saturday, Sundays, and holidays, a private detective licensed in California shall be present in the defendant's residence as approved by Pre-Trial Services.

(12) The defendant shall sign a waiver of extradition in a form prepared by the United States and an agreement to be tried and sentenced in absentia in the event he is not present for trial in this case.

With these conditions, extraordinary in this District, the defendant's presence will be absolutely assured at trial.[5]

---

[4] Bankruptcy Judge Robert S. Bardwil, on application of the Trustee in the SK Foods LP bankruptcy, issued a Temporary Restraining Order, based largely on Agent Artley's allegations in the affidavit in support of the arrest warrant and the accompanying documents. The TRO was followed by the issuance of a Preliminary Injunction, although the affidavit was not admitted when the government declined to produce the Agent for the hearing on March 18, 2010. At the time of the hearing of the TRO, Judge Bardwil, in response to counsel's expressed concern that the defendant's ability to post real property to secure bail was put at risk by the order, indicated that before any of the business farming land assets, listed in the financial statement provided to Pre-Trial Services in this case, may be used to support bail, application must be made to him for relief from his order.

[5] The alternative suggestions concerning the defendant's place of pretrial residence are intended to put to rest the government's unfair and inflammatory argument that the defendant will reside in a "mansion" pending trial. Pre-Trial Services has advised the Court that they can electronically monitor the defendant in Monterey or Sacramento with the same level of assurance. Moreover, the home in which the defendant resides, while substantial, is not a mansion and the defendant's interests here are in being able to prepare for trial and not mere personal comfort.

**The Enormous Amount Of Discovery Which Will Be Made Available
By The Government And The Complexity Of This Case Requires
More Than Just The Pretense of Due Process**

Immediately after the hearing before this Court on March 18, 2010, defense counsel requested a meeting with the attorney members of the prosecution team to assess the volume of discovery currently in the government's possession and immediately available to the defense. The prosecution team advised that it has available: (1) a hard drive containing approximately four hundred thousand (400,000) documents; (2) one million (1,000,000) hard copies of documents at the Sacramento office of the FBI; (3) 190 hours of recordings generated by wire interceptions and body microphones; and, (4) another hard drive in the preparation process containing various affidavits, interviews, and debriefing memoranda all pertinent to the case.

Counsel met with Mr. Salyer the next day at the Sacramento County jail to discuss the additional discovery materials necessary to supplement the government's discovery. (Counsel was precluded from meeting with the defendant the afternoon or evening after the hearing because the Sacramento county Main Jail floor was "locked down" as the result of an unrelated security incident.) Thereafter, defense counsel sent a letter to the government triggering Rule 16 discovery and requesting access to a substantial range of discovery materials in the hands of other federal agencies within the scope of the prosecution's control.[6] The basis for the request was, in part, that the charges in this case involve but a very small part of a

---

[6] In addition to Rule 16, the request was made under the auspice of the "*Memorandum for Department Prosecutors*" recently issued by Deputy Attorney General David W. Ogden on January 4, 2010. The Memorandum issued new guidance on discovery in criminal cases to all United States Attorneys "intended to establish a methodical approach to consideration of discovery obligations that prosecutors should follow in every case to avoid lapses that can result in consequences adverse to the Department's pursuit of justice." The Memorandum reiterates "the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all members of the prosecution team. Members of the prosecution team include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant."

large, international food production business and the government has collected in one place only a portion of the records necessary to the defense.[7]

Counsel also requested that the government make arrangements for defense counsel to visit the offices of the FBI on Friday afternoon, March 19, in order for Agent Artley to show counsel the records secured at that location.

The pertinent records are maintained in three, approximately 12 by 16 feet, contiguous rooms, all within security locked premises. They are in file cabinets, in stacked boxes, and in multiple binders on book shelving. An equivalent number of boxes and other materials, including seized food samples, and customer order records and contract files, are contained in two locked pods within the security perimeter of the FBI offices. They are all labeled and accessible.

It appears from defense counsel's review of the three office rooms where the records are located that two of the three rooms are primarily used to hold the records for regular examination and the third to also hold records and serve as an immediate reviewing facility. The review room contains a desk table and chairs, at least one telephone, a document scanning device, a copy machine, two computer desk-top work stations, a tape player, and assorted working materials. It is believed that the assigned agents from the FBI also have their own offices in the suite with additional working space, and conference rooms and additional available working spaces are located in the immediately adjacent FBI building.

Counsel does not know the quantum of work space being employed by the United States Attorney's Office and the Anti-Trust Division prosecution team in San Francisco, or the resources, work space, and documents used by the Food and Drug

---

[7] Records of SK Foods' business are under the control of the bankruptcy Trustee and the United States Trustee; testing and other government records are in possession of the FDA; customer records are in possession of the Department of Justice Antitrust authorities; and, customer internal and third party laboratory testing records are in possession or control of the USDA and the Department of Agriculture. While the government has obtained records of other producers and customers, many of their other business documents will be required and will be sought by Rule 17 subpoenas.

Administration or the Internal Revenue Service, both of which are members of the prosecution team.  Counsel expects them to be substantial in square footage based upon the nature of the case and the prominence those government agencies have enjoyed in the many press releases to date.

The government, at the Court's direction, will present the Court with proposals under which it believes the defendant and his counsel can be afforded the opportunity to review the millions of evidentiary documents in its possession while the defendant remains in custodial custody.  Any such proposal must and will inevitably fail.

The government has had more than three years and extraordinary resources to review the records in its possession.  It has had the availability of former employees of the company and of the many customer companies - some of whom are cooperating under the compulsion of a plea agreement under which they personally benefit by assisting the government.  They have had the expertise of the constituent federal agencies and their agents, who are throughly versed in the issues at bar, *viz.* the FDA, the USDA, the Anti-Trust Division and the IRS.

Virtually all of the other SK Foods' employees with percipient knowledge of the records in the government's possession are unavailable to the defendant to assist in the review process, even if they could be admitted to the prison detention facilities. Some former company employees currently work for the SK Foods' bankruptcy Trustee, with whom the defendant is adverse in litigation; many former key and knowledgeable employees work for the company which purchased SK Foods facilities from the bankruptcy estate and are unmotivated to cooperate with the defense; some are employees of customers who are asserted to be victims of the alleged fraudulent conduct, who have been indicted for receipt of bribes from Mr. Rahal, and others are threatened with indictment; and, the companies themselves most certainly have cooperated with the prosecution but are unlikely to provide

///

assistance to the defense. Thus, the defendant is faced with a stark imbalance wherever the reviewing process occurs.

Even without immediate access to the broad array of records in possession or control of the other members of the investigative team, discovery review here is daunting. The charges in the indictment require not just a review of more than one million documents and stored electronic media self-selected and collected by the government over the past several years to support and perfect its case, but also require the gathering and review of a large volume of business records of the SK Foods complex business enterprise (the claimed RICO enterprise) to contest the allegations of the indictment. It will require the review of hundreds of thousands of records of the company and consultation with retained experts to prepare the defense.

Time management, a secure working space, and ready access to the defendant are absolutely critical for a successful defense. The basic needs of the defense and its operational setup from a logistical and "square footage" standpoint, is qualitatively no different from the government's in preparing and investigating the case and it took the government several years to perfect its case with extraordinary resources from several investigative agencies.[8]

It is beyond dispute that this is a very complex case, involving four Title III intercept applications, hundreds of consensual monitored calls, body wires, numerous e-mails, shipping contracts, warehouse documents, affidavits, and search

---

[8] The time and expense necessary to travel to the detention facility and gain access, and the ready availability of access to the facilities must also be a substantial factor in the Court's consideration of the government's proposal. Placing an unreasonable burden on the defendant as he is moved from his cell to the location of the documents or an equally unfair time, travel and cost burden on counsel over a prolonged period will inexorably result in a failure to adequately prepare the defense. It is one thing to examine a large number of interviews and documents or play several tapes for a few days and an entirely different thing to expect counsel, with finite resources, to examine millions of discovery documents over months at a remote or secure location.

warrants that the defendant must review in advance of trial.  The defense of the case requires that documents be reviewed in context, as part of the work flow of the business in order to decipher the meaning of thousands of corporate documents, e-mails, taped conversations and to examine the business relationships of people within the different companies as well as within SK Foods.  The defendant must provide that contextual information in a place where face-to-face meetings and document exchanges can freely and openly occur.

Questions will invariably arise while reviewing documents or listening to a taped conversation or an intercepted call that will require a contemporaneous explanation or interpretation by the defendant which could directly impact the direction and pace of the defense investigation and preparation for trial.  Contact must be made with resources away from the review facility by secure phone.  It would not be feasible to have to wait for several hours or the next day to have access to the defendant because of visiting restrictions and other internal institutional restrictions impairing the defense teams' access to the defendant.  Time would also be limited because jail personnel would likely have to take the defendant out for meals and other administrative matters.[9]

///

---

[9] The defendant's diet is particularly important and has for the past many weeks been problematic.  For the past ten years the defendant, who has a substantial family history of diabetes, has been taking medications, including Tricor and Zetia, both prescription medications, to lower triglycerides and control his cholesterol in order to prevent stroke. The medications, dietary restrictions and regular exercise are intended limit the symptoms and effects of his diabetes.  It has become apparent to visitors that the defendant has become "shaky" and sometimes slightly disoriented as time has passed between visits.  When the issue was raised by a friend on March 22, counsel inquired of the defendant and learned that <u>his medication is not available to him</u> at the Sacramento County Jail and that the food he has received has created an obvious fluctuation in his blood sugar.  He is currently beginning to suffer vision problems in one of his eyes.  Even if properly medicated, the defendant's ability to work closely with counsel for extended periods while in custody is constrained by his diabetes because his blood sugar vacillates depending on the quality of his diet and the timing of meals.

In order to adequately prepare his defense, the defendant and his counsel require consistent daily access to a locked and secure room for storage and viewing of the discovery materials and derivative materials prepared by the defense, including charts. Telephones, filing cabinets, tables/desks, desk top computers (with internet access to follow the trail of information as it is raised by the defendant is needed), printers, and recording/monitoring equipment to listen to the recorded intercepts are required. The electronic equipment must be supported by access to multiple electrical outlets, critical to equipment operation. The room or rooms must have a place where lawyers and the defendant can confer with experts, sufficient silent areas to listen to tape recordings and a place to lay out voluminous discovery documents. Documents must be correlated and compared with each other; product must be traced and compared to the Certificates of Analysis; and, alleged bribes, pricing of products, customer bids, related bids, year to year bidding, and pricing must be compared. Wall space for charts is also vital because the charts depict the visual presentation of the documents, which cannot be shared or gleaned from a cold reading by an individual of the separate documents.

Having to take the preparation apart and reassemble the preparation every day would be enormously time consuming and expensive. Breaking the defense investigation down each day would mean several people would have to collect the materials and bring them to a central location and reassemble it for use as needed. The defendant would be unable to review the materials in the absence of the team because the entirety of the discovery would be elsewhere.[10]

With sufficient staffing, to which the defense can and will commit, and with the active participation of the defendant, defense preparation can be accomplished

---

[10] Even were the facility able to store the records overnight, secure from other inmates, visitors and staff, and the attorney-client and work product privileges honored by the ability to secure the room, that provides little additional assistance to the defense since it precludes the ability of dedicated investigators and attorneys from accessing the records at off hour times when a lead is generated or records needed for immediate review or for use in a witness interview.

within a reasonable period of time if the discovery and other materials are located at counsel's office or in a home with sufficient space to accommodate the materials and equipment.  Given the complexity of the case and the sheer volume of materials which the defendant will need to personally and jointly review to assist in his defense, counsel respectfully cannot conceive of a workable arrangement should the defendant remain detained in custody pending trial.  Unless dedicated space is committed to the case, with the attorney-client privilege secure when it is not in use but available to the defendant at times when counsel and investigators are not present, any government proposals involving temporary and intermittent use of space must and will inevitably fail. That failure will be at substantial financial cost to the defendant and at a cost to a legal system founded on adherence to due process.

### Conclusion

The defendant requests that he be released as mandated by the Bail Reform Act.  If the Court determines that conditions of release are required, the defendant proposes that he be released on the least onerous conditions proffered in this memorandum and preferably those regularly utilized in this District.

The Court should not accept government-sponsored alternatives to release, which clearly undermine the principles underlying and stated in the Bail Reform Act. Those alternatives will likely seem, on their surface, to be a means to review the discovery and prepare for trial but will, in fact, provide only the appearance and not the actuality of due process.

Respectfully submitted,

Dated:   March 23, 2010          **SEGAL & KIRBY LLP**

BY:   /s/ Malcolm S. Segal
MALCOLM S. SEGAL
Attorneys for Defendant
FREDERICK SCOTT SALYER