1 | MALCOLM S. SEGAL - 075481
  | JAMES P. MAYO - 169897
2 | **SEGAL & KIRBY LLP**
  | 770 L Street, Suite 1440
3 | Sacramento, CA  95814
  | Telephone: (916) 441-0828
4 | Facsimile: (916) 446-6003

5 | Attorneys for Defendant
  | FREDERICK SCOTT SALYER

6

7

IN THE UNITED STATES DISTRICT COURT FOR THE

8

EASTERN DISTRICT OF CALIFORNIA

9

10 | UNITED STATES OF AMERICA,        CASE NO: 2:10-CR-0061-LKK

11 |                 Plaintiff,       **DEFENDANT'S MOTION FOR
   |                                  RELEASE AND/OR
12 |        v.                        RECONSIDERATION OF THE
   |                                  COURT'S MARCH 30, 2010 ORDER
13 | FREDERICK SCOTT SALYER,          CONCERNING CONDITIONS OF
   |                                  RELEASE**
14 |                 Defendant.       _____

15 | _____/    **Date:       April 13, 2010
   |                                  Time:       9:15 a.m.**
16 |                                  **Judge:      Hon. Lawrence K.
   |                                               Karlton**

17

18 |                        **INTRODUCTION**

19 |        The Court's pre-trial release order, filed March 25, 2010, expressly stated that,

20 | in addition to the $300,000 cash bail to be posted by the defendant, together with a

21 | broad array of other conditions designed to reasonably assure his appearance at

22 | trial, the defendant shall sign a personal surety bond secured by "[his] *interest* and

23 | the *interest* of [his] daughters' trust" in the home located at Ronda Road, Pebble

24 | Beach, California.  Order (3/25/10 - Docket No. 48), at ¶¶ 16 & 17 (italics added).

25 | The government filed a notice of appeal, although acknowledging that it had not

26 | received authority to proceed, and moved to stay the order.  The Court of Appeals

27 | denied the government's motion for a stay and it has apparently determined not to

28 | pursue the appeal.

1   The defendant has done exactly what the order literally required of him – he

2   recorded notarized Deeds of Trust in Monterey County (identifying the Clerk of this

3   Court as the beneficiary) conveying *his interest* and *his daughters' trusts' interests* in

4   the Ronda Road home to secure the personal surety bond.[1]

5   The government then objected to the use of the Ronda Road home as

6   collateral because the defendant's former wife had filed a lis pendens on the

7   property on January 28, 2010, just prior to his arrest.  The government, after it filed

8   its motion for a stay in the Ninth Circuit, claimed that the lis pendens will impair its

9   interest as a putative lien claimant should the defendant not appear for trial.  After

10  further briefing from the parties, a hearing was held on the matter on March 30,

11  2010.  At that hearing, the Court expressed concern about the collateral and

12  thereafter issued an order in which it stated it "will not accept the Pebble Beach

13  home as sufficient support for the bond under the [release] order."  Order (3/30/10 -

14  Docket No. 65).

15  But the Court, recognizing the serious due process concerns created by the

16  defendant having to prepare for trial in this "extraordinary case," as the government

17  has characterized it, stated in its March 30, 2010 order that it was "premised upon

18  the government being able to ensure defense counsel's access to the defendant in

19  the Sacramento County Jail as heretofore proposed by the government."

20  The defendant respectfully seeks reconsideration of the March 30, 2010

21  detention order and requests his immediate release from detention in accordance

22  with the terms of the Court's original release order filed on March 25, 2010, on the

23

24  [1] The Deeds of Trust were recorded in Monterey County on March 29, 2010, and
remain ready for filing with the Court (they were previously attached as Exhibit A to
25  "Defendant's Memorandum Regarding Ronda Road Property To Be Posted As Security
For Personal Surety Bond" filed March 29, 2010 (Docket No. 62)).  The $300,000 cash
26  bail, in the form of cashier's check payable to the Clerk of the Court, was deposited with
the Clerk on March 29, 2010, as was the defendant's passport and pilots licenses,
27  which were deposited on March 26.  The Third Party Custody agreement required by
the release order is ready to file with the Court, and the defendant has executed a
28  waiver of extradition and agreement to be tried and sentenced in absentia.

1   following two grounds:  (1) the Court's March 30, 2010 order is at odds with legal

2   precedent in this Circuit, which provides that it is improper under the Bail Reform Act

3   to require that property used to secure pre-trial release be unencumbered to

4   "protect" the government's interests; and, (2) the defendant is being deprived of due

5   process under the current custodial arrangement at the Sacramento County Jail

6   despite the prior representations and assurances made by the government to the

7   Court that it would provide him with sufficient access to counsel, discovery and

8   constitutionally adequate accommodations and resources.

9   ### REQUEST FOR RECONSIDERATION

10  **A.    The Ronda Road Property, Worth Almost $6,000,000, Met The
         Terms Of The Court's Order And Controlling Precedent In This
11       Circuit Demonstrates That It Ought Be Accepted As Adequate
         Collateral.**

12       **1.    The Bail Reform Act Does Not Permit Consideration Of The
13            Government's Ability To Collect On Security As A Condition
              Of Release.**

14

15  In *United States v. Frazier*, 772 F.2d 1451 (9th Cir. 1985),[2] a Magistrate Judge

16  ordered a defendant charged with bank robbery, use of a dangerous weapon and

17  taking of hostages in commission of a robbery, and who was deemed a flight risk,

18  suitable for release on a $75,000 appearance bond but required, as a condition of

19  release, and at the government's request, that the property used to secure the bond

20  be "unencumbered."  The defendant moved for reconsideration in the District Court

21  of that part of the release order requiring that the property used to secure the bond

22  be unencumbered.  Following a hearing, the District Court affirmed this condition, but

23  indicated that a corporate surety would be a satisfactory alternative to the secured

24  appearance bond.  The defendant appealed the District Court's order to the Ninth

25  Circuit.

26  _____

27       [2] In the haste to respond to the government's assertion that its security was
28  impaired by the lis pendens, counsel focused on the purpose of a lis pendens and
     failed to locate and cite this Ninth Circuit precedent in prior briefing in this matter.

1       The Ninth Circuit reversed, although noting that the District Court determined

2 the defendant there was a flight risk (which was not challenged on appeal), that the

3 District Court was "concerned about whether the government could protect its lien

4 interest if prior lienholders foreclose on the parents' real property," and that "the

5 district court imposed the condition out of concern for the government's claimed

6 inability to protect its lien interest in the event of default in a prior lien."  The Court

7 held that these concerns are inimical to the terms of the Bail Reform Act and may

8 not be considered.  The Court explained:

9      [T]his concern over the government's property interest is simply a
matter of among creditors; it does not, by itself, affect the deterrent

10 effect on [the defendant].  Since the Bail Reform Act of 1984 nowhere
authorizes consideration of the government's ability to collect on

11 security, this concern is not a proper basis for imposing a further
restrictive condition on [the defendant's] release.

12

13 We conclude that the district court committed error by requiring the
condition that the secured property be unencumbered since he did not
determine that the condition was reasonably necessary to ensure [the

14 defendant's] appearance.

15 772 F.2d at 1452-53.

16      While in the instant case this Court later expressed concern about the

17 possible change in value of property on which a claimant had placed a lis pendens,

18 this Court's original order stated in the alternative that:

19      "[The defendant] shall sign a personal surety bond secured by [his]
interest and the interest of [his] daughter's trust in the property located

20 at Redondo Road (sic), Pebble Beach, California, or, in the alternative,
[the defendant] shall cause to be posted as security an interest in one or

21 more homes or real property owned by friends, family or neighbors, the
total between the cash bond and the personal surety shall equal

22 $6,000,000." (Emphasis added.)

23 Order (3/25/10 - Docket No. 48), at ¶ 16.

24      Here, after the defendant met the literal terms of the release order, which

25 directed a posting of the defendant's "interest" in the property and that of his

26 childrens' trusts, this Court, acted on the government's challenge to the order and

27 essentially determined that the Ronda Road home must be unencumbered by the lis

28 ///

4

1  pendens filed against the property as a condition of release.[3]  The government

2  argued its position "out of concern for the government's claimed inability to protect its

3  lien interest in the event of default."[4]  Since the lis pendens seeks to tie the property

4  up for an unspecified and uncertain amount of money on an attenuated claim that

5  the property was transferred to the defendant's own children by their father almost

6  two years earlier, there is no way to assess an amount "in excess of the lis pendens"

7  to establish a residual security of $6,000,000, and under the government's theory it

8  can never be used as collateral.

9         That theory is contrary to law.  <u>Coupled with the fact that the defendant's</u>

10 <u>daughters' trusts have offered to put at risk their best and most valuable asset to</u>

11 <u>gain their father's release, the mere filing of a lis pendens does not diminish the</u>

12 <u>asset's use or efficacy as collateral for the defendant's bail</u>.  The Bail Reform Act

13 mandates that the defendant be released from detention in accordance with the

14 terms of the Court's March 25 release order.

15             **2.    The Lis Pendens Will Not Impair The Defendant's Interest In**
                    **The Property And Its Mere Presence On Title Does Not**
16                  **Undercut The Property's Deterrent Value To Flight.**

17        The alleged basis for the lis pendens is a complaint filed by the defendant's

18 former wife in the Monterey County Superior Court on January 28, 2010 as a follow

19 on to a marital dissolution action resolved several years ago.  As part of a stipulated

20 judgment entered in the dissolution action in July 2006, the defendant became

21

22        [3] The government in opposition papers argued that the Court had lost jurisdiction
    to amend its order by reason of the government's having filed a notice of appeal and its
23  emergency motion to the Ninth Circuit, but was apparently grateful that the Court
    appeared to find for it because it has not followed through with the appeal.
24

25        [4]  See Government's "Notice of Request for Strict Enforcement of Secured Bond
    Condition" at 2:21-28 ("Thus, if the Court were to accept the Defendant's deed and he
26  were to fail to appear and thus forfeit the appearance bond, the 'security' would, in all
    likelihood, be subordinated to the lis pendens.")  Notably however, as was the case in
27  *Frazier,* the government did not dispute or challenge that the actual equity value in the
    property owned by the defendant's daughters' trusts is in excess of the collateral
28  required by the Court to secure the defendant's bond.

1   obligated to pay his former wife monthly spousal support and child support, as well

2   as periodic property settlement payments.

3   By the new complaint, she claims the defendant transferred ownership of

4   property he personally acquired in 2007; and, which he later transferred to his

5   daughter' trusts for value and as part of an estate plan created by counsel.  The

6   complaint seeks to set aside the transfers and to impose an equitable lien and a

7   constructive trust on the property owned by the daughters' trusts.  The net result of

8   the lawsuit, should the former wife prevail, would be to reinstate the defendant as the

9   owner of the property.  It would not mean that the former wife owns the property, is

10   entitled to lien any property to obtain payment, is entitled to payment or that she has

11   any interest whatsoever in the property.

12   There is no legal basis, and indeed no reason to reject the property as

13   collateral, since all a lis pendens does is impose a cloud on the title and does not

14   affect the value the owners of the property place on it or its effective use a deterrent

15   to flight.  As the Ninth Circuit has clearly stated in *Frazier*, the issue here is not

16   whether the government will be able to collect as a lien holder, but rather would the

17   defendant, having carefully planned his estate through counsel almost two years ago

18   by transferring this $6,000,000 property to his children for value, at a time when he

19   had substantial assets and an operating company generating millions of dollars in

20   income, now suddenly abandon his children and his newly-born grandchild and their

21   largest personal asset, and flee the country.[5] He would not.

22   _____

23   [5] In that regard, the defendant asks that the Court revisit the declarations of the
defendant's daughter and son-in-law, the letter from his youngest daughter and the

24   letters from friends and family all of whom clearly stated that the defendant would never
flee and leave his daughters and grandchild.  Similarly, the Court may wish to note that

25   the defendant had not fled and loved his children enough to purchase a one-way ticket
back to the United States in February of this year for the birth of a grandchild - a fact no

26   one disputes.  Even if the Court entertains anxiety generated by the down payment on a
condominium in Andorra, that deposit has been lost.  If the concern is that the

27   defendant has funds in Andorra, those funds have been frozen by the government of
that country.  And, if the concern is based on the assertion that Andorra does not have

28   a treaty with Andorra, the evidence is clear that they recently extradited an American to

Defendant's Motion for Release and/or Reconsideration of the Court's March 30 Order

1

            **3.**      **The Property Has Substantial Economic And Personal Value**
                            **Irrespective Of The Lis Pendens.**

2

3        As stated above, the issue before the Court is really whether the property,

4    worth six million dollars, five million or even two million dollars, will cause the

5    defendant not to leave the Court's jurisdiction rather than economically injure his

6    children and himself.[6]  The property has substantial value even with the lis pendens

7    and the government has not been able to prove to the contrary.

8        The home is worth six million dollars to the defendant's children and since the

9    children are the defendant's "life," as a friend put it in a letter to this Court, they mean

10    even more to him.  Since a lis pendens does not preclude a sale of the property, it

11    has value in the commercial market.  A willing buyer could pay a huge sum of money

12    to acquire such a property even subject to the lis pendens and take the commercial

13    risk that the defendant's wife could recover in her litigation.[7]  If such is the case, and

14    it is the home that compels the bail decision and the requirement that the home have

15    value, the dictates of the Bail Reform Act are well met.  Moreover, the defendant will

16    be living at the home, notwithstanding the lis pendens, and the Court will readily be

17    able to monitor his status there through the use of the electronic bracelet it has also

18    ordered.  And, of course, the Court is free to add a requirement to its release order

19   ——————————————

20    this country in a financial crimes case, with or without a treaty and the defendant has in
     any event signed a waiver of extradition.

21

22       [6] The only other assets potentially available to satisfy a six million dollar surety
    bond are valuable farm lands subject to a preliminary injunction recently issued by

23    Judge Bardwil in the Bankruptcy Court over counsel's objection that there was no basis
    for the injunction and that issuing one would deny the defendant due process and his

24    right to bail in the criminal case.  The order has been appealed to the District Court and
    a notice of related cases has been filed by counsel which will potentially bring that

25    matter before this Court.  The trusts are willing to post that property to secure the
    defendant's release but the bankruptcy court's order precludes that act.

26

27       [7] Compare, *Mangan v. Brierre*, 2007 WL 4285366 (3rd Cir. 2007) ("A notice of lis
    pendens may impair the market value of real property but does not cause the total

28    destruction of the property's value because it does not foreclose all economically viable
    uses of the land.")

1  that the status of the domestic relations case be reported to Pre-Trial Services on a

2  regular basis.

3  **B.  The Defendant Is Being Deprived Of His Fundamental
        Constitutional Due Process Rights To Prepare And Present A**

4  **Meaningful Defense While Incarcerated At The Sacramento County
        Jail.**

5

6      On March 25, 2010, the government expressly represented to the Court that:

7  "custodial arrangements can be made that will enable [the defendant] to

8  meaningfully interact with his defense team on a regular basis . . ..";  "the Main Jail is

9  prepared to accommodate [the defendant's] reasonable needs in this extraordinary

10  case"; and, "[t]he Sacramento County Main Jail has agreed to provide a

11  comprehensive package of accommodations that will permit counsel `meaningful

12  access' to the Defendant on a daily basis."   See United State's Memorandum

13  Concerning Defendant's Custody at 1:25-2:9 (Docket No. 44).

14      Despite these lofty representations and assurances to the Court to satisfy its

15  due process concerns, the arrangements made by the government with the Jail,

16  even as later modified by the jail personnel permitting more usage during the

17  business day, have not and cannot provide meaningful access to the defendant, and

18  the conditions do not provide any measure of due process.  It comes down to this: Is

19  the opportunity to visit in person with a client, talk generally about the case and

20  review some documents, but without being able to accomplish anything with him

21  toward the preparation of a defense involving millions of complicated records

22  actually meaningful or does it merely provide the appearance of due process in order

23  to further the government's interests?

24          **1.    Access To The Defendant.**

25      The hours initially proposed by the government, <u>which the prosecution team is</u>

26  <u>not itself prepared to work</u>,[8]  called for the defense attorneys to meet with their client

27  ───────────────

28      [8] Counsel asked for the opportunity this past week to review some of the
    hundreds of thousands of records located at the FBI office, following a visit scheduled

1   in a "line-up room" from 4:00 pm to 2:00 am, Tuesday through Friday, the business

2   day on Monday, and all day on Saturday and Sunday. See United States'

3   Memorandum Concerning Defendant's Custody at 3:6-15 (Docket No. 44).  Since

4   then, the Sheriff's Department has offered to modify the visitation hours to enable

5   counsel to use the room at earlier hours during the week when the room is not

6   needed for line-ups or psychiatric examinations <u>but only if the defense schedules</u>

7   <u>time a week in advance</u>.  The schedule must be adhered to by counsel.

8            **2.      The "Ground Rules" For Visitation With The Defendant.**

9            The defense tried to attempt to work with the Sheriff's Department in the

10  interests of its client.  The day after the Court issued its March 30 order, a meeting

11  was attended with the Jail Commander and staff  where they were to show counsel

12  the facility, set the ground rules and answer questions.[9]  The main theme of the

13  meeting was to address these issues in the context of the jail's security concerns.

14  Those security interests may be appropriate but they create an enormous

15  impediment to the defendant's ability to prepare for trial.

16  ///

17  ///

18  ///

19  ///

20  ───────────────────

21  in advance at the Jail with his client. He requested by letter a visit on either Saturday or
    Sunday afternoon, April 3 and 4, 2010, for a couple of hours. The response was that

22  the government was not willing to work over the holiday weekend and that: "With
    reasonable lead time, agents can make search warrant materials available for your

23  inspection, <u>on business days and during reasonable business hours. It is not</u>
    <u>reasonable to expect government agents to work weekends pulling evidence for you</u>

24  <u>and to pull evidence on "immediate" notice.  It is particularly unreasonable this</u>
    <u>weekend, which is a holiday weekend for the agents."</u>  (Emphasis added.)

25

26            [9] Although some questions were answered, the circumstances were sufficiently
    unique to require some additional thought by the Jail Commander. The questions which

27  remain unanswered to date involve who can be in the room.  Is the room limited to
    attorneys and investigators, or can an accountant, experts, witnesses, individuals

28  knowledgeable about agriculture and food processing and others informally assisting
    the defense enter the room?

1    Some of the security rules are clear. The defense attorneys and other visitors

2   may <u>not</u> bring cell phones into the facility.  There is no phone available in the room.[10]

3   There is no email access in the room because there is no internet connection, nor

4   does a cellular computer access card - even though permitted - penetrate the thick

5   concrete walls of the room.  No food whatsoever may be brought into the facility.

6    Since counsel and the defendant are locked into the room, once in the room

7   there is no access to the outside world for the purpose of gaining information about a

8   document the defendant has questioned or followup on his ideas of how the

9   document relates to others, no ability to research a fact or legal question, no

10   possibility of communicating with an expert or a witness or to schedule a meeting to

11   followup with someone on an issue, and no immediate opportunity to bring in

12   additional documents to review pertaining to a general subject or to interrelate

13   information stored elsewhere <u>unless</u> counsel decides to leave the building and come

14   back later or sends a lawyer out for that purpose.

15    If counsel leaves, the defendant may not be in the room alone and must be

16   returned to his cell until counsel returns. Upon leaving, the defendant must be

17   physically and thoroughly searched and on return to the facility, counsel's materials

18   must also be again searched - about which more discussion is necessary.  If counsel

19   leaves, any laptop computers must leave with him or her, they may not be left in the

20   room, and any pens, clips, pencils or office materials must leave also.

21    Accordingly, once entering the facility, counsel is a prisoner of circumstances

22   for several hours because it is impractical to leave and come back and the only way

23   to work a full day is to have someone else come to the room (on a predetermined

24   schedule because counsel cannot reasonably leave to go outside and call his office

25   for a replacement or additional assistance).

26   _____

27    [10]For emergency purposes only, should anyone need to get in contact with a
defense attorney, the Sheriff has provided them with the direct dial number to the office

28   where a deputy is observing the line-up room through a large glass window.

1    The additional rules for counsel are: that counsel must come to the Jail at the

2    appointed time with such materials as counsel may wish to use that day and that

3    every bag, box or container must be x-rayed and physically searched.  Groups of

4    documents much be searched page by page.   A note or log of each and every pen,

5    pencil, stapler, and item of office supply to be brought in for use that day (and which

6    cannot be left behind) must be available to the searching officer and on departure

7    each pen, pencil and item of office supply must be fully accounted for and logged

8    out.  The names of all persons  are taken, with identification required, and entered in

9    a specially created log book.[11]

10                    **3.    The "Line-Up" Room.**

11    The approximately 13 by 15 foot windowless room has a small portable table

12    and six molded plastic chairs.[12]  The room is otherwise bare and used for line-ups

13    and occasionally for psychiatric exams.  The entire room is intentionally continuously

14    under observation during the meeting by an officer seated at a desk in a room next

15    door through a large shared, one-sided mirrored wall used for the line-up process.

16    The room is also apparently continuously videotaped because a ceiling camera is

17    pointed into the room and the room's image and that of the defendant, as well as

18    some of those present around the table appears on a time and date stamped video

19    screen in the adjoining room.  The room is also microphoned.  The guard tells

20    counsel when the microphone is going off and on and counsel must rely on that

21

22            [11]On arrival, after passing through the x-ray and the search of all bags, boxes
23    and documents at the entrance and lobby of the Jail, the defense party is escorted to
      the second floor and enters the internal facility through a locked door, walks through a
24    cafeteria, and then passes through a double security door (one opens, you are secured
      in, and then the other door opens).  The party then walks down another corridor and is
25    taken to the line-up room and locked in awaiting the defendant's arrival to the room.
      After some time, the defendant is brought to the room in handcuffs, and, after being
26    searched and unchained, he too is locked in the room.

27            [12]  The chairs are not just uncomfortable, they are debilitating.  Lead counsel
28    suffers from two level "degenerative disc disease" and has had to take 800 mg.
      Ibuprofen tablets almost nightly after sitting in the chairs.

11

1   representation as privileged conversations ensue.  Should counsel need to leave the

2   room for any purpose, he or she knocks on the window and the microphone is said

3   to be turned on while the officer comes around through the security doors described

4   above to open the room door.[13]  Counsel has to confirm the microphone is off in

5   order to avoid inadvertently disclosing attorney-client privileged matters while

6   waiting. Nonetheless, the officer is always visually observing the interaction between

7   attorney and client.

8        While the defense is permitted to have laptop computers in the room, and the

9   defendant can use one while there, he is not permitted to take a laptop back to his

10  cell or take with him any other electronic device to play the 190 hours of recordings

11  contained on multiple CDs of intercepted calls or body wires.  The defendant is

12  permitted to take two boxes of documents to and from his cell but that has proven to

13  be impractical for reasons which will be set forth later in this motion.  Up to

14  approximately 24 boxes may be left in the room overnight, but unless the defense

15  copies hundreds of thousands of records and copies them yet again to have an

16  office copy, at an expense factor of hundreds of thousands of dollars, that too has

17  thus far been impractical.

18          **4.**    **The Accommodations Are Unworkable In This Case And Do**
                   **Not Provide Meaningful Access To The Defendant To Prepare**
19                 **His Defense**.

20       In a case with a few thousand documents, although difficult, this system might

21  work.  In a case with millions of documents and of this complexity, it is not only

22  impossible, it is physically debilitating and effectively does not provide even a

23  semblance of due process.  There are two reasons for this strong statement:   SK

24  Foods was a business which produced hundreds of millions of pounds of products

25

26        [13] To use the restroom, the defense team member is escorted through the
    infirmary area, an area utilized by sick prisoners, to the officer's unisex bathroom.  If the
27  defendant needs to use the bathroom, he is escorted to the inmate's bathroom in a
    nearby area.  Since the microphone is presumptively on, all discussions must cease.
28

1   every year.  It generated thousands and thousands of emails, purchase and

2   production records, samples, certificates of analysis, contracts, letters, shipping

3   records and other documents as tomatoes were purchased from growers,

4   manufactured into a product, packed, sold, and delivered.  The inventory and

5   packing process was itself complicated and difficult to operate even through a

6   complex computer system.  Inventory records, which are part of the government's

7   case, controlled millions of pounds of products held and shipped to giants in the

8   industry, such as Kraft Foods.  Those companies produced their final product after

9   testing the ingredients and followed strict labeling requirements.

10          That process from order to production to delivery, and associated documents,

11  must be reviewed in context; telephone conversations occurring over years must be

12  contextually considered in sequence; and, emails, letters, contracts, the conduct of

13  other businesses and persons must be examined for their relationships one with the

14  other.  An isolated record or call may be understandable and sometimes "sound bad"

15  but in actuality be normal in the food business.  An example is that someone might

16  say "that certain tomatoes had mold" and make it sound like a criminal act.  But in

17  the industry everyone knows that all tomatoes in bulk have naturally occurring mold

18  and that the test for mold is incredibly unscientific.  Mold is often discussed and an

19  innocent conversation may be made to look like a guilty act  by an informant with

20  self-interest in mind.  At SK Foods, using industry standards and above industry

21  standards, a thimble sized sample of tomato paste was taken from a small bag of

22  product which was taken from a continuous production line run to represent the

23  quality of millions of pounds of product processed during many hours of production.

24          It is necessary to review the production records, the timing and quality of the

25  tests, the retesting of the product by the customer and whether the intended

26  customer is domestic or foreign (where higher mold levels are permissible) to

27  appreciate if mold is a real issue or not.  Then records must be identified and

28  reviewed to see if the defendant was ever even aware of the issue, was traveling at

Defendant's Motion for Release and/or Reconsideration of the Court's March 30 Order

1 the time, was dealing with the product in a commercially acceptable manner or was

2 otherwise not involved in the conduct alleged to be conspiratorial.  Similarly, the

3 screen size for a production run or other factors such as brix are, notwithstanding

4 contract terms, part of a customer needs analysis (the contract specifications are as

5 stated, but the customer plant may actually want or need something else at the

6 moment).  Documents must be retrieved, including SK Foods and customer email

7 communications, correspondence, contract and production histories, then reviewed,

8 and documents from a variety of ancillary sources obtained, and all must be

9 compared and related to determine whether the product was as desired by the

10 buyer.  Finally, even if the product is "off spec," it may well be that the customer

11 wants it or does not mind that it is off specifications because it can then seek a

12 discount when accounts are settled.  The customer's history provides that

13 information.  To perform this analysis, more than a few boxes of records are

14 required, and hundreds if not hundreds of thousands of interrelated documents must

15 be collected and reviewed in proper sequence.

16     Stated another way, there is no labeling fraud if the parties got what they

17 wanted or expected or the goods were as represented; the records will eventually tell

18 the full story but they must be carefully mined for the information by someone who

19 knows what he is doing with years of experience in the field.

20     A similarly detailed analysis is required when it comes to allegations about

21 pricing, the bidding process, and the conduct of the independent broker Rahal.  In

22 the case of the latter, the defense will be able to demonstrate that Rahal had

23 everything to personally gain by bribing buyers, and SK Foods had nothing to gain,

24 but all of his sales must be examined in relationship to sales by other customers and

25 by others to the same customer.  The case does not depend on what Rahal said or

26 his braggadocio statements of ownership, which were false, but rather on what he

27 actually did and why.  That cornerstone analysis is one in which the defendant must

28 personally participate because of his knowledge base.

1   This is not a waste of time or an effort to burden the Jail.  The defendant

2   wishes to review the materials in person with diligence to demonstrate that he is not

3   guilty of these charges which, as the government has noted, carry with them a

4   potential sentence of over 25 years,  which will consume the balance of his life

5   expectancy.

6   That said, while the prosecution team works in the comfort of its offices in the

7   federal building with desks, chairs, file cabinets, conference rooms, office equipment,

8   internet and online research, easy access to all of the prosecution documents or the

9   ability to pick up the phone and ask for more, and a cafeteria or other food supply;

10   and, the FBI agent works in a three room office suite away from downtown

11   Sacramento, with a complete set of the investigative records readily at hand along

12   with phones, copying equipment, document scanning equipment, email and access

13   to the internet for research, or are at home with family, the defense is locked in a 13

14   by 15 foot room for hours at a time with no windows, a plastic table, six plastic

15   chairs, no telephones, no cell phones, no ability to communicate with the outside

16   world and no access to food unless the session is terminated.  In the relative comfort

17   of their offices, linked by powerful computers to the United States Attorneys Office,

18   the FDA, the IRS, the Antitrust Division, the USDA and with the assistance of them

19   all and their staffs, it took the FBI several years to collect and analyze what they

20   believe to be documentary evidence supporting its case.

21   The defense has no comfort and doesn't expect it.  It doesn't have the ability

22   to mount the kind and size of the resources the government has used to prepare its

23   case.  It is, however, entitled to the opportunity to use its resources to examine the

24   government's evidence in a reasonable way and under circumstances where it can

25   prepare to contest it and use the defendant's extensive and percipient knowledge of

26   the business to do so. Confinement and security concerns at the Jail make that effort

27   impossible.

28   ///

1        **5.      The Jail's Institutional "Rules" Preclude Meaningful Access
2                 To The Defendant To Prepare His Defense**.

3        The Sacramento County Main Jail is frequently publicly criticized as a

4   detention facility, but the Sheriff's Department officers themselves have been decent

5   and professional to counsel and his staff and as accommodating as possible under

6   circumstances where their paramount responsibility is to maintain the safety and

7   security of a prison system with a population of often dangerous and violent

8   offenders.  The difficulty is that to maintain security, rules have been created and are

9   employed for the protection of guards, inmates and visitors but those rules crush the

10  defense effort here, making it virtually impossible to productively prepare for trial and

11  creating nothing but concern while the defense team tries to figure out how to

12  manage a defense of this complexity and volume in this intractable working

13  environment.[14]

14       The defendant must submit to those security measures or suffer real

15  consequences, including physical danger to himself, but he is a novice to the system

16  and makes mistakes.  His ability to work with counsel has been impaired by that

17  naivete and potential adverse discipline creates an enormous impediment to the

18  defendant's ability to prepare for trial.[15]

19       For example, on March 31, 2010, when defense counsel finally, after months

20  of promises, received copies of the Title III telephone call interception affidavits,

21  reports to the Court, and search warrant affidavits on a CD from the government,

22

23       [14]To comply with the rules, counsel spends a couple of hours preparing to
    bring materials to the Jail, making sure the briefcases are loaded and their
24  contents are compliant and do not contain extra pens or staples, going to the Jail,
    going through the search process, getting into the room and waiting for the
25  defendant. The task would take minutes in a law office or in a house where
    records are stored.
26

27       [15] Counsel was incorrect when he said in Court that he could give a writing pad
    to the defendant.  It is not permitted in the cell. The defendant must write in his cell with
28  a short pencil without an eraser on a pad purchased from the commissary.  No
    highlighters, clips, staples, post-its or pens are permitted in the cell.

Defendant's Motion for Release and/or Reconsideration of the Court's March 30 Order

1    counsel immediately had a number of sets of copies of the approximately 1680

2    pages made and brought some to the Jail that very night for his first visit with the

3    defendant in the line-up room.   Members of the defense worked late into the

4    evening.  Some of the documents were initially stapled.

5           Because of Jail rules, dozens of staples had to be removed before the

6    defendant was given documents to bring to his cell for later review.  Five small

7    removed staples apparently dropped to the bottom of the box and under a flap but

8    were recovered by an officer who took them into custody.  That resulted in the officer

9    having to conduct a more complete search of the box and then later the defendant's

10   cell which resulted in a complete disruption of the documents that the defendant had

11   separated, labeled and placed in order.  It also resulted in the finding of a prisoner

12   shirt and socks in the defendant's cell, which he had not put out for washing while

13   preparing for or visiting with counsel.

14          The defendant received a write up.  Thereafter, two ballpoint pens were found

15   in the cell.  They too had apparently been in the box taken to the cell on the first day

16   when inspection was not as stringent.  Since pens are considered a potential

17   weapon (and the defendant many only use a short stub pencil purchased from the

18   commissary with which to write about the voluminous records he is reviewing in his

19   cell or write down his thoughts), the defendant was warned that having had the pens

20   was considered a second incident and that should another incident occur, he will be

21   moved to yet a higher level of security.  As it is now, the defendant is classified as a

22   prisoner separated from the population for his own safety; such a move would place

23   him in the cell block with those charged with murders and like extremely violent

24   offenses.  <u>As punishment, the defendant was locked down 24 hours a day for</u>

25   <u>several days, except when with counsel.</u>

26          No one contends that security rules are not vital to an institution housing

27   extremely dangerous offenders, but as the result of these incidents committed as a

28   novice prisoner, the defendant remains fearful that carrying even his two allotted

1   boxes of documents to meetings with counsel to the line-up room might create a

2   situation where they are searched and disrupted or will result in an error which will

3   cause him to be confined to a higher security and more even more dangerous

4   environment.  He has now left most of his documents in the line-up room rather than

5   in his cell and cannot review them at night.[16]

6          Counsel, and his legal and investigative staff have spent many hours at the

7   Jail, seven days a week and late into the night.  But, the facility itself, the rules

8   intended to achieve security and the complexity of the effort needed from the

9   defendant himself, all effectively work to make the task of preparing a defense, to a

10  defensible case, virtually impossible under these circumstances, no matter how

11  much the defendant tries and how hard counsel works.  The prosecution has

12  exacerbated the problem.

13          **6.    The Government's Current Discovery Methodology Has Not
                    Aided In Resolving The Problem.**

14

15          The government was not prepared to provide the defendant with discovery

16  months after he was arrested.  While providing the defendant with materials as they

17  become available, it has ostensibly refused to recognize the difficulty faced by the

18  defense.  It has resisted the defendant's personal access to documents and

19  materials necessary to his defense by declining to provide them at the Jail, taking

20  the position that counsel can look at them at the FBI office and copy them at the

21  defendant's expense but only during business hours (often when counsel is at the

22  Jail).  They have also refused to bring them to the United States Attorney's Office

23  where they can be more readily accessed and brought to the Jail or to bring them

24

25  _____

26  [16] The defendant has had his blood tested at approximately 4:00 am ever since
    the issue of his diabetes arose in prior motions.  He was advised that the range of his
    blood sugar is from the low 100s to the 160s and that his triglycerides are high.  He has
27  a "black spot" in his right eye field of vision, likely attributable to the diabetes.  He still
    does not receive his prescribed medicine.  His ability to work with counsel over long
28  periods noticeably varies as time progresses.

Defendant's Motion for Release and/or Reconsideration of the Court's March 30 Order

1 themselves to the Jail for the defendant's review.  This is so even under

2 circumstances where counsel has explained that the defendant is the only person on

3 the defense team who has any direct and personal knowledge of the documents,

4 knows how the production and sales processes worked at SK Foods, has an

5 understanding of how the documents should look and how they fit into the ordering,

6 manufacturing or sales process, and where the documents would be largely

7 meaningless to defense counsel or another outsider without his assistance.

8      On March 19, 2010, after the Court had asked the government to address due

9 process concerns, defense counsel sent a detailed letter to the government

10 triggering Rule 16 discovery and requesting access to a substantial range of

11 discovery materials in the hands of other federal agencies within the scope of the

12 prosecution's control.[17]  Although the government has had more than three years

13 and extraordinary resources to review the records in its possession, including the

14 availability of former employees of the company and of the many customer

15 companies and have also had the expertise of the constituent federal agencies and

16 their agents, *viz.* the FDA, the USDA, the Anti-Trust Division and the IRS, it was not

17 ready to proceed.

18      On March 23, it provided a 400 gigabyte hard-drive containing hundreds of

19 thousands of documents which the government described as "coming from a variety

20 of defendants and third-party sources" but which was inaccessible because they

21 failed to tell counsel for days that it required a special program to be useful.  The

22 government's accompanying letter, which also promised to provide "within the next

23

24      [17] In addition to Rule 16, the defense noted the "*Memorandum for Department Prosecutors*" issued by Deputy Attorney General David W. Ogden on January 4, 2010,

25 in an attempt to avoid cases where the government has been embarrassed by failures to disclose evidence.  The Memorandum reiterates "the obligation of federal

26 prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all members of the prosecution team.  Members of the prosecution team include

27 federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the

28 defendant."

Defendant's Motion for Release and/or Reconsideration of the Court's March 30 Order

1  few days" "witness interview statements, 302's and Memoranda of Interview," further

2  stated it "has established a document depository at the offices of the [FBI],"

3  containing "inter alia, hundreds of thousands of documents and materials that were

4  obtained by the government as a result of the search warrants in this matter."

5       The promised documents have not yet been received after almost two

6  weeks.  The government has promised more documents soon and will likely deliver

7  some of them by the time of the hearing of this motion but it has not substantively

8  responded to the requests for documents in the hands of companion agencies or

9  provided the specific documents requested.[18]  It apparently believes that by

10  eventually scanning documents on a hard-drive it will satisfy its statutory discovery

11  obligations to the defendant.  Whether or not he can use them effectively under the

12  conditions of confinement, they leave it to him.

13       If anything is clear to counsel by now, hundreds of thousands and millions of

14  documents housed in a laptop or laptops are unusable at the Jail because they do

15  not permit the kinds of record comparisons necessary here. This is not a computer

16  game.  It took rooms full of hard copy records over years to prepare the

17  government's case and years to do it.

18       Defendant is incarcerated at a place of the government's own choosing, under

19  circumstances it controls, because it alone has determined to reject any form of

20  release with conditions intended to assure the defendant's presence at trial.  Under

21  these circumstances, the constitutional requirements to provide due process and

22  simple fairness, collectively require that the government make extraordinary efforts

23  to make sure the defendant has early access to all discovery in this case and in a

24  non-piecemeal form in which it is effectively usable by the defendant while in

25  custody.  It has not done so and even if the records were provided, the security

26  

27      [18]The government has recently agreed to provide a compilation of records the
agents prepared to assist in "their"case. They may help in understanding the

28  government's contentions but don't satisfy the need to review hundreds of thousands of
other documents pertaining to the case.

1   issues and the storage space at the Jail would not enable them to be used to

2   prepare the defense.

          **7.      The Defendant's Due Process Needs Have Not Been Met**.

4          In order to adequately prepare his defense, the defendant and his counsel

5   require ready, reasonable and safe access to the defendant, and to records,

6   equipment and a place to work.  The place provided by the government, which

7   entails extensive screening and requires that the defense take apart their

8   preparation and reassemble it every day is enormously time-consuming and

9   expensive, meet none of these basic requirements and simply do not comport with

10  due process.[19]  The present conditions of confinement make trial preparation

11  impossible.

                            **CONCLUSION**

13          The Court should not accept the present form of incarceration as an

14  alternative to release.  It is unworkable and clearly antithetical to the due process

15  principles underlying and stated in the Bail Reform Act.

16          There are conditions available to this Court which will assure the defendant's

17  presence at trial and enable him to prepare a defense.  As an example, at the last

18  hearing the defendant suggested, and the Court considered, the requirement that

19  the defendant post an additional $500,000 in property to supplement the six million

20  dollar home already offered as collateral for release.  If the Court requires more

21  security, even though under the circumstances the Ronda Road property should be

22  more than sufficient, the defendant believes he will be able to post a million dollar

23  security, approximately $800,000 of it in property and the balance from a family or

24  _____

25          [19] See *Jones v. United States*, 463 U.S. 354, 361 (1983) (observing that
    "commitment for any purpose constitutes a significant deprivation of liberty that requires
26  due process protection."); *Johnson-El v. Schoemehl*,  878 F.2d 1043, 1051 (8th
    Cir.1989) ("Pre-trial detainees have a substantial due process interest in effective
27  communication with their counsel and in access to legal materials.   When this interest
    is inadequately respected during pre-trial confinement, the ultimate fairness of their
28  eventual trial can be compromised.")

1   friend's personal bank account in addition to the Ronda Road six million dollar

2   property.  The Bail Reform Act, predicated on due process principles, mandates that

3   such alternatives be considered.  *United States v. Orta*, 760 F.2d 887, 892 (8th Cir.

4   1985) ("The structure of the statute mandates every form of release be considered

5   before detention may be imposed.")

6       The defendant requests that he be released as mandated by the Bail Reform

7   Act under the terms and conditions previously ordered by the Court on March 25.  If

8   other bail conditions are required, the defendant ought be given the opportunity to

9   meet them.

10                                  Respectfully submitted,

11  Dated:   April 7, 2010          **SEGAL & KIRBY LLP**

12

13                      BY:   /s/ Malcolm S. Segal
                              MALCOLM S. SEGAL
14                            Attorneys for Defendant
                              FREDERICK SCOTT SALYER

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant's Motion for Release and/or Reconsideration of the Court's March 30 Order