MALCOLM S. SEGAL - 075481
JAMES P. MAYO - 169897
**SEGAL & KIRBY LLP**
770 L Street, Suite 1440
Sacramento, CA  95814
Telephone: (916) 441-0828
Facsimile: (916) 446-6003

Attorneys for Defendant
FREDERICK SCOTT SALYER

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br><br>    v.<br><br>FREDERICK SCOTT SALYER,<br><br>         Defendant.<br>_____/ | CASE NO: 2:10-CR-0061-LKK<br><br>**DEFENDANT'S REPLY TO UNITED STATES' MEMORANDUM IN OPPOSITION TO DEFENDANT'S APR. 7, 2010 MOTION FOR RELEASE AND RECONSIDERATION**<br>_____<br>Date:    April 13, 2010<br>Time:   9:15 a.m.<br>Judge:  Hon. Lawrence K. Karlton |

## Introduction

The government opposes the defendant's motion for release under this Court's pre-trial release order and the defendant's motion for reconsideration, claiming as they have before that the defendant must have financial resources of which they are not aware and that they believe the conditions afforded him at the Sacramento County Main Jail are sufficient to enable him to mount a defense.  In so doing, the government has disregarded this Court's order of March 25, 2010, which found that there were conditions of release which would reasonably assure the defendant's appearance at trial and setting those conditions.  Rather than come to grips with Ninth Circuit precedent in *United States v. Frazier*, and after dismissing their appeal to the Ninth Circuit following their motion for a stay, they now seek to

1

invoke this Court's jurisdiction and reargue bail by asking the Court to reverse course and find that there are no conditions under which he can or should be released.

### The Available Assets

The government argues that the defendant's statements on a telephone line at the Jail he knew was being recorded, since that was announced prior to the conversation and referred to in the conversations, reveal assets of which the Court is not aware. That is simply untrue, and the record plainly reveals that untruth.

The defendant has provided a clear statement of assets to Pre-Trial Services, prepared by an accountant, and the government has seen it. That detailed statement reveals the presence of funds in a now blocked bank account in Andorra, an account of which the Court was made aware and has restricted in its release by requiring that Pre-Trial Services be made aware of its use when such is planned.[1]

In order to access that account, the defendant will have to be released from custody so he can verbally request that the bank, and the government of Andorra permit the bank, to give him access to the funds and the defendant will have to obtain the specific permission of the Pre-Trial Services Officer to repatriate the funds to the United States. The money is not freely available nor accessible as the government implies.

The government's arguments about a so-called shell game are misplaced. The money is where the defendant's accountant said it was and where the defendant said it was, and remains there in Andorra.

### The Lis Pendens

Having creatively argued the existence of more money than exists, the government postulates from the recorded conversations that the defendant's

---

[1] No one has or can dispute the fact that over a million dollars of those funds belong to his daughters' trusts and are controlled by a Trustee as the result of a settlement with the Bankruptcy estate supervised and approved by the bankruptcy court.

candidly anguished cries to his young daughter that he is essentially dying in jail[2] because his former wife will not subordinate her lis pendens and would rather give the property to the bankruptcy trustee than the wife, are indicative of a willingness to flee. That is nonsense.[3]  In context, the defendant was saying to her and to all that he was willing to ask for and use the funds in Andorra to bring his obligation to his ex-wife to a level he thought would make her current (which he believed to be 1.3 million dollars) if she agreed to lift the lis pendens, with the understanding that she could then continue her action to seek any additional funds to which she claimed entitlement.[4]  This was so even under circumstances where he believed that the lis pendens was improper insofar as it was imposed on an asset owned by the girls' trusts and not him.[5]

---

[2] He was not overstating the case. The defendant, a man of modest size has lost approximately 15-17 pounds in Jail in just a couple of months. He has had an episode of sufficient magnitude to require the Marshal's to call a physician to examine him because of a sudden weakness and rise in blood pressure and heart rate while present in the Court house. His blood sugar has fallen and risen from the 70's to the 160's, a condition the nursing staff at the jail has noted in his records with concern. He is not getting his medication intended to prevent stroke. The food exacerbates his condition and he gets none of the needed exercise to assist in keeping his diabetes under control. He has just been released from a several day 24 hour lockdown and is confined to a cell approximately 23 ½ hours a day unless he is locked up with his attorneys in a small room. There are dangerous prisoners around him and he is classified as a prisoner needing physical protection by the Jail. The conditions under which he is confined preclude him from adequately defending himself under circumstances where he faces what could be a life sentence - over 28 years - or at least a sentence beyond the life expectancy for a man of 54 years of age with diabetes.

[3] Indeed, the transcript of the call with his daughter notes on the same page (Exhibit C, filed page 51) that the defendant would not destroy the assets that would support his daughters for the rest of their lives. He further reiterated in his call to "Robert" that: "The only way you don't get the asset back (the house) is if I disappear somewhere which isn't going to happen . . .." (Exhibit D, filed page 57).

[4] The $1.3 million "offer" to the defendant's former wife is of course, consistent with his intent to post bail and to preserve the government's putative interest in the property as a deterrent to flight.

[5] At bottom, it does not follow that just because the defendant may have said to his daughter that he would be willing to see the property go to the government or to the bankruptcy trustee rather than to his former wife that he will flee or is thinking about

3

Was he angry? Of course he was because he believed that his ex-wife, the mother of the daughter with whom he was speaking, was acting in a way to take advantage of his circumstances and that her daughters were not sticking up for their father despite the fact that he had exhausted much of his own resources and time to litigate against the bankruptcy trustee and others who were attacking not just him but the children's trusts.[6]

Despite the prosecutors' efforts to show a family breach and upset caused by this case and the collapse of a business when the creditors withdrew their support for the annual purchase of crops and production, the defendant's children remain supportive of him and have submitted declarations and letters for him. They, and their trustee, have expressed willingness to post their most valuable asset to gain his freedom to prepare for trial. The lis pendens does not diminish the asset's use or efficacy as collateral for the defendant's bail and as a deterrent for flight, nor does it diminish their love for their father or their willingness to trust him, even though they appreciate that it is their own mother, and his former wife, who has declined to make the slightest accommodation to permit him the opportunity to use a home the children separately own in their trust to gain his release and enable him to prepare a defense.

The defendant, under the pressures of confinement, has clearly pressed them to urge their mother to change positions, and he has displayed anger and upset at

---

fleeing. It is a non-sequitur because the net result of the fraudulent transfer claim does not mean, as pointed out in the motion, that the property will ever go to the ex-wife. The lis pendens claim is only arguably permissible because the fraudulent transfer action "relates to" title of real property – it is not an action to quiet title for example, where the wife claims a direct interest in the property.

[6] As noted in the motion, the Bankruptcy Court has enjoined the use of a variety of valuable assets under legal theories which are contested in that forum. The injunction has been appealed to the District Court and a notice of related cases has been filed. Other matters have been previously appealed and found to have sufficient merit to have caused a District Court Judge of this Court to grant an emergency stay and deny dismissal of the appeal on application of the Trustee.

some of them for not being able to make inroads with her, but his love for his children and desire to protect them from the terrible consequences of the bankruptcy and the impending, and now actual, criminal charges which have devastated wealth it took generations to accumulate by hard work is evident.  That love is made manifest by the very fact that he has fought the creditors and the trustee at every step to pursue their defense and his and sought business opportunities everywhere he could to start over again for the benefit of the family.

To accept the prosecutors' notion that he is not entitled to the opportunity to gain his release because of that upset, because they think, without support, that he has assets beyond those disclosed to the Court or because they think the Court erred in making its finding that the defendant should be released under conditions is to ignore the many letters and declarations the Court received from friends and family and accept supposition for facts.  The Court's decision granting release was correct in the first instance under the Bail Reform Act.[7]

The defendant submits that under *United States v. Frazier*, as originally ordered by the Court, he is entitled to release irrespective of the lis pendens which only theoretically "encumbers" the property.  However, the Act provides for and requires modification of the terms of release for a defendant who needs that modification to gain release as long as other terms or additional terms will reasonably assure his presence at trial.  Those terms are proposed in that part of the defendant's motion seeking reconsideration and the Court is urged to consider them, and others if necessary, to permit the release under the Act.

///

///

///

---

[7] The government disagreed with that decision, appealed and sought an emergency stay of the order. The motion was denied and it dismissed the appeal, apparently never having received permission to pursue it.  The decision to grant release under conditions should stand.

## The Defendant Is Being Denied Due Process Under
## The Conditions Of Pre-Trial Confinement

This Court has clearly recognized the serious due process concerns created by the defendant having to prepare for trial in this "extraordinary case," under the conditions extant in the Sacramento County Mail Jail. The Court offered to reconsider the terms of release upon application by the defendant after having had an opportunity to try to function under the Jail conditions proposed by the government. The conditions were not as they first appeared because the government either did not know what they were or did and was not candid with the Court when they were proposed.

The authors of the government's opposition may or may not have ever defended a criminal case, they may or may not have ever defended a criminal case with a couple of million documents to review and 190 hours of tapes to hear, but they have most certainly never defended a case where with that volume of discovery to be reviewed, the defendant was locked down in his cell with a two inch stub of a pencil and a yellow pad as his only tools with which to assist him for 16-18 hours a day when he is not with counsel. The defendant has no highlighting pen, no paper clips, no post-its, no tabs, no folders or other organizational aids, and is left by himself to read documents, dog ear some pages and make a note with a golf pencil to record complex information on hundreds and thousands of documents.

The government told the Court they would provide access to the defendant and then proposed absurd hours which would have counsel working unfed and with an unfed diabetic defendant until two in the morning (when his blood sugar is tested around 4:00 am by a needle stick) and outside a jail facility from which counsel has had to send his paralegal home before dark for fear of her safety. Moreover, even the prosecutor who previously told counsel that his staff would be monitored by Jail staff to make sure the room was being used and then said they would not be monitored must acknowledge that they are monitoring the defense. It is obvious

from the motion that they have been clocking the defense in and out of the facility, in addition to having a sheriff's officer seated at a desk looking at counsel engage the defendant in discussions, show him documents and play tapes, as if the defense was in a fish bowl. That observation occurs through the one way mirrored wall of the lineup room and the Sheriff is apparently recording pictures of the defense by the use of an obvious camera trained on the room housed on the ceiling. Counsel has seen pictures on the screen and the time stamp as the screen moves forward.

The prosecutors decry the fact that the defendant has not spent hundreds of thousands of dollars copying records at the FBI and has requested instead that he be able to look at originals at the Jail but ignore the fact that the defendant's resources are limited by orders of the various courts.[8]

The prosecutors have an answer to the problem, articulated in their response, in essence, "don't show the discovery documents to the defendant." This, of course, begs the due process question.

The defendant is the only person who knows his former enormous and incredibly complex business, of which the allegations in this case form only a small part, and is the only person available to the defense who can examine and explain documents in context and in historical complex for transactions and production processes going back almost many years. In contrast, the government has promised sentencing consideration to the people who managed production,

---

[8] They don't mention that the 400,000 documents they did provide on a hard drive could not be accessed because they offered no information about the programs they had used to load it and that it was necessary to have a conference call with the Antitrust Division and their information technology expert and lead counsel and a computer expert engaged by the defense to learn how to possibly but not necessarily definitely access them. Nor does the government mention in the opposition that the CDs on which they loaded 190 hours of recordings do not all work and that some of them are inaudible when they do work. Thus far they have replaced but two of the many called to their attention. The do not mention also that counsel has sent them well over a dozen letters and emails asking for specific information necessary to further this stage of the defense, only to be greeted with a response that counsel is sending too many letters and too many emails but no answers.

controlled inventory, tested product, prepared certificates of analysis, sold the product and bribed buyers of several customers, provided those people "materially assist the prosecution." It has available a cadre of investigators from several agencies with offices, equipment, computers, scanners and copying machines to contrast and examine the documents, manipulate the data, transmit it to other government agencies and witnesses, gather more records and continue the process.

The defendant has a stub of a pencil and a pad he must order and buy from the commissary and wait for delivery.[9]

Even the government must acknowledge from its surveillance of the defense - itself despicable under the Constitution - that the defense has worked seven days a week with the defendant since the room was made available for that purpose.[10] At the pace mandated by the conditions imposed on it by the government, the defendant respectfully submits that even with mass copying of documents and even were there some way to ameliorate the security process at the Jail, set up a more permanent and useful way to work and to leave work in place day to day, even without phones and email and internet access, an effective defense would take years to achieve and mount in this case.[11]

---

[9] Counsel cannot give him a pad, that is a security breach.

[10] The defense did not require that the FBI agent work on Easter Sunday. Rather it offered the opportunity for anyone from the government to spend two hours that afternoon with counsel after counsel's scheduled visit to the Jail **or** a couple of hours after the scheduled Saturday Jail visit. Since the government and the agent sadly would not agree to work "after business hours," counsel agreed to meet the following Wednesday morning - his first available moment - and the worked with the defendant into the late night at the Jail.

[11] Under these circumstances, "[t]he government cannot be permitted to essentially unilaterally control the date of trial by dribbling out discovery in a haphazard and disorganized manner." See *United States v. Graham*, 2008 WL 2098044 (SD Ohio May 16, 2008) (Dismissing indictment without prejudice for Speedy Trial violation: "In this case, the problem, as the parties well know, is and has been discovery. The discovery itself breaks down into three separate problems. One, the volume of discovery in this case quite simply has been unmanageable for defense counsel. Two, like a restless volcano, the government periodically spews forth new discovery, which

Frankly, it doesn't matter to the defendant or to the Constitution whether the Jail commander advises, as the prosecutors claim, that more accommodations have been granted to this defendant than others previously incarcerated.  <u>The defendant is not Theodore Kaczynski, he didn't maim or try to kill people</u>.  The defendant is accused of a financial crime involving fraud.  He has plead not guilty and should be permitted the opportunity to fairly defend a case a half dozen prosecutors, several primary agents, an expensive private investigation firm hired by a competitor and over a hundred agents have worked on for five years.  As counsel has advised this Court, there is a defense in this case which can and will be mounted if the defendant and counsel have a reasonable opportunity and the means to prepare.

### Conclusion

The Court should not accept the present form of incarceration as an alternative to release.  It is unworkable and clearly antithetical to the due process principles underlying and stated in the Bail Reform Act.

There are conditions available to this Court which will assure the defendant's presence at trial and enable him to prepare a defense.  The defendant requests that he be released as mandated by the Bail Reform Act under the terms and conditions previously ordered by the Court on March 25.  If other bail conditions are required, the defendant ought be given the opportunity to meet them.

Respectfully submitted,

Dated:   April 12, 2010            **SEGAL & KIRBY LLP**

BY:    /s/ Malcolm S. Segal
       MALCOLM S. SEGAL
       Attorneys for Defendant
       FREDERICK SCOTT SALYER

---

adds to defense counsels' already monumental due diligence responsibilities. Three, the discovery itself has often been tainted or incomplete. For example, during oral argument, counsel for Defendants stated that computer hard drives produced by the government were riddled with bugs and viruses and that tape recordings and transcriptions were missing or incomplete. Indeed, it appears that these issues may require yet another continuance of the trial if the indictment is not dismissed.")

9