MALCOLM S. SEGAL - 075481
JAMES P. MAYO - 169897
**SEGAL & KIRBY LLP**
770 L Street, Suite 1440
Sacramento, CA  95814
Telephone: (916) 441-0828
Facsimile: (916) 446-6003

Attorneys for Defendant
FREDERICK SCOTT SALYER

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>     v.<br><br>FREDERICK SCOTT SALYER,<br><br>            Defendant.<br>_____/ | CASE NO: 2:10-CR-0061-LKK<br><br>**DEFENDANT'S REQUEST FOR RECONSIDERATION OF CONDITIONS OF RELEASE**<br>_____<br>Date:      TBD<br>Time:      TBD<br>Judge:    Hon. Lawrence K. Karlton |

## INTRODUCTION

This Court, after a hearing, approved the defendant's release on March 25, 2010, requiring, among other conditions, that the defendant sign a personal surety bond secured by his interest and the interest of his daughters' trusts in a home located in Pebble Beach, California, to secure bail in the amount of six million dollars, which was selected because it was then thought to be the equity in the home.  The Court subsequently ruled that the existence of a lis pendens imposed on the property by the defendant's former spouse deprived it of its equity. The Court later, although it did not change the terms for release, essentially expressed the view that the defendant was unlikely to flee and gravely financially harm his immediate family because of the substantial equity requirement in the property securing the bail.

The defendant, in order to comply with this condition of release, sought to have the lis pendens expunged by litigation in the Superior Court.  His sister, Linda Lee, graciously advanced more than a hundred thousand dollars of her personal funds for those very substantial legal efforts.  Those efforts have not proven successful against the yet unproven demands of his former spouse and the defendant cannot meet the security conditions imposed by the present release order and gain his release from custody.

The defendant, through close family and friends, has now secured substitute property of a very substantial value, although not in the amount previously set by the Court, and requests that the Court reconsider the conditions of release based on the value of the property to be posted as security, the relationship of the defendant to the persons who are willing to post their homes and property and in the interests of providing the defendant with a measure of due process as he attempts to defend this extraordinarily complex case.

## The Substitute Collateral

The defendant's family and longtime friends have rallied to his support and trust him not to flee.  The following collateral, valued at almost two million dollars, is offered to support the defendant's release:

1. The home owned by Scott Salyer's sister, Linda Lee, in which she personally resides and in which she has lived for many years.

2. A separate home in the same city, also owned by Scott Salyer's sister, Linda Lee, in which his sister Christine Salyer personally resides.

3. A home owned by Scott Salyer's close friend of more than 40 years, Robert Pruett and his fiancé, in which Mr. Pruett and she personally reside.

4. Family property owned by Mr. and Mrs. Robert Pruett, parents of Robert Pruett and friends of the defendant since he and their son were boyhood companions.  The property is one of Mr. and Mrs. Pruett's main financial assets.

///

5.  A home owned by the defendant's friend of more than thirty-five years, Calvin Carter and his wife Diane, in which they have lived for twenty years.

The value of this real property is comprised of assets each having an individual value of at least two hundred thousand dollars, at least one, far more. Each of the persons posting the property is prepared to declare under oath that the loss of the property would have a serious adverse impact on his or her financial status and resources.

This motion proposes that all other conditions previously imposed by the Court concerning reporting, travel and the wearing of an electronic bracelet remain the same.  In addition, the defendant agrees to supplement that reporting by in-person visits and telephonic monitoring by Robert Storey, a former and well-respected Probation Officer of this Court.  Mr. Storey, who has served in a similar capacity in other cases in this Court, would independently report to Pre-Trial Services any instance where he had any concern or questions about the defendant's status even in the face of apparent complete compliance with the terms of release.

## Additional Reasons for Release on New Conditions[1]

The Bail Reform Act recognizes that a defendant has a constitutionally-based right to adequately prepare his defense without unwarranted government interference, including overbearing pre-trial detention. 18 U.S.C. § 3142(i)(3).  The Supreme Court long ago stated in *Stack v. Boyle*, 342 U.S. 1, 3 (1951):

> From the passage of the Judiciary Act of 1789, 1 Stat. 73, 91, to the present Federal Rules of Criminal Procedure, Rule 46(a)(1), 18 U.S.C.A., federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail.  This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. See *Hudson v. Parker*, 1895, 156 U.S. 277, 285, 15 S.Ct. 450, 453, 39 L.Ed. 424. Unless this right to bail before trial is preserved,

---

[1] The defense, as it promised the Court, has filed a motion under ten pages in length and has intentionally not filed a plethora of declarations or documents. The most salient portion of this motion is the willingness of the defendant's family and longtime friends to use their homes and personal assets to secure his release. The defendant will vindicate their faith in him and is enormously grateful for their support.

      the presumption of innocence, secured only after centuries of struggle, would lose its meaning.

This Court too has obviously struggled with the due process concerns where the defendant, with no prior criminal record and substantial ties to the community, is charged in an extraordinarily complex white collar criminal case, with well over one and a half million discovery documents, and is trying to prepare a defense while confined at the Sacramento County Main Jail. It would be naive to suggest that the Court did not have a basis for its concerns, but the Court has resolved them by setting conditions for release <u>and</u> pending that release, by trying its best to insure that the defendant be provided with a reasonable opportunity to confer with his defense attorneys at the Jail and review the extraordinary amount of discovery.

As will be briefly discussed, the ability to prepare a trial defense in the custodial environment of the Sacramento County Main Jail is unworkable because: (1) It is simply physically impossible to confer with the defendant, review discovery and prepare for trial in any reasonable amount of time while the defendant is confined; (2) the prosecutor assigned the case has recently admitted to Magistrate Judge Hollows that it would take him at least a year and a half to even partially comply with Judge Hollows' order that he review the discovery thus far provided to the defense for *Brady* disclosures; and, (3) the defendant, who has health problems, is locked down virtually 24 hours a day except to see his attorneys, the defendant's privileged documents left in his cell and in the lineup room are being disturbed and jail personnel are serving as an adjunct to the prosecution by voluntarily holding and systematically copying the defendant's mail and recording all of his phone conversations for the prosecution. Moreover, the strength of the government's case is suspect, the defendant having filed, but the United States not yet responded to, substantial motions supported by the government's own investigative reports which demonstrate Fourth Amendment violations which, if granted, will jeopardize the core evidence in the case (illegal warrantless searches, tainted probable cause and clear

*Franks v. Delaware* violations in Title III and search warrant affidavits).

1. <u>Discovery review and trial preparation:</u> A review of Judge Hollows' recent Order on Reconsideration, dated August 2, 2010, on the government's motion to reconsider a discovery order (Court docket #181) makes it clear that the government itself has not reviewed and managed the discovery in this case so as to comply with *Brady v. Maryland*. Government counsel, during argument, has admitted an inability to review the evidence for that purpose in any reasonable period of time. Much of the FBI's physical evidence is contained in three rooms and two portable pods on the FBI's property. Just as to the two of the pods of evidence, a relatively small sector of the available discovery, the prosecutor stated: "If we are ordered to read every page in two pods, I can't do this case inside a year and a half, and I know they don't want that . . . Essentially, this Court's order to go through everything eyes on with your Bar card on the line is an order to dismiss this case... ." (August 2, 2010 Hearing Transcript at page 59). The defense cannot perform any better and particularly so with the defendant effectively detained only because he cannot post the current security required for his release and unable to assist in that physical review onsite at the FBI office.

In his Order on Reconsideration, granting the government more time (90 days), Judge Hollows stated:

> The government's "impossible" burden objections to the court's order (and DOJ Guidelines) are somewhat colorable, although as observed below, these arguments conflict with the inconsistent argument that with a modicum of diligence, the defense can ferret out all of the *Brady/Giglio* material itself. The objections also are hyperbole. And while the undersigned is sympathetic, he is not too sympathetic. During the course of any large case investigation, investigators and attorneys are going to have to review and organize the sometimes immense amount of evidence that is acquired. During the course of the years long investigation in this case, the government personnel seemed to be able to segregate that evidence which would be useful in the prosecution in terms of guilt, but apparently made no efforts to segregate that evidence which runs counter to the charges. Assuming for the moment that some *Brady/Giglio* evidence, as the court has defined it below, exists, the reviewing personnel apparently made no note of the evidence, or merely having noted it, "stuck it back" in the ever-increasing pile to be an inevitably hidden part of the mass disclosure. The obligations

1      imposed by *Brady* et al. have been well established for years, and should be anticipated in every case during the investigation phase. If the government argues that it is now "impossible" to comply with the burden of reviewing evidence for identification purposes, the government more or less made its own bed in this matter by making it impossible.

4  (Docket #181 at 6:17-7:9).

5      And, despite the government's prior representations to the Court that: "custodial arrangements can be made that will enable [the defendant] to meaningfully interact with his defense team on a regular basis . . . " and "the Main Jail is prepared to accommodate [the defendant's] reasonable needs in this extraordinary case," such has clearly not been the case.  See United State's Memorandum Concerning Defendant's Custody at 1:25-2:9 (Docket #44).

11      Whether legally correct or not, the Jail has recorded and voluntarily sent to the government, at its request, more than thirty telephone conversations between the defendant and his attorneys and the government hid that fact by withholding Rule 16 discovery until a demand was made on them for that specific material.  They also hold and copy all of the defendant's personal mail and turn it over to the prosecution. Whether for security reasons or not, or to protect him from violent prisoners or not, the guards release the defendant at times when it is impossible to reasonably reach counsel – often after midnight.  For whatever purposes, security or otherwise, when he is away from his cell it is sometimes searched and his boxes of carefully-assembled legal materials emptied.  Boxes of legal documents stored in the lineup room are regularly disturbed by other people using the room.  Those and other conditions at the Main Jail more than unduly hamper preparation and trusted communications between client and counsel.  The law is clear that:  "Pre-trial detainees have a substantial due process interest in effective communication with their counsel and in access to legal materials.   When this interest is inadequately respected during pre-trial confinement, the ultimate fairness of their eventual trial can be compromised." *Johnson-El v. Schoemehl*,  878 F.2d 1043, 1051 (8th Cir.1989).

28  ///

    2.    <u>Ability to assist in the defense</u>: The defendant's ability to assist in his defense is hampered by the fact that his health has eroded while he has been detained and he has received little or no care in that regard.  Moreover, when the issue of the defendant's health was raised in this Court, the defendant has seemingly been punished under the rubric of monitoring his condition.  As an example, when the defendant raised appropriate concerns about his diagnosed diabetes, he was awakened day after day, at odd hours, for multiple daily blood sticks for testing. That testing effort had no continuity and often suddenly stopped when the defendant's health was not being addressed as a bail issue.  He still has diabetes, often displays shakiness – a symptom of low blood sugar, and has lost thirty pounds during his incarceration.  He requires commissary snacks to maintain his blood sugar level but access to commissary is often missed for no ostensible reason.  The defendant has glaucoma, which affects his vision but Jail personnel have no treatment or ability to medically test him for corneal pressure because of previous eye surgery requiring special testing equipment not available in the jail.  The defendant's eyes are regularly visibly puffy during visits and he often complains of long-lasting headaches.

    3.    <u>The government's case is weakened by illegal searches:</u>  The recently-filed suppression motions filed by the defendant raise serious issues under the Fourth Amendment which, if granted, will greatly impact the strength of the government's case.  Even though the motions will be contested by the government, the Court has the ability to preliminarily gauge the seriousness of the issues by a brief review of the filed motions.  The FBI case agent, through an informant, conducted more than 40 illegal warrantless searches of the defendant's records and took more than a thousand records and product samples.  The agent withheld information from the court about an informant and misrepresented laboratory test results in his affidavits in support of the Title III interception orders and for search warrants.  Although not as important an issue as the defendant's health or ability to

prepare for trial and mount a defense, the strength of the government's case is a factor in the review of a bail motion.  Here the motions cast doubt on the credibility of the government's principal agent, its key informant and the viability of the government's evidence.

## CONCLUSION

Family members and longtime friends of the defendant have agreed to post their residences and most valuable assets as security for his release.  That security and the proposed conditions will assure the defendant's presence at trial.  The defendant requests that he be released under terms and conditions which he now can meet, a bond secured by real property in excess of one million, seven hundred and fifty thousand dollars and a cash deposit sufficient to bring the total security to two million dollars. The defendant's release will give him a reasonable opportunity to review all of the discovery, including *Brady* disclosures, adequately prepare for motions and hearings and ready himself, if necessary, for the future trial of this case.

Respectfully submitted,

Dated:   August 6, 2010     **SEGAL & KIRBY LLP**

BY:   /s/ Malcolm S. Segal
MALCOLM S. SEGAL
Attorneys for Defendant
FREDERICK SCOTT SALYER