1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE EASTERN DISTRICT OF CALIFORNIA

3                              ---O0O---

4         BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    UNITED STATES OF AMERICA,

7           Plaintiff,

8    Vs.                              CASE NO. CR. S-10-061 LKK

9    FREDERICK SCOTT SALYER,

10          Defendant.

11   _____/

12

13

14

15                              ---o0o---

16

17                       REPORTER'S TRANSCRIPT

18                     TUESDAY, AUGUST 3RD, 2010

19       RE:  DEFT'S REQUEST FOR STAY OF DISCOVERY IN BANKRUPTCY

20    PROCEEDING – GOVT'S MOTIONS FOR COURT ORDER – DEFT'S MOTION

21   TO SUPPRESS EVIDENCE – DEFT'S REQUEST FOR PERMISSION TO FILE

22

23                              ---o0o---

24

25   Reported by:                  CATHERINE E.F. BODENE,
                                   CSR. No. 6926

```
 1                        APPEARANCES

 2                          ---o0o---

 3

 4    For the Government:

 5            UNITED STATES ATTORNEYS OFFICE
              501 I Street, 10th Floor
 6            Sacramento, California  95814

 7            BY:  MATTHEW SEGAL,
                   Assistant U.S. Attorney
 8            BY:  STEVE LAPHAM,
                   Assistant U.S. Attorney
 9

10

11

12    For the Defendant:

13             SEGAL & KIRBY LLP
               770 L Street, Suite 1440
14             Sacramento, California  95814

15             BY:  MALCOLM S. SEGAL,
                    Attorney At Law
16

17

18

19    For the Trustee:

20            SCHNADER ATTORNEYS AT LAW
              One Montgomery Street, Suite 2200
21            San Francisco, California  94104-5501

22            BY:  MICHAEL M. CARLSON,
                   Attorney At Law
23            BY:  GREGORY C. NUTI,
                   Attorney At Law
24

25                          ---o0o---
```

1

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | SACRAMENTO, CALIFORNIA                                       |
| 2  | TUESDAY, AUGUST 3RD, 2010 – 9:15 A.M.                        |
| 3  | ---o0o---                                                    |
| 4  | THE CLERK:  Calling Criminal Matter 10-0061, United         |
| 5  | States v. Frederick Scott Salyer.                           |
| 6  | MR. MATTHEW SEGAL:  Good morning, Your Honor.               |
| 7  | Matthew Segal for the United States.  I am here with        |
| 8  | Mr. Steve Lapham.                                            |
| 9  | MR. MALCOLM SEGAL:  Good morning, Your Honor.               |
| 10 | Malcolm Segal on behalf of the defendant who is present in  |
| 11 | court.                                                       |
| 12 | MR. CARLSON:  Good morning, Your Honor.  Michael           |
| 13 | Carlson and Greg Nuti.  We're here on behalf of Bradley     |
| 14 | Sharp, the Chapter 11 Trustee, on the stay matter.          |
| 15 | THE COURT:  All right.  Let's take care of the few         |
| 16 | things that we can do quickly, and we'll get to the more    |
| 17 | difficult things shortly thereafter.                        |
| 18 | Mr. Salyer, you don't have to stand there.  If you         |
| 19 | want, you can sit down.  It is up to you.  I don't care.    |
| 20 | THE DEFENDANT:  I'll stand, Your Honor.                    |
| 21 | THE COURT:  All right.                                     |
| 22 | I have a motion by the defendant to be permitted to        |
| 23 | file a new motion relative to bail, and I want everybody to |
| 24 | know that just because of what I'm seeing here today, that  |
| 25 | doesn't strike me as frivolous.                             |

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

2

1          I am not suggesting that in the past it was

2     frivolous, Mr. Segal, but I'm not going to decide that today

3     because I'm going to continue this whole matter -- much of

4     this matter over until we resolve some of the other questions

5     which have arisen in the course of the bankruptcy.  And

6     particularly, I'm concerned with all of the appeals that are

7     before me, which make much of this very, very difficult.

8          It is the Court's present intention, but subject to

9     argument, that the Court will continue the temporary

10    prohibition against taking the depositions of Mr. Salyer or

11    Mr. Segal pending resolution of the appeals because it

12    appears to the Court that to a very large extent -- not a

13    very large extent, but to an extent that is significant, what

14    I do with those appeals will have some significant

15    consequences relative to the discovery.

16          I don't want to think out loud, but that's the

17    Court's present intention.

18          Position of the government?

19          MR. MATTHEW SEGAL:  None.  I am going to stand aside.

20          THE COURT:  Sir.

21          MR. CARLSON:  I'll move over here so I can use the

22    microphone.

23          Your Honor, the Trustee's position is that the

24    Trustee has an obligation to the creditors, obviously, to

25    protect their interests and believes that any stay of the

3

1  proceeding at this time would be to the detriment of the

2  creditors and of the estate.

3         Judge Bardwil considered that matter and found, in

4  fact, that it would be detrimental to the creditors to stay

5  the action at this time.

6         Now, obviously Mr. Salyer has an interest here.

7         THE COURT:  Oh, how kind of you to recognize it.

8         MR. CARLSON:  I didn't mean to be flip, Your Honor.

9         The standard that's set forth in the Keating case

10  obviously is the governing standard.  The Keating case asks

11  the question of whether there is a -- do the criminal and

12  civil actions spring from the same nucleolus of facts.

13         And we believe it is quite clear that they don't

14  spring from the same nucleolus of facts either factually or

15  temporally.

16         The criminal matters in the Indictment deals with the

17  prices that were charged by SK Foods to its customers and the

18  quality of the products provided to those customers.

19         None of those -- none of those criminal charges deal

20  with relationships between SK Foods and between the different

21  entities -- forming entities.

22         We think this is quite different from the adversary

23  proceedings which revolve around the relationships between

24  SK Foods and other farming entities with which it worked and

25  how assets were transferred back and forth between those

4

1    entities.  They're also temporally distinct.

2         The Indictment covers activities through April

3    2008 --

4         THE COURT:  Let me ask you:  Why do you think the

5    government wants you to have the power to listen to telephone

6    calls made by Mr. Salyer last week?  I'm making it up.  Maybe

7    it was two weeks ago.

8         Do you think that they might think that things going

9    on today might in some way affect their ability to convict

10   Mr. Salyer?

11        Sure you do.

12        Even if you have never practiced criminal law, which

13   is also true of Judge Bardwil, you know, common sense

14   suggests that.

15        MR. MALCOLM SEGAL:  Just briefly, Your Honor.

16        Of course I agree with Your Honor's ruling except to

17   say that since Your Honor issued that ruling, the Trustee

18   has -- Trustee's counsel has read that ruling far more narrow

19   than the way I think the Court intended.

20        Since you have issued the ruling, they've sent us

21   numerous letters indicating they're about to make motions

22   challenging our right to assert the Fifth Amendment

23   privilege.  They have bombarded us with additional discovery,

24   demanded answers to additional interrogatories, they've sent

25   us more interrogatories.  They won't stop.

5

1          THE COURT:  Just stop.  Just stop doing all that

2     until the Court rules.  Period.

3          I must confess to a certain disappointment that the

4     United States has not taken an appropriate position.  I've

5     been in this business 32 years.  I have never before...

6          Sorry.

7          The United States has always stipulated in these

8     situations.  And I understand that the United States is not

9     the prosecuting party here.  Not the point.

10          I don't want to hear from you, Mr. Segal.  I'm just

11     letting you know I'm disappointed.

12          MR. MATTHEW SEGAL:  There is another one that we

13     likely will move to stay because we do think it is related.

14     This one we don't.

15          THE COURT:  The Court will continue its stay.  I'm

16     not saying I ultimately will rule one way or another.  I've

17     got to understand more about what's going on in the

18     bankruptcy.  And my own judgment is that it is very, very

19     difficult.

20          I mean, you know, you can read the complaints down

21     below narrowly, as you are doing.  You can read them broadly,

22     as the defendant is doing.  And I just have -- I just want to

23     know a lot more than I know now.  So I'm continuing the

24     matter pending the hearing on the appeals.

25          The next motion is the motion for the Court to

6

1  determine that the privilege does not apply to the calls that

2  were overtly -- It is funny.  I didn't mean to characterize

3  it that way because I know what the answer is as soon as I

4  characterize it that way, but the problem is -- and the

5  defendant's counter motion to suppress.

6       The problem is, sir, I am told by the government, I

7  gather you do not deny, that there's a big sign that says, in

8  effect, "Whatever you say is going to be recorded," and the

9  implication reasonably being that means listened to and acted

10  upon.

11       Apparently, I'm told by the government, that when you

12  pick up the phone, the first thing that happens is you get a

13  message that says:  This is being recorded and you do so at

14  your own risk so to speak.

15       After that how can there be a belief in

16  confidentiality?

17       MR. MALCOLM SEGAL:  First of all, Your Honor, I

18  believe that the -- first of all, I believe we need an

19  evidentiary hearing on this matter.  Because the Jail Rule

20  Book, which was the handbook which was given to me as the

21  book that determines the rights of the prisoners while lodged

22  at the Sacramento County Jail, it says nothing about this

23  inhibition on the free exchange between the attorney and his

24  client.

25       THE COURT:  That's because there are, I am told by

7

1    the government -- And let me tell you that there are some

2    state practitioners who are really surprised to hear there

3    was this way of communicating from the jail because they take

4    the position and they tell their clients, the first thing

5    they say is, "Don't talk on the phone, on any phone."  Just

6    goes to show you what you know and what you don't know.

7          MR. MALCOLM SEGAL:  Then there is a second reason,

8    and that is that the defendant is locked down at the prison

9    23-and-a-half hours a day for the most part.  The only time

10   he's free on most days is after midnight or late in the

11   evening when my offices are closed and when all the

12   attorneys' offices are closed.

13         We did everything we could to preserve the

14   attorney-client privilege, including announcing at the

15   beginning of each call that this was an attorney-client

16   privileged conversation.

17         And we understand there is a purpose for the rule.

18   The purpose for the rule by which they record, apparently if

19   they do record those conversations, are for prison security

20   reasons.

21         Once they record that call, if they choose to listen

22   for security reasons, which they did not do here, they would

23   have heard immediately --

24         THE COURT:  No.  The government hasn't listened in.

25   We don't have any idea whether the -- I'm sorry.  I am

8

1  thinking this is a 1983 case.  The jail authorities listened

2  to ensure that it was nothing that involved security.

3        MR. MALCOLM SEGAL:  We don't know because they

4  haven't told us that.  What we do know is this:  We do know,

5  at the government's request, the jail ferreted out all of the

6  calls made between the defendant and known attorneys,

7  attorneys who had registered with the jail as representing

8  the defendant, and attorneys who had appeared in the line-up

9  room with him to go over the criminal discovery in this case.

10        The government asked the jail apparently to pull out

11 those recordings and deliver them to the government to listen

12 to.

13        We know from the government's documents that in at

14 least one case they did listen to the entire tape of a

15 conversation between the defendant and one of his attorneys.

16        I think that under the case law, notwithstanding that

17 warning, that a defendant is entitled to claim his

18 attorney-client privilege under those necessary circumstances

19 and to believe that his rights to an attorney will be

20 respected.

21        And most certainly, if the jail felt it had to record

22 those conversations, it should have alerted counsel that

23 counsel's conversations were being overheard.  And the

24 government, we believe, has a duty to tell the defense that

25 those conversations were being recorded and that they were

9

1    being delivered to the government.

2         This was an evidence collection effort on behalf of

3    the government.  They withheld those conversations in their

4    records.  They reviewed those conversations without telling

5    us for months that they had them.

6         Mr. Segal could have picked up the phone the first

7    time one of those calls was recorded and said to me:  We are

8    capturing attorney-client privileged conversations.  He chose

9    not to do that.

10        THE COURT:  The problem is -- And I don't mean to cut

11   you out, Mr. Segal.  I'll get to you in a minute because the

12   suggestion is that an evidentiary hearing may be -- I doubt

13   it -- but may have some relevance.

14        The problem is that you've characterized these as

15   "privileged conversations," but the essence of a privilege --

16   not the essence, but one of the elements of a privilege is

17   that it be viewed by the makers as privileged.

18        And while it may be true that the lawyers

19   misconstrued what was going on, Mr. Salyer couldn't because

20   he had been informed.  And you're not challenging, I gather,

21   that both the sign and the recorded message existed.

22        If it isn't confidential, then -- Why am I having

23   trouble speaking this morning?

24        If it isn't confidential, why is it privileged?

25        MR. MALCOLM SEGAL:  First of all, because when he was

10

1   on that phone call with his attorneys, the recorded voice

2   came on and said:  Conversations may be recorded by the jail

3   for security purposes.  I gather that's a private service

4   that does that.

5        Mr. Salyer heard the recording say that, then heard

6   his own attorney saying:  This is an attorney-client

7   privileged conversation.  And he relied upon that.  And he

8   relied upon it because his attorneys advised him of that.

9        And no one can argue -- And clearly we told him it

10  was an attorney-client privileged conversation.  I said that

11  on the tape recording they captured of me.

12       It seems to me he was entitled to rely upon that.

13  And those conversations, which took place at the only time of

14  day when he could be released to speak to his attorneys,

15  involved matters of bail, involved a number of issues that

16  pertained to this criminal case.

17       THE COURT:  Assuming that at an evidentiary hearing

18  the Court were to find that he could only make those

19  conversations -- make those telephone calls when he did

20  because he was locked down otherwise, why does that make it

21  any different than if he had used the appropriate --

22  apparently the appropriate way of communicating?

23       MR. MALCOLM SEGAL:  That's one of the reasons why I

24  would like to have an evidentiary hearing because I don't

25  believe there is a so-called "appropriate way" of

11

1    communicating.

2            The jail handbook doesn't tell anyone about it.

3    Frankly, I didn't even know it existed.

4            THE COURT:  Well, you're not alone apparently.

5            MR. MALCOLM SEGAL:  I've asked.

6            THE COURT:  I have personal reasons to know you're

7    not alone.

8            MR. MALCOLM SEGAL:  I've asked people who have been

9    former prosecutors in the U.S. Attorneys Office, people who

10   were criminal defense attorneys, people who believed --

11   defense attorneys who believed that when they say on that

12   phone call, when they get a call from the prison, "this is an

13   attorney-client privileged conversation," that that is

14   honored.  That's the current belief of many practitioners,

15   experienced practitioners before this court.

16           THE COURT:  Okay.  I really will get to you,

17   Mr. Segal.  I'm just trying to process what I'm told.

18           MR. MATTHEW SEGAL:  I didn't mean to seem anxious,

19   Your Honor.

20           MR. MALCOLM SEGAL:  Just one further fact?

21           THE COURT:  It doesn't matter whether you're anxious

22   or not.  He's not going to let you.

23           MR. MALCOLM SEGAL:  I want to fill up the air time.

24           The affidavit supplied by the government says

25   somewhere that I registered to be a caller from the jail.  I

12

1    know of no such registration.

2           You know, frankly I don't know how they got that.  I

3    signed on at one point to a private service where you deposit

4    money and they allow the prisoner to call you, and I think

5    that applies to civilians and attorneys, but I know of no

6    registration for the purpose of making the call.

7           THE COURT:  Sir?

8           I thought this was really easy.

9           MR. MATTHEW SEGAL:  Well, so did I, and I still do.

10          I think doctrinally it is easy.  Every time they

11   picked up the phone, they were told that they were being

12   monitored.  And this idea -- And everybody in this

13   courthouse, everybody in this district knows that the

14   government uses the jail calls for all kinds of things.  I

15   mean, that's just something that is common knowledge.

16          And the fact that they weren't aware of the

17   confidential call system, as in the Pelullo case, the one

18   from New Jersey with the white color defendant who called his

19   many attorneys, it doesn't change the fact that they held

20   this conversation in the overt hearing of a third-party.  It

21   is as if we were riding down in the elevator together.

22          THE COURT:  No, it isn't.  No, it isn't.

23          Just a minute.  Shush.

24          Mr. Segal, I will be candid with you.

25          MR. MATTHEW SEGAL:  Which one?

13

1          THE COURT:  Right you are.

2          Mr. Malcolm Segal, I will be candid with you that I

3     think you are up against very likely a loss.  But I think you

4     have -- but you certainly have the right to make a record.

5     And it sounds to me -- I mean nobody -- I'm in a trial that

6     is going to last at least until I retire and maybe six months

7     after that, but everybody suddenly wants a hearing.

8          It appears to me that this hearing is more than

9     simply an hour.  You're going to put on attorneys.  You're

10    going to call people from the jail.  You're going to get

11    your --

12         MR. MALCOLM SEGAL:  So there is no harm here, Your

13    Honor.  We originally intended to bring this motion on for

14    the hearings that were scheduled in September, no harm to the

15    government if we just continue the seal on these recordings

16    and schedule a hearing for September sometime.

17         Where is the government harmed?

18         THE COURT:  It doesn't matter.  I'll be in this trial

19    in September.  I'll be in this trial forever.

20         MR. MALCOLM SEGAL:  Schedule it for October.

21         MR. MATTHEW SEGAL:  There is one thing, Your Honor,

22    before --

23         THE COURT:  Go ahead.

24         MR. MATTHEW SEGAL:  There are two things I want to

25    say.

14

1          THE COURT:  Go ahead.

2          MR. MATTHEW SEGAL:  The first concerns an evidentiary

3 hearing.  If the defendant wants to put on witnesses to

4 support a claim that these conversations were privileged,

5 that's one thing.  But if he wants to start calling people

6 from inside the government to have his own kind of reverse

7 investigation of, you know, who listened to calls and what

8 people knew, the predicate for all of that is first

9 establishing that they're privileged.

10         THE COURT:  I'm satisfied that allowing the defendant

11 to make whatever record he needs to make is an appropriate

12 thing to do so that objection will be overruled.

13         But I am concerned -- Well, maybe I'm not concerned.

14         MR. MATTHEW SEGAL:  Let me tell you, I got a letter

15 from the defendant the other day listing out kind of eight

16 people in the government and asking, you know, can you make

17 them available.  And they're people in Brooklyn, people in

18 D.C..

19         THE COURT:  Why are you calling people in Brooklyn

20 and D.C.?

21         MR. MALCOLM SEGAL:  Sean Flynn was the Assistant US

22 Attorney on the on Franks versus Delaware motion.  It has

23 nothing to do with this motion.  It is a totally different

24 issue.  That's the motions -- the round of motions we just

25 filed to suppress evidence.

15

1          MR. MATTHEW SEGAL:  It is the case agent.

2          MR. MALCOLM SEGAL:  I'm trying to anticipate what is

3    going to happen in September.

4          THE COURT:  Okay.

5          MR. MATTHEW SEGAL:  Then the second point, moving

6    aside from the evidentiary hearing, is this:  I think the

7    Court -- I'm not going to argue the doctrine.  The Court is

8    probably wondering why are we doing this, right?

9          And I understand that that -- If it is not, I'm going

10   to keep quiet.

11         THE COURT:  You're doing it because you want to

12   gather evidence.  You know, what's wrong with that?

13         The question is whether you're gathering evidence

14   contrary to the Constitution.  Otherwise, you have a perfect

15   right to gather evidence.

16         MR. MATTHEW SEGAL:  All right.

17         THE COURT:  You know, I mean -- Despite Keating,

18   there is a constitutional issue here.

19         I didn't mean that.  Yes, I did.

20         How long is this hearing going to take?  Couple of

21   days?

22         MR. MALCOLM SEGAL:  No.  I don't think it will take

23   that long.  I would move right through it.  I think a day.

24         THE COURT:  You won't be putting anything on, do you

25   think?  Or maybe you will.  Who knows.

1          MR. MATTHEW SEGAL:  I know that -- The problem with

2     this is that the best evidence that we have that these calls

3     are not privileged is for the Court to listen -- is to listen

4     to the beginning of each call where the automated message

5     says:  You're being recorded.

6          THE COURT:  That portion you may play in court.

7     Indeed, you're directed to play it in court.

8          MR. MATTHEW SEGAL:  Okay.  And they kind of talk back

9     to it like -- I mean, you wonder how they -- what happens

10    when they call the cable company.  You know, they kind of

11    talk back to the machine.  That's -- So there is that.

12         If you're gonna -- It may be appropriate -- I mean,

13    the government's position here is that without regard to what

14    they talked about, these conversation aren't privileged

15    because they can't prove confidentiality.  It is the

16    defendant's burden of proof.

17         THE COURT:  Absolutely.

18         MR. MATTHEW SEGAL:  Okay.  It is also true, if the

19    Court is going to hear evidence, that they may in these

20    conversations not even be talking about things that would be

21    covered by the privilege.

22         I'm not interested in reviewing the evidence that

23    would prove that, but it is something that really should be

24    asserted on a call-by-call basis.

25         I don't know if the Court wants to --

17

1      THE COURT:  I don't agree with you about that.  If,

2  in fact, they are conversations between Mr. Salyer and his

3  lawyers, the Court can presume that he wasn't calling to find

4  out what they had for dinner.

5      MR. MATTHEW SEGAL:  There is one call -- Now that I

6  have heard the defendant's argument, there's a call where

7  they don't make that claim.  It doesn't start, "This is an

8  attorney-client call," and it might have been this person.

9  And it is my understanding that they don't talk about

10  anything like that.

11      THE COURT:  I mean, if there's some call in which

12  there is no assertion, then no matter what, Mr. Segal, that

13  call is clearly not privileged.

14      MR. MALCOLM SEGAL:  I respectfully disagree with the

15  Court because the attorney and the defendant, depending on

16  when that call occurred, believed that they had registered

17  their presence with the jail as an attorney representing the

18  defendant.

19      THE COURT:  But that's not the only thing.  For there

20  to be privilege, the conversation must address legal

21  matters --

22      MR. MALCOLM SEGAL:  And presumptively that occurs.

23      THE COURT:  -- and I'm told it had to do with

24  lunch.

25      MR. MATTHEW SEGAL:  Based on a summary.  Based on a

18

1    summary I read and my inference from counsel's argument.

2          MR. MALCOLM SEGAL:  I am frankly stunned at the

3    government's position on this because what that means is,

4    when I go and visit my client at the jail, unless every

5    minute I spend talking to him pertains to the case, that some

6    of that conversation is not privileged.  That's absurd.

7          THE COURT:  Mr. Segal, that exaggerates.  I don't

8    mean to be speaking for the government.  You would agree that

9    that exaggerates your position?

10          MR. MATTHEW SEGAL:  Yes.

11          THE COURT:  No kidding.

12          MR. MALCOLM SEGAL:  Can I give you a clear example?

13          THE COURT:  No.  This is not the time.  I will give

14    you an evidentiary hearing in which I will hear all of this

15    stuff.

16          MR. MATTHEW SEGAL:  We'll maintain the seal on the

17    tapes until --

18          THE COURT:  Thank you, sir.

19          MR. MATTHEW SEGAL:  We disclosed some more to the

20    defense while this was pending.  I will say from the time

21    that we filed that motion, until, you know, the future, we

22    view anything as fair game and they ought to know that.

23          THE COURT:  You are now informed, so that there will

24    be no doubt, that any conversations on the telephone, until

25    and unless this Court rules otherwise, are not privileged as

19

1  long as you are informed of that fact.

2          Now, that raises serious questions about

3  communications being not privileged when they're the only

4  possible way that, as a practical matter, the client can

5  speak with his lawyers.  And that's just going to have to be

6  the rule until September whenever because --

7          MR. MATTHEW SEGAL:  The confidential system is in

8  place.

9          THE COURT:  Well, get together with Mr. Segal, that

10  Mr. Segal, after the hearing and tell him how to get on that

11  because he's apparently not aware of it.

12          MR. MALCOLM SEGAL:  Well, it apparently doesn't work.

13  That's the point.  They record those conversation also.

14          MR. MATTHEW SEGAL:  That I have never heard.

15          MR. MALCOLM SEGAL:  I've heard that because an

16  attorney in town, who is a former Assistant U.S. Attorney, I

17  called them and asked them that question.

18          So what the government has done, and they are

19  pleased to do this, is they've continued to cripple the

20  defense by preventing us from speaking to our client when we

21  need to.

22          THE COURT:  You know, Mr. Segal, you usually don't

23  get trial paranoia until trial.

24          MR. MALCOLM SEGAL:  But, Your Honor, you can get

25  angry at any time.  This is that time.

20

1          THE COURT:  All right.

2          Well, I don't know what to do about that.  All I'm

3    telling you is that, at least insofar as the calls which

4    start off by saying, "Look out, I'm going to record this,"

5    you are on notice that unless the Court orders otherwise,

6    those are open for -- may be open for review until the Court

7    orders.  It is up to you to make decisions about that.

8          Madam Clerk, give me a date.

9          MR. MATTHEW SEGAL:  Can we get in touch with the

10   Court about this because we've got so many other dates

11   running here.

12         THE COURT:  Sure.  All right.

13         Call Ana.  And, you know, let me tell you no date

14   will be convenient.  So if you can, fix it on a Tuesday

15   because that way we'll just tell the jury not to come in that

16   day.  But if you can't, you know, you do what you can do.

17         All right.

18         Oh, the U.S. Government's motion to contribute to the

19   operation of the line-up room is denied.

20         Now we've got a bunch of other motions, I guess, that

21   are on today.  The motion to suppress evidence of warrantless

22   search.

23         MR. MALCOLM SEGAL:  Oh, no.  Your Honor, that was

24   just as part of our request for the permission to file a bail

25   motion.

21

1          MR. MATTHEW SEGAL:  You've got to let me file a brief

2    first on that one.

3          THE COURT:  Is that also true on the motion to

4    suppress statements?

5          MR. MALCOLM SEGAL:  Yes.  They all --

6          THE COURT:  All the rest of them.

7          MR. MALCOLM SEGAL:  What we did was indicated to the

8    Court in the document we filed that given the circumstances

9    at the jail, given the defendant's health, given the nature

10   of the motions we have filed, that are now on file with the

11   Court supported by the reports of the agents, we believe we

12   have shown a substantial reason why, A, the government's case

13   is weakened, and B, why the defendant should be -- at least

14   get some reconsideration of his bail.

15          And there is one additional factor which I did not

16   include, and that is that last week in front of Judge Hollows

17   Mr. Segal indicated to Judge Hollows that if he were required

18   to comply with Judge Hollows' order regarding the delivery of

19   Brady material to the defense, it would take him a

20   year-and-a-half to do that.

21          MR. MATTHEW SEGAL:  That's not what happened, Judge.

22          MR. MALCOLM SEGAL:  We'll get the transcript for Your

23   Honor.

24          Second of all, he said that he's been on the case for

25   five months.  He has not reviewed all the discovery in the

22

1   case.  No Assistant U.S. Attorney has reviewed all the

2   discovery in the case.  We think the defendant's bail should

3   be reconsidered

4          MR. MATTHEW SEGAL:  Your Honor --

5          THE COURT:  Sometimes I hear things that make me have

6   to stop and think about where I am.

7          Yes, sir.

8          MR. MATTHEW SEGAL:  Okay.  The Court will have --

9   Judge Hollows' determination will be brought up to this Court

10  also.  And it is not to turn over all Brady.

11         What the judge said was that the United States has to

12  go through what it already has produced and identify what we

13  think is exculpatory without knowing what the defense is in

14  this case, for example.  And I told the court that I have not

15  put eyeballs on every page.  I just haven't.

16         The Court knows the history of this case better than

17  I do which is the investigation was supervised by Mr. Lapham,

18  Miss Pings, Mr. Flynn, and then I came on for motions

19  practice and now here I am.  The person -- And so --

20         THE COURT:  I don't know what we're going to do about

21  this, but, you know -- I don't mean this -- I fear that it is

22  going to be mistaken.  There is much about this case, and

23  this, I suppose, will comfort the bankruptcy lawyers, but

24  there is much about this case which indicates that if it ever

25  goes to trial, I'll be very lucky.  It will be some other

23

1    judge because I'll be dead by then.

2         Millions of pages -- Stop talking.

3         MR. MALCOLM SEGAL:  I'm sorry, Your Honor.

4         THE COURT:  I'm sorry.  I didn't mean to raise my

5    voice.

6         MR. MALCOLM SEGAL:  I'm sorry I interrupted.

7         MR. MATTHEW SEGAL:  I can say --

8         THE COURT:  Please, it is not true that every time

9    the Court stops it's an invitation for somebody to talk.

10        This is a very complicated matter.  And every time we

11   get together I just ask myself how can this case be conducted

12   in a reasonable way that will ensure the defendant's rights

13   and protect the government's ability.  And the answer

14   sometimes appears to me to be so illusive...

15        MR. MATTHEW SEGAL:  May I make a suggestion?

16        THE COURT:  No.

17            (Brief pause.)

18        I don't think anything useful can be done -- anything

19   more useful can be done.  If you're going to bring up Judge

20   Hollows' order, we'll worry about it when you do.  If you're

21   going to do it, we'll worry about it when you do.

22        MR. MALCOLM SEGAL:  All I'm asking for, Your Honor,

23   is you instructed me at a previous hearing --

24        THE COURT:  I know what I did.

25        MR. MALCOLM SEGAL:  I'm only asking to file a ten

24

1    page bail motion.  That's all I'm asking for.

2          THE COURT:  If you file 10 pages, they got to file 10

3    pages, you got to answer, I got to read it all.  And reading

4    it all is -- Really, much of what is in your favor is all of

5    this going on, which to be candid, I don't really have a

6    strong understanding of.  I don't precisely know what the

7    bankruptcy appeals are all about and how they affect the

8    defendant.

9          I mean, I see how you perceive them to affect the

10   defendant, and it appears to me not to be unreasonable, but I

11   can't be certain without knowing.  And I can't know without

12   hearing the appeals.  And that's off in September somewhere.

13   I can't even remember where now.  And I see this as

14   inhibiting your ability to represent your client.  And if he

15   hadn't behaved -- Strike that.

16         It won't do any good to file it now because I've

17   still got to understand what's going on, and I don't think I

18   can.

19         MR. MALCOLM SEGAL:  If I could just file -- even if I

20   could file five pages, if I just told the Court what bail we

21   can post.

22         THE COURT:  All right.  You may file it.  You don't

23   have to answer unless I order you to.  The matter otherwise

24   is continued to whatever dates we've set.

25         THE CLERK:  September 8th.

25

```
 1            THE COURT:  September 8th.
 2            MR. MALCOLM SEGAL:  That's correct, Your Honor.
 3            Thank you, Your Honor.
 4            THE COURT:  That's the order.
 5            MR. MATTHEW SEGAL:  To the degree the request turns
 6    on the asserted merit of the motions that have been filed,
 7    the Court will just wait until we file our response?
 8            THE COURT:  That's exactly right.
 9            MR. MATTHEW SEGAL:  Thank you, Your Honor.
10            MR. MALCOLM SEGAL:  Thank you, Your Honor.
11            THE COURT:  Stand in recess.
12            Defendant is remanded to the custody of the
13    marshal.
14            (Off the record at 10:20 a.m.)
15                        ---o0o---
16
17
18
19
20
21
22
23
24
25
```

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3
   STATE OF CALIFORNIA   )
4  COUNTY OF SACRAMENTO  )

5

6
         I certify that the foregoing is a correct transcript
7
   from the record of proceedings in the above-entitled matter.
8

9

10                 IN WITNESS WHEREOF, I subscribe this
   certificate at Sacramento, California on this 12th day of
11 AUGUST, 2010.

12

13

14  /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
15        Official United States District Court Reporter

16

17

18

19

20

21

22

23

24

25