IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| | Plaintiff, | CR. NO. S-10-0061 LKK [GGH] |
| | vs. | |
| FREDERICK SCOTT SALYER, | | FINDINGS & RECOMMENDATIONS |
| | Defendant. | |

*Introduction and Summary*

The trial judge, Honorable Lawrence K. Karlton, referred the matter of discovery, and specifically the production of voluminous amounts of electronic and hard copy discovery to the undersigned, to advise on the impact of such discovery to motion and trial dates set, or to be modified, in the above criminal case. Unlike the usual discovery dispute – not enough produced – the dispute between the parties involves too much produced, in too many formats, and whether the defense has been given a fair opportunity within the parameters of an adversary system of criminal justice to make use of that discovery.

The undersigned first analyzes, as best he can, the history which led up to the present situation, the real problems faced by the defense, the solutions which have been launched at this time to alleviate any problems, the matter of a web-based common data base equally accessible to both parties, and finally the undersigned's evaluation of the defense readiness for

motions and trial in light of or despite discovery/resource problems.

*Case Background*[1]

      The United States believes that defendant Salyer, the one-time head of a large food processing company(s) involving, to a large extent, tomato products, and assisted by persons both within and outside his company, committed several commercial crimes over an extended period of time.  Specifically, Salyer is charged with racketeering activity, falsification of records and antitrust violations.  In general, Salyer's company, SK Foods, acquired tomatoes and other vegetables from growing enterprises, and through brokers or otherwise, sold processed products to large companies engaged in using the wholesale food products in retail/consumer products, e.g., catsup, salsa, spaghetti sauce, and the like.  The sixty-five page superseding indictment alleges that Salyer:

> preserv[ed, protect[ed] and enhanc[ed] SK Foods' profits and customer base through acts of mail fraud, wire fraud and bribery;
>
> caus[ed] purchasing agents and other employed by SK Foods' customers to breach a duty of loyalty and fidelity which they owed to their respective employers;
>
> increas[ed] SK Foods' profits by fraudulently inducing certain of SK Foods' customers to pay for adulterated and misbranded processed tomato products by causing the falsification of mold counts and other grading factors and data contained on quality control documents that accompanied customer-bound shipments of processed tomato products that were produced, purchased, and sold by SK Foods, and by actually shipping the adulterated and misbranded tomato products to customers along with the altered documentation;

Superseding Indictment at 10.

      SK Foods and its related companies were not a small operation.  It sold multi-million dollars worth of product to companies located throughout the nation.  It may well be (or was) international in scope, but the focus of this prosecution is United States based.  As is the case with all large companies with many customers involving large quantities of product, immense amount of records, paper and electronic, are involved.  The many years long scope of

---

[1] It is not the purpose of these Findings to document precisely the nature of SK Foods; the introduction is given merely to give context to the discovery problems herein.

1  the investigation (1998-2008) exacerbates the volume of records potentially relevant.  The
2  multitudinous number of companies with which SK Foods did business again increases the
3  volume of pertinent records in that SK Foods included documentation with or about its
4  shipments to the companies, and the companies themselves kept their own records.  SK Foods
5  use of "independent" brokers again multiplies the near mountain of records.  Added to this vast
6  array of documentation are the records created by the investigative agencies regarding its
7  investigation including wire recordings/transcripts, subpoenaed documents, and documents
8  acquired by search warrant.  There exists much duplication in the records acquired, but they must
9  be examined to some extent to see if discrepancies are extant.  It is probably no exaggeration to
10 state that 1-2 terabytes of information are involved.  A very visual definition of the amounts of
11 data involved appears in www.whatsabyte.com and is set forth in the footnote below.[2]  Of course,

---

[2] This is based on the IBM Dictionary of computing method to describe disk storage - the simplest.

Now let's go into a little more detail.
Bit: A Bit is the smallest unit of data that a computer uses. It can be used to represent two states of information, such as Yes or No.

Byte: A Byte is equal to 8 Bits. A Byte can represent 256 states of information, for example, numbers or a combination of numbers and letters. 1 Byte could be equal to one character. 10 Bytes could be equal to a word. 100 Bytes would equal an average sentence.

Kilobyte: A Kilobyte is approximately 1,000 Bytes, actually 1,024 Bytes depending on which definition is used. 1 Kilobyte would be equal to this paragraph you are reading, whereas 100 Kilobytes would equal an entire page.

Megabyte: A Megabyte is approximately 1,000 Kilobytes. In the early days of computing, a Megabyte was considered to be a large amount of data. These days with a 500 Gigabyte hard drive on a computer being common, a Megabyte doesn't seem like much anymore. One of those old 3-1/2 inch floppy disks can hold 1.44 Megabytes or the equivalent of a small book. 100 Megabytes might hold a couple volumes of Encyclopedias. 600 Megabytes is about the amount of data that will fit on a CD-ROM disk.

Gigabyte: A Gigabyte is approximately 1,000 Megabytes. A Gigabyte is still a very common term used these days when referring to disk space or drive storage. 1 Gigabyte of data is almost twice the amount of data that a CD-ROM can hold. But it's about one thousand times the capacity of a 3-1/2 floppy disk. 1 Gigabyte could hold the contents of about 10 yards of books on a shelf. 100 Gigabytes could hold the entire library floor of academic journals.

1  when one consider the terabytes of information in this case are comprised of thousands and
2  thousands of individual records, the mass of documentation acquired in the investigation and
3  turned over in discovery is extreme.
4        As set forth in the government brief to the undersigned, the categories of
5  documents produced to Salyer in discovery from different sources, and which nearly encompass
6  the waterfront of produced materials, are a useful way to view the conceptual problems involved
7  in production of massive amounts of electronic information:
8      1. The <u>first</u> category consists of documents such as the government[']s case files,
9  interview reports, photographs and items received from the informant.  These were OCR'd and
10  scanned into .pdf form and produced almost all with accompanying text searchable files.[3]
11      2. The <u>second</u> category consists of third party records [understood by the undersigned to
12  be non-SK Foods documents, e.g., Kraft Foods, Frito-Lay, Antitrust Division, and so forth]
13  received by the government in electronic form.  These were copied for the defense in the same
14  fashion received.  Almost all are text searchable [government included a footnote saying that *all*

---

Terabyte: A Terabyte is approximately one trillion bytes, or 1,000 Gigabytes. There was a time that I never thought I would see a 1 Terabyte hard drive, now one and two terabyte drives are the normal specs for many new computers.  To put it in some perspective, a Terabyte could hold about 3.6 million 300 Kilobyte images or maybe about 300 hours of good quality video. A Terabyte could hold 1,000 copies of the Encyclopedia Britannica. Ten Terabytes could hold the printed collection of the Library of Congress. That's a lot of data.

[3] [undersigned's note] Pdf is a very common format which issued when either scanning paper documents or in converting documents in other formats to an easily transferable, and generally unchangeable form.  However, a "plain" pdf document is not text searchable, in essence, it is simply a "photograph" of the document.  In order to make a pdf document (and other formatted types) "text searchable," an OCR (optical character recognition) process must be employed in the conversion process such that with the proper program, a computer can now recognize typed text and basic graphics with a high degree of accuracy.  This gives it a searchable attribute.  Care must be used, however, to ensure that the document remains unchangeable as a OCR process can oftentimes allow editing.  Indeed, the undersigned has at home, Nuance pdf converter software, which allows editing of pdf documents. Conversion settings, either by default or by manual setting, can assure the unchangeability. TIFF is another format popular for capturing images.  It is beyond the scope of this Findings (and beyond the undersigned's knowledge) to list all the variations that can exist in a TIFF format which make it difficult to utilize data in a TIFF format derived from numerous sources.

would be text searchable soon] and came with load files for Summation and Concordance.[4]

3. The <u>third</u> category consists of third-party records received by the government in paper form. These were scanned into electronic form and produced in text-searchable [format] with Summation and Concordance load files.

4. The <u>fourth</u> category consists of all paper records seized pursuant to search warrants. These have been meticulously organized in boxes by item number in the search warrant and are easily accessible to the defendant.

[undersigned's explanation][On Tuesday, April 5, the undersigned visited the FBI location where these documents were kept. Many boxes of documents existed in pods and in two rooms inside an office annex. However, the bulk of the documents were well organized and labeled shipping documents. These documents reflected a particular product shipped at a particular time along with product specification information. While there were many, many of these boxes, each containing voluminous records, if one had a particular shipment in mind, it would be relatively easy to acquire the documents for that shipment as the boxes were well labeled and organized. The remaining hard copy documents (some of which had been scanned and delivered to the defense already) were a pot pourri of records seized as a result of various search warrants and subpoenas. While the boxes were labeled, it would be difficult to understand what had been placed in each box without looking through it. Handwritten search returns were available for review, but as is generally the case, the descriptions on the return are fairly general. Arrangements were made to supply the defense with a master index (assumed to be fairly accurate) of all the boxes contained at the FBI facility. The FBI facility is a very secure setting. Any visitor is under escort at all times for chain of custody purposes and other reasons. This makes it difficult for the defense to engage in a review of documents in that conversations

---

[4] [undersigned's note] For litigation purposes, "load files" are used to import data into a database used to organize/manipulate information for pre-trial review, and to present information at trial or other hearing. Commonly used data bases are Summation, Concordance, Sanction, IPRO; there are others.

amongst the defense team are kept to a minimum. The fact that the boxes are in different locations adds to the difficulty; however, if one knows what he is looking for, the difficulty is manageable. The pods setting also makes it difficult to review documents when the weather is inclement. There are no desks or chairs in pods setting effectively limiting the time review can be made due to discomfort. Any copying to be done must be done by a copy service brought to the FBI facility for that purpose. ]

    5. The fifth category is a subset of category 4 and consists of selected shipping records tracing [according to the government] the shipping of moldy and/or mislabeled paste with altered documentation. These were culled by hand over a period of months in 2008. They have been scanned and the hard copies organized into about thirty binders which have been presented to the Defense. [undersigned's note][These binders constitute the heart of the government's fraud case. However, defense counsel refused to concede that this organization of the government's case aided the defense discovery efforts; this dispute is referenced further below.]

    6. The sixth category consists of the SK Foods inventory and quality control system, known as the "AAS" system. This was produced to the defense as a forensic image along with an explanation of how to recreate it as it ran at SK Foods at the time of the search. [undersigned's note][The forensic image referenced was actually the entire inventory and quality control system *database* as it appeared on the main SK corporate computer/server as of the date of the search. This database approaches a 500 gigabyte size (very large). The forensic copy (initially requested by Salyer) was only of limited value. Although it could be made searchable by means of special software, it is more difficult to find what one desires to find than when one was looking for the same information on the actual SK computer system housing the information and using SK systems/software. The United States, through sophisticated software manipulation, and the assistance of present or former SK employees, was able to actually "re-create" the SK computer database, and run it as if that database were being queried by an SK employee at the time of the search. The re-creation has the look of what the SK employee would see at the time

as well.  Salyer was told how to do this re-creation, but his experts did not have access to the SK employees who aided the government computer personnel when those personnel were re-creating the database, and Salyer's experts may have been unfamiliar with the proprietary software that SK was using at the time.  At hearing on March 30, the government offered to "give" Salyer (lend for the duration of the proceedings) an up-and- running re-created database.  At the April 5 "hard copy" site review, *two* of these re-created systems were given to the defense so that Salyer could utilize this re-creation himself in Monterey County.  A separate order will reflect this "gift."  This re-creation is very useful in attempting to correlate input/modified data on the system with initial handwritten data recordations.  A large part of the government's case involves its belief that the computer data was unlawfully modified, and the government plans to prove this by reference to the raw, handwritten data.]

    7. The <u>seventh</u> category consists of all of the other computers seized from SK Foods and the other subjects in the case.  These were produced as forensic images because that is what the defendant specifically requested.  The defendant does not contend that these are not searchable [however, special software must be employed to make forensic images searchable], only that the 25 or so hard drives are not searchable at once.  This is not a capability the government has either.

*The Problems/Issues*

    After consideration of all the submissions of the parties, the in-court demonstration, and the visit to the FBI hard copy document storage, the court finds that the following problems/issues have complicated expeditious pre-trial review of the massive amounts of information.  But first, the undersigned emphasizes that no party to this criminal action has acted in bad faith.  The government has attempted to mitigate the electronic discovery problems encountered by Salyer; indeed, the government has gone the extra mile in supplying Salyer part of its work product in terms of exhibits to be used at trial and re-creation of SK computer systems.  Salyer has been initially, legitimately overwhelmed by the amount of information to

7

review and organize, although the extent to which this initial state remains is not completely clear.

   1. Too Much Information From Multiple Sources

As is the case with many criminal cases in which much of the evidence will be found on electronic storage devices, the present method of operation is seize first, analyze later. The undersigned is not asserting that such is unreasonable per se, as the government has little practical choice but to perform the computer forensics to discover information pertinent to a search warrant or subpoena in a separate laboratory situation. The end result, however, is that much information seized will not be utilized in the case. The defendant, generally and in this case, desires to see *everything* that the government has collected, evidently not trusting the government's relevance analysis. The problem is, however, that as the information to be reviewed explodes exponentially, not much thought is given by the government during the acquiring phase to the effect on the defendant of having so much information to review, and the effect that such massive disclosure will have on the pretrial process.

And, the "too much" problem here, though not created by the government, is exacerbated because the information comes from various sources. As presently constituted, defendant has to maintain a separate data base, more or less, for each batch of discovery which arrives from a different source. While some issues in the case should not require the querying of every data base, as a particular issue may be associated with only one source, general issues, e.g, the giving of bribes/gifts, others may require looking into numerous sources. Separate hard drives with differing formatting requirements have to be loaded, or one CD replaced by another, has to be viewed. The problem here is analogous to having massive paper discovery organized by source all placed into separate rooms of scattered locale, all with somewhat differing organization. Trying to pin down all the differing responses to an e-mail discussing adulterated food products, e.g., the e-mail "thread," in-house memorandums, corresponding testing results, captured phone discussions, what is truly duplicative, and the like, would require getting up after

8

one room's search, and traveling to the next room, to the next room, and so forth. This is bound to take much extra time. It also takes electronic discovery expertise.

Thought to mitigate such potential delay accruing from the massiveness and separate source has come piecemeal as the defendant complains rather than from foresight. The fact that the government's lawyers/investigators often have the luxury of time (years) in which to organize and cull the pertinent information produces little empathy for the plight of the defense lawyer(s) who have to review the information within the time parameters of a criminal pretrial setting.

When the amount of information in a criminal case reaches the hundreds of gigabytes/terabyte stage, the government should consider whether *everyone* is better served if this information is placed in a common data base. See e.g., United States v. Perraud, 2010 WL 228013 *5 (S.D. Fla. 2010) ( a case involving the seizure of multiple computer hard drives and approximately 5,000,000 documents):

> Separate and apart from the discovery described above, on approximately August 1, 2009, the United States established iConnect, an online database to house all of the evidence in the Texas Action and the pending matter. Id. at 5. As the Government explains it, iConnect is an "[I]nternet-driven database that allows for the upload and search of volumes of documents and materials," which enables a user to view and search evidence from any computer with Internet access. Id. According to the Government, iConnect "has all the [G]overnment's documents relating to [the Texas Action], ... [but the Government] performed iConnect searches of ["]Raffanello,["]["]Perraud["] and related documents/employees and identified approximately 5,000 documents or [fewer]." D.E. 91-3. To facilitate discovery in both the Texas Action and the instant case, the Government asserts, it provided each defense attorney in both cases with access to iConnect so they may view and search the evidence that the United States has obtained in its investigation. D.E. 95 at 5. Among other information, the iConnect database includes the materials that the Government had previously provided to Defendant Perraud. Id. The United States sent defense counsel an e-mail instructing them how to access iConnect and provided each attorney with a manual to aid in searching the iConnect database. Id. at 6.

Whether this can, or should, be accomplished at this point is discussed below.

\\\\\

\\\\\

2. <u>Resources of Defense Counsel</u>

The problem is not the *"readability"* of the electronic discovery produced, although there have been some format glitches over the months, but in its *"useability."* as referred to in paragraph 1. It is one thing to be able to understand the facial substance of an electronic document (those problems have been largely solved, if not solved all together); it is quite another to be able to organize and present what one has been given.

Defense counsel in this case do not have the resources to quickly and efficiently organize and cull the electronic and hard copy paper discovery. In such a case, there is the need to coordinate immediately with computer forensic experts as well as the need to hire paralegal resources to help organize and review. While the undersigned is not privy to Salyer's remaining monetary assets, it is probable that Salyer cannot afford to retain such experts *long term* with a view to placing all of the produced information (electronically produced as well as hard copy documents) into a common data base, and then cull the wheat from the extensive chaff so as to be able to mount defense exhibits on a trial preparation/presentation software.[5] One of the government attendees at the in-court demonstration opined that it would cost between $1-2 million dollars to transfer all electronic discovery as well as to scan the hard copy discovery, into a common data base at this time.

Care must be taken to separate the discovery organization issues from those of presentation at trial. While defense counsel bemoan the fact that it would take hundreds of thousands of dollars to convert the [relevant] data produced in discovery onto a Summation platform, this is not a problem that the government can fix for the defense. "Searchable" discovery is one thing; "preparing it" for loading onto a defense counsel's chosen computer

\\\\\

\\\\\

---

[5] Defense counsel have apparently used experts on a sparing basis to help them overcome specific problems.

presentation device is quite another.[6]

It is also clear that the defense team does not have access to the number of support staff available to the government. Even with a searchable data base, either from multiple sources or a common data base, culling the pertinent information with a degree of accuracy will take time. Of course, it will take more time, if multiple sources, e.g., materials from the antitrust division, the SK Foods computers, and so forth have to be individually queried. However, the extent to which the defense *really* needs to review all of the seized information, or even have electronic access to it, remains unclear. This issue is discussed further below.

### 3. Technological Learning Curve

Quite a bit of time spent so far by the defense team, although that word may encompass two lawyers only, has been on a technology learning curve. There has been quite a bit of back and forth between the defense team and the government in that discovery has been produced in the absence of knowing (by the government) what the defense technological problems may be. It may well be the case that defense counsel, very skilled in all traditional respects, find themselves behind the technological knowledge curve when it comes to preparing an electronically based mega-documents case.

### 4. Salyer's Need To Review All Discovery

The defense has made clear that it desires Salyer's personal presence both at the defense law firm when necessary and when reviewing discovery on-site takes place. This "requirement" does cause delay in that Salyer's release conditions mandate permission for him to travel to Sacramento, or wherever, and then he has to be back home in Monterey County by a set time each day. This discovery schedule has to be coordinated with his counsels' schedule. The defense has a partial point here in that Salyer's participation in defense preparation is more extensive than usual.

---

[6] This is not so much a technology question, but one of time spent to cull out the trial evidence.

1    This is not the case where an individual criminal defendant in a white collar
2 corporate case has corporation behind him, assisting him however it can. Compare United States
3 v. W.R. Grace, 401 F. Supp. 2d 1069, 1080 (D. Mont. 2005). Rather, the *government* has the
4 assistance of former SK Foods employees and outside individuals associated with this case.
5 There is not a defense team as is often the case when similarly situated defendants are opposing
6 the attempts of the government to convict them as a group. Rather, as perceived by the
7 undersigned, Salyer himself is the sum total of the defense "corporate knowledge" of the years
8 long activities at issue in this case. The defense does rely on Salyer to instruct and interpret the
9 evidence. Thus, it is not unexpected that Salyer would play a large role in defense preparation
10 than might ordinarily be the case. It should also not be unexpected that this participation would
11 take extra time.

12    Nonetheless, the problem here should be receding in importance, especially in that
13 Salyer has been out of custody and aiding the defense for sometime. The lawyers in this case are
14 not clueless as to what the issues are, as well as the possible defenses. As all good lawyers can
15 do, and especially with significant time in this case under their belts, Salyer's present lawyers
16 should be able to determine the significance, or lack thereof, of most documents. Defense
17 resources would be better served if they were directed in the main at lawyers, paralegals and
18 experts at this time as opposed to completely facilitating Salyer's knowledge of all discovery.

19    5. Inability to Agree on the Precise Issues in Dispute and the Documents Needed

20    This problem would appear to be unlikely as the indictment is fairly specific with
21 respect to what is being charged. The indictment alleges several criminal law violation theories,
22 e.g., racketeering, wire/mail fraud, price fixing, but the factual overlays for each theory all rely,
23 more or less, on the same facts. The government has charged Salyer with fostering bribery in
24 order to get a leg up on his competition, with mislabeling or falsifying quality control
25 information sent to customers, thereby again, getting a leg up on the competition (by not having
26 to send higher cost, correctly labeled/documented product), with using bribes to acquire a

competitor's propriety information. The indictment breaks out specific examples of activities with specific companies. As referenced above, the government has supplied the defense team with binders setting forth a great deal of their falsification/mislabeling exhibits.

Rather than respond to the indictment allegations head-on, i.e., the alleged acts did not happen, the defense theory appears to be one created out of alleged business custom and practice. The undersigned uses the word "appears," as the defense theory has not been spelled out with clarity. The theory, directed to the falsification/mislabeling allegations, asserts that it was common practice for business entities such as those referenced in the indictment to informally relax their contractual standards as emergent difficulties popped up with respect to the food manufacturers' needs. That is, for example, business X which uses tomato products in its food products might have a shortage of that raw product if the contract specifications were rigidly followed. A phone call or e-mail would waive the standards for specific shipments.[7] The defense contends that broad document searches from multiple sources have to be undertaken in order to present this defense.

*Solutions and Timelines*

Motions to Suppress

The undersigned has reviewed the presently filed motions to suppress. An index of such motions appears at Docket #160. Two of the motions have been resolved, Docket #144, resolved Docket #273 (Motion re Warrantless Searches), and Docket 141, resolved Docket #276 (Motion to Suppress Jail Conversations). With respect to the first referenced motion, Salyer filed a memorandum asserting that more, yet undiscovered, documents were needed (Docket #250); this position was rejected by Judge Karlton.

\\\\\

---

[7] The undersigned does not know, however, why documents would have to be sent with alterations making it appear that contractual standards were met instead of a document which read in substance, "per our conversation, the X shipment is being sent with Y (less than contractual specifications) quality standards."

13

Four motions to suppress remain pending: Docket#147 (Motion to Suppress Statements), Docket # 151 (Motion to Suppress Search Warrants (based on information from wiretaps)), Docket # 154 (Motion to Suppress Illegal Wiretaps), and Docket #157 (Motion to Suppress Google e-mail Search). Some of these motions were accompanied by a significant documentary presentation. While any lawyer might desire to find one more document to submit as an exhibit prior to resolution, none of these motions should be significantly impacted by any remaining discovery problems. The motions, to the extent that they rely on documentary exhibits, are sufficiently referenced to discrete data bases and production of documents such that awaiting resolution of all discovery documents problems is not warranted. The defense has had sufficient ability, access to, and time to review/ present pertinent documents for its motions. The undersigned recommends that the trial judge schedule hearings as expeditiously as he desires.

Trial Preparation

Preparation for trial is a more difficult matter. The undersigned makes the following recommendations for the reasons given for each recommendation.

1. *The undersigned does not recommend that the United States be compelled to contribute to the cost of a common data base.*

First, there exists no tangible authority to compel such a contribution. The undersigned understands that some necessary flexibility exists in the Federal Rules of Criminal Procedure to order actions not expressly sanctioned in the Rules. See Salyer Order of July 9, 2010, at 6, 8-12; Salyer Reconsideration Order of August 2, 2010, at 3-4; W.R. Grace, supra. However, ordering the government to contribute some hundreds of thousands of dollars for the creation of a common data base which it would probably not utilize at this time (its work having been mostly done) is beyond flexibility and into a non-adversarial system of criminal justice. While the creation of such a data base might well have been appropriate if *voluntarily* created at an earlier stage when both sides could have utilized it, such is not appropriate ordered at this time. Perhaps, if the government has purposefully disorganized the discovery, the undersigned

14

might think further of ordering a common data base as a sanction, but purposeful (or mindless) disorganization of the voluminous documentation in this case did not occur. Moreover, the government has gone to some expense in making certain hard copy discovery electronically accessible. It has re-created the SK server data base, in part, for use by the defense and Salyer personally. The government has assisted in resolving some of defendant's technical problems.

Secondly, cost is a reason in the undersigned's opinion for not creating a common data base at this time. The transformation of documents presently in electronic form, but in different formats, into a commonly formatted data base could be done fairly efficiently. But even then the cost would run in the low hundreds of thousands.[8] If all the remaining hard copy documents were scanned, the total cost of creating a useable data base would range from approximately $350,000 to nearly $800,000. As set forth below, the undersigned would not recommend the scanning of the multitudinous customer shipping documents in any event. Approximately 40% of the cost would be saved thereby. Salyer professes no present ability to pay for the common data base, but if the Andorra trust funds became available to him, he might be able to contribute up to $250,000.

Next, the undersigned has no clear understanding of what the defense hopes to accomplish by creation of a common (all-in-one) data base. Yes, it would be easier to not to have to load different data bases on different computers, and it would be more efficient to perform document searches with one search instead of several. Salyer, personally, would have access to this common data base as well for whatever assistance he could provide.

However, most of the discovery is accessible electronically, and Salyer can be hooked up to computers in defense counsel's office with little cost involved. The re-created and quite searchable SK Foods data base has to be of much assistance to the defense team in any

---

[8] The undersigned asked the defense to supply bids for making a common data base out of the information in its present form, electronic or hard copy. The defense did so, submitting two bids and one still to arrive. The bids were informed, but tentative in nature.

event, and is a data base familiar to Salyer personally, and now one in his possession.  Moreover, if one were researching an asserted deal in which quality standards were waived by specific customers, that search can be directed at discrete data bases without the necessity of searching all-at-once the universe of companies with which SK Foods did business.  Indeed, one would think that the defense would start with the binders given to them by the government to see if any of the asserted waivers apply to the exhibits in the government's case.  The defense does not have to submit singular evidence relating to *every* business transaction over the course of years which involved waived quality standards; the defense can submit summaries, or combine illustrative exhibits with testimony to prove the point, if it in fact is provable. The great bulk of hard copy customer order documents at the FBI annex are well organized, and with sufficient pre-visit research, the purchase orders necessary to retrieve can be so retrieved without a great deal of difficulty, and with a minimum of visits.  There is no justifiable point to scanning these thousands and thousands of customer shipping documents.  The remainder of the hard copy documents to be reviewed entail various discrete searches/subpoenas which turned up, in all probability, redundant or unimportant material.  The defense has had time to peruse these materials over the last seven or so months.  In any event, and importantly, the government was ordered to perform a search of its materials to determine the existence of Brady/Giglio material, which in the defense words, revealed a "treasure trove" of useable, but heretofore, undiscovered by the defense team documents.[9]  To the extent that the defense has not already hand searched the miscellaneous documents, one could question the value at this point of scanning these documents into a common data base for the purpose of yet another search.

A main pillar of the government's charges, bribes to acquire business, are certainly charges to which focused searches can now be made, or have been made, and appear unrelated to the informally explained defense theory.  The same goes for the allegations of price

---

[9] Defendant's Reply memorandum, filed March 28, 2011 at 2.

fixing. The altered documents charge (minutes of the SK Board meetings) do not require omnibus searches.

For all of the above reasons, the undersigned does not recommend the ordering of a common data base with government (prosecution) participation.

2. *CJA Request*

Title 18 USC 3006A does not by its words require that a defendant be indigent for all purposes before an expense request paid for by CJA monies may be approved. The "expense" section of 3006A is distinct from that of appointing counsel for indigent defendants.

> (e) Services other than counsel.--
> (1) Upon request.--Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate judge if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.

These services referenced in subsection (e) do not require that "counsel" be CJA appointed counsel; neither will the undersigned.[10]

The key balancing on a CJA request is concerned with the cost of the requested services in light of its reasonably expected benefit to the defendant. In other words, would a retained counsel representing an adequately financed defendant reasonably expend the client's monies for these services. United States v. Chase, 499 F.3d 1061, 1066-67 (9th Cir. 2007) (defense entitled to expert for use in drug case where drug quantity was disputed). Section 3006A has constitutional underpinnings, see Ake v. Oklahoma, 470 U.S. 68, 76-77, 105 S.Ct. 1087 (1985). "[F]undamental fairness entitles indigent defendants to an adequate opportunity to present their claims fairly within the adversary system." Id. Thus, every defendant should have

---

[10] Direct case law on the issue could not be found after some searching.

"access to the raw materials integral to the building of an effective defense." Id. See United States v. Lefkowitz, 125 F.3d 608, 620 (8th Cir. 1997) (approval of $169,000, but not more, for expert advice in a large documents fraud sufficient for defense); United States v. Rivera, 292 F. Supp.2d 823 (E.D. Va. 2003) (jury consultant not a necessary expense).

As set forth in the previous section, the undersigned does not believe that the court has the authority to order the Executive Branch to share the cost with the defense of creating a common data base, and also, Salyer has not demonstrated a specific necessity for such. The undersigned believes that Salyer should, however, be permitted to attempt to acquire such funds, in whole or in part, through an ex parte showing of indigency (in light of the service requested) and its specific need. "Need" will be judged in terms of its necessity to the bringing of an effective defense. Not any potential or possible benefit will do – defendant must show that the cost (hundreds of thousands of dollars) justifies the requested services in terms of showing that an effective defense will be substantially impaired in the absence of such expenditures. Salyer should be able demonstrate real-life examples of his defense from his previous review of documents which could reasonably be viewed as a microcosm for an effective macrocosm defense based on a consolidation of the universe of evidence, and which could only be reasonably obtained if a common data base was created. On the other hand, a presentation only showing through the creation of a common data base that it *might* be easier to ferret out a yet specifically undefined defense which *might* be available by use of a common data base will not suffice.

3. *Trial Dates*

A CJA request to grant funds for the purpose of establishing a common data base should be made, if Salyer so desires, no later than 30 days from the date of a district court order reviewing these findings. Such a data base primarily obtained from information already electronically stored (again, not permitting the hard copy shipping order documents to be scanned, as such are usable without transformation to electronic form) could be created within

approximately 30 days from the date of approval.  If such services were approved for Salyer, the undersigned believes the defense could not be prepared for a late 2011, early 2012 trial.

*Conclusion*

        The undersigned summarizes his recommendations as follows:

        1. The court need not delay resolution of the various suppression motions due to the volume of discovery in this case;

        2. The government (prosecution) not be compelled to create, or share in the cost of creating, a common data base;

        3. If Salyer desires to do so, he be permitted to file *ex parte,* within thirty days of any district judge order adopting this recommendation, a CJA request for services in which he details his financial need for such, and the necessity for such with respect to preparation of an effective defense;

        4. That trial be scheduled for late 2011 or early 2012.

        These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Notwithstanding any lengthier period authorized by law, within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: April 18, 2011

                              /s/ Gregory G. Hollows
                              UNITED STATES MAGISTRATE JUDGE

salyer.dscyf&r