1  KEKER & VAN NEST LLP
   JOHN W. KEKER - #49092
2  jkeker@kvn.com
   ELLIOT R. PETERS - #158708
3  epeters@kvn.com
   BRIAN L. FERRALL - #160847
4  bferrall@kvn.com
   710 Sansome Street
5  San Francisco, CA  94111-1704
   Telephone:  (415) 391-5400
6  Facsimile:  (415) 397-7188

7  Attorneys for Defendant
   FREDERICK SCOTT SALYER

8

9

10              UNITED STATES DISTRICT COURT

11            EASTERN DISTRICT OF CALIFORNIA

12                 SACRAMENTO DIVISION

13

14  UNITED STATES OF AMERICA,          Case No. 2:10-CR-0061-LKK (GGH)

15                      Plaintiff,     **DECLARATION OF JOHN W. KEKER
                                       IN SUPPORT OF DEFENDANT'S
16      v.                             OPPOSITION TO THE
                                       GOVERNMENT'S MOTION FOR
17  FREDERICK SCOTT SALYER,            DISQUALIFICATION**

18                      Defendant.     Date:      August 9, 2011
                                       Time:      9:15 a.m.
19                                     Courtroom: 4, 15th Floor
                                       Judge:     Hon. Lawrence K. Karlton
20
                                       Date Comp. Filed:      February 18, 2010
21
                                       Trial Date:  April 17, 2012
22

23

24

25

26

27

28

I, JOHN W. KEKER, declare and state as follows:

1.     I am an attorney licensed to practice law in the State of California and before this Court.  I am a partner at the law firm of Keker & Van Nest LLP, counsel for Frederick Scott Salyer in this matter.  I state the following based on personal knowledge and, if called as a witness, could and would testify competently thereto.

2.     Attached hereto as Exhibit 1 is a true and correct copy of the FBI interview of Mark Stephen Grewal, dated April 17, 2008 and bates labeled USAO-003649-53.

3.     Attached hereto as Exhibit 2 is a true and correct copy a letter from Anna Tryon Pletcher to me, dated May 31, 2011.

4.     Attached hereto as Exhibit 3 is a true and correct copy of the Declaration of Frederick Scott Salyer, dated June 7, 2011.

5.     Attached hereto as Exhibit 4 is a true and correct copy of the ethical waiver signed by Mark S. Grewal, dated June 7, 2011.

6.     Attached hereto as Exhibit 5 is a true and correct copy of the Government's Unopposed Motion for a Hearing On Defense Counsel's Potential Conflict of Interest, filed in *United States v. Clemens*, Criminal No. 10-223 (RBW) (D.D.C.), filed on January, 21, 2011 (Dkt. 10).

I declare under penalty of perjury that the foregoing is true and correct.  Executed in San Francisco, California on July 28, 2011.


         /s/ John W. Keker
         JOHN W. KEKER

# EXHIBIT 1

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   04/17/2008

     Mark Stephen Grewal, also known as                    , White
male, date of birth              place of birth
California, Social Security number _____ , residing at
                  California 33245, telephone number
                was contacted at his residence.  Also present
during the interview was Richard Cohen, Antitrust Division, U.S.
Department of Justice.  Intermittently present during the
interview was Grewal's son who sat and listened to the exchange
of information.  Grewal was advised of the identities of the
interviewing agents through display of credentials and provided
with the agents' respective business card.  Grewal was advised
that the interview pertained to an investigation related to the
tomato processing industry and that he might have information
which would assist that investigation.  Prior to the interview,
Grewal was advised he was under no obligation to talk to the
agents present but that if he did so he should not lie since
lying to a federal agent was a federally prosecutable offense.
Grewal thereafter volunteered the following
information:

     Grewal owns Grewal Consulting Team, which operates out
of his residence.  He also has a farming business named Sandy
Valley Farms, LLC which is owned fifty percent by Rick Worth and
50% by him.  Among Grewal's many positions, he is on the Board
of Directors of a cooperative named Calamco and on the Board of
Directors of Custom Chemicides.  He is on the Founders Board at
Fresno States University and a member of the Lemoore Chamber of
Commerce.

     Grewal was President and Chief Operations Officer (COO)
at S K Foods from February 2005 to May 2007 but only served in
that position until December 2006.  As such he oversaw the
management of S K Foods.

     When Grewal was first hired Scott Salyer was President
and Chief Executive Officer of all the companies affiliated with
S K Foods.  Those companies included Cedenco in New Zealand  and
Australia, Colussa Canning, S K Foods and Salyer American Fresh
Food (SAFF).  When Grewal was employed by S K Foods, he reported
directly to Salyer.  Grewal was also on the Board of Directors
for SAFF, which processes lettuce and fresh produce.

Investigation on   04/16/2008   at  Lemoore, California

File #  318A-SC-39878 ╶╴260                    Date dictated

by   SA Harriet Dugal:hd
     108hd03.302

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency;

USAO-003649

318A-SC-39878

Continuation of FD-302 of ____Mark S. Grewal_____ , On _04/16/2008_ , Page ___2___

      Currently, Grewal is a consultant for S K Foods handling acquisition of raw produce. His consulting contract started in December 2007 and runs for ten months. Grewal is aware that Tom Welch, Don Blodgett and Larry Ryan, who were Vice Presidents of SAFF, left the company in the middle of 2007.

      Grewal explained he left S K Foods because of a conflict in management style with Scott Salyer. He believed that as COO he should be able to make operations decisions. Salyer made it clear that Salyer would make those decisions, as a result, Grewal          resigned.

      Grewal indicated that Alan Huey, S K Foods's marketing Vice-President, headquartered in Monterey, California was responsible for product marketing decisions. While Grewal was COO at S K Foods, Huey reported directly to Salyer.

      Grewal was replaced at S K Foods by Glen McClaran. Since his departure from S K Foods in December 2006 Grewal is not privy to the management organization within the company. Grewal indicated that he had interviewed McClaran when McClaran was seeking a position at S K Foods. At the time, McClaran wanted to be President of the company but Grewal indicated that he would be more suited in the Human Resource Department. Grewal believed McClaran lives in Clovis, California.

      Grewal knew Randy Rahal who lived in New Jersey. He described Rahal as a commissioned salesman. Rahal did not work for S K Foods and did not have any ownership in S K Foods. Rahal acts as a broker for S K Foods. Rahal's company is Intramark and he is the sole agent for that company. Grewal indicated that he has met Rahal and has spoken to him once, about a year and a half ago. Grewal could not remember the details related to that conversation.

      Grewal was asked whether he was aware of S K Foods' process of re-labeling product. Grewal indicated he was not aware that S K Foods was engaged in such conduct. It never happened while he worked at S K Foods. Grewal explained that the first labeling is done just out of production. When the product is re-packaged in smaller containers a second re-labeling takes place reflecting the quality content of the product.

USAO-003650

318A-SC-39878

Continuation of FD-302 of ___Mark S. Grewal_____ , On _04/16/2008___ , Page ___3___

      Grewal was familiar with the 'Bill and Hold" system by which S K Foods would sell in advance its product to a customer and hold it for the customer.  Grewal was asked whether S K Foods sold "bill and hold" product purchased by a specified customer to other customers.  Grewal stated that he was not aware of any such conduct taking place at S K Foods.  No bill and hold switch took place while he was COO at S K Foods.

      Grewal was asked if he was ever asked to misrepresent inventory on S K Foods books.  Scott Salyer never asked Grewal to "fudge" the inventory.  Grewal explained that Salyer never asked him to do anything inappropriate or unethical and Grewal stated that even if he was asked to do something like that he would not had done it.

      Grewal explained that S K Foods can borrow from lending institutions up to 60% of the value of its inventory.  The lending institution which finance S K Foods regularly send auditors to verify the company's inventory.

      Grewal explained that S K Foods is in partnership with Ingomar and Los Gatos in the exportation of processed tomato products.  In order to do that, those three companies formed a group called the California Tomato Export Group (CTEG).  CTEG was formed in 2006 so that the three companies could jointly export market product to foreign markets.  According to Grewal the three companies worked together not against each other.  There is no competition between them and they actually help each other when in need.  Grewal mentioned that the real competition is with Morning Star.

      The President of CTEG is Robert Wasson.  Wasson was recommended by Stuart Woolf.  Wasson is responsible for ensuring that the participants only discuss sales to foreign markets and do not engage in collusive conduct directed at the domestic market.  Wasson attends export shows to promote the companies' labels.  When Grewal was employed at S K Foods he used to represent S K Foods at the CTEG meetings.  Now, that Grewal no longer works there, he believes that Salyer represents the company at those meetings.  Ingomar is represented by Greg Pruett, and Los Gatos is represented by Stuart Woolf.  The CTEG members meet on a quarterly basis.  Grewal attended a couple of the 2006 CTEG meetings.

USAO-003651

FD-302a (Rev. 10-6-95)

318A-SC-39878

Continuation of FD-302 of ___Mark S. Grewal_____, On _04/16/2008___, Page ___4___

Grewal stated that no domestic prices were mentioned or discussed while he attended CTEG meetings. Grewal did not have any reason to believe that Salyer would discuss domestic prices with any of his competitors.

Grewal mentioned that Salyer had attempted to take over Ingomar but did not succeed. Grewal added that none of the company owners trusted each other and that on two occasions Salyer almost destroyed the positive working relationships between the CTEG members.

When asked whether the CTEG members used CTEG meetings to set domestic pricing Grewal indicated that the processing companies did not determine prices. Prices are primarily based on the prices offered by the California Tomato Growers Association (CTAG). Once CTAG sets the price for raw tomatoes, the processors determine their price by adding their processing costs and margin. CTAG set the price at $50 a ton last year. Grewal mentioned that the raw produce cost corresponds to 70% to 80% of the tomato processed product cost. Grewal stated that as far as he knew, domestic processed tomato floor prices were not discussed during CTEG meetings.

Grewal never participated in reverse auctions. While Grewal worked at S K Foods, the company did not participate in reverse auctions.

When he was COO of S K Foods, Grewal had three principal areas of responsibilities: 1) Making sure the plant was running properly; 2) Working with the Human Resource Department managed by Lisa Crist; and 3) Providing expertise related to purchasing raw tomatoes from growers. While Grewal was responsible for those areas, Jeff Beasley, Tony Manuel, Alan Huey and Mike Peretti were responsible for the Sales Department. Glen Long was in charge of quality control and Jennifer Dahman was a Customer Service Representative. Dalhman reported to Alan Huey. She made sure the customers received what they ordered.

Grewal admitted that while working at S K Foods he was responsible for most of the banking loan acquisitions. Initially he worked with Rick Washburn in dealing with the banks. Grewal had to ask Rick Washburn to leave his position as Chief Financial Officer (CFO) of S K Foods because he was not qualified to hold such a position. To replace him, Grewal hired Stacy Alexander who was a Certified Public Accountant (CPA).

318A-SC-39878

Continuation of FD-302 of ____Mark S. Grewal_____, On _04/16/2008___, Page __5___

She was first hired as a Controller and was promoted to CFO.
However Alexander left shortly after Grewal's departure because
she did not like working for Glen McClaran.  McClaran had hired
Karen Reinhart to take Alexander's position and demoted
Alexander.  Alexander did not like working with Reinhart either.

        Grewal indicated that he has entered into a contract
with Salyer to facilitate negotiations with the tomato growers.
Salyer owns SS Farms, a small farming company which is
harvesting tomatoes and fresh produce.  Salyer is not growing
produce but leases his farm land.  Grewal did not believe that
Salyer was a member of the CTGA.

# EXHIBIT 2



**U.S. Department of Justice**

Antitrust Division

---

*San Francisco Field Office*

*450 Golden Gate Avenue*                    *415/436-6660*
*Box 36046, Room 10-0101*                   *FAX 415/436-6687*
*San Francisco, California 94102*

May 31, 2011

VIA EMAIL & U.S. MAIL

John W. Keker
Keker & Van Nest LLP
710 Sansome Street
San Francisco, CA 94111

Re:    United States v. Frederick Scott Salyer, CR 10-0061 LLK

Dear Mr. Keker:

At a hearing in this matter on May 18, 2011, you entered a special appearance on behalf of defendant Scott Salyer and stated that you were considering representing him. As you are aware, your partner, Michael Celio, currently represents Mark Grewal. We write to express our concern that Keker & Van Nest LLP ("Keker & Van Nest")'s simultaneous or successive representation of Messrs. Salyer and Grewal may give rise to such a grave conflict of interest as to jeopardize any conviction that might result in this case. On May 25, 2011, we discussed this issue with Mr. Celio and, subsequently, asked him to inform you of our intention to write this letter setting forth the position of the United States.

On May 18, 2011, you represented that you had waivers from Messrs. Grewal and Salyer. The existence of waivers is not dispositive. *See, e.g.*, *Wheat v. United States*, 486 U.S. 153, 159 (1988); *United States v. Rewald*, 889 F.2d 836, 857-858 (9th Cir. 1989). Ultimately, in order to protect any verdict from review or collateral attack, the Court will have to evaluate the conflict and proffered waivers under applicable law. "[A] court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel." *Wheat*, 486 U.S. at 160.

Mr. Grewal was President of SK Foods, LP ("SK Foods") and reported directly to Salyer during the time covered by the Superseding Indictment. He is expected to provide evidence that Salyer used him as a go-between in collusive agreements with Stuart Woolf of Los Gatos Tomato Products ("Los Gatos") and Greg Pruett of Ingomar Packing Company ("Ingomar"). This expectation is based on review of Grewal's emails and consideration of your partner Mr. Celio's description of Grewal's anticipated testimony. It is, therefore, very likely that the government will call Mr. Grewal as a witness against Mr. Salyer.

John W. Keker
May 31, 2011
Page 2

       Should Mr. Grewal testify, he would, of course, be subject to cross-examination by Mr. Salyer. California Rules of Professional Conduct prohibit counsel from representing both a defendant and a witness who will be providing testimony adverse to that defendant. *See CA Eth. Op. 1980-52, 1980 WL 19389, \*3 (Cal. St. Bar. Comm. Prof. Resp.)* (finding that, in a criminal case, defense counsel "should not undertake to represent a client where it is reasonably foreseeable that the confidences or secrets of a former client may be, or reasonably appear to the client to be, used"); *see also In re Grand Jury Investigation*, 436 F. Supp. 818, 821 (W.D. Penn. 1977) ("whenever any type of immunity is offered by the government to Grand Jury witnesses, advice relating to such immunity should be forthcoming from an attorney who does not represent any people who could be hurt by such testimony. . . . There can be no better example of the ancient axiom that 'no man can serve two masters.'"). "[T]here can be no doubt that [the Court] may decline a proffer of waiver." *Wheat*, 486 U.S. at 162. If your firm represents both Mr. Salyer and Mr. Grewal, the government will move for disqualification and ask the Court to make an independent inquiry into whether conflict can be waived, whether the waivers are adequate, and whether the Court should exercise its discretion to allow representation under these circumstances.

<u>BACKGROUND</u>

       On April 16, 2008, the government executed a search warrant against SK Foods, a tomato processing company owned by entities controlled by Mr. Salyer. At that time, the government interviewed Mr. Grewal, a former SK Foods officer, in connection with possible fraud and price-fixing activity. On August 28, 2008, the government again interviewed Mr. Grewal, who, at the time, was represented by Roger Nuttal, a Fresno, California attorney. Beginning in November 2009, Mr. Nuttal and the government engaged in negotiations to reach a disposition of possible criminal charges against Mr. Grewal. On April 29, 2010 the Eastern District of California Grand Jury returned a twelve count Indictment against Mr. Salyer (*United States v. Salyer*, 2:10-CR-061 LKK, Doc 95) charging RICO, Fraud and Restraint of Trade violations.

       In May 2010, Mr Grewal engaged your partner, Mr. Celio, to represent him in this matter. Mr. Celio then engaged in negotiations with our office related to possible criminal action against Mr. Grewal. During those negotiations, we made clear to Mr. Celio that no matter what disposition was reached, Mr. Grewal would be called testify for the government in its prosecution of Mr. Salyer. On May 25, 2011, we informed Mr. Celio that the government was not going to prosecute Mr. Grewal for his involvement in conduct related to the charges against Mr. Salyer, but, based on information provided by Mr. Grewal and his attorneys, the government still intended to call him as a witness at trial.

       We anticipate that Mr. Grewal will provide evidence that Mr. Salyer entered into an agreement to fix the price of tomato paste sold to McCain Foods' American subsidiary, Ellio's Pizza, and to Con Agra. Mr. Grewal is expected to testify that Mr. Salyer asked him to contact Salyer's co-conspirators, Mr. Woolf and Mr. Pruett, to encourage them to follow the agreement. Mr. Grewal will state that the agreement included offering McCain and Con Agra, as well as others, tomato paste at $0.34 a pound. Mr. Grewal will testify that he followed Mr. Salyer's instructions by contacting Mr. Woolf and Mr. Pruett, both by phone and in person, and encouraging them to follow the agreement. He will also authenticate and testify about emails

John W. Keker
May 31, 2011
Page 3

between himself and Mr. Salyer in which Mr. Salyer reiterated the price agreement he had with Mr. Woolf and Mr. Pruett. Finally, Mr. Grewal will testify that the price agreement applied to domestic sales and, as a result, were not covered by the CTEG export trade certificate.

Mr. Grewal still needs attentive, non-conflicted counsel. His anticipated testimony and corroborating emails put him in the middle of a Sherman Act conspiracy and are at odds with certain unsworn statements that he made to investigators in this case.

ETHICAL ISSUES

Attorneys practicing in the courts of the Eastern District of California are required to comply with the standards of professional conduct required of members of the State Bar of California. Civil L.R. 180(e). The standards of professional conduct in California, as elsewhere, include duties of loyalty and confidentiality and prohibit conflicts of interest.

As one court described the duty of loyalty, "[a]ttorneys bear a fiduciary relationship of the highest character to their clients, and may not assume positions inconsistent with the interests of their clients. 'By virtue of this rule an attorney is precluded from assuming any relation which would prevent him from devoting his entire energies to his client's interests.'" *Tsakos Shipping & Trading, S.A. v. Juniper Gardon Town Homes, Ltd.*, 12 Cal. App. 4th 74, 95 (1993) (quoting *Anderson v. Eaton*, 211 Cal. 113, 116 (1960)). It does not matter "that the intention and motives of the attorney are honest. The rule is designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent." *Id.*; *see also Flatt v. Superior Court*, 9 Cal. 4th 275, 289 (1994).

As to confidentiality, it is the duty of every attorney "to maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." Cal. Bus. & Prof. Code § 6068(e)(1). The duty is permanent and, "[w]here the requisite substantial relationship between the subjects of the prior and current representations can be demonstrated, access to confidential information by the attorney in the course of the first representation (relevant, by definition, to the second representation) is *presumed* and disqualification of the attorney's representation of the second client is mandatory." *Flatt*, 9 Cal. 4th at 283.

With respect to conflicts of interest, California Rules of Professional Conduct prohibit lawyers from "(1) Accept[ing] representation of more than one client in a matter in which the interests of the clients potentially conflict; or (2) Accept[ing] or continu[ing] representation of more than one client in a matter in which the interests of the clients actually conflict; or (3) Represent[ing] a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter." Cal. R. Prof. Conduct 3-310(C). The rules also prohibit a lawyer from accepting employment "adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." Cal. Rule Prof. Conduct 3-310(E). The rules also prohibit a lawyer from accepting a

John W. Keker
May 31, 2011
Page 4

representation "where the member knows or reasonably should know that the member previously
had a legal, business, financial, professional, or personal relationship with a party or witness in
the same matter; and the previous relationship would substantially affect the member's
representation; or the member has or had a legal, business, financial, professional, or personal
relationship with another person or entity the member knows or reasonably should know would
be affected substantially by the resolution of the matter." Cal. Rule Prof. Conduct 3-310(B).

Mr. Grewal will likely be providing evidence against Mr. Salyer in a criminal trial. If you
accept representation of Mr. Salyer, your firm will be representing clients whose interests are
directly adverse. *See Ames v. State Bar*, 8 Cal. 3d 910, 917 (1973) (defining "adverse" as "(1)
acting against or in a contrary direction; (2) hostile, opposed, antagonistic; (3) in opposition to
one's interests: detrimental, unfavorable"). "An attorney's simultaneous representation of clients
with differing interests presents a classic situation of conflict. Each client is entitled to
unimpaired loyalty of counsel; an attorney representing clients with conflicting or potentially
conflicting interests may be tempted to favor the interests of one over the other." *Tsakos*, 12 Cal.
App. 4th at 96. As the California Supreme Court has held, simultaneous representation of clients
with adverse interests is "[t]he paradigmatic instance of [a] prohibited dual representation--one
roundly condemned by courts and commentators alike." *Flatt*, 9 Cal. 4th at 284, n3. The Court
described such a conflict situation as a "spectacle" that is "so patently improper" that it need not
even be addressed in codes of professional ethics. *Id.* The conflict would exist even if a
defendant and a possible witness against him were represented by separate attorneys in the same
firm. CA Eth. Op. 1979-49, 1979 WL 15841 (Cal. St. Bar Comm. Prof. Resp.) at 3. That is
because "it is the firm, not the individual attorney, which represents the client." *Id.*

We have doubts as to whether this type of conflict is curable by the clients' waivers. A
party may not consent to dual representation of conflicting interests "when there is an actual,
present, existing conflict and the discharge of duty to one client conflicts with the duty to
another." *Tsakos*, 12 Cal. App. 4th at 95-96 (citations omitted). "'As a matter of law a purported
consent to dual representation with adverse interests . . . would be neither intelligent nor
informed. Such representation would be per se inconsistent with the adversary position of an
attorney in litigation, and common sense dictates that it would be unthinkable to permit an
attorney to assume a position at a trial or hearing where he could not advocate the interests of one
client without adversely injuring those of the other.'" *Id.* (quoting *Klemm v. Superior Court*, 75
Cal. App. 3d 893, 898 (1977)); *see also Flatt*, 9 Cal. 4th at 284-85 ("[I]n all but a few instances,
the rule of disqualification in simultaneous representation cases is a per se or 'automatic' one.")
(citing *Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976) ("[A]dverse
representation is prima facie improper"); *Kelly v. Greason*, 23 N.Y.2d 368 (1968) ("[W]ith rare
and conditional exceptions, the lawyer may not place himself in a position where a conflicting
interest may, even inadvertently, affect, or give the appearance of affecting, the obligations of the
professional relationship.")).

Mr. Celio's withdrawal from the representation of Mr. Grewal would not cure the conflict.
"So inviolate is the duty of loyalty to an existing client that not even by withdrawing from the
relationship can an attorney evade it." *Flatt*, 9 Cal. 4th at 288. The California Supreme Court in
*Flatt* discussed the "hot potato rule," that is, "the bar on curing dual representation conflicts by
the expedient of severing the relationship with the preexisting client." *Id.* The Court noted that

John W. Keker
May 31, 2011
Page 5

"[t]he principle precluding representing an interest adverse to those of a current client is based . . .
on the need to assure the attorney's undivided loyalty and commitment to the client. . . . [T]he
automatic disqualification rule applicable to concurrent representation [cannot] be avoided by
unilaterally converting a present client into a former client prior to a hearing on the motion for
disqualification[.]" *Id.* (quoting *Truck Ins. Exchange v. Fireman's Fund Ins. Co.,* 6 Cal. App. 4th
1050, 1056 (1992)).

    The Supreme Court in *Wheat* expressed concerns about defendants who try to "whip saw"
the courts by proffering a waiver of conflict at trial and then arguing ineffective assistance on
appeal or collateral attack.  486 U.S. at 161; *see also Burden v. Zant,* 498 U.S. 433 (1991)
(reversing rejection of defendant's conflict of interest *habeas* claim when counsel represented
both a material witness and defendant.)  The trial courts thus have discretion to reject the waivers
that you indicate you have.  *Id.* The government also has standing because "[u]nder the Sixth
Amendment, a criminal defendant has the right to be represented by counsel whose loyalties are
undivided." *United States v. Christakis,* 238 F.3d 1164, 1168 (9th Cir. 2000) (citing *Wood v.
Georgia,* 450 U.S. 261 (1981); *Mannhalt v. Reed,* 847 F.2d 576, 579 (9th Cir. 1988)); *see also
Alberni v. McDaniel,* 458 F.3d 869, 870 (9th Cir. 2006)); *United States v. Basho Elliot,* 444 F.3d
1187, 1193 (9th Cir. 2006); *United States v. Mett,* 65 F.3d 1531, 1534 (9th Cir. 1995); *United
States v. Wheat,* 813 F.2d 1399, 1402 (9th Cir. 1987), *aff'd on other grounds,* 486 U.S. 153.

    The United States, like the Court, has an interest in the integrity of any verdict in this case.
Thus, if you make a general appearance for Mr. Salyer in this case, the United States intends to
move to disqualify Keker & Van Nest from simultaneous or successive representation of Messrs.
Salyer and Grewal.  If you are aware of authority that would permit or require the Court to allow
your firm to represent both a corporate president on trial and the CEO who is testifying against
him, please call it to the attention of the undersigned.

                    Sincerely,

                    /s/

                    Anna Tryon Pletcher
                    Richard B. Cohen
                    Tai S. Milder
                    Trial Attorneys, Antitrust Division

cc: Michael Celio, Esq.

# EXHIBIT 3

MALCOLM S. SEGAL – 075481
JAMES P. MAYO – 169897
SEGAL & KIRBY LLP
770 I Street, Suite 1440
Sacramento, CA  95814
Telephone: (916) 441-0828
Facsimile: (916) 446-6003

Attorneys for Defendant
FREDERICK SCOTT SAYLER

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 2:10-CR-0061-LKK |
|---|---|
| Plaintiff, | **DECLARATION OF FREDERICK SCOTT SALYER** |
| v. | Judge:     Lawrence K. Karlton |
| FREDERICK SCOTT SALYER, | Trial Date:  April 17, 2012 |
| Defendant. | |

I, F. Scott Salyer, declare as follows:

1.      I am the Defendant in *United States v. Salyer*, Case no. 2:10-CR-0061-LKK, currently pending in the Eastern District of California.

2.      I am in the process of retaining John W. Keker and Elliot R. Peters of Keker & Van Nest, LLP, to represent me, together with my current attorney Malcolm S. Segal, Segal & Kirby, LLP, during pre-trial proceedings and at trial of the above-captioned indictment. I believe that they are the best team to represent me. Consequently, they are counsel of my choice.

3.      When I first approached Mr. Keker about representation in this case, he advised me that other partners at his firm already represented Mark Grewal in connection with the investigation which led to my indictment. I advised him that I did not believe a real conflict existed between Mr. Grewal and me, and if it did, I wanted to waive that conflict.

4.      I have read and reviewed with Mr. Segal and Mr. Keker the letter dated May 31,

1

1   2011, from trial attorneys in the Antitrust Division to Mr. Keker. That letter is attached to this

2   Declaration as Exhibit 1. While I doubt some of the factual allegations in it, I understand that the

3   prosecutors are alleging that Mr. Grewal will give testimony adverse to me. Knowing that, I still

4   wish to have Mr. Keker and Mr. Peters represent me, and seek by this Declaration to provide the

5   informed written consent required by the California Rules of Professional Conduct.

6       5.      If Mr. Grewal testifies as a government witness at my trial, I understand that he

7   will be cross-examined by my current lawyer, Malcolm Segal, and not by a member of Mr.

8   Keker's firm. That is fine with me and I waive any trial or appellate rights that could

9   conceivably result from having Mr. Segal prepare for and then examine Mr. Grewal as a witness.

10      6.      I understand that should the Government call Mr. Grewal as a witness, Mr. Segal

11  will, of course, not be given access to any information obtained by Keker & Van Nest, LLP by

12  reason of its representation of Mr. Grewal and will examine him based on information already in

13  his possession and such separate investigation as he may pursue independent of Keker & Van

14  Nest's efforts in the case.

15      7.      I have discussed with Mr. Keker and with my current counsel, Mr. Segal, the

16  potential drawbacks of having Mr. Grewal represented as a witness by a partner in Mr. Keker's

17  firm, and have been made aware of the dangers and possible consequences of Mr. Keker's

18  partner representing Mr. Grewal during his testimony at trial. I am prepared to be examined by

19  Judge Karlton *in camera* and on the record so that the Court can satisfy himself of my

20  understanding, and that I am making a knowing and voluntary waiver of my right to complain of

21  conflicted representation because the Keker firm also represents Mr. Grewal.

22      8.      I object to the Government's effort to deny me my counsel of choice. I want

23  Messrs. Keker and Peters to join with Mr. Segal to represent me in the fight of my life. I believe

24  the Government has already denied me my rights in many ways, and believe the best team to

25  defend me is the one I have chosen. I am confident they will protect my rights, and my

26  confidential information.

27

28

2
DECLARATION OF FREDERICK SCOTT SALYER
CASE NO. 2:10-CR-0061-LKK

9.     In case this Declaration is not already clear enough, I waive any and all rights to complain that the lawyers of my choice, John Keker and Elliot Peters, from Keker & Van Nest, have a partner(s) who has and does represent Mark Grewal in connection with my case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration was signed in Monterey, California.

Dated:  June 7, 2011

F. SCOTT SALYER

561720.01

DECLARATION OF FREDERICK SCOTT SALYER
CASE NO. 2:10-CR-0061-LKK

3

# EXHIBIT 4

LAW OFFICES

# KEKER & VAN NEST
### LLP

710 SANSOME STREET
SAN FRANCISCO, CA 94111-1704
TELEPHONE (415) 391-5400
FAX (415) 397-7188
WWW.KVN.COM

MICHAEL D. CELIO
MCELIO@KVN.COM

June 3, 2011

**VIA U.S. PRIORITY MAIL**

Mark S. Grewal
564 Philan Circle
Lemoore, CA 93245

Re:     *United States v. Frederick Scott Salyer*, CR. 10-0061 LLK

Dear Mark:

Pursuant to our retainer letter dated May 13, 2010, we have been representing you in connection with a criminal investigation regarding SK Foods being conducted by the Antitrust Division of the Department of Justice and the United States Attorney's Office in Sacramento. We have met with lawyers from the Antitrust Division, who have informed us that you may be a subject or a witness in connection with that investigation. You have not been charged and we have not been told that you will be charged. Indeed, in a letter I received this week, the Department of Justice stated that you would <u>not</u> be charged. (A copy of that letter is enclosed).

The investigation also concerns the conduct of F. Scott Salyer, the former CEO of your former employer, SK Foods. Mr. Salyer has been indicted by the United States Attorney in Sacramento, and faces a trial on multiple charges regarding SK Foods products, including racketeering, fraud, bribery, and anti-trust violations. As we have explained to you, Mr. Salyer has asked our firm to represent him in the criminal case, and we understand that you are in favor of Mr. Salyer having our firm available to represent him in this criminal case and are therefore amenable to taking steps to permit that to happen, notwithstanding the potential for conflicts between our firm's representation of you and our firm's proposed representation of Mr. Salyer. The purpose of this letter is to (1) explain to you the nature of the potential conflicts of interest, (2) describe how we would propose to handle them in representing both you and Mr. Salyer, (3) recommend that you seek independent counsel with respect to the waiver contained in this letter, and then (4) if, based on your reflection and independent advice, you choose to waive the potential conflicts, provide a place for you to sign and effectuate that waiver.

You and Mr. Salyer each have independent, personal interests in connection with these investigations. Each of you desire not to be prosecuted, convicted or sued civilly in connection with any alleged wrongdoing. Since you worked together, and played separate roles in the conduct under investigation, there is a potential for conflict. You may have information that could be used against Mr. Salyer. He may have information that could be used against you. You each have an interest that confidential information you may have furnished to your attorney not be used in any way against you, and that it remain confidential. That potentially would become an actual conflict if you were asked to testify against Mr. Salyer. Absent a waiver, it would

Mark S. Grewal
June 3, 2011
Page 2

likely not be possible for the same law firm to represent you and Mr. Salyer. Indeed, in the letter confirming your status as a witness, not a target of the investigation, the government has asserted an actual conflict exists.

To protect your interests, our firm will screen Bob Van Nest and me from any involvement in the Salyer case. Bob and I will not discuss that case, or have access to any documents, pleadings or information pertaining to that case. We will not discuss with any lawyer working on the Salyer case anything about you or our firm's representation of you. Bob and I are the only lawyers at this firm who have worked on your case. The files in your case and Mr. Salyer's case will be prominently marked so that no lawyer working on one case, has access to any information about the other.

In the event that you were ever called as a witness against Mr. Salyer, our firm would have nothing whatever to do with cross-examining you, or preparing the cross-examination of you. All preparation for, and actual examination of you would be conducted by a separate attorney, not affiliated with our firm. At present, we anticipate that would be Mr. Salyer's present counsel Malcolm Segal, with whom you have no relationship and have had no prior dealings.

You should seek independent counsel regarding this letter and the meaning of the waiver you are offering to sign.

Pursuant to these proposed arrangements, and subject to your signing the waiver of conflicts appearing below, Bob and I will continue to represent you vigorously in connection with this investigation. We are aware of no impediment, ethical or personal, to our doing so going forward, if there is a waiver.

Very truly yours,

MICHAEL D. CELIO

MDC/gap

Enclosure

Having been advised of the nature of the potential conflict of interest between Keker & Van Nest's representation of me and its proposed representation of F. Scott Salyer, and having sought and obtained independent legal advice on that subject, I hereby waive any potential conflicts that I am able to waive, pursuant to the terms set forth in this letter.

Dated: 6/7/2011

By: Mark S. Grewal
Mark S.Grewal

558006.01

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **Criminal No. 10-223 (RBW)** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **WILLIAM R. CLEMENS,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## GOVERNMENT'S UNOPPOSED MOTION FOR A HEARING ON
## DEFENSE COUNSEL'S POTENTIAL CONFLICT OF INTEREST

The United States of America, through its attorney, the United States Attorney for the District of Columbia, respectfully requests that this Court conduct an inquiry into the potential conflict of interest of defense counsel Rusty Hardin, Esq., and his firm, Rusty Hardin & Associates, in their representation of defendant William R. Clemens. As discussed below, the government believes Hardin and his firm are barred from cross-examining government witness Andrew Pettitte should the case proceed to trial. Mr. Hardin and his firm, for a short time in early December of 2007, represented both defendant Clemens and Mr. Pettitte in related matters and, therefore, Mr. Hardin and his firm would potentially have a conflict as to which client's interest to protect, that is, that of Mr. Clemens or Mr. Pettitte. Assuming, however, that appropriate steps have been taken and continue to be taken to protect co-counsel Michael Attanasio, who is with a different firm, from any privileged information, and that defendant Clemens is willing to waive any potential conflict, the government does not object to Mr. Attanasio cross-examining Mr. Pettitte. Defense counsel does not object to a hearing on this matter.

### A.  Background

1.  On August 19, 2010, a District of Columbia Grand Jury returned a six count indictment against defendant Clemens.  The indictment charged one count of Obstruction of Congress, in violation of 18 U.S.C. §§ 1505 and 1515(b), three counts of False Statements, in violation of 18 U.S.C. §§ 1001(a)(2) and (c)(2), and two counts of Perjury in violation of 18 U.S.C. § 1621(1). On August 30, 2010, defendant Clemens was arraigned before the Court.

2.  As further detailed in the Government's Indictment, this case arises from defendant Clemens's statements in a 2008 Congressional hearing titled "The Mitchell Report: The Illegal Use of Steroids in Major League Baseball."  That hearing, as suggested by the title, related to an investigative report released by former Senator George Mitchell on December 13, 2007, as to the use of performance-enhancing drugs by players in Major League Baseball.

3.  Prior to the release of the Mitchell Report, but in anticipation of it, in early December of 2007, attorney Hardin and other members of his firm met with Clemens and Pettitte separately to discuss the anticipated Report, engaging in apparent privileged conversations.  As discussed in more detail below, Hardin and other members of his firm apparently talked with Clemens and Pettitte separately about the potential of them being named in the Report as alleged users of performance-enhancing drugs, allegations provided to Mitchell by Brian McNamee, a former trainer for Clemens and Pettitte.  Thereafter, investigators for Hardin's firm met with McNamee in New York to discuss these matters.  At that time, the investigators provided to McNamee two authorizations dated December 11, 2007, signed respectively by Clemens and Pettitte, stating in relevant part that "[t]his is to confirm that [the investigators] work for the law firm that represents me."  (Attachment #1; Authorizations).  After the December 13, 2007, release of the Report, Hardin held a press conference

2

in which he, among other things, announced that he had been retained to represent Clemens, but not Pettitte, and that Clemens denied the allegations in the Mitchell Report.

4.   On December 15, 2007, Pettitte issued a statement confirming McNamee's statements in the Mitchell Report as to Pettitte, that is, that he had used human growth hormone.  Leading up to the Congressional hearings on February 13, 2008, Pettitte gave a deposition to Congressional staffers on February 4, 2008.  During the deposition, Pettitte was asked if he was represented by Hardin in early December of 2007, and Pettitte said that he was.  Pettitte Deposition, at 66 (Attachment #2; relevant pages of deposition).  On February 8, 2008, Pettitte provided an Affidavit in the Congressional investigation in which he recounted a conversation in 1999 or 2000 with Clemens in which Clemens admitted to Pettitte his own use of human growth hormone.  (Attachment #3; Affidavit).  In the Affidavit, Pettitte also admitted his own use of human growth hormone in 2002 and 2004.

5.   Subsequent to the release of he Mitchell Report, attorney Hardin, on January 6, 2008, filed on behalf of Clemens a defamation action against McNamee in state court in Harris County, Texas, based on McNamee's claims Clemens used performance enhancing drugs.  The action was removed to the United States District Court for the Southern District of Texas about a month later. Clemens v. McNamee, Case 4:08-cv-00471, Dkt. No. 1.  The defendant in that action, McNamee, thereafter filed a motion to disqualify Clemens's attorney, Rusty Hardin, and his firm, from representing Clemens.  McNamee based his motion on an alleged conflict resulting from Hardin and his firm having represented both Clemens and Pettitte, a potential witness adverse to Clemens, for a limited period of time in matters related to the civil action.  Id., Dkt. No. 21. Hardin opposed that motion, relying on three arguments:  (a) that Clemens's interests and that of Pettitte were not

materially adverse; (b) any potential conflict with Pettitte would be resolved by Clemens's retention

of unconflicted co-counsel to handle any tasks adverse to Pettitte and the employment of screening

measures between Hardin and co-counsel; and (c) McNamee did not have standing to complain

about a potential conflict of interest involving Pettitte. Id., Dkt. No. 23 at 8-23 (Attachment #4, but

excluding Exhibits C-E as not relevant to this motion). The district court judge, relying on the latter

ground, that is, lack of standing, denied McNamee's motion. Dkt. No. 30 at 1; also at 2008 WL

1969315, at *1 (S.D. Tex. 2008).[1]

     6.   In the Memorandum and Order denying McNamee's motion, the district judge set forth

most of the facts relevant in the instant case as to the potential conflict by Hardin and his firm:

> The facts surrounding McNamee's Motion are essentially uncontested.
> According to Plaintiff William Roger Clemens and his attorney, Rusty Hardin, on
> December 5, 2007, Hardin received a phone call from a sports agent, Randy
> Hendricks, who represented both Clemens and Andy Pettitte, a professional baseball
> player who is not a party to this lawsuit. During this phone call, Hardin learned that
> McNamee had alleged to Senator George Mitchell and others, during a private
> investigation commissioned by Major League Baseball, that both Clemens and
> Pettitte had used performance enhancing drugs, and that the two baseball players
> might be interested in retaining Hardin to help defend them against the allegations.
> Neither Hardin nor his firm, Rusty Hardin & Associates, P.C. ("RH & A"), had any
> dealings with either Clemens or Pettitte prior to this phone call.
>
> On December 7, 2007, Hardin and other members of RH & A met with
> Hendricks to review a copy of a tape-recorded phone conversation between
> McNamee and one of Hendricks' colleagues in which McNamee discussed his

---

[1]  On February 12, 2009, the district court granted, in large part, McNamee's motion to
dismiss Clemens's action against him for lack of personal jurisdiction. Clemens v. McNamee, 608
F.Supp.2d 811 (S.D. Tex.), reconsideration denied, 638 F.Supp.2d 742 (S.D. Tex. 2009). That
dismissal was affirmed on appeal. 615 F.3d 374 (5th Cir. 2010). Subsequent to Clemens filing his
defamation action, McNamee filed a similar action against Clemens in state court in New York,
which was then removed to the United States District Court for the Eastern District of New York
on April 22, 2009. McNamee v. Clemens, Case#1:09-cv-01647-SJ-CLP, Dkt. No. 1. A motion to
dismiss filed by Clemens, which McNamee opposed and for which the court held a hearing, but has
not yet ruled, is pending in that matter. Id., Dkt. Nos. 26 and 27; Dkt. Entry 9/8/10.

allegations.  On December 9, 2007, Hardin and other members of RH & A met with Clemens and Pettitte in person and proceeded to interview each separately, first speaking with Clemens, then Pettitte.  According to Hardin, each individual was interviewed outside the presence of the other.

On December 12, 2007, RH & A sent two investigators to speak with McNamee in person about his allegations.  The investigators arrived bearing two documents, signed by Clemens and Pettitte, respectively, each stating, "This is to confirm that [the investigators] work for the law firm that represents me."  (Def.'s Motion, Doc. No. 21, Ex. D.)  The investigators spoke to McNamee for several hours, and later that evening they debriefed Hardin and Clemens as to the details of their discussion.

On December 13, 2007, Senator Mitchell released his report, which included McNamee's allegations about Clemens and Pettitte.  The same day, Hardin held a press conference at which he announced that he had been retained to represent Clemens, but not Pettitte.  Subsequently, Pettitte confirmed McNamee's allegations about him; Clemens denied them and filed this lawsuit alleging defamation.  Shortly thereafter, McNamee filed the instant Motion, arguing that Hardin's prior joint representation of both Clemens and Pettitte created a conflict of interest requiring the disqualification of Hardin and RH & A.  Pettitte ultimately retained his own counsel; his public testimony regarding Clemens' use of performance enhancing drugs has been subject to various and conflicting interpretations, and is likely to be central to this lawsuit.  Pettitte has neither consented nor objected to Hardin or RH & A representing Clemens, although McNamee's attorney has submitted a sworn declaration stating that, according to Pettitte's current attorney, Pettitte will not waive any attorney-client privilege that attaches to his communications with Hardin.  (Decl. of Richard D. Emery, Doc. No. 21, ¶ 6.)[2]

Id., at 1-3; also at 2008 WL 1969315, at *1 (S.D. Tex. 2008).

---

[2]  The footnote at this point in the Memorandum and Order, footnote 1, reads as follows: "The Court will not pause to consider the evidentiary implications of the hearsay contained in the declaration."

## II. **Argument**

The facts discussed above show that Mr. Hardin and his firm have a potential conflict of interest in the criminal matter before this Court. That is, the representation by Mr. Hardin and his firm of defendant Clemens in this case after previously representing a government witness in a related matter creates a potential conflict of interest. The Sixth Amendment provides a right to the "Assistance of Counsel" in "all criminal prosecutions." See Powell v. Alabama, 287 U.S. 45, 63 (1932). The right is not, however, absolute. A criminal defendant's Sixth Amendment right to effective assistance of counsel includes the right to counsel who is unimpaired by conflicting loyalties. See Glasser v. United States, 315 U.S. 60, 70 (1942) ("[T]he '[a]ssistance of [c]ounsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests."). See also United States v. Ramsey, 661 F.2d 1013, 1017 (4th Cir. 1981). "[C]ounsel owes the client a duty of loyalty, a duty to avoid conflicts of interest," which is "perhaps the most basic of counsel's duties." Strickland v. Washington, 466 U.S. 668, 688 (1984).

A presumption in favor of a defendant's choice of counsel "may be overcome not only by a demonstration of actual conflict but also by a showing of a serious potential conflict." Wheat v. United States, 486 U.S. 153, 164 (1988); see United States v. Cronic, 466 U.S. 648, 657 n.21 (1984) (Sixth Amendment inquiry properly focused on adversarial process rather than relationship between defendant and lawyer); Morris v. Slappy, 461 U.S. 1, 15 (1983). As noted by the Supreme Court in Wheat, 486 U.S. at 153:

> [district] court[s] must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses.

Further, in United States v. Williams, 81 F.3d 1321 (4th Cir. 1996), the court upheld the lower court's ruling to disqualify defense counsel on the basis that the defense counsel had previously represented a government witness. The Fourth Circuit ruled that defense counsel was at risk of both improperly using privileged communications from its previous representation of the government witness, or in an effort to avoid impropriety, failing to effectively cross-examine the witness. In the context of joint representation, the Supreme Court ruled that "the evil . . . is in what the advocate finds himself compelled to refrain from doing." Holloway v. Arkansas, 435 U.S. 475, 490 (1978) (emphasis in original). The government intends to call Mr. Pettitte as a government witness in this case. As a result of his prior representation of Mr. Pettitte, Mr. Hardin and his law firm potentially face the above-described risks should he or another member of his firm cross-examine Mr. Pettitte.

"The test for deciding whether a so-called 'successive conflict of interest' exists is whether the matter in which an attorney represents a current client is 'substantially related' to the matter in which he or she represented a former client." United States v. Childress, 731 F.Supp. 547, 550 (D.D.C. 1990), citing National Souvenir Center v. Historic Figures, Inc., 728 F.2d 503, 517 (D.C. Cir.), cert. denied, 469 U.S. 825 (1984). In this case, Mr. Hardin's representation of defendant Clemens is substantially related to his prior representation of Mr. Pettitte. If this case proceeds to trial, Mr. Hardin will be faced with the challenge of cross-examining Mr. Pettitte, a former client in a related matter. See, e.g., United States v. Moscony, 927 F.2d 742, 750 (3rd Cir. 1991) (an attorney who seeks to cross-examine a former client "inherently encounters divided loyalties"). Some courts erect an irrebuttable presumption that counsel obtained privileged information from the prior client, see, e.g., United States v. Provenzano, 620 F.2d 985, 1005 (3rd Cir. 1980), and will

7

usually reject counsel's assurance that no privileged data will be used in examination.  See, e.g.,
United States v. James, 708 F.2d 40, 46 (2nd Cir. 1983).

### III.  Proposed Resolution of this Issue

As discussed above, it appears that Mr. Hardin has taken steps that possibly could resolve
the potential conflict in this case.  That is, the retention of unconflicted co-counsel, Michael
Attanasio, and the implementation of screening measures between Mr. Hardin and co-counsel.
See Attachment #4 at 11-12 (using page numbers at bottom of document).  Moreover, defendant
Clemens has filed a Declaration in the civil case in which he stated he understood and agreed with
the steps taken "to resolve any potential conflict and prevent the disqualification of Rusty Hardin
and Rusty Hardin &Associates, P.C."  Id., Exhibit B at 2.   In light of the very limited time that
Mr. Hardin and his firm represented Mr. Pettitte, this potential solution may resolve this issue and
would not require Mr. Hardin's, or that of his firm, disqualification from the case.  The United States
respectfully submits, however, that the Court should have a hearing to make the appropriate record
of waiver of any residual potential conflict.  See United States v. Childress, 731 F.Supp. at 551
(disqualification of defense attorney's law partner based on potential conflict of interest created by
partner's prior representation of juvenile coconspirator did not require attorney's disqualification
in conspiracy prosecution where juvenile specifically waived right to seek attorney's disqualification
and attorney had not learned any confidential information about juvenile from partner).

**IV.  <u>Conclusion</u>**

WHEREFORE, the Government respectfully requests that this Court conduct an inquiry into a potential conflict of interest on the part of Mr. Hardin and his firm.  Defense counsel does not object to a hearing on this matter.

                                           Respectfully Submitted,

                                           RONALD C. MACHEN JR.
                                           UNITED STATES ATTORNEY

                                               / s /

By:        _____
                                           STEVEN J. DURHAM
                                           D.C. Bar # 993780
                                           DANIEL P. BUTLER
                                           D.C. Bar # 417718
                                           Assistant United States Attorneys
                                           Fraud & Public Corruption Section
                                           555 Fourth Street, N.W., 5th Floor
                                           Washington, D.C.  20530
                                           (202) 252-7862 and (202) 252-7881
                                           Steven.Durham@USDOJ.Gov
                                           Daniel.Butler@USDOJ.Gov