BENJAMIN B. WAGNER
United States Attorney
R. STEVEN LAPHAM
MATTHEW D. SEGAL
JARED C. DOLAN
Assistant U.S. Attorneys
501 "I" Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2700

SHARIS A. POZEN
Acting Assistant Attorney General
RICHARD B. COHEN
ANNA T. PLETCHER
TAI S. MILDER
Trial Attorneys
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue, Room 10-0101
San Francisco, CA 94102
Telephone: (415) 436-6660

**FILED**

AUG 17 2011

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
　　　　　　DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.  2:10-CR-0061-LKK |
| Plaintiff, | VIOLATIONS: 18 U.S.C. § 1962(c) – Conducting the Affairs of an Enterprise Through a Pattern of Racketeering Activity; 18 U.S.C. § 1962(d) – Conspiring to Conduct the Affairs of an Enterprise Through a Pattern of Racketeering Activity; 18 U.S.C. §§ 1343, 1346 – Honest Services Wire Fraud (4 Counts); 18 U.S.C. § 1519 – Destruction, Alteration, or Falsification of Records in a Federal Investigation; 15 U.S.C. § 1 – Conspiracy in Restraint of Trade (5 Counts); 18 U.S.C. § 1963 – Racketeering Forfeiture; 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c), and 21 U.S.C. § 853 – Forfeiture |
| v. | |
| FREDERICK SCOTT SALYER, | |
| Defendant. | |

-1-

S E C O N D   S U P E R S E D I N G   I N D I C T M E N T

COUNT ONE: [18 U.S.C. § 1962(c) – Conducting the Affairs of an
           Enterprise Through a Pattern of Racketeering Activity]

The Grand Jury charges:

FREDERICK SCOTT SALYER,

defendant herein, as follows:

### The Racketeering Enterprise

1.   At all times relevant to this Indictment, SK Foods, L.P.
was a limited partnership, with principal places of business in
Monterey, California, and in Williams, Ripon, and Lemoore, in the
State and Eastern District of California.  SK Foods, L.P., including
its related corporate entities involved in the business of producing
tomato products in the State of California ("SK Foods"), was a
grower and processor of tomato products and other food products for
sale to food product manufacturers, food service distributors and
marketers, and retail outlets.  For purposes of this Indictment,
"processed tomato products" include, among other things, bulk tomato
paste and diced tomatoes.

2.   At all times relevant to this Indictment, SK Foods,
including its leaders, employees and associates, constituted an
"enterprise" as defined in Title 18, United States Code, Section
1961(4) (hereinafter "the enterprise"), that is, a legal entity that
was engaged in, and whose activities affected, interstate and
foreign commerce.

-2-

3.   At all times relevant to this Indictment, defendant FREDERICK SCOTT SALYER ("SALYER") was an indirect owner of, and served as Chief Executive Officer of, SK Foods.  In that capacity, defendant SALYER served as SK Foods' primary leader and decision maker, giving direction to and receiving regular reports regarding all manner of SK Foods' business from SK Foods' leadership and employees.

4.   At all times relevant to this Indictment, Intramark USA, Inc. ("Intramark"), was a New Jersey-based company holding itself out as a wholesaler of food ingredients, including processed tomato products, and an importer of juice concentrates.  In that capacity, Intramark acted on behalf of itself and others in selling processed tomato products to customers.

5.   At all times relevant to this Indictment, Intramark was owned and operated by Randall Lee Rahal ("Rahal"), who is charged elsewhere.  Through Intramark, Rahal worked on behalf of SK Foods as a sales broker.  In that capacity, and with defendant SALYER's knowledge and direction, Rahal oversaw the negotiation and execution of contracts between SK Foods and many of its customer companies, among other things.  Rahal also acted as an advisor and director of SK Foods, giving direction to and receiving periodic reports regarding various aspects of SK Foods' business from SK Foods' leaders, associates and employees.

6.   At all times relevant to this Indictment, Alan Scott Huey ("Huey"), who is charged elsewhere, served in a variety of

-3-

positions, and most recently as Senior Vice President for Sales and Marketing for SK Foods, working in Lemoore, California, in the Eastern District of California, and out of the company's Monterey, California, headquarters.  In that capacity, Huey served as a senior officer of SK Foods reporting directly to defendant SALYER.  Among other responsibilities, as Senior Vice President for Sales and Marketing, Huey oversaw and managed SK Foods' inventory of processed tomato products and other food products, to include the shipment of those food products to SK Foods' customers across the United States.

7.  Between 2004 and 2008, Jeffrey Sherman Beasley ("Beasley"), who is charged elsewhere, served as Vice President for Industrial Sales for SK Foods, working in Ripon, California, in the Eastern District of California, and out of the company's Monterey, California, headquarters.  In that capacity, Beasley served as a senior officer of SK Foods, reporting directly to defendant SALYER and Huey.  Among other responsibilities, as Vice President for Industrial Sales, Beasley, along with other SK Foods leaders, helped oversee and manage the pricing of SK Foods' processed tomato products, as well as the ultimate sale of those products to certain customers.

8.  At all times relevant to this Indictment, Jennifer Lou Dahlman ("Dahlman"), who is charged elsewhere, was employed by SK Foods in a variety of positions, most recently serving as a Reports and Business Analyst.  Working out of SK Foods' Lemoore, California, facility in the Eastern District of California, Dahlman assisted in

-4-

managing SK Foods' inventory of processed tomato and other food products, and assisted in arranging for the shipment of those food products to SK Foods'. customers across the United States.

9.   At various times relevant to this Indictment, defendant SALYER, and others known to the Grand Jury, were leaders, employees and associates of SK Foods, an enterprise whose leaders, employees and associates engaged in acts of mail fraud, wire fraud and bribery, and which operated principally in the Eastern District of California, the Northern District of California, and the District of New Jersey.

### Other Parties

10.   At all times relevant to this Indictment, Frito-Lay, Inc. ("Frito-Lay") was a multinational food products company with a principal place of business in Plano, Texas.   Frito-Lay was a regular customer of SK Foods with respect to processed tomato products and other food products.

11.   At all times relevant to this Indictment, James Richard Wahl, Jr. ("Wahl"), who is charged elsewhere, resided in the Northern District of Texas and served as, among other positions, Senior Group Manager for Ingredients Purchasing for Frito-Lay, working out of the company's Plano, Texas, headquarters.   As an employee of Frito-Lay, Wahl owed Frito-Lay a fiduciary duty of honest and faithful services.

12.   At all times relevant to this Indictment, B&G Foods, Inc.

-5-

("B&G") was a multinational manufacturer, seller and distributor of various food products with a principal place of business in Parsippany, New Jersey.  B&G was a regular customer of SK Foods with respect to processed tomato products and other food products.

13.  At certain times relevant to this Indictment, Robert C. Turner, Jr. ("Turner"), who is charged elsewhere, resided in the District of New Jersey and served as a corporate purchasing manager for B&G, working out of the company's Parsippany, New Jersey, headquarters.  Between in or about 2007 and in or about April 2008, Turner was Director of Purchasing for B&G.  As an employee of B&G, Turner owed B&G a fiduciary duty of honest and faithful services.

14.  At all times relevant to this Indictment, Kraft Foods, Inc. ("Kraft") was a multinational food products company with a principal place of business in Northfield, Illinois.  Kraft was a regular customer of SK Foods with respect to processed tomato products and other food products.

15.  At certain times relevant to this Indictment, Robert Watson ("Watson"), who is charged elsewhere, resided in the Southern District of New York and the Northern District of Illinois, and served as Purchasing Manager for Kraft, working out of the company's Northfield, Illinois, headquarters.  As an employee of Kraft, Watson owed Kraft a fiduciary duty of honest and faithful services.

16.  At all times relevant to this Indictment, H.J. Heinz Company, Inc. ("Heinz") was a multinational manufacturer, seller and distributor of various food products with a principal place of

business in Pittsburgh, Pennsylvania.  Heinz was a regular customer

of SK Foods with respect to processed tomato products and other food

products.

17.  At all times relevant to this Indictment, Morning Star

Packing Company ("Morning Star") was a California limited

partnership, with its principal places of business in Los Banos,

California, and Williams, California.  Morning Star is a

manufacturer and marketer of bulk tomato products and distributes

those products in both national and international markets.

18.  At all times relevant to this Indictment, Safeway, Inc.

("Safeway") was a multinational food products company with a

principal place of business in Pleasanton, California.  Safeway was

a regular customer of SK Foods with respect to processed tomato

products and other food products.

19.  At certain times relevant to this Indictment, Michael

Chavez ("Chavez"), who is charged elsewhere, resided in the Northern

District of California and served as a purchasing manager for

Safeway, working out of the company's Pleasanton, California,

headquarters.  As an employee of Safeway, Chavez owed Safeway a

fiduciary duty of honest and faithful services.

20.  At all times relevant to this Indictment, Land O'Lakes,

Inc. ("Land O'Lakes") was a multinational food products company and

a leading marketer of dairy-based food products for consumers, food

service professionals, and food manufactures with a principal place

of business in St. Paul, Minnesota.  Land O'Lakes was a regular

customer of SK Foods with respect to processed tomato products.

21.   At certain times relevant to this Indictment, Antis Foods Products, Inc. ("Antis") was a miscellaneous food wholesaler with a principal place of business in Lancaster, Pennsylvania.   Antis was a regular customer of SK Foods with respect to processed tomato products.

22.   At all times relevant to this Indictment, Nestle USA ("Nestle") was a multinational manufacturer, seller and distributor of various food products with a principal place of business in Glendale, California.   Nestle was a regular customer of SK Foods with respect to processed tomato products.

23.   At certain times relevant to this Indictment, San Antonio Farms ("San Antonio Farms") was a producer of sauces and other food products in the domestic market, and was a subsidiary of TreeHouse Foods, Inc., with a principal place of business in Westchester, Illinois.   San Antonio Farms was a regular customer of SK Foods with respect to processed tomato products and other food products.

24.   At certain times relevant to this Indictment, Barilla America, Inc. ("Barilla") was a multinational food products company with a principal place of business in Bannockburn, Illinois. Barilla was a regular customer of SK Foods with respect to processed tomato products and other food products.

25.   At certain times relevant to this Indictment, Chelten House Products, Inc. ("Chelten House"), was a national food products company with a principal place of business in Bridgeport, New

-8-

Jersey.  Chelten House was a regular customer of SK Foods with respect to processed tomato products.

26.  At all times relevant to this Indictment, ConAgra Foods, Inc. ("ConAgra") was a multinational manufacturer, seller and distributor of various food products with a principal place of business in Omaha, Nebraska.  ConAgra was a regular customer of SK Foods with respect to processed tomato products and other food products.

27.  At certain times relevant to this Indictment, General Mills Operations, Inc. ("General Mills") was a multinational manufacturer, seller and distributor of various food products with a principal place of business in Minneapolis, Minnesota.  General Mills was a regular customer of SK Foods with respect to processed tomato products and other food products.

28.  At certain times relevant to this Indictment, Tyson Foods, Inc. ("Tyson") was a multinational food products company with a principal place of business in Springdale, Arkansas.  Tyson was a regular customer of SK Foods with respect to processed tomato products.

29.  At certain times relevant to this Indictment, Gerber Products Company ("Gerber") was a national purveyor of baby food and baby food products with a principal place of business in Freemont, Michigan.  Gerber was a regular customer of SK Foods with respect to processed tomato products.

///

-9-

## Purposes of the Defendant

30.   The purposes of the defendant and other leaders, employees and associates of the enterprise included the following:

a.   providing SK Foods and its leaders, employees, and associates with an expanding base of corporate customers for processed tomato products and other food products;

b.   preserving, protecting, and enhancing SK Foods' profits and customer base through acts of mail fraud and wire fraud;

c.   secretly paying bribes and kickbacks to purchasing agents and others employed by SK Foods' customers in exchange for their using their positions to take official actions favorable to SK Foods;

d.   increasing SK Foods' profits by fraudulently inducing certain of SK Foods' customers to pay for adulterated and misbranded processed tomato products by causing the falsification of mold counts and other grading factors and data contained on the quality control documents that accompanied customer-bound shipments of processed tomato products that were produced, purchased, and sold by SK Foods, and by actually shipping the adulterated and misbranded tomato products to customers along with the altered documentation;

e.   promoting and enhancing the enterprise and its leaders, employees and associates' activities;

f.   enriching the leaders, employees and associates of the enterprise; and

-10-

g.   concealing the illegal activity and otherwise protecting the participants from detection and prosecution.

## Means and Methods of the Defendant

31.   Among the means and methods by which the defendant and other leaders, employees, and associates of the enterprise conducted and participated in the conduct of the affairs of the enterprise were the following:

a.   Defendant SALYER and other leaders, employees and associates of the enterprise engaged in a scheme to defraud various SK Foods customers through acts involving mail fraud, wire fraud and bribery, which were intended to:   (1) ensure that those customers purchased processed tomato products and other products from SK Foods rather than from certain of its competitors; (2) ensure that those customers paid an inflated price for such products; (3) induce the customers' purchasing agents to disclose bidding and other proprietary information of certain of SK Foods' competitors; and (4) ensure that SK Foods could control certain customers' purchasing agents' decisions as to when to accept and not accept product from SK Foods.

b.   Defendant SALYER directed that bribe payments be made to the purchasing agents of SK Foods' customers.   Those same bribe payments were also made with the knowledge and consent of other SK Foods' leaders, employees, and associates.

c.   Defendant SALYER, assisted by other leaders, employees

-11-

and associates of the enterprise, constructed and transmitted

fraudulent financial and business information to SK Foods' customers

to induce those customers to do business with, and release funds to,

the enterprise.

d.   Defendant SALYER caused the falsification of, and

directed other SK Foods' leaders, employees and associates to

falsify, various grading factors and data contained on Certificates

of Analysis ("COAs") and other quality control documents that

accompanied customer bound shipments of processed tomato product

that was produced, purchased and sold by SK Foods.   Defendant SALYER

caused and directed, in many instances, the falsification of these

documents so that they reflected mold count levels in SK Foods'

tomato product as being below the applicable Food Defect Action

Level set forth in federal regulations, when, in fact, those levels

were significantly above the federal threshold.

e.   In other instances, defendant SALYER caused the

falsification of, and directed other SK Foods' leaders, employees

and associates to falsify, certain SK Foods quality control

documents so that they reflected Natural Tomato Soluble Solids

("NTSS") levels that were higher than what the processed tomato

product actually contained.   Such documents also reflected altered

pH, color, viscosity, date of production, and classification

(organic versus conventional) values.   These falsifications were

made in order to deceive customers into believing that the processed

tomato product that they were receiving from SK Foods was in

-12-

compliance with contractual specifications when, in fact, it was not.

f.   Defendant SALYER and other SK Foods leaders, employees and associates subsequently caused the distribution of such product, along with the falsified quality control documents, to certain of SK Foods' customers through interstate commerce.  Defendant SALYER's conduct, and the conduct of other SK Foods' leaders, employees and associates in this regard, was undertaken with the intent to defraud and mislead.  As a result, certain of SK Foods' customers were fraudulently induced to pay for inferior processed tomato product.

### The Racketeering Violation

32.   Beginning in or about January 1998, and continuing through in or about April 2008, within the Eastern District of California and elsewhere, defendant FREDERICK SCOTT SALYER, together with others known to the Grand Jury, being persons employed by and associated with SK Foods, an enterprise which engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully, knowingly and intentionally conducted and participated, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, that is, through the commission of Racketeering Acts One through Twenty as set forth in paragraphs thirty-four through eighty-seven below.

///
///
///

-13-

## The Pattern of Racketeering Activity

33.   The pattern of racketeering activity as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following acts:

### Racketeering Act One - Wire and Mail Fraud with Respect to Frito-Lay

34.   Beginning no later than in or about January 1998, and continuing until in or about April 2008, in the Eastern District of California, the Northern District of California, the Northern District of Texas, the District of New Jersey, and elsewhere, defendant SALYER and others known and unknown to the Grand Jury, did knowingly devise and intend to devise a material scheme and artifice to defraud and deprive Frito-Lay of its right to the honest and faithful services of James Wahl through bribery, kickbacks, and the concealment of material information, and did use the mails, private, and commercial interstate carriers, and interstate wire communications to execute said scheme.

35.   The manner and means by which the wire and mail fraud scheme was accomplished were as follows:

36.   In his capacity as Senior Group Manager for Ingredients Purchasing for Frito-Lay, Wahl was vested with authority to negotiate and enter into contracts, with the approval of his employer, for the purchase of processed tomato products and other food products from various processors, such as SK Foods.  In the normal course, Frito-Lay and Wahl received bids for the sale of processed tomato products and other food products from processors to

-14-

Frito-Lay by way of what was intended to be a competitive bidding process.

37.  Beginning no later than in or about January 1998, Rahal began making personal bribe payments to Wahl on behalf of SK Foods. Such bribe payments were made with the knowledge, and, in many instances, at the direction of defendant SALYER.  In return for the personal bribe payments, Wahl agreed to and did ensure that Frito-Lay purchased processed tomato products and other food products from SK Foods rather than from certain of SK Foods' competitors.  In addition, in return for the bribe payments, Wahl provided SK Foods with certain data, including the proprietary bid information of certain of SK Foods' competitors in the tomato processing industry, which allowed SK Foods to sell certain food products to Frito-Lay at inflated prices.

38.  Defendant SALYER's direction to Rahal in this regard was, in part, conducted by way of interstate telephone communications. By way of example, on or about April 11, 2008, defendant SALYER and Rahal engaged in a recorded interstate telephone conversation during which the two discussed that so long as Wahl remained employed by Frito-Lay as Senior Group Manager for Ingredients Purchasing, SK Foods' competitor, Morning Star, would not be approved to supply processed tomato product to Frito-Lay.  Later in that same conversation, defendant SALYER directed Rahal to speak with Wahl, and to direct Wahl on how to allocate Frito-Lay's tomato product purchases between SK Foods and another SK Foods' competitor.

-15-

39.   Additionally, on or about April 7, 2008, in return for personal bribe payments made by defendant SALYER, Rahal and SK Foods, Wahl transmitted to Rahal, via email from the Northern District of Texas to the District of New Jersey, a Morning Star proposal for a three-year contract for the sale of processed tomato products to Frito-Lay.   That same day, Rahal transmitted the surreptitiously obtained proposal to defendant SALYER and other senior leaders of SK Foods, via email, from the District of New Jersey to the Eastern and Northern Districts of California.

40.   Between in or about 1998 and in or about April 2008, Wahl received approximately $160,000 in personal bribe payments from defendant SALYER, Rahal and SK Foods in this manner.

41.   On or about the dates set forth below, and for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud and deprive, defendant SALYER, in the Eastern and Northern Districts of California and the District of New Jersey, did knowingly transmit, and cause to be transmitted by means of wire communications in interstate or foreign commerce, the writings, signs, signals and communications described below, any one of which alone constitutes the commission of Racketeering Act One:

///

///

///

///

///

-16-

| RACKETEERING ACT | DATE | WIRE COMMUNICATION |
|---|---|---|
| 1A | 4/7/2008 | Email correspondence from Rahal in the District of New Jersey to defendant SALYER and other SK Foods leaders in the Eastern and Northern Districts of California enclosing Morning Star bid proposal to Frito-Lay |
| 1B | 4/11/2008 | Telephone conversation between defendant SALYER in the Northern District of California and Rahal in the District of New Jersey discussing Wahl's participation in the scheme to defraud Frito-Lay |

42. Furthermore, on or about the dates set forth below, in the Northern District of California, the District of New Jersey, and the Northern District of Texas, for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud and deprive, defendant SALYER did knowingly cause to be delivered by mail and private and commercial interstate carrier, and Wahl did knowingly take and receive from authorized depositories for mail and other matter sent or delivered by the United States Postal Service, and private and commercial interstate carrier, the items listed below, any one of which alone constitutes the commission of Racketeering Act One:

///

///

///

///

-17-

| RACKETEERING ACT | DATE | SENDER | ITEM INCLUDED IN MAILING |
|---|---|---|---|
| 1C | 9/7/2006 | Rahal | Check in the amount of $4,000 from Intramark's Sun National Bank account number XXXXXX5624, payable to James Wahl in the Northern District of Texas |
| 1D | 3/19/2008 | Rahal | Check in the amount of $1,203.10 from Intramark's Sun National Bank account number XXXXXX5624, payable to James Wahl, in the Northern District of Texas |
| 1E | 3/26/2008 | Rahal | Check in the amount of $5,722.94 from Intramark's Sun National Bank account number XXXXXX5624, payable to James Wahl, in the Northern District of Texas |

All in violation of Title 18, United States Code, Sections 2, 1341, 1343, and 1346

**Racketeering Act Two – Wire and Mail Fraud with Respect to Kraft Foods, Inc.**

43. Beginning in or about January 2004, and continuing until in or about April 2008, in the Eastern District of California, the Northern District of California, the Northern District of Illinois, the District of New Jersey, and elsewhere, defendant SALYER, and others known and unknown to the Grand Jury, did knowingly devise and intend to devise a material scheme and artifice to defraud and deprive Kraft of its right to the honest and faithful services of Robert Watson through bribery, kickbacks, and the concealment of material information, and did use the mails, private and commercial interstate carriers, and interstate wire communications to execute said scheme.

-18-

44.   The manner and means by which the wire and mail fraud scheme was accomplished were as follows:

45.   In his capacity as Purchasing Manager for Kraft, Watson was vested with authority to negotiate and enter into contracts, with the approval of his employer, for the purchase of tomato and other food products from various processors, including SK Foods.   In the normal course, Kraft and Watson received bids for the sale of processed tomato products from processors to Kraft by way of what was intended to be a secret and competitive bidding process.

46.   Beginning no later than in or about January 2004, Rahal began making personal bribe payments to Watson on behalf of SK Foods.   Such bribe payments were made with the knowledge and, in many instances, at the direction of defendant SALYER.   In return for the personal bribe payments, Watson agreed to and did ensure that Kraft purchased processed tomato products and other food products from SK Foods rather than from certain of SK Foods' competitors.   In addition, in return for the bribe payments, Watson provided SK Foods with certain data, including the proprietary bid information of certain of SK Foods' competitors in the tomato processing industry, which allowed SK Foods to sell processed tomato products to Kraft at inflated prices.

47.   Defendant SALYER's direction to Rahal in this regard was, in part, conducted by way of interstate telephone communications. By way of example, on or about April 14, 2008, defendant SALYER and Rahal engaged in a recorded interstate telephone conversation during

-19-

which the two discussed how Rahal had recently made personal bribe payments to Watson totaling $24,000. Later in that same conversation, defendant SALYER expressed his concern to Rahal that SK Foods was not getting the maximum value for its bribes to Watson.

48.   Between in or about January 2004 and in or about April 2008, Watson received approximately $158,000 in personal bribe payments from defendant SALYER, Rahal and SK Foods in this manner.

49.   On or about the dates set forth below, and for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud and deprive, defendant SALYER, in the Northern District of California, the District of New Jersey and the Northern District of Illinois, did knowingly transmit, and cause to be transmitted by means of wire communications in interstate or foreign commerce, the writings, signs, signals and communications described below, any one of which alone constitutes the commission of Racketeering Act Two:

///
///
///
///
///
///
///
///
///

| RACKETEERING ACT | DATE | WIRE COMMUNICATION |
|---|---|---|
| 2A | 2/13/2004 | Email correspondence between defendant SALYER in the Northern District of California and Rahal in the District of New Jersey in which defendant SALYER recognized that Watson would be amenable to bribe payments because he experienced increased costs commuting between Illinois and New York |
| 2B | 4/14/2008 | Telephone conversation between defendant SALYER in the Northern District of California and Rahal in the District of New Jersey discussing personal bribe payments made to Watson |
| 2C | 4/8/2008 | Facsimile from Watson in the Northern District of Illinois to Rahal in the District of New Jersey enclosing Morning Star contract proposal to Kraft |

50.   Furthermore, on or about the dates set forth below, in the Northern District of California, the District of New Jersey, and the Northern District of Illinois, for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud and deprive, defendant SALYER did knowingly cause to be delivered by mail and private and commercial interstate carrier, and Watson did knowingly take and receive from authorized depositories for mail and other matter sent or delivered by the United States Postal Service, and private and commercial interstate carrier, the items listed below, any one of which alone constitutes the commission of Racketeering Act Two:

///

///

-21-

| RACKETEERING ACT | DATE | SENDER | ITEM INCLUDED IN MAILING |
|---|---|---|---|
| 2D | 1/19/2006 | Rahal | Check in the amount of $10,000 from Intramark's Sun National Bank account number XXXXXX5624, payable to Robert Watson in Wheeling, Illinois |
| 2E | 7/25/2007 | Rahal | Check in the amount of $17,252.78 from Intramark's Sun National Bank account number XXXXXX5624, payable to Robert Watson, in Wheeling, Illinois |

All in violation of Title 18, United States Code, Sections 2, 1341, 1343 and 1346.

**Racketeering Act Three – Wire and Mail Fraud with Respect to B&G Foods, Inc.**

51.   Beginning no later than in or about September 2004, and continuing until in or about April 2008, in the Eastern District of California, the Northern District of California, the District of New Jersey and elsewhere, defendant SALYER, and others known and unknown to the Grand Jury, did knowingly devise and intend to devise a material scheme and artifice to defraud and deprive B&G of its right to the honest and faithful services of Robert Turner through bribery, kickbacks, and the concealment of material information, and did use the mails, private and commercial interstate carriers, and interstate wire communications to execute said scheme.

52.   The manner and means by which the wire and mail fraud scheme was accomplished were as follows:

53.   In his capacity as a corporate purchasing manager and

-22-

Director of Purchasing for B&G, Turner was vested with authority to negotiate and enter into contracts, with the approval of his employer, for the purchase of processed tomato products and other food products from various processors, including SK Foods.  In the normal course, B&G and Turner received bids for the sale of processed tomato products and other food products from processors to B&G by way of what was intended to be a competitive bidding process.

54.   Beginning no later than in or about September 2004, Rahal began making personal bribe payments to Turner on behalf of SK Foods.  Such bribe payments were made with the knowledge, and, in many instances, at the direction of defendant SALYER.  In return for the personal bribe payments, Turner agreed to and did ensure that B&G purchased processed tomato products and other food products from SK Foods rather than from certain of SK Foods' competitors.  In addition, in return for the bribe payments, Turner secured contracts between B&G and SK Foods, which allowed SK Foods to sell certain food products to B&G at elevated prices.

55.   Defendant SALYER's direction to Rahal in this regard was, in part, conducted by way of interstate telephone communications.  By way of example, on or about June 12, 2007, defendant SALYER and Rahal engaged in a recorded interstate telephone conversation during which the two discussed how Rahal had just secured a cost-plus contract with B&G for the purchase of jalapeno and chile peppers from SK Foods.  During the call, Rahal relayed to defendant SALYER that he had promised Turner a personal bribe payment in order to

-23-

secure the contract.

56.   Subsequently, on or about June 21, 2007, defendant SALYER and Rahal engaged in a recorded interstate telephone conversation during which defendant SALYER instructed Rahal to increase the price per pound that B&G would pay SK Foods under the pepper contract.   In this regard, defendant SALYER further directed Rahal to provide Turner and B&G with a fictitious justification for the increased contract price, namely that SK Foods was experiencing increased agricultural costs in connection with the peppers.

57.   Between in or about September 2004 and in or about April 2008, Turner received approximately $14,698 in personal bribe payments from defendant SALYER, Rahal and SK Foods in this manner.

58.   On or about the dates set forth below, and for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud and deprive, defendant SALYER, in the Northern District of California and the District of New Jersey, did knowingly transmit, and cause to be transmitted by means of wire communications in interstate or foreign commerce, the writings, signs, signals and communications described below, any one of which alone constitutes the commission of Racketeering Act Three:

///

///

///

///

///

-24-

| RACKETEERING ACT | DATE | WIRE COMMUNICATION |
|---|---|---|
| 3A | 6/12/2007 | Telephone conversation between defendant SALYER in the Northern District of California and Rahal in the District of New Jersey discussing personal bribe payments to Turner |
| 3B | 6/21/2007 | Telephone conversation between defendant SALYER in the Northern District of California and Rahal in the District of New Jersey discussing the provision of a fictitious justification for a price increase to a contract between B&G and SK Foods |

59.  Furthermore, on or about the dates set forth below, in the Northern District of California and the District of New Jersey, for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud and deprive, defendant SALYER did knowingly cause to be delivered by mail and private and commercial interstate carrier, and Turner did knowingly take and receive from authorized depositories for mail and other matter sent or delivered by the United States Postal Service, and private and commercial interstate carrier, the items listed below, any one of which alone constitutes the commission of Racketeering Act Three:

///
///
///
///
///
///

-25-

| RACKETEERING ACT | DATE | SENDER | ITEM INCLUDED IN MAILING |
|---|---|---|---|
| 3C | 5/17/2006 | Rahal | Check in the amount of $1,000.00 from Intramark's Sun National Bank account number XXXXXX5624, payable to Turner's wife in the District of New Jersey |
| 3D | 7/11/2007 | Rahal | Check in the amount of $2,000.00 from Intramark's Sun National Bank account number XXXXXX5624, payable to Turner's wife in the District of New Jersey |
| 3E | 12/12/2007 | Rahal | Check in the amount of $9,698.80 from Intramark's Sun National Bank account number XXXXXX5624, payable to Turner's wife in the District of New Jersey |

All in violation of Title 18, United States Code, Sections 2, 1341, 1343, and 1346.

**Racketeering Act Four – Wire Fraud with Respect to Safeway, Inc.**

60.   Beginning no later than May 2005, and continuing until October 2007, in the Eastern District of California and elsewhere, defendant SALYER, and others known to the Grand Jury, did knowingly devise and intend to devise a material scheme and artifice to defraud and deprive Safeway of its right to the honest and faithful services of Michael Chavez through bribery, kickbacks, and the concealment of material information, and did use interstate wire communications to execute said scheme.

61.   The manner and means by which the wire fraud scheme was

-26-

accomplished were as follows:

62. In his capacity as a corporate purchasing manager for Safeway, Chavez was vested with authority to negotiate and enter into contracts, with the approval of his employer, for the purchase of processed tomato products from various processors, including SK Foods. In the normal course of business, Safeway received bids for the sale of processed tomato products and other food products from food processors through what was intended to be a competitive bidding process.

63. As part of a scheme to defraud Safeway, between May 2005 and October 2007, Rahal, on behalf of defendant SALYER and SK Foods, paid Chavez personal bribes totaling approximately $5,000. In return for these bribes, Chavez agreed to, and did, ensure that Safeway purchased processed tomato products and other food products from SK Foods rather than from certain of SK Foods competitors.

64. Interstate wire communications were used to arrange bribe payments, thus furthering the scheme. By way of example, on or about June 6, 2007, Chavez and Rahal engaged in an interstate telephone conversation during which the two discussed meeting for lunch in northern California so that Rahal could deliver another personal bribe payment to Chavez. This personal payment was for a five-hundred-thousand-pound order for processed tomato product that Safeway had recently placed with SK Foods.

65. Also on or about June 6, 2007, Rahal informed defendant SALYER that he was going to have lunch with Chavez, and stated about

Chavez, "He don't give a shit about lunch.  You know what he cares about."

66.  On or about July 19, 2007, Rahal met Chavez at a Bay Area Rapid Transit station in Walnut Creek, California in order to deliver a $1,000 personal bribe payment to Chavez.

All in violation of Title 18, United States Code, Sections 2, 1343, and 1346.

**Racketeering Acts Five Through Nineteen – Mail and Wire Fraud with Respect to the Shipment to Customers of Adulterated and Misbranded Processed Tomato Products**

### Introduction

67.  During all times relevant to this Indictment, and in the normal course, the market price of processed tomato products was affected by the percentage of NTSS that the product contained (also known as the product's "Brix value").  SK Foods' customers frequently specified a required NTSS concentration in their contracts with SK Foods.  Customers also often specified acceptable levels of other processed tomato product characteristics such as the product's pH, mold content, color, acidity, and viscosity (sometimes referred to as "Bostwick"), depending on the customer's intended finished product (i.e., ketchup, salsa, barbeque sauce, etc.).

68.  In addition to the characteristics described above, SK Foods' customers typically specified the acceptable age of the processed tomato products they were purchasing from SK Foods.  For example, most SK Foods' customers contractually required that SK Foods provide processed tomato products that were twenty-four months

old or less.   In addition, internal SK Foods "Quality Management

Systems Product Specification" documents represented that the

maximum shelf life of SK Foods' aseptic tomato paste product was

twenty-four months from the actual date of production.

69.   At all times relevant to this Indictment, SK Foods was a

registered seller of organic products in the State of California.

As such, it was subject to the regulations promulgated by the

National Organic Program ("NOP")(Section 6517 of the federal Organic

Foods Production Act of 1990 (7 U.S.C. § 6501 et seq.)).   The NOP

states that no product shall be labeled and sold as "organic" unless

it is produced specifically according to certain NOP regulations.

70.   At all times relevant to this Indictment, SK Foods was

also subject to the United States Standards for grades of tomato

paste and puree as established by the United States Department of

Agriculture ("USDA").   SK Foods was further subject to Title 21,

Code of Federal Regulations, Section 110.110, through which the

United States Food and Drug Administration ("FDA") has established

maximum limits of natural or unavoidable defects in foods sold

within the United States, which present no health hazard.   The

limits are set out as Food Defect Action Levels.   The limits

prescribed by the Food Defect Action Levels represent thresholds

above which FDA will take enforcement action for the food products

being "adulterated" pursuant to 21 U.S.C. § 342(a)(3).   For example,

FDA has set a Food Defect Action Level for mold in tomato paste; if

the mold count (as measured using the Howard mold count method) of

-29-

all of the subsamples of one lot of tomato paste are higher than 40%, the FDA considers that product adulterated and unfit for sale within the United States.

71.   To that end, during the relevant period, SK Foods was required to subject its processed tomato products to laboratory testing to ensure it complied both with applicable laws and regulations, and with customer specifications.   In the normal course, SK Foods' employees initially recorded the raw results of this testing process on handwritten lab result registers.   The data was subsequently entered into a proprietary computer system owned and operated by SK Foods.   When processed tomato products were shipped to customers, they were usually accompanied by a Certificate of Analysis, which identified the particular grading factors (i.e., pH, mold count, color, viscosity and NTSS) derived from the SK Foods' laboratory testing of the product.   Additionally, SK Foods routinely affixed labels to the actual storage containers holding the processed tomato product destined for its customers.   These container labels, along with the bills of lading and invoices that accompanied a customer-bound shipment, typically identified the date of production and NTSS level of the processed tomato paste.   Often times, duplicate copies of the documents described above also were faxed or mailed to SK Foods' customers at the time of product shipment.

///

///

-30-

**Racketeering Acts Five Through Nineteen - Mail and Wire Fraud With Respect to Land O' Lakes, Inc.; Antis Food Products, Inc.; Gerber Products Company; Nestle USA; San Antonio Farms; Barilla America, Inc.; Chelten House Products, Inc.; Kraft Foods, Inc.; ConAgra Frozen Foods; B&G Foods, Inc.; General Mills Operations, Inc.; Heinz USA; and Tyson Foods, Inc.**

72.   Beginning no later than in or about February 2001, and continuing until in or about April 2008, in the Eastern District of California, the Northern District of California, and elsewhere, defendant SALYER, and others known and unknown to the Grand Jury, did devise and intend to devise a material scheme and artifice to defraud certain customers of SK Foods, and to obtain money and property from those customer companies by means of materially false and fraudulent pretenses, representations and promises, and did use the mails, private and commercial interstate carriers, and interstate wire communications to execute said scheme, and to conceal said scheme.

73.   The manner and means by which the wire and mail fraud scheme was accomplished are set out below:

74.   Defendant SALYER directed Huey, Dahlman, and certain other SK Foods' employees to cause the falsification of the various grading factors and data contained on the COAs, bills of lading, invoices and bin labels (hereinafter, "quality control documents") that accompanied customer-bound shipments of tomato products, which were produced, purchased, and sold by SK Foods.  Specifically, defendant SALYER, in many instances, directed Huey, Dahlman and certain other SK Foods' employees to falsify these documents so that

they reflected mold count levels in SK Foods' processed tomato products as being below the applicable Food Defect Action Level when, in fact, those levels were significantly above the federal threshold and therefore could not legally be sold in the United States under applicable regulations administered by the FDA.

75.   In other instances, defendant SALYER directed Huey, Dahlman and other SK Foods' employees to falsify quality control documents so that they reflected NTSS levels that were higher than what the tomato product actually contained, as well as altered pH, color, viscosity values, dates of production, and classification (organic versus conventional) to meet customers' contractual specifications, when, in fact, the product did not meet such customers' specifications.

76.   Defendant SALYER subsequently directed that these processed tomato products be distributed, along with the falsified quality control documents, to certain of SK Foods' customers in interstate commerce.

77.   As a result of defendant SALYER's conduct, and the conduct of other SK Foods' leaders, employees and associates, adulterated and misbranded processed tomato products were frequently introduced into interstate commerce, and SK Foods' customers were fraudulently induced to pay for such products, or to overpay for such products. SK Foods made such material misrepresentations to more than fifty-five customers, causing a substantial loss to those entities.

78.   On or about the dates set forth below, and for the purpose

-32-

1  of executing and attempting to execute the aforementioned scheme and

2  artifice to defraud, defendant SALYER, in the Eastern District of

3  California and the Northern District of California, did knowingly

4  transmit, and cause to be transmitted by means of wire

5  communications in interstate or foreign commerce, the writings,

6  signs, signals and communications described below, any one of which

7  alone constitutes the commission of Racketeering Act Five:

8

| RACKETEERING ACT | DATE | WIRE COMMUNICATION |
|---|---|---|
| 5A | 1/23/07 | Email correspondence between Beasley in the Eastern District of California, and defendant SALYER, Huey and other SK Foods' employees in the Northern District of California and elsewhere, in which the parties discussed the misbranding of approximately 18 million pounds of processed tomato products to meet SK Foods' contractual requirements to customers |
| 5B | 6/11/07 | Telephone conversation between defendant SALYER in the Northern District of California and Rahal in the District of New Jersey, during which the two discussed the value of certain SK Foods' employees who routinely falsified COAs and quality control data |

22      79.   Furthermore, on or about the dates set forth below, in the

23  Eastern and Northern Districts of California, for the purpose of

24  executing and attempting to execute the aforementioned scheme and

25  artifice to defraud, defendant SALYER did knowingly cause to be

26  delivered by mail and private and commercial interstate carrier, the

27  items listed below:

28

-33-

| RACKETEERING ACT | DATE | SENDER | ITEM INCLUDED IN MAILING | ASSOCIATED FALSIFICATION |
|---|---|---|---|---|
| 6 | 2/20/01 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Intramark USA in Westwood, New Jersey, via United States Mail, with respect to customer Land O'Lakes | Production date for 16,251 pounds of tomato paste falsified from 9/25/98 to 7/24/99 |
| 7 | 7/10/03 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Gerber Products in Michigan, via United States Mail | Production date for 13,475 pounds of tomato paste falsified from 8/4/00 to 7/7/02 and 7/8/02 |
| 8 | 7/18/03 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Antis Food Products, Inc. in Pennsylvania, via United States Mail | Classifica-tion for 9,217 pounds of tomato paste falsified from conventional to organic |
| 9 | 7/23/03 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Heinz USA in California, via United States Mail | Classifica-tion for 37,721 pounds of tomato paste falsified from conventional to organic |

-34-

| 10 | 3/1/05 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Nestle USA in Ohio, via United States Mail | Mold count for 26,050 pounds of tomato paste falsified from 56% to 40% |
| 11 | 3/7/05 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to San Antonio Farms in Texas, via United States Mail | Production date for 40,032 pounds of tomato paste falsified from 9/23/02 and 9/24/02 to 9/17/03 and 9/18/03 |
| 12 | 1/4/07 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Barilla America, Inc. in Illinois, via United States Mail | Mold count for 54,160 pounds of tomato paste falsified from 58% to 36% |
| 13 | 4/17/07 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Intramark USA in Westwood, New Jersey, via United States Mail, with respect to customer Chelten House | Mold counts for 137,070 pounds of tomato paste falsified from 48-86% to 36-40% |
| 14 | 5/1/07 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Kraft Foods, Inc. in Texas, via United States Mail | Mold counts for 137,066 pounds of tomato paste falsified from 48-86% to 34-40% |

| 15 | 6/22/07 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Con Agra in Nebraska, via United States Mail | Mold count for 5,988 pounds of tomato paste falsified from 74% to 40% |
| 16 | 12/5/07 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to B&G Foods in Maryland, via United States Mail | Mold count for 11,347 pounds of tomato paste falsified from 62% to 40% |
| 17 | 12/18/07 | Dahlman | Invoice sent from SK Foods' Williams, CA facility to General Mills Operations, Inc. in Minnesota, via United States Mail | Mold count for 19,564 pounds of tomato paste falsified from 53% to 40% |
| 18 | 2/4/08 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Heinz USA in California, via United States Mail | Mold count for 4,811 pounds of tomato paste falsified from 76% to 40% |
| 19 | 3/20/08 | Dahlman | Invoice sent from SK Foods' Lemoore, CA facility to Tyson Foods, Inc. in Arkansas, via United States Mail | Mold count for 2,889 pounds of tomato paste falsified from 60% to 20% |

All in violation of Title 18, United States Code, Sections 2, 1341 and 1343.

## Racketeering Act Twenty – Wire Fraud With Respect to Kraft Foods, Inc.

80.   Paragraphs sixty-seven through seventy-six of Count One

-36-

are realleged and incorporated herein as if fully set forth.

81.   Beginning no later than in or about January 2007, and continuing until in or about April 2008, in the Eastern District of California, the Northern District of California and elsewhere, defendant SALYER, and others known to the Grand Jury, did knowingly devise and intend to devise a material scheme and artifice to defraud Kraft, and to obtain money and property from Kraft by means of materially false and fraudulent pretenses, representations and promises, and did use interstate wire communications to execute said scheme, and to conceal said scheme.

82.   The manner and means by which the wire fraud scheme was accomplished are set out below:

83.   During 2007, SK Foods experienced a period during which it was unable to provide an adequate supply of processed tomato paste containing 31% NTSS in order to meet its contractual obligations to certain customers, including Kraft.  In an attempt to alleviate the shortage, defendant SALYER contacted a competing manufacturer of processed tomato products, via email, on January 10, 2007, and arranged to purchase approximately 3,400,000 pounds of processed tomato products containing lower NTSS concentrations of 26% and 28%. Defendant SALYER knew that the product to be purchased from the competitor was also classified as "high mold," and uniformly contained mold counts significantly in excess of the applicable FDA Food Defect Action Level.

84.   The product purchased from the competitor did not meet the

-37-

specifications contained in certain of SK Foods' existing contracts, and was adulterated and unsaleable in the United States due to its excessive mold content.  In order to conceal its inferior quality, defendant SALYER directed Huey and other SK Foods employees to misbrand the product by causing the falsification of certain customer-bound quality control documents so that they incorrectly reflected the product as uniformly containing 31% NTSS tomato paste and a mold count at or below 40%.  One example of defendant SALYER's direction in this regard came in the form of a January 22, 2007, email in which defendant SALYER directed Huey to misbrand the adulterated, high mold paste and to allocate the high mold paste to domestic SK Foods' customers.

85.   Furthermore, at defendant SALYER's direction, Huey and other SK Foods employees subsequently caused the adulterated and misbranded tomato products, and the accompanying falsified quality control documents, to be shipped during the spring of 2007, via interstate carrier, from SK Foods' facilities in the Eastern District of California to Kraft's facilities in other states.  One such shipment occurred on or about April 12, 2007.  On that date, SK Foods shipped tomato product, accompanied by, among other things, a bill of lading, which falsely represented the contents of the shipment, from its facilities in the Eastern District of California to Kraft in Darien, Wisconsin.

86.   In many instances, the misbranded and adulterated tomato products were accompanied by certain quality control documents,

which defendant SALYER ordered falsified so that they misrepresented the NTSS content and mold count of the tomato products in the shipment.  Defendant SALYER's actions in this regard were made with the specific intent to defraud and mislead Kraft.  As a result, Kraft was unknowingly induced to pay for the adulterated and misbranded tomato paste.

87.  On or about the dates set forth below, for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud, defendant SALYER, in the Northern District of California, did knowingly transmit, and cause to be transmitted by means of wire communications in interstate or foreign commerce, the writings, signs, signals and communications described below, any one of which alone constitutes the commission of Racketeering Act Twenty:

| RACKETEERING ACT | DATE | WIRE COMMUNICATION |
| --- | --- | --- |
| 20A | 1/22/07 | Email correspondence from defendant SALYER in the Northern District of California to Huey and Rahal in the District of New Jersey, directing Huey to misbrand approximately 3,400,000 pounds of high mold tomato paste, and to allocate that high mold tomato paste to domestic SK Foods customers |
| 20B | 4/12/07 | Facsimile from SK Foods' facility in Lemoore, in the Eastern District of California, to Intramark USA in the District of New Jersey containing falsified quality control documents sent to Kraft. |

All in violation of Title 18, United States Code, Sections 2

and 1343.

All of the above in violation of Title 18, United States Code, Section 1962(c).

COUNT TWO:   [18 U.S.C. § 1962(d) - Conspiring to Conduct the Affairs of an Enterprise Through a Pattern of Racketeering Activity]

The Grand Jury further charges:

FREDERICK SCOTT SALYER,

defendant herein, as follows:

1.   Paragraphs one through thirty-one of Count One are realleged and incorporated herein as if fully set forth.

## The Racketeering Conspiracy

2.   Beginning in or about January 1998, and continuing through in or about April 2008, within the Eastern District of California and elsewhere, defendant FREDERICK SCOTT SALYER, together with others known to the Grand Jury, being persons employed by and associated with SK Foods, an enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of SK Foods through a pattern of racketeering activity, as that term is defined in Sections 1961(1) and 1961(5) of Title 18, United States Code, consisting of multiple acts indictable under the following provisions of federal law:   18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

-40-

3.   It was a further part of the conspiracy that defendant SALYER agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

All in violation of Title 18, United States Code, Section 1962(d).

COUNT THREE: [18 U.S.C. §§ 1343, 1346 – Honest Services Wire Fraud]

The Grand Jury further charges:

FREDERICK SCOTT SALYER,

defendant herein, as follows:

1.   Paragraphs one through seven, nine through eleven, and seventeen of Count One are realleged and incorporated herein, as if fully set forth.

## I.   **THE SCHEME TO DEFRAUD**

2.   Beginning no later than in or about January 1998, and continuing until in or about April 2008, in the Eastern District of California, the Northern District of California, the Northern District of Texas, the District of New Jersey, and elsewhere, defendant SALYER and others known and unknown to the Grand Jury, did knowingly devise and intend to devise a material scheme and artifice to defraud and deprive Frito-Lay of its right to the honest and faithful services of James Wahl through bribery, kickbacks, and the concealment of material information.

## II.   **MANNER AND MEANS**

The manner and means by which the wire fraud scheme was

-41-

accomplished were as follows:

3.   Paragraphs 36 through 40 of Count One are realleged and incorporated herein, as if fully set forth.

### III.   THE INTERSTATE WIRE COMMUNICATION

4.   On or about April 7, 2008, and for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud and deprive, defendant SALYER did knowingly transmit, and cause to be transmitted by means of wire communications in interstate or foreign commerce, certain writings, signs, signals and communications, namely an email communication from Rahal in the District of New Jersey to defendant SALYER and other SK Foods' leaders in the Eastern and Northern Districts of California enclosing a Morning Star bid proposal to Frito-Lay.

All in violation of Title 18, United States Code, Sections 2, 1343, and 1346.

COUNTS FOUR AND FIVE:      [18 U.S.C. §§ 1343, 1346 – Honest Services
                           Wire Fraud]

The Grand Jury further charges:

FREDERICK SCOTT SALYER,

defendant herein, as follows:

1.   Paragraphs one through seven, nine, fourteen, fifteen, and seventeen of Count One are realleged and incorporated herein, as if fully set forth.

### I.   THE SCHEME TO DEFRAUD

2.   Beginning in or about January 2004, and continuing until in or about April 2008, in the Eastern District of California, the

-42-

Northern District of California, the Northern District of Illinois, the District of New Jersey, and elsewhere, defendant SALYER, and others known and unknown to the Grand Jury, did knowingly devise and intend to devise a material scheme and artifice to defraud and deprive Kraft of its right to the honest and faithful services of Robert Watson through bribery, kickbacks, and the concealment of material information.

## II.   MANNER AND MEANS

The manner and means by which the wire fraud scheme was accomplished were as follows:

3.   Paragraphs 45 through 48 of Count One are realleged and incorporated herein, as if fully set forth.

## III.   THE INTERSTATE WIRE COMMUNICATIONS

4.   On or about the dates set forth below, and for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud and deprive, defendant SALYER did knowingly transmit, and cause to be transmitted by means of wire communications in interstate or foreign commerce, the writings, signs, signals and communications described below:

///

///

///

///

///

///

-43-

| COUNT | DATE | WIRE COMMUNICATION |
|-------|------|--------------------|
| FOUR | 7/11/2007 | Telephone conversation between Rahal in the District of New Jersey and Beasley in the Eastern District of California discussing personal bribe payments made to numerous customer purchasing managers |
| FIVE | 4/8/2008 | Email from Rahal in the District of New Jersey to Huey and Beasley in the Northern and Eastern Districts of California enclosing a Morning Star contract proposal to Kraft |

All in violation of Title 18, United States Code, Sections 2, 1343, and 1346.

COUNT SIX: [18 U.S.C. §§ 1343, 1346 - Honest Services Wire Fraud]

The Grand Jury further charges:

FREDERICK SCOTT SALYER,

defendant herein, as follows:

1.   Paragraphs one through seven, nine, twelve, and thirteen of Count One are realleged and incorporated herein, as if fully set forth.

## I.   **THE SCHEME TO DEFRAUD**

2.   Beginning no later than in or about September 2004, and continuing until in or about April 2008, in the Eastern District of California, the Northern District of California, the District of New Jersey and elsewhere, defendant SALYER, and others known and unknown to the Grand Jury, did knowingly devise and intend to devise a material scheme and artifice to defraud and deprive B&G of its right to the honest and faithful services of Robert Turner through

-44-

bribery, kickbacks, and the concealment of material information.

## II.   **MANNER AND MEANS**

The manner and means by which the wire fraud scheme was accomplished were as follows:

3.   Paragraphs 53 through 57 of Count One are realleged and incorporated herein, as if fully set forth.

## III.   **THE INTERSTATE WIRE COMMUNICATION**

4.   On or about June 13, 2007, and for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud and deprive, defendant SALYER did knowingly transmit, and cause to be transmitted by means of wire communications in interstate or foreign commerce, certain writings, signs, signals and communications, namely an email communication from an SK Foods leader in the Eastern District of California to Rahal in the District of New Jersey, which contained a pricing agreement for a pepper contract between B&G and SK Foods.

All in violation of Title 18, United States Code, Sections 2, 1343, and 1346.

COUNT SEVEN: [18 U.S.C. § 1519 - Destruction, Alteration, or
                    Falsification of Records in a Federal Investigation]

The Grand Jury further charges:

FREDERICK SCOTT SALYER,

defendant herein, as follows:

1.   Paragraphs one through five and nine of Count One are realleged and incorporated herein, as if fully set forth.

2.   On or about April 16, 2008, agents of the Federal Bureau of

-45-

Investigation and the Internal Revenue Service, Criminal

Investigation executed judicially authorized search warrants at SK

Foods' facilities in the Eastern and Northern Districts of

California, and at Intramark's offices in the District of New Jersey

seeking evidence relating to, among other crimes, various acts of

bribery and fraud committed by defendant SALYER, Rahal, and other

leaders, employees and associates of SK Foods.  Defendant SALYER

became aware of the federal investigation in this matter on or about

April 16, 2008.  Subsequently, on or about December 16, 2008, Rahal

pleaded guilty in the Eastern District of California to a three-

count Information charging him with violations of 18 U.S.C. §§

1962(d) and 1957, and 15 U.S.C. § 1.  By way of his publicly-filed

plea agreement, Rahal agreed to cooperate in the government's

ongoing investigation of defendant SALYER, SK Foods and other

individuals and entities in the tomato processing industry.  The

factual basis for Rahal's guilty plea indicated that from 2004 to

2008, Rahal formally served on SK Foods' Board of Directors, and

that Rahal routinely paid bribes to the purchasing managers of many

of SK Foods customers with the knowledge and "at the direction of

certain leaders of SK Foods."  Consequently, defendant SALYER became

aware that Rahal was actively cooperating in the government's

investigation on or about December 16, 2008.

     3.  On or about December 31, 2008, in the Eastern District of

California, and elsewhere, defendant FREDERICK SCOTT SALYER

knowingly altered and falsified, and caused others to alter and

-46-

falsify a document, namely the minutes of a Board of Directors'
meeting for the "SK Foods Entities," which was dated December 14,
2007, so that it omitted reference to "Randy Rahal" as a "Director &
Officer" of "the SK Foods company including all SK Foods entities."
In truth and in fact, as defendant SALYER then well knew, the
original minutes of the December 14, 2007 Board of Directors'
meeting listed "Randy Rahal" as a "Director & Officer" of "the SK
Foods company including all SK Foods entities." Defendant SALYER
altered and falsified the aforementioned document, and caused others
to alter and falsify the document, with the intent to impede,
obstruct, and influence an investigation within the jurisdiction of
the Federal Bureau of Investigation.

All in violation of Title 18, United States Code, Sections 2
and 1519.

COUNT EIGHT: [15 U.S.C. § 1 - Price Fixing]

The Grand Jury further charges:

FREDERICK SCOTT SALYER,

defendant herein, as follows:

1.   Paragraphs one and three of Count One are realleged and
incorporated herein, as if fully set forth.

2.   Beginning in or about January 2006, and continuing until
in or about June 2007, the exact dates being unknown to the Grand
Jury, in the Eastern District of California and elsewhere, defendant
SALYER and others known and unknown to the Grand Jury entered into
and engaged in a combination and conspiracy to suppress and

-47-

eliminate competition by raising and fixing prices of tomato paste to be sold in the United States.  The combination and conspiracy engaged in by defendant SALYER and co-conspirators was in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

3.    The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among defendant SALYER and co-conspirators, the substantial terms of which were:

a.   to fix prices for the sale of tomato paste sold to McCain Foods, USA, Inc. ("McCain"); and

b.   to provide product and receive payment from McCain at the fixed prices.

## I.   **MEANS AND METHODS OF CONSPIRACY**

4.    For the purpose of forming and carrying out the charged combination and conspiracy, defendant SALYER and co-conspirators did those things that they combined and conspired to do, including, among other things:

a.   participating in meetings, conversations, and communications to discuss the prices of tomato paste;

b.   agreeing, during those meetings, conversations, and communications, to fix prices of tomato paste to McCain for use at its facilities located in the United States; and

-48-

c.   issuing price quotations to McCain in accordance with the agreement reached.

## II.   TRADE AND COMMERCE

5.   During the period covered by this Count, defendant SALYER and co-conspirators sold and distributed processed tomato products from processing facilities located in the State of California in a continuous and uninterrupted flow of interstate trade and commerce to customers located outside the State of California.

6.   The business activities of defendant SALYER and co-conspirators that are the subject of this Count were within the flow of, and substantially affected, interstate trade and commerce.

## III.   VENUE

7.   The combination and conspiracy charged in this Count was carried out, in part, in the Eastern District of California, within the five years preceding the filing of this Indictment.

## IV.   CO-CONSPIRATORS

8.   Various corporations and individuals, not made defendants in this Count, participated as co-conspirators in the offense charged in this Count and performed acts and made statements in furtherance of it.

All in violation of Title 15, United States Code, Section 1.

///
///
///
///

-49-

COUNT NINE: [15 U.S.C. § 1 - Price Fixing]

The Grand Jury further charges:

FREDERICK SCOTT SALYER,

defendant herein, as follows:

1.   Paragraphs one and three of Count One and paragraphs five through eight of Count Eight are realleged and incorporated herein, as if fully set forth.

2.   Beginning in or about January 2006, and continuing until in or about June 2007, the exact dates being unknown to the Grand Jury, in the Eastern District of California and elsewhere, defendant SALYER and others known and unknown to the Grand Jury entered into and engaged in a combination and conspiracy to suppress and eliminate competition by increasing and fixing prices of processed tomato products to be sold in the United States.  The combination and conspiracy engaged in by defendant SALYER and co-conspirators was in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among defendant SALYER and co-conspirators, the substantial terms of which were:

a.   to fix prices for the sale of processed tomato products to ConAgra; and

b.   to provide product and receive payment from ConAgra as a result of the fixed prices.

-50-

## I.   MEANS AND METHODS OF THE CONSPIRACY

For the purpose of forming and carrying out the charged combination and conspiracy, defendant SALYER and co-conspirators did those things that they combined and conspired to do, including, among other things:

a.   participating in meetings, conversations, and communications to discuss the prices of processed tomato products;

b.   agreeing, during those meetings, conversations, and communications, to increase and fix the prices of processed tomato products to be sold to ConAgra, for use by ConAgra at facilities located in the United States;

c.   issuing price quotations to, and receiving payment from, ConAgra in accordance with the agreements reached.

All in violation of Title 15, United States Code, Section 1.

COUNT TEN: [15 U.S.C. § 1 - Price Fixing and Bid Rigging]

The Grand Jury further charges:

FREDERICK SCOTT SALYER,

defendant herein, as follows:

1.   Paragraphs one and three of Count One and paragraphs five through eight of Count Eight are realleged and incorporated herein, as if fully set forth.

2.   Beginning in or about January 2007, and continuing until in or about April 2008, the exact dates being unknown to the Grand Jury, in the Eastern District of California and elsewhere, defendant SALYER and others known and unknown to the Grand Jury entered into

-51-

and engaged in a combination and conspiracy to suppress and
eliminate competition by fixing prices and rigging bids for the sale
of tomato paste to be sold in the United States.  The combination
and conspiracy engaged in by defendant SALYER and co-conspirators
was in unreasonable restraint of interstate trade and commerce in
violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

3.    The charged combination and conspiracy consisted of a
continuing agreement, understanding, and concert of action among
defendant SALYER and co-conspirators, the substantial terms of which
were:

a.    to allocate among defendant SALYER and co-conspirators
contracts for the sale of tomato paste to Kraft;

b.    to fix prices for, and submit collusive,
noncompetitive, and rigged bids for contracts for the sale of tomato
paste to Kraft; and

c.    to provide product and receive payment from Kraft as a
result of the price fixing and collusive bidding.

## I.   **MEANS AND METHODS OF THE CONSPIRACY**

4.    For the purpose of forming and carrying out the charged
combination and conspiracy, defendant SALYER and co-conspirators did
those things that they combined and conspired to do, including,
among other things:

a.    participating in meetings, conversations, and
communications to discuss the prices of processed tomato products
sold to Kraft;

-52-

b.   agreeing, during those meetings, conversations, and communications, to fix prices and submit collusive, noncompetitive, and rigged bids for the sale of tomato paste to Kraft for use in Kraft facilities located in the United States;

c.   issuing bid quotations to, and receiving payment from, Kraft in accordance with the agreements reached; and

d.   bribing a purchasing agent for Kraft to obtain confidential bid information in order to monitor compliance with the agreements reached.

All in violation of Title 15, United States Code, Section 1.

COUNT ELEVEN: [15 U.S.C. § 1 - Price Fixing]

The Grand Jury further charges:

FREDERICK SCOTT SALYER,

defendant herein, as follows:

1.   Paragraphs one and three of Count One and paragraphs five through eight of Count Eight are realleged and incorporated herein, as if fully set forth.

2.   Beginning in or about August 2005, and continuing until in or about April 2008, the exact dates being unknown to the Grand Jury, in the Eastern District of California and elsewhere, defendant SALYER and others known and unknown to the Grand Jury entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing prices of processed tomato products to be sold in the United States.   The combination and conspiracy

-53-

engaged in by defendant SALYER and co-conspirators was in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

3.   The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among defendant SALYER and co-conspirators, the substantial terms of which were:

a.   to fix prices by including certain charges in contracts for the sale of processed tomato products; and

b.   to provide product and receive payment from customers as a result of the price fixing.

## I.   MEANS AND METHODS OF THE CONSPIRACY

4.   For the purpose of forming and carrying out the charged combination and conspiracy, defendant SALYER and co-conspirators did those things that they combined and conspired to do, including, among other things:

a.   participating in meetings, conversations, and communications to discuss adding a gas adjuster charge in contracts for the sale of processed tomato products;

b.   agreeing, during those meetings, conversations, and communications, to include a gas adjuster charge as part of the offer price to customers for processed tomato products to be utilized by those customers at facilities located in the United States; and

c.   entering into contracts in accordance with the

1   agreements reached.

2       All in violation of Title 15, United States Code, Section 1.

3   ///

4   COUNT TWELVE: [15 U.S.C. § 1 - Price Fixing]

5       The Grand Jury further charges:

6                       FREDERICK SCOTT SALYER,

7   defendant herein, as follows:

8

9       1.   Paragraphs one and three of Count One and paragraphs five

10  through eight of Count Eight are realleged and incorporated herein,

11  as if fully set forth.

12      2.   Beginning in or about the fall of 2006, and continuing

13  until in or about April 2008, the exact dates being unknown to the

14  Grand Jury, in the Eastern District of California and elsewhere,

15  defendant SALYER and others known and unknown to the Grand Jury

16  entered into and engaged in a combination and conspiracy to suppress

17  and eliminate competition by fixing prices of processed tomato

18  products to be sold in the United States.  The combination and

19  conspiracy engaged in by defendant SALYER and co-conspirators was in

20  unreasonable restraint of interstate trade and commerce in violation

21  of Section 1 of the Sherman Act (15 U.S.C. § 1).

22      3.   The charged combination and conspiracy consisted of a

23  continuing agreement, understanding, and concert of action among

24  defendant SALYER and co-conspirators, the substantial terms of which

25  were:

26

27              a.   to raise and fix prices for bin deposits in contracts

28

                                   -55-

for the sale of processed tomato products; and

        b.   to provide product and receive payment from customers as a result of the price fixing.

### I.   MEANS AND METHODS OF THE CONSPIRACY

4.   For the purpose of forming and carrying out the charged combination and conspiracy, defendant SALYER and coconspirators did those things that they combined and conspired to do, including, among other things:

        a.   participating in meetings, conversations, and communications to discuss the prices of bin deposits for processed tomato products;

        b.   agreeing, during those meetings, conversations, and communications, to raise and fix prices of bin deposits at $90 for processed tomato products sold to customers in bins for use by those customers at facilities located in the United States; and

        c.   issuing price quotations and receiving payment in accordance with the agreements reached.

All in violation of Title 15, United States Code, Section 1.

FORFEITURE ALLEGATION: [18 U.S.C. § 1963 - Racketeering Forfeiture]

        The Grand Jury further charges:

FREDERICK SCOTT SALYER,

defendant herein, as follows:

1.   The allegations contained in Counts One and Two of this Indictment are hereby repeated, realleged and incorporated by reference herein, as though fully set forth at length for the

purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 1963, and Title 28, United States Code, Section 2461(c).

2.   Pursuant to Rule 32.2(a), Fed. R. Crim. P., defendant SALYER is hereby notified that, upon conviction of either of the violations of Title 18, United States Code, Section 1962, as charged in Counts One and Two of this Indictment, the defendant shall forfeit, pursuant to Title 18, United States Code, Section 1963:

a)   all interests acquired and maintained in violation of Title 18, United States Code, Section 1962;

b)   all interests in, securities of, claims against, and property and contractual rights of any kind affording a source of influence over, the enterprise named and described herein which the defendant established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and

c)   all property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962.

The property subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1), (a)(2), and (a)(3), includes, but is not limited to, at least $8,800,000, said amount being the total of the interests acquired

-57-

and the gross proceeds obtained through the violations of Title 18, United States Code, Section 1962.

3.   Pursuant to Title 18, United States Code, Section 1963(m) and Title 21, United States Code, Section 853(p), as incorporated by 28 U.S.C. § 2461(c), defendant shall forfeit substitute property up to the value of the property described in the previous paragraph if that property, as a result of any act or omission of the defendant:

a)   cannot be located upon the exercise of due diligence;

b)   has been transferred or sold to, or deposited with, a third party;

c)   has been placed beyond the jurisdiction of the Court;

d)   has been substantially diminished in value; or

e)   has been commingled with other property which cannot be subdivided without difficulty.

All pursuant to Title 18, United States Code, Section 1963; Title 28, United States Code, Section 2461(c); and Rule 32.2(a) of the Federal Rules of Criminal Procedure.

///
///
///
///
///
///
///
///

-58-

FORFEITURE ALLEGATION:      [18 U.S.C. § 981(a)(1)(C), 28
                            U.S.C. § 2461(c), 21 U.S.C. § 853 -
                            Forfeiture]

The Grand Jury further charges:

FREDERICK SCOTT SALYER,

defendant herein, as follows:

1.    The allegations contained in Counts Three Through Six of this Indictment are hereby realleged and incorporated by reference, as if fully set forth herein, for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853.

2.    From in or about January 1998, continuously thereafter, up to and including in or about April 2008, in the Eastern District of California, the Northern District of California, and elsewhere, defendant SALYER violated Title 18, United States Code, Section 1343, as alleged in Counts Three Through Six, respectively.  Upon conviction of any of Counts Three through Six, SALYER shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853, the following:

a.    All right, title, and interest in any and all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses;

b.    A sum of money equal to the total amount of proceeds derived from each such offense for which defendant is convicted.

-59-

3.   Pursuant to Title 21, United States Code, Section 853(p),
as incorporated by Title 28, United States Code, Section 2461(c),
defendant SALYER, if so convicted, shall forfeit substitute
property, up to the total value of the property described in
paragraph 2(a) if, by any act or omission of the defendant, the
property described in paragraph 2(a), or any portion thereof, (a)
cannot be located upon the exercise of due diligence; (b) has been
transferred or sold to, or deposited with, a third party; (c) has
been placed beyond the jurisdiction of the court; (d) has been
substantially diminished in value; or (e) has been commingled with
other property that cannot be divided without difficulty.

All pursuant to Title 18, United States Code, Section
981(a)(1)(C), Title 28, United States Code, Section 2461(c), and

///
///
///
///
///
///
///
///
///
///
///
///

-60-

1 | Title 21, United States Code, Section 853.

3                    A TRUE BILL.



FOREPERSON

BENJAMIN B. WAGNER
United States Attorney

SHARIS A. POZEN
Acting Assistant Attorney General

SCOTT D. HAMMOND
Deputy Assistant Attorney General

JOHN F. TERZAKEN
Director of Criminal Enforcement

ANNA T. PLETCHER
Trial Attorney
Antitrust Division

# UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

## THE UNITED STATES OF AMERICA
*vs.*

Federick Scott Salyer

### S E C O N D  S U P E R S E D I N G  I N D I C T M E N T

**VIOLATION(S):** 18 U.S.C. § 1962(c) -Conducting the Affairs of
an Enterprise Through a Pattern of Racketeering Activity;
18 U.S.C. § 1962 (d) - Conspiring to Conduct the Affairs of an
Enterprise Through a Pattern of Racketeering Activity;
18 U.S.C. § 1343 - Wire Fraud (4 Counts);
18 U.S.C. § 1519-Destruction, Alteration, or Falsification of
Records in a Federal Investigation;
18 U.S.C. § 1963-Forfeiture; 18 U.S.C. § 981(a)(1)(C),
28 U.S.C. § 2461(c), 21 U.S.C. § 853-Forfeiture

*A true bill,*

_ _ _ _ _ _ _ _ _ _ _ _ _ _ /S/ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
*Foreman.*

*Filed in open court this* _ _ _ _ _ _ _ _ _ _ _ _ *day*

*of* _ _ _ _ _ _ _ _ _ _ _ _ _, *A.D.* 20 _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
*Clerk.*

*Bail, $* _ _ _ _ ~~NO PROCESS NECESSARY~~

_ _ _ _ _ _ _ _ _ William W. Shubb _ _ _ _ _ _ _ _ _ _
8/17/2011

GPO 863 525

Penalty Slip
Second Superseding Indictment

FEDERICK SCOTT SALYER

Count 1

Violation:    18 U.S.C. § 1962 (c)-Conducting the Affairs of an Enterprise Through a Pattern
              of Racketeering Activity

Penalty:      Not More than 20 years, or
              Not More than $250,000,000, or both
              TSR 3 years

Count 2

Violation:    18 U.S.C. § 1962 (d)-Conspiring to Conduct the Affairs of an Enterprise
              Through a Pattern of Racketeering Activity

Penalty:      Not More than 20 years, or
              Not More than $250,000,000 fine, or both
              TSR 3 years

Count 3

Violation:    18 U.S.C. § 1343-Wire Fraud

Penalty:      Not More than 20 years, or
              Not More than $250,000,000 fine, or both
              TSR 3 years

Counts 4 and 5

Violation:    18 U.S.C. § 1343-Wire Fraud

Penalty:      Not More than 20 years, or
              Not More than $250,000,000 fine, or both
              TSR 3 years

Count 6

Violation:    18 U.S.C. § 1343-Wire Fraud

Penalty:      Not More than 20 years, or
              Not More than $250,000,000 fine, or both
              TSR 3 years

Count 7

Violation:    18 U.S.C. § 1519-Destruction, Alteration, or Falsification of Records in a Federal
              Investigation

Penalty:      Not More than 20 Years, or
              Not More than $250,000,000 fine, or both
              TSR 3 years

Forfeiture Allegation:

Violation:    Racketeering Forfeiture-18 U.S.C. § 1963

Forfeiture Allegation:

Violation:    Forfeiture- 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461 (c), 21 U.S.C. § 853

Assessment: $100.00 special assessment (each count)