UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        NO. CR. S-10-061 LKK

    Plaintiff,

  v.                        O R D E R

FREDERICK SCOTT SALYER,

    Defendant.
                                   /

On July 20, 2010, defendant Salyer sought to suppress evidence that had been obtained through warrantless searches and seizures carried out by a government confidential informant. Dkt. No. 144. On February 7, 2011, this court denied Salyer's motion, finding that he lacked standing "relative to the searches which he seeks to suppress." Dkt. No. 273 at 2. Defendant seeks reconsideration because he believes he is entitled to develop a factual record demonstrating his reasonable expectation of privacy "in the places, things and records searched by the government." Upon

reconsideration, the motion to suppress is again DENIED.[1]

**SUMMARY**

It is the defendant's burden to establish his standing to challenge a search or seizure on Fourth Amendment grounds. U.S. v. Ziegler, 474 F.3d 1184, 1189 (9th Cir. 2007), cert. denied, 552 U.S. 1105 (2008) (it is defendant's "burden to prove" his claim to a "*legitimate* expectation of privacy in the place searched or the item seized") (emphasis in text). Where, as here, defendant requests an evidentiary hearing, he must make a threshold showing that there are disputed facts "which, if proved, would allow the court to suppress" the evidence. U.S. v. Howell, 231 F.3d 615, 620-21 (9th Cir.), cert. denied, 534 U.S. 831 (2000).

In the circumstances presented by this case, the possible facts that could establish defendant's standing are: (i) the confidential informant searched places personal to Salyer, such as his personal office, see Mancusi v. DeForte, 392 U.S. 364, 369 (1968) (DeForte "had Fourth Amendment standing to object to the admission" of papers seized from his office, even though he

---

[1] It is not clear that defendant's motion for reconsideration meets the basic standards for such a motion. See U.S. v. Navarro, 972 F. Supp. 1296 (E.D. Cal. 1997) (reconsideration requires "a change in the controlling law, facts, or other circumstances, the need to correct a clear error, or the need to prevent manifest injustice"), rev'd on other grounds, 160 F.3d 1254 (9th Cir. 1998), cert. denied, 527 U.S. 1011 (1999). This motion appears to be simply taking another tack on arguments already made, and addressing circumstances already existing when the original motion was made. Nevertheless, given new counsel, the court will proceed to reconsideration.

shared it with others); (ii) the confidential informant searched or seized items personal to Salyer, see <u>U.S. v. SDI Future Health, Inc.</u>, 568 F.3d 684, 698 (9th Cir. 2009) (standing may be shown by "some personal connection to the places searched and the materials seized"); or (iii) the circumstances of the search here are sufficiently close to those of the wiretapping in <u>U.S. v. Gonzalez, Inc.</u>, 412 F.3d 1102 (9th Cir. 2005), <u>as amended by</u> 437 F.3d 854, 1116 (2006) (in determining the reasonableness of the expectation of privacy "it is important to assess the nature of the location where these conversations were seized"), as to warrant standing.

Here, Salyer has not met his burden to establish standing, nor has he made a threshold showing to justify an evidentiary hearing on the matter.

**ANALYSIS**

"The Fourth Amendment ensures that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" <u>U.S. v. SDI Future Health, Inc.</u>, 568 F.3d 684, 694-95 (9th Cir. 2009).  It is undisputed that a confidential informant carried out searches of, and seizures from, the premises of SK Foods, at the behest of the government, and that he did so without a warrant.  The question for the

3

reconsideration motion is whether defendant Salyer has standing to challenge these searches and seizures.[2]

### I.  **MANCUSI v. DeFORTE**

In <u>Mancusi v. DeForte</u>, 392 U.S. 364 (1968), the Supreme Court held that a union official had Fourth Amendment standing to challenge the government's search of, and seizure of documents from, the office he worked in.  The office was a large room he shared with other union officials; it was not for his own exclusive use.  The official reasonably expected that no one would enter the office other than those with whom he shared the office, and their invitees.  In other words, Mancusi had a reasonable expectation of privacy in his "personal office." Moreover, he had standing even though he was not the owner of the premises, even though he shared the office with other union officials, and even though the documents seized were *union* documents, not personal documents.

The <u>Mancusi</u> holding is still the law of the land.  <u>See, e.g.</u>, <u>SDI</u>, 568 F.3d at 699 ("[o]f course" the defendants "have standing to challenge the admission of any evidence obtained from their own personal, internal offices"); <u>U.S. v. Ziegler</u>, 474 F.3d 1184, 1190 (9th Cir. 2007) (defendant "had a reasonable

---

[2] Although this and other courts use the term "standing" in this context, it is actually a shorthand for whether the search and seizure violated *defendant's* rights, rather than those of a third party.  <u>See</u> <u>Rakas v. Illinois</u>, 439 U.S. 128, 139 (1978) (distinguishing Article III standing from the Fourth Amendment requirements of injury in fact and "whether the proponent is asserting his own legal rights and interests rather than basing his claim for relief upon the rights of third parties").

4

expectation of privacy in his office"), cert. denied, 552 U.S. 1105 (2008); Ortega v. O'Connor, 146 F.3d 1149, 1157 (9th Cir. 1998) ("it was clearly established in 1981 that, in the absence of an accepted practice or regulation to the contrary, government employees such as Dr. Ortega had a reasonable expectation of privacy in their private offices, desks, and file cabinets"); U.S. v. Taketa, 923 F.2d 665, 673 (9th Cir. 1991) ("O'Brien had a reasonable expectation of privacy in his office").[3]

The government does not seem to dispute that Salyer would have standing to challenge a warrantless government search of his personal office, if it had occurred. The problem for Salyer is that he has made no showing – and does not even assert – that the confidential informant searched or seized anything from Salyer's own personal office. In the absence of even a threshold showing that the confidential informant searched or seized anything from Salyer's own personal office, Mancusi does not support standing or the need for an evidentiary hearing to

---

[3] Accord, O'Connor v. Ortega, 480 U.S. 709 (1987), in which the Plurality acknowledged the continuing validity of Mancusi, and one Concurring and four Dissenting Members of the Court agreed that a defendant had a reasonable expectation of privacy in his private office. See 480 U.S. at 717-16 (O'Connor, J., Plurality Opinion) (acknowledging Mancusi's holding that defendant "had a privacy interest in the office"); 480 U.S. at 730 (Scalia, J., concurring in the judgment) ("one's personal office is constitutionally protected against warrantless intrusions by the police, even though employer and co-workers are not excluded"); 480 U.S. at 732 (Blackmun, J., dissenting, with Brennan, Marshall and Stevens, JJ.) ("Dr. Ortega had an expectation of privacy in his office, desk, and file cabinets");

5

1 determine standing.

## II. U.S. v. SDI FUTURE HEALTH, INC.

At the hearing on this motion, Salyer identified a document – which he asserts was previously submitted to court with the original motion to suppress – that he claims could have come from "Sky Park." Salyer says that Sky Park is the location of SK Foods's headquarters, its executive suite, and his own personal office. However, taking an expansive view of Mancusi standing, Salyer claims that this one document could have come from the office of "Alan Huey," an SK Foods executive who apparently had an office within Salyer's "executive suite" at Sky Park. Neither Mancusi nor any of its progeny goes so far as to grant to defendant a reasonable expectation of privacy in someone else's office. Salyer apparently argues that he has standing to challenge an illegal search of Huey's office because that office is a part of Salyer's executive suite. The problem for Salyer here is that SDI precludes such an argument.

A. Circumstances and Holding of SDI

In SDI Future Health, the Ninth Circuit considered the Fourth Amendment standing of two controlling shareholders of a corporation. They sought the suppression of search warrant evidence obtained from SDI's headquarters. Both defendants maintained offices at the headquarters location. Apparently, the company itself "was a moderate size company employing approximately 40-50 employees at its corporate headquarters and several hundred others at other locations around the country."

6

See <u>U.S. v. SDI Future Health, Inc.</u>, 2006 WL 4457335 *18 (D. Nev. 2006) (Mag. J.).  The district court found that both defendants had standing, and suppressed the evidence.  The Ninth Circuit reversed and remanded.

The Court determined that "[o]f course" the defendants "do have standing to challenge the admission of any evidence obtained from their own personal, internal offices." <u>SDI</u>, 568 F.3d at 699.  However, as for the search of the remainder of the headquarters, the Court found that it fell into a "gap" in existing Ninth Circuit law: "it is unclear in which premises and materials belonging to a corporation a corporate employee has a legitimate expectation of privacy."  It then applied guidance provided by the Tenth Circuit in <u>U.S. v. Anderson</u>, 154 F.3d 1225, 1230-32 (1998), to "fill in the gap." <u>SDI</u>, 568 F.3d at 697.

Thus the Ninth Circuit was poised to address precisely the issue we face here: <u>Mancusi</u> grants standing to challenge a search of one's own, personal office, but does not specifically address the result when the search goes beyond the boundaries of one's own, internal office, and spills out into the surrounding headquarters offices.  <u>SDI</u> resolved the issue thus:

> except in the case of a small business over which an individual exercises daily management and control, an individual challenging a search of workplace areas *beyond his own internal office* must generally show some personal connection to the places searched and

7

the materials seized.

SDI, 568 F.3d at 698 (emphasis added).  Because neither defendant claimed "to enjoy 'exclusive use' of the places searched – that is, the entire SDI office," a remand was needed to see if they could show "a personal connection, along the lines we have drawn out of Anderson, to justify an expectation of privacy."  SDI, 568 F.3d at 698.

SDI teaches then, that Mancusi standing does not extend beyond the defendant's "own internal office," even when that office is part of a headquarters that houses other executives of the company.  Defendant can, however, challenge illegal searches or seizures from elsewhere in the workplace – including elsewhere in the headquarters where he maintains an office – if he can show "some personal connection" to the thing searched or seized, or to the place that is searched.  SDI, 568 F.3d at 698.[4]  Since, as discussed above, Salyer has made no showing that anything was taken from his own, personal office, nor has he made a threshold showing that an evidentiary hearing is needed, he can only rely on the possibility that the confidential informant searched some other place that was personal to Salyer, or seized an item that was personal to him.

---

[4] The "strength of such personal connection" will be related to the following factors: "(1) whether the item seized is personal property or otherwise kept in a private place separate from other work-related material; (2) whether the defendant had custody or immediate control of the item when officers seized it; and (3) whether the defendant took precautions on his own behalf to secure the place searched or things seized from any interference without his authorization."  SDI, 568 F.3d at 698.

1        B.   Application of SDI

2        Salyer has made no showing that the confidential informant
3   search any other place personal to him, or that any item seized
4   was personal to him in any way.[5]  To the contrary, the original
5   suppression motion makes very clear that the confidential
6   informant traveled far and wide to *company* locations and
7   retrieved *company* documents.  Although many company locations,
8   including offices and warehouses, are mentioned as locales of
9   the confidential informant's search, Salyer's own, internal
10  office is not among them.

11   **III. U.S. v. GONZALES**

12       The binding authority of Mancusi and SDI Future Health,
13  combined with the absence of even a threshold showing that the
14  confidential informant searched Salyer's personal office or
15  seized anything personal to Salyer, would thus seem to preclude
16  any possibility of standing for Salyer to challenge the
17  warrantless searches of SK Foods.

18       Ever resourceful, however, Salyer reaches out to an
19  apparent "exception" identified by SDI Future Health, namely,
20  "the case of a small business over which an individual exercises
21  daily management and control."  SDI Future Health, 568 F.3d at

---

[5] Salyer does not explain his failure to do so, but the court notes that his ability to make a protected (or immunized) statement in support of his Fourth Amendment challenge is protected by Simmons v. U.S., 390 U.S. 377 (1968).  The absence of any assertion that anything personal to *Salyer* is particularly striking considering that Salyer does allege that the confidential informant retrieved the personal calendar of "Jim McKendry."  Motion To Suppress Warrantless Searches at 18 (Dkt. No. 145 at 21).

698.  This is clearly a reference to <u>Gonzalez</u>, which involved the "'small, family-run business housing only 25 employees at its peak.'"  <u>SDI Future Health</u>, 568 F.3d at 696 (<u>quoting</u>, <u>Gonzalez</u>, 412 F.3d at 1116).

  A. Circumstances and Holding

  Francisco Gonzalez was the "founder and vice president" of Gonzalez Inc. dba Golden State Transportation ("GST"). <u>Gonzalez</u>, 412 F.3d at 1107.  Antonio Gonzalez was the president and Chief Operating Office of GST, and the son of Francisco Gonzalez.  <u>Id.</u>[6]  GST was a bus company that had terminals in nine Western States.  412 F.3d at 1106.  In addition, there clearly are other employees of the company, such as terminal employees and dispatchers.[7]

  GST's headquarters office however, was a rather more modest affair, housed in a building on Blake Avenue in Los Angeles. The Ninth Circuit described it thus: "the Blake Avenue office was a small, family-run business housing only 25 employees at

---

[6] In their briefs on appeal, the government asserted that two other sons of Francisco Gonzalez also had management positions at GST.

[7] <u>See</u> <u>Gonzalez</u>, 412 F.3d at 1107 ("the government intercepted an additional telephone conversation between Francisco and a Phoenix terminal employee"); <u>see</u> <u>Gonzalez</u>, 412 F.3d at 1109 (the dispatcher and manager confidential informants were not identified "as having worked at the Blake Avenue office").  According to the Gonzalezes' appellate brief, the company had 500 employees at its peak, and served 50 cities.  The government, in its appeal brief, clearly agreed that this was a large company, describing it as "a public bus company" that had "bus operations in Arizona and Texas ... [and] terminals in nine western states, in locations that included El Paso, Tucson, Phoenix, Albuquerque, Las Vegas, Denver, and Los Angeles, and cities in Mexico."

10

its peak." 412 F.3d at 1116. It is not entirely clear why the Ninth Circuit referred to the Blake Avenue office as a "small, family run business."[8] However, it is the case that the Gonzalezes *personally* owned the premises that housed GST's headquarters, and leased it to GST. Thus it would appear that the <u>building</u> was the "small, family-run business" that the <u>Gonzalez</u> court was referring to. In any event, it is clear that it was <u>not</u> a reference to the company, GST, overall, which plainly was not a "small, family-business." Furthermore, the Ninth Circuit's count of 25 employees is apparently a reference only to "the 25 people with offices at Blake Avenue." <u>See</u> <u>Gonzalez</u>, 412 F.3d at 1108 ("The evidence produced in the Franks hearing, however, indicated that only one of the 25 people with offices at Blake Avenue was a member of the Gonzalez family").

The government applied for and was granted permission to wiretap the telephones in GST's terminals in Phoenix and Tuscon. Later, it applied for and was granted wiretaps in "GST's Blake Avenue office in Los Angeles." <u>Id.</u> The district court denied the Gonzalezes' motion to suppress the evidence garnered from the Phoenix and Tuscon wiretaps, but granted the motion to suppress the Blake Avenue office wiretap evidence. 412 F.3d at

---

[8] It also is not clear why there was any discussion of its size and family-run nature. In <u>Alderman v. U.S.</u> 394 U.S. 165 (1969), the Supreme Court, without any discussion of the size of the business or premises, held that the wiretap statute granted a defendant standing to challenge a wiretap so long as he was the "owner" of the business premises where the wiretaps were placed. There was no dispute in <u>Gonzalez</u> that the Gonzalezes personally owned the premises where the wiretaps were placed.

11

1109. Only the suppression of the Blake Avenue wiretap evidence was appealed. Id. ("The government timely appeals the suppression of evidence from the Blake Avenue wiretap and the granting of standing to Antonio and Francisco to challenge all intercepted calls under the Blake Avenue wiretap"). Accordingly, Gonzalez did not address standing to challenge wiretaps of an entire company, only the wiretapping of the small, family-owned premises which housed the company's headquarters office.

On the government's appeal, the Ninth Circuit found that the Gonzalezes had standing to challenge "all intercepted communications from the Blake Avenue wiretap, because they had "a reasonable expectation of privacy over calls made on the premises." 412 F.3d at 1109 & 1117.

## 2. Application of Gonzalez

In support of his claim of standing, Salyer asserts that SK Foods "is owned 100% by Salyer." The government does not dispute the assertion of ownership.[9] Salyer further argues that

---

[9] Nevertheless, Salyer's relationship to SK Foods appears to be more complicated than simple "100%" ownership. According to Salyer, "SK Foods is a limited partnership." Motion To Reconsider (Dkt. No. 340-2) at 6. Forty-five percent (45%) of SK Foods is owned by its limited partner, Salyer's family trust. Salyer claims that he owns and controls the family trust. The other 55% of SK Foods, according to Salyer, is owned by its general partner, SKPM, Inc., which Salyer says is an S-Corporation. In turn, Salyer says that SKPM, Inc. is "wholly owned" by Salyer's family trust, which as noted, Salyer says he owns. In other words, Salyer asks the court to ignore all the structures which obscure his asserted ownership of SK Foods. Since resolution of this motion does not turn on ownership, however, there is no need to discuss the matter further.

12

SK Foods fits the mold of the "small, family-run business" discussed in U.S. v. Gonzalez. Inc., 412 F.3d 1102 (9th Cir. 2005), as amended by 437 F.3d 854 (2006). This argument would seem to be made only in support of the position that Salyer has standing to challenge the search of his personal office, and possibly, his executive suite, or even the entire headquarters building. But Salyer appears to argue, that Gonzalez grants him standing to challenge searches of all of SK Foods, no matter where the searches occurred.

Gonzalez does not help Salyer in his broad claim of standing to challenge any illegal search of SK Foods. Gonzalez only granted standing to challenge a search and seizure (wiretap) of that portion of defendants' business which consisted of their family owned premises that housed the company's headquarters. It did not involve standing to challenge searches or seizures carried out throughout the rest of the business's premises.[10]

Salyer's attempt to expand Gonzalez standing beyond its Alderman roots, and beyond the scope of Mancusi has already been rejected by the Ninth Circuit in SDI. In SDI, as here, the defendants argued that Gonzalez gave them standing to

---

[10] As noted, the government in Gonzalez obtained wiretaps for the company's terminals. Those wiretaps were not involved in the appeal. Salyer correctly argues that Gonzalez only addressed standing to challenge the wiretapping of the "Blake Avenue office," but he nevertheless goes on to argue that the case somehow also grants standing to challenge a search of the entire company's premises.

13

challenge searches of the headquarters, not just their own internal offices.  The SDI court expressly rejected that attempt.  Under SDI, therefore, Salyer may only challenge the search and seizure of SK Foods property if the search was of "his own internal office," or if the things seized are personal to him.  SDI, 568 F.3d at 698.

More hopeful for Salyer is his claim that a document may have been taken from the office of Alan Huey, who had an office in the SK Foods headquarters.  Here, Salyer implicitly argues that Gonzalez stretched the notion of the "internal office" to reach as far out as the headquarters building, and therefore it would cover the search of Huey's office.

The problem for Salyer is that this interpretation requires way too imaginative a reading of Gonzalez.  That case simply did not address the issue of whether standing extends beyond the Gonzalez's personal or internal offices; in fact, it never discusses the issue, nor even cites Mancusi.  In fact, Gonzalez is completely governed by Alderman, the Supreme Court case.  Alderman had already held that the owner of business premises had standing to challenge wiretaps of those premises, precisely the issue raised in Gonzalez.  Accordingly, the holding of Gonzalez is the same as the holding of Alderman, namely, the owner of business premises has standing to challenge a government wiretap of those premises.  As far as this court can tell, all the rest is a recitation of the circumstances present, but not actually

14

necessary to the decision.[11]

Setting all the extraneous discussion aside then, Salyer is left with SDI's teaching that a defendant has no standing to challenge the search of business premises beyond his own, internal office.[12] Salyer has made no showing that anything was taken from his own, internal office.

**IV.  TIMELINESS**

Finally, defendant's argument about the need for an evidentiary hearing to determine whether the confidential informant searched his personal office – which in his view apparently extends to Alan Huey's office – comes down to a

---

[11] Gonzalez launched into its discussion of the "nature of the location" where the seizures occurred, after noting that the government claimed that Alderman involved a residential property, not a "commercial" property, and was therefore distinguishable. See Gonzalez, 412 at 1116. But in fact, Alderman involved the defendant's "place of business," 394 U.S. at 167, just like the premises in Gonzalez, and just like the premises in SK Foods.

[12] Although SDI itself goes on to set forth all the circumstances in Gonzalez, it does not explain which of them really matters for the standing determination. See, e.g. SDI Future Health, 568 at 696 ("in Gonzalez we focused on the close control that the owner-operators exercised over their small business, which happened to be family-run"); id. (in Gonzalez, "we explicitly tied the defendants' standing to the 'nature of the location.'"); id. ("The defendants exercised, in the context of a 'small, family-run business housing only 25 employees at its peak,' 'managerial control over [the] day-to-day opeartions' of the office"); id. ("they owned the building where the office was located"); id. ("they not only could access the office but actually 'exercised full access to the building'"); id. at 697 (at most, defendants "managed and worked in the office of a business of which they were, together, controlling shareholders"); id. (the company's headquarters "is twice the size of the office at issue in Gonzalez"); id. (defendants "owned and had authority to set policy at SDI); id. (no showing that defendants "personally managed the operation of the office on a daily basis").

single document which defendant brandished at the hearing on this motion.

The problem for Salyer here is that the hearing on the Motion To Reconsider is way too late to *identify* a document as possibly coming from Alan Huey's office, even if the document was *submitted*, with a mountain of other documents, with the original motion to suppress.[13]  Defendant's opportunity to identify this document, and others like it, as critical to the standing issue, has long passed.[14]

Defendant's last-minute move is further weakened by the conceded fact that the confidential informant attended a meeting where the same document – or perhaps a different version of the same document – was provided, and which was later e-mailed to the confidential informant.  Although defendant argues that the document he brandished is from a different year, it does not help his argument – that it could

---

[13] It is not for the court to sniff out these gems from the mountain of paper submitted with motions; it is for the defendant to point out the documents he believes are critical to his motion. As the Seventh Circuit has aptly stated, and as often cited by this court, "judges are not like pigs, hunting for truffles buried in briefs." U.S. v. Dunkel, 927 F.2d 955, 956 (7th Cir.1991), quoted in Newman v. Checkrite California, Inc., 912 F. Supp. 1354, 1377 & n.34 (E.D. Cal. 1995).

[14] See Motion To Suppress Evidence of Warrantless Searches (Dkt. No. 144); Memorandum Responsive to this Court's Order for a Proffer (Dkt. No. 250) (submitted in response to the court's request for a proffer showing why an evidentiary hearing was required to establish that he standing to seek suppression); Motion for Reconsideration (Dkt. No. 340) (submitted long after Salyer knew for certain that the government challenged his standing to object to the search); Reply to the Motion for Reconsideration (Dkt. No. 364) (same).

1  only have come from a search and seizure at Sky Park – to know
2  that that type of document was obtained from a meeting
3  attended by the confidential informant, or was e-mailed to
4  him.  In other words, it is not the type of document that
5  defendant could reasonably argue is only available in his
6  personal office, such as a personal phone book, notebook,
7  diary, or the like.

**CONCLUSION**

9  Salyer has made no showing that the informant searched or
10 seized anything from his personal office, or that anything
11 personal to him was seized.  He has made no threshold showing
12 that an evidentiary hearing is needed for him to establish any
13 of those things.  For those reasons, the motion for
14 reconsideration (Dkt. No. 340) is DENIED.

15 The court further orders that it shall hear defendant's
16 motions to suppress (Dkt. Nos. 147, 151, 154, 157) on
17 September 22, 2011 at 10:00 a.m.

18 IT IS SO ORDERED.

19 DATED: August 31, 2011.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

17