# EXHIBIT 1A

**Randall Rahal Interview (Day 2)**
**10/29/2008**

Counsel: Randall Rahal, Chris Adams, David Dratman
Staff: Barbara Nelson, Richard Cohen, Noah Fischer (note taker), Tim Lester (FBI), Tony Lovan, Steve Delaney (IRS), Paul Artley (FBI), Sean Flynn (AUSA), Ben Wagner (AUSA)

## I. Rahal's Concerns about Salyer

Rahal gave Staff examples of Salyer's aggressive behavior:

Sometime last year, Salyer called Rahal and told him he was going to fire Emmitt. Salyer said that he would put one of his pistols in his briefcase to bring to his office when he fired Emmitt. According to Rahal, Salyer wanted to bring his pistol because he thought Emmitt might get out of line. Lisa Crist called Rahal after Salyer's meeting with Emmitt and told Rahal that Salyer had a pistol in his briefcase while he was meeting with Emmitt. Rahal believes that Crist was telling the truth. Emmitt was not ultimately fired.

Rahal never saw Salyer carrying a gun, but knew that he had guns in his house.

In approximately 2005, Salyer complained to Rahal that Morning Star's Chris Rufer was ruining his business and suggested that it would be great if he was run over by a truck. At a later date, Salyer asked Rahal if he knew someone in New Jersey who could take care of Rufer. Rahal responded that he did, but Rahal told Staff that he did not follow through with Salyer's request. Rahal thought that this sounded like the start of a serious plot.

## II. Rahal's Role at SK Foods

Rahal began as a broker for SK Foods. His role was to bring in business. As time went on, Salyer began to trust Rahal because of the deals he brought in. Salyer saw that Rahal could make and develop good relationships with customers–he considered Rahal a definite need. He also observed that Rahal had the ability to fix things–he could put out fires in addition to his role as a salesman. According to Rahal, Salyer considered him the "voice of reason." Often, Rahal would be asked to fix Salyer's blow ups.

Salyer also relied on Rahal to assist in hiring decisions. For instance, Rahal encouraged Salyer to hire Richard Lawrence. Rahal was told that Salyer considered him a mentor and Salyer looked to Rahal for advice on business decisions. In particular, Rahal would help make business decisions relating to human resources, sales, and company buy outs. For example, Rahal encouraged Salyer to purchase Cedenco. Salyer had Rahal look at the Cedenco proposal and then followed his advice. During this time, Rahal met with stockholders in Australia and interviewed employees together. He told Salyer to get rid of Cedenco's manager. However, Rahal mostly

assisted in personnel decisions.    With respect to financial decisions, Rahal's involvement would usually be limited to big decisions such as the purchase of Cedenco. Rahal also advised Salyer on customer lists–i.e. he told him which customers were good for SK.

Salyer told Rahal to ask David Hay to run Cedenco once Salyer fired Dean (the previous manager). Hay called Rahal and told him he did not want the job, so Salyer asked Rahal to talk to Richard Lawrence. Rahal interviewed Lawrence and decided that SK should hire him. Rahal called Salyer and told him that he should hire Lawrence. Salyer wanted to meet him first but eventually hired Lawrence. Cedenco is no longer a public company–SK bought it in full.

Rahal was on SK Foods Group's board. After the Kraft deal was put together in approximately 2004, Salyer put Rahal on the board in an advisory role. Rahal attended one board meeting which was held in 2007 at Casa Palmeiro. Mark McCormick, Lisa Crist, and Stephanie Salyer also attended. Rahal was one of the trustees of the Salyer trust. Peter Blackstock was the other trustee and also attended. At the meeting, Rahal received a binder that listed all of the employees of Salyer's companies. Rahal had been aware of SAFF and SS Farms but did not know about Salyer's other entities before this meeting. Rahal's official title was "director"–this was listed in the binder. Rahal became a trustee of the Salyer trust long before the board meeting. When SAFF was purchased, Rahal had to vote–this was the only vote that he was involved in. Rahal provided guidance, support, and advice to Salyer. His role on the board of directors made Rahal that much closer to Salyer. Rahal felt that being on the board also gave him more respect amongst the other board members.

Rahal believes that he may have mentioned to SK employees that he was a business partner with Salyer for SK Foods. At a Christmas party in approximately 1994, Salyer told the other attendees that Rahal was the reason everyone was there. All of the managers were present and Rahal gave a speech forecasting the future of the company. Rahal always referred to SK Foods as "our" company.

As SK Foods became more involved in criminal activity, Rahal gained greater exposure. He and Crist feared that firings would reveal the criminal behavior. For example, Salyer wanted to fire Dahlman, but she knew too much.

Salyer wanted a new salesmen for SK Foods. Rahal interviewed Rich Traverse who was a salesman for Tometek that he used to do business with. Rahal recommended that Salyer hire Traverse and Salyer did.

It was typical for Salyer to ask Rahal to find competitor employees for SK to hire.

Rahal's commission remained constant, or even decreased for larger volumes, as he became closer to Salyer.

Salyer took Rahal on trips and insisted that Rahal stay at his house when visiting

California. Salyer would also stay at Rahal's house in New Jersey.
Salyer thanked Rahal for his jet because he thought that the new business Rahal brought in allowed him to purchase it.

Rahal wanted to maintain his relationships with SK's customers in order to protect his role with SK. Rahal realized that he could become expendable based on the way Salyer treated other SK employees such as Mettler. Salyer wanted Rahal to focus his attention away from the juice business and to SK Foods. Rahal's accountant told Rahal that he should have a $5 million insurance policy in case something happened to his role with SK because Rahal was so reliant on SK's business–90% of his income was from his work with SK. Rahal pays the premium on his insurance policy, which started four or five years ago. Salyer signed the policy. Rahal told Staff that he was protecting his business interests from Salyer.

Rahal made sure that if there was something that Salyer wanted him to do that he could do, he would do it.

Rahal could lose his bribe connections at anytime because of employee turnover at big corporations.

At one point, Salyer told Rahal that he wanted to build a sales force. After SK tried to buy Ingomar, Salyer asked Rahal whom he should hire from Ingomar. Rahal recommended Bill Cahill. Salyer told Rahal that he could hire Cahill in approximately 2002. Salyer sent the offer to Cahill, but Cahill turned the offer down after using it as leverage to obtain a higher salary from Pruett. Salyer was upset that Cahill turned down the position with SK after initially expressing interest, so he sent Cahill's contract to Pruett.

Salyer trusted Rahal to find and hire employees. Lawrence was the first example of this. Rich Traverse was also hired by Rahal, and then Traverse's boss at Tometek after Traverse was fired. Later, SK was in need of a new president. Rahal saw that SK Foods was too big for Salyer to run on his own, so Rahal told Salyer that they needed someone to run the company who lives in Lemoore. Salyer agreed and told Rahal that he would introduce him to someone of whom Salyer wanted Rahal's opinion. They met with Grewal at a diner. Salyer introduced Rahal to Grewal as his right hand man. Salyer told Grewal that he was interested in hiring a COO/President of SK Foods. Grewal knew the farming side of the business well, and Rahal believed that Grewal was a good fit. After Salyer introduced Rahal to Grewal, he asked Rahal to meet with Grewal on his own. Rahal believes that people were generally more comfortable talking with him than with Salyer. There were three one-on-one meetings between Grewal and Rahal. Rahal told Salyer that he should hire Grewal. The interviewing process began when Rahal suggested that SK needed someone to run the company, which was too big for absentee ownership. Grewal was working for J.G. Boswell at the time. He was in charge of putting the agricultural contract together for Boswell to grow tomatoes to sell to SK. Grewal told Rahal that he needed to finish putting together the deal between SK and Boswell for all the tomatoes out of the field at $42/ton. The contract was completed

and signed by Boswell and Emmitt.  Boswell was very happy with the contract.
At the February 2005 CLFP, Grewal officially joined SK Foods.  On the first day of the
convention, Salyer and Rahal had to inform SK's managers such as Emmitt and
Washburn who did not know about Grewal's hiring.  Rahal made the announcement that
Grewal was the new COO of SK Foods to Emmitt, Huey, Beasley, and the rest of the
SK Foods' senior managers.

After Grewal was hired, Rahal met with him every time he was in California–probably
15-20 times, 5-10 times per year.  Rahal also stayed at Grewal's house.

According to Rahal, the high level employees of SK Foods looked up to him.

When Grewal and Rahal met, they would mostly talk about agricultural issues, but
Rahal would also instruct Grewal about bill and hold and other sales procedures.  He
would introduce Grewal to SK's salesmen and to the particulars of SK's accounts.
Grewal knew that Rahal was bribing his customers since Rahal told him that he did.  In
2005, not long after Grewal was hired, Grewal, Salyer, and Rahal sat in  Grewal's
corner office (Salyer's old office) in Lemoore and discussed the Frito-Lay and Safeway
bribes.  Rahal does not believe that anyone else was present at this meeting.  Rahal
told them that Wahl was paid a bribe, which was SK's strength at Frito- Lay.  Rahal said
something like, "Don't worry about Frito-Lay because I take care of Wahl, and we get
the business every year."  They were not talking about a particular shipment, just their
long-term relationship with Frito-Lay.   Rahal thinks that Grewal knew what he meant
when he said he took care of Wahl because he believes that he told Grewal that
Intramark bribed its customers.  If he didn't tell Grewal about Intramark's bribes, Salyer
did because Salyer told this to many people.  Beasley, Grewal, Manuel, Steve King, and
Lawrence all revealed to Rahal that Salyer told them that Intramark pays bribes.  Rahal
does not think that he ever used the word "bribe,"but he did say "commissions."  Rahal
told Grewal that he paid commissions to his customers–meaning bribes.   SK's
employees knew that Intramark was responsible for the payments.

Salyer never explicitly said that it was important that bribes were paid by Intramark to
protect SK, but this was implied.  Rahal believes that Salyer always wanted separation
between Intramark and SK Foods because Intramark did SK Food's dirty work.  After
Salyer asked Rahal to join SK Foods as its president, Salyer and Rahal had discussions
about the importance of keeping SK and Intramark separate.  When Rahal told Salyer
he wanted to retire at the swimming pool at the Ranch House in approximately 2005,
Salyer said that Rahal could not retire because he needed to be the one to pay the "
commissions."   Salyer, Grewal, and others knew that Rahal's bribes ensured SK's
business relationships.

Rahal would receive competitor bid information.  Salyer told Rahal to find people to hire
that could bring in competitor information–i.e. sales lists, customer lists, financial
information, and costs.  Beasley brought tomato paste cost information from Morning
Star.  Manuel also brought Morning Star cost information.  Beth Clare was the customer
service rep for Morning Star.  She was the right hand man to Mike Poretti.  Salyer

decided to move SK's customer service representatives out of the Lemoore plant after Rahal suggested that they should be moved to the sales office in Ripon. Around this time, Beasley or Manuel told Rahal about Beth Clare of Morning Star. Rahal called Clare and told her that they wanted to hire her as a customer service representative. He told her that he would see her at a conference in Chicago. Poretti was also in Chicago. Rahal introduced himself to her and she expressed interest in the job at SK. Rahal could not hire her until they moved the customer service office out of Lemoore, but once they did about a year later, he hired her. Rahal asked her to bring any information from Morning Star and Heinz that she had available. Salyer told Rahal to see what he could get from her and Rahal knew that he wanted whatever she knew about the Heinz-Lidestri deal with Morning Star. Clare brought the information in an envelope and gave it Beasley. The envelope contained the contract from the Heinz-Lidestri deal with Morning Star. Beasley opened the envelope and read the contract to Rahal and Salyer over the phone. Clare was uncomfortable about revealing this information, but Rahal told Clare not to worry because she was giving the information to Intramark, not SK. .

Beasley or Manuel told Rahal about Eric Childs who was Chris Rufer's personel driver, and mechanic. He handled Rufer's personal IT and mentored his son. Rufer fired Childs because Childs wanted to work less hours. Beasley or Manuel informed Rahal that Childs had been fired. Before Rahal talked with Childs, he told Salyer that Childs would not be useful to SK Foods as an employee. He told Salyer that he wanted to talk with Childs to learn information about Morning Star. Salyer told Rahal to get what he could get from the conversation–Rahal understood this to mean any information that would help SK Foods. Rahal called Childs and told him that he wanted to meet with him in Modesto. They had an interview during which Rahal asked what he had overheard. Rahal gave Childs $100 for his time, but Childs wanted a job from Rahal. Rahal told Childs that SK was interested in him and asked what services he could provide besides driving. Rahal gave Childs $100 after their conversation. Rahal asked about the relationship between Rufer and Lidestri. Childs responded that Lidestri did not seem like anything more than a regular customer. Childs also revealed information about Rufer's quirky personality. Childs said that he worked on Rufer's computers. The meeting ended after Rahal gave him the $100.

Rahal told Salyer what Childs said over the phone. He told Salyer that Childs was an IT guy. Salyer told Rahal he wanted to meet Childs. Salyer interviewed Childs about Morning Star's IT and specifically about Rufer's personal computer. Rahal told Salyer that Childs was of no value to SK as an employee, but Salyer said that he might be. Salyer had Grewal meet with Childs and pay him $1,000. Salyer then called Rahal and told him that he had Morning Star's financials on a CD. Salyer received the CD from Grewal who had told Childs that he would hire Childs in return for the CD. Rahal saw Morning Star's financials on Salyer's computer–these were numbers from previous years and maybe the current year as well. Grewal and Salyer went over it. They told Rahal that Grewal met with Childs and gave him money for the CD. Rahal believes that Salyer sent Grewal because he always wanted a buffer. He used Rahal and Grewal and tried to use McClaran for this purpose. Rahal thinks that Morning Star's financial

information was on a round CD.  He saw what Salyer had in his possession which may not necessarily be what Childs gave Grewal.

Rahal also hired Poretti who brought information from his old partner at Hatch.

Beasley and Lawrence would request information and Rahal would take the competitor information to Salyer.

Rahal asked Rich Freitas if he was interested in becoming SK's Colusa plant manager while he was working for probably General Mills.  Freitas responded that he was interested in the position.  Rahal told Salyer that they needed Freitas to run their Colusa plant and Salyer agreed.  In general, if Rahal wanted to hire someone, he would meet with them and they would tell him if they were interested.  If they were, Rahal would tell Salyer and SK would make the formal offer.

The hirings of Beasley, Manuel, Poretti, and McKendry were facilitated by Rahal. Salyer wanted Rahal to meet McKendry, so that Rahal could tell Salyer what he thought of him.  After Rahal told Salyer about his conversation with McKendry, Salyer hired him. Rahal had control over starting the sales force.  He controlled the activities of SK's salesmen after they were hired.  For example, he told McKendry what to do with regard to the jalapeno purchases.

Rahal handled pricing.  He did not work with Beasley and Manuel in a managerial role because they knew he worked for Intramark.  Rahal talked with them about customers when there was a problem.  For instance, Little Lady Foods was a copacker for Kraft– they made pizza sauce in their factory for Kraft, so it was responsible for purchasing ingredients.  Beasley dealt with Little Lady Foods while he was at Morning Star and then at SK Foods.  Little Lady Foods received a different price from SK than Kraft which created a problem when these companies saw this difference.  Rahal told Beasley not to worry about Kraft; he should just worry about Little Lady Foods.  Rahal got credit per pound from Little Lady Foods because of his ties to Kraft.

There were times when Rahal had sales people deal with sales to Rahal's customers. For example, SK had three salesmen dealing with Campbell's including Rahal, so Rahal suggested that Salyer give Beasley sole responsibility of Campbell's.  Rahal also agreed to let Beasley deal with the Borden/Heinz account.  Kraft was Rahal's account. He would use Beasley and Manuel if there was a claim or quality issue, but they did not deal with Kraft on a day-to-day basis.

Rahal would tell Beasley and Manuel what to do when problems arose.  For example, Morning Star ran short of cold break tomato paste for Kraft, so Watson asked Rahal if SK had cold break paste available, and Rahal passed this information along to Manuel. Manuel told Rahal that the price for SK's available cold break paste was 37 cents per pound, and Rahal told this to Watson.  Morning Star then came back to Kraft with more cold break tomato paste.  Watson went to his boss and told him that Intramark and SK Foods offered their product when Morning Star could not, so Watson wanted to buy from SK.  His boss, Gerona (?), agreed that Watson should buy from SK Foods even

after Morning Star complained. Manuel did the work to find the cold break paste that was necessary to make the deal.

Rahal had heard that SK's invoices were being altered but never actually did this before his phone call requesting one.

At one time, there was a problem with the seeds and skins in the tomato paste at Kraft's pizza sauce plant. Rahal found out that the product used a .060 instead of .045 screen. At the IQF frozen foods show in Monterey, Huey told Watson that if he wanted .060, the product would have seeds and skin and Watson responded that he did not care what they sent as long as it didn't have a defect. As a result, SK changed the labels from .045 to .060 on .045 product and then shipped it to Kraft. According to Rahal, finer screens do not give the same yield–i.e. .045 gives less yield than .060–this is why Kraft wanted .060 even though the product was not working and could be fixed with .045.

Rahal does not remember relabeling NTSS levels. However, he remembers that SK changed screen size and dates on labels. It is more difficult to see differences between screen size than NTSS. With respect to Kraft, Glenn Long told Rahal that they would pack .045 and send it to Kraft. King told Rahal that they would pack .045 and label it as .060 and send it to Kraft.

COAs could not be changed at Intramark, but they could be changed at SK Foods. With Advanced Foods Products (a customer that received diced tomatoes through an internal Intramark account), Rahal needed COAs to be changed because there were problems with ph levels. In general, the quality control employee of a customer would call Rahal at Intramark and tell him that the COA was wrong, and if it was off enough, the customer would reject the product that could not be used. With AFP, there was a problem with the ph–some of it could be used and some would be sent back. Rahal called Huey after he heard this and told him what the problem was. Huey knew that Rahal wanted him to send a new COA. Huey called Dahlman who created a new COA.

Rahal believes that you could not create a false COA for a tomato company like ConAgra because they know the tomatoes business too well. Other companies would rely on the COAs. Rahal would tell Huey that there was a problem with the COA that needed to be fixed. Huey would send Rahal a new COA with different numbers. Rahal believes that Huey had Dahlman change the COAs. One time, Rahal talked to Dahlman directly when Huey wasn't around and asked her to change the label on product he needed.

Intramark also had COA problems with Clement Papas. At one point, the ph was wrong on the cold break paste sold to Clement Papas. Tanya called and informed Rahal who was with Salyer, Huey, and King at the time. Rahal told Salyer and then Huey about the problem. Huey responded something like, "Damn it, they shipped the wrong stuff again." The quality control person at Clement Papas had seen the COA and some of the drums did not meet ph specifications on paper. Clement Papas called Intramark and rejected the product based on the COA. Huey told Rahal that they sent the wrong COA

–the COA that was sent contained the actual numbers for the product and Huey intended to send an altered one. Huey told Rahal, Salyer, and everyone else on the plane coming back from the IQF food convention in 2007 that 90% of the COAs SK produces are altered. This is when Rahal first knew that this many COAs were being altered. Salyer did not say anything in response. A new dummy COA was produced and sent to Intramark which sent it to Clement Papas.

Salyer was always on Poretti's case about closing his deals. Salyer told Rahal to make sure Poretti was making his deals in the correct manner including getting his paperwork done. Poretti made a deal with ConAgra and told SK to start producing the product without a signed contract. Huey found out and was upset. Huey called Salyer and told him and Salyer called Rahal. Salyer told Rahal to get Poretti onboard, to tell him that he can't order product that hasn't been signed for. Rahal called Poretti and said "we" (meaning SK) don't do this. Poretti ultimately got a signed contract.

Huey, Beasley, King, and probably Grewal were present when Rahal told Salyer that he had to get cash because certain bribe recipients would not accept checks. They did not know the dollar amount of the bribes but knew that Rahal was bribing his customers. Huey, Beasley, and Salyer knew Rahal's bribing formula for Watson at Kraft–Rahal told Salyer over the phone that he sent $1,000 to Watson per million pounds. Huey found out later than Salyer. Beasley probably found out when dealing with Little Lady Foods.

Staff presented a document from 4/19/2004 regarding Kraft. Rahal asked Huey to create a document to send to Watson outlining the differences between China and U.S. tomato paste including final costs, so that Watson could justify purchases from SK to his boss. In the document provided by Staff, Rahal writes, "Bob Watson (my monkey)." Rahal told Staff that this comment refers to his control of Watson due to bribes as well as his race. Rahal told Lawrence that he paid Wahl and Watson. "Greedy Monkey" specifically refers to Watson's bribes.

Two years ago, Watson called Rahal and asked for crushed tomatoes for a new Kraft product produced by SK Foods in #10 cans. Rahal called Poretti and asked what they had. Poretti sent the SK's crushed tomatoes information to Kraft's R&D people so they could decide what they wanted. They eventually decided that they wanted 13% crushed and Watson placed the order. Kraft eventually decided that it no longer wanted the crushed product, so Watson agreed to pay for it at $57,000 but did not want the product shipped. Watson then told Rahal to sell the product and pay Kraft the difference. However, SK gave Kraft a credit for less than what they sold it for. Rahal believes that he told Poretti to sell the product on the market after Kraft told him it no longer wanted it. They sold it for about $13 or $14 per case and SK paid Kraft about $8 per case. Rahal told Watson he would get a credit for $8 but did not tell him they sold it for $14. Rahal told Salyer about this and he responded that the extra money could pay for their wine.

John Price was president of North and South America Unilever. Rahal gave him an envelope containing a picture of their kids at a swim meet. Salyer portrayed this as a bribe, but Rahal told Staff that it was not.

## III. Antitrust Violations

When Salyer and Rahal went through SK's customer list, Rahal does not think that they specified which customers were SK's and which were Intramark's. All of the customers on the list were the responsibility of Intramark. The customers that Intramark had always sold directly to before SK was in the picture, Intramark continued to sell directly to as a trader. For example, Intramark sold directly to Clement Papas since SK was not originally interested in Clement Papas because it was a juice company. When SK had available cold break paste, Intramark handled its sale to Clement Papas.

The only customer Rahal did not handle was Hunt Wesson. He handled every other customer before Traverse and Traverse's old boss were hired by SK. Maryanne also dealt with these customers.

Salyer wanted to grow the business while Rahal was content with the business he already had. Salyer told Rahal to build a sales team that could hurt Morning Star by getting its customer lists.

Rahal talked with Salyer about keeping the sales force at SK instead of Intramark. Beasley wanted to be employed by Intramark and not SK because he wanted to be protected from Morning Star. But Rahal did not want more employees at Intramark than he already had and expressed this desire to Salyer.

Beasley was not fully responsible for customers that Rahal had on the program but would help Rahal with the billing of these customers–however, there was no explicit discussion of this. Beasley had customers that were loyal to him–i.e. Vicuzi Packing and Heinz, but mostly smaller companies–and he handled their accounts.

At one point, Salyer told Rahal that his competitors worked out a deal where they would set pricing for customers that they shared. He was referring to Los Gatos and Ingomar. Rahal believes that Woolf and Pruett were responsible for this agreement. Cahill was involved, but Salyer did not like Cahill and would complain that he was not keeping with price-fixing agreements. This initial discussion about price agreement occurred before CTEG was officially created, sometime in 2005.

Salyer saw what was happening in the California tomato industry. Pruett wanted to sell Ingomar because farming was becoming too costly. Los Gatos then did the same. Ingomar, Los Gatos, and J.G. Boswell were growers and Salyer thought that he was going to lose his 330,000 ton supply agreement with J.G. Boswell Company. He realized that pricing on tomato paste was plunging while costs and overhead were increasing. Around this time, Salyer told Rahal something like, "I don't know what we're gonna do." At SK's annual end-of-the-year meeting, Salyer would always present a chart that showed profits from each product. Every year, margins decreased.

J.G. Boswell bought Rio Bravo and became a tomato processor, in addition to its farming business. This scared Salyer and Huey. Because Ingomar, Los Gatos, and SK

were uncomfortable with the state of the industry, it was a good opportunity for discussions among them to begin. Salyer completed due diligence with Ingomar and also had some discussions with Los Gatos concerning possible purchases of both companies.

Salyer asked Rahal what he thought about founding an export company. Salyer said it would be called CTEG and thought that he could get Woolf and Pruett to join. Rahal thought that the export group would not actually come together. Six months later, Salyer called Rahal and told him, Ingomar, Los Gatos, and SK had agreed to form CTEG.

At the 2006 CLFP conference, Rahal believes that Salyer had discussions with Pruett and Woolf to fix prices on paste and diced tomatoes. On the second or third day of the CLFP show, Salyer approached Rahal and showed him his business card. He told Rahal that Pruett and Woolf had agreed to the domestic price written on the card. CLFP only meets once a year in Sacramento in January or February. Rahal believes that there was both a diced and paste price on the back of Salyer's business card (maybe diced, definitely paste). Only numbers were written. Nothing was written about Woolf and Pruett, but Salyer told Rahal that they had agreed. Rahal recalls that they did not know what the market price was going to be at the time which is why they had to sit down and agree to a number. Rahal knows that the numbers on Salyer's card were domestic prices because SK rarely exported product–it didn't even have an export salesman. There may have been a couple truck shipments to Mexico, but there was no major business for export, and thus Rahal has no reason to believe that these price agreements were for export. Manuel, who was knowledgeable about exports, had not yet been hired.

McCain Foods

The CLFP was in February and the McCain Foods contracts were probably produced in March or April of the same year as the conference.

*Staff presented a McCain Foods bid request from Mary Rose Blunda dated 1/10/2006.* Rahal considered Blunda a loyal customer. This document refreshed Rahal's memory that the above-mentioned CLFP conference occurred in February 2006. Rahal believes that he sent this bid request to Huey so that he could give Rahal a price to offer McCain Foods. Huey was always involved in making sure the price was right. In this case, he told Rahal what the price should be–maybe 34 cents a pound. The price Huey gave Rahal was the same price that Salyer showed Rahal at the CLFP conference.

Offers to McCain Foods were originally submitted in writing. Rahal could communicate a price to Blunda, but it had to be officially submitted with SK letterhead. The 2006 bid request was in a new format.

"... no later than Friday, January 27, 2006": According to Rahal, this date was flexible. SK ultimately submitted its offer after the CLFP conference.

Rahal did not discuss Blunda's request with Salyer, since it was a yearly occurrence.

Rahal called Blunda and told her the price of SK's offer which would be for a bill and hold contract. A couple days later, she called back and told Rahal that his price was too high. Rahal was surprised by this because SK had been McCain's only supplier. Blunda told him that Gary Warren, who was a broker for Los Gatos, offered a lower price. She was upset because she wanted SK to get the business, and Rahal did not want to meet Los Gatos' price. She sent the McCain bid request to many brokers other than Rahal, but she did not know the other brokers like she knew Rahal. Rahal told Blunda to send him the offer she received from Warren.

*LGTP007851-2 (2/13/2006)*
Blunda sent Warren's offer to Rahal at his office and Rahal sent it to Salyer.

Rahal recognized LGTP007852 as the Los Gatos offer that Blunda sent him. Blunda whited out certain sections of the document such as the file # and buyer information.

LGTP007851was sent from Tania's email address because everything that was sent out from Intramark went through Tania's computer. Randy identified this email as the one that he sent to Salyer with LGTP007852 attached.

Rahal was very upset by Los Gatos' bid. Salyer called Rahal back on his phone, and Rahal told Salyer something like, "I told you this was not going to work." Salyer told Rahal that he would take care of it and Rahal should hang around his phone while he did. Salyer then called Rahal back and said that he sent the McCain bid document to Woolf.

*Staff presented Salyer's journal entry dated 2/13/2006*
Rahal recognized that this document contains Salyer's handwriting and confirmed that 2/13 was the date of his conversation with Salyer about the Los Gatos' bid to McCain Foods.

*LGTP007847-8 (2/13/2006)*
Rahal does not recall seeing this document before. Salyer called Rahal back (not necessarily on same day) and told Rahal that Woolf backpedaled. As a result, Warren was going to withdraw the McCain offer. He also said that Chris Woolf was responsible for the screw up.

*ING00056483 (2/14/2006)*
Rahal does not recall seeing this document before but noted that it corroborates

the information that Salyer told Rahal.

"We discussed not going after partners customers...": Rahal does not recall that Salyer told him that staying away from each other's customers was the basis for CTEG. He thought its purpose was to fix prices.

One or two days later, Blunda called Gary Warren and inquired about his offer. She told Rahal that Warren never called her back.

*LGTP007839-41 (2/13/2006)*

Rahal believes he received this email on 2/14/2006.

"the time of the Cutting" refers to the CLFP conference

"you cost SK aprx $225,000 with McCains": Rahal believes that Salyer was referring to the amount that SK would lose if they had to meet Los Gatos' bid price for McCain Foods.

Rahal does not think that SK revised its bid price to McCain Foods based on the information it learned about Los Gatos' bid.

*Staff presented an email from Salyer to Rahal dated February 13, 2006 at 7:40pm.*

Rahal recognized this email as one that he received. Salyer sent Rahal this email to let him know how he handled the McCain Foods situation.

"W/O your inside info, Stuart would have never come straight with us": Salyer did not trust Woolf, but knew that Rahal would find the truth so that Woolf could not cheat without being caught. In other words, Salyer knew that Rahal would keep the other CTEG members honest.

"Now he has to try and re-neg": Rahal believes Salyer meant that Woolf would have to withdraw his offer to McCain Foods.

"the damage is already done": Rahal believes that Salyer was referring to the damage done to CTEG's competitor agreements.

Once CTEG was formed, Rahal thinks that his bribe program became much more important. Rahal would guarantee through the competitor information he learned from his bribe recipients that the other CTEG members were keeping to their agreements on price.

Rahal later spoke to Salyer who said that Woolf would withdraw his McCain offer.

*LGTP007834-7 (2/13/2006)*

Rahal remembers that Blunda told him that Warren never called her back regarding his offer. He never saw an email from Warren saying that they were

withdrawing their offer. If she had told Rahal that Wwarren had called to withdraw his offer, Rahal would have told Salyer. However, if Blunda said that Warren called her to withdraw his offer, Rahal would not refute it.

*LGTP009572-75 (2/13-14/2006)*
Staff called witness' attention to Woolf's comment on LGTP008572, "tear it up": Rahal does not recall seeing this email before, but does remember that Salyer told Rahal about Woolf's email over the phone. Rahal believes that Woolf was willing to tear up his offer to McCain Foods because Rahal caught him cheating and he wanted to continue to be a part of CTEG.

*Staff presented a letter from Huey to Blunda dated February 22, 2006 and an attachment with an offer to McCain Foods from the same date.*
Recalls recalls receiving and reading the letter and offer. These documents refreshed Rahal's memory that the initial and final offers to McCain Foods in 2006 were priced at 34 cents per pound. Rahal thinks that the number on the back of Salyer's business card could have been 34 cents. He assumes that he would have written down the number on the back of Salyer's business card in his notebook.

Rahal would gather competitor pricing information and send it to huey. Rahal's value to SK was in his ability to gather information through his close relationships with customers.

If Los Gatos had not withdrawn its offer of 33 cents per pound, Rahal believes that SK would have met this price to win McCain's business.

Rahal explained that bin deposits were an industry standard. They were priced on top of the price of the paste and were reimbursed once bins were returned. In the early days, SK Foods sold net and did not charge for its bins. Their competitors would have increased the price by 2 cents (when the bins were priced at $60) to include the bin deposit price. The bin deposit price was later changed to 3 cents per an agreement among the three competitors. At the Ranch House meeting in 2006, CTEG members agreed to price bin deposits at 3 cents. After this point, all three companies agreed to include the bin deposit in their price quotes--up to this point SK had not done this. Salyer wanted everyone to be on the same page.

Rahal thinks that Grewal was very uncomfortable with phone conversations relating to domestic pricing agreements.

There was a general meeting at Harris Ranch involving SK's field and sales employees, Rahal, Salyer, Emmitt, Stuart Woolf, Chris Woolf, Anne Delaware, Ingomar's field employees, Cahill and Pruett. The meeting was held by Wasson and his secretary, Leigh Selby. Wasson explained exactly how CTEG was set up and who was going to represent SK, Ingomar, and Los Gatos in their meetings. They were trying to legitimize CTEG. At this meeting, Salyer, Woolf, and Pruett disappeared, probably to talk about

domestic pricing and Frito-Lay.

Frito-Lay

Wahl called Rahal in April before the Harris Ranch meeting and faxed him diced tomatoes pricing information from Ingomar's broker Terry Plum. Rahal showed this information to Salyer.

*Staff presented Salyer's journal entry dated 3/5/2006*
> -Rahal had never seen this document before. More information about Ingomar's bid is written in this document than what Rahal learned from Terry Plum. Rahal did not attend the referred to CTEG meeting.

*ING00032168 (3/28/2006)*
> This email refreshed Rahal's recollection crop inventories were decreasing while prices were increasing at this time.
>
> "Frito Int": Rahal told Staff that Salyer's use of "Int" was a "con job." There is no such thing as Frito International.
>
> Wahl sent Rahal the offer from Ingomar and its broker after the date of this email.
>
> Rahal believes that Salyer wanted Ingomar to submit its offer so that he would know if it was sticking to their price agreement and because he wanted to speed up the process and close the contract. SK could not close a deal with Wahl until Ingomar had submitted its bid. Rahal does not recall that Wahl told him that he could not close the deal without Ingomar's bid, but he believes that this was Wahl 's general policy. Wahl would always call Rahal before he spoke with anyone else at SK.
>
> Rahal recalls that Salyer wanted Ingomar's price to be the same as SK's.

*ING00032169 (4/6/2006)*
> Rahal thinks that Pruett used "International" to hide domestic pricing discussions.
>
> Wahl probably told Rahal Ingomar's bid price, Rahal told Salyer, and then Salyer sent   this email to Pruett.

Rahal gave Salyer the fax of Ingomar's bid price from Wahl at the Harris Ranch meeting. After the meeting, Salyer told Rahal that everything was ok and the three competitors agreed on a price.

Rahal believes that the price recorded in Salyer's journal entry dated 3/5/2006 ("30 cents net...") was the original Frito-Lay price that the three competitors agreed to.

Rahal did not change the original price he offered to Frito-Lay and he was eventually awarded its business.

*Staff asked Rahal about a wiretapped call on 4/16/08 between Rahal and Salyer where Rahal mentioned Frito-Lay*

"he raised his price to Jim Wahl also": he meant that because Rahal's bribes to Wahl raised prices, Pruett raised Ingomar's price to Frito-Lay in order to meet SK 's price without having to bribe Wahl.

Wahl would have told Rahal that there was too much difference between SK's prices and those of its competitors if Pruett's price was more than half a cent off from SK's, so Rahal believes that Pruett must have benefitted from the increased price that SK received in return for its bribes. As little as two cents a pound difference between SK and Ingomar's prices would have been sufficient to keep Wahl from being able to accept SK's prices. Rahal told Beasley that one of the reasons he did not like CTEG was that he not only drove the market for SK Foods, but also pulled its competitors up with it.

Woolf told Rahal that he knew Rahal was paying off his customers.

Kraft

*1KF0816 (Kraft contract for 2007 production)*
Staff presented the 2007 Kraft contract to refresh Rahal's memory.

Rahal remembers talking to Beasley about submitting a bid to Kraft. He also remembers receiving bid information from Bob Watson about Morning Star's bid to Kraft. Rahal thinks that he told Beasely that Morning Star was bidding 35 cents a pound and that SK should charge 36 cents a pound because it would still get the business.

Rahal recalls meeting with Watson in Chicago. He does not remember if Watson told him to bid 36 cents, but he remembers calling Beasley and telling him to bid 36 cents a pound. He also told Beasley to get a hold of Pruett to tell him to also bid 36 cents per pound. However, Beasley told Rahal that it was not part of his job responsibilities to contact Pruett about price. While Rahal was at a bar with Salyer and Bill Whipple of Wells Fargo, Rahal called Glen McClaran and told him that SK needed to bid 36 cents a pound. Salyer told Rahal to tell McClaran to quote at this price. Salyer also wanted Rahal to tell McClaran to tell Pruett to bid at the same price. Salyer suggested that Rahal contact McClaran because Beasley was not comfortable following these orders.

Rahal knows that McClaran represented SK at CTEG meetings because while he was at Salyer's house, he overheard Salyer ask McClaran via phone how his meeting with Woolf and Pruett went. McClaran responded that Woolf and Pruett did not trust Salyer and Rahal.

After Rahal called McClaran and told him to talk to Pruett, McClaran called Rahal back and told him that Pruett was going to go along with the suggested price. Rahal does not remember McClaran's exact words, but he knew that McClaran meant that Pruett had agreed to price at the price Rahal requested. Pruett did this because he wanted the business from Kraft. 36.5 cents was a very good price for SK Foods and Ingomar for

this volume of product.

Rahal remembers that SK came in at 36 cents to Kraft and then increased it to 36.5 cents after Ingomar bid at 36.5 cents. Pruett always said that he did not want to bid at the same price as SK.

*ING00020010 (7/26/2007)*
    Staff presented this email and contract to refresh Rahal's memory.

Rahal thinks that Watson told Rahal that Ingomar had bid at 36.5 cents. As a result, SK increased its bid to 36.5 cents.

There was a problem with the 36 cents bid submission so Watson told Rahal to resend the bid at 36.5 cents. If Watson had not been on Rahal's bribe program, Rahal does not think that SK would have gotten this volume of business or the increased bid price of 36.5 cents.

According to Rahal, SK's bid to Kraft was higher than Morning Star's bid every year, but every year, SK would be awarded the contract. One year, Morning Star bid as much as 1.5 cent lower, but still lost the contract to SK. Watson convinced his boss that Morning Star was a bad supplier because it had come up short on its pizza sauce supply. As long as Ingomar and SK Foods's bid prices were close or the same, Watson's boss would award SK the contract with no questions asked. Either Grewal, McClaran, or Huey would tell Ingomar what price to bid every year starting in 2005 for Kraft based on what Watson told Rahal.

*ING00054844-5 (5/22-23/2007)*
    "Rufer offered very cheap price to Kraft International, SK & IPC were on par...":
Rahal thinks this comment corraborates his belief that Kraft would accept SK's bid even if Morning Star bid a lower price because Morning Star had "shorted Kraft Int. 2 years in a row."

    Rahal was shocked that Wasson was attached to this email. There was no "Kraft International," and Rahal finds it hard to believe that Salyer would drag Wasson into domestic price-fixing discussions.

*LGTP005559-75 (5/4/2007)*
    Rahal does not remember if Los Gatos was an approved supplier for Kraft.

    Rahal had not seen this document. It seems to Rahal that Los Gatos bid 33.8 cents per pound to Kraft but this surprises him.

*Staff presented Salyer's journal entry dated 6/4/2006*
    Rahal was with Salyer in Tunisia on this date.

    "pruett wants disprotion": Pruett wanted more than the usual quantity.

"as group": Rahal believes that this meant that they will fix prices as a group to ConAgra.

Salyer notes that 230 million total pounds would be supplied to ConAgra, but Rahal thinks that ConAgra only buys 150-200 million pounds.

Rahal believes that there was a price agreement between Salyer and Pruett for Kraft in 2006.

### ING00033031 (11/17/2005)
Watson told Rahal and Rahal told Grewal and Grewal told Pruett the bid price information for Kraft in 2005. Kraft got burned on a previous deal, so it would buy for 13 months to ensure that its supply would not come up short. Ingomar came in a penny a pound below SK in 2005 but because of Rahal's bribes to Watson, SK was awarded the business. Rahal did not want the spotlight to come on Watson, so he wanted Ingomar to bid close or equal to SK's price.

Rahal does not recall price-fixing in relation to the June 6, 2007 contract for Little Lady Foods.

Rahal is not aware of any agreement between the three competitors to eliminate brokers.

### Red Gold

### ING00056483 (2/14/2006)
"IPC under cut the SK price on dice with Red Gold by 2.5 cents / #": all three companies met with Red Gold at the February 2006 CLFP conference. There was a free flow of dialogue between the owner of Red Gold, Lynch Bennett, Rahal, Grewal, and Salyer. Rahal, Grewal, and Salyer would tell Red Gold what price they were willing to offer. Ingomar and Los Gatos would do the same. The assumption was that Los Gatos and Ingomar would quote the same price as SK. Salyer and Rahal did what price Los Gatos and Ingomar offered until Bennett told Rahal after the CLFP show that Ingomar priced 2.5 cents lower. Rahal does not think that Bennett would lie to him, so he believes that there was an agreement between the three competitors that was not kept by Ingomar.

### ConAgra

Rahal knew the price for ConAgra in 2006 that SK had to bid at to get its business.

### LGTP009480 (7/2/2006)
-"ConAgra global pricing...": ConAgra Global was an actually entity. ConAgra had global influence.

Rahal does not remember receiving this email.

Rahal does not believe that they would have brought in Wasson to discuss domestic pricing. Rahal believed that Wasson was clean and would not discuss domestic pricing..

Pat Coe told Rahal that his price was too high which Rahal passed on to Grewal. Then Grewal sent the email bates numbered LGTP009480 to Pruett. Rahal does not know if Ingomar revised its price in response. Pat Coe would show Rahal the initial offer but never the final offer. The bid price for ConAgra was initially quoted by Rahal at 34 cents per Salyer's request. Coe told Rahal that SK's price was too high and showed Rahal Ingomar's quote. Rahal told Salyer the information he received from Pat Coe. Salyer said that he would take care of it. The bill and hold price was the only Ingomar price that Coe showed Rahal.

*Staff presented an email from Grewal to Salyer dated 2/19/2006*
Rahal has not seen this email. It refreshed his memory that Salyer wrote the 34 cent non- bill-and-hold price on his business card at the CLFP conference.

Salyer's comment on the second page ("No B&H: 34 net") also corroborates the 34 cent price agreement.

There is no question in Rahal's mind that Salyer had agreed to the 34 cent price with Woolf and Pruett.

In 2005, Salyer showed Rahal the agreed upon price and told him to make sure that the other competitors were on board. Rahal called Cahill and made sure that he was on board with that price for Frito-Lay. Cahill responded that he did not want to be involved in price-fixing.

In February 2008, Salyer wanted Rahal to reinforce the price with Pruett and Cahill because they would be more likely to follow it since Rahal had a relationship with the customer. Rahal approached Pruett outside of the show and told him that SK was going to price at 45 cents but Pruett responded that they were going to be at 38 cents. Rahal ended up bidding 38 cents and told Salyer that this is where the market was.

In 2006, Salyer also showed Rahal the agreed to price on his business card.

*2/19/2006 seized email continued*
On the second page, Grewal references that Pruett never wanted to be at the same price as SK so he shaved a quarter of a cent off his price.

"IPC pulled the diced order with RG": Rahal believes that Ingomar did not pull its bid for Red Gold. It wanted more product but could not get it.

On the first page, Grewal writes, "IPC wants to use RG....": Bill Cahill hired Lynch Benett, so they had a strong relationship, and Ingomar's diced product was better

than SK's. According to Rahal, Ingomar's paste product was always better than SK's. Ingomar wanted to take the lion share of Red Gold's business. CTEG members divided up Red Gold's business. If requested, SK would submit a higher price so that Ingomar would be the primary supplier. Ingomar would do the same for SK with its big customers–Heinz, ConAgra, etc.

"Agusa is requesting bid from LG...": Rahal originally bid for the Agusa deal, but SK's price was high and it had product quality issues, so SK dropped its bid. The year Rahal paid Delira, he learned who got the lion share of the business. Ingomar's price was surprisingly low.

*Staff present an email from Grewal to Salyer dated 3/2/2006*

Grewal wanted them to visit the Pennsauken factory to decide if SK should buy it from Heinz.

"Pat Coe rejected IPC offer...": Rahal was in San Diego when he told Cahill where to price in 2006.

SK shared Campbell's business with Ingomar. Rahal believes that there was collusion with Campbell's that Rahal did not know about.

"We" meant Salyer, Grewal, and Pruett.

Rahal had nothing to do with Golden State Foods but he heard about it through Beasley. It makes ketchup for McDonalds. At one point, Beasley told Rahal he wanted to bid a low price to Golden State and wanted Woolf and Pruett to come in at the same price. According to Rahal, SK Foods' tomato paste is not good for ketchup because it does not have a high yield–Los Gatos and Morning Star are better suited for this purpose.

*LGTP009572-75*

Woolf had an evergreen contract with Red Gold, but he was fed up with it because of increasing energy costs. Pruett, Woolf, and Salyer talked about energy costs all the time. Rahal does not know if there was an agreement about energy costs but believes that there was.

On July 3, 2007, McClaran was trying to get a cheaper diced price from Heinz, but SK lost Heinz as a customer.

Nestle is both a U.S. and International customer. Rahal believes that Salyer might have told him that Pruett was going to bid at 41 cents per pound for Nestle. Nestle was handled by Beasley.

Customer allocation: Rahal overheard that there was talk about splitting customer business.

Salyer, Woolf, and Pruett agreed to price bins at $90 sometime between April and July 2006 at the Ranch House. Rahal was there to meet with customers. Woolf and Pruett came and discussed domestic bins and drums; there was no discussion of splitting up customers because they were uncomfortable that Rahal was there. Salyer complained that the bin deposit price was not consistent. Salyer wanted a 3 cent agreement on bin deposit prices and they all agreed. They also agreed to a 3 cent upcharge for drums. Rahal saw them write the agreement in their books. To his knowledge, it was crystal clear that they were talking about domestic business; they never mentioned export, but instead talked in general terms. He does not remember discussion about export quality bins. SK followed through and changed its prices where it could (unless Morning Star was not quoting this price).

*Staff presented Salyer's journal entry dated 6/2/2006*

Rahal remembers that Salyer told him that he had an agreement on the price written in his journal: 36 and a half cents and 30 cents.