1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10   UNITED STATES OF AMERICA,

11            Plaintiff,                    No. CR. 10-0061 LKK

12        vs.

13   FREDERICK SCOTT SALYER,

14            Defendant.                    <u>ORDER</u>
     _____/

15

16        The assigned district judge, Judge Karlton, previously heard (1) the government's motion

17   to listen to and use, as they believe appropriate, phone calls made by defendant Salyer to his

18   various attorneys while he was in pretrial detention in the Sacramento County Jail, Dckt. No.

19   129; and (2) Salyer's motion to suppress the recordings, relying on the attorney-client privilege,

20   Dckt. Nos. 141-43.  In an earlier order, Judge Karlton resolved all other issues raised in the

21   parties' motions but referred to the undersigned certain issues concerning recorded calls between

22   the defendant and attorney Cynthia Longoria.  *See generally* Dckt. No. 276.

23        Judge Karlton found that Salyer reasonably believed that his communications with his

24   attorneys were made in confidence and that he did not waive his attorney client privilege as to

25   attorney client communications during those jail calls by waiting nearly a month to assert the

26   privilege.  *Id.* at 7-8.  However, because the government "raised a potential concern as to

1

whether the communications with Longoria were actually attorney client communications as opposed to communications of a personal nature," and because "the privilege only applies 'where legal advice of any kind is sought,'" the district judge referred that precise dispute to the undersigned. *Id.* at 9. Specifically, Judge Karlton directed the undersigned to "listen to the calls [to Longoria] and report to the court on their nature," and determine whether "the calls are attorney client communications." *Id.* His order states that insofar as the undersigned "determines that the calls are attorney client communications, the government's motion is denied and the defendant's motion is granted," and insofar as the undersigned "determines that the calls are not attorney client communications, the government's motion is granted and the defendant's motion is denied."[1] *Id.* at 9-10. He then added that "[o]nly the calls that are not determined to be attorney client communications may be presented to or filed before this district court." *Id.* at 10.

The undersigned has listened carefully to 119 recordings of such phone calls. *See* attached list.[2] In addition, the undersigned met in chambers with counsel for the government and the defense on September 30, 2011 to address the status of that task.[3] After meeting briefly with

---

[1] Although Salyer also argues that his Sixth Amendment rights to counsel and a fair trial would be violated if the calls are disclosed to the government, that issue has not been referred to the undersigned. The only issue referred to the undersigned for decision is whether the calls are covered by the attorney client privilege. Any arguments beyond that scope, including the Sixth Amendment or Due Process issues, must be directed the district judge, to the extent those arguments have not already been raised and rejected. The undersigned does not reach those issues, nor any issues as to the future use or admissibility of any of the statements in any of the calls. The undersigned also does not address whether any non-privileged conversations between Salyer and Longoria resulted in a waiver of any other privileges that may exist between Salyer and his other attorneys.

[2] Specific communications or statements within particular calls that are discussed below are identified by citation to the "file number" (see the attached list) designated for that recorded call and to the time reference, within the recording, that the statements occur. As noted below, *see infra* n.4, the numbering systems the parties use is cumbersome, inconsistent, and has not been helpful in facilitating this process.

[3] Present at that conference were attorneys Malcolm Segal and Paven Malhotra for the defendant, and Assistant U.S. Attorney Matthew Segal for the government.

all counsel, the prosecutor was excused and the court met in camera with defense counsel.  The court informed defense counsel that although it had not yet completed the audit of all the recordings, it had been through more than half and, based on what had been heard, the court's initial impression was that the content of the recorded statements does not support the asserted privilege.  Rather, as defense counsel were informed at that time, the recordings appear to be predominately of a personal nature in which Mr. Salyer had telephone visits with a girlfriend who happened to be an attorney.  Outside the presence of the government's counsel, the court specifically invited defense counsel to direct the court's focus as to any specific statements or communications, within any particular recording that was of concern and could be shown to fall within the privilege.  The court noted that a blanket assertion of privilege was simply unhelpful.  Counsel took the position that all of the communications were privileged but accepted the court's invitation to respond to the court's concerns in writing.

The government's counsel was then brought back into the conference and informed that, at the court's request, defense counsel would be submitting, in camera, further written argument identifying communications that counsel believed to be privileged.  To that end, on October 24, 2011, defense counsel submitted a letter brief setting out Salyer's position.  That letter brief is not any more specific.  It reiterates the defense position that nearly all of the calls are privileged and lists 112 calls in an attachment that are claimed to be attorney client communications.[4]  As

---

[4] The failure of the parties to utilize a single, coherent numbering system for the recorded calls has been frustrating.  Complicating an already convoluted system for identification of the recordings, the attachment to defendant's letter brief uses an entirely different identification system and does not cite to the "File Name" designation that appears for each of the electronic recordings that was provided to the court.  This appears to be due to the defense using a different software application than the jail's proprietary software application.  Defendant's letter indicates, at footnote 1, that the defense is using a Microsoft Windows Media Player format, but the court was provided the recordings in an Active Lplayer format.  Each application appears to have a different numbering system.  Rather than referring to the calls by the ActiveLplayer "file name" that was provided to the court, the defense list uses an "Image Key" numbering system.  These numbering systems have nothing in common.  This has not made the court's task any easier.  Nor does it help that the original list of Active Lplayer recordings have "file names" that are an inexplicable combination of numbers and letters and are not always in sequential order.

1    discussed below, careful auditing of the 119 recorded calls, as a whole, very plainly

2    demonstrates the opposite for the vast majority of the conversations.

3    I.    Background

4         Because the background to this dispute is clearly laid out in the district judge's order,

5    Dckt. No. 276 at 2-4, it is not repeated herein.

6    II.   Applicable Law

7         "Except as otherwise required by an Act of Congress or in rules prescribed by the

8    Supreme Court . . . privilege . . . shall be governed by the principles of the common law as they

9    may be interpreted by the courts of the United States in the light of reason and experience . . . ."

10   Fed. R. Evid. 501.  As a general matter "[a] client has a privilege to refuse to disclose and to

11   prevent others from disclosing confidential communications made for the purpose of facilitating

12   the rendition of professional legal services to the client (1) between himself . . . and his lawyer

13   . . . ."  *Weinstein's Federal Evidence*, 2d Ed. 503-96.

14        The Ninth Circuit has explained that the attorney client privilege applies, "(1) where

15   legal advice of any kind is sought (2) from a professional legal advisor in [her] capacity as such,

16   (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are

17   at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8)

18   except the protection be waived."  *United States v. Landof*, 591 F.2d 36, 38 (9th Cir. 1978).

19   Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly

20   construed."  *Weil v. Inv./ Indicators, Research & Mgmt., Inc.* 647 F.2d 18, 24 (9th Cir. 1981).

21   ////

22   _____

23        To further complicate matters, the defense's list only references 112 calls, even though
     there are 119 recordings.  It is unclear and not explained how the defendant's list varies from the
24   original list of recordings.  Nonetheless, the court can only listen and refer to the calls under the
     format and numbering system in which they were provided to the court, which the court has
25   done.  Therefore, this order adheres to that system.  The court has, however, numbered--in
     sequential order--the Active Lplayer format list to ensure that it has, in fact, listened to all 119
26   recordings.  That numbered list is attached to this order.

1   The party asserting the privilege also has the burden of establishing the particular

2   communication is, in fact, subject to privilege.  "A party claiming the privilege must identify

3   specific communications and the grounds supporting the privilege as to each piece of evidence

4   over which privilege is asserted."  *United States v. Martin*, 278 F.3d 988, 1000 (9th Cir. 2002);

5   *see also United States v. Ruehle*, 583 F.3d 600, 609 (9th Cir. 2009) ("As the party asserting the

6   privilege, Ruehle was obliged by federal law to establish the privileged nature of the

7   communications and, if necessary, to segregate the privileged information from the

8   non-privileged information.").  Blanket assertions are "extremely disfavored."  *Martin*, 278 F.3d

9   at 1000.

10        "Further, the communication must be between the client and lawyer for the purpose of

11   obtaining legal advice."  *Id.*  "[T]here is general agreement that the protection of the privilege

12   applies only if the *primary or predominate purpose* of the attorney-client consultations is to seek

13   legal advice or assistance."  1 Paul R. Rice, *Attorney-Client Privilege in the United States* § 7:5,

14   at 43-44 (2d ed. 1999); *see also North Pacifica, LLC v. City of Pacifica*, 274 F. Supp.2d 1118,

15   1127 (N.D. Cal. 2003) ("In general, legal advice is implicated 'if the nonlegal aspects of the

16   consultation are integral to the legal assistance given and the legal assistance is the primary

17   purpose of the consultation.'"); *In re County of Erie*, 473 F.3d 413, 420-21 (2d Cir. 2007) ("We

18   consider whether the predominant purpose of the communication is to render or solicit legal

19   advice. . . .  The predominant purpose of a communication cannot be ascertained by

20   quantification or classification of one passage or another; it should be assessed dynamically and

21   in light of the advice being sought or rendered, as well as the relationship between advice that

22   can be rendered only by consulting the legal authorities and advice that can be given by a

23   non-lawyer.").

24   III.   Discussion

25        As noted above, the district judge has referred to the undersigned the narrow and specific

26   question of "whether [the calls] are attorney client communications."  Dckt. No. 276 at 9.  Thus,

under the applicable law, the undersigned must decide (1) whether Salyer sought legal advice from Longoria; (2) whether the advice was sought from Longoria in her capacity as a professional legal advisor; and (3) whether the communications related to that purpose (obtaining legal advice).

Salyer argues that although Longoria is not counsel of record in the case, she served as a consulting attorney in the criminal case and the investigation that preceded it.  Dckt. No. 142 at 3.  Salyer also contends that Longoria was his "long-term counsel" and that she served in that role well before his other counsel.  Def.'s Oct. 24, 2011 Ex Parte Letter to the Court at 1.  He also contends Longoria assisted in retaining Salyer's counsel of record in the case and that she "regularly discussed with Defendant matters regarding the bail request, discovery motions, the government's violation of Defendant's constitutional rights, case strategy, and case developments."  *Id.*  Salyer adds that Longoria relayed information about the case to and from Salyer and offered her assessment of case developments on a regular basis.  *Id.* at 2.  As a result, Salyer argues that the predominant purpose for Longoria's calls was to provide legal services, and contends that the fact that some of the calls include a discussion of personal matters in no way negates their privileged status since those "personal exchanges were part of the process of building rapport and confidence building."  *Id.*

In the attachment to defendant's October 24, 2011 letter brief, the defense list by general topical description what sort of "privileged legal content" they contend is discussed in each of the 112 calls they address.  The attachment categorizes the "privileged legal content" in very broad, generic terms, and does not point to any specific discussion(s) in the calls at issue, nor does it explain why any such specific statement or communication within a particular conversation should be protected by the attorney client privilege.  Rather, the defense has broadly painted 112 calls in issue under a blanket claim of privilege.

For the reasons discussed in detail below, no such general or sweeping assertion of privilege is supported by the content of the recordings as a whole, nor by the applicable law as to

6

privilege. Additionally, upon a careful audit and analysis of each recording, very few contain

statements of either party to the call that can support an arguable claim that the predominate

purpose of the conversation was an attorney client communication and therefore privileged.

After a discussion of the nature of the calls generally, the court will address each of the

categories of content that the defense contends are privileged.

Those categories are as follows:

1. <u>Defense Preparation and Strategy in Criminal Case</u>

- Trial strategy (calls 1, 12)[5];
- Bail motion strategy (and lis pendens issue) (calls 1, 4, 7-14, 16-23, 25-27, 29, 31, 36, 38, 53, 56-58, 60, 62, 64-66, 72, 73, 93, 94, 96, 98, 99, 104, 106, 109);
- Results of FBI discovery (and review of same) (calls 1, 3, 4);
- Preparation of defense regarding due process issues (calls 1, 12, 22, 24, 30, 68);
- Privileged status of jail calls and queries to Malcolm Segal regarding the same (call 2);
- Discussion of prior communications from Malcolm Segal (call 2);
- Meeting(s) with counsel (calls 3, 35, 112);
- Indictment charges (call 4);
- Government's position regarding extradition (call 4);
- Illegal searches (call 4);
- Strategy regarding RICO charges (call 5);
- Court hearings and rulings (call 6, 32, 74, 75, 100, 104, 105, 107-09, 112);
- Bail issues and document production (call 6);
- Request to obtain search warrants (call 8);
- Government review of privileged emails between Salyer and Malcolm Segal (call 8, 10);
- Government's position regarding use of wiretaps at hearing (call 11);
- Defense preparation, investigation, and strategy generally (calls 15, 28, 30, 32, 37, 48, 51, 60, 64, 73, 75, 77, 84, 92, 93, 95, 96, 98, 100, 109);
- Government's strategy regarding discovery (call 15);
- Indictment charges regarding mold issues and preparation of defense (call 15, 22, 67);
- Private investigator's misconduct (call 16);
- Legal advice from Malcolm Segal (call 22, 107);
- General legal and appellate process (call 24);
- Appellate strategy, issues, and motions (call 24, 25, 49, 52, 71, 92);
- Jail's improper review of Salyer's privileged documents (call 26);
- Government obligations and misconduct (call 28, 29, 54, 67, 68, 88, 89, 94);
- Plea offer (and plea agreement) (call 30, 42, 67)
- Government strategy regarding interviewing of witnesses (call 32);
- Admissions of Rahal (call 32);

---

[5] Here, the court repeats the call numbers as listed in the attachment to defendant's October 24, 2011 letter brief. Those call numbers are used here for the limited purpose of noting the claims the defense has made regarding the bases for the attorney client privilege. As noted previously, *see* n.4, these call numbers do not match the numbering system for the calls provided to the court.

- Strategy regarding motion to suppress (and hearing) (call 34, 36, 38, 39, 54, 56, 71, 76);
- Wiretap affidavits (call 35);
- Strategy regarding Franks motion (call 38);
- Retention of Skadden firm/Skadden's role in proceedings (call 38, 39);
- Advice from Skadden (call 42);
- Investigations and strategy regarding individuals and companies' knowledge of and involvement in bribery (call 42-45);
- Strategy regarding motions generally (call 47, 60, 71, 81-83, 85, 87-91, 96, 97, 108, 111);
- Damages related to indictment counts (call 48);
- Discovery issues (call 50, 110);
- Strategy regarding Fourth Amendment claims (call 54);
- Allegations of price fixing (call 76);
- Bribery charges in indictment (call 77);
- Strategy regarding grand jury proceedings (call 98);
- Application of attorney client privilege to conversations (call 112).

### 2. Discussion of Defendant's Other Legal Actions

- Bankruptcy proceedings (call 30, 42, 45, 104, 105);
- Divorce proceedings (and strategy regarding) (calls 36, 38, 40, 46, 52, 57-64, 66, 69, 70, 72, 86, 97, 100-02, 108).

### 3. Retention of Longoria for Miscellaneous Purposes

- Conveyance of "questions" to Gibbons by Longoria (call 2);
- Retention of Longoria for research and investigative purposes (call 15);
- Payment for Longoria's legal services (call 33);
- Securing information from Roger Wasson, CTEG administrator (call 84).[6]

### A.   Calls Not Covered by the Attorney Client Privilege

After listening to the recordings, the undersigned cannot agree with the defense's characterization of the content of the calls between Salyer and Longoria.  The recordings consist of conversations that are primarily of a personal and social nature.  They reflect telephone visits between two persons with a long term and ongoing personal relationship.  Over the many conversations, Salyer and Longoria discuss movies, books, magazine and news articles, mutual friends, family members, health, food, airplane flights, past vacations, their relationship and Salyer's relationships with others, life in general, and, of course, Salyer's current problems.

---

[6] In defendant's attachment to the October 24, 2011 letter brief, defendant also concedes that four of the calls were strictly personal (calls 55, 78, 79, 80); one call was a ministerial call regarding placing additional funds on a calling card (call 41); and one call was simply a brief call where Salyer indicated he would call Longoria (call 103).

1 While Salyer's legal situation is often discussed, the predominate purpose of the conversations is

2 manifestly personal in nature.  Although the participants share candid views about Salyer's legal

3 situation, including the attorneys involved, the court, his family members, and friends who may

4 or may not want to be supportive, the majority of the recordings do not reflect an attorney client

5 relationship.  *See United States v. Tedder*, 801 F.2d 1437, 1441-43 (4th Cir. 1986) (defendant

6 spoke to attorney "as a friend personally involved in the case rather than as a professional legal

7 advisor"); *In re Kinoy*, 326 F. Supp. 400, 403 (S.D.N.Y. 1970) (when father is asked where his

8 daughter is, "it is by no means self-evident that his knowledge on that subject comes to him via a

9 privileged communication rather than in his role as parent"; court finds daughter would have told

10 her lawyer father her whereabouts, even if her father had not been her lawyer); *Modern*

11 *Woodmen of Am. v. Watkins*, 132 F.2d 352, 354 (5th Cir. 1942) (if statement is to lawyer merely

12 as a "personal friend," matter is not privileged); *United States v. Evans*, 113 F.3d 1457 (7th Cir.

13 1997) (no privilege arises where attorney-client communication made in presence of defendant's

14 family attorney who was present as a friend and potential character witness rather than as an

15 attorney).

16   That Longoria is an attorney as well as a close friend does not, itself, convert the nature

17 of the calls.  *Martin*, 278 F.3d at 999 ("The fact that a person is a lawyer does not make all

18 communications with that person privileged."); *see also Liew v. Breen*, 640 F.2d 1046, 1050 (9th

19 Cir. 1981) (lawyer-client communications were not privileged where the "clients did not

20 approach him for legal advice and assistance, but rather with the aim of finding [investment

21 opportunities].").  That fact was, however, one that appears to have been exploited for purposes

22 of obtaining greater access to phone visits than otherwise would have been available, as

23 discussed further below.

24   The phone visits begin with a recorded announcement informing participants in the call

25 that the call was being recorded.  In the first call at issue, Salyer then told Longoria that he

26 wanted to make sure "we're on an attorney client call."  Longoria, in a statement that is perhaps

1  unintentionally descriptive of the true nature of the calls, asks "How do you do that?"

2  2S3020FN.v10.  Salyer then told her what to say, she said it, and a social conversation ensued.

3  Salyer told Longoria he received her letter, he described to her his daily routine in the jail, he

4  described for Longoria a detention hearing (which she did not attend), they discussed a news

5  program, and Longoria expressed her unhappiness over another of Salyer's friendships.  Salyer

6  discussed what has occurred in his case, but he did not seek legal advice from, or representation

7  by, Longoria.  Rather, the conversation was manifestly a social conversation between two

8  persons with a long term close personal relationship.  As discussed below, the subsequent calls

9  continue with this pattern.

10                    1.  <u>Defense Preparation and Strategy in Criminal Case</u>

11          Defendant contends that many of the calls at issue should be protected by the attorney

12  client privilege since Salyer and Longoria discussed preparation and strategy in Salyer's criminal

13  case, including the charges against him, trial strategy and motion strategy, discovery issues, due

14  process and Fourth Amendment issues, plea offers, the government's strategy, the government's

15  alleged misconduct, and court hearings and rulings.  *See* chart, *supra* 7-8.

16          Admittedly, the characterization of the calls between Salyer and Longoria is complicated

17  by the fact that intermingled with their discussions of many personal and social matters having

18  nothing to do with Salyer's criminal case, Salyer also told Longoria about court appearances and

19  what occurred and told her generally about defense strategy as to bail and a suppression motion.

20  He also told her generally about discovery documents that he was reviewing.  However, the

21  predominate purpose of the conversations is decidedly personal, not professional.  *See Martin*,

22  278 F.3d at 1000 (noting that "the communication must be between the client and lawyer *for the*

23  *purpose of obtaining legal advice*") (emphasis added).  The content of nearly all of the calls

24  demonstrates that those calls were not for the purpose of obtaining legal advice.  Rather, the

25  recordings consist primarily of phone visits between Salyer and his long term girlfriend,

26  Longoria.  *See, e.g.,* 3D3020KY.v10 at 2:02; 9:34; 3G3020LT.v10 at 14:50; 3F3020L7.v10 at

14:55; 3H3020M4.v10 at 5:44; 3K3020NL.v10 at 12:00 and 15:36; 3M3020OF.v10 at 3:00,

14:07; *see also* 2S3020FN.v10 at 3:00; 3D3020KY.v10 at 2:04, 9:34; 3H3020M4.v10 at 5:44;

3R3020QA.v10 at 11:00; 4C39107X.v10 at 7:44; 443020R5.v10 at 12:20; 4O3020SP.v10;

4O3020SQ.v10 at 17:10; 5N0L204P.v10 at 12:35; 5SOL2061.v10 at 12:50-14:03;

5VOL2074.v10 at 9:20; 61OL207Z.v10 at 8:14; 613Y10T5v10 at 15:40; 623Y10U7.v10 at 2:40;

743Y10R1.v10 at 14:15; 743Y10RH.v10; 7A3220VV.v10 at 1:53-8:26; 7N1G10CL.v10 at

15:00; 701G10DG.v10 at 5:45-8:20 and 14:35; and 8Q1520LS.v10 at 12:34.[7]  In addition to the

intimate and personal nature of nearly all of the calls at issue, it is clear Longoria was acting as a

supportive friend but she was not acting--and was in no position to act--as his attorney.

   With very few exceptions noted below, there is simply no support for the claim that the

conversations were communications made pursuant to a professional relationship in which

Longoria was representing a client and/or providing legal advice in a represented relationship.

Although "[t]he attorney-client privilege applies to communications between lawyers and their

clients when the lawyers act in a counseling and planning role, as well as when lawyers represent

their clients in litigation," *United States v. Chen*, 99 F.3d 1495, 1500 (9th Cir. 1996), Longoria

was not counseling Salyer as his lawyer nor was she planning or strategizing his defense.  In

nearly every instance when Salyer's case is discussed between them, it is Salyer informing his

friend, Longoria, of what is occurring, who the various actors are, what roles they play, and how

the case is proceeding.  What little Longoria appears to know about these matters she learned

primarily from the jail phone calls from Salyer rather than by acting as a member of the defense

team.  In the portions of conversations where Salyer's case is discussed, it is Salyer, not

Longoria, who explains the status of the case and what has been happening in court.  Although

---

[7] The salacious details of these cited conversations need not be repeated here.  Suffice it to note that they demonstrate a relationship that was personal, intimate and plainly not a professional attorney client relationship.  More to the point, they illustrate that the many phone calls in issue here are not communications for which the predominate purpose is Longoria providing legal advice or representation to Salyer.

there are several instances where Salyer and Longoria discuss the proceedings, the persons involved in the proceedings, and Salyer's observations and critiques of those persons, it is clear that Longoria is not involved in the defense of the case nor even present during most of the court appearances.

For example, in a conversation in which Salyer expresses his views of the Pretrial Services Officer, the prosecutor (Mr. Flynn) and his own attorney (Mr. Malcolm Segal), Longoria asked whether Mr. Flynn was the Magistrate Judge. No. 3G3020LT at 5:25. It is Salyer telling Longoria what the legal issues are and how the legal proceedings are progressing. 3I3020M7.v10 at 12:00; 3M3020OA.v10 at 4:15. It is Salyer who informs Longoria what the Pretrial Services Office was requiring or seeking in the way of collateral for a secured bond. 3N3020P9.v10. It is Salyer who tells Longoria that the district judge granted a stay. It is Salyer correcting Longoria's misunderstanding about how an appeal would proceed, informing her that it is the Court of Appeals--not the Supreme Court--that would next consider an appeal from any order for release. 3R3020Q9.v10. Likewise, it was Salyer explaining to Longoria what had been learned in discovery rather than the other way around, as would normally occur in a true attorney client relationship. 4B39107M.v10.[8]

It is clear from the conversations that attorney Malcolm Segal's law office, not Longoria, was formulating strategy, and providing legal advice and representation to Salyer and what little Longoria knew of that advice she learned primarily from Salyer. Moreover, not only was Salyer not seeking legal advice or representation from Longoria, it is apparent that she could not genuinely offer any such assistance. The conversations show pointedly that Longoria simply lacks any expertise in the subject matter and was not purporting to be defendant's attorney for any other purpose than the brief announcement at the beginning of telephone visits. There are numerous instances in which Longoria is clearly unaware of the dates and times of court

---

[8] Similarly, it is Salyer explaining to his friend Longoria the procedures for jail visitation, phone calls and mail. 3D3020KY.v10 at 2:04; 3F3020L7.v10 at 3:40-4:26.

appearances and what would be occurring or what arguments were being made and what issues were being decided.  It is also clear from the conversations that Longoria was not present at most of the court appearances, 3I3020M7.v10 (Salyer describes to her what happened at the hearing); 4E39108M.v10 at 11:45 (same), and that when she was present, she played no role. 3R3020QA.v10 (Longoria: "Was it not good of me that I came to your hearing?"  Salyer: "I hear you were there."); 7R1G10JQ.v10 at 7:20 (Longoria unaware of impending hearing and topic of hearing).  Although Longoria is an attorney and presumably has expertise in other areas, the conversations are replete with examples of her utter lack of experience or knowledge of criminal procedure in general and Mr. Salyer's case in particular or the bankruptcy issues as they related to Salyer's bail issues.  3F3020L7.v10 at 10:54 (Longoria refers to the PTS Officer as the "sentencing clerk"); 3F3020NJ.v10 at 9:47; 3R3020QA.v10 at 12:00 (regarding the Ninth Circuit, Longoria states, "I think there is more than 3"); 4E39108X.v10 at - 4:00 - 4: (Longoria asks Salyer if Malcolm Segal could plan the hearings at 11:00 instead of 9:00 so that she could watch.  "He needs to talk to the clerk; tell them that I have a problem getting there at that time. See whether they will accommodate me."); 7L1G109X.v10 at 126 (Longoria learns for first time from Salyer of Ninth Circuit ruling on bail appeal: "I hadn't heard.  What did they say?"); 891G107F.v10 at 12:24 (Longoria statement regarding Pretrial Services: "Well, I don't understand very much about that.").

## 2. Discussion of Defendant's Other Legal Actions

Defendant contends that conversations between Salyer and Longoria regarding Salyer's bankruptcy proceedings and divorce proceedings are also privileged.  However, as discussed above, the predominate purpose of nearly all of Salyer and Longoria's conversations was decidedly personal and not professional.  *See* chart, *supra* 8.  Just as the majority of discussions regarding Salyer's criminal case are in the context of personal conversations, conversations about Salyer's legal issues with his divorce and bankruptcy are also decidedly personal in nature. To the extent that the conversations touch upon Salyer's bankruptcy and/or divorce issues, the

conversations do not differ in kind from the personal chats in which Salyer updated Longoria on what was happening generally.  With the few exceptions noted below, the calls do not include attorney client communications.  Rather, during most of the conversations in which Salyer's bankruptcy proceedings or divorce proceedings were mentioned, Salyer did not seek Longoria's legal advice, nor did she provide it.  She was not planning or strategizing his case in either of those actions, and when those cases were discussed between them, once again, it was Salyer informing Longoria of what was occurring and how the cases were proceeding.[9]  Again, what little Longoria appears to know about both proceedings, she learned primarily from Salyer. 4C39107W.v10 at 7:25 (Salyer described a recently filed bankruptcy brief as "some of [his] finest work" and asked Longoria if she had read it.  She responded that she had not and Salyer then described it to her and explained his view of the law); 3N3020OT (Salyer telling Longoria what is happening in his bankruptcy case); 3R3020Q9 (Salyer telling Longoria that the district judge granted the bankruptcy stay); 4C39107X (bankruptcy settlement occurring but Longoria did not attend and they agree it would not make any difference if she were there).  The conversations also demonstrate Longoria's lack of expertise in those areas, and once again reveal that the predominate purpose of their communications was their personal relationship, and not to provide legal advice in Salyer's pending matters.

3.  Retention of Longoria for Miscellaneous Purposes

Defendant also claims that calls between Salyer and Longoria in which Salyer asked Longoria to convey information to and from third parties (defense calls 2 and 84), a call regarding retaining Longoria for research and investigative purposes (defense call 15), and a call regarding payment for Longoria's legal services (defense call 33) are protected by the attorney

////

---

[9] To be sure, Longoria occasionally offered Salyer advice of a personal nature, but she did not attempt to provide Salyer legal advice on how to proceed in either the bankruptcy or divorce proceedings.

client privilege.[10]  However, to the contrary, those calls reflect that there was not in fact an

attorney client relationship between Salyer and Longoria.  When, during the conversations,

Salyer looked for tasks for Longoria to perform, it appears to be contrived, as he struggled to

identify make-work tasks for her, rather than Longoria truly rendering legal services in an

attorney client relationship.  For example, in one phone visit Salyer actually discussed whether

to hire her.  3K3020NJ.v10, at 12:45.  Longoria, in a surprised tone, asked "to do what?"  Some

discussions ensued in that conversation in which Salyer struggled to find something Longoria

could do.  He discussed having her do investigative work to develop factual information.

However, he eventually got to the true purpose which was made clear when he informed

Longoria that if she is on the legal team "guess who gets to hang out with me."  3K3020NL.v10

at 11:30.  She expressed reluctance (*id.* at 12:40) and no agreement was reached in that call.[11]

　　This pattern recurs in the conversation at 4H39109M.v10 at 1:00.  Salyer asked Longoria

if she could bring a laptop to a jail visit.  He told her she could read documents that he and his

_____

[10]  Where compensation is discussed, the statements refer to reimbursement for costs. *See, e.g.,* 4E39108X.v10, 7L1G109Y.v10.  Longoria mentioned on several occasions the high cost to her for the toll charges for the calls from the jail.  They also discussed reimbursement for her trips to Sacramento to visit Salyer at the jail.  There is no evidence in the calls or the submissions by the defense that there was an attorney fee agreement between Salyer and Longoria or that Longoria was paid attorney's fees.

[11] There are other instances in which this primarily personal rather than professional purpose for the communications and visits is illustrated.

> Salyer:  Whenever you can, come up here.  Why don't you come up.  We can go into the little room, or even the big room.  And we spend an hour going over strategies and stuff.

> Longoria:  Well the bad thing about that though is then we would have to get watched.  In a way, it's nicer to spend time in that little room because nobody's watching us and if they are they're not scrutinizing us.

> Salyer:  Well, that's not quite accurate.

> Longoria:  Well might be watching us but they definitely can't see us . . . .  We're not as conspicuous.  I know you would like me in that room as much as possible.

4C39107W.v10 at 13:05.

attorneys of record had already read.  When Longoria asked why she needed to read them, Salyer then struggled to provide a meaningful response.  *Id.* at 6:58 (Salyer to Longoria: "you have to have something to do."), *id* at 3:10 (Longoria to Salyer: "You have to tell me this stuff.  And how am I going to get these affidavits?" ).  This conversation occurred after an earlier recorded call (i.e., 4C39107W.v10, at 1:00) in which the participants discussed the fact that there were recordings of their earlier conversations.

Several statements in the conversations show an attempt to take advantage of Longoria's status as an attorney, thus allowing for greater access for visitation, not for the primary purpose of representing Salyer but for increased personal visits (phone and in person) without monitoring.  3D3020KY.v10 at 1:50 (discussing limitations on visits Salyer notes: "lawyers can come and go when they want" and as to phone calls he states "I can talk to lawyers as much as I want.").  Although they occasionally joke about the privilege, their comments are revealing. *See, e.g.*, 5J0L2034v10 at 15:00 (Salyer: "You want to send me some pictures, I, you can put them in an attorney client privileged envelope."  Longoria:  "Oh yeah.  That's what I want to do. I want to violate the attorney client, uh, uh, thing some more, so that, you know, maybe they will ban my stuff."); 3H3020M4.v10 at 5:50 (after an exchange of personal comments on the nature of their relationship, Salyer joked "Is this still attorney client privilege?"); 743Y10R1.v10 (Salyer, referring to a personal letter he was promising Longoria: "I'll write a letter back.  I'll write you a letter, but I'm putting it attorney client because I don't want them reading all my stuff."  Longoria:  "Just give me the letter next week."  "I will be there next Saturday."); 7O1G10DG.v10 at 5:45 (joking about describing personal letters as "memos" to avoid jail rules that pertain to review of personal correspondence).

The personal chat that was recorded in 763Y10TM.v10 is an illustrative example of the abuse of the claim of privilege.  Like most of the conversations, Longoria begins with the announcement that the call is an attorney client privileged conversation and immediately thereafter the participants launch into a lengthy personal chat having nothing to do with legal

representation or legal advice.  Similarly, at 7A3220VV.v10, Longoria provides an elongated statement that the call would be an attorney client protected conversation, complete with reciting her bar number, yet the parties immediately thereafter enter into a lengthy personal conversation about their personal relationship.  *Id.* at 1:53 - 8:26.

Furthermore, although Salyer asked Longoria to pass information for him, her role in that regard was not providing legal representation or acting as his attorney.  *See United States v. Huberts*, 637 F.2d 630, 640 (9th Cir. 1980) (finding that no privilege existed where attorney acted as "business agent" in supervising consignment sale of printing press, and noting that "[t]his is one specific application of the general rule that ministerial or clerical services performed by an attorney are not within the privilege.") (quoting *Harris v. United States*, 413 F.2d 316, 320 (9th Cir. 1969)).  Rather, her role was simply passing communications between Salyer and others.  *See Brincko v. Rio Props., Inc.*, 2011 WL 6029680, at *8 (D. Nev. Dec. 2, 2011) ("[W]hen an attorney is merely communicating information, the communications between the attorney and the client are not privileged.") (citing *United States v. Gray*, 876 F.2d 1411 (9th Cir. 1989)).

For example, Salyer asked Longoria to inquire with "Linda" whether she would "put up anything" in the way of property that Salyer would then "back" with other property.  3M3020OA.v10 at 8:05 through 3M3020OB.v10, and 3M3020OF.v10 (discussion regarding using a life insurance policy on a third party to motivate Linda to post a home for bail).  There is nothing in the conversation to indicate that he asked Longoria to communicate that inquiry because she is an attorney or has knowledge and expertise in bail hearings (indeed, the conversations collectively show quite the opposite).  Rather, the recordings show that the point of having Longoria present the proposal to Linda is Longoria's personal familiarity with Linda and the nature of their relationship, not the coincidental fact that Longoria is an attorney.  *Id.*  The proposal and the strategy were Salyer's and not the result of legal advice from Longoria.

////

1    Longoria, who was communicating regularly with Linda, was simply asked to pass on the

2    communication.[12]  *See In re Grand Jury Proceedings*, 616 F.3d 1172, 1182 (10th Cir. 2010)

3    ("Where questions only request information regarding communications where the attorney was

4    acting as a 'conduit' for non-confidential information, the client may not invoke the

5    attorney-client privilege. . . . These questions did not request information regarding privileged

6    legal advice provided by the attorney to his client, nor would the questions tend, directly or

7    indirectly, to require the attorney to reveal the substance of any legal confidence"); *United States*

8    *v. Wilson*, 798 F.2d 509, 513 (1st Cir. 1986) (privilege denied where attorney characterized his

9    role as that of "messenger"); *United States v. Horvath*, 731 F.2d 557, 561 (8th Cir. 1984)

10   (attorney "functioned primarily as a courier").

11          Any argument that Longoria's phone visits with Salyer were being performed at the

12   direction of Salyer's counsel of record are undermined not only by the predominately personal

13   nature of the conversations, but by the many examples in which it is painfully clear that when the

14   chats turned to Salyer's case the communications were too often at cross purposes with Salyer's

15   attorney, Malcolm Segal.  4O3020SQ.v10 at 11:27-12:05 ("Malcolm doesn't listen to anything I

16   say."); 4C39107X.v10 at 12:18 (Longoria: "I'm not calling Malcolm."  Salyer:  "No. Don't call

17   Malcolm.  He don't need to . . . you don't need to talk to him."  Longoria: "I always feel like I'm

18   intruding on him."); 3G3020LU.v10 at 3:55; 6S3220SX.v10 at 6:35 - 7:14 (Longoria informing

19   Salyer that counsel of record Segal was not interested in hearing from her regarding a pending

20   motion); *id.* at 13:40 (Longoria regarding disagreement with Segal: "So don't worry, it's not as if

21   I'm listening to him."); 763Y10TL.v10 (most of call consisting of conversation regarding

22   Longoria's hurt feelings that Mr. Segal would not permit her to assist in editing a brief in support

23   of a motion); *id.* at 8:34 (Longoria: "It's clear he's telling me to fuck off."  "I half expected it . . .

24   _____

25          [12] Longoria reported back to Salyer on the results of her contact with Linda, indicating
     that Linda believed Salyer should get the money from his daughters; and that Linda was thinking
     worst case if Salyer skips, that Linda did not like the idea of the insurance policy on the third
26   party to cover her as collateral.  3N3020OT.v10.

1   what I didn't expect was for him to tell me so blatantly to leave him alone."); 8H1S20S5.v10

2   (Salyer's instructions not to involve Segal in question and irritation over the comment that

3   Longoria's "visiting was not the same").

4       To be sure, there are statements by Longoria expressing confidence in the representation

5   by Mr. Segal as well, but those supportive comments are in the nature of encouragement from a

6   friend rather than the rendering of legal advice and acting as a lawyer.  Although "[t]he

7   attorney-client privilege may extend to communications with third parties who have been

8   engaged to assist the attorney in providing legal advice," *United States v. Richey,* 632 F.3d 559,

9   566 (9th Cir. 2011) (citing *Smith v. McCormick*, 914 F.2d 1153, 1159–60 (9th Cir. 1990)),

10  "'[w]hat is vital to the privilege is that the communication be made *in confidence* for the purpose

11  of obtaining *legal* advice *from the lawyer*.'"  *United States v. Gurtner*, 474 F.2d 297, 299 (9th

12  Cir. 1973) (quoting *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)); *see also United*

13  *States v. Haynes*, 216 F.3d 789, 798 (9th Cir. 2000), *amended on denial of reh'g*, (Aug. 15,

14  2000) (conversation with investigator retained by attorney about details of marijuana growing

15  operation were not privileged where client told investigator not to relay conversation to

16  attorney).  Here, they were not.  Indeed, with the few exceptions noted, the court has not found a

17  single instance in the calls in question in which Salyer relied on the legal advice and opinions of

18  Longoria rather than the attorneys he retained to represent him in the criminal, bankruptcy and

19  divorce matters.  On the other hand, there are examples too numerous to quote in which Salyer

20  explained at length to Longoria his own legal opinions and strategies but shows no reliance

21  whatsoever on the legal advice or expertise of Longoria.  Indeed, one compelling example

22  included this exchange regarding grand jury proceedings:

23      Salyer: You can't have a lawyer.

24      Longoria: You can't have a lawyer with you at a grand jury?

25      Salyer: What the hell law school did you go to?  You go to Sears or Montgomery
        Ward, or a big discount Walmart?  You can't have a lawyer with you in a grand
26      jury hearing.

7R1G10J4.v10 at 13:45.  It simply strains credulity to suggest that Salyer was seeking or Longoria was providing legal advice on the topics discussed in the vast majority of the recorded calls.

The recordings demonstrate that not only did Salyer and Longoria both know that the primary nature of their phone visits were personal chats, but they also appear to appreciate quite well the risk that their attempt to cloak the conversations under a claim of privilege may well fail.  3D3020KY.v10 at 1:00 (following Longoria announcement that call is privileged both parties express the view that her pronouncement does not make any difference);  4139106F.v10 (Longoria asks "can I talk about this, real estate you are trying to protect?"); 443020R3.v10 at 14:05 (Longoria to Salyer: "there is stuff I want to talk about even in private when I get there."); 4B39107M.v10 (Longoria:  "I prefer not to talk about the specifics."  "I don't really trust who's listening."  Salyer: " I don't trust them at all.  I agree."); 4C39107W.v10 at 1:00 (discussion of government having possession of recordings of the earlier conversations); 5N0L204P.v10 at 12:35-13:00 (Longoria: I don't really want to talk about this.  Especially on this call, where somebody is probably listening.  Salyer:  [laughter]); 5SOL2061.v10 at 6:30 (Salyer: "I wish I could tell you all of it, but I don't trust the phone."); 61OL207Z.v10 at 8:14 - 8: (Longoria: "Well I don't want to hear, cause I don't want anyone listening."  Salyer: [laughter] "you know they are."  Longoria: "I know they are, that's why I don't want you to tell me."); 68OL209F.v10 at 1:31 (Salyer: "I know they are listening."); 7P1G10GO.v10 at 6:14; 7P1S20GO.v10 at 13:24; 7T1G10QT.v10 at 1:40; 8H1S20S5.v10 at 4:57; 8Q1520LS.v10 at 12:34; 8T1S20ZV.V10 at 10:35; 921G1086.v10 at 1:21.

Indeed, after it was apparent to them that the ruse was failing and their recorded conversations had become an issue in a motion, the representations as to the nature of the calls temporarily changed.  743Y10RI.v10 at 00:45 (Salyer: "You're back."  Longoria:  "And in the interest of fairness I'm not even going to call this an attorney client privileged call since we are just chatting."  Salyer: "No, cause I was just getting ready to say we ought to talk about some of

the business stuff so that we can make it an attorney client call."  Longoria: "Well, the last one wasn't at all, and if they are going to listen to our calls we might as well be honest.")[13]  In the next three calls thereafter the conversations--for the first time--took on a semi-professional nature in which Longoria actually offered legal advice in the form of suggested edits to a brief.  753220UR.v10, 753Y10RY.v10, and the majority of 753Y10RZ.v10.  These conversations stand in stark contrast to nearly all of the others that preceded them and, as discussed below, the court finds that the predominate purpose of these three calls, at least as intended by the participants, was for Longoria to provide legal advice.[14]  But, ultimately, this effort failed as a result of Longoria's lack of expertise in the topics for which Salyer needed legal advice and the subsequent calls resorted back to predominately personal chats and social phone visits.  By the fourth call thereafter, notwithstanding Longoria's announcement that the call was an attorney client communication, the conversation was predominately a social visit.  763Y10SZ.v10.

Accordingly, the undersigned finds that the predominant purpose of all of the calls not exempted below was to engage in personal phone conversations and not to seek or provide legal advice.  Therefore, except for the few calls specifically delineated below, the calls between Salyer and Longoria are not protected by the attorney client privilege.

B.   Calls Protected by the Attorney Client Privilege

As indicated above, in a handful of calls between Salyer and Longoria, Salyer arguably sought legal advice from Longoria in her capacity as a professional legal advisor.  Although those calls are few and far between, and although the legal advice being sought and/or provided in those calls appears to be sought primarily to create an appearance of an attorney client

---

[13] Similarly, representations of non-privileged documents changed.  6P3220RF.v10 at 13:58 (Salyer, regarding a magazine article: "Say that it has to do with attorney client, you know something to do with attorney client."  Longoria: "Well, it's not attorney client anything and if they take it away from you they take it away from you.").

[14] Ultimately, all of Longoria's suggested edits were rejected by Salyer's attorney of record.  763Y10TL.v10 at 3:15 at 7:50 (Longoria complaining that Mr. Segal rejected her comments because they would "ruin" the motion).

relationship, the undersigned nonetheless finds that in those few calls Longoria's legal advice was sought by Salyer and/or was provided by Longoria and that advice was the predominate purpose of those calls.  Specifically, in call 633220K0.v10, Longoria provided limited legal advice in Salyer's divorce case; in call 723220U5.v10, Longoria provided comments on a legal brief in Salyer's criminal case; and, as mentioned above, in calls 753220UR.v10, 753Y10RY.v10, and 753Y10RZ.v10, Longoria provided legal advice in the form of suggested edits to a brief in Salyer's criminal case.

IV.    Conclusion

Accordingly, the court finds that calls 633220K0.v10, 723220U5.v10, 753220UR.v10, 753Y10RY.v10, and 753Y10RZ.v10 are protected by the attorney client privilege.  However, because the predominate purpose of all of the other calls between Salyer and Longoria was to engage in personal phone conversations and not to seek legal advice from Longoria, Salyer has not met his burden of establishing that those calls, or the communications therein, are protected by the attorney client privilege.

Therefore, as stated in the district judge's order, with regard to calls 633220K0.v10, 723220U5.v10, 753220UR.v10, 753Y10RY.v10, and 753Y10RZ.v10, the government's motion is denied and Salyer's motion is granted.  With regard to all of the other calls, the government's motion is granted and Salyer's motion is denied; accordingly, effective fourteen days from the date this order issues, the government may listen to those recordings.

It is further ordered that defendant's letter brief addressing the claim of attorney client privilege, submitted in camera on October 24, 2011, shall be docketed but the letter is ordered sealed.

DATED:  February 15, 2012.

_Edmund F. Brennan_
EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

1

**ATTACHMENT**

2

3

| | File Name |
|---|---|
| **1** | 2S3020FN.v10 |
| **2** | 2S3020FO.v10 |
| **3** | 2S3020FR.v10 |
| **4** | 3D3020KX.v10 |
| **5** | 3D3020KY.v10 |
| **6** | 3F3020L7.v10 |
| **7** | 3G3020LT.v10 |
| **8** | 3G3020LYU.v10 |
| **9** | 3H3020M2.v10 |
| **10** | 3H3020M4.v10 |
| **11** | 3I3020M7.v10 |
| **12** | 3K3020NJ.v10 |
| **13** | 3K3020NL.v10 |
| **14** | 3M3020OA.v10 |
| **15** | 3M3020OB.v10 |
| **16** | 3M3020OF.v10 |
| **17** | 3N3020OT.v10 |
| **18** | 3N3020P5.v10 |
| **19** | 3N3020P9.v10 |
| **20** | 3O3020PK.v10 |
| **21** | 3R3020Q9.v10 |
| **22** | 3R3020QA.v10 |
| **23** | 3T39104V.v10 |
| **24** | 4139106F.v10 |
| **25** | 443020R3.v10 |

| 26 | 443020R5.v10 |
|----|--------------|
| 27 | 4B39107M.v10 |
| 28 | 4C39107W.v10 |
| 29 | 4C39107X.v10 |
| 30 | 4E39108M.v10 |
| 31 | 4E39108X.v10 |
| 32 | 4H39109M.v10 |
| 33 | 4O3020SP.v10 |
| 34 | 4O3020SQ.v10 |
| 35 | 551S20C4.v10 |
| 36 | 5J0L2033.v10 |
| 37 | 5J0L2034.v10 |
| 38 | 5J0L2039.v10 |
| 39 | 5L0L2048.v10 |
| 40 | 5L0L2049.v10 |
| 41 | 5L0L204A.v10 |
| 42 | 5N0L204P.v10 |
| 43 | 5N0L204Q.v10 |
| 44 | 5O0L2051.v10 |
| 45 | 5P0L205L.v10 |
| 46 | 5P0L205M.v10 |
| 47 | 5R0L2060.v10 |
| 48 | 5S0L206I.v10 |
| 49 | 5T0L2074.v10 |
| 50 | 5V3220J7.v10 |
| 51 | 5V3220JB.v10 |
| 52 | 5V3220JG.v10 |
| 53 | 610L207Z.v10 |
| 54 | 613Y10T5.v10 |

| 55 | 623Y10U7.v10 |
|----|--------------|
| 56 | 630L2089.v10 |
| 57 | 633220K0.v10 |
| 58 | 633220K2.v10 |
| 59 | 673220L0.v10 |
| 60 | 680L209F.v10 |
| 61 | 693220LP.v10 |
| 62 | 6N3Y10F1.v10 |
| 63 | 6N3Y10FB.v10 |
| 64 | 6P3220RF.v10 |
| 65 | 6S3220SX.v10 |
| 66 | 6T3220TD.v10 |
| 67 | 6U3220TM.v10 |
| 68 | 713Y10OZ.v10 |
| 69 | 713Y10P1.v10 |
| 70 | 723220U5.v10 |
| 71 | 743Y10R1.v10 |
| 72 | 743Y10RB.v10 |
| 73 | 743Y10RH.v10 |
| 74 | 743Y10RI.v10 |
| 75 | 753220UR.v10 |
| 76 | 753Y10RY.v10 |
| 77 | 753Y10RZ.v10 |
| 78 | 763Y10SZ.v10 |
| 79 | 763Y10TL.v10 |
| 80 | 763Y10TM.v10 |
| 81 | 7A3220VV.v10 |
| 82 | 7C1R20MZ.v10 |
| 83 | 7C1R20N0.v10 |

| 84 | 7C1R20N1.v10 |
|---|---|
| 85 | 7E1G104B.v10 |
| 86 | 7K1R20OC.v10 |
| 87 | 7L1G109X.v10 |
| 88 | 7L1G109Y.v10 |
| 89 | 7N1G10CL.v10 |
| 90 | 7O1G10DG.v10 |
| 91 | 7P1G10GO.v10 |
| 92 | 7P1S20GO.v10 |
| 93 | 7R1G10J4.v10 |
| 94 | 7R1G10JQ.v10 |
| 95 | 7S1G10M6.v10 |
| 96 | 7S1G10ME.v10 |
| 97 | 7T1G10MY.v10 |
| 98 | 7T1G10QT.v10 |
| 99 | 851G1013.v10 |
| 100 | 851G1014.v10 |
| 101 | 851S20LS.v10 |
| 102 | 861S20LV.v10 |
| 103 | 891G107F.v10 |
| 104 | 8B1S20PR.v10 |
| 105 | 8E1S20QW.v10 |
| 106 | 8F1G10H4.v10 |
| 107 | 8H1G10KF.v10 |
| 108 | 8H1S20S5.v10 |
| 109 | 8I1G10LW.v10 |
| 110 | 8L1G10RC.v10 |
| 111 | 8O0P103C.v10 |
| 112 | 8P0P103N.v10 |

| 113 | 8P1S20WJ.v10 |
|-----|--------------|
| 114 | 8Q1R204E.v10 |
| 115 | 8Q1520LS.v10 |
| 116 | 8R2U10F9.v10 |
| 117 | 8S1S20Y6.v10 |
| 118 | 8T1S20ZV.v10 |
| 119 | 921G1086.v10 |