BENJAMIN B. WAGNER
United States Attorney
MATTHEW D. SEGAL
R. STEVEN LAPHAM
JARED C. DOLAN
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA  95814
Telephone:  (916) 554-2700
Facsimile:   (916) 554-2900

ANNA T. PLETCHER
TAI S. MILDER
Trial Attorneys
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue, Room 10-0101
San Francisco, California 94102
Telephone: (415) 436-6660

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO.  2:10-CR-61 LKK |
|---|---|
| Plaintiff, | |
| v. | UNITED STATES' OBJECTIONS TO PRESENTENCE REPORT |
| FREDERICK SCOTT SALYER | |
| Defendant. | |

## I.    INTRODUCTION

For years, Scott Salyer operated SK Foods, L.P. as a racketeering enterprise.  Through SK Foods, Salyer cheated his customers through commercial bribery and product misbranding, defeated FDA regulations by altering lab test results for people's food, and undermined the free market by colluding with his competitors.  These were serious crimes that merit severe consequences.  After the Government uncovered Salyer's crimes through an informant operation, wiretaps, and search warrants, it decapitated SK Foods by filing criminal charges against most of its top-level managers.  Six

executives from SK Foods and three from other companies have pleaded guilty. After the investigation became public, frustrated creditors forced SK Foods into Title 11 proceedings and reduced the company to a shell of a bankruptcy estate. Salyer has been deposed from management and the tomato paste processing plant has been sold off. Today, creditors seek assets on three continents.

The Court should sentence Salyer to seven years imprisonment. This would be a sentence higher than that of any other "Rotten Tomato" defendant but still within the same broad range. This recommendation accounts for the fact that this case has always been about a major fraud, but not a mass poisoning. The Defendant's guilty plea resolved sentencing uncertainty, saved the Government substantial expenditure of resources, and removed a reason for delay in multiple related proceedings before this Court and others. This would not be the Government's recommendation if the food regulation violated were not expressly unrelated to human health. See 21 C.F.R. § 110.110 (natural or unavoidable defects in food for human use that present no health hazard).

These objections are intended to address the Government's difference with some calculations in the PSR. They also initially describe the Government's position as to the reasonable sentence in this case. See PSR ¶ 190. Defendant is expected to ask for an even lower sentence for reasons that he will explain. The Government will respond to Salyer's objections in a subsequent filing.

## II.   THE PRESENTENCE REPORT FACTS

The United States has no objections to any material information in the Presentence Report. Fed. R. Crim. P. (f)(1). The PSR accurately describes the bribery scheme, the mislabeling and adulterated food scheme, and the antitrust conspiracy. There was not much that Defendant did with SK Foods that did not violate one law or another.

### A.   The Bribery Scheme

Between January 2004 and April 2008, Defendant Salyer directed Randal Rahal's routine payment of bribes to purchasing agents of SK Foods customers. PSR ¶ 9. Altogether, they paid bribes totaling about $357,605 to purchasing officers at four different companies: Kraft, Frito-Lay, B&G Foods, and Safeway. PSR ¶ 12. This bribery was referred to as "the program" and knowledge of it was common among the top managers at SK Foods. PSR ¶ 11. The bribes were consideration for purchasing officers purchasing from SK Foods rather than competitors (especially Morning Star),

paying inflated prices, disclosing to SK Foods its competitors' bids, and following instructions on how much product to order and when.  PSR ¶¶ 9, 14.

The bribery scheme had measurable effects on Kraft, Frito-Lay, and B&G.  PSR ¶ 53.  They paid higher prices and they bought paste on terms more favorable to SK Foods.  Bribery of Safeway's agent was stopped so early that it had not yet resulted in a loss that the Government can quantify.  Id.

### B.     The Mislabeling and Adulterated Food Scheme

Salyer also directed SK Foods employees' routine practice of falsely describing its product as meeting customer specifications and regulatory requirements.  Plea Agr. at A-2; PSR ¶ 15.  SK Foods thus falsified documents describing, among other things, tomato paste's natural tomato soluble solids ("NTSS" is essentially how much of it was not water), mold count, and production date.  Id.  They also labeled conventional paste as organic.  Id.  Jennifer Dahlman, who was directly responsible for altering data, estimated that ninety percent of SK Foods's product was mischaracterized in some way.  PSR ¶ 18.  SK Foods computer records indicate that between January 2000 and April 2008, this conduct affected 46,494 units.  Id.  The Government has not attempted to assign a dollar value to the lies that SK Foods told about NTSS, production date, or conventional/organic.  This part of the fraud cannot be quantified.

During the investigation, SK Foods had supply problems because it sold much more tomato paste than it actually had.  PSR ¶ 48.  Salyer made up for this shortfall by falsifying test results for "high-mold" tomato paste and sending it out to customers.  Even though mold is an aesthetic defect only, this misbranded, high-mold paste was illegal to sell in the United States.  See 21 C.F.R. § 110.110; 21 U.S.C. § 331(a).  The partial records available for seizure at the time of the search warrant show that SK Foods's sales of high-mold paste amounted to no less than $7 million.  PSR ¶ 19.  There are at least sixty-three customers who received paste misrepresented as to mold and/or production date.  PSR ¶ 20.

### C.     Price Fixing and Bid Rigging

SK Foods, Ingomar, and Los Gatos formed the California Tomato Export Group (CTEG) ostensibly to discuss export prices under an export trade certificate that they received on February 21, 2006.  PSR ¶ 23.  But even before that date, SK Foods and its CTEG co-conspirators had discussed and agreed upon target prices for the U.S. market.  PSR ¶ 26.  Count 8, to which Defendant pleaded guilty, concerned Salyer's invoking their 34-cent-per-pound agreement to induce Los Gatos to revoke a lower

United States' Objections to PSR               3

offer that had been offered to McCain Foods.  Id.  Salyer emailed his competitors to complain about cheating on the (illegal) agreement and averred, "We had a deal, we had an agreement" on the price and Los Gatos should not undercut it.  PSR ¶ 26.  Defendant later stated that ceasing such competitive price cutting was "the very reason CTEG was started."  PSR ¶ 27.

In this same period of early 2007, Salyer and his CTEG co-conspirators specifically discussed a major contract with ConAgra in the context of this thirty-four-cent-per-pound target price agreement. PSR ¶¶ 28-31.  The same co-conspirators agreed to rig their bids for a major contract with Kraft (where Rahal was bribing the purchasing officer) and to require the same terms for passing along to customers the risk of natural gas price changes and a deposit for tomato paste bins.  PSR ¶¶ 32-43.  All together, the collusive agreements among SK Foods, Ingomar, and Los Gatos affected $120 million in sales.  PSR ¶ 44.  How pricing was actually affected is unknown and immaterial in this criminal case.  PSR ¶ 55.

### III. OBJECTIONS TO PRESENTENCE REPORT GUIDELINES APPLICATIONS

The Government does not agree that the mere fact that the Defendant was chief executive officer of an enterprise that he owned requires an adjustment for abuse of position of trust.  U.S.S.G. § 3B1.3; PSR ¶¶ 75, 81.  This adjustment would be appropriate in a case in which an executive abused his position as the shareholders' agent.  See United States v. Kay, 513 F.3d 432, 459-461 (5thCir. 2007). Here, Salyer was indirectly the one hundred percent owner of SK Foods.  PSR ¶ 6.  The sole shareholder of the enterprise knew that management was running the enterprise corruptly because he was the one directing the corruption.  The nature of SK Foods's relationship with its customers is reflected in PSR ¶ 75, but it is plausible to say that Defendant's victims were generally large corporations that had engaged in more-or-less arm's-length transactions not worthy of this adjustment.

There is some reason to discount the two-point sophisticated means enhancement applied in the PSR at Paragraph 73.  U.S.S.G. § 2B1.1(b)(10)(C).  The Government is not recommending this adjustment for any other defendant involved in the mislabeling scheme, even the ones who directly administered the scheme on Salyer's behalf.  See Plea Agreements in United States v. Alan Huey, (2:09-cr-468 LKK, Dkt. No. 3); United States v. Jeffrey Beasley, (2:09-cr-351 LKK, Dkt. No. 5); United States v. Jennifer Dahlman, (2:09-cr-62 LKK, Dkt. No. 7).  As Salyer himself remarked on one of the recorded conversations, all that his product falsification scheme required was a label printer.  True lab

United States' Objections to PSR                    4

results were never important to him.

The Government does not object to any of the other Guidelines calculations in the PSR. The Plea Agreement accounts for the fact that there are contrary arguments to be made, but there is no doubt that the PSR treats loss from adulterated food reasonably. PSR ¶¶ 15, 18-20, 71. Even though Defendant's customers turned his tomato paste into food, sold it to customers, and suffered no monetary loss themselves, the PSR's loss calculation is very well supported in the law. See U.S.S.G. §§ 1B1.3, 2B1.1 n.3(E)(v); United States v. Milstein, 401 F.3d 53, 74 (2d Cir. 2005) (re-labeled pharmaceuticals); United States v. Gonzalez-Alvarez, 277 F.3d 73, 79-80 (1st Cir. 2002) (intended loss for adulterated milk that dairy farmer sold to distributers to sell to consumers was the total consumer retail price).

### IV.   CONCLUSION

Defendant will make his own objections that he can articulate himself. The Government will answer them. In this filing, and accounting for all of the arguments that Defendant made to the Probation Officers, the United States submits that in the context of this negotiated settlement, seven years is both adequate and required to comply with the purposes of sentencing. 18 U.S.C. § 3553(a)(1).

If the Court is at all inclined to sentence below seven years, the Government requests opportunity to present a selection of conversations and emails in which Salyer discussed food mislabeling, bribery, and collusion. Summaries do not really capture the tone of these communications. Defendant was not merely aware of what his subordinates were doing on his behalf -- Salyer delighted in what they were all doing together and he expressed contempt for those who would not go along.

Respectfully submitted,

Dated: January 22, 2013

BENJAMIN B. WAGNER
United States Attorney

/s/ Matt Segal
MATTHEW D. SEGAL
R. STEVEN LAPHAM
JARED C. DOLAN
Assistant United States Attorneys