Dale C. Campbell, State Bar No. 99173
James Kachmar, State Bar No. 216781
**weintraub tobin** chediak coleman grodin
LAW CORPORATION
400 Capitol Mall, 11th Floor
Sacramento, California  95814
Telephone:   916.558.6000
Facsimile:    916.446.1611
dcampbell@weintraub.com

Attorneys for Non-Party Victims
The Morning  Star Packing Company, L.P. and
Liberty Packing Company, LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FREDERICK SCOTT SALYER,<br><br>Defendant. | Case No. 2:10-cr-0061-LKK<br><br>**SUPPLEMENTAL BRIEF IN SUPPORT OF REQUEST FOR RESTITUTION BY VICTIMS THE MORNING STAR PACKING COMPANY, L.P. AND LIBERTY PACKING COMPANY, LLC**<br><br>Courtroom 27, The Hon. Dale A. Drozd |

{1685110.DOCX;}

Brief ISO Morning Star's Request for Restitution

# TABLE OF CONTENTS

*Page*

I. INTRODUCTION ... 1

II. LEGAL AUTHORITIES AND ARGUMENT ... 2

    A. Morning Star Is a "Victim" of Salyer's Unlawful Conduct and Is Entitled to Mandatory Restitution ... 2

        1. Morning Star Is a Victim Entitled to Restitution ... 3

    B. Morning Star Is Entitled to Restitution for Its Lost Profits ... 3

        1. Morning Star's Lost Sales to Kraft as a Result of Salyer's Criminal Scheme ... 5

        2. Morning Star Lost Sales to Frito-Lay as a Result of Salyer's Criminal Scheme ... 6

        3. Morning Star's Lost Sales to Safeway ... 8

        4. Morning Star's Lost Profit Calculations ... 8

            a. Morning Star's Lost Sales in Pounds ... 9

            b. Morning Star's Lost Profits per Pound ... 9

            c. Morning Star's Total Lost Profits ... 10

III. CONCLUSION ... 11

weintraub tobin chediak coleman grodin
law corporation

# TABLE OF AUTHORITIES

**Page**

### Cases

United States v. Ageloff
    809 F.Supp.2d 89 (E.D.N.Y. 2011) .................................................................. 4

United States v. Battista
    575 F.3d 226 (2d Cir. 2009) ........................................................................... 3

United States v. Brock-Davis
    504 F.3d 991 (9th Cir. 2007) .......................................................................... 2

United States v. Dove
    585 F.Supp.2d 865 (W.D. Va. 2008) ............................................................... 3

United States v. Fair
    699 F.3d 508 (D.C. Cir. 2012) ..................................................................... 4, 8

United States v. Gallion
    2011 U.S. Dist. LEXIS 101748 (E.D. KY Sept. 9, 2011) ................................... 10

United States v. Gamma Tech. Indus., Inc.
    265 F.3d 917 (9th Cir. 2001) .......................................................................... 4

United States v. Gordon
    393 F.3d 1044 (9th Cir. 2004) ..................................................................... 2-3

United States v. Jones
    641 F.3d 706 (6th Cir. 2011) .......................................................................... 3

United States v. McKanry
    628 F.3d 1010 (8th Cir. 2011) ........................................................................ 4

United States v. Navarrete
    667 F.3d 886 (2d Cir. 2012) ........................................................................... 3

United States v. Newcomb
    2012 U.S. Dist. LEXIS 110660 (E.D. Cal. Aug. 7, 2012) .................................... 2

United States v. Parker
    553 F.3d 1309 (10th Cir. 2009) ...................................................................... 4

United States v. Reynolds
    2011 U.S. Dist. LEXIS 53235 (E.D. Cal. May 18, 2011) .................................... 2

### Statutes

11 U.S.C.
    § 523(a)(7) ................................................................................................. 11
    § 523(a)(13) ............................................................................................... 11

weintraub tobin chediak coleman grodin
law corporation

18 U.S.C.
   § 3663A(a)(2) .................................................................................... 2
   § 3663A(c)(1)(A)(ii) ........................................................................... 2
   § 3663A(c)(3)(B) ............................................................................... 1
   § 3664(d)(4) ................................................................................. 4, 10

{1685110.DOCX;}                          iii              Supp. Brief ISO Morning Star's Request for Restitution

Pursuant to the Court's June 5, 2013 Order, The Morning Star Packing Company, L.P. and Liberty Packing Company, LLC (collectively, "Morning Star") submit this supplemental brief in support of their request for restitution against Scott Salyer ("Salyer") as follows:[1]

## I.   INTRODUCTION

The Government's Brief regarding Restitution (Dckt. # 638 – "Gov't Brief"), as well the prior briefs submitted by Morning Star concerning restitution (Dckt. ## 555 & 563), demonstrate that Morning Star was a "direct victim" of Salyer's criminal scheme and is entitled to mandatory restitution under the Mandatory Victims Restitution Act ("MVRA"). The only issues before this Court are: (1) what is the amount of restitution to which Morning Star is entitled from Salyer; and (2) whether, as Salyer claims, the determination of restitution is so "complex" that it would "complicate or prolong the sentencing process to such a degree that the burden outweighs the need to provide restitution." See 18 U.S.C. § 3663A(c)(3)(B).[2] As the following demonstrates, the determination of the amount of restitution owed to Morning Star is rather straightforward, i.e. the amount of its lost profits as a result of Salyer's criminal scheme. Contrary to Salyer's claims, this determination is not too "complex" nor does its burden "outweigh" the need to provide restitution to Morning Star as a direct victim of Salyer's criminal scheme.

Morning Star is entitled to restitution as set forth below and respectfully requests the Court enter an order awarding it restitution as to Salyer in the amount of $18,794,089.42.[3]

---

[1] Morning Star understands that it is requesting a significant amount of restitution, but that amount reflects only a portion of the monetary harm caused by Salyer and his co-conspirators. Morning Star is filing a motion to seal some of its evidence in support of its restitution request due to the confidential and proprietary nature of the information used to calculate Morning Star's lost profit caused by Salyer's criminal scheme related to specific customers.

[2] Salyer has already been sentenced to six years in prison and has begun serving his sentence. Therefore, the determination of restitution does not prolong the sentencing process.

[3] The Government's Brief suggests that Morning Star's lost profits can be determined simply by using the "net profit margin" acknowledged by Salyer of "4-5%". See Gov't Brief, at pp. 10-11. While this may simplify the process somewhat (i.e. multiplying Morning Star's lost sales revenue by 0.05 to determine its lost profits), this would not make Morning Star whole because Morning Star's lost profits on the lost sales is greater than a "net

weintraub tobin chediak coleman grodin
law corporation

## II. LEGAL AUTHORITIES AND ARGUMENT

### A. Morning Star Is a "Victim" of Salyer's Unlawful Conduct and Is Entitled to Mandatory Restitution.

Under the MVRA, the Court "shall" award restitution to the victim of a crime, such as Morning Star, which involves "an offense against property [under Title 18], ... including any offense committed by fraud or deceit ... ." 18 U.S.C. § 3663A(c)(1)(A)(ii). Salyer pled guilty to a racketeering scheme, including a "'scheme to defraud, mail fraud and wire fraud" as well as "honest services" mail fraud. Salyer Plea Agreement (Dckt. # 478), at p. 3 [pleading guilty to racketeering violation]; *see id.* at pp. 7-9 [setting forth elements of racketeering violations, including mail and wire fraud and honest services fraud]. Salyer acknowledges that the Court is <u>required</u> "to order restitution to the victims of the offenses to which [he] is agreeing to plead guilty." *Id.* at p. 3.

The MVRA defines "victim" to mean "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2) [MVRA]. The government bears "the burden of establishing by a preponderance of the evidence that the victim's damages were caused by the conduct of which the defendant was convicted." *United States v. Brock-Davis*, 504 F.3d 991, 998 (9th Cir. 2007); *see, also, United States v. Reynolds*, 2011 U.S. Dist. LEXIS 53235 at *2 (E.D. Cal. May 18, 2011) [recognizing that Government also bears burden of establishing "the amount of loss" by a preponderance of the evidence for restitution purposes.].

However, given "'the remedial purposes of the MVRA,' 'district courts [have] a degree of flexibility in accounting for a victim's complete losses.'" *United Stated v. Newcomb*, 2012

---

profit margin" of 4-5%. See Declaration of Chris Rufer ("Rufer Decl."), ¶ 17. As discussed below, the proper analysis is to take the amount of Morning Star's lost sales revenue and subtract from that its additional variable costs (but not fixed costs) to make those sales. This results in proper lost profit calculation which is higher than what would result from the calculation proposed by the Government. Nevertheless, if the Court is inclined to find the calculation of "variable costs" to be prohibitively complex, Morning Star is willing to accept the restitution calculation proposed by the U.S. Attorney based upon Salyer's "net profit" admission.

{1685110.DOCX;}  2  Supp. Brief ISO Morning Star's Request for Restitution

U.S. Dist. LEXIS 110660 at *2 (E.D. Cal. Aug. 7, 2012); *see, also, United States v. Gordon*, 393 F.3d 1044, 1048 (9th Cir. 2004) (recognizing that "uncertainties [should be] resolved with a view toward achieving fairness to the victim."). Further, "[i]t is well established that a restitution award may be based on victim impact statements or victim affidavits." *Id.* at *4.

   1.   **Morning Star Is a Victim Entitled to Restitution.**

Courts have recognized that "the definition of victim is certainly broad ..." *United States v. Battista*, 575 F.3d 226, 231 (2d Cir. 2009). In *United States v. Navarrete*, 667 F.3d 886 (2d Cir. 2012), the Court awarded restitution to a bank whose officers had been bribed by the defendant to award it certain contracts. In addition to recognizing that the bank whose officers were bribed was a "victim" for restitution purposes, the Court noted that there were other victims for restitution purposes, <u>including the defendant's competitor who was edged out for the business as a result of the bribes</u>. *Id.* at 890; *see, also, United States v. Jones*, 641 F.3d 706, 714 (6th Cir. 2011) ("In the context of mail fraud convictions, we have read this statutory definition of 'victim' to allow for restitution for the loss attributable to all the victims of a defendant's scheme to defraud, even when the defendant was not indicted or convicted of fraud with respect to each victim.").

Here, the evidence demonstrates that Morning Star was the intended target of Salyer's criminal scheme. Gov't Brief, at pp. 5-11; see also Morning Star's Brief re Restitution (Dckt. # 555), at pp. 3-10 [describing how Salyer's criminal scheme specifically targeted Morning Star]. Morning Star was shut out of the competitive bid process for several customers, including Kraft, Frito-Lay and Safeway, as a result of the criminal scheme and suffered lost profits as a result. Morning Star is a direct victim of Salyer's scheme and is entitled to restitution for its losses.

B.   **Morning Star Is Entitled to Restitution for its Lost Profits.**

As a victim, Morning Star is entitled to its lost profits as a result of Salyer's criminal acts. *United States v. Dove*, 585 F.Supp.2d 865, 868-69 (W.D. Va. 2008) ("'[T]he *amount* of restitution that may be awarded is limited to the victim's provable actual loss ....' The proper measurement of loss is lost net profit, not lost gross income."). The process for determining

Morning Star's lost profits as a result of Salyer's criminal scheme is straightforward. Morning Star is entitled to the amount of sales revenue it lost to the criminal scheme minus the variable costs Morning Star would have incurred in making these additional sales. *See United States v. Gamma Tech. Indus., Inc.*, 265 F.3d 917, 926 (9th Cir. 2001) (MVRA is intended to provide restitution to victims for their actual losses resulting from the defendant's criminal conduct.)

In *Sure-Trip, Inc. v. Westinghouse Engineering*, 47 F.3d 526 (2nd Cir. 1995), the Court addressed the necessary factors for performing a lost profit analysis:

> Where plaintiff is seeking to recover lost profits, such damages are equal to the revenue that would have been derived, less additional costs that would have been incurred, …. Fixed overhead costs, as opposed to variable costs, are not properly deducted in calculating plaintiff's lost profits. … Fixed costs represent the total dollar expense that occurs regardless of output … .
>
> In contrast, variable expenses, defined as those additional costs necessarily incurred in performing the contract, must be deducted from plaintiff's recovery so plaintiff is not put in a better position than it would have been had defendant performed. Thus, Sure-Trip's alleged lost revenue had to be offset by any additional costs it would necessarily have expended in performing the contract to arrive at its lost profits.

*Sure-Trip*, 47 F.3d at 531-32; *see, also, Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1029-30 (2d Cir. 1995) ("[C]ourts generally do not include fixed costs in the calculation of lost profits … . This is, of course, because the fixed costs would have been encountered whether or not the breach occurred").

"Because the damage wrought by fraud is sometimes difficult to calculate, a district court is charged only with reasonably estimating the loss using a preponderance of evidence standard." *United States v. McKanry*, 628 F.3d 1010, 1019 (8th Cir. 2011); *see, also, United States v. Parker*, 553 F.3d 1309, 1323 (10th Cir. 2009) ["The determination of an appropriate restitution amount is by nature an inexact science."]. Further, there is going to be "a degree of tedium [that] inheres in the [calculation] process", but this does not make that process complex. *See United States v. Ageloff*, 809 F.Supp.2d 89, 99 (E.D.N.Y. 2011.)[4]

---

[4] The Court may also require, before awarding restitution, additional documentation, hearing testimony, or refer the matter to a magistrate. *See United States v. Fair*, 699 F.3d 508, 513 n. 2 (D.C. Cir. 2012). Under 18 U.S.C. § 3664(d)(4), the Court must take efforts "to the greatest extent possible" to protect the privacy rights of victim's in submitting testimony or evidence in support of a restitution request, such as protecting Morning Star's confidential business information. This includes allowing Morning Star to submit additional supporting evidence for the Court's *in camera* review. 18 U.S.C. § 3664(d)(4).

Morning Star's restitution claim is based on the profits it lost from being shut out of doing business with Kraft, Frito-Lay, and Safeway for the years 2004-2008, as a result of Salyer's criminal scheme.[5] The calculation of Morning Star's lost profit is not difficult.

### 1. Morning Star's Lost Sales to Kraft as a Result of Salyer's Criminal Scheme

Morning Star had a long-term, large-volume business relationship with Kraft. In fact, the year 2003 was the last year of a five (5) year contract between Morning Star and Kraft. Then, in 2004, Salyer began to bribe Robert Watson, Kraft's sales representative, and Morning Star lost that large volume business. Watson Plea Agreement (Dckt. # 7), Case No. 2:09-cr-0035-LKK; at 11:18-23; see also Declaration of Scott Manion ("Manion Decl."), ¶¶ 3-4.

In 2005, Watson purported to put Kraft's business out to bid, with the bid due by June 24, 2005. Unbeknownst to Morning Star, Watson had already granted the contract to SK Foods on June 3, 2005, three weeks before the supposed close of the public bid. The bribes paid to Watson guaranteed SK Foods the contract despite the charade played to make others think there was an open bidding process.

In 2007, Salyer was able to obtain Morning Star's bid information for a new contract with Kraft, which allowed SK Foods to submit a winning bid for tomato products – even though it was higher than Morning Star's. See Randall Rahal Interview Notes (Day 2) ("Rahal Int. # 2), at p. 15, attached as Exh. 1A to Declaration of Richard B. Cohen in support of U.S.'s Opposition to Motion for Severance (Cohen Decl.") (Dckt. # 420); Affidavit of Special Agent Paul S. Artley in Support of Arrest Warrant and Criminal Complaint ("Artley Aff.") (Dckt. No. 1) at ¶ 45. In May 2007, Morning Star bid $0.33 per pound for 67 million pounds of tomato paste and $0.18 per pound for 3.5 million pounds of diced tomatoes. Id., ¶ 46. As a result of the bribes, SK Foods was awarded the Kraft contract instead of Morning Star, despite bidding $0.005 (0.5¢) per pound higher than Morning Star for the diced tomatoes and

---

[5] Morning Star's total damages are substantially higher as a result of the bribery/price-fixing scheme, corporate espionage, and misappropriation of confidential and trade secret information. Morning Star lost other customers during this time period as a result of the wrongful conduct of Salyer and others. However, to streamline this process, Morning Star is seeking restitution in this matter for only three customers whose purchasing managers who admitted being bribes as established by the existing guilty pleas.

$0.035 (3.5¢) per pound higher than Morning Star for the tomato paste. *Id.*, ¶¶ 46-47. The bribed agent even allowed SK Foods to submit a second, higher bid for the tomato paste <u>after</u> the bidding had closed. *Id.*, ¶ 47. Watson made it known that as long as SK Foods' bid prices "were close or the same" as Morning Star's, Kraft would give the business to SK Foods "with no questions asked." Rahal Int. #2 at p. 16; see also Gov't Brief, Exh. D, at pp. 36, 38 of 61.

In fact, SK Foods obtained the Kraft contract for 2004-2008 despite a higher bid than Morning Star as a result of the bribery scheme. Rahal Int. #2, at p. 16. In another year, SK Foods was awarded a contract by Kraft despite Morning Star's bid being 1.5 cents per pound lower than SK Foods'. Rahal Int. # 2, at p. 16. Salyer told Greg Pruett, president of Ingomar Packing Company (one of the CTEG members that conspired to fix prices with Salyer/SK Foods), that Kraft would not buy from Morning Star so Ingomar was free to bid higher prices for these contracts as well. See G. Pruett Interview ("Pruett Int.") dated October 30, 2008, at p. 6, attached as Exh. 3 to Cohen Decl.[6]

When Salyer's criminal scheme was disclosed (and Kraft's purchasing agent arrested for accepting the bribes), Kraft turned to Morning Star to sell it product at the same levels as before the criminal scheme. Manion Decl., ¶ 5; Rufer Decl., ¶ 10.

2.   Morning Star Lost Sales to Frito-Lay as a Result of Salyer's Criminal Scheme.

Salyer and SK Foods reached a similar arrangement with the purchasing agent of Frito-Lay. Frito-Lay's purchasing agent, James Wahl, admits that the bribes began in 1998 thereby keeping Morning Star out of Frito-Lays' business for over a decade. Plea and Cooperation Agreement ("Wahl Plea") Case No. 2:09-cr-00040-LKK (Dckt. No. 3) at 15:18-22. After receiving bribes, Wahl ensured that Frito-Lay "would not buy from Morning Star." See Rahal Interview (Day 1) dated October 28, 2008 ("Rahal Int. # 1") at p. 13, attached as Exh. 1B to

---

[6] Watson, the Kraft Purchasing Manager who was bribed, pled guilty to honest services mail fraud on or about January 27, 2009. See Watson Plea Agreement. Watson admitted that, in exchange for the bribes, he would ensure that SK Foods was awarded contracts instead of Morning Star and would provide confidential bidding information for competitors like Morning Star to SK Foods. *Id.*, Exh. A.

weintraub tobin chediak coleman grodin
law corporation

{1685110.DOCX;}   6   Supp. Brief ISO Morning Star's Request for Restitution

Cohen Decl.; *see id.* at p. 14 [explaining how the purchasing agent made it clear that Frito-Lay would not purchase from Morning Star and that this benefited SK Foods/Salyer since allowing Morning Star to compete for the business would have driven prices down]; *id.* at p. 17 ["SK [Foods] could not compete with Morning Star's paste prices, so keeping Morning Star out of the Frito-Lay account was absolutely critical for SK Foods."][7]

Morning Star attempted to bid on Frito-Lay's business for years and was never allowed to do so. The problem became so persistent that Morning Star's president wrote to the Frito-Lay's president asking him to investigate why Frito-Lay would not allow Morning Star to even bid on the contracts. Morning Star had also been made aware from one of its other customers, McCormick (a large supplier of spices and flavoring to Frito-Lay), that Frito-Lay instructed McCormick to stop doing business with Morning Star and instead buy its paste from SK Foods, which McCormick did. Mr. Rufer also asked Frito-Lay's president to investigate why that was done. Rufer Decl., ¶¶ 11-12 and Exhs. B-C thereto.

Additional evidence establishes that Salyer knew that his bribes were keeping Morning Star from becoming an approved supplier for Frito-Lay. In April 2008, Salyer and Rahal discussed how Morning Star "would not be approved to supply processed tomato products to Frito-Lay" as long as the bribed agent was there. Artley Aff., ¶ 32. Salyer and Rahal discussed:

> Salyer: ... The problem with Frito is, is that they can't get Morning Star in cause they're not approved yet.
> Rahal: And you can thank Jim Wahl [the bribed purchasing agent] for that.
> Salyer: Exactly, and I think it'll take [Morning Star] a couple years, at least, to get approved.
> Rahal: Well they've been trying to get approved for the last five years.
> Salyer: Right.
> Rahal: As long as [Wahl] is there, they're not gonna get approved, I can tell you that.

See Exh. B to Gov't Brief, at p. 22 of 68.

In addition to keeping Morning Star from being awarded contracts, the bribes were also used to obtain Morning Star's confidential bid information from Frito-Lay. Rahal Int. No. 1, at

---

[7] Wahl pled guilty to honest services mail fraud on or about January 26, 2009. See Plea Agreement. In exchange for bribes, Wahl ensured that SK Foods would be awarded contracts from Frito-Lay instead of its competitors like Morning Star and provided confidential bid information to SK Foods. *See id.* at Exh. A.

p. 16. Salyer would use the Morning Star bid information to have "an idea of where the competition would be" and use it to prepare SK Foods' bids. *See* Alan Huey Interview ("Huey Int.") dated September 2, 2009, at p. 12, attached as Exh. 2 to Cohen Decl. In April 2008, Rahal and Salyer received "a Morning Star proposal for a three-year contract for the sale of processed tomato products to Frito-Lay." Artley Aff., ¶ 33. SK Foods used this confidential bid of Morning Star "to set bid prices" for SK Foods a few days later. *Id.*, ¶ 33.

Like with Kraft, once Salyer's criminal scheme was exposed, Frito-Lay began purchasing processed tomato products from Morning Star. Rufer Decl., ¶ 14; *see, also*, Victim Frito-Lay, Inc.'s Supplemental Brief and Exhibits regarding Restitution (Dckt. #640), Exh. A, at p. 2 (confirming that Frito-Lay would have purchased from Morning Star in 2008, the only year for which Frito-Lay is seeking restitution, but for the bribes paid to its purchasing agent.)

### 3.  Morning Star's Lost Sales to Safeway

Like the other customers discussed above, Salyer and his co-conspirators bribed a purchasing agent at Safeway to ensure that SK Foods would be awarded contracts instead of Morning Star. In his plea agreement, Safeway's purchasing manager, Michael Chavez, admitted that, in exchange for receiving the bribes, he would ensure that Safeway awarded contracts to SK Foods instead of its competitors like Morning Star. *See* Chavez Plea Agreement, Case No. 2:10-cr-002 (Dckt. # 7), at Exh. A.

### 4.  Morning Star's Lost Profit Calculations

Given the above, it is not too complex to determine Morning Star's lost profits as a result of Salyer's criminal scheme to keep it from obtaining business from Kraft, Frito-Lay and Safeway. The Court should look to (1) the amount of sales (in pounds) that Morning Star lost as a result of Salyer's criminal scheme and multiply that by (2) the average lost profit per pound that Morning Star experienced. This formula's product results in the lost profits Morning Star sustained as a result of Salyer's criminal scheme. *United States v. Fair*, 699 F.3d 508, 514 (D.C. Cir. 2012) (recognizing that under a lost profit theory, "the government must offer sufficient evidence to establish both the profit margin per sale and the number of sales lost.").

///

{1685110.DOCX;}  8  Supp. Brief ISO Morning Star's Request for Restitution

a. Morning Star's Lost Sales in Pounds

In order to determine the amount of sales that Morning Star did not realize as a result of Salyer's criminal scheme, the Court can look to the amount of tomato products that SK Foods sold to Kraft, Frito-Lay and Safeway during the relevant time period 2004-2008, when the bribes and price-fixing scheme occurred. This information can be derived from the records of SK Foods as maintained by the Bankruptcy Trustee, whose supporting declaration shows the total amount of product (paste and diced) in pounds that SK Foods sold to Kraft, Frito-Lay and Safeway during this time period. See Sharp Decl., ¶ 3, and Exh. A thereto.[8]

The evidence demonstrates that Morning Star would have otherwise had this business but for Salyer's scheme. First, Kraft acknowledges that it knows of no business reason why Kraft would have purchased the products from SK Foods that it previously (and subsequently) purchased from Morning Star but for the criminal scheme. See Manion Decl., ¶ 8. Second, it can be reasonably concluded that Morning Star would have made these sales because once the criminal scheme was discovered, Kraft and Frito-Lay resumed purchasing tomato products from Morning Star at the same levels. Rufer Decl., ¶¶ 10, 14.

b. Morning Star's Lost Profits per Pound

The next step in the analysis is determining the amount of Morning Star's lost profit per pound of the tomato products for which it lost sales as a result of Salyer's criminal scheme. To determine this figure, Morning Star's President has determined the historical weighted average sales price per pound for tomato paste and diced tomatoes for the years 2004-08. Rufer Decl., ¶ 18, and Exh. D thereto. This takes into consideration the sales prices multiplied by the number of pounds of product sold at that price in calculating the average price. *Id.*

///

---

[8] In the event that Salyer wishes to claim that Morning Star lacked the capacity to make these additional sales to Kraft, Safeway and Frito-Lay, Morning Star's president has analyzed his company's production capacity for these years and determined that Morning Star had sufficient capacity with its three existing plants to produce and sell this additional amount of product in the years at issue. Rufer Decl., ¶¶ 22-23 and Exhs. H-I thereto. In fact, when the criminal scheme was exposed, Morning Star picked up this business and was able to meet this demand without having to expand its existing facilities or build a new plant. Rufer Decl., ¶¶ 6-8, 10, 13-14, 22-23.

The next step is to determine the weighted average variable cost of production and marketing expenses that Morning Star would have incurred in making the lost sales. Rufer Decl., ¶ 19. Mr. Rufer calculated the variable costs by using Morning Star's operating expense records that are contemporaneously maintained by the companies. Morning Star used a weighted variable cost average which accounts for the slight differences of operating expenses at all three plants (to avoid using only the plant with the lowest operating expenses to artificially inflate the lost profit analysis). *Id.* This results in a computation of Morning Star's weighted average variable cost to produce and market a pound of tomato paste or diced tomatoes for the years at issue. *Id.* and Exh. E thereto.

The final step in this part of the analysis is to subtract the weighted average costs to produce a pound of tomato products from the historical weighted average sales price per pound to determine Morning Star's average lost profit (in cents) per pound of tomato paste and diced tomatoes for the years 2004-2008. Rufer Decl., ¶ 20, and Exh. F thereto.

### c.   Morning Star's Total Lost Profits

After determining the total amount of sales (in pounds) lost by Morning Star as a result of Salyer's criminal scheme (subsection a, above) as well as determining the average lost profit per pound of tomato paste or diced tomato for each year of sales (subsection b, above), the remaining part of the analysis is to multiply the lost sales by the average lost profit per pound to determine the total amount of Morning Star's lost profits as a result of the criminal scheme. This calculation results in the total amount of $18,794,089.42 that represents the total lost profits as to Kraft, Frito-Lay and Safeway, which Morning Star sustained as a result of the criminal scheme. Rufer Decl., ¶¶ 20-21, and Exh. G thereto.[9]

---

[9] Morning Star's detailed financial information supporting this lost profit calculation is confidential and proprietary. Morning Star's competitors would gain undue advantage should they be able to discover this information; that is exactly why Salyer bribed the purchasing agents, Morning Star's employees, and even Mr. Rufer's personal assistant to obtain such information. That is why Morning Star requests to submit its business information supporting its restitution calculation *in camera* or in a filing under seal with access to such evidence limited only to Salyer's counsel. 18 U.S.C. § 3664(d)(4); *see, also, United States v. Gallion*, 2011 U.S. Dist. LEXIS 101748, at *13-14 (E.D. KY Sept. 9, 2011) [recognizing that court can exercise its discretion to seal records offered to support a restitution request to protect the privacy of a victim's records]. This protection is especially important given Salyer's propensity to steal Morning Star's business information and the fact that documents

### III. CONCLUSION

Morning Star respectfully requests the Court to order that Salyer pay restitution to Morning Star for the lost profits it suffered as the result of Salyer's criminal scheme in the total amount of $18,794,089.42.

The evidence presented is not so complex as to unreasonably complicate the calculation of lost profit. The use of variable costs is well established as the appropriate measure to calculate lost profit. The time to consider Morning Star's lost profit calculation pales in comparison to Morning Star's need for restitution. Salyer professes to be broke, yet continues to claim ownership of over $40 million dollars located in Australia. Morning Star is the targeted victim in this case, even to the point of Salyer asking if Rahal "knew someone in New Jersey who could take care of Rufer". Rahal Int. # 2, at p. 1. As the targeted victim, Morning Star is entitled to a timely award of restitution for these crimes and not be relegated to the civil courts to suffer further cost and delay. Moreover, an order of restitution is not dischargeable in Bankruptcy Court in the event Salyer elects to seek a "fresh start" in violation of his plea agreement. 11 U.S.C. §§ 523(a)(7) and (13). All of these considerations weigh in favor of granting restitution and far outweigh the time necessary to achieve fairness for Morning Star.

///
///
///
///
///
///
///
///
///

---

produced to Salyer and his counsel under this Court's Order granting the limited production of Grand Jury materials (Dckt. # 33) have been posted on public websites directly linked to Salyer. See Morning Star's Motion to Seal, which is being filed contemporaneously herewith.

1  In the event the Court is inclined to accept the Government's proposed simplified
2  restitution formula, Morning Star's restitution award would be $4,890,413 based upon a
3  five percent "net profit margin" calculation.
4
5  Dated: October 4, 2013      Respectfully submitted,
6                              **weintraub tobin** chediak coleman grodin
                                Law Corporation
7
                                By: ___/s/ Dale C. Campbell___
8                                   Dale C. Campbell
                                    State Bar No. 99173
9
                                Attorneys for Non-Party Victims The Morning Star
10                              Packing Company, L.P. and Liberty Packing
                                Company, LLC