Hendrika A. Sheldon
119 Alta Drive
La Selva Beach
California 95076-1622

August 31, 2014

Senior United States District Judge Lawrence K. Karlton
US District Court
Eastern District of California



Case # 2:10-cr-0061 TLN

Dear Your Honor,

I have been asked to deliver the Documents of Mr, Scott Salyer to Mr Malcolm Sega l, Attorney, by
Dr. M EL Hussein Dadouri, Diplomat, appointed by His Majesty King Mohamed Vl of Morocco.

Mr Segal has declined and told me to deliver the Documents to Kekker and Van Nest, Attorneys.
But that is in dispute.
So I am sending the Documents personally to you Judge Karlton; because the situation applies to you,

In his speech on 10-28-13, in Marrakesh, Morocco, Attorney General Eric Holder spoke about Reform
and up holding the Geneva Conference rights for all citizens of the world including the US!
And Reforms to strengthen the Rule of Law have been signed in Agreements this past weeks, as such
making your Honor into an example has been put in motion. It is evident that your Honor very recently
became aware of issues regarding injustices against the person of Scott Salyer. This is a window of
opportunity your Honor to correct the embroiled situation yourself,and Retract the Indictment and
leave the situation behind for others involved to answer for. It will be a 1st for all parties involved at the
Eastern District of California that gaming the system will be challenged.
Mr Segal, also, in formed me of your retirement of the Bench. I am Wholeheartedly wishing you Joy,
Peace and Contentment in your Leisure.
Kindest Regards,

Hendrika A Sheldon

# Petition for Commutation of Sentence

*Please read the accompanying instructions carefully before completing the application. Type or print the answers in ink. Each question must be answered fully, truthfully and accurately. If the space for any answer is insufficient, you may complete the answer on a separate sheet of paper and attach it to the petition. You may attach any additional documentation that you believe is relevant to your petition. The submission of any material, false information is punishable by up to five years' imprisonment and a fine of not more than $250,000. 18 U.S.C. §§ 1001 and 3571.*

**Relief sought:** *(check one)*

☐ **Reduction of Prison Sentence Only**          ☑ **Reduction of Prison Sentence and Remission**
☐ **Remission of Fine and/or Restitution Only**     ☑ **Other** _Retract Indictment_

## To The President of the United States:

The undersigned petitioner, a Federal prisoner, prays for commutation of sentence and in support thereof states as follows:

1.  **Full name:** _Frederick_   _Scott_   _Salger_
        First           Middle           Last

    **Reg. No.** _65150-053_        **Social Security No.** _5023_

    **Confined in the Federal Institution at** _Lompoc Satelite Camp_

    **Date and place of birth:** _12|11|1955   Fresno, California_

    **Are you a United States citizen?**                              ☑ yes ☐ no
    *If you are not a U.S. citizen, indicate your country of citizenship*

    _____

    **Have you ever applied for commutation of sentence before?**        ☐ yes ☑ no
    *If yes, state the date(s) on which you applied, and the date(s) when you were notified of the final decision on your petition(s).*

    _____

    _____

### Offense(s) For Which Commutation Is Sought

2.  **I was convicted on a plea of** _guilty - Plea Bargin_ **in the United States District Court**
                         (guilty, not guilty, nolo contendere)

    **for the** _Eastern_ **District of** _California_ **of the crime of:**
          (Northern, Western, etc.)                    (identify state)

Count One RICO and Count Eight Anti TRusT
*(State specific offense(s); provide citation of statute(s) violated, if known)*
of the Indictment
Violations: 18 U.S.C. § 1962 (c) Act 3D
15 U.S.C. § 1 - Price Fixing

I was sentenced on __Feb. 12__, __2013__ to imprisonment for __72 months__, to pay
*(month/day)* *(year)* *(length of sentence)*

☑ a fine of $ __200.00__, ☐ restitution of $ _____, and to
*(do not include special assessment)*

☑ supervised release or ☐ special parole for _____, and/or to probation for

__36 months__. I was __0__ years of age when the offense was committed.
*(length of sentence)*

3.    I began service of the sentence of imprisonment on __4-9__, __2013__, and I am projected to
*(month/day)* *(year)*

be released from confinement on __November__, __2016__.
*(month/day)* *(year)*

**Are you eligible for parole?**                                    ☐ yes ☑ no
*If yes, indicate the date when you became eligible for release, and state whether your application for parole was
granted or denied*

**Have you paid in full any fine or restitution imposed on you?**    ☑ yes ☐ no
*If the fine or restitution has not been paid in full, state the remaining balance.*

4.    **Did you appeal your conviction or sentence to the United States Court of
Appeals?**                                                          ☐ yes ☑ no

**Is your appeal concluded?**                                       ☐ yes ☐ no
*If yes, indicate whether your conviction or sentence was affirmed or reversed, the date of the decision, and the
citation(s) to any published court opinions. Provide copies of any unpublished court decisions concerning such
appeals, if they are available to you.*

U.S. Attorneys and Defense Attorneys colluded to deny my
rights to any defense, trial, appeals nor appropriate requests
such as a request to Retract the Indictment

**Did you seek review by the Supreme Court?**                       ☐ yes ☑ no

**Is your appeal concluded?**                                       ☐ yes ☐ no
*If yes, indicate whether your petition was granted or denied and the date of the decision.*

**Have you filed a challenge to your conviction or sentence under 28 U.S.C. § 2255 (habeas corpus)?**                                                ☐ yes ☑ no

**Is your challenge concluded?**                                                ☐ yes ☐ no

*If yes, indicate whether your motion was granted or denied, the date of the decision, and the citation(s) to any published court opinions, if known. Provide copies of any unpublished court decisions concerning such motions, if they are available to you. If you have filed more than one post-conviction motion, provide the requested information for each such motion.*

Defense Attorneys refuse to make any efforts to defend including challenging under 28 U.S.C. § 2255, Rule 35, trial nor appeal.

5. **Provide a complete and detailed account of the offense for which you seek commutation, including the full extent of your involvement. If you need more space, you may complete your answer on a separate sheet of paper and attach it to the petition.**

Dear Mr. President:

I am the victim of Operation Rotten Tomato. I was informed by Richard Marmaro of Skadden and Arps that "$25 million will buy your freedom, Scott." One can only imagine what this world has come to. Through the assistance of respected Diplomacy Appointees of the Kingdom of Morocco I have continued to persevere to seek any and all possibilities to save my life and to find ears prepared to hear the truth. My Diplomacy friends have sent letters to all of Congress, the Human Rights Organizations, UN, FBI Director, yourself Mr. President, Secretary of State Clinton while in office, the SEC and His Majesty the King. Today I learned the SEC has instated new regulation forbidding the under reporting of expenses by BDS's. This where one will uncover the crimes against my person by Private Capital seeking to maximize profit by "gaming the system". The BDS's who created the fake criminal case against myself are Development Specialists, Inc. Bill Brandt and BMO Capital Markets working the Courts like a Stock Market.

**6.** **Aside from the offense for which commutation is sought, have you ever been arrested or taken into custody by any law enforcement authority, or convicted in any court, either as a juvenile or an adult, for any other incident?** ☐ yes ☑ no

*For each such incident, provide: the date, the nature of charge, the law enforcement authority involved, and the final disposition of the incident. You must list every violation, including traffic violations that resulted arrest or in an criminal charge, such as driving under the influence.*

**Arrests:**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Convictions:**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

7.  **State your reasons for seeking commutation of sentence. If you need more space, you may complete your answer on a separate sheet of paper and attach it to the petition.**

Mr. President:

I am petitioning for the recommutation of my Sentence due to the lawlessness of those who positioned my person as a tool in their game. Clearly their is an important and powerful motivation for the turn of events which, hopefully, one day, I can come to respect as necessary in the grand scheme of life. It is my goal to remain open to that possibility. In the meantime I was violently taken down starting in April of 2008, I have been held at gunpoint by over 50 Armed agents, arrested as a Federal RICO Prisoner, held in the Sacramento County Jail, stripped, chained, dragged, starved, poisoned with sewage, left until unconscious in a hot shower with no ventilation, Kept in Solitary Confinement for 7 months, then on a very tightly managed home confinement for 2 years and 7 months and now in US Federal Prison Camp for 13 months. I have not been permitted to provide for my livelihood nor support my youngest daughter who was a college student through out this ordeal. It is my sincere hope to be immediately returned to Society where I might again grow produce and put people to work who are among the most Struggling in the world on the African Continent. I love American Know how, work ethic and heart. I love how, other than a few unscrupulous Private Capital Power Game Players, we abide by law. I Know that I can make good on the American promise of positive exceptionalism. I would like to be released. Thank you for your time and consideration, Sir.

## Certification and Personal Oath

I hereby certify that all answers to the above questions and all statement contained herein are true and correct to the best of my knowledge, information, and belief. I understand that any intentional misstatements of material facts contained in this application form may cause adverse action on my petition for executive clemency and may subject me to criminal prosecution.

Respectfully submitted this __5__ day of __May__ , __2014__ .
(month)        (year)

_____
Signature of Petitioner

FREDERICK SCOTT SALYER on 7/13/2014 8:24:17 PM wrote
Hi

Today I'm off to get major awards !

Since arriving at Lompoc ,

I've given 7 speeches at Toastmasters ( 10 is most you can give )
Completed Aviation class
Completed Science class
Completed study of Art Class

Completed Parenting class

Completed Horticulture

And of coarse RDAP ...

Not many people have accomplished so much with positive attitude in Prison .

Now I'm off for group picture !!

Hope you are well,

Scott

# Certificate of Completion

In recognition of

## Frederick Salyer

As having successfully met the standards and competencies of

## Parenting

FCC Lompoc, RDAP

Thereby receiving this 24 hour award on

April 24, 2014

65150-053

Ms. F. Deeter, MFT
Parenting Instructor

Mr. M. Brown
Supervisor of Education



# Certificate of Achievement

## Federal Correctional Complex, Lompoc, CA

awarded to:

### Frederick Sawyer

### #65150-053

For successful completion of the
500 Hour
RESIDENTIAL DRUG ABUSE PROGRAM

_____
_____ Libertatore, Ph.D., Residential DAPC

May 16, 2014
Date

MR. (FREDERICK) SCOTT SALYER
UNITED STATES FEDERAL PRISON INMATE NUMBER 65150-053
FEDERAL PRISON LOMPOC SATELITE CAMP
RDAP BUILDING
3705 West Farm Road
Lompoc, California USA 93436

26 April 2014

### INTERNATIONAL ROGATORY COMMISSION

To:   **REQUIRING AUTHORITY**
*Cano'lic Examining Judge of the Principality of Andorra*
Av. Tarragona no. 62, Tel: 00376 870 730 - Fax: 00376 867 661,
Andorra la Vella, Principality of Andorra.
www.batilia.instruccci'o.4@andorra.ad

Ref. No. - **DP-846-4/10**

I, Frederick Scott SALYER, send you greetings and hereby provide **Responses** to the **ENQUIRIES OF INTEREST** previously addressed by this Court on 16, November 2012 and again on 29, October 2013 to:

**AUTHORITY REQUIRED:**
To the competent authority in Washington, USA, Ms. Patricia J. REEDY, "ASSOCIATE DIRECTOR UNITED STATES DEPARTMENT OF JUSTICE, OFFICE OF INTERNATIONAL AFFAIRS CRIMINAL DIVISION", 1301 New York Ave., N.W. WASHINGTON, DC 20005.

**ENQUIRIES OF INTEREST**

1. - That you inform us on the state of proceedings in progress against FREDERICK SCOTT SALYER and if a firm legal decision has been delivered, transmitting copies of all the processing and of the resolution in the event of there being one.

[Response - in light of the fact that the competent authority in Washington refused to Satisfy this Request.

To date - the US Government has procured a signed Plea Agreement from myself, which Judge Karlton ratified on 12 February 2012 whereby I was Sentenced to 72 months and that I was to self-surrender to the Federal Prison Camp at Lompoc, that due to the fact that Alcoholism had infiltrated my health the Judge recommended I be admitted and treated at RDAP while incarcerated, that I must serve a period of probation upon release and that I must agree to the Government's interest in Forfeiture of Funds in Andorra. Hearings continue. I was informed that Judge Lawrence K. Karlton will conduct a hearing regarding funds in Andorra in May 2014 and that he will also conduct a Hearing on Restitution in October 2014. Unable to confirm that as we have only located a Hearing Schedule as follows:

[Response - I, Frederick Scott SALYER born 11 December 1955, do hereby provide, on my own with no corresponding reading of rights nor legal assistance, the requested declaration. Let it be known that I reserve all rights that I would normally be protected under within the US Constitution and Geneva Convention as if the US Government were to stay within the bounds of the recognized legal framework provided to all US and International peoples and as outlined in this Questions Request.]

Regarding the issue of:
*BACKGROUND OF FACT*

*That these preliminary enquiries were started through a report from the Money Laundering Prevention Unit (UPB) on 3 March 2010. That the report referred to indicated that on 30 December 2009 Frederick Scott SALYER, born on 11 December 1955 in California, USA, American citizen, with passport number 47635550, issued on 2 December 2005, opened account number 95B200 in the banking entity of the Principality of CRE'DIT ANDORRA', with a positive balance on 24 February 2010 of USD 3,179,142.24 and EUR 3,773.07. That this person was accompanied by Sally Gayle ALEXANDER TATE, born on 7 March 1975 in Sydney, Australia, of Australian nationality, with passport no. M5372153 issued on 15 June 2006, who also opened an account, number 95B218, in her own name, with a positive balance on 24 February of EUR 1,373.07.*

*That SALYER explained that he had no working activity, but that his father, Fred SALYER, had set up a company in the food and agriculture sector in the United States, which his children then continued, and it was established that Frederick Scott SALYER had been CEO of the family business SK FOODS GROUP. At the same time Sally Gayle ALEXANDER TATE declared that her profession was as a consultant in the fashion world. -*

[Response – Additionally, it was more accurately stated at the time that I provided information regarding a contract opportunity offered to myself in the sector of Agriculture in the country of Paraguay. That financing options for this project would be possible through Credit Andorra involving a Panama affiliate, working with an Australian at INVICO, that it would be necessary for "SALYER" to establish a bank account with Credit Andorra and in order to do that "SALYER" would be required by law to procure a local address, as my address in the United States of America, my address in New Zealand, my address in Australia and my address in France do not meet Andorra banking regulation. The profession of Ms. Tate had been confirmed to me as the same.]

*That in December 2009 the account in the name of Frederick Scott SALYER received a transfer for the value of USD 3,249,968 from a banking entity in Liechtenstein, for which reason the banking entity asked him for details of the origins and justification for this amount. That since then the customer has been postponing the justification referred to. Nevertheless, he authorised the issue of a national transfer for the value of 45,500 euro to the Real Estate Agency INVICO, in order to put down the deposit for the purchase of a home in the country.*

[Response – As stated at the time, the funds transferred to Credit Andorra were and remain property of Fast Falcon LLC, a related entity owned by Salyer Family Trusts for the purpose of establishing a banking relationship with Credit Andorra in anticipation of commencing work in Paraguay. The 47,500 was a deposit on a rental condo that established my residency in order to become a Credit Andorra account holder and borrower. What does not make sense is the timing and other information stated in the FBI 302 report attached. The report claims Credit Andorra viewed the bank account as "suspicious " in December 2009. And that a transfer was made in the amount of $3,498,968.00 1/12/2010. However, Credit Andorra issued two credit cards to me in late December 2009 with 25,000 euro limit per card.

I was in Andorra in late January 2010 and signed the payment authorization for the transfer to INVICO. Andorra banker, Xavier, was excited/pleased about the transaction leading to my residency, an Andorra Banking Regulation, and authorized the transfer. Xavier would not call the Andorra Government regarding, "Highly Suspicious Transfer" and the following month continue to issue credit and authorize banking transactions, he would be compelled to satisfy Banking Regulation prior, which he did.

*With regard to the financial profile and operation, it is indicated that on 12 January 2010, by SWIFT, an amount of USD 3,249,968 was paid into SALYER'S account, from the Austrian banking branch VOLKSBANK, VORARLBERG which is located in Liechtenstein, with IBAN number L1410 8812 1050 2063 0000, the customer ordering being the company FAST FALCON LLC. That the remitting bank had to make this international transfer through its correspondent bank, as did the receiving bank. For the former this was THE BANK OF NEW YORK (USA) and for the Andorran bank JP MORGAN CHASE BANK (USA). Once the money was paid into the account and changed into euro, a transfer was ordered on 5 February 2010 for the sum of 47,500 euro, the beneficiary being the Real Estate Agency INVICO (Andorra), as a deposit to purchase a house in the Principality on behalf of the client.*

[Response – I ordered a transfer of funds for February 2010. The apartment that I contracted for was a few miles out of Villa Andorra. Credit Andorra also approved the site, as it needed to qualify for a residency permit. Further it was INVICO who had handled the Credit Andorra banking introduction.

The plan was to put 47,500 down payment, borrow balance from Credit Andorra and lease the place out covering all costs. ++++This is a key fact ++++
The Bank agreed to finance the property with me as the borrower, they would NOT have done this if I was "highly suspicious".

As usual, FBI Special Agent Paul S. Artley has mislead the actual facts.

*Finally, the banking entity became aware through digital communication means of the detention of a person in New York, USA, by members of the FBI, corresponding to SALYER's description and nationality, for presumed crimes of bribery, as well as the manipulation of prices in food products.*

[Response – At no point in time is a purported News Paper story such as this "digital communication" grounds for any action to be taken by anyone at any point in time as it is possible that some ulterior motive could be the impetus for the outlet disseminating digital communication such as blocking funds and making it seem reasonable to detain a person outside of the bounds of the law. It is true that on 04 February 2010 I was illegally arrested, chained and taken into custody, where I continue to be held up until this very moment in time. The FBI 302 Report and this Enquirie do not match. Additionally, the events unfolded in reality differently than both of the above explanations. The Arrest Warrant was granted on the grounds of "flight risk". although I had just traveled from Europe into the United States, I was somehow fleeing away from the United States of America in order to avoid defending myself against charges that would be made against my person in the future that at this point in time were a surprise as no one had informed me that there would even ever be criminal charges of any kind made against my person, making it impossible for me to even know about it let alone flee.]

*That having requested, at police level, information from the United States Embassy in Madrid, Spain, in relation to background of the accused, and whether it really was SALYER who was detained, on 14 April 2010 the office of the legal attache' in Madrid of the United States Department of Justice reported that SALYER had been detained on 04 February 2010 and that up to today he had no criminal record. With regard to TATE they had no information. That SALYER was accused of many offenses of private*

*corruption and alteration of "records", being officially charged on 18 February 2010, on which date he was in prison, his current situation being unknown.*

**[Response** – US Government filed Criminal Search Warrants against my businesses on April 16, 2008. Due to the Government's illegal acts, my businesses were seized and sold. Immediately upon taking me into custody on 4 February 2010, the US Government began seizure of my assets and business around the world to prevent my being able to pay for my defense. In addition to being deprived of my 6th Amendment Right to a Fair Trial safeguarded within the Constitution of the United States of America, I was Sentenced to a very stiff penalty including 72 months incarceration within the US Federal Prison system based on 1 count that states a man named Randall RAHAL of Intramark bribed many companies by writing one two thousand dollar check to the wife of a B & G Foods broker and 1 count that Jennifer Dalhman "relabeled" product. And some form of "relevant conduct" involving a "co-conspirator" causing his broker to retract a bid that supposedly caused several things to occur affecting the flow of Interstate Commerce.

1.) I am not Randall Rahal.
2.) It was never ascertained whether or not the check for $2,000.00 written to Vickie Turner was even a bribe.
3.) SK Foods LP is not Intramark and it was established in Court Documents by Keker and Vannest that Scott Salyer and SK Foods LP never paid a bribe to anyone.
4.) According to EXHIBIT "A" Facutal Basis for Plea, Intramark USA was a New Jersey wholesaler of food ingredients including SK Foods tomato products. from "January 2004 to April 2008, Mr. Salyer encouraged Rahal to pay bribes and kickbacks to purchasing officers employed by SK Foods's customers Kraft Foods, Frito-Lay and B&G Foods. The intent was to induce Kraft's Robert Watson, Frito-Lay's Richard Wahl and B&G's Robert Turner to promote the interests of SK Foods over their employers' interests." However, checks written by Randall Rahal or his CPA, Gary Ferrentino (of Weiss, Moskowitz & Ferrentino) to the wife of a B&G Foods employee date back to at least as early as 2004. SK Foods LP was never a supplier of anything to B&G until 2006 and again in 2007 SK supplied small quantities of industrial chili sauce, but no processed tomatoes nor tomato paste, to B&G. Morning Star Packing Company supplied 100 percent of B&G's tomato paste through their broker, Hartog Rahal Foods, Inc. of New York, NY (Randall Rahal's uncle) and John Lidestri Jr., son of John Lidestri, partner of Chris Rufer at The Morning Star Packing Co. This began prior to 2004. Rahal was one of 26 brokers representing SK Foods LP.
5.) It is impossible to bribe this long list of companies by way of one $2,000.00 check.
6.) It was never ascertained as to why Jennifer Dalhman engaged in "relabeling".
7.) Former employee of The Morning Star Packing Co, Tony Manual changed the code on 80,000 pounds going to ConAgra from a 900 series label to a 100 series label, causing Jennifer Dalhman to run label printers round the clock in order to "relabel".
8.) At the DEMAND of Erica Kuhlman of Bank of Montreal, the SK Foods LP bank loan syndicating agent, Glen McClaren would be named CFO of SK Foods LP. McClaren insisted on CPA, Katherine Reinhardt joining his staff and together they deleted the inventory from the computer system. Inventory gets into the computer system at the time it is "labeled" and so almost the entirety, something like 90% of the inventory had to be "relabeled". It is important to note that it took extensive efforts to legally dismiss McClaren and Renhardt and when they were finally removed from the SK Foods LP business site they printed checks for $250,000.00 each, McClaren cashed his check immediately and SK Foods LP employee, Lisa Christ was able to put a stop payment on Reinhardt's check prior to it being cashed. SK Foods LP filed Legal Action against McClaren and Renhardt who complicated the proceeding citing unlawful

dismissal ultimately others involved with Bank of Montreal dropped the case without my authorization.

9.) Regarding "relevant conduct". It is important to understand that the mold count is taken at the field upon harvest prior to arrival at the tomato processing factory. Although, this mold count could be considered important by a Government Agency for fresh tomatoes, it is not relevant for processed tomatoes as the tomatoes are washed thoroughly prior to entering the factory, then they are sorted for premium and non-premium and then export. Then they are processed at very high temperature. All that said, SK Foods LP had perfected tomatoes grown with our grower partners so that all met Premium Grade with almost zero % on the mold count which made it difficult if not impossible for other suppliers to compete in Premium Grade Processed Tomatoes. The issue discussed by the US Government was in fact an export contract, and so this mold count argument would not apply anyway. The US Government ignored that fact in the charges and in the Plea Agreement. Further the bid the US Government discusses was never proffered to the "co-conspirator" at the time they show dated on the bid and the bid expired without going to contract, so it is not material to anything that the "co-conspirator" offered to have his broker retract that bid or requested that his broker retract the bid, in an e-mail string, due to the fact that the bid had already expired and the "co-conspirator" had verified with the corresponding employee at his company that the bid had not been proffered to them by this broker anyway. That this bid never resulted in a contract with this export customer and was never invoiced, shipped, nor paid for. So, how then was Interstate Commerce substantially affected by something that never occurred in relation to an export customer which already renders the mold count issue irrelevant, plus the discussions concerning mold count by the US Government did not relate to the customer discussed in the Plea, it actually related to an export to Mexico, which met their mold count specification and so was not included in the Plea after all even though it had been included in the Indictment and featured heavily in the "digital communication" that is stated as having led to the actions of Credit Andorra. This issue was created, by an involved grower partner reneging on a contract to supply 80,000 pounds of tomatoes that actually met Premium Grade, causing the US Government Informants to purchase tomatoes from a "co-conspirator" that the Government claims to have proved has a mold count that would not have met Interstate Specification. But, even that was never proven to be true. Leaving lastly a labeling issue created by the Government's Informant who ran a series of Organic Tomato Labels on a non organic run of tomatoes. I am not the Government's Informant. I never instructed anyone to mislabel anything. But, since this case can never go to trial that fact will never enter into evidence.]

*Having seen the Criminal Procedure Code in force and, in particular, the articles of application to Rogatory commissions, and in accordance with the principal of international reciprocity existing, this Commission is sent for the purposes indicated, so that once carried out and formalised, it may be returned by the same route as that of its receipt, the reciprocity remaining due.*
*Andorra la Vella, 16 November 2012.*
*THE JUDGE CLERK OF THE COURT (two signatures)*

**That he be questioned on the facts transcribed in the body of this Rogatory Commission and specifically asked on the items in the list of questions attached:**

1. - What is his professional activity and what resources has he available.

[**Response** - I currently have no professional activity that I am incarcerated as a US Federal Prisoner and that I have no resources what so ever available.]

2. - If he knows Sally Gayle ALEXANDER TATE, born on 7 March 1975 in Sydney, Australia, and what type of relationship they have.

[Response - I formerly had a close personal relationship with this person, that we had intended to live as man and wife. The events that unfolded were the direct cause of the demise of this relationship. There is no further relationship between myself and this person.]

3. - That the account opened by SALYER in Andorra, account number 95B200 positive balance on 24 February 2010 of USD 3,179,142.24 and EUR 3,773.07. That he accredits the transfer received in this account in December 2009 for a value of USD 3,249,968, from a banking entity in Liechtenstein.

[Response – please see **bank statement**

4. - Does he know the company FAST FALCON LLC and/or COLLINS & ASSOCIATES and, in the affirmative case, what is his relationship with them.

[Response -At the advisal of Trust Attorney Jacob Stein FAST FALCON LLC, a Roatonga Registered related entity, was founded in order to receive funds in the form of a personal IRS Refund and a waste water lease agreement of Salyer Family Trusts. Funds were sourced from the US and cleared by the Federal Bankruptcy Court. At no time has this entity been accused of any wrongful acts. COLLINS & ASSOCIATES CPA handle my tax reporting, refunds and had been in the past involved to facilitate some treasury activities such as banking transfers engaged in in the past on my own behalf and/or on behalf of Trusts affiliated with my family other than myself.]

5. - That he gives his address for the purposes of notification, also details for telephone contact. Taking a photocopy of his passport or identity card.

[Response - I, Frederick Scott SALYER do hereby respond my current address location and address for mail to be:

MR. (FREDERICK) SCOTT SALYER
UNITED STATES FEDERAL PRISON INMATE NUMBER 65150-053
FEDERAL PRISON LOMPOC SATELITE CAMP RDAP BUILDING
3705 West Farm Road
Lompoc, California USA 93436

That as a US Federal prisoner I am not permitted to possess a telephone. It is possible, however, for me to make outgoing phone calls and that in the event it becomes important to speak directly via telephone I would like to suggest a letter to be sent to me outlining the correct phone number and time frame to make this phone call, the name of the person who shall receive such a phone call if any and if a language other than in English a translator would be on the call in the form of a Conference call. My Attorney Gerard Alis Eroles and head of my International Diplomatic Relations Docteur M. El Housseine Dardouri and my International Liaison Ms. Monika L. Sheldon-London, (she who has been tasked specifically with making sure I understand everything by handling the communicating back and forth in French), can be consulted regarding facilitating such an arrangement.
In the event such an arrangement would be facilitated it is necessary to tap 5 on the telephone apparatus upon answering the call and hearing the US Federal Prison Recording that introduces the call, wait one to two seconds for the call to connect and then you will hear my voice in English.

Ms. Monika L. Sheldon-London
monikalsheldonlondon@gmail.com

Gerard Alis Eroles, Avocat
BUFET PUJADAS AVOCATS
Edifici Alba - Avinguda De Mitjavila, 5, 2
Andorra la Vella
Telefon - 376 802047 - Fax: 376 860842
gerard.alis@bufetpujadas.com

Docteur M. El Housseine Dardouri, Diplomat
President ACTM
Maroc-France Consulat de Bordeaux
22 Ave. de Lattre de Tassigney
Villeneuve-sur-Lot
47300 FRANCE
33 6 19 64 30 46
alphamaths.sudouest@orange.fr

Maitre Daniel Veyssiere, Barreau de Cours
SCP VEYSSIÈRE AVOCATS
25 boulevard Saint-Cyr de Coquard BP 201
47305 Villeneuve-sur-Lot Cedex
Tél. 011 05 53 49 80 80
Fax 011 05 53 49 80 81
d.veyssiere@scpveyssiereavocats.com

6. - Any other question which arises from the above and which could be of interest for the examination of this case.

[**Response** - I, Frederick Scott SALYER do hereby respond that I am the victim of OPERATION ROTTEN TOMATO, an FBI Sting Operation designed to locate and identify, a yet to be disclosed, White Collar Crime Ring. In addition to being falsely accused and charged in the Eastern District of California, I was also falsely accused and charged in the Principality of Andorra. I was not accused nor charged with any crime in the other countries of my business, Australia and New Zealand, although, my assets in Australia and New Zealand were illegally confiscated and then illegally handed over to the accusers in the United States citing assistance by Members of the US Congress/Legislature, Ambassadors and the Department of the Secretary of State as having brought to bear the needed impetus that ultimately resulted in their successful illegal confiscation. Please see attached Document Footnote #6.

To deprive me of my 6th Amendment Constitutional Right to a Fair Trial the US Department of Justice tried to Forfeit Funds in Andorra that were transferred by FAST FALCON LLC from a Liechtenstein bank to Credit Andorra in a Document titled Plea Agreement. The funds were blocked in a false accusation of Money Laundering in Andorra to ensure that I would be unable to pay for my Defense in the United States. In the throws of a highly complex game, my Defense Attorney demanded $1 million, (in addition to the $4 million already paid to them and held on account at the Law Firm, Keker and Van nest), immediately or he would quit prior to the early April 2012 Trial date. The money had to be transferred from Andorra to the Law Firm as it was the last source of funds that would be accessible in

the very short time frame they allotted. The date being identified as March 23, 2012. And so, in order to stop the movement of this money underway with the assistance of M. Dardouri and Maitre Daniel Veyssiere the Government infiltrated the Law Firm of Pujols who then failed to record with the Greffe. After that, the Government wrote a Forfeiture line as a term into the Plea Agreement in order to block the movements of M. Dardouri. I did not want to sign this Plea Agreement and I demanded a Fair Trial in the Court of Law continuously through out the ordeal. John Keker and Elliot Peters told me that according to US Attorney Ben Wagner, SALYER is not going to survive and needs to accept and come to terms with that and that the Salyer Case can never go to Trial.

I supplied more detail on this issue to my Attorney Gerard Alis Eroles of Bufet Pujadas and I hereby authorize him to go into greater detail with the Court on my behalf. And so in order to survive, against my will, which I stated clearly and on multiple occasions to the defense attorneys John Keker and Elliot Peters of Keker and Vannest, Attorney Maitre Daniel Veyssiere, CPA Cary Collins, head of my International Diplomatic Relations Docteur M. El Housseine Dardouri, my International Liaison Ms. Monika L. Sheldon-London and friends and family, including family attorney Robert Johns of San Francisco, that I am providing my signature to this Plea Agreement under duress, against my will and under extreme coercion including threat of no less than 30 years in Federal Prison and/or loss of my life.

This fact renders the Plea Agreement unenforceable in any Convention de Geneve Signatory Country including the US and Andorra. It is also important to note that although charges of Money Laundering were made against my person in Andorra no charges of Money Laundering were made against my person in the United States of America. That fact alone renders the entirety of the affair suspicious, dubious, rife with Political Mal Practice and clear and evident Abuse of Power by Government Appointees of at least three Sovereign Nations against my person in addition to torture and being the cause of the torture of my person by blocking the movement of my funds that would have funded my defense. I hereby request that funds be returned via M. Dardouri who I have granted Authority.]

I Frederick Scott SALYER do hereby attest that I have made every effort in my debilitated state of incarceration to generate facts and dates as accurately as possible, I also have read and approve of the contents of this **Response** to **Question Request** and **Declaration** bearing my name.

This _5th_ day of ~~April~~ _may_ 2014.

_(signature)_

_____

(Frederick) Scott SALYER
US FEDERAL PRISON INMATE NO: 65150-053

_(signature)_

(Rev. 05-01-2008)

UNCLASSIFIED

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                      **Date:** 04/19/2010

**To:** Sacramento             **Attn:** SA Paul S. Artley
       International Operations    **Attn:** Europe Unit
                                       UC Steven L. Paulson
                                       SSA Khaimraj Y. Bhagwandin
                                       SSA Andres E. Quintero
                                       FOS Jocelyn M. Gillis

**From:** Madrid
         **Contact:** ALAT Manuel Alvarez, Jr., 011-34-91-587-2354

**Approved By:** Varri Marc L

**Drafted By:** Alvarez Manuel Jr:ma

**Case ID #:** 318A-SC-39878    (Pending)

**Title:** RAHAL, RANDALL
          INTRAMARK USA INC
          SCOTT SAYLER, DBA SK FOODS;
          CORPORATE FRAUD

**Synopsis:** To memorialize contact between Legat Madrid and the Policia d'Andorra.

**Administrative:** Re telcals and internal emails during March and April 2010, between ALAT Manuel Alvarez, Jr., Legat Madrid, and SA Paul S. Artley, Sacramento, wherein the facts in this communication were briefly discussed.

**Enclosure(s):** Enclosed for Sacramento are the following:

            1. One photocopy of a note from the Policia d'Andorra, dated 03/24/2010; and

            2. One photocopy fo a response note from Legat Madrid to the Policia d'Andorra, dated 04/14/2010.

**Details:** In early March 2010, the Policia d'Andorra telephonically contacted Legat Madrid in an effort to conduct a name check of subject Scott Salyer.

UNCLASSIFIED

USAO-029483

To:   Sacramento   From:  Madrid
Re:   318A-SC-39878, 04/19/2010

        By way of background information, the Government of
Andorra was contacted by a bank known as Credit Andorra,
regarding a suspicious bank account belonging to Salyer.   On
12/30/2009, Salyer opened the account at Credit Andorra in his
true name.   On 01/12/2010, the account received a wire transfer
of $3,498,968.00 from a bank in Liechtenstein (NFI).   Credit
Andorra asked Salyer for an explanation regarding the large
incoming wire transfer.   He did not provided a satisfactory
explanation, so Credit Andorra notified the Andorran authorities
and they froze the account pending an investigation by the
Policia d'Andorra.   Therefore, the request for a name check by
the Policia d'Andorra.

        Additionally, Salyer's wife, Sally Gayle Alexander
Tate, opened an account at Credit Andorra with an initial deposit
of 1,000 Euros (approximately $1,400).   Her account has also been
frozen.

        With the concurrance of Sacramento, Legat Madrid
provided the Policia d'Andorra with the unsealed documents from
the Eastern District of California which recently charged Salyer,
as well as with his current custodial status.   That information
was memorialized in the enclosed note from Legat Madrid to the
Policia d'Andorra, dated 04/14/2010.

        Lastly, the Policia d'Andorra advised Legat Madrid that
Salyer paid a real estate agent in Andorra approximately $50,000,
presumably for the purchase of unknown real property in Andorra.

        Legat Madrid recommends that should Sacramento be
interested in obtaining the bank records or funds frozen at
Credit Andorra, or an official copy of the Policia d'Andorra
investigative file, it should coordinate a letter rogatory
request from the U.S. Department of Justice – Office of
International Affairs to the Principality of Andorra.   Legat
Madrid is unable to obtain the bank records directly from the
Policia d'Andorra, but it is confident the funds will be frozen
for an indefinite time period.   Additionally, Sacramento should
note that Legat Madrid has in the recent past unsuccessfully
attempted to repatriate funds frozen by Andorran authorities on
other FBI investigations.   Legat Madrid is not optimistic that
the funds can be repatriated in quick or simple fashion.

        The above information is being forwarded to Sacramento
for whatever action deemed appropriate.   Legat Madrid is taking
no further action at this time.

USAO-029484

To: Sacramento  From:  Madrid
Re:  318A-SC-39878, 04/19/2010

**LEAD(s):**

**Set Lead 1:   (Info)**

    <u>ALL RECEIVING OFFICES</u>

        Read and clear.

♦♦

USAO-029485

Conversation Topic: Rework
Subject: Rework
From: Terria Williams
Sender Name: Terria Williams
To: Jennifer Dahlman
Delivery Time: 12/27/2006 1:51:16 PM
Creation Time: 12/27/2006 1:51:16 PM
Modification Time: 12/27/2006 2:39:10 PM
Submit Time: 12/27/2006 1:51:02 PM
Importance: Normal
Priority: Normal
Sensitivity: Normal
Flags: 1 = Read
Size: 6288

Jen,

A comment was made to me last week, let me quote "not all product for rework was actually brought up and we had to relabel "

I found that statement hard to believe and just wanted to see if you had any knowledge of this. According to my warehouse folks the comment is bogus.

Terria L. Williams

Warehouse Manager

SK Foods

1175 S. 19th Avenue

P.O.Box 160

Lemoore, Ca. 93245-0160

(559)925-2867 Direct

(559)925-2882 FAX

terriaw@skfoods.com

"Relabeling an non factual rumor "

## Factual Basis for Plea

At trial, the government would prove the following facts beyond a reasonable doubt:

SK Foods, L. P. ("SK Foods") was a limited partnership doing business in Ripon and Lemoore, in the State and Eastern District of California, and in Monterey, California. SK Foods was a grower and processor of tomato and other food products. SK Foods conducted all of its tomato paste processing in the Eastern District of California. SK Foods sold tomato paste and other processed agricultural products to food manufacturers in interstate commerce.

Frederick Scott Salyer ("Salyer") was the Chief Executive Officer of SK Foods. Through the Scott Salyer Revocable Trust, he also exercised ownership rights over SK Foods.

### Count One

Randall Lee Rahal ("Rahal") was the president of Intramark USA, Inc. ("Intramark"), a New Jersey wholesaler of food ingredients, including SK Foods tomato products. Rahal oversaw, among other things, the negotiation of contracts between SK Foods and some of its customers. Rahal acted as an agent of SK Foods.

Between no later than January 2004 and continuing until in or about April 2008, with Salyer's knowledge and encouragement, Rahal routinely paid bribes and kickbacks to the purchasing agents of several SK Foods customers. These payments and their purposes were concealed from SK Foods's customers through various means. In return for the routine payments, the purchasing managers promoted SK Foods's interests at the expense of the interests of their employers. Between January 2004 and April 2008, Rahal paid concealed bribes and kickbacks to, among others, the Director of Purchasing at B&G Foods, Inc., Robert C. Turner, Jr. ("Turner"); the Senior Group Manager for Ingredients Purchasing at Frito-Lay, Inc., James Richard Wahl, Jr. ("Wahl"); and a Purchasing Manager at Kraft Foods, Inc., Robert Watson ("Watson"). B&G Foods, Frito-Lay, and Kraft would not have allowed the bribe and kickback payments had those companies been aware of them. The payments violated the conflict of interest policy of each company.

At all times material, B&G was a multinational manufacturer, seller and distributor of various food products with a principal place of business in Parsippany, New Jersey. B&G was a regular customer of SK Foods. Turner worked out of the company's Parsippany, New Jersey headquarters.

In May 2007, SK Foods and B&G entered into a "cost-plus" contract whereby SK Foods agreed to sell B&G chili and jalapeno peppers at a price of $0.22 per pound. Subsequent to entering into the agreement, Rahal convinced Turner to increase the amount B&G would pay for the order. In exchange, Rahal agreed to pay Turner a 0.5 cent per pound

1  kickback for the price increase.

2      Rahal reported his activities to Salyer for the purpose of
   planning and promoting SK Foods's business.  In an intercepted
3  telephone conversation on June 22, 2007, Rahal explained to Salyer
   that he had gotten Turner to commit B&G to paying extra in exchange
4  for the bribe.  Salyer acknowledged the arrangement with B&G and the
   bribe payment to Turner, and planned SK Foods's business affairs
5  accordingly.

6      On July 11, 2007, Rahal made a concealed bribe to Turner  by
   mailing a $2,000 check to Turner's wife. This transaction is charged
7  as Racketeering Act 3D.

8      At Salyer's direction, beginning no later than 2003, and
   continuing until April 2008, SK Foods routinely materially falsified
9  the values of the various grading factors and data contained on the
   certificates of analysis, bills of lading, invoices and bin labels
10 that SK Foods sent to its customers.  Former employees Alan Huey and
   Jennifer Dahlman falsified and directed other SK Foods employees to
11 falsify these documents to appear to meet customer specifications
   and/or regulatory requirements concerning the percentage of natural
12 tomato soluble solids, mold count, screen size, production date,
   viscosity, and whether the tomato paste qualified as "organic."  SK
13 Foods falsified this data for the purpose of inducing its customers to
   accept product that the customers may otherwise have rejected.   In his
14 position as CEO and owner of SK Foods, Salyer ordered his subordinates
   to falsify grading factors.
15

16      In a transaction charged as Racketeering Act 8, on July 18, 2003,
   SK Foods, in Lemoore, California, mailed an invoice for 9,217 pounds
17 of tomato paste to a customer in Pennsylvania.   Consistent with
   Salyer's instructions to falsify information to match customers'
18 contractual specifications, the tomato paste classification was
   falsified from conventional to organic.   If the customer had known
19 that the paste was not organic under FDA regulations, the customer
   would not have accepted it or paid for it.

20                        Count Eight

21      Beginning at least as early as January 2006 and continuing until
   approximately June 2007, in the Eastern District of California and
22 elsewhere, Salyer participated in a conspiracy to fix prices of tomato
   paste sold to McCain Foods, USA, Inc. ("McCain").   The primary purpose
23 of this conspiracy was to fix the price of tomato paste sold to McCain
   in the United States.   During the relevant time, Salyer was the Chief
24 Executive Officer of SK Foods and had ultimate authority to make
   pricing decisions.
25

26      In or about January 2007, McCain solicited bids for approximately
   2.5 million pounds of tomato paste to be used in making Ellio's Pizza,
   which is sold only in the United States.   Rahal, on behalf of SK
27 Foods, submitted a bid at 34 cents per pound.

28      Around the same time, Salyer and his co-conspirators discussed

                              A-2

1  setting a target price of 34 cents per pound for tomato paste sold to
2  certain customers, including McCain.

3      Sometime later, one of Salyer's co-conspirators submitted a bid
   to McCain for 33 cents per pound. When Salyer learned that the
   co-conspirator had offered less than 34 cents per pound, he confronted
4  that co-conspirator. After further discussions with Salyer and
   others, the coconspirator withdrew the 33-cent per pound offer to
5  McCain.

6      During the relevant period, tomato paste sold to McCain by one or
   more of the conspirators, as well as payment for such tomato paste,
7  traveled from facilities located in the Eastern District of California
   to customers located outside California. The business activities of
8  the defendant and co-conspirators were within the flow of, and
   substantially affected, interstate trade and commerce.
9
10     The foregoing would be proven by recorded conversations, emails,
   SK Foods's own test results as compared to the representations that it
   made to its customers, financial records, and the testimony of
11 witnesses including Rahal, Wahl, Huey, Dahlman, and representatives of
   former customers of SK Foods.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1     *Likelihood of Collection:*

2         Collection risks were not pertinent to the Trustee's analysis. SKFA's assets have been

3     sold and the Australian Assets are distributable. Thus, if successful in defending against the

4     AFP's forfeiture action, the Trustee believes the assets would be recoverable. The Trustee has

5     operated on the assumption that any claims held against John Sheahan and Ian Lock (in their

6     capacities as liquidators) and ANZ Bank would be collectible in full.

7     *Litigation Complexity and Expense:*

8         The proposed settlement with the AFP and all other parties resolves several litigations that

9     would certainly prove to be lengthy and costly. Under POCA's civil forfeiture regime, a

10    suspicion that the funds are traceable to crimes in the United States is enough to justify a

11    restraining order, and if a restraining order is entered, the AFP will embark on a 18 to 24 month

12    long investigation to determine if the funds are proceeds of criminal offences committed in the

13    United States, and therefore, subject to forfeiture. See Sharp Decl. at ¶ 12. As a result, continued

14    litigation will likely cause a considerable delay in any recovery for creditors as well as a

15    significant increase in costs to the estate. Further, due to the complexity of the issues raised, and

16    facts and circumstances surrounding the AFP's forfeiture proceedings, the Trustee anticipates that

17    the estate would incur $2 to $3 million to defend against the forfeiture of the Australian Assets.

18    In short, a successful defense would require examination of transactions occurring more than a

19    decade ago and a forensic accounting analysis to determine whether any proceeds of alleged

20    crimes wound up being used by SK Foods to make its investment in SKFA, while at the same

21    time bearing the costs of litigating in Australia.[6]

22        Accordingly, the Trustee has determined that settling without incurring the costs of

23    continued litigation is the most favorable result for the estate.

24

25

---

[6] While the Trustee has had to assess the potential costs and delay of continued litigation with the
26    AFP, there is some chance that intervention by the United States Government would cut short that
litigation. Specifically, as of the filing of this motion, several members of Congress contacted the
27    Australian Embassy in Washington to complain about the AFP's actions and ask that it exercise
discretion to discontinue the proceedings. Contacts were also made to the State Department
28    asking it to intercede on our behalf. The political pressure that has been brought to bear on the
Australian Government is likely one factor which has lead to the instant settlement.