1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,                No.  2:08-cr-0566 TLN

12                    Plaintiff,

13           v.                               <u>FINDINGS AND RECOMMENDATIONS</u>

14   RANDALL LEE RAHAL,

15                    Defendant.

16

17   UNITED STATES OF AMERICA,                No.  2:09-cr-0040 TLN

18                    Plaintiff,

19           v.

20   JAMES RICHARD WAHL, JR.,

21                    Defendant.

22

23   UNITED STATES OF AMERICA,                No.  2:09-cr-0062 TLN

24                    Plaintiff,

25           v.

26   JENNIFER LOU DAHLMAN,

27                    Defendant.

28

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

ROBERT C. TURNER, JR.

        Defendant.

No.  2:09-cr-0145 TLN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

JEFFREY SHERMAN BEASLEY,

        Defendant.

No.  2:09-cr-0351 TLN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

ALAN SCOTT HUEY,

        Defendant.

No.  2:09-cr-0468 TLN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

STEVEN JAMES KING,

        Defendant.

No.  2:10-cr-0059 TLN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

FREDERICK S. SALYER,

        Defendant.

No.  2:10-cr-0061 TLN

1       BACKGROUND

2              These criminal actions arise from conduct of the various defendants constituting bribery

3       and conspiracy to commit commercial bribery, honest services fraud, racketeering, price fixing,

4       and the shipping and introduction of misbranded and adulterated food products.  The prosecutions

5       and issues arising therein with respect to sentencing, particularly with respect to restitution, if

6       any, to be imposed as part of the judgments of conviction have a lengthy and somewhat tortured

7       history.  Below, the undersigned will attempt to summarize the relevant history as succinctly as

8       possible.

9              On March 23, 2012, defendant Frederick S. Salyer ("Salyer"), entered pleas of guilty to

10      one count of racketeering in violation of 18 U.S.C. § 1962(c) and one count of price fixing in

11      violation of 15 U.S.C. § 1 pursuant to a plea agreement filed with the court that same day.

12      United States v. Salyer, No. 2:10-cr-0061 TLN, Dkt. Nos. 478 at 3 & 479.[1])  A three-page factual

13      basis for the plea was attached to that plea agreement and provided, in relevant part, as follows:

14                      (1) between January 2004 and April 2008, bribes and kickbacks
                    were paid to purchasing managers of several customers of Salyer's
15                  SK Foods, L.P. ("SK Foods"), a processor of tomato and other food
                    products; (2) the purchasing managers, in return, "promoted SK
16                  Foods's interests at the expense of the interests of their employers,"
                    the customers of SK Foods; (3) those customers included Kraft
17                  Foods, Inc., and Frito-Lay, Inc.; (4) defendant Salyer was the Chief
                    Executive Officer of SK Foods and the bribes were paid with his
18                  knowledge and encouragement; and (5) from January 2006 until
                    June of 2007, defendant Salyer also participated in a conspiracy to
19                  fix the prices of tomato paste sold to McCain Foods, USA, Inc.

20      (United States v. Salyer, No. 2:10-cr-0061 TLN, Plea Agreement (Dkt. No. 478) at 16-17.)

21             The plea agreement was presented to the court pursuant to Rule 11(c)(1)(C) of the Federal

22      Rules of Criminal Procedure with the parties agreeing that the total term of imprisonment should

23      be no less than four years and no more than seven years, with the government agreeing to

24      recommend no more than seven years and the defendant agreeing to seek a prison term of no less

25      than four years.  (Id. at 2, 5-6.)  The government also agreed to move, at the time of sentencing to

26      dismiss the remaining counts of the indictment against defendant Salyer.  (Id. at 6.)  The

27      _____

28      [1]  Page number citations such as this one are to the page number reflected on the court's CM/ECF
        system and not to page numbers assigned by the parties.

defendant unconditionally agreed to waive his right to appeal the conviction and any aspect of his

sentence, including specifically giving up his right to appeal any order of restitution the court

might impose. (Id. at 12.)   In addition, defendant Salyer agreed to forfeit to the United States any

interest in $3.25 million in funds that were transferred from Volksbank in Liechtenstein to Credit

Andorra on January 5, 2010. (Id. at 4.)  The plea agreement provided that there was no

agreement between the parties as to the appropriate fine, if any, to be imposed. (Id. at 3-4.)

Finally, as to the subject of restitution, the plea agreement of the parties provided as follows:

> The Mandatory Victim Restitution Act requires the Court to order
> restitution to the victims of the offenses to which the defendant is
> agreeing to plead guilty.  The defendant and the government have
> no agreement on the appropriate amount of restitution.   The
> defendant reserves the right to contest any restitution claim in this
> criminal case, and herein merely acknowledges that he has notice of
> the claims that have been made against the bankruptcy estate of SK
> Foods L.P. based on the facts alleged in this case.  The defendant
> understands that this agreement cannot bind any third party.  If the
> court does order restitution, payment should be made by cashier's
> or certified check made payable to the Clerk of the Court.   The
> defendant further agrees that he will not seek to discharge any
> restitution obligation or any part of such obligation in any personal
> bankruptcy proceeding.  The defendant further understand that it is
> the Department of Justice policy, whenever possible, to use
> forfeiture proceeds to compensate victims of the crimes underlying
> the forfeiture, and under the law, such payments are credited
> against the amount of any restitution order.

(Id. at 3.)

On February 12, 2013, in keeping with the terms of his plea agreement defendant Salyer

was committed to the custody of the Bureau of Prisons for concurrent terms of seventy-two

months to be followed by concurrent supervised release terms of thirty-six months, imposition of

a fine was waived based upon a finding that the defendant was unable to pay a fine, and the

mandatory special assessments totaling $200 were imposed. (Dkt. Nos. 559 & 560.)  The

preliminary order of forfeiture was made final and the matter of restitution was continued for

hearing to March 12, 2013. (United States v. Salyer, No. 2:10-cr-0061 TLN, Dkt. No. 559.)

After receiving additional briefing from the government, defendant Salyer and one of the

identified victims on the issue of restitution, on March 12, 2013, the then assigned District Judge

held a restitution hearing and declined to enter a restitution order. (United States v. Salyer, No.

4

2:10-cr-0061 TLN, Dkt. No. 567.)  Thereafter, an amended judgment was entered.  (United States v. Salyer, No. 2:10-cr-0061 TLN, Dkt. No. 569.)

The government appealed on March 13, 2013, and on March 29, 2013, the Ninth Circuit granted a writ of mandamus, vacated the judgment with respect to restitution and remanded the matter for further proceedings to determine whether to award restitution to any victims.  (United States v. Salyer, No. 2:10-cr-0061 TLN, Dkt. No. 587.)  Specifically, the Ninth Circuit found that in declining to enter a restitution order the then assigned District Judge committed a legal error by relying, in part, on defendant's "claimed financial status and the potential availability of civil remedies."  In re Morning Star Packing Co., LP, 711 F.3d 1142, 1144 (9th Cir. 2013).  The Ninth Circuit also noted that

> . . . to the extent that the district court's denial of restitution rested on a determination that complex issues of fact would complicate or prolong the sentencing process, the record is unclear as to whether the district court conducted the balancing test required by 18 U.S.C. § 3663A(c)(3) and determined "from facts on the record" that the burden on the sentencing process of determining restitution would outweigh the need to provide restitution to victims.  See 18 U.S.C. § 3663A(c)(3).

Id.

Following the remand, on April 1, 2013, the then assigned District Judge vacated the judgment as to restitution in defendant Salyer's case and referred the matter to the undersigned for the issuance of findings and recommendations with regard to whether an award of restitution was appropriate.  (United States v. Salyer, No. 2:10-cr-0061 TLN, Dkt. No. 589.)  On June 5, 2013, the matter came before the undersigned for a status conference, at which time a briefing schedule was set.  (Id., Dkt. No. 623.)  Pursuant to that briefing schedule, on September 13, 2013, the government filed its brief regarding restitution.  (Id., Dkt. No. 638.)  On October 3, 2013, Frito-Lay, Inc., ("Frito-Lay"), filed its brief regarding restitution.  (Id., Dkt. No. 640.)  That same day Kraft Foods, Inc., ("Kraft"), also filed a brief regarding restitution.[2]  (Id., Dkt. No. 641.)  The following day The Morning Star Packing Company, L.P., and Liberty Packing Company, LLC,

---

[2]  Kraft's one-page brief simply acknowledged its satisfaction with the government's brief.

1   ("Morning Star"), filed its brief regarding restitution.  (Id., Dkt. No. 642.)  On November 12,

2   2013, defendant Salyer filed his brief regarding restitution.  (Id., Dkt. No. 644.)  On November

3   26, 2013, reply briefs were filed by Morning Star, (Id., Dkt. No. 646), and the government.  (Id.,

4   Dkt. No. 647.[3])

5       The issue of defendant Salyer's restitution order was then taken under submission with the

6   intention of issuing findings and recommendations for the consideration of the assigned District

7   Judge.  However, in mid-2015, the undersigned discovered that the issues with respect to

8   restitution as to the other defendants named in the caption of these findings and recommendations

9   had also been assigned to him for findings and recommendations either on the record during

10  sentencing hearings or in judgments.  Accordingly, on July 1, 2015, the undersigned issued an

11  order setting each of the cases, other than defendant Salyer's, for status conference on July 29,

12  2015.  At those status conferences, briefing schedules were set and the undersigned indicated that

13  a global finding and recommendation would thereafter issue.  The parties have submitted their

14  supplemental briefs.

15      Below, the undersigned will first set forth the applicable law and legal standards

16  governing restitution in federal criminal prosecutions.  The undersigned will then address each of

17  the eight cases, and the arguments with respect to restitution made by the parties therein, in turn.

18                      THE MANDATORY VICTIM RESTITUION ACT

19      As stated by the Ninth Circuit when addressing the writ of mandamus, the Mandatory

20  Victim Restitution Act ("MVRA"),

21          provides restitution, *inter alia*, to victims of offenses against
22          property, "including any offense committed by fraud or deceit."  18
            U.S.C. § 3663A(c)(1)(A)(ii).  Under the MVRA, "the court shall
23          order restitution to each victim in the full amount of each victim's
            losses as determined by the court and without consideration of the
24          economic circumstances of the defendant."   18 U.S.C. §
            3664(f)(1)(A).  Moreover, the alternative availability of recovery
25          through a civil lawsuit is irrelevant in determining restitution under

26  [3]  The undersigned notes that this lengthy briefing schedule was set in large part at the request of
    counsel for the government.  At that time, counsel for defendant Salyer observed, not without
27  some merit, that the sheer amount of time being requested to address the issue of restitution was
    some indication of the complexity of the determination as to the amount of restitution
28  appropriately ordered under the facts of this case, if any.

1    the MVRA.  See 18 U.S.C. § 3664(f)(1)(B) ("In no case shall the
     fact that a victim has received or is entitled to receive compensation
2    with respect to a loss from insurance or any other source be
     considered in determining the amount of restitution."); see also
3    United States v. Cienfuegos, 462 F.3d 1160, 1168 (9th Cir. 2006)
     ("under the MVRA the availability of a civil suit can no longer be
4    considered by the district court in deciding the amount of
     restitution").

5

6    In re Morning Star, 711 F.3d at 1143.

7        The MVRA defines a victim as "'a person directly and proximately harmed as a result of

8    the commission of an offense for which restitution may be ordered." United States v. Anderson,

9    741 F.3d 938, 951 (9th Cir. 2013) (quoting United States v. Yeung, 672 F.3d 594, 600 (9th Cir.

10   2012)).  See also United States v. Reifler, 446 F.3d 65, 135 (2nd Cir. 2006) ("At bottom, the

11   notion of proximate cause reflects ideas of what justice demands, or of what is administratively

12   possible and convenient . . . . The requirement that the harm have been directly caused doubtless

13   reflects the same interest in efficiency, because the less direct an injury is, the more difficult it

14   becomes to ascertain the amount of a plaintiff's damages attributable to the violation").  Thus,

15   "'[b]ut for' cause is insufficient." United States v. Swor, 728 F.3d 971, 974 (9th Cir. 2013).

16       In this regard, "a court may award restitution under the MVRA only for loss that flows

17   directly from 'the specific conduct that is the basis of the offense of conviction.'" United States

18   v. May, 706 F.3d 1209, 1214 (9th Cir. 2013) (quoting United States v. Gamma Tech Indus., Inc.,

19   265 F.3d 917, 927 (9th Cir. 2001)).  See also United States v. Archer, 671 F.3d 149, 170 (2nd Cir.

20   2011) (seeking restitution for losses caused by an unprosecuted offense rather than by the offense

21   of conviction is something the government "may not do").  Moreover, the amount of restitution

22   that may be ordered in a criminal judgment is limited "by the victim's actual loss." United States

23   v. Bussell, 504 F.3d 956, 964 (9th Cir. 2007).  See also United States v. Fair, 699 F.3d 508, 514

24   (D.C. Cir. 2012) ("The MVRA demands that restitution be awarded only for the victim's actual,

25   provable loss . . .");  United States v. Innarelli, 524 F.3d 286, 294 (1st Cir. 2008) ("This is

26   necessarily a backward-looking inquiry that takes into account what actually happened, including

27   whether the victim managed to recover some or all of the value it originally lost.").

28   "Accordingly, 'the district court may not order restitution to reflect Defendants' ill-gotten gains.'"

                                             7

1   Anderson, 741 F.3d at 951 (quoiting United States v. Fu Sheng Kuo, 620 F.3d 1158, 1165-66 (9th

2   Cir. 2010)).

3          Although the MVRA grants district courts "a degree of flexibility in accounting for a

4   victim's complete loses," the court may "utilize only evidence that possesses 'sufficient indicia of

5   reliability to support its probable accuracy.'"  United States v. Waknine, 543 F.3d 546, 557 (9th

6   Cir. 2008) (quoting United States v. Garcia-Sanchez, 189 F.3d 1143, 1148-49 (9th Cir. 1999)).

7   Moreover, while "the MVRA does not require courts to calculate restitution with exact precision,

8   some precision is required – '[s]peculation and rough justice are not permitted.'"  United States .

9   v. Kilpatrick, 798 F.3d 365, 388 (6th Cir. 2015) (quoting United States v. Ferdman, 779 F.3d

10  1129, 1133 (10th Cir. 2015)).  "The government has the burden of proving the amount of the loss

11  by a preponderance of the evidence."[4]  Anderson, 741 F.3d at 951.

12         The MVRA, however, is not mandatory in all circumstances.  Rather, the MVRA

13               shall not apply … if the court finds, from facts on the record, that ...
               determining complex issues of fact related to the cause or amount
14             of the victim's losses would complicate or prolong the sentencing
               process to a degree that the need to provide restitution to any victim
15             is outweighed by the burden on the sentencing process.

16  18 U.S.C. § 3663A(c)(3).  By including this exception to the MVRA's restitution requirement

17  Congress "hoped to avoid creating a system that would, essentially, turn sentencing hearings into

18  complicated, prolonged trials of the normal civil variety."  United States v. Gordon, 393 F.3d

19  1044, 1060 (9th Cir. 2004) (Fernandez, J., concurring and dissenting).  See also United States v.

20  Kones, 77 F.3d 66, 69 (3rd Cir. 1996) ("it was expected that entitlement to restitution could be

21  readily determined by the sentencing judge based upon the evidence he had heard during the trial

22  of the criminal case or learned in the course of determining whether to accept a plea and what an

23  appropriate sentence would be"); S. REP. NO. 104-179, at *19 (1996), reprinted in 1996

24  U.S.C.C.A.N. 924, 931-32 ("In all cases, it is the committee's intent that highly complex issues

25  related to the cause or amount of a victim's loss not be resolved under the provisions of

26  mandatory restitution.  The committee believes that losses in which the amount of the victim's

27

28  [4]  That burden, however, may be carried by a non-party.  See United States v. Tsosie, 639 F.3d
    1213, 1221 (9th Cir. 2011).

8

1   losses are speculative, or in which the victim's loss is not clearly causally linked to the offense,

2   should not be subject to mandatory restitution.").

3        Below, the undersigned will apply these legal standards to the referred restitution issues

4   with respect to each of the individual defendants in these related criminal prosecutions.

5   ANALYSIS

6   I.  <u>Defendants Jennifer Lou Dahlman and Steven James King</u>

7        On February 18, 2009, defendant Jennifer Dahlman ("Dahlman"), pled guilty to causing

8   the introduction or delivery for introduction of adulterated and misbranded food into interstate

9   commerce with the intent to defraud and mislead in violation of 21 U.S.C. §§ 331 (a) and 333

10  (a)(2).  (<u>United States v. Jennifer Lou Dahlman</u>, No. 2:09-cr-0062 TLN, Plea Agreement (Dkt.

11  No. 7) at 2.)  On March 30, 2010, defendant Steven King ("King"), pled guilty to the same

12  conduct.  (<u>United States v. Steven James King</u>, No. 2:10-cr-0059 TLN, Plea Agreement (Dkt. No.

13  3) at 2.)  At their sentencings, the issue of the amount of restitution, if any, defendants Dahlman

14  and King should be ordered to pay was referred to the undersigned.

15       The government, however, now concedes that, as to both defendants Dahlman and King,

16  the government has no "theory to support any restitution amount" against either of these

17  defendants.  (<u>United States v. Jennifer Lou Dahlman</u>, No. 2:09-cr-0062 TLN, Mem. In Supp.

18  (Dkt. No. 45) at 3.)  The government, therefore, has not satisfied its burden of proving the amount

19  of loss attributable to the conduct that served as the basis of their convictions and no restitution

20  should be ordered as to these defendants.  <u>See</u> <u>Anderson</u>, 741 F.3d at 951 ("The government has

21  the burden of proving the amount of the loss by a preponderance of the evidence.").

22  II.  <u>Defendant Robert C. Turner</u>

23       Pursuant to his May 5, 2009 plea agreement, defendant Robert Turner, ("Turner"), pled

24  guilty to two counts of honest services mail fraud and agreed to pay restitution in accordance with

25  the MVRA to B & G Foods, Inc., of Parsippany, New Jersey, in the amount of $14,698.00, and to

26  Nabisco, Inc., in the amount of $50,500.  (<u>United States v. Robert C. Turner, Jr.</u>, No. 2:09-cr-

27  0145, Plea Agreement (Dkt. No. 9) at 2-3.)  That restitution award, however, has already been

28  paid in full by defendant Turner.  (<u>United States v. Robert C. Turner, Jr.</u>, No. 2:09-cr-0145,

9

Judgment (Dkt. No. 47) at 5.)  Although restitution as to defendant Turner was referred to the undersigned "solely for the purpose of identifying the Victim(s)," (id.), Turner's plea agreement specifically identifies the victims of his criminal conduct as B & G Foods, Inc., of Parsippany, New Jersey and Nabisco, Inc., and identifies the appropriate restitution amount as to each of those victims.   There is no further evidence or argument before the court with respect to defendant Turner's restitution.

Accordingly, under these circumstances, the now assigned District Judge should make no further order with respect to defendant Turner's restitution.

III.  Defendant James Wahl, Jr.

On February 18, 2009, defendant James Wahl, ("Wahl"), pled guilty to committing honest services mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1346.  (United States v. James Richard Wahl, Jr., No. 2:09-cr-0040 TLN, Entry of Plea, Dkt. No. 10.)  The "determination of restitution" was "deferred until determined by the Magistrate Judge."  (United States v. James Richard Wahl, Jr., No. 2:09-cr-0040 TLN, Amended Judgment (Dkt. No. 60) at 5 (emphasis in original).

In its brief filed August 5, 2015, with respect to defendant Wahl, the government states:

> Wahl pleaded guilty to receiving bribes when he was a purchaser for Frito-Lay.  (2:09-cr-40 TLN, Dkt. 3, at 15.)  Between 1998 and 2008, he received a total of $160,000 from Rahal.  (Id.)  Frito-Lay wrote directly to the Probation Officer to seek restitution and the PSR recommends $919,661.28.   In the Government's view explained above, King and Dahlman should not be ordered to pay this restitution, which was caused by Wahl's participation in the commercial bribery scheme that their pleas did not implicate.

(United States v. James Richard Wahl, Jr., No. 2:09-cr-0040 TLN, Restitution Memorandum (Dkt. No. 63) at 3.)  Although the government's brief refers to the amount of restitution sought by Frito-Lay, defendant Wahl's former employer, and identifies other defendants who should not be ordered to pay that restitution, the government's filing does not aid the court in determining how much restitution defendant Wahl should be ordered to pay, if any.

Defendant Wahl argues that his restitution amount should be set at $160,219.00, which represents the amount he received in commercial bribes, and he challenges the sufficiency of the

10

1    evidence before the court with respect to any restitution amount in excess of the amount he

2    proposes with respect to Frito-Lay's actual loss attributable to his crime.  (United States v. James

3    Richard Wahl, Jr., No. 2:09-cr-0040 TLN, Opposition (Dkt. No. 65) at 1-5.)

4          In arriving at the $919,661.28 figure, it appears that the probation officer's PSR relied

5    entirely on letters drafted by Frito-Lay's counsel.  No evidence, however, has been submitted in

6    support of those letters.  Without sufficient documentation it is the undersigned's view that the

7    court cannot, at this time and without further delay, determine Frito-Lay's actual loss attributable

8    to defendant Wahl's offense.  See Ferdman, 779 F.3d at 1140-41 ("While the abuse-of-discretion

9    standard under which we ultimately review a district court's award of restitution is deferential and

10   highly so, such standard will not countenance a finding of lost sales based on a victim's

11   unverified claim that 'my losses are X and the value of X is shown on the sales' receipts.");

12   United States v. Hosking, 567 F.3d 329, 333-34 (7th Cir. 2009) ("there is inadequate explanation

13   and insufficient reasoning why the district court relied on the face of the government's document

14   without requiring evidence that the costs reported were directly and reasonably demanded");

15   Waknine, 543 F.3d at 557 ("We hold that in this case the district court erred by relying

16   exclusively on the one-page loss summaries provided by the victims and in not requiring more

17   detailed explanations of the losses each victim suffered."); United States v. Quillen, 335 F.3d 219,

18   224 (3rd Cir. 2003) ("the Government must provide sufficient documentation and explanation for

19   the victims' claimed losses"); United States v. Menza, 137 F.3d 533, 539 (7th Cir. 1998) ("the

20   government must provide the district court with more than just the general invoices submitted by

21   the DEA and Meriter, ostensibly identifying the amount of their losses").

22         Moreover, of the $919,442.28 in restitution sought by Frito-Lay, $419,081.90 is being

23   sought for "bid-rigging damages."  (United States v. James Richard Wahl, Jr., No. 2:09-cr-0040

24   TLN, Victim Impact Statement (Dkt. No. 41-3) at 6.)  In this regard, Frito-Lay asserts that "had

25   Mr. Wahl and SK Foods not rigged the process," Frito-Lay would have purchased "all of its 2008

26   crop cycle tomato product," from Morning Star, an SK Foods competitor, "at a lower price than

27   what SK Foods was offering.  (Id.)  However, as defendant Wahl notes in his opposition, Frito-

28   Lay's argument with respect to this additional $419,081.90 in claimed loss "assumes that

11

1   Morning Star would have been Frito-Lay's exclusive supplier." (United States v. James Richard

2   Wahl, Jr., No. 2:09-cr-0040 TLN, Wahl Opp.'n (Dkt. No. 65) at 3.).  That claim is undercut by an

3   April 23, 2009 letter from Frito-Lay's counsel explaining that in February of 2009 Frito-Lay

4   obtained "additional volume" of tomato product from not only Morning Star but also a company

5   called Ingomar.  (United States v. James Richard Wahl, Jr., No. 09-cr-0040 TLN, Victim Impact

6   Statement (Dkt. No. 41-3) at 11.)  Based on this evidence before the court, defendant Wahl

7   contends that an evidentiary hearing would disclose that it was actually "Frito-Lay's own

8   practice" to maintain "two, three or more vendors for any one ingredient to avoid dependence on

9   any one supplier."  (United States v. James Richard Wahl, Jr., No. 09-cr-0040 TLN, Wahl Opp.'n

10   (Dkt. No. 65) at 4.)  Of course, the holding of an evidentiary hearing would obviously further

11   prolong the already extended sentencing process in this case.  Moreover, it is not at all clear that

12   even if the court conducted a thorough and extensive evidentiary hearing that the court could

13   arrive at a restitution figure in respect to Frito-Lay's alleged "bid-rigging damages" with any

14   degree of precision.

15       Accordingly, the undersigned finds that determining how much restitution defendant Wahl

16   should pay, in excess of the $160,219.00 in commercial bribes he received, would involve

17   complex issues of fact that would further complicate or unnecessarily prolong the criminal

18   sentencing process.  Accordingly, defendant Wahl should be ordered to pay restitution in the

19   amount of $160,219.00 to Frito-Lay as part of his criminal judgment.

20   IV.  Defendants Frederick S. Salyer, Randall Lee Rahal, Jeffrey Sherman Beasley and Alan Scott

21       Huey

22       A.  Arguments of the Parties

23       The government argues that the court should enter a restitution award against defendant

24   Salyer and in favor of his alleged victims Kraft, Frito-Lay, Morning Star, and the SK Foods's

25   bankruptcy estate.  The government also argues that defendants Rahal, Beasley and Huey "should

26   be ordered to pay the same restitution as the Court finds appropriate in Salyer."  (United States v.

27   Randall Lee Rahal, No. 2:08-cr-0566 TLN, Restitution Memorandum (Dkt. No. 59) at 2.)  As

28

1  noted above, each of the corporate victims in question have advanced their own arguments in

2  support of restitution awards in their favor, some more detailed than others.

3       On the other hand, defendant Salyer asserts that the government has failed to establish that

4  any of these corporations or entities are victims of the two offenses for which he was convicted

5  and "would argue that none of them was harmed by the specific offense for which he was

6  convicted." (United States v. Salyer, No. 2:10-cr-0061 TLN, Def.'s Brief (Dkt. No. 644) at 11.)

7  Even assuming that these corporations and entities are victims of his offenses thereby qualifying

8  for an award of restitution, defendant Salyer contests the various proffered calculations of losses

9  attributable to his two offenses of conviction.[5]  Defendants Rahal, Beasley and Huey have

10  likewise filed oppositions challenging the calculation of an appropriate restitution order.   Below,

11  the undersigned will summarize the various arguments regarding restitution as they relate to each

12  alleged victim and address them in turn.

13            1.  As to Kraft

14       The government notes that Kraft originally sought restitution in the amount of $1,800,000,

15  but has since received $1,000,000 in settlement funds from the SK Foods bankruptcy estate, and

16  thus now seeks a criminal restitution award of only $800,000.  In support of such an award of

17  restitution, the government asserts that defendant Rahal, an SK Foods agent, bribed a Kraft

18  purchasing manager Robert Watson ("Watson"), to "steer Kraft's business to SK Foods." (United

19  States v. Salyer, No. 2:10-cr-0061 TLN, Govt. Brief (Dkt. No. 638) at 5-6.)  The government

20  argues that during the time Watson received those bribes he was employed by Kraft and,

21  therefore, that Kraft is entitled to restitution in the full amount of the bribes paid by Rahal to

22  Watson, $158,000, or in an amount equal to a percentage of Watson's salary.  (Id. at 6.)  The

23  government also argues that Kraft is entitled to a restitution award of $800,000 because in 2008,

24  Rahal convinced Watson to grant SK Foods an early release from a contract to sell 12 million

25  pounds of tomato products to Kraft so that SK Foods could in turn sell that product at a higher

26  price to another buyer.  (Id.)  According to the government, as a result of that early release of SK

27

28  _____

[5]  In light of the analysis set forth herein, the undersigned will assume, without deciding, that the
parties identified by the government are victims.

1    Foods from its contract, Kraft was forced to enter into a new purchasing agreement at an

2    additional cost of $.50 per pound of tomato products purchased.  (Id.)  The government further

3    alleges that the seller involved in Kraft's new purchase agreement was SK Foods, resulting in yet

4    an additional profit to SK Foods of $1.62 million.  (Id.)

5         In opposing restitution with respect to Kraft, defendant Salyer argues that neither the

6    government nor Kraft has any evidence that he was even aware of the specific bribes paid by

7    defendant Rahal to Watson.  (United States v. Salyer, No. 10-cr-0061 TLN, Def.'s Brief (Dkt. No.

8    644) at 13.)  According to Salyer, the government's contention that the early release of SK Foods

9    from its 12-million pound tomato product contract with Kraft was a result of the criminal conduct

10   of which he was convicted, is supported only by a recorded conversation between defendant

11   Rahal and Watson in which they discuss the purchase of 10 million pounds of tomato paste from

12   one of SK Foods competitors.  (Id.)  In this regard, defendant Salyer argues that by the time SK

13   Foods was released from that contract by Kraft, the FBI had already raided SK Foods and

14   interviewed Watson.  (Id.)  Accordingly, defendant Salyer argues, it is inconceivable that any

15   criminal RICO scheme was ongoing at the time that Kraft released SK Foods from its contract.

16   (Id.)  Therefore, defendant Salyer concludes, because there is no evidence that the release of SK

17   Foods from that contract was improper or the result of commercial bribery, any alleged loss

18   attributable to that business decision cannot properly be part of any restitution order in this

19   criminal action.  (Id.)

20              2.  As to Frito-Lay

21        The government contends that a restitution award in favor of Frito-Lay in the amount of

22   $3,333,826.09 is appropriate.  (United States v. Salyer, No. 2:10-cr-0061 TLN, Govt. Brief (Dkt.

23   No. 638) at 7.)  According to the government, this amount is comprised of:  $919,442.28

24   attributable to bribery/bid-rigging losses; $1,627,379.16 in losses attributable to misbranding of

25   SK Foods' tomato products; and $787,004.65 expended by Frito-Lay to resolve the civil disputes

26   involving tomato products received from SK Foods in 2009.  (Id.)

27        In support of the requested restitution award to Frito-Lay, the government argues that

28   "[i]dentical to the Kraft scheme, Salyer, SK Foods, and Rahal acted in concert to bribe Frito-

14

Lay's purchasing manager." (<u>Id.</u> at 8.)  The government contends that the $919,442.28 in Frito-Lay losses attributable to bribery/bid-rigging losses may be further broken down as follows: $419,081.90 in losses suffered by Frito Lay in purchasing tomato products from SK Foods in 2008 at a price greater than that offered by SK Food's competitor, Morning Star; $160,000 in bribes paid by defendant Rahal to Frito-Lay's purchasing manager; $13,526.24 in replacement costs incurred; and $326,833.84 in costs incurred by Frito-Lay as a result of their cooperation in the criminal investigation of defendant Salyer.  (<u>Id.</u> at 7-9)  With regard to the $1,627,379.16 in losses attributable to misbranding, the government asserts that such was the loss incurred "as a result of discarding unusable tomato product purchased from SK Foods and obtaining replacement tomato product . . . ."  (<u>Id.</u> at 10.)

Defendant Salyer opposes the restitution sought for Frito-Lay.  First, he argues that many of the costs and/or losses Frito-Lay seeks compensation for are "questionable," "vague and unsubstantiated . . . ."  (<u>United States v. Salyer</u>, No. 2:10-cr-0061 TLN, Def.'s Brief (Dkt. No. 644) at 16.)  Defendant Salyer notes that Frito-Lay has not even offered any proof that it discarded any tomato product that it alleges could not be used and that Frito-Lay can attribute no loss as a result in any event because "Salyer would offer evidence" that at least some of any such products "could have been sold in foreign markets and that foreign prices for American tomatoes were higher than domestic prices."  (<u>Id.</u> at 17.)  Thus, defendant Salyer argues that some of the costs included by Frito-Lay in its request for a restitution award against him are simply attributable to its own, independently reached, business decisions and are not attributable to the crimes of which he was convicted.  (<u>Id.</u> at 18.)

### 3. As to Morningstar

The government notes that it is seeking restitution on behalf of SK Foods' competitor, Morning Star, "for profits lost based on Salyer's bribes to the purchasing managers of Frito Lay, Kraft, and Safeway."  (<u>United States v. Salyer</u>, No. 2:10-cr-0061 TLN, Gov.'t Brief (Dkt. No. 638) at 10.)  The government argues that because "Morning Star outbid SK Foods and the competition, and Salyer's bribes were the only reason SK Foods" got the tomato product contracts in question, "[t]he only remaining issue is *how* to calculate Morning Star's lost profits."

1   (Id.) (emphasis in original).  The government proposes that in determining the amount of

2   restitution to be awarded Morning Star for this loss "[i]f the object is to come to a reasonable

3   calculation, the Court can simply adopt the figure that Salyer represents was SK Foods' net profit

4   margin . . . ."[6]  (Id.)  However, the government also suggests that were the court to determine

5   "that an evidentiary hearing is necessary, Morning Star should have the opportunity to present

6   evidence that its profit margins are subject to reasonable calculation for purposes of restitution."

7   (Id. at 11.)

8        In its separate brief addressing the issue of restitution, Morning Star confirms that it does

9   in fact have its own view as to how the appropriate amount of restitution is determined based on

10  its own profit margins.  (United States v. Salyer, No. 2:10-cr-0061 TLN, Morning Star Brief (Dkt.

11  No. 642) at 5.)  Specifically, Morning Star contends that it is entitled to a restitution award

12  against defendant Salyer in the amount of $18,794,089.42.[7]  In support of this claim, Morning

13  Star argues that it is entitled to "the amount of sales revenue it lost to the criminal scheme minus

14  the variable costs Morning Star would have incurred in making these additional sales."  (Id. at 8.)

15  According to Morning Star, the court "should look to (1) the amount of sales (in pounds) that

16  Morning Star lost . . . and multiply that by (2) the average lost profit per pound" in calculating its

17  restitution award.  (Id. at 12.)  Morning Star also contends that in performing this calculation the

18  court should first "look to the amount of tomato products that SK Foods sold to Kraft, Frito-Lay

19  and Safeway during the relevant time period," then determine Morning Star's lost profits per

20  pound by subtracting the "weighted average costs to produce a pound of tomato products" from

---

21  [6]  Implicitly conceding both the uncertainty in, as well as the potential for disputes surrounding,
22  such a restitution calculation the government acknowledges that "Morning Star may have its own
    view on how to determine the profit margins in this case."  (United States v. Salyer, No. 2:10-cr-
23  0061 TLN, Gov.'t Brief (Dkt. No. 638) at 11.)  The undersigned notes that unlike in the cases of
    each of the other victims in which it argued for a specific amount of restitution, the government
24  makes no such specific recommendation with respect to the amount of restitution that should be
    awarded to Morning Star.  Instead, the government vaguely refers in its conclusion generally to
25  amounts set forth in defendant Salyer's Presentence Report (PSR).

26  [7]  This is far more than the amount reflected in defendant Salyer's PSR.  Evidencing the
27  complexity of determining any restitution award with respect to Morning Star, the undersigned
    notes that amount in restitution requested by Morning Star is several multiples greater than the
28  combined restitution amounts sought by Kraft and Frito-Lay.

1   the historical weighted average sales price per pound" to determine the average lost profit per

2   pound.  (Id. at 14.)  Finally, according to Morning Star, the court should multiply the lost sales by

3   the average lost profit per pound to determine the total amount of Morning Star's lost profits

4   attributable to defendant Salyer's criminal conduct.[8]  (Id.)

5       Defendant Salyer, predictably, objects to Morning Star's restitution claim, arguing that "it

6   is simply incredible to think that 100% of SK Foods's business would have gone to Morning

7   Star" since there were other major competitors to both SK Foods and Morning Star in the relevant

8   market.  (United States v. Salyer, No. 2:10-cr-0061 TLN, Def.'s Brief (Dkt. No. 644) at 15.)

9   Moreover, defendant argues that evidence exists establishing there were other reasons why

10  Morning Star failed to obtain the contracts in question that had nothing to do with commercial

11  bribery.  (Id. at 15-16.)

12                    4.  <u>As to the SK Foods Bankruptcy Estate</u>

13      Finally, the government argues in favor of an award of restitution in the amount of

14  $5,675,027.04, on behalf of SK Food Chapter 11 Bankruptcy estate.  (United States v. Salyer, No.

15  10-cr-0061 TLN, Gov.'t Brief (Dkt. No. 638) at 11.)  The government contends that as a result of

16  the defendant Salyer's criminal actions "companies refused to pay" SK Foods and instead

17  claimed that "their current debt should be reduced based on damages stemming from Salyer's

18  crimes."  (Id.)  According to the government, "[e]ach offset claim has been resolved pursuant to

19  settlements filed in bankruptcy court," and thus this amount of $5,675,027.04 due to the

20  bankruptcy estate "has already been determined through the bankruptcy settlements."  (Id.)

21      Defendant opposes this request, arguing that these "claims are entirely speculative," and

22  that "[m]ultiple intervening causes break the chain of causation."  (United States v. Salyer, No.

23  2:10-cr-0061 TLN, Def.'s Brief (Dkt. No. 644) at 18.)

24  _____

25  [8]  In a footnote in its brief, Morning Star states that, in the alternative, it is "willing to accept the restitution calculation" proposed by the government, "if the Court is inclined to find that

26  calculation of the 'variable costs' to be prohibitively complex," despite the fact that the government's proposed calculation "would not make Morning Star whole . . . ."  (United States v.

27  v. Salyer, No. 2:10-cr-0061 TLN, Morning Star Brief (Dkt. No. 642) at 5-6.)  However, Morning Star does not identify the amount of restitution that should be awarded to it under that alternative

28  calculation or how that alternative number would be calculated with any degree of precision.

1    B.  Application of the MVRA Under the Circumstances Presented In This Case

2        Here, the undersigned finds with respect to defendants Salyer, Rahal, Beasley and Huey

3    that, from the record before the court, determining multiple complex issues of fact related to the

4    cause and amount of the victims' losses would complicate and prolong the sentencing process to a

5    degree that the need to provide restitution to any victim of these offenses at issue is outweighed

6    by the burden on the sentencing process.

7        In this regard, the government's brief notes that Frito-Lay seeks "$787,004.65 to resolve

8    the civil disputes involving tomato product it received from SK Foods and Salyer in 2009."

9    (United States v. Salyer, No. 2:10-cr-0061 TLN, Gov.'t Brief (Dkt. No. 638) at 7).  No further

10   information is provided with respect to that requested amount.  While Frito-Lay submitted its own

11   supplemental brief, "as its argument both legal and factual, in support of its restitution claims,"

12   that brief consists almost entirely of three letters its counsel sent to the U.S. Probation Office of

13   this District and to the Department of Justice in support of Frito-Lay's request for restitution.

14   (United States v. Salyer, No. 2:10-cr-0061 TLN, Frito-Lay's Brief (Dkt. No. 640) at 2-15.)  Those

15   letters, however, simply state the amounts Frito-Lay seeks and the legal authority supporting an

16   award of restitution, without any evidentiary support.  (Id. at 3-10.)  Thus, while it is clear that

17   Frito-Lay and the government are in agreement with regard to how much restitution Frito-Lay

18   seeks, neither has produced any evidence that would aid the court in determining the cause or

19   amount of Frito-Lay's loss with any degree of precision.

20       Frito-Lay also seek $419,081.90 in restitution representing the difference between what it

21   paid SK Foods and the price Morning Star would have charged it for the same product.  (United

22   States v. Salyer, No. 2:10-cr-0061 TLN, Gov.'t Brief (Dkt. No. 638) at 9.)  As noted by defendant

23   Wahl in his opposition discussed above, it is not at all clear that absent defendant Salyer's

24   wrongful conduct Frito-Lay would have purchased its product solely from Morning Star.  Also,

25   Frito-Lay's restitution request for this amount fails to address whether it may have offset any loss

26   from higher costs through other means, for example by raising its prices charged to its own

27   customers.  See Gamma Tech Industries, Inc., 265 F.3d at 926 ("The district court recognized

28   that, if Pac Ship had been able to pass on to Navy the inflated charges from Gamma Tech and

18

1    Tidelands when negotiating the price of the modifications, Pac Ship would have suffered no

2    loss.").

3         Additionally, Frito-Lay seeks $100,000.00 in cleanup costs, $37,774.92 for delivery by

4    truck as opposed to rail, and $175,000 in costs for paying to ship products from the west coast to

5    the east coast as part of a restitution award.  (United States v. Salyer, No. 2:10-cr-0061 TLN,

6    Frito-Lay Brief (Dkt. No. 640) at 5.)  Presented with just the bare requests for those amounts,

7    however, it is not clear from the record that the defendants' criminal conduct was the cause of

8    those particular loses in whole or in part, or if instead some or all of those costs were the result of

9    normal operating procedures, business decision, etc.[9]

10        Thus, there are unresolved and complex issues of fact as to the amount and cause of Frito-

11   Lay's claimed loss, the resolution of which would further prolong these already extended

12   sentencing processes.  See 18 U.S.C. § 3664(e) ("Any dispute as to the proper amount or type of

13   restitution shall be resolved by the court by the preponderance of the evidence."); Waknine, 543

14   F.3d at 557-58 ("We hold that in this case the district court erred by relying exclusively on the

15   one-page loss summaries provided by the victims and in not requiring more detailed explanations

16   of the losses each victim suffered.").

---

[9]  As noted above, Kraft seeks $158,000, and Frito-Lay seeks $160,000, in restitution against
defendant Salyer for the amount of bribes paid to Robert Watson, Kraft's employee, and
defendant Wahl, Frito-Lay's employee.  (United States v. Salyer, No. 2:10-cr-0061 TLN, Gov.'t
Brief (Dkt. No. 638) at 6, 9).  However, each of the cases cited by the government in support the
award of such restitution, as well as the additional cases found by the court, involve the award of
restitution in the amount of bribes paid only against the former employee who received the bribe,
not against the party who paid the bribe.  See United States v. Bahel, 662 F.3d 610, 649 (2nd Cir.
2011) ("There is no question that a portion of an individual's salary can be subject to forfeiture
where, as here, an employer pays for honest services but receives something less."); United States
v. Crawley, 533 F.3d 349, 359 (5th Cir. 2008) ("In other words, the MVRA requires the
defendant to return any ill-gotten property which has been acquired by, inter alia, fraud on the
victim.  The salary and pension received by Crawley after/in connection with his 2002 voter fraud
certainly meets this requirement.  Crawley procured the salary and pension through his fraudulent
acts, bringing his conduct within the above-quoted statutory language.  Therefore, returning the
salary and pension is required."); United States v. Gaytan, 342 F.3d 1010, 1012 (9th Cir. 2003)
("Gaytan accepted $61,506.63 in bribe money.  So long as Gaytan retains those funds, the City of
Colton suffers a loss in that amount.  The district court properly ordered Gaytan to pay restitution
to the City."); Gamma Tech Industries, Inc., 265 F.3d at 929 ("The district court properly sought
to remedy this loss by ordering Stanley to reimburse Pac Ship for the kickbacks he received from
the unindicted subcontractors.").  Here, the court has already found that defendant Wahl should
be ordered to pay Frito-Lay $160,219.00 in restitution for the bribes he received.  In addition
defendant Robert Watson has been ordered to pay Kraft restitution in the amount of $1,858,000.
(See United States v. Robert Watson, No. 2:09-cr-0035 TLN, Judgement (Dkt. No. 19) at 5.)

1        With respect to Kraft, the government cites a transcript of a recorded phone conversation

2    between defendants Rahal and Watson in support the argument that the defendants caused Kraft

3    to grant SK Foods an early release from a contract which caused a loss to Kraft of $1.62 million.

4    (United States v. Salyer, No. 2:10-cr-0061 TLN, Gov.'t Brief (Dkt. No. 638) at 6.)  A reading of

5    that transcript alone, however, neither establishes that the defendants' specific criminal conduct

6    that was the basis of their convictions was the cause of Kraft's loss, nor does it help the court

7    determine the amount of the actual loss Kraft suffered as a result.  Moreover, defendant Salyer

8    has offered his own evidence in support of his argument that he was not in fact the cause of

9    Kraft's loss.  (See United States v. Salyer, No. 2:10-cr-0061 TLN, Golub Decl. Ex. D (Dkt. No.

10    658-2) at 5.[10])  In fact, it is defendant Salyer's position that the release of SK Foods from the

11    contract with Kraft had nothing to do with the commercial bribery and was instead "jointly

12    approved by Kraft Material Management based on Kraft's projected needs."  (United States v.

13    Salyer, No. 2:10-cr-0061 TLN, Def.'s Brief (Dkt. No. 644) at 16.)

14        Thus, in this instance as well there are unresolved and complex issues of fact as to the

15    amount and cause of Kraft's alleged losses, the resolution of which would further prolong the

16    already extended sentencing processes in these criminal cases.  See Swor, 728 F.3d at 974 ("We

17    have interpreted the similarly worded Victim and Witness Protection Act of 1982 to require that

18    the government . . . show not only that a particular loss would not have occurred but for the

19    conduct underlying the offense of conviction, but also that the causal nexus between the conduct

20    and the loss is not too attenuated either factually or temporally.").

21        Finally, the undersigned finds that the calculation of any restitution award with respect to

22    Morning Star would, if even possible, be especially complex and time consuming.  For instance,

23    and as noted above, Morning Star proposes that the court apply the "lost profit theory" in

24    calculating its award of restitution.  (United States v. Salyer, No. 2:10-cr-0061 TLN, Morning

25    Star Brief (Dkt. No. 642) at 12.)  In doing so, Morning Star asserts that the court should make use

26    of the "historical weighted average sales price per pound for tomato paste and diced tomatoes for

27

28

---

[10]  Because this document was filed under seal the undersigned will not address the specific evidence set forth therein.

the years 2004-08," and "the weighted average variable cost of production and marketing expenses that Morning Star would have incurred in making the lost sales," to determine Morning Star's total lost profits.  (Id. at 12-14.)

In addition to being unwieldy, applying such calculations as historical weighted averages and weighted average variable costs of production and marketing expenses, in an attempt to calculate the actual loss suffered by Morning Star as a result of the defendants' crimes of conviction, interjects supposition to such an extent that the risk that Morning Star would be over compensated for any loss would be far from insignificant.  See Fair, 699 F.3d at 512 ("Awarding restitution in excess of the victim's actual loss would be punitive in nature and thus fall outside the scope of the MVRA.").

Moreover, courts have typically applied the lost profit theory in cases involving copyright infringement to compensate the manufacturer for the sale of pirated merchandise, see United States v. Anderson, 741 F.3d 938, 952-54 (9th Cir. 2013), or to compensate an employer for lost profits wrongfully taken by an employee.  See Gamma Tech Industries, Inc., 265 F.3d at 926-28. In such instances, it is clear that the defendant was unquestionably the cause of the victim's lost revenues and that all of those revenues would have flown to the victim if not for the defendant's wrongful conduct.  Here, however, Morning Star's relationship to defendant Salyer, through SK Foods, was not one of copyright holder-infringer or employee-employer.  Instead, Morning Star and SK Foods were direct competitors in a market occupied by other competitors as well.

Implicit in Morning Star's proposed calculation of lost profits underlying its restitution claim is an assumption that every contract agreed to between SK Foods and Kraft, Frito-Lay and Safeway during the relevant period of time would have instead gone to Morning Star, and not one of any number of other capable competitors, if not for the defendants' criminal actions.  The undersigned finds that claim, at best, to be inherently speculative.  Indeed, Morning Star's own evidence offered in support of its restitution argument betrays its speculative nature.  In this regard, Morning Star has provided a declaration from Scott Manion, a Senior Manager with Kraft. With regard to the issue at hand, the most Mr. Manion can declare is as follows:

/////

21

1

2

3

> Everything else equal, if SK Foods had not bribed Kraft's employee, and if Morning Star was the low-price bidder *and* could provide the requisite supply, Kraft *likely* would have continued to purchase a *substantial* portion, if not all, of its tomato products from Morning Star.

4   (United States v. Salyer, No. 2:10-cr-0061 TLN, Manion Decl. (Dkt. No. 642-1) at 3) (emphasis

5   added).[11]  Moreover, as noted above, defendant Wahl has represented that Frito-Lay typically

6   purchased its tomato products from more than one supplier.

7            At a minimum, it is evident that this issue is a thoroughly disputed issue of fact between

8   Morning Star, (United States v. Salyer, No. 2:10-cr-0061 TLN, Morning Star Brief (Dkt. No. 642)

9   at 9-12), and the defendants.  (Id., Def.'s Brief (Dkt. No. 644) at 15-16.)  That dispute cannot be

10  resolved on the current record and any attempt to resolve that dispute would require considerable

11  further delay and the resolution of complex issues of fact.

12           In an effort to avoid the complexity of this issue, the government proposes that the court

13  can "simply adopt the figure that Salyer represents was SK Foods' net profit margin for tomato

14  product sales during his crimes."  (Id., Gov.'t Brief (Dkt. No. 638) at 10.)  Although the

15  government acknowledges that such a calculation "will not fully compensate Morning Star for its

16  loss," (id. at 11), an assertion that Morning Star fully agrees with, (Id., Morning Star's Brief (Dkt.

17  No. 642) at 5-6), the government nonetheless argues that such a calculation "is an efficient way to

18  determine restitution and does not prolong the sentencing process."[12]  (Id., Gov.'t Brief (Dkt. No.

19  638) at 11.)

20  /////

21

22  [11]  Morning Star has submitted additional evidence in support of its arguments, however, that

23  evidence was filed under seal and its access is restricted to viewing by attorneys' eyes only.  (See Dkt. Nos. 659 & 660.)  While the undersigned has reviewed that evidence, in light of the applicable privacy restrictions, the undersigned will not discuss the specifics of that evidence,

24  other than to note that it is consistent with the undersigned's findings and fails to establish that

25  every sale between SK Foods and Kraft, Frito-Lay and Safeway during the relevant period of time would have instead gone to Morning Star if not for defendant Salyer's conduct that was the

26  basis of his conviction.

27  [12]  Indeed, Morning Star affirmatively argues that the government's proposed calculation, "would not comply with the spirit of the MVRA . . ."  (United States v. Salyer, No. 2:10-cr-0061 TLN,

28  Morning Star Reply (Dkt. No. 646) at 8.)

1    However, while a restitution award to Morning Star based on the SK Foods's net profits

2    may be simple, it likewise assumes that all of the sales that went to SK Foods during the relevant

3    period of time would have instead gone to Morning Star if not for the criminal conduct of the

4    defendants.  Again, the undersigned finds that assertion highly and inappropriately speculative.

5    See Ferdman, 779 F.3d at 1140 ("The likelihood that certain facts exist to confirm Sprint's

6    estimates, no matter how probable, does not relieve the Government of its burden, after proper

7    objection, to establish their actuality.").

8    Moreover, simply calculating the restitution award based on SK Foods's net profits, and

9    thus implicitly defendant Salyer's profits, without determining Morning Star's actual loss, would

10    also be impermissible.  See Kilpatrick, 798 F.3d at 390 ("before a court can convert the amount of

11    a defendant's gain into the amount of the victim's loss, the government must establish a direct

12    correlation between the two"); United States v. Zangari, 677 F.3d 86, 93 (2nd Cir. 2012) ("We

13    now join these courts and hold that a sentencing court ordering restitution under the MVRA may

14    not substitute a defendant's ill-gotten gains for the victim's actual loss."); Anderson, 741 F.3d at

15    951 ("A 'back-of-the-envelope' approach simply will not do."); United States v. Chao Fan Xu,

16    706 F.3d 965, 994 (9th Cir. 2013) ("Restitution can only be based on actual loss."); Fu Sheng

17    Kuo, 620 F.3d at 1165-66 ("the district court may not order restitution to reflect Defendants' ill-

18    gotten gains"); United States v. Gallant, 537 F.3d 1202, 1243-44 (10th Cir. 2008) ("Unlike loss

19    under the Guidelines, the MVRA requires proof of actual loss and does not allow alternative

20    metrics, such as gain."); United States v. Innarelli, 524 F.3d 286, 294 (1st Cir. 2008) (remanding

21    to the district court to reconsider several possible errors in its "rough approximation" of the

22    victims' losses).

23    The undersigned therefore finds that any attempt to calculate Morning Stars' loss would

24    involve time consuming and complex issues of fact, and would be unlikely to result in even a

25    reasonable estimate of its loss.  See Anderson, 741 F.3d at 954 ("Where the alleged loss is not

26    quantifiable to any degree of certainty, the government's burden has not been satisfied, and no

27    restitution should be ordered.").

28    /////

CONCLUSION

For the reasons stated above, the undersigned finds that, aside from the restitution amounts identified above, the record before the court establishes that multiple complex issues of fact related to the cause and amount of the victims' losses would complicate and prolong these already prolonged sentencing processes to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.  In light of that finding the undersigned will recommend that, aside from the specific amounts referenced above, a restitution award not be ordered.  See Fair, 699 F.3d at 516 ("And in the event the actual-loss calculation is in fact too complex to permit a timely calculation of reasonable restitution, the MVRA envisions the appropriate path for a district court is to hold additional proceedings or to decline to order restitution at all, not to issue an order unsupported by the evidence."); United States v. Martinez, 690 F.3d 1083, 1089 (8th Cir. 2012) ("We have stated in applying § 3663A(c)(3)(B) that a burdensome, complicated, or speculative calculation provides a good reason for the district court to decline to exercise its discretion."); Reifler, 446 F.3d at 136 ("Congress plainly intended that sentencing courts not become embroiled in intricate issues of proof, as it provided that the MVRA is to be inapplicable if the court finds that the determination of complex factual issues related to the cause or amount of the victims' losses would unduly burden the sentencing process."); United States. v. Barber, 86 F.Supp.3d 922, 932 (W.D. Ark. 2015) ("The loans and deals involved in this case were far from straightforward, and given the complexities of the transactions and this case in general, it would be a long and likely fruitless endeavor for the Court to attempt to piece together any sufficiently firm finding of causation.  Determination of the amount of loss would likewise be overly complicated, as it is not clear that the amount of the deficiency judgments secured by the lenders would be an appropriate amount to award in restitution."); United States v. Adorno, 950 F.Supp.2d 426, 431 (E.D. N.Y. 2013) (declining to award restitution where "any estimate would be too arbitrary to sustain and that a hearing to achieve a non-arbitrary result would involve protracted proceedings that, even if conducted, might well not produce a non-arbitrary result"); United States v. BP Products North America Inc., 610 F.Supp.2d 655, 691 (S.D. Tex. 2009) ("[C]ourts are most likely to conclude that determining the amount of a fine or restitution would

24

unduly complicate or prolong the sentencing proceeding when there are:  multiple victims; the causation issues are disputed; or disputed future losses are involved.").

Accordingly, after conducting the balancing required by 18 U.S.C. § 3663A(c)(3) and considering the facts on the record, IT IS HEREBY RECOMMENDED that with respect to the criminal judgments:

1. No restitution order be entered against defendant Jennifer Lou Dahlman and defendant Steven James King;

2. No further restitution order be entered as to defendant Robert C. Turner;

3. Defendant James Wahl, Jr., be ordered to pay restitution to Frito-Lay in the amount of $160,219.00;

4. The court find that the calculation of any other restitution orders would involve complex issues of fact related to the cause and amount of the victims' losses which would complicate and prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process; and

5. Decline to enter any additional award of restitution.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  November 1, 2015

_Dale A. Drozd_
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:6
Ddad1\orders.criminal\salyer.0061.rest.f&rs.3.docx

25